1 | **MICHAEL E. WEINSTEN (SBN 155680)**
**DANIEL GUTENPLAN (SBN 260412)**
2 | **LAVELY & SINGER**
**PROFESSIONAL CORPORATION**
3 | 2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
4 | Telephone: (310) 556-3501
Facsimile: (310) 556-3615
5 | E-Mail:  mweinsten@lavelysinger.com
         dgutenplan@lavelysinger.com
6 |

7 | Of Counsel:

8 | **MAURA J. WOGAN** (*pro hac vice* application to be filed)
**JEREMY S. GOLDMAN** (*pro hac vice* application to be filed)
9 | **FRANKFURT KURNIT KLEIN & SELZ, P.C.**
488 Madison Avenue, 10th Floor
10 | New York, NY 10022
Telephone: (212) 980-0120
11 | Facsimile: (212) 593-9175
E-Mail:  mwogan@fkks.com
12 |          jgoldman@fkks.com

13 | Attorneys for Plaintiffs HASBRO, INC.
14 | and WIZARDS OF THE COAST LLC

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 3 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

**CV13-03406 ~ DMG(JCG)**

HASBRO, INC., a Rhode Island corporation; and WIZARDS OF THE COAST LLC, a Delaware limited liability company,

                    Plaintiffs,

          vs.

SWEETPEA ENTERTAINMENT, INC., a Delaware corporation; and SWEETPEA B.V.I. LTD., a British Virgin Islands corporation,

                    Defendants.

Case No.:

**COMPLAINT FOR:**

1. **COPYRIGHT INFRINGEMENT**
2. **TRADEMARK INFRINGEMENT**
3. **FALSE DESIGNATION OF ORIGIN**
4. **TRADEMARK DILUTION**
5. **DECLARATORY RELIEF**

**DEMAND FOR JURY TRIAL**

CONFORMED COPY

1    Plaintiffs Hasbro, Inc. ("HI") and Wizards of the Coast LLC ("Wizards") (HI and
2  Wizards are collectively referred to herein as "Hasbro"), for their Complaint against
3  Defendants Sweetpea Entertainment Inc. ("SEI") and Sweetpea B.V.I. Ltd. ("SBL") (SEI
4  and SBL are collectively referred to herein as "Sweetpea"), allege as follows:

5                              **JURISDICTION AND VENUE**

6         1.    This Court has jurisdiction over the subject matter of this action pursuant to
7  28 U.S.C. §§ 1331 (federal question), 1338(a) (copyright and trademark) and 15 U.S.C. §
8  1121(a) (trademark).  Further, 28 U.S.C. § 2201 authorizes this Court to grant the
9  requested declaratory relief.

10        2.    Upon information and belief, this Court has personal jurisdiction over
11 Defendants and venue is proper pursuant 28 U.S.C. §§ 1391(a)(1) and (c), because each
12 of the Defendants has its principal place of business and/or transacts substantial business
13 in Los Angeles, California.

14                              **NATURE OF THE ACTION**

15        3.    This is an action for copyright and trademark infringement arising from
16 Sweetpea's unauthorized production of a theatrical motion picture (the "Infringing
17 Motion Picture") based on the *Dungeons & Dragons* property (the "Property"), the
18 copyrights and trademarks in which are owned by Hasbro.  Hasbro seeks a permanent
19 injunction enjoining Sweetpea from violating its exclusive rights in the Property, as well
20 as a judgment declaring that the rights to produce and exploit theatrical or non-theatrical
21 motion pictures based on the Property belong to Hasbro.

22        4.    Within the last several weeks, Hasbro learned that Sweetpea was actively
23 working with Warner Bros. Pictures ("WB") to produce a *Dungeons & Dragons* movie.
24 The Infringing Motion Picture is to be marketed and distributed for theatrical release
25 under the *Dungeons & Dragons* trademark, using a script entitled *Chainmail* that is based
26 upon, and contains many protected elements from, the Property.  In recent
27 correspondence from Sweetpea and in reports in the media, Sweetpea has alleged that it,

28

1   and not Hasbro, owns the rights to produce and exploit, and to license others (including

2   WB) the right to produce and exploit, a theatrical motion picture based on the Property.

3        5.     Sweetpea bases its claim of ownership of the theatrical motion picture rights

4   upon a license agreement between the predecessors-in-interest of Hasbro and Sweetpea,

5   dated September 1, 1994 (the "New License Agreement"), as amended by agreements

6   dated March 19, 1998 (the "First Amendment") and June 8, 1998 (the "Second

7   Amendment") (collectively, the "License").  Copies of the New License Agreement, First

8   Amendment and Second Amendment are annexed hereto as Exhibits A, B and C,

9   respectively.

10        6.     Pursuant to the License, Hasbro granted Sweetpea the right to make one

11   live-action theatrical motion picture based on the Property, a right which Sweetpea

12   exercised by producing the first *Dungeons & Dragons* movie, released in U.S. theaters on

13   December 8, 2000 (the "Picture").  Hasbro further granted Sweetpea the right to make

14   one or more sequels, prequels or remakes based on the Picture, the Picture Creations (*i.e.*,

15   materials Sweetpea independently created for the Picture) and the Property, for theatrical

16   or non-theatrical release (collectively, "Sequel Rights").  *See* Ex. B. ¶ 6.  In addition,

17   Sweetpea received a separate and independent right to make one or more live-action

18   television series or television motion pictures based on the Picture, the Picture Creations

19   and the Property (collectively, "Television Rights").  *Id.* ¶ 10.

20        7.     Sweetpea's claim of ownership of the theatrical motion picture rights in the

21   Property is baseless because the Sequel Rights have reverted to Hasbro.

22        8.     Specifically, the First Amendment contains two separate reversion

23   provisions – one related to the Sequel Rights and one related to the Television Rights –

24   each operating independently.  The First Amendment provided that the Sequel Rights

25   would "revert on a rolling basis . . . on the earlier of (i) five (5) years from of [sic] the

26   initial U.S. release or (ii) seven (7) years from final director's cut of the immediately

27   prior picture." *Id.* ¶ 6.  A second separate provision in the First Amendment provided

28   that the Television Rights would revert to Hasbro if Sweetpea failed to "commence a

1 production based on the [Television Rights] on a rolling basis within five (5) years after
2 the initial broadcast of the final original episode of any television series or of any
3 television motion picture[.]" *Id.* ¶ 12.

4      9.    Following the release of the Picture, Sweetpea produced two television
5 motion pictures. The first such television motion picture, entitled *Wrath of the Dragon*
6 *God* (the "First TV Movie"), premiered in the United States on the Syfy Channel (p/k/a
7 Sci-Fi Channel) on October 8, 2005. Thereafter, Sweetpea produced a second television
8 motion picture, entitled *The Book of Vile Darkness* (the "Second TV Movie"), which
9 premiered on the Syfy Channel on November 24, 2012.

10      10.    Despite initial plans to release the First TV Movie as a theatrical or non-
11 theatrical sequel based upon the Picture, the production actually was released in the
12 United States as a television motion picture. Thus, the First TV Movie represented an
13 exercise of the Television Rights and did not reset the Sequel Rights' five-year reversion
14 clock.

15      11.    In contrast to the First TV Movie, the parties at all times intended, treated,
16 referred to, produced and released the Second TV Movie as a made-for-television motion
17 picture based on the Property, without any connection to the Picture or the First TV
18 Movie. The Second TV Movie was financed in part by, and produced for distribution on,
19 the Syfy Channel, thus representing an exercise of Sweetpea's *Television Rights*, not an
20 exercise of the separate Sequel Rights.

21      12.    Significantly, in connection with the production of the Second TV Movie,
22 Sweetpea paid, and Hasbro accepted, a payment of $20,000 – the amount contractually
23 tied *only* to the exploitation of Television Rights, and consistent with the parties' mutual
24 understanding that the Second TV Movie was a made-for-television production for
25 release on the Syfy Channel. *Id.* ¶ 11. Were the Second TV Movie planned or released
26 as a theatrical or non-theatrical sequel, prequel or remake based on the Picture, Sweetpea
27 would have paid the greater amount required under the License for exercising the Sequel
28 Rights.

13.     In addition, the Second TV Movie neither continued, contained, nor referred to any of the characters, storylines, settings or events from the Picture or the First TV Movie.  The Second TV Movie was always a stand-alone television motion picture, not a sequel, prequel or remake.

14.     Thus, the Sequel Rights reverted to Hasbro as early as December 8, 2005, but in no event later than October 8, 2010, five years after the initial broadcast of the First TV Movie.

## PARTIES

15.     Plaintiff HI is, and at all relevant times was, a corporation duly organized and existing under the laws of the State of Rhode Island, with its principal place of business in Pawtucket, Rhode Island.

16.     Plaintiff Wizards is, and at all relevant times was, a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Renton, Washington.  Wizards is a wholly-owned subsidiary of HI.

17.     Upon information and belief, Defendant SEI is a corporation organized under the laws of the State of Delaware with its principal place of business located in Los Angeles, California.

18.     Upon information and belief, Defendant SBL is a corporation organized under the laws of the British Virgin Islands with its principal place of business located in Los Angeles, California.  Upon information and belief, Sweetpea B.V.I. Ltd. is the successor-in-interest to Sweetpea Entertainment Corporation ("SEC").

## FACTS

**(a)     *Dungeons & Dragons*: The Role Playing Game**

19.     *Dungeons & Dragons* ("D&D") is a role-playing game set in fantasy worlds of magic, monsters and dragons, in which each player in a group takes on the role of a fantasy hero (*e.g.*, warrior, wizard, thief, healer, etc.) and participates in an imaginary adventure through collaborative storytelling, multi-sided dice, intricate rules, maps and

adventure books.  Each D&D game requires a Dungeon Master, who presents the group with challenges, adjudicates the rules and narrates the adventure.

20.    D&D was originally designed by Gary Gygax and Dave Arneson and was first published in 1974 by Tactical Studies Rules, Inc., which later became TSR, Inc. ("TSR").  In 1997, TSR was acquired by Wizards, which in turn, was acquired by HI in 1999.

21.    Hasbro owns the copyright in the Property (D&D itself and certain derivative works based on D&D), including, but not limited to, the exclusive right to produce and distribute theatrical motion pictures based on D&D.

22.    In addition, Hasbro owns the worldwide trademark rights in the name *Dungeons & Dragons* (the "D&D Trademarks").  Hasbro has used and continues to use the D&D Trademarks to brand entertainment products and services.  Hasbro also has used, and continues to use, the D&D Trademarks on a wide variety of goods and services in connection with a highly successful worldwide merchandizing program.

23.    Today, D&D is played by as many as 6 million people around the world and consumers have spent more than $1 billion on D&D products.

(b)    **The License**

24.    On or about May 3, 1991, TSR and SEC entered into an Option Agreement, pursuant to which TSR granted SEC an option to license from TSR "the rights in and to the Property to produce and exploit one (1) motion picture based thereon[.]"  Annexed as an exhibit to the Option Agreement was a form license agreement (the "Old License Agreement") that would go into effect in the event that SEC elected to exercise its option under the Option Agreement.

25.    Pursuant to a letter agreement dated January 5, 1993, the Old License Agreement was replaced with the New License Agreement, which is attached hereto as Exhibit A.

26.     Pursuant to an Assignment and Acknowledgement Agreement dated December 15, 1993, SEC assigned to SBL the rights that SEC acquired from TSR under the Option Agreement.

27.     On or about September 2, 1994, SBL exercised its option under the Option Agreement and the terms of the New License Agreement went into effect.

**(c)     The 1998 Action**

28.     On February 20, 1998, TSR commenced an action against Sweetpea in the Superior Court for the County of Los Angeles (the "1998 Action") that, on March 2, 1998, was removed to this District Court (Case No. 98 Civ. 1439 (RAP)).

29.     In the 1998 Action, TSR alleged that Sweetpea failed to commence principal photography of the Picture pursuant to the New License Agreement and that, consequently, the rights granted thereunder reverted to TSR.

**(d)     The First Amendment**

30.     As part of an effort to settle the 1998 Action, on or about March 19, 1998, TSR and Sweetpea entered into the First Amendment, which is annexed hereto as Exhibit B.

31.     Pursuant to the First Amendment, the parties agreed that Sweetpea would resume principal photography of the Picture before a certain date. *See* Ex. B ¶ 1.

32.     With respect to Sequel Rights, the parties agreed as follows:

> TSR grants to Sweetpea the rights to make one or more sequels (which shall be defined to include prequels) or remakes based on the Picture, the Picture Creations and the Property. *These rights shall revert on a rolling basis (but not the Picture Creations) to TSR on the earlier of (i) five (5) years from of [sic] the initial U.S. release or (ii) seven (7) years from final director's cut of the immediately prior picture.*

*Id.* ¶ 6 (emphasis added).

33.     The First Amendment set forth various amounts that Sweetpea would be obligated to pay TSR for each theatrical or non-theatrical sequel, prequel or remake, with a minimum amount of $116,667 payable for non-theatrical exploitation. *See id.* ¶¶ 7-9.

34.     In addition to and independent of the Sequel Rights, TSR separately granted to Sweetpea certain Television Rights.  The First Amendment provided, in relevant part, that:

> TSR grants to Sweetpea the right to make one or more live-action television series or television motion pictures (individually and collectively 'Television Program(s)') based on the Picture, the Picture Creations and the Property . . ., provided that Sweetpea shall first have released the Picture.

*Id.* ¶ 10.  Unlike the Sequel Rights, the Television Rights do not require the productions to be "sequels," "prequels" or "remakes" based on the Picture.

35.     Paragraph 11 of the First Amendment contained the royalty schedule for Television Rights, providing, in relevant part, as follows:

> Sweetpea shall pay to TSR for such live-action television rights to [sic] the following:
>
> a.     For each episode not exceeding 30 minutes, $5,000;
> b.     For each episode not exceeding 60 minutes, $7,500;
> c.     For each episode of more than 60 minutes, $10,000;
> d.     For each movie of the week or miniseries, $10,000 per hour and no more than $80,000 in the aggregate.

*Id.* ¶ 11.

36.     The First Amendment also contained a separate and independent reversion provision governing the Television Rights, providing that:

> If Sweetpea does not commence a production based on the rights referenced in Paragraph 11 hereunder on a rolling basis within five (5) years after the initial broadcast of the final original episode of any television series or any television motion picture, such rights shall revert to TSR (but not the Picture Creations). . . .

*Id.* ¶ 12.

**(e)     The Second Amendment**

37.     At the time the parties entered into the First Amendment, they contemplated negotiating and entering into a long-form "formal amendment" at a later date.  Although the parties exchanged several drafts of a "formal amendment" that, if executed, would have superseded the terms of the First Amendment, they were unable to agree on certain key terms.

38.     On or about June 8, 1998, TSR and Sweetpea entered into the Second Amendment, which is annexed hereto as Exhibit C.

39.     The Second Amendment provided, among other things, as follows:

> All references in the [First] Amendment to a "formal amendment" are deleted. The parties acknowledge that this amendment, when taken together with the [New License] Agreement, constitutes a valid binding, enforceable and fully integrated agreement between the parties."

Ex. C ¶ 12.

40.     On or about October 8, 1998, the parties entered into a Settlement Agreement and Mutual Release, pursuant to which the parties released all claims against the other and they agreed to dismiss the 1998 Action.

41.     On October 16, 1998, the District Court dismissed the 1998 Action with prejudice in its entirety.

**(f)     *Dungeons & Dragons*: The Theatrical Motion Picture**

42.     On December 8, 2000, the Picture, entitled *Dungeons & Dragons*, was released in theaters in the United States.

43.     The Picture underperformed at the box office, grossing $33,807,422 worldwide on a production budget of $45 million.  *See* Box Office Mojo, http://www.boxofficemojo.com/movies/?id=dungeonsanddragons.htm (last visited May 9, 2013).

**(g)     First TV Movie: *Wrath of the Dragon God***

44.     On October 8, 2005, the First TV Movie, entitled *Wrath of the Dragon God*, premiered in the United States on the Syfy Channel.

45.     Despite initial plans to release the First TV Movie as a theatrical or non-theatrical sequel based upon the Picture, the production actually was released in the United States as a television motion picture.

**(h)     Second TV Movie: *The Book of Vile Darkness***

46.     On or about June 30, 2010, Hasbro learned that Sweetpea, by and through its sub-licensee Silver Pictures, was planning to produce two made-for-television *Dungeons*

1  & *Dragons* movies, each of which would premiere on the Syfy Channel.  Hasbro also

2  learned that the Syfy Channel had agreed to pay a portion of the production financing for

3  the television movies.

4       47.   On or about October 7, 2010, Sweetpea paid, and Hasbro accepted, a

5  payment in the amount of $20,000 for Sweetpea's exercise of its Television Rights

6  pursuant to paragraph 11 of the First Amendment.  *See* Ex. B ¶ 9.

7       48.   On November 2, 2012, the Syfy Channel issued a press release announcing

8  the upcoming release of the Second TV Movie:  "**SYFY ORIGINAL MOVIE**

9  **DUNGEONS AND DRAGONS: THE BOOK OF VILE DARKNESS PREMIERES**

10  **SATURDAY, NOVEMBER 24.**" (Emphasis added).

11       49.   On November 24, 2012, the Second TV Movie premiered in the United

12  States on the Syfy Channel.

13       50.   The Second TV Movie was not a sequel, prequel or remake based on the

14  Picture, Picture Creations and the Property.  The Second TV Movie contained none of the

15  same characters, plotlines, settings or events as the prior productions.  The Second TV

16  Movie was a stand-alone television motion picture.

17       51.   The Second TV Movie is classified by IMDb (Internet Movie Database) as a

18  "TV Movie." *See* IMDb, http://www.imdb.com/title/tt1733125/ (last visited May 12,

19  2013).

20      **(i)**   **The Reversion of the Sequel Rights to Hasbro**

21       52.   Prior to December 8, 2005 or, at the latest, October 8, 2010, Sweetpea

22  neither produced nor released any theatrical or non-theatrical motion picture sequel,

23  prequel or remake.

24       53.   By virtue of the reversion provision contained in paragraph 6 of the First

25  Amendment, the Sequel Rights reverted to Hasbro on December 8, 2005 or, at the latest,

26  October 8, 2010, when Sweetpea failed to exercise its Sequel Rights within five years of

27  the U.S. release of the Picture or the First TV Movie, respectively.

28

**(j)     The Infringing Motion Picture**

54.     In or around October 2012, WB approached Hasbro to obtain certain film rights in the Property.  WB provided Hasbro with a script for a film entitled *Chainmail* that was based on, and contained many protected elements of, the Property.  WB expressed an interest in creating a *Dungeons & Dragons* motion picture based on the script.  After several discussions with WB, Hasbro passed on the script.

55.     Thereafter, Hasbro learned that WB and Sweetpea had entered into discussions concerning the production of the Infringing Motion Picture – a *Dungeons & Dragons* movie based on the *Chainmail* script.

56.     Upon information and belief, Sweetpea falsely represented to WB that Sweetpea continues to hold the Sequel Rights and is authorized to sublicense the Sequel Rights to WB and to market and distribute films pursuant to the Sequel Rights using D&D Trademarks.

57.     On April 30, 2013, Hasbro sent a letter to Sweetpea advising it that the Sequel Rights, including the theatrical motion picture Sequel Rights, had reverted to Hasbro.  Hasbro demanded that all development, production and/or distribution activities related to a theatrical motion picture based on the Picture or the Property immediately cease.

58.     By letter dated May 2, 2013, Sweetpea responded by, among other things, denying that the Sequel Rights had reverted and confirming that Sweetpea had entered into a contract with WB.

59.     On May 7, 2013, *Deadline Hollywood* reported:

> Warner Bros has acquired rights to make a movie based on Dungeons &
> Dragons, the perennially popular role-playing game fantasy game.  The
> studio is actually quite far along in the development of the project, as it
> will use a script by Wrath Of The Titans and Red Riding Hood scribe
> and Frank Darabont protege David Leslie Johnson.  That script,
> Chainmail, was acquired last year as a free-standing project, based on an
> obscure game that was also hatched by D&D designer Gary Gygax
> before he and Dave Arneson launched D&D.  It is being retro-fitted to
> fit the much bigger game creation.  The film will be produced by The
> Lego Movie producer Roy Lee and Courtney Solomon.  The latter

1    actually directed a 2000 Dungeons & Dragons feature, a film that starred
     Jeremy Irons and did not do well.

2    *See* Exhibit D, annexed hereto.

3        60.    As a result of Sweetpea's actions, including falsely claiming ownership of

4    the Sequel Rights to WB and, upon information and belief, the media and other third

5    parties, Hasbro may not be able to exercise its right to exploit the Sequel Rights.

6                        **FIRST CLAIM FOR RELIEF**

7                         **(Copyright Infringement)**

8        61.    Hasbro repeats and realleges each allegation contained in Paragraphs 1

9    through 60 of this Complaint as if fully set forth herein.

10       62.    Hasbro owns registered copyrights in and to the Property. A list of

11   registered copyrights is annexed hereto as Exhibit E.

12       63.    By producing the Infringing Motion Picture, Sweetpea has infringed and,

13   unless enjoined, will continue to infringe, Hasbro's exclusive rights to reproduce, prepare

14   derivatives based upon, distribute and/or publicly perform the Property.

15       64.    Moreover, by licensing Sequel Rights to WB, Sweetpea has infringed

16   Hasbro's exclusive right to authorize third-parties to reproduce, prepare derivatives based

17   upon, distribute and/or publicly perform the Property.

18       65.    Sweetpea's actions have irreparably injured Hasbro and, unless enjoined,

19   will continue to cause such harm.

20       66.    Hasbro has no adequate remedy at law and is entitled to injunctive relief.

21       67.    Sweetpea's infringement of Hasbro's copyright in the Property has damaged

22   and will continue to damage Hasbro in an amount that, at present, is not determined.

23                       **SECOND CLAIM FOR RELIEF**

24                   **(Federal Trademark Infringement)**

25       68.    Hasbro repeats and realleges each allegation contained in Paragraphs 1

26   through 67 of this Complaint as if fully set forth herein.

27       69.    Hasbro has registered the D&D Trademarks with the United States Patent

28   and Trademark Office. A list of certain federally-registered trademarks owned by Hasbro

using the D&D Trademarks is annexed hereto as Exhibit F. Each of these registrations is valid and in effect. In addition, the exclusive right of Hasbro to use its registered D&D Trademarks in commerce for goods and services specified is incontestable pursuant to 15 U.S.C. § 1115(b).

70.   Sweetpea is using, and threatens to use, in commerce, without Hasbro's authorization or consent, and in an explicitly misleading manner, Hasbro's registered D&D Trademarks in connection with the advertisement and offering for sale, and/or sale of a theatrically-released motion picture. Hasbro is informed and believes, and on that basis alleges, that Sweetpea is using the D&D Trademarks with the intent to unfairly compete against Hasbro, to trade upon Hasbro's reputation and goodwill by causing confusion and mistake among customers, and the public, and to deceive the public into believing that the Infringing Motion Picture is associated with, sponsored by, or approved by Hasbro, when it is not.

71.   Sweetpea's unauthorized use of Hasbro's registered D&D Trademarks is an infringement of Hasbro's federal registrations that include the D&D Trademarks and is likely to cause confusion, mistake or deception in violation of 15 U.S.C. § 1114.

72.   Unless restrained by this Court, Sweetpea will, upon information and belief, continue to infringe Hasbro's registered trademarks and irreparably harm and impair Hasbro's reputation and brand under its D&D Trademarks. Sweetpea's actions have irreparably injured Hasbro and, unless enjoined, will continue to cause such harm.

73.   Hasbro has no adequate remedy at law and is entitled to injunctive relief.

74.   Sweetpea's unauthorized use of the registered D&D Trademarks has damaged and will continue to damage Hasbro's business, reputation, and goodwill.

75.   As a result of the foregoing, Hasbro has been damaged in an amount that, at present, is not determined.

## THIRD CLAIM FOR RELIEF

### (False Designation of Origin and Unfair Competition)

76.   Hasbro repeats and realleges each allegation contained in Paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77.   The D&D Trademarks are used in commerce, are non-functional, are distinctive, and have acquired substantial secondary meaning in the marketplace.

78.   Sweetpea's unauthorized use of Hasbro's registered D&D Trademarks constitutes false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

79.   Hasbro is informed and believes, and on that basis alleges, that Sweetpea had actual knowledge of Hasbro's ownership and use of the D&D Trademarks prior to commencing the conduct complained of herein.

80.   Hasbro is informed and believes, and on that basis alleges, that Sweetpea intends to compete unfairly against Hasbro, to trade upon Hasbro's reputation and goodwill by causing confusion and mistake among customers and the public, and to deceive the public into believing that the Infringing Motion Picture is associated with, sponsored by, or approved by Hasbro, when it is not.

81.   As a result of the acts complained of herein, Sweetpea has created a likelihood of injury to Hasbro's business reputation and to the reputation and goodwill surrounding the D&D Trademarks and a strong likelihood of consumer confusion as to the source of origin of, or the relationship between Hasbro and, the Infringing Motion Picture, and have otherwise competed unfairly with Hasbro.

82.   Hasbro has no adequate remedy at law and is entitled to injunctive relief.

83.   As a result of the foregoing, Hasbro has been damaged in an amount that, at present, is not determined.

**FOURTH CLAIM FOR RELIEF**

**(Trademark Dilution)**

84.    Hasbro repeats and realleges each allegation contained in Paragraphs 1 through 83 of this Complaint as if fully set forth herein.

85.    Hasbro's pervasive and extensive use and promotion of the D&D Trademarks has rendered those trademarks famous and distinctive within the meaning of Section 43(c) of the Lanham Federal Trademark Act, 15 U.S.C. § 1125(c).

86.    Sweetpea's use and threatened use of the D&D Trademarks in connection with the advertisement and offering for sale, and/or sale of the Infringing Motion Picture is likely to dilute and impair the famous and distinctive quality of the D&D Trademarks in violation of 15 U.S.C. § 1125(c).

87.    Unless restrained and enjoined by this Court, Sweetpea will, upon information and belief, continue to violate Hasbro's rights under 15 U.S.C. § 1125(c) of the Lanham Act and irreparably impair and damage the famous and distinctive quality of the D&D Trademarks.

88.    Sweetpea's violation of 15 U.S.C. § 1125(c) by use of the D&D Trademarks has damaged and will continue to damage Hasbro's business, reputation and goodwill.

89.    Hasbro has no adequate remedy at law and is entitled to injunctive relief.

90.    As a result of the foregoing, Hasbro has been damaged in an amount that, at present, is not determined.

**FIFTH CLAIM FOR RELIEF**

**(Declaratory Relief)**

91.    Hasbro repeats and realleges each allegation contained in Paragraphs 1 through 90 of this Complaint as if fully set forth herein.

92.    Sweetpea has formally notified Hasbro by the May 2, 2013 letter that it claims ownership of the Sequel Rights, including the right to make a theatrical motion picture sequel, prequel or remake based on the Property.

93.     Pursuant to paragraph 6 of the First Amendment, the Sequel Rights reverted to Hasbro on December 8, 2005 or, at the latest, on October 8, 2010, because Sweetpea failed to exercise the Sequel Rights within five years of the initial U.S. release of the Picture or the First TV Movie, respectively.

94.     By virtue of the contentions in Sweetpea's May 2, 2013 letter, the contract entered into between Sweetpea and WB, and Sweetpea's false representations to third parties, including to WB and members of the press, concerning Sweetpea's alleged ownership of the Sequel Rights, there is a real and appreciable controversy between the parties.  Moreover, Hasbro has a real and reasonable apprehension of being subject to a lawsuit if Hasbro exploits its Sequel Rights.

95.     By claiming ownership of the Sequel Rights, Sweetpea has threatened Hasbro's ability to exploit the Sequel Rights in violation of its copyrights and trademarks in connection with the Property.

96.     An immediate declaration is necessary and appropriate at this time so that Hasbro and Sweetpea may ascertain who holds the Sequel Rights.

97.     Hasbro has been, continues to be, and will continue to be, irreparably injured as a result of Sweetpea's actions, and Hasbro has no adequate remedy at law.

98.     Accordingly, Hasbro seeks a judgment from this Court, pursuant to 28 U.S.C. § 2201, declaring that any Sequel Rights that were granted to Sweetpea under the License have reverted to Hasbro.

## PRAYER FOR RELIEF

WHEREFORE, Hasbro prays for judgment against Sweetpea as follows:

(a)     Pursuant to 17 U.S.C. § 502, this Court enter an injunction enjoining Sweetpea from infringing Hasbro's copyrights in the Property, including, without limitation, by producing or exploiting the Infringing Motion Picture or any other theatrical or non-theatrical motion picture based on the Property;

(b)   Pursuant to 17 U.S.C. § 504, this Court enter an award in favor of Hasbro and against Sweetpea of statutory damages or actual damages suffered by Hasbro as a result of Sweetpea's copyright infringement, and any profits of Sweetpea that are attributable to the infringement;

(c)   Pursuant to 17 U.S.C. § 505, this Court enter an award in favor of Hasbro and against Sweetpea for full costs and attorney's fees;

(d)   Pursuant to 15 U.S.C. § 1116(a), this Court enter an injunction enjoining Sweetpea from infringing and diluting Hasbro's D&D Trademarks, including, without limitation, by using the D&D Trademarks or any other mark, word or name which is likely to cause consumer confusion, mistake or deception as to Hasbro's association, endorsement and/or approval of the Infringing Motion Picture or any other of Sweetpea's theatrical or non-theatrical motion pictures;

(e)   Pursuant to 15 U.S.C. § 1117(a), this Court enter an award in favor of Hasbro and against Sweetpea of the damages suffered by Hasbro as a result of Sweetpea's acts of trademark infringement, and that this award be trebled;

(f)   Pursuant to 15 U.S.C. § 1117(a), this Court enter an award in favor of Hasbro and against Sweetpea requiring Sweetpea to account to Hasbro for any profits derived by Sweetpea from its acts of trademark infringement;

(g)   Pursuant to 15 U.S.C. § 1117(a), this Court find that this is an exceptional case and enter an award in favor of Hasbro and against Sweetpea of Hasbro's reasonable attorney's fees;

(h)   Pursuant to 28 U.S.C. § 2201, this Court declare that any Sequel Rights, including the rights to produce and exploit any theatrical or non-theatrical motion picture based on the Property, which were granted to Sweetpea under the License, reverted to Hasbro;

(i)   For pre-judgment and post-judgment interest as may be provided by law; and

1

2      (j)      This Court grant Hasbro such other and further relief as may be deemed just

3               and equitable.

4

5

6   Dated: May 13, 2013                    LAVELY & SINGER
                                           PROFESSIONAL CORPORATION
7                                          MICHAEL E. WEINSTEN
                                           DANIEL GUTENPLAN
8

9

10  By: _____
                                            MICHAEL E. WEINSTEN
11                                          Attorneys for Plaintiffs HASBRO, INC.
                                            and WIZARDS OF THE COAST LLC
12

13  Of Counsel:

14
    MAURA J. WOGAN (*pro hac vice* application to be filed)
15  JEREMY S. GOLDMAN (*pro hac vice* application to be filed)
    FRANKFURT KURNIT KLEIN & SELZ, P.C.
16  488 Madison Avenue, 10th Floor
    New York, NY 10022
17  Telephone: (212) 980-0120
    Facsimile: (212) 593-9175
18  E-Mail: mwogan@fkks.com
19          jgoldman@fkks.com

20

21

22

23

24

25

26

27

28

## **DEMAND FOR JURY TRIAL**

Plaintiffs HASBRO, INC. and WIZARDS OF THE COAST LLC hereby demand a trial by jury in the above-entitled action.

Dated:  May 13, 2013

LAVELY & SINGER
PROFESSIONAL CORPORATION
MICHAEL E. WEINSTEN
DANIEL GUTENPLAN

By: _____
      MICHAEL E. WEINSTEN
Attorneys for Plaintiffs HASBRO, INC.
and WIZARDS OF THE COAST LLC

COMPLAINT
19

# EXHIBIT A

— "New" License Agreement —

Sweetpea Agreement

### Exhibit "B"
### EXCLUSIVE IRREVOCABLE LICENSE AGREEMENT

THIS AGREEMENT made and entered into this _____ day of _____, 199__ between TSR, Inc., 201 Sheridan Springs Road, Lake Geneva, Wisconsin 53147, a Wisconsin corporation (hereinafter referred to as "Licensor") and Sweetpea Entertainment Corporation, an Ontario corporation, 320 Richmond Street West, Toronto, Ontario M5V 1X2, Canada (hereinafter referred to as "Licensee").

### WITNESSETH:

WHEREAS, Licensor is the sole owner throughout the universe of all rights in and to the games entitled in whole or in part "DUNGEONS & DRAGONS" and its worlds, any and all associated trademarks together with all plots, themes, titles, subtitles, characters, trademarks and copyrights thereof; and

WHEREAS, Licensee, relying upon Licensor's representations and warranties hereunder, desires to acquire from Licensor an exclusive, irrevocable, universe-wide license of certain motion picture, television, videogram, live stage and allied and incidental rights in and to the Property (as hereinafter defined);

NOW, THEREFORE, the parties hereto agree as follows:

1. **Definitions.**

As used in this Agreement, the terms set forth in this Paragraph shall have the following meanings:

(a) "Territory": The Universe.

(b) "Term": In perpetuity, unless earlier termination pursuant to Paragraph 15 hereof.

(c) "Property": The trademark "Dungeons and Dragons", and titles, character names, characters, visuals, stories, props, places, identifications, and other copyrights and trademarks associated with the trademark, all materials bearing the DUNGEONS & DRAGONS trademark unrelated to the Picture, including, but not limited to, games, rules, adventures, TSR's magazines, all materials created with the DUNGEONS & DRAGONS licenses for the manufacture of merchandise unrelated to the Picture, including all materials that exist or are hereinafter created solely by Licensor but not in connection with the Picture, all ~~t~~ and graphics contained within materials bearing the ~~D~~IGEONS & DRAGONS trademark unrelated to the Picture, including not limited to characters, monsters, settings, items, magic ~~spe~~lls and effects, costuming and accessories as depicted in

-i-

LICENSE-02

games, rules, adventures, books, references, worksheets, and articles appearing in any of TSR's Magazines and all Materials created with the DUNGEONS & DRAGONS licenses for the manufacture of merchandise unrelated to the Picture, including all materials that exist or that are hereinafter created, all of the above being in that original form as originally created by Licensor, unchanged by any elements added by, on behalf of, or created by, Licensee for the Picture or Picture Merchandising. Specifically excluded from the term Property is ADVANCED DUNGEONS AND DRAGONS and its worlds and associated trademarks other than those elements which are also contained in or associated with the Property.

(d) "Picture": One (1) theatrical or television motion picture based in whole or in part on the Property and including all rights granted in Paragraph 2 hereafter, but specifically excluding the right to an all-animated Picture (but including the right to use animation for special and optical effects of characters and other elements in the Picture, provided such use shall be supportive and not dominant).

(e) "Picture Creations": The characters, story, plotlines, themes, or other elements created, in whole or in part, by Licensee and/or any third party contracted by Licensee or any assignee or licensee of Licensee for the Picture or versions of the Picture including, but not limited to, the story idea, story outline, script, format, storyboards, stills or excerpts from the Picture, usage of the Picture's trademarked logo(s), visuals, plots, characters and characterizations, the using of the likenesses of actors portraying the characters, settings, names, titles and logos, as depicted by names linked to unique graphic representations, and copyrights thereto that were created in whole or in part by Licensee and/or a third party contracted by Licensee, whether or not modifying or based on the Property and/or Licensor owned characters and elements in whole or in part, and whether or not created for treatments, scripts, film, tape, promotion, advertising or other development, production, distribution or exploitation of the Picture. Excluded from the term "Picture Creations" are all settings, characters, creatures, items, graphics, game terms, trademarks and copyrights originally created and owned by Licensor as they appear in that original form as originally created by Licensor, such as, but not limited to, all settings, characters, creatures, items, graphics, game terms, trademarks and copyrights originally created and owned by Licensor that have not been changed in some manner, whether visual or otherwise, which distinguishes them as "Picture Creations" of the Picture.

(f) "Picture Logo" shall mean any pictorial, visual or graphic logo created by Licensee, its producer(s), distributor(s), or a third party contracted by Licensee, which serves as identification of the Picture for the purpose of exploiting the Picture or any merchandise resulting from the

-2-

EXHIBIT A  21

Picture. "Picture Logo" shall also mean the title of the Picture which may include the trademark name "Dungeons & Dragons" (i.e. "Dungeons & Dragons: The Movie") pursuant to Licensee's rights to use the trademark as the title of the Picture or in connection with the exploitation of the Picture as set forth in Paragraphs (2)(a)-(j) herein. Neither Licensor or Licensee shall have the right to use any Picture Logo created hereunder which incorporates Licensor's trademark for any other purposes except in connection with the Picture and Picture Merchandising pursuant to this agreement, without the written consent of the other. Licensee's use of Licensor's trademark shall in no way entitle Licensee to any ownership rights in or to Licensor's trademark, and shall in no way limit Licensor's use of its trademark, except as specifically set forth in the preceding sentence.

(g) "Property Merchandising": Shall mean all merchandising, publishing or creation of products, or other items, based in whole or in part, on the Property as such term is defined above, which is part of the Licensor's normal business of licensing, merchandising and commercial tie-up rights to the Property, including without limitation the trademark DUNGEONS & DRAGONS, its titles, character names, characters, visuals, stories, props, places, identifications, plots, themes, stories and other copyrights and trademarks associated with the trademark, and all materials bearing the DUNGEONS & DRAGONS trademark as originally created and owned by Licensor as they appear in their original form, unchanged by any elements added by, on behalf of, or created by, Licensee for any Picture Creation, the Picture or Picture Merchandising.

"Licensee Shared Property Merchandising" shall mean specifically the Dungeons & Dragons game (Product 1070).

"Licensed Property Merchandising" shall mean all Property Merchandising which is licensed to third parties by Licensor and not actually manufactured by Licensor.

"Property Merchandising Term" shall mean the period in which Licensee shall be entitled to share in Gross Receipts derived from Licensee Shared Property Merchandising, and New Licensed Property Merchandising, which period shall commence six (6) months prior to the actual initial theatrical release of the Picture in the United States of America, and end twenty-four (24) months after the date of the initial theatrical release of the Picture in the United States. In the event Licensee shall produce and distribute any sequel or remake, Licensee shall be entitled to share in Gross Receipts derived from Licensee Shared Property Merchandising and New Licensed Property Merchandising for each sequel or remake for a period commencing six (6) months prior to the actual initial theatrical release of each sequel or remake in the United States of America and ending twenty-four (24) months after the date of the initial theatrical release of such sequel or remake in the United States of America.

-3-

(h)  "New Licensed Property Merchandising" shall mean all Licensed Property Merchandising which is not currently part of Licensor's normal business of licensing, merchandising and commercial tie-up rights in the Property as of the beginning of the Property Merchandising Term (as defined hereinabove and in paragraph 3 below).

(i)  "Picture Merchandising" shall mean any and all merchandising, publishing and creation of products or other items based, in whole or in part upon and/or arising out of or in connection with the Picture, including but not limited to, Picture Creations, the Picture, the story, plotlines, titles, graphics, visuals, visual effects, the billing block, script logos, themes created by, or on behalf of Licensee for the Picture or versions of the Picture, and any sequel, remake or spinoff or other version permitted to Licensee pursuant to this Agreement and whether based in whole or in part on the Property. The term Picture Merchandising shall include only those elements classified as "Picture Creations", or that appear in the Picture, but excludes any product or merchandising, whether now existing or hereinafter created solely by Licensor, that is classified as Property Merchandising, and does not have any elements that appear in the Picture and is not in any other way a Picture Creation, or that has not been changed in some manner, whether visual or otherwise, which distinguishes it as a Picture Creation.

(j)  "Videograms" shall mean any cassette, disc, tape, or other device now known or hereafter devised which is or are designed primarily for home use or other private viewing, by which visual live-action type images with or without sound can be perceived, reproduced or otherwise communicated either directly or with the aid of an electronic, mechanical or other apparatus such as a television receiver or comparable device for displaying the Picture in whole or in part. Videograms shall not include interactive computer and video games, magnetic game diskettes, personal computer games and virtual reality games.

2.  <u>Grant of Rights</u>.

Licensor hereby grants, conveys and assigns to Licensee, its successors, licensees and assigns exclusively, in perpetuity (but subject to Licensor's rights in Paragraphs 5, 15 and 19(c)), the sole, irrevocable license throughout the universe (herein the "Exclusive License") to produce, distribute, exhibit and exploit in any and all manner, medium, media and methods now known or hereafter devised, one (1) theatrical or television motion picture based in whole or in part on the Property including videograms thereof and certain allied and incidental rights therein as specifically set forth herein (collectively the "Picture") and, including live stage rights to the Property (as permitted by and subject to Paragraph 2(b) below) and an

-4-

EXHIBIT A  23

irrevocable universe-wide license to use the trademarks, copyrights and other component parts of the Property in connection with the Picture and, subject to Paragraph 2(j) hereof, remakes of and sequels to any motion picture or television or videogram or live stage production or other authorized version, adaptations or uses produced hereunder. Included among the rights granted to Licensee hereunder (without in any way limiting the grant of rights hereinabove made) are the following sole and exclusive, perpetual rights throughout the universe:

(a) To make, produce, adapt, sell, lease, rent, reissue, exhibit, perform and generally deal in and with and to copyright one live-action motion picture or television production, and videogram versions thereof, and live stage productions authorized by Paragraph 2(b) hereafter and all other versions, adaptations or uses granted pursuant to this Agreement, based in whole or in part on the Property, of every size, gauge, color or type, whether produced for exhibition on television, theatrically, non-theatrically, or by videograms (including musical motion pictures, television and live stage productions) and, subject to Paragraph 2(k) hereof, remakes of and sequels to any motion picture or television or videogram or live stage production produced hereunder. Licensee shall, after consultation with Licensor and subject to Licensor's approval pursuant to the time limitations in Paragraph 7(a)(1), which approval will not be unreasonably withheld, engage a writer or writers to create a treatment and/or screenplay based on the Property.

(b) Notwithstanding anything to the contrary contained in this Agreement with respect to live stage rights, it is agreed that neither Licensor nor Licensee shall produce a live stage production based in whole or in part on the Property without the other party and in any event not until at least five (5) years after the commercial United States release of the Picture by Licensee hereunder, after which time Licensor will be free and clear to assign such live stage rights for any live stage production based, in whole or in part, on Licensor's property. If either Licensor or Licensee desires to produce or to permit others to produce a live stage production based in whole or in part on the Property, it shall notify the other in writing of such desire and Licensor and Licensee shall promptly within five (5) days of such written notice, negotiate in good faith to reach an agreement with respect to such live stage production and the compensation to Licensor and Licensee for such live stage production.

(c) The rights herein granted to Licensee do not include the right to produce an all-animated motion picture or television production, but do include the rights to use special and optical effects without limitation, and the right to use special and optical effects for characters in the Picture

-5-

provided however that any such animation shall be supportive and not dominant in the Picture.

(d)  Except in connection with the production and exploitation of the Picture or any version thereof (including, but not limited to a theatrical or television motion picture, videogram and any live stage production authorized by Paragraph 2(b) above, and including the script of each such Picture and all of the characters, themes and plots thereof), Licensor shall not have the right to use any Picture Creations without the express prior written consent of Licensee in each instance.   Neither party shall have the right to exploit or otherwise produce any sequels or remakes of any Pictures produced hereunder without negotiation in good faith by both parties as set forth in Paragraph 2(k) hereinafter.

(e)  To record, broadcast, transmit, exhibit, manufacture, perform, sell, lease or reproduce the Picture or any version thereof (including, but not limited to, a theatrical or television motion picture, videograms and any live stage production authorized by Paragraph 2(b) above, and including the script of such Picture and all of the characters, themes and plots thereof), in motion picture theatres, by means of television or any process analogous thereto and all other audio visual media whether now known or hereafter devised (including but not limited to commercially sponsored, sustaining and subscription television, pay-TV, cable, pay-cable, MDS, LPTV, HDTV, satellite broadcast, video cassettes, videotapes, video discs, compact discs, picture discs, and all other audio visual devices but excluding all computer games, video games and other devices excluded from Videograms), through the use of motion pictures and television productions produced on film or by means of magnetic tape, disc or wire or any other device now known or hereafter devised and including the exclusive right to produce videograms of the Picture presented by or on film, tape or by any other means now known or hereafter devised.

(f)  Without in any way limiting or derogating from any of the other rights herein licensed or granted Licensee, to broadcast and/or transmit by means of television or radio or any process analogous thereto whether now known or hereafter devised, the Picture and excerpts from the Picture, including any television or theatrical motion picture, videogram, and live stage production authorized by Paragraph 2(b) above, or other version or versions thereof permitted by this Agreement, and announcements concerning such motion picture or other version or versions, for the purpose of advertising, publicizing, promoting and/or exploiting the Picture or other version or versions or any other rights granted hereunder, which broadcasts or transmissions may be accomplished through or by any method, means and media now known or hereafter devised including, without limitation, the use of television, theatrical and/or videogram motion pictures (including trailers) reproduced on film or tape or by means of

-6-

230/LICENSE-02

film, magnetic tape or wire or through the use of other recordings or transcriptions.

(g)  Without in any way limiting or derogating from any of the rights in and to the Property expressly reserved by Licensor, to advertise, promote, publicize and exploit the Picture.  In connection therewith and specifically for the purposes of advertising, promoting, publicizing and exploiting a motion picture or television production based in whole or in part on the Property, and videograms and live stage versions thereof authorized by Paragraph 2(b) above, to publish, print and sell and copyright or cause to be published, printed and sold and copyrighted in the name of Licensee or its nominee or designee or writers engaged by Licensee in any and all languages throughout the universe, in any form or media: synopses not to exceed 2,500 words, adapted from the Property, Picture or from any videogram, television or theatrical motion picture, or live stage versions of the Property authorized by this Agreement.

(h)  To translate into all languages, to freely adapt, change, transpose, revise, rearrange, vary, modify, add to and subtract from the Property or any part thereof, and the title, themes, plots, sequences, incidents, characters and characterizations thereof, to make interpolations in and substitutions for any part or parts thereof, to use any part or parts of the Property or of the themes thereof or any incidents, characters or characterizations therein contained in conjunction with any other work or works, and to separately or cumulatively do any and all of the foregoing, to the extent as the Licensee, in its sole discretion, may deem expedient in the exercise of any and all rights, licenses or privileges herein conveyed and in the making of any television or theatrical motion picture, videogram versions, live stage version authorized by Paragraph 2(b) above, or any other versions, adaptations and uses permitted to Licensee pursuant to this Agreement, to interpolate in any such versions or adaptations musical compositions, songs, lyrics and music of all kinds, to set to music any verse, lyric, prose or part or parts of the Property and any characters thereof, and to use, print, reprint, publish, copy or vend such songs, the music and/or lyrics (sound on film, magnetic tape, wire, record or other reproducing device, whether similar or dissimilar to the foregoing, and whether now or hereafter known), to use the title of the Property and/or the names of the characters as the title of any television or theatrical motion picture, videogram and/or live stage production authorized by Paragraph 2(b) of this Agreement or in connection with any other versions, adaptations and uses permitted to Licensee pursuant to this Agreement, or as the title of any musical composition contained in any such motion picture or other version of the Property authorized by this Agreement, and to perform for profit (or non-profit), arrange, adapt, and exploit same throughout the universe and to secure copyright therein throughout the universe in Licensee's name or otherwise, and to use, superimpose and/or photograph excerpts

-7-

230/LICENSE-02

from or translations of the Property for the title, sub-titles, text and dialogue of any versions. Licensor hereby waives the benefits of any provisions of law or right known as "droit moral", or any similar laws, and shall not institute, support, maintain, or authorize any action or lawsuit on the ground that any television, theatrical or videogram motion pictures or live stage productions authorized by Paragraph 2(b) above, or in connection with any other versions, adaptations and uses permitted to Licensee pursuant to this Agreement, or sound records or music publishing or other publishing or written audio or audio/visual materials produced therefrom or from other versions or adaptations of the Property authorized by this Agreement in any way constitutes any infringement or violation of any law or right such as "droit moral" or a defamation or mutilation of any part thereof, or that Licensee's use constitutes or contains unauthorized variations, alterations, modifications, changes or translations.

(i) To make, copy, vend, license, and otherwise use in any manner that the Licensee may desire, disc or other sound records, sight-and-sound recordings, video cassettes, video discs, sound on film, and any and all other mechanical, electrical and any other contrivances or devices of any nature whatsoever, for the recordation and re-recordation of the sound, dialogue, musical and any and all other audible or visual portions of any television or theatrical motion picture versions, videograms, live stage versions authorized by Paragraph 2(b) above, or any parts of any of the foregoing, and for the reproduction, transmission, projection and/or performance of any and all such sounds separately or as part of or incidental to or in synchronization with the exhibition or performance thereof, whether such contrivances or devices are now known or hereafter known, invented or devised.

(j) To secure copyright and renewals and extensions thereof in Licensee's name or otherwise (or equivalent protection) in all parts of the universe for such television or theatrical motion picture versions, videograms, and live stage versions (as authorized by Paragraph 2(b) above), or in connection with any other versions, adaptations and uses permitted to Licensee, pursuant to this Agreement, of the Property herein elsewhere granted to Licensee and under any now existing or hereafter created laws, regulations or rules, in the name of Licensee or its successors, nominees or assignees.

(k) Licensor hereby grants to Licensee, its successors and assigns, the right of First Negotiation/Last Refusal with respect to all sequels and remakes of any television or theatrical motion picture produced hereunder and any live stage, version authorized by Paragraph 2(b) above, pursuant to the following:

–8–

230/LICENSE-02

(i)  The term "Right of First Negotiation" means that (A) if Licensee notifies Licensor of its desire to produce a remake or sequel to any motion picture, television, live stage (as stated in Paragraph 2(b)) or videogram version of the Property or (B) Licensor desires to produce a sequel and/or remake itself or receives notice of interest from a third party in respect of a sequel or remake then, in either event Licensor shall (unless Licensee elects not to utilize its Rights of First Negotiation) immediately thereafter negotiate in good faith with Licensee with respect to such sequel and/or remake rights and if, after the expiration of sixty (60) days the parties have negotiated in good faith but no agreement has been reached, then Licensor shall be free to produce the sequel or remake itself on the terms it proposed to Licensee or if it desires to negotiate with a third party then to negotiate elsewhere with respect to such sequel or remake, subject to Licensee's right of Last Refusal and subject to Paragraph 2(d) above.  Licensee's Right of First Negotiation shall again arise for each such sequel or remake contemplated on different terms.

(ii)  The term "Right of Last Refusal" means that if Licensee does not elect to produce a sequel or remake itself per Paragraph 2(k)(i) above, or if Licensee and Licensor fail to reach an agreement pursuant to Licensee's Right of First Negotiation or Licensee does not elect to utilize its Right of First Negotiation, and Licensor desires to produce a sequel and/or remake itself or receives a bona fide offer with respect to any such sequel and/or remake rights or in any interest therein, Licensor shall promptly notify Licensee by prepaid registered mail or telegram of such offer or the terms pursuant to which Licensor intends to produce such picture itself, the name of the offeror, the proposed purchase price, and the financial and other terms of such offer.  During the period of thirty (30) days ("Licensee's Time Period") after Licensee's receipt of said notice, Licensee shall have the exclusive option to purchase the particular sequel and/or remake right or the interest therein referred to in such offer, at the same purchase price and financial terms as are set forth in such notice or if Licensor has elected to produce such sequel or remake itself then Licensee shall have the right to elect to produce such sequel and/or remake in lieu of Licensor on the same terms and conditions pursuant to which Licensor was to produce such picture.  If Licensee elects to exercise the said option, Licensee shall notify Licensor of the exercise thereof by registered mail or telegram within Licensee's Time Period, otherwise Licensor shall be free to accept said bona fide offer made by another, subject to Paragraph 2(d) above; provided that, if any such proposed transaction is not consummated within thirty (30) calendar days following the expiration of Licensee's Time Period, or Licensor does not commence production of a sequel or remake, itself on the terms it proposed to Licensee (as applicable) within six (6) months from the date of its election to do so or such date as was proposed by any third party, if

-9-

230/LICENSE-02

later, Licensee's said option shall revive and shall apply to each and every further offer or offers at any time received by Licensor and relating to the sequel and/or remake rights or any interest therein and shall revive for each and every sequel and remake which Licensor desires to produce itself on terms other than those proposed to Licensee by Licensor; provided, further, that Licensee's said option shall continue in full force and effect in perpetuity for each and every sequel and remake contemplated or desired; and shall inure to the benefit of Licensee's successors and assigns and shall bind Licensor and Licensor's successors and assigns.

(1) All rights, licenses, privileges and property herein granted Licensee shall be cumulative and Licensee may exercise or use any and all of said rights, licenses, privileges or property simultaneously with or in connection with or separately and apart from the exercise of any other said rights, licenses, privileges and property as Licensee in its sole discretion may determine. Subject to the provisions of Paragraphs 5, 15 and 19(c), Licensee shall enjoy, solely and exclusively, all the rights, licenses and privileges and property granted hereunder throughout the universe, in perpetuity, as long as any exclusive rights in the Property are recognized in law or equity.

3.  Merchandising and Commercial Tie-Up Rights:  Licensee recognizes that Licensor is engaged in the business of licensing merchandise and commercial tie-up rights in connection with the Property. In reliance upon the foregoing, Licensee has agreed that the Picture Merchandising derived from or arising in connection with the Picture and/or any elements thereof shall be negotiated, developed, manufactured, distributed and exploited in accordance with the following terms, conditions and understandings, subject however to Licensee's rights in Paragraphs 2(a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k), (l) and 3(h)(vi) below. In connection therewith, Licensee shall use its best efforts to obtain from any actors and other creative personnel engaged in the production of the picture, and/or sequel, spin-off or remake, the rights to utilize their names, images, and/or likenesses for purposes of exploiting merchandise and commercial tie-up rights. If Licensee is able to obtain such rights, Licensee shall assign them to Licensor. Licensee will grant Licensor the right to use artwork and photographs from the Picture for the purposes of exploiting merchandise connected with the Picture, provided, however, Licensor will be required to make payments to creative personnel as may be required in the agreements with said creative personnel (or in applicable collective bargaining agreements) for the use of artwork or photographs. Licensee acknowledges that all rights in and to the Property Merchandising, Licensee Shared Property Merchandising and New Licensed Property Merchandising are reserved to Licensor; provided, however, Licensee will share in the profits derived from Licensee Shared Property Merchandising

-10-

EXHIBIT A  29

and New Licensed Property Merchandising as set forth below.  All rights in New Licensed Property Merchandising and Picture Merchandising shall be governed by this paragraph 3 and Licensee hereby grants Licensor its rights in said merchandising subject to paragraphs 3(g)(vi) and 3(f) below.

      (a)  The Picture merchandising and publishing items and agreements covered in this Paragraph 3 shall be limited to those that include elements which are derived from the Picture, appear in the Picture, or are based on any Picture Creation, including without limitation, any and all characters (whether live or animated, or drawings or special effects), scenes, locations, plots, themes, storylines, profiles, logos, drawings, special effects, optical effects, computer generated effects, virtual reality elements, and elements of the Picture whether based in whole or in part on Picture Creations owned by Licensee, and whether based in whole or in part on underlying characters, trademarks, copyrights and/or elements of the Property owned by Licensor which appear in the Picture and have been changed in some manner, whether visual or otherwise, which distinguishes them as Picture Creations.

      (i)  Licensee acknowledges and agrees that nothing contained within this Paragraph 3 gives, grants or assigns to Licensee any trademark ownership rights, in or to all or any part of the underlying property or Property Merchandising based on the underlying Property as originally created and owned by Licensor as it appears in its original form, unchanged by Licensee, all of which remains the sole property of Licensor.

      (ii)  Picture Merchandising and publishing items herein shall specifically exclude free promotional, free business and free corporate tie-ins for the Picture (e.g., the kinds of promotion customarily associated with promotion of a picture such as, without limitation, press kits, limited cast and crew T-shirts and screenings), publication rights of Licensee set forth in Paragraph 2(g), and music and soundtrack record rights of Licensee set forth in Paragraphs 2(h) and 2(i) herein, which rights shall be owned, exercised and retained solely by Licensee, its successors and assigns.

      (iii)  Picture Merchandising and publishing items, agreements, and other merchandising arrangements hereunder shall include all types of arrangements, other than those set forth in Paragraphs 3(a)(i) and 3(a)(ii) above, such as, but not limited to, hard and soft cover book publishing (written, and/or audio and/or pictorial), puppets, dolls, toys, action figures, play sets, clothing and accessories, apparel, board games, role playing games, video and computer games, headgear, hair goods and accessories, jewelry, paper goods, school supplies, household items, costumes, theme parks, notions, glassware, stickers, china, plastic items, royalty bearing retail and/or corporate tie-ins which are derived from the Picture, appear in the

-11-

Picture, or are based on any Picture Creation as defined in Paragraph 1(e) hereinabove (but not free promotional, free business and free corporate tie-ins all of which are reserved herein exclusively to Licensee).

(b) If the Picture is produced and released theatrically in the United States of America within two (2) years after the earlier of the date of completion of the Final Cut (as that term is customarily defined by the Los Angeles entertainment community) of the Picture or the date which is seven (7) months after the date upon which principal photography of the Picture is completed, then Licensor agrees to, and will, subject to and in accordance with the following terms and conditions, manufacture the Picture Merchandising products and publishing items based upon the Picture or Picture Creations as are set forth in Paragraphs 3(b)(E)(i), (ii), (iii) and (iv) below (or items substantially similar to the items listed in said subparagraphs) (the "Picture Merchandising Product Commitment"). The extent of Licensor's obligation with respect to the Picture Merchandising Product Commitment shall depend upon the final negative cost of the Picture as follows:

(A) If the Picture is classified as a "low budget" picture, then Licensor shall use its best efforts to manufacture, market, distribute and release the items comprising the Picture Merchandising Product Commitment; provided, however, that the selection of the actual products Licensor shall produce shall be at Licensor's discretion, subject to Licensee's rights as set forth in subparagraph 3(b)(E)(vi) below.

(B) If the Picture is classified as a "medium budget" picture, then Licensor shall use its best efforts to manufacture, market, distribute and release the items comprising the Picture Merchandising Product Commitment, but shall in any event be obligated to manufacture, market, distribute and release not less than fifty percent (50%) of such items; provided, however, that the selection of the actual products to be produced by Licensor shall be at Licensor's discretion, subject to Licensee's rights as set forth in Paragraph 3(b)(E)(vi) below.

(C) If the Picture is classified as a "high budget" picture, then Licensor shall be obligated to manufacture, market, distribute and release substantially all of the items comprising the Picture Merchandising Product Commitment.

(D) For purposes of this Paragraph 3(b), the Picture shall be classified a "low budget" picture if its final negative cost falls within the range from $0 to $13,999,999, shall be classified a "medium budget" picture if its final negative cost falls within the range from $14,000,000 to $29,999,999, and shall be classified a "high budget" picture if its final negative cost is $30,000,000 or greater. The foregoing negative cost ranges shall be adjusted (up if applicable) by the

-12-

230/LICENSE-02

delete
3.04

same percentage that the MPAA average negative cost of major studio motion pictures for the year the Picture commences principal photography has increased or decreased from the MPAA average for 1992 ($26.1 million).

(E)   The items comprising the Picture Merchandising Product Commitment are as follows:

(i)   Poster Sets:

A.   Movie posters done as paintings.
B.   Movie posters done as camera stills of the actors and actresses.
C.   Movie posters depicting actions scenes from the Picture.

(ii)   Collector Cards:

Amendment 1
Exhibits A,B,C

A.   Packages of stills from the Picture (Bubble Gum cards).
B.   Boxed set of entire collection of Bubble Gum cards.
C.   Special Deluxe Edition of a limited series tin box Bubble Gum cards.

(iii)   Role Playing Games:

A.   Boxed accessory set based on the movie (D&D: The Movie Game).
B.   Short module adventures based on portions of the movie.
C.   Villain and Hero accessory product.
D.   Map Set.
E.   Extensive "DRAGON" and "DUNGEON" magazine articles.

(iv)   Book Productions, Novelizations and Publishing Based on the Movie:

A.   Movie story novel adaptation.
B.   Calendars.
C.   Novels.
D.   Spinoff books based on Picture Characters.

Licensor shall have the right to arrange for the manufacturing of products, publishing items and/or other merchandising as set forth in Paragraphs 3(b)(E)(i), (ii), (iii) and (iv), through the use of a third party license.  Any such decision to use a third party licensee for the Products as defined and listed in Paragraphs 3(b)(E)(i),  (ii),  (iii) and (iv) shall be at Licensor's discretion, provided however that any such third party licensee will be governed by the applicable terms of this Paragraph 3.

-13-

EXHIBIT A  32

delete
3.04

(v) Licensor agrees and warrants that the quality, quantity, manufacturing, distribution and exploitation of the Picture Merchandise products listed and defined in Paragraphs 3(b)(E)(i), (ii), (iii) and (iv) hereinabove shall be handled in the same manner as that of a typical major studio Picture merchandising campaign for a picture that is merchandised.

(vi) Licensee, its producer(s), distributors and financiers will have the right to request the manufacture of additional Picture Merchandising items or products (but specifically excluding those products covered in Paragraphs 3(b)(E)(i), (ii), (iii) and (iv)) to be manufactured by Licensor, and Licensor shall use its best efforts to accommodate any such request made by Licensee, its producers, distributors and financiers. In the event Licensor and Licensee cannot agree on the decision to manufacture or produce any such additional Picture Merchandising product or item to be manufactured by Licensor, then Licensor and Licensee shall negotiate in good faith to resolve any such dispute within a forty-eight (48) hour period from the time of disagreement, and if not so resolved then Licensor's decision shall be final and binding upon the parties.

(vii) With respect to items to be manufactured by Licensor, or its licensees in connection with the Picture, Licensee shall promptly execute and deliver to Licensor a license in a form to be submitted by Licensee, and if required together with a payment of a license fee (not to exceed $1.00 for any of the products created in connection with this Paragraph 3(b)(E)(i) (ii) (iii) (iv) hereinabove) to Licensee set forth therein, for the use of any Picture Creation from the Picture to be used in, on or in connection with any such Picture Merchandising and/or publishing items to be manufactured by Licensor, or its licensees in connection with the Picture in accordance with the terms hereof and/or in, on or in connection with the packaging, marketing, advertising, promotion and/or exploitation of any such items for the Picture, including the use of such Picture Creations such as but not limited to, artwork, photography, likenesses, logos, dialogue, characters, storylines, plots, special effects, optical effects, computer generated effects, virtual reality elements, trademarks and/or copyrights owned and/or controlled by Licensee and/or its production, distribution and/or financing entities.

(viii) Licensor shall not, in any event, have the right to use or further develop any Picture Creations including but not limited to, the storylines, plots, characters, themes, titles, artwork, illustrations, likenesses, photography, dialogue, graphics, visual effects or any other elements of the Picture or Picture Creations except as depicted in and as Picture Merchandising for Licensee's Picture, and except in accordance

-14-

EXHIBIT A  33

with a specific written license from Licensee for each use in each instance.

*delete 2.04*

(c) If the Picture is produced and released theatrically in the United States of America within two (2) years after the earlier of the date of completion of the Final Cut of the Picture or the date which is seven (7) months after the date upon which principal photography of the Picture is completed, then Licensor or any qualified licensing agent, as the case may be (Licensor shall have the right to engage any qualified licensing agents to seek licenses on Licensor's behalf), agrees to, and will, subject to and in accordance with the following terms and conditions, obtain licenses for the manufacture, distribution and exploitation of the Picture Merchandising products based upon the Picture and/or Picture Creations as are set forth in subparagraphs 3(c)(E)(i)(1) through 3(c)(E)(i)(16) below (or items substantially similar to the items listed in said subparagraphs) (the "Licensed Picture Merchandising Commitment"). The extent of Licensor's obligation with respect to the Licensed Picture Merchandising Commitment shall depend upon the final negative cost of the Picture as follows:

(A) If the Picture is classified as a "low budget" picture, then Licensor shall use its best efforts to obtain licenses for the manufacture, marketing, distribution and release of the items comprising the Licensed Picture Merchandising Commitment; provided, however, that the selection of the actual products Licensor shall obtain licenses for shall be at Licensor's discretion, subject to Licensee's rights as set forth in subparagraph 3(c)(E)(iii) below.

(B) If the Picture is classified as a "medium budget" picture, then Licensor shall use its best efforts to obtain licenses for the manufacture, marketing, distribution and release of the items comprising the Licensed Picture Merchandising Commitment, but shall in any event be obligated to obtain licenses for the manufacture, marketing, distribution and release of not less than fifty percent (50%) of such items; provided, however, that the selection of the actual products Licensor shall obtain licenses for shall be at Licensor's discretion, subject to Licensee's rights as set forth in Paragraph 3(c)(E)(iii) below.

(C) If the Picture is classified as a "high budget" picture, then Licensor shall be obligated to obtain licenses for the manufacture, marketing, distribution and release of substantially all of the items comprising the Licensed Picture Merchandising Commitment.

(D) For purposes of this Paragraph 3(c), the Picture shall be classified a "low budget" picture if its final negative cost falls within the range from $0 to $13,999,999, shall be classified a "medium budget" picture if its final

-15-

EXHIBIT A  34

*delete 2.04*

negative cost falls within the range from $14,000,000 to $29,999,999, and shall be classified a "high budget" picture if its final negative cost is $30,000,000 or greater. The foregoing negative cost ranges shall be adjusted "up", if applicable, by the same percentage that the MPAA average negative cost of major studio motion pictures for the year the Picture commences principal photography has increased or decreased from the MPAA average for 1992 ($26.1 million).

(E) (i)  The items comprising the Licensed Picture Merchandising Commitment are as follows:

(1)  All types of APPAREL generally associated with a Picture Merchandising campaign such as: T-shirts, jackets, shorts, socks, sweatshirts, caps, gloves, scarfs, sport shirts, etc.)

(2)  MASTER TOY LICENSE involving plastic action figures, accessories (i.e. vehicles, play sets) typically associated with a motion picture toy license.

(3)  MINIATURE FIGURES based on all the characters of the Picture.

(4)  COMPUTER GAMES and VIDEO GAMES.

(5)  SCHOOL SUPPLIES such as: pens, pencils, erasers, notebooks, rulers, markers, knapsacks, school bags, etc.

(6)  PAPER GOODS such as posters, bookmarks, stickers, greeting cards, etc.

(7)  BOARD GAMES.

(8)  CRAFT AND ACTIVITY SETS.

(9)  COSTUME AND MASKS.

(10) PUZZLES.

(11) BUTTONS and PINS.

(12) CHILDREN'S BOOKS (picture storybooks, coloring and activity books).

(13) COLLECTIBLES (ceramic figures, limited edition lithographs and portfolios, prints).

(14) LUNCH KITS and THERMOS BOTTLES.

(15) RACK TOYS (i.e. weapons sets, etc.).

-16-

(16) SHEETS and TOWELS and other domestic household items.

(ii) Licensor agrees and warrants that the Picture Merchandising campaign will be conducted to the best advantage of the Picture. To that end, Licensor agrees to so provide in its agreements with any third party licensee(s) involved in the manufacturing of Picture Merchandise that the quality, quantity, distribution, and exploitation of the Picture Merchandise products as listed and defined in Paragraphs 3(c)(E)(i)(1)- 3(c)(E)(i)(16) hereinabove shall be handled in the same manner as that of a typical major studio picture merchandising campaign connected with a picture that is merchandised.

(iii) Licensee, its producers, distributors and financiers, shall have the right to request additional Picture Merchandising, publishing items and other agreements that licensee, its producers and/or financiers deem necessary or appropriate for the Picture Merchandising campaign, and Licensor shall use its best efforts to accommodate any such request made by Licensee, its producers, distributors and financiers. In the event Licensor and Licensee cannot agree on a Picture Merchandising license or item or arrangement (but specifically excluding those products covered in Paragraphs 3(c)(E)(i)(1)- 3(c)(E)(i)(16)), Licensor and Licensee shall negotiate in good faith to resolve such dispute within a forty-eight (48) hour period from the time of disagreement, and if not so resolved then Licensor's decision shall be final and binding upon the parties.

(iv) Licensor agrees to send a written deal memo, and all revised deal memos which shall include normal and customary provisions, and any information pertaining to the financial or business terms for each Picture Merchandising and Picture Publishing product and item covered in this Paragraph 3(c), either above or below, to Licensee, for their comments and/or suggested changes. Licensor agrees to use all best efforts to make, or cause to be made, any such changes as are reasonably requested by Licensee, and/or any producer or distributor of the Picture in connection with Picture Merchandising, products, items and publishing items in any way associated with or derived, in whole or in part, from the Picture. Licensor further agrees to provide a copy, for Licensee's records, of all contracts, agreements, licenses or arrangements for each Picture Merchandising and Picture Publishing product and item covered in this Paragraph 3(c), either above or below.

(v) Licensor and Licensee agree to work together in good faith to coordinate all release dates of the merchandising and publishing items covered in this Paragraph 3, with the release dates of the Picture, and both Licensor and Licensee will use their respective best efforts to coordinate the release dates of the Picture with the release of the Picture

-17-

EXHIBIT A  36

delete
2.04

Merchandising campaign. Licensor acknowledges and agrees that the best efforts of Licensor and Licensee to coordinate the release dates of the Picture are of paramount importance, and that in the event of any conflicts in scheduling, timing, marketing or other conflict after the release date of the Picture has been confirmed, the control and needs of the Picture shall be met. In the event that the release date of the Picture changes after having been confirmed, Licensor agrees to use best efforts to modify its release dates for merchandise, but is not responsible for any circumstances beyond its control or that cannot be reasonably changed.

(vi) Licensor shall, and shall cause any Licensing Agent, or similar individual, that may be used pursuant to Paragraph 3(c), either above or below, to comply with the accounting, payment and audit provisions of Paragraph 3(h)(i)(iii) hereinafter, and provide appropriate accounting, payment and audit provisions to protect Licensee and Licensor in all licensing agreements.

(d) Picture Merchandising and publishing rights for the Picture being licensed by Licensor, or a Licensing Agent pursuant to Paragraph 3(c), as the case may be, shall be limited to the license and manufacture of Picture Merchandising and publishing items developed from elements of the Picture, but do not include any right to develop the elements of the Picture or Picture Creations (e.g. characters, characterizations, storylines, artwork, likenesses, photographs, visual effects, dialogue, plots, themes, titles, graphics, illustrations or, without limitation, other Picture Creation elements) any further or into the future without Licensee's express written authorization, and do not include soundtrack record rights or free promotional tie-in rights, all of which are reserved hereby to Licensee.

(e) Licensee recognizes and acknowledges the value of the publicity and goodwill associated with Licensor's underlying original Property, and that such value is exclusively that of Licensor; and that the Property has acquired a secondary meaning as the trademark of Licensor and/or a particular identity in the mind of the purchasing public. In consideration thereof, Licensee has agreed that the copyright to all Picture Merchandising produced hereunder based specifically on and containing a portion of the Property (but specifically excluding the copyright to the Picture, and/or any Picture Creation of Licensee) shall be jointly owned by Licensee and Licensor, subject however, to the terms and conditions set forth herein either above or below in Paragraphs 2(d), 3(a)(ii), 3(a)(iii), 3(d). Licensee recognizes and acknowledges that its ownership rights in and to Picture Merchandising do not entitle Licensee to any copyright or ownership rights in Licensor's original Property and Property Merchandising derived therefrom, provided, however, Licensee will share in the profits derived from Licensee Shared Property Merchandising and New Licensed Property Merchandising as set forth below for the Property Merchandising Term.

-18-

(f)  Except in connection with the production and exploitation of the Picture or other version, adaptation of the Property permitted to Licensee hereunder, after the Property Merchandising Term, neither party shall have the right to use, exploit or otherwise deal with or authorize or permit others to use, exploit or otherwise deal with, any Picture Creation or Picture Merchandising not already designed or created without negotiation in good faith by both parties and the express written agreement of the other party.

(g)  Licensor agrees to keep accurate, full and complete records of all merchandising and publishing activities, arrangements and products and all manufacturing, distribution, marketing, transactions and licenses involving such merchandising and publishing.

*Keep 2.04i*

(i)  With respect to all Picture Merchandising and publishing items and arrangements manufactured by Licensor as permitted by Paragraph 3(b), Licensor shall send detailed written statements to Licensee within thirty (30) days after the close of each calendar quarter separately setting forth each item, each media, and each territory, and the number of each such product sold in each, the gross monies received, the permitted deductions of actual manufacturing and distribution costs therefrom, and Licensee's share thereof, accompanied by all monies due to Licensee hereunder.

*delete 2.04*

(ii) With respect to Picture Merchandising and publishing items and arrangements licensed by Licensor, or by a licensing agent or similar individual pursuant to Paragraph 3(c) hereinabove, Licensor shall promptly send a written copy of all statements, invoices, receipts and accountings received by Licensor from its licensees, licensing agent or others within 30 days after the close of each calendar quarter, of each calendar year, accompanied by all monies due to Licensee hereunder.

(iii) All the aforesaid statements shall commence at such time as merchandise or publishing items based on the Picture are manufactured, or other Picture Merchandising agreements are entered into, or advances or other monies are received, whichever comes first, and shall continue for as long as there is any manufacturing, distribution and/or exploitation of products, items and/or monies due and/or becoming due in connection with the Picture Merchandising and publishing items, agreements, arrangements and activities hereunder.

(iv) Receipt by Licensee of any statement pursuant to the terms of this Agreement or acceptance by Licensee of any sums paid hereunder shall not preclude Licensee from questioning the correctness thereof at any time during the eighteen (18) months following receipt of such statement; provided, however, that Licensee shall have no right to dispute any items or

-19-

230/LICENSE-02

*delete 2.04*

information in that statement (and shall forever be barred from commencing any action, suit or proceeding) unless Licensor shall receive from Licensee an objection, in writing, specifying in detail the items or transaction which Licensee contests. In the event that any inconsistencies or mistakes are discovered in any such statement or payment, they shall be promptly rectified.

(v)  Each statement and the accompanying remittance will be made on a collection (as opposed to accrual) basis in the United States in United States currency.  Licensor shall not be liable in any way for any losses caused by fluctuation in the rate of exchange or because of any failure to convert or remit any particular funds to the United States at any particular time or at a more favorable cost or rate of exchange than the cost or rate of exchange at which such conversion and remittance was accomplished, it being agreed that Licensee shall be bound by whatever reasonable arrangements Licensor may make, in its best business judgement, for the conversion and remittance of foreign funds and by whatever reasonable cost or rate of exchange is incurred or used for such conversion and remittance.  Licensor agrees that it shall use best efforts to collect and remit funds hereunder in the same manner as it uses for all its own merchandising accounts for the Property and shall not discriminate against the Picture Merchandising related to the Picture.

*Keep 2.04*

(vi) Licensee shall have the right to grant credits (in opening or end titles) for services in kind or appearances of branded products in the Picture and/or other versions or adaptations permitted to Licensee hereunder ("Product Placements").  All fees, payments, benefits and other things of value, if any, paid by the sponsors of Product Placements ("Product Placement Sponsors") for the appearances of products in the Picture ("Product Placement Fees") shall be credited to and shall reduce the negative cost of the Picture or shall be deemed Gross Receipts of the Picture, at Licensee's election.  Licensee shall have the right to give to Product Placement Sponsors the right to use Picture Creations or other Picture elements in advertisements for any purpose whatsoever in connection with the Picture or any sequel or remake of the Picture.  Licensee shall also have the right to enter into advertising tie-ins with third party manufacturers, vendors, suppliers, sponsors and/or providers of goods and/or services ("Third Party Advertisers") which advertising tie-ins are intended to advertise and/or promote both the Picture and the products/services of such Third Party Advertisers ("Advertising Tie-Ins").  All fees, payments, benefits and/or other things of value, if any, paid by Third Party Advertisers in connection with any such Advertising Tie-Ins ("Advertising Tie-In Revenues") shall be credited to and shall reduce the negative cost of the Picture or shall be deemed Gross Receipts of the Picture, at Licensee's election.  Alternatively, any such Advertising Tie-In Revenues may be made available as a credit toward, offset against or augmentation of the

-20-

EXHIBIT A  39



advertising/promotional budget and/or any advertising/promotional expenditures paid or incurred in connection with the exploitation of the Picture. Notwithstanding anything to the contrary in the foregoing: (i) in the event any promotional and/or advertising campaign for the Picture (including Advertising Tie-Ins) involves the sale of items of merchandise, other than free "premiums" (as that term is commonly understood in the motion picture industry) given away without charge to purchasers of goods and/or services sold by Third Party Advertisers, the sale of such items of merchandise shall be deemed Picture Merchandising and shall be governed by the provisions of this agreement regarding Picture Merchandising provided that in the event a fee or royalty is received in connection with any "free premium" merchandise, then such fee or royalty shall also be deemed Picture Merchandising and shall be governed by the provisions of this Agreement regarding Picture Merchandising; and (ii) in the event any Third Party Advertiser pays a royalty based upon the sales of such Third Party Advertiser's goods and/or services for the right to use any Picture Creation or any other element of the Picture on or in connection with the products and/or services sold, then such royalty shall be deemed Picture Merchandising and shall be governed by the provisions of this agreement regarding Picture Merchandising. Licensee agrees to cause the studio or other distributor releasing the Picture to give Licensor reasonable advance notice (five (5) days being deemed "reasonable") prior to finalizing any Advertising Tie-Ins, which notice shall identify the Third Party Advertisers involved. If, as a result of such notice, (i) Licensor is required to cancel or forego a license agreement with a third party advertiser in connection with a Property Merchandising advertising tie-in, and (ii) the Property Merchandising advertising tie-in cancelled or foregone provided for a guaranteed license fee to Licensor, and (iii) as a result of such cancellation or forbearance such guaranteed license fee is no longer payable to Licensor and (iv) the Advertising Tie-In described in such notice provides for a license fee to Licensee or the distributor of the Picture and Licensee actually receives all or a portion of such license fee (i.e., if the license fee is neither credited to the negative cost of the Picture, nor deemed Gross Receipts of the Picture, nor credited to the promotional/advertising budget of or promotional/advertising expenditures for the Picture), then Licensor shall be entitled to receive fifty percent (50%) of any such amounts actually received by Licensee as a license fee in connection with the Advertising Tie-in in question. Notwithstanding anything to the contrary in the foregoing, nothing contained in this Paragraph 3(g)(vi) shall interfere with or derogate from Licensor's right to engage in Property Merchandising or Commercial or Advertising Tie-ins connected with Property Merchandising; provided that Licensor agrees that if the financier(s) or distributor(s) of the Picture object to any such Commercial or Advertising Tie-Ins connected with Property Merchandising, then Licensor agrees not to enter into any new such tie-ins throughout the Term of Picture Merchandising and in the event such financiers(s) or

-21-

230/LICENSE-02

distributor(s) desire that Licensor cancel any such Commercial or Advertising Tie-In connected with Property Merchandising which Licensor has entered into and which is to be conducted during the Term of Picture Merchandising, as aforesaid, Licensor agrees to do so immediately provided said distributor(s) and/or financier(s) agree to pay all the costs or losses associated with any such cancellation and/or agree to indemnify and hold Licensor harmless from and against all charges, damages, costs, expenses (including reasonable counsel fees and expenses), judgments, penalties, liabilities or losses of any kind or nature whatsoever, which may be sustained or suffered by or secured against or imposed upon Licensor by reason of the cancellation of any such Property Merchandising Commercial or Advertising Tie-In.

(vii) Licensee shall have the right to audit Licensor's books and records with respect to Licensee Shared Property Merchandising, New Licensed Property Merchandising and/or Picture Merchandising at reasonable times and upon reasonable notice and to take extracts therefrom, but no more than once each calendar year. Licensor shall account to Licensee with respect to Licensee Shared Property Merchandising, New Licensed Property Merchandising and/or Picture Merchandising on a quarterly basis no later than thirty (30) days following the end of each calendar quarter. Each statement and the accompanying remittance will be made on a collection basis in Lake Geneva, Wisconsin in United States currency. If any foreign receipts are frozen or unremittable, such receipts shall to the extent allowable by law be transferred to Licensee's account in such foreign country and Licensor shall notify Licensee to such effect. Upon Licensee's written request and upon condition that the same shall be permitted by the authorities of such foreign country, Licensor shall transmit to Licensee in such foreign country and in the currency thereof, at Licensee's cost and expense, such part of such foreign receipts to which Licensee would be entitled hereunder if the funds were transmitted and paid in the United States in accordance with the terms hereof.

(viii) Licensee shall have the right, at it own expense, to require that Licensor audit the books and records of any licensee under the terms of the license agreement with such licensee, and to send a written report of all such audit rights to Licensee hereunder. If Licensor requests such audit, it shall be at Licensor's expense, and if Licensee and Licensor jointly desire and request the audit, Licensor and Licensee shall share the costs of the audit equally. Licensor and Licensee shall share equally in percentages of fifty percent (50%) each any monies derived therefrom, after the party that paid the costs of such audit recoups its costs from any such monies derived therefrom.

230/LICENSE-02

(h)   Merchandising Fee Schedule:

(i) Licensor and Licensee shall share in equal portions of fifty percent (50%) each in all Net Profits derived from all merchandising and publishing items and agreements derived from or based in whole or in part on the Picture and the Property, as follows: (1) revenue attributable to New Licensed Property Merchandising, and (2) revenue which is expressly related to Picture Merchandising, shall be shared by the parties pursuant to subparagraph (iii) herein below for the period specified in subparagraph (v). It is understood and agreed that in the event Licensor arranges to license merchandise and commercial tie-up rights to the characters which do not appear in the Picture or any sequel, remake or other version or adaptation permitted hereunder, as well as arranging to license merchandise and commercial tie-up rights to the characters and/or other specific elements from the Picture and/or any sequel, or remake, Licensee shall be entitled to receive as its share of revenues from such multiple character license a prorated percentage of the revenue paid to Licensor that is directly and expressly attributable to the exploitation of the characters or other specific elements from the Picture and/or any sequel, remake or other version or adaptation permitted hereunder. Included in the revenues shall be all advances paid to Licensor for any such multiple character license for any exploitation hereunder.

(ii) Licensor shall pay to Licensee 5% of the Licensee Shared Property Merchandising Net Profits derived from sales of Licensee Shared Property Merchandising in all English language versions only, regardless of the territory in which sold [(TSR Product #1070 [the Dungeons and Dragons Game]) in excess of 250,000 units annually for the Property Merchandising Term specified in subparagraph 3(h)(v) below.

(iii) Subject to Subparagraphs (v) and (vi) below, Licensor's Gross Receipts throughout the world derived from the exploitation of New Licensed Property Merchandising and/or from Picture Merchandising shall be dispersed by Licensor as follows:

A.   Licensor shall first pay any sums due to any third party by Licensor entitled to receive a participation in gross receipts derived from the exploitation of New Licensed Property Merchandising and/or from the Picture Merchandising (e.g. any actor appearing in the Picture and/or sequel or remake because of Licensor's use of the actor's image, name, or likeness) that Licensee shares in the revenues of hereunder:

B.   Licensor shall then retain for its own account amounts equal to its actual and accountable direct out-of-pocket costs, actually expended in connection with the exploitation of New Licensed Property Merchandising and/or Picture Merchandising or, if such costs were separately billed to its licensees, then the excess of the amount expended, less the

-23-

EXHIBIT A  42

amounts paid by said licensees, specifically incurred in connection with the revenues that Licensee shares in hereunder.

C. The balance, if any, of the Gross Receipts derived from New Licensed Property Merchandising and/or Picture Merchandising as set forth in this paragraph 3(h)(iii) shall then be shared equally between Licensor and Licensee ("Net Profits").

For purposes of this paragraph, "Gross Receipts" shall mean all revenues derived by Licensor, its parents, affiliates, subsidiaries, and licensees, which are derived from the exploitation of the New Licensed Property Merchandising and/or Picture Merchandising, less to the extent not deducted, any and all taxes paid by Licensor to third parties, sales commissions, currency exchanges, losses and expenses related specifically to those gross receipts. Licensor will use best efforts to release blocked funds in accordance with customary provisions. With respect to New Licensed Property Merchandising, Gross Receipts shall include all revenues collected during the Property Merchandising Term as specified in subparagraph (v) below from licenses entered into during said Property Merchandising Term, whenever they may be received but shall not include any revenues due after the Property Merchandising Term has expired.

(iv) Subject to subparagraphs (v) and (vi) below, Licensor's Gross Receipts throughout the world derived from the exploitation of English language versions only (regardless of the territory in which sold) of Licensee Shared Property Merchandising shall be disbursed by Licensor as follows:

A. Licensor shall first pay any sums due to any third party by Licensor entitled to receive a participation in Gross Receipts derived from the exploitation of Licensee Shared Property Merchandising that Licensee shares in.

B. Licensor shall then retain for its own account amounts equal to its actual and accountable direct out-of-pocket costs, actually expended in connection with the manufacturing, marketing and exploitation of Licensee Shared Property Merchandising that Licensee shares in.

C. The balance, if any, of the Gross Receipts derived from merchandising set forth in this paragraph 3(h)(iv) shall be split 95% thereof to Licensor and 5% thereof to Licensee ("Licensee Shared Property Merchandising Net Profits").

For purposes of this paragraph, "Gross Receipts" shall mean all revenues derived by Licensor, its parents, affiliates and subsidiaries, which are derived from the exploitation of the Licensee Shared Property Merchandising, less to the extent not deducted, any and all taxes paid by Licensor to

-24-

third parties, sales commissions, currency exchanges, losses and expenses related specifically to those gross receipts. Licensor will use best efforts to release blocked funds in accordance with customary provisions with respect to Licensee Shared Property Merchandising.

        (v)  In the event Licensee produces and distributes the Picture, Licensee shall be entitled to share in Gross Receipts derived from Licensee Shared Property Merchandising and New Licensed Property Merchandising for a period commencing six (6) months prior to the actual initial theatrical release of the Picture in the United States of America, and ending twenty-four (24) months after the date of the actual initial theatrical release of the Picture in the United States ("Property Merchandising Term").  In the event Licensee shall produce and distribute any sequel, or remake, Licensee shall be entitled to share in Gross Receipts derived from Licensee Shared Property Merchandising and New Licensed Property Merchandising for each sequel or scheduled remake for a period commencing six (6) months prior to the actual initial theatrical release of each sequel or remake in the United States of America and ending twenty-four (24) months after the date of the actual initial theatrical release of such sequel or remake in the United States of America ("Subsequent Production Property Merchandising Term").  Except as provided in paragraphs 3(j) and 14(a), Licensee shall be entitled to share in Gross Receipts derived from Picture Merchandising in perpetuity.

        (vi) A.   In the event that a Licensing Agent, if any, is required to represent the licensing of Licensor Merchandising pursuant to Paragraph 3(c)(iv), a fee not to exceed thirty-five percent (35%) of gross U.S. licensing payments for U.S. licenses, and an override to the United States Licensing Agent of ten percent (10%) over foreign subagents, such foreign subagent fees not to exceed thirty-five percent (35%) of foreign gross license payments for non-U.S. licensing; and

        B.   Participation in merchandising revenues (whether gross, adjusted gross, net or otherwise), if any, granted to actors and actresses not to exceed 5% for all such persons, prorated by the total number of such persons used on such items entitled to a royalty.  Licensee shall have the right to grant additional participations to persons other than actors and actresses not to exceed 5% in the aggregate in merchandising to any other persons or entities, such as, but not limited to, Investors, Directors, Writers, Executive Producers and Producers provided, however, that if Licensee requests that said participation be deducted "off the top" from both Licensor and Licensee, Licensee shall so notify Licensor.  In such event, Licensor agrees to negotiate in good faith with Licensee to reach a mutually acceptable decision regarding such request within two weeks of the date of Licensee's request, taking into account such person's stature in the motion picture industry, such person's

-25-

contribution and importance to the Picture, the necessity of such person or entity, the necessity of such a merchandising participation to the financing and/or production and/or distribution of the Picture, and the time requirements of the Picture and of completing an agreement with such person or entity.

(i) Advertising the Picture on Merchandising.

(i) Licensor shall have the right to make incidental references to the Picture on the cover of or in connection with Merchandising manufactured or licensed by Licensor not based on the Property (i.e., Advanced Dungeons and Dragons, Forgotten Realms, Dragonlance, SpellJammer, Greyhawk, Ravenloft, Dark Sun) for the purpose of advertising the Picture to Licensor's existing market. All such advertising must be approved in advance in writing by Licensee and/or its distributors. The Picture's logo and artwork may not be used without the written consent of Licensee and/or Licensee's distributor(s). Approvals to be given by Licensee and/or Licensee's distributor(s) pursuant to this paragraph 3(i)(i) shall be given or denied within seven (7) business days following receipt of written request therefor from Licensor. If Licensee and/or its distributor(s) fail to deny any such written request for approval within such seven (7) business day period, such request shall be deemed approved.

(ii) Licensor agrees to provide advertising support in the following ways ~~Licensor shall provide Licensee and their distributor(s)~~ in accordance with the pre-release of the Picture, release dates of the Picture, and release dates of the video version of the Picture:

A. In product advertisements about the Picture (all product lines).

B. Articles and advertisements in DRAGON & DUNGEON Magazines.

C. Advertisements in Licensed products of all product lines where Licensor can obtain authorization from its licensees.

D. Advertising support at gaming conventions.

(j) Notwithstanding anything contained herein to the contrary, in the event the Picture to be produced hereunder is not released theatrically in the United States of America within two (2) years after the earlier of the date of completion of the Final Cut of the Picture or the date which is seven (7) months after the date upon which principal photography of the Picture is completed, then Licensee shall not be entitled to share in any

-26-

230/LICENSE-02

revenues of any kind or nature whatsoever derived from the exploitation of Licensee Shared Property Merchandising, New Licensed Property Merchandising and/or Picture Merchandising which Licensor may have arranged pursuant to this Agreement prior to Licensee's failure to release the Picture theatrically in the United States of America as aforesaid; and, even if the Picture subsequently is released theatrically in the United States of America at a later date (i.e., after the time period described hereinabove), Licensee shall not be entitled to share in any such merchandising revenues.   Also, should Licensor have paid to Licensee any revenues derived from the exploitation of Licensee Shared Property Merchandising, New Licensed Property Merchandising and/or Picture Merchandising prior to Licensee's failure to release the Picture theatrically in the United States of America on a timely basis as specified in the preceding sentence, then Licensor shall have the right to be repaid any such revenues by Licensee promptly upon demand.

4.   Reserved Rights/Hold Backs/Restrictions.

(a)   Animation and Television Series:   Licensor may grant licenses to others to use the Property in connection with live action television series, animated theatrical or television motion pictures, but based solely on underlying copyrights and trademarks owned by Licensor and not on any Picture Creations or the Picture or any elements thereof, provided however, that except with respect to historical programs and/or documentaries for exhibition on television related to role-playing games in general and/or to Licensor, educational programs and game show programs based upon the Property, the rights to which Licensor may grant to others without any holdback, Licensor shall withhold the exercise of such rights for live action television series until the expiration of five (5) years following the first general commercial release in the United States of the first television or theatrical motion picture produced hereunder based on the Property or seven (7) years from the date of this Agreement, whichever shall first occur, Licensor also and shall withhold the exercise of such rights for animated theatrical motion pictures for twelve months from the date of the commercial release in the United States of the Picture, but in any event later than December 31, 1996.  There shall be no holdback with respect to animated television series or animated television motion pictures.  In any event, the foregoing productions shall not be based upon or include, in whole or in part, Picture Creations, the Picture or any elements of either, such as but not limited to, the story, plot, dialogue, script, illustrations, photographs, likenesses, visuals, special effects, characters, characterizations, copyrights or trademarks derived from the Picture and/or of any Picture Creations and/or merchandising or publishing items based on the Picture and/or Picture Creations.

(b)   Advanced Dungeons & Dragons:   Licensor may produce or grant licenses to others to produce a live-action or animated

-27-

EXHIBIT A  46

motion picture and/or television production based on Licensor's "ADVANCED DUNGEONS & DRAGONS" game and trademark, but it shall not have the right, and shall not authorize or permit others to, exhibit, release, promote or exploit any live action ADVANCED DUNGEONS & DRAGONS motion picture and/or television production or any merchandising or publishing in connection therewith, at anytime earlier than twelve (12) months following the initial general commercial release in the United States of the Picture produced hereunder. Notwithstanding the foregoing, if the Picture to be produced hereunder is not released theatrically in the United States of America within two (2) years after the earlier of the date of completion of the Final Cut of the Picture or the date which is seven (7) months after the date upon which principal photography of the Picture is completed, then the holdbacks and restrictions contained in the preceding sentence shall be null and void automatically without notice to Licensee from Licensor being required.

(c) Licensor warrants and agrees that it shall not by the exercise of any of its reserved rights, except as specifically permitted hereunder, compete or interfere in any way with or derogate from any rights and licenses granted hereunder or the Picture or other version of the Property permitted hereunder, or the release, marketing, promotion, publicity, exploitation and merchandising of the Picture and other permitted versions of the Property hereunder.

(d) <u>Licensor's Reserved Rights</u>.  All rights in and to the Property not specifically granted to Licensee herein are reserved to Licensor (subject only to the limited holdbacks expressly described in subparagraphs 4(a), (b) and (c) above), and provided that in the event any "new right" in connection with a new means or way of recording, distributing, or exhibiting the Picture to be produced hereunder which would be considered standard with the grant of film rights herein is hereinafter created or discovered in the motion picture industry, (e.g. videocassettes were not a normal part of revenues in 1950 associated with a picture, but in 1980 video revenues became a major revenue generating category), then such new right shall be deemed to be included amongst those rights granted to Licensee herein; provided, however, that in no event shall any such new right be included in the rights granted to Licensee hereunder if such right is expressly and specifically contemplated herein and has been reserved to Licensor hereunder. Notwithstanding anything to the contrary elsewhere in this agreement, it is agreed and understood that, at any time during the term of this agreement, Licensor may produce and distribute game related videos which explain the concept of role playing to beginning players and/or which are designed to promote particular products and publications of Licensor; provided, however, that in no event shall such videos include any portion of the Picture or any Picture Creations.



230/LICENSE-02                                    -28-

5.  Compensation.

As full and complete consideration for all of the rights herein granted to Licensee and for the representations and warranties of Licensor hereunder, Licensee agrees to pay to Licensor, and Licensor agrees to accept the sums set forth below, after deduction of all Option payments made to Licensor pursuant to the Option Agreement to which this Agreement is attached as Exhibit "B":

→ insert 2.06

(a)  A License Fee in a sum equal to two percent (2%) of the final production budget of the Picture (excluding all financing and legal charges, interest and financing fees, contingency allowances and completion bond fees), but in no event less than Three Hundred Fifty Thousand Dollars ($350,000.00 U.S.) less all Option payments.  Said Three Hundred Fifty Thousand Dollars ($350,000.00 U.S.) less Option payments, shall be payable upon exercise of the Option and the remainder, if any, (i.e. the difference between two percent (2%) of the final production budget excluding all financing and legal charges, interest and financing fees, contingency allowances and completion bond fees and the sum of $350,000.00 U.S.), shall be payable upon commencement of principal photography of the Picture produced hereunder.  Notwithstanding anything else in this or any other agreement to the contrary, this Agreement and licenses and rights granted by it to Licensee shall not be effective unless the minimum License Fee payable hereunder ($350,000 less Option payments) is paid to Licensor upon exercise of the Option.

6.  Licensor Obligations.

Licensor warrants and agrees that it shall cooperate in the creative development of stories, scripts and artwork for the Picture and all related promotional efforts, and in the creation of a customized "treatment" (as the term is understood in the film industry) for the Picture, including original new characters not previously embodied or used in the Property.  To that end, Licensor shall make its creative personnel available for consultation with Licensee and its creative personnel on a reasonable basis from time to time, and shall supply Licensee free of charge with such written and/or illustrated materials as may be reasonably required by Licensee in creating the Picture, which among other things shall include sample copies of all appropriate storylines, text books, illustrations, drawings, likenesses, photographs, artwork, visuals, trademarks, characters, games and other materials relating to the Property; provided, however, that Licensor shall provide the first $1,000 (at wholesale) of any such merchandise otherwise sold to the public at its expense and, if Licensor so requires, Licensee shall pay Licensor the wholesale price of all such merchandise required by Licensee in excess of $1,000.

-29-

7.   Licensor Consultation/Approval/Copies Rights.

(a) Provided Licensor is not in material breach or material default hereunder, Licensor shall have the following consultation and/or approval rights, as applicable, which consultation/approval rights shall be exercised by one (1) individual designated in writing by Licensor promptly following execution hereof:

(i) The right of consultation and approval (not to be unreasonably withheld) with respect to the engaging of a writer or writers to create a treatment and/or screenplay based on the Property, provided however that if Licensor does not respond or approve in writing any such writer within ten (10) business days from receipt of said writer's name and credentials and other materials obtained from said writer by Licensee, if any, said writer shall be deemed approved.

(ii) Licensee shall provide Licensor with a copy of each final draft of any treatment and script written for the Picture and Licensor shall have ten (10) business days from its receipt of each such draft to comment and suggest revisions to it, subject to Paragraph (b) below and to request writers to make such changes as are reasonable and agreeable to all parties subject to the then-existing time requirements and commitments of Licensee, writer(s), and of the project itself;

[handwritten margin note: delete & replace 2.08]

(iii) Right of approval subject to Paragraph (b) below and not to be unreasonably withheld, of Licensee's creative concept for the Picture in the form of a detailed outline of the plot, provided, however, that if Licensor does not respond or approve, in writing, same within ten (10) business days then it shall be deemed approved;

(iv) For Licensor's records only, Licensor shall be furnished photocopies of the pencilled storyboards and script direction;

(v) For Licensor's records only, Licensor shall be furnished a copy of each full treatment for the Picture, and each full draft of the script for the Picture created by Licensee's contracted writers;

(vi) Right of approval, subject to Paragraph (b) below and not to be unreasonably withheld, of all graphic designs for posters and other promotional materials, provided, however, that if Licensor does not respond or approve, in writing, same within forty-eight (48) hours from the initial request for its approval, such designs shall be deemed approved;

[handwritten margin note: delete & replace 2.09]

(vii) For Licensor's records only, Licensor shall be provided a photocopy of the final draft of the actual shooting script and final art on all posters and promotional materials.

-30-

EXHIBIT A  49

(b)  Licensor's approval rights will be limited to a review of the creative elements of each script to ensure that it maintains the standards of good taste in keeping with the standards of the Los Angeles Entertainment Community in order to protect the value of its trademarks and copyrights, that the elements are consistent within the accuracy and terminology of the game rules, and that they meet the requirements set forth herein as pertains to credits to Licensor and protection of ownership of Licensor's trademarks and copyrights.  Licensor may offer comment on other aspects of the elements defined hereinabove, but has no approval over their details.

(c)  If any changes or modifications are required to be made to any such material, Licensor shall give notice to Licensee in writing within the applicable time periods specified in subparagraphs (a)(ii), (iii) and (vi) above, and Licensee agrees to make such changes or modifications as are permitted or required by the foregoing Paragraph (b) and as are reasonably possible, practical and do not materially add to the cost of the budget for the Picture, writer's schedule and the Picture's schedule of due dates and delivery dates.  If no such notice is received by Licensee within the applicable period, such materials shall be deemed approved by Licensor.

(d)  Licensor shall promptly upon execution hereof appoint one specific staff-member to act as its authorized contact with Licensee with regard to all approval procedures set forth herein.  Approval or comments communicated to Licensee by such authorized contact shall constitute the approval or comments, as applicable, by Licensor.

(e)  With respect to costume designs, Licensee shall consult with Licensor and Licensee agrees to be faithful to the basic conceptualization of the costumes as contained in the Property.

(f)  Upon the commencement of principal photography of the Picture, Licensor hereby agrees that Licensee shall, subject to the standards and restrictions set forth herein, have sole creative control of the script and the production and post-production of the Picture, and that Licensor's only remaining approval rights shall be those with respect to uses of Licensor's trademarks, as set forth in Paragraph 9 hereinafter.

(g)  All approval rights and consultation rights of Licensor hereinabove shall be a condition to any third party production, distribution and/or financing agreements entered into by Licensee.

(h)  All approvals of Licensor pursuant to this Paragraph 7 shall be delivered to Licensee, in writing, within the time period contained within this Paragraph 7 for Licensor to

-31-

EXHIBIT A  50

provide any such approval, and in the event of disapproval by Licensor, then Licensor shall clearly state the material reasons for Licensor's disapproval in each such instance.

8.  Credit.

(a)  Provided a Picture is produced and released based on the Property, Licensor shall be accorded credit on all positive prints of the Picture on a single card, in the main titles substantially as follows:

"Based on (or suggested by) the game "DUNGEONS & DRAGONS" owned by TSR, Inc." All other aspects of such credit shall be in the sole discretion of Licensee and any third party producer/distributor and/or financier of the Picture.

(b)  A trademark statement, in the end titles, identifying Licensor as the owner of the rights in and to the trademark "DUNGEONS & DRAGONS" and displaying either the Licensor's Corporate Logo or the words TSR, Inc. in substantially the following form: "DUNGEONS & DRAGONS" is a trademark owned by TSR, Inc. and licensed for use hereunder."

(c)  Inadvertent failure by Licensee or failure by any other persons or entities to accord credit to Licensor or errors and omissions in any or all of them, shall not entitle Licensor to injunctive or other equitable relief. Licensee shall endeavor to prospectively correct any such errors or omissions made by Licensee, upon written notice from Licensor, and provided such correction is feasible on a prospective basis and is not an unreasonably excessive cost to Licensee or its production, distribution and/or financing entities.

9.  Licensor Trademarks and Copyrights.

(a)  Provided a Picture based on the Property is produced and released, Licensee shall affix on all positive prints of the Picture, a trademark statement in the end titles, identifying Licensor as the owner of the rights in and to the trademark "DUNGEONS & DRAGONS" and displaying either the Licensor's corporate logo or the words TSR, Inc. in substantially the following form: "'DUNGEONS & DRAGONS' is a trademark owned by TSR, Inc. and licensed for use hereunder."

(b)  Licensee, its successors and assigns agree to comply with Licensor's reasonable instructions regarding proper trademark and copyright notices and agree to submit for Licensor's prior approval, not to be unreasonably withheld, and to be approved in writing within five (5) business days after Licensor's receipt of same, all proposed trademark and copyright notices, including their proposed manner of usage.

-32-

230/LICENSE-02

(c) Licensee recognizes the great value of the publicity and good will associated with the Property and acknowledges that such good will is exclusively that of Licensor; and that the Property has acquired a secondary meaning as the trademark of Licensor and/or a particular identity in the mind of the purchasing public.

(d) Licensee, its successors and assigns agree to take whatever action, in Licensor's sole reasonable opinion, is appropriate or necessary to protect Licensor's rights in or the the trademark and the copyrights therein, including without limitation, affixing or causing to be affixed on each print of the Picture and of any sequel or remake produced by Licensee, and on the materials used in connection therewith or in connection with the soundtrack album and video disc and videocassette versions of the Picture and/or any sequel or remake, and in all advertising, packaging and distribution materials relating thereto, the proper trademark and copyright notices indicating Licensor's interests therein. The form of such notices shall be designated by Licensor to Licensee in writing. Unless Licensee receives written instructions from Licensor for requesting Licensee to take specific additional actions, Licensee shall be deemed in compliance with the provisions of the foregoing two sentences so long as Licensee shall take actions consistent with the existing practices at the time of the U.S. motion picture industry for the protection of Licensor's trademarks and copyrights. To the extent that Licensor shall request Licensee to take actions not consistent with such industry practices which require Licensee to incur extraordinary costs in excess of Ten Thousand Dollars ($10,000) in any one instance or Fifty Thousand Dollars ($50,000) in the aggregate for any motion picture, then Licensee shall inform Licensor, in writing, in advance of incurring same and request Licensor's instructions in connection therewith. If Licensor shall still request such actions be taken, then Licensor shall reimburse Licensee for such costs promptly following Licensor's receipt of reasonable proof of Licensee's expenditure of same.

10. Representations and Warranties.

(a) Licensor warrants and represents (i) that Licensor is the sole owner of all the rights, licenses, privileges and property herein conveyed including without limitation the unlimited universe-wide motion picture, television rights, videogram, live stage and allied and ancillary rights in the Property conveyed hereunder and has the full and sole right and authority to convey the said rights herein granted; (ii) that no part of the motion picture or television rights or videogram or live stage rights to the Property conveyed hereunder or any other rights, licenses, privileges or property herein conveyed have in any way been encumbered, conveyed, granted or otherwise disposed of and the same are free and clear of any liens or claims whatsoever in favor of any party whatsoever and said rights, and

-33-

EXHIBIT A  52

the full right to exercise the same, have not been in any way prejudiced, limited, diminished or impaired; (iii) that Licensor has not entered into and will not enter into any agreement involving or affecting the rights granted hereunder; (iv) that the title or titles of the Property may be legally used in the exercise of all or any of the rights granted hereunder; (v) that the Property and all characters therein do not infringe upon any copyright, trademark, and any common law right, literary, dramatic, motion picture or any other rights of any party whomever, or constitute a libel or defamation of, or invasion of any rights (including without limitation, privacy and publicity) of any third party; (vi) that Licensor has not done and will not do any act or thing that will or may in any way prevent or interfere in any manner with the full and exclusive enjoyment by Licensee of all the rights, license, privileges and property herein conveyed or which will or may impair or encumber such rights, licenses, privileges or property; (vii) that there are no claims or litigation pending, outstanding or threatened adversely affecting or that may in any way prejudice Licensor's exclusive rights in the Property or any of the rights, licenses, privileges and property herein conveyed; (viii) that no motion picture, television program or videogram or live stage production, has been produced based upon the Property not has any version nor adaptation of the Property at any time been broadcast (other than the existing animated television series based on "DUNGEONS AND DRAGONS"); (ix) that the Property has been validly registered for trademark and/or copyright protection, as applicable to each element of the Property, in the United States and all other territories of the universe where registration is permitted or required; (x) that Licensor shall not, itself or through others, use, merchandise, publish or exploit in any manner, in whole or in part, the Picture Creations or any element(s) thereof including, without limitation, any characters, dialogue, titles, storylines, photographs, illustrations, likenesses, plots, themes, graphics, visuals, special effects, trademarks or other elements created by Licensee, except as may be licensed by written agreement to Licensor by Licensee in each specific instance, and even in such event not in plots, storylines or character development other than as specifically depicted in the Picture produced by Licensee hereunder.

The foregoing warranties and representations are made by Licensor to induce Licensee to execute this Agreement and Licensor acknowledges and concedes that Licensee has executed this Agreement in reliance thereon. Licensor's warranties and representations contained in this Paragraph 10 do not apply to new matter (including characters) inserted by Licensee into the Picture.

(b) Each party agrees and guarantees to defend, indemnify and hold the other, and its assignees, licensees, officers, employees, agents, parents, subsidiaries, affiliates, harmless from and against any charges, damages, costs, expenses

—34—

230/LICENSE-02

(including reasonable counsel fees and expenses), judgments, penalties, liabilities or losses of any other kind or nature whatsoever, which may be sustained or suffered by or secured against or imposed upon such indemnified party, or to assignees, licensees, officers, employees, agents, parents, subsidiaries, affiliates or associates of other such parties by reason of the breach of any of the covenants, representations or warranties herein contained by the indemnifying party.

11.   Suspension/Extension.

Provided Licensee is engaged in active development of the Picture pursuant to the terms hereof, and if Licensee is unable to meet any time limitations or to exercise any of its rights under this Agreement including, without limitation, to exercise rights of First Negotiation and Last Refusal, to employ a writer for a treatment and/or screenplay or teleplay, and/or the time limits within which to obtain a treatment and/or screenplay, and/or the time limits within which to obtain financing and/or the time limits to produce or commence production or photography on a motion picture or television production hereunder as a result of any Force Majeure event which substantially affects and interferes with Licensee's ability to proceed with the development and/or production of the Picture, including without limitation, any act of God, strike, earthquake, fire, civil commotion, epidemic, act of government, its agencies or officers, illness, incapacity, withdrawal or termination or disability of the writer(s), director, producer, principal cast members, (provided that if any such suspension by reason of illness, incapacity, withdrawal, termination or disability of a writer, director, producer or principal cast member exceeds ninety (90) days, Licensee shall use its best efforts to replace such writer, director, producer or principal cast member as soon as possible thereafter) and/or any other legitimate cause beyond the control of the parties which substantially interferes with the intended production, distribution or exploitation of the Picture or the exercise of any rights under this Agreement, then this Agreement shall be automatically suspended and the time to exercise the Option, to exclusively hold rights, to exercise rights of First Negotiation and Last Refusal, to employ a writer, to obtain a treatment and/or screenplay, to produce or commence photography of a motion picture or television production hereunder and any other rights granted to Licensee or time limits set for Licensee under this Agreement, shall be extended upon written notice within ten (10) days after the occurrence of the Force Majeure event, giving the particulars thereof and the likely duration of any extension caused thereby for a period equivalent to the period that any such condition shall prevail; provided that no Force Majeure extensions shall exceed one (1) year in the aggregate.  No monies or compensation due under this Agreement shall be payable to Licensor during the existence of any such Force Majeure event but Licensee shall have the right to continue its activities hereunder.

-35-

230/LICENSE-02

12. <u>Further Documents</u>.

Licensor will duly execute, acknowledge, and deliver to Licensee or cause to be executed, acknowledged and delivered to Licensee, in form approved by Licensee, any and all further assignments or instruments which Licensee may reasonably deem necessary, expedient or proper to carry out and effectuate the purposes and intent of this agreement, including but not limited to (a) a short form assignment of all the rights, licenses, privileges and property contained herein granted to Licensee, duly executed and acknowledged in the form of the attached Exhibit "B"; and (b) a release in form acceptable to Licensee from the manufacturer/ distributor of the games entitled in whole or in part "DUNGEONS & DRAGONS" (excluding "ADVANCED DUNGEONS & DRAGONS") and from the producer/distributor of the animated television series based on "DUNGEONS & DRAGONS"; and (c) at Licensee's request, a release in form acceptable to Licensee from any other parties having rights in the Property. In the event Licensor fails to execute additional documents within five (5) business days after the date of written notice from Licensee, Licensor hereby irrevocably appoints Licensee as its attorney-in-fact to do so in its name, the foregoing being a power coupled with an interest and irrevocable.

13. <u>Assignment</u>.

Licensee may assign, sublet, sublicense or transfer this agreement and all or any part of its rights hereunder to any of the entities or persons listed in Paragraphs 13(a)(i)-13(a)(vii) without limitation, and without the approval of Licensor. Any other potential licensee not classified within the guidelines of Paragraphs 13(a)(i)-13(a)(vii), will have to be presented, in advance, to Licensor and will require the written approval of Licensor. This agreement shall inure to the benefit of Licensee's successors, licensees and assigns and shall be binding upon and inure the benefit of Licensor's successors and assigns.

(a) Any purported assignee must have been approved by Licensor, in writing, in advance; provided, however, that Licensee shall not be required to obtain the approval of Licensor in the event of an assignment to any of the following:

    (i) Major U.S. Motion Picture Distributors (e.g. Paramount Pictures, MCA/Universal, Columbia Pictures, Tri-Star Pictures, Warner Bros., Disney/Buena Vista, Twentieth Century Fox, etc.).

    (ii) Major Foreign/International distributors (e.g. Canal plus, U.I.P., Polygram, etc.).

    (iii) Major U.S. Film Production Companies (e.g.

-36-

EXHIBIT A  55

Morgan Creek, Amblin Entertainment, Lucasfilm Ltd., Largo Entertainment, Imagine Films Entertainment, Cinergi, etc.).

(iv) Major Foreign/International Film Production Companies (e.g. CIBY2000, Fujisankei Entertainment, Shochiku Films, Bertolusconni, etc.).

(v) Major or well known entertainment persons (e.g. Steven Spielberg, Tim Burton, George Lucas, Simpson/Bruckheimer, Larry Gordon, etc.).

(vi) An entity, such as a partnership, in which Licensee has a twenty-five percent (25%) or greater ownership interest, and which supplies a substantial portion of the production financing for the Picture.

(vii) A subsidiary, parent, affiliate or related company of Licensee.

(b) Due to the generality of Paragraphs 13(a)(i)-13(a)(v) above, and for purposes of clarification, the potential assignees listed in Paragraphs 13(a)(i)-13(a)(v) hereinabove are intended to be representative of bona-fide, well established entities or individuals who are well regarded in the entertainment community and are intended to be illustrative and not limitative. In furtherance of the foregoing, any purported assignment to an entity or person that does not meet the standards delineated herein, or is not similar to the examples provided in Paragraphs 13(a)(i)-13(a)(v), shall require the written approval of Licensor.

(c) Licensor may assign, sublet, or transfer this Agreement to any person, firm, or corporation, without limitation, provided, however, that the purported assignee is able to assume all of Licensor's rights and obligations hereunder and that the assignment in no way affects any of the rights granted to Licensee hereunder or any of the representations and warranties of Licensor hereunder (e.g. any purported assignee of Licensor must become the holder of the rights granted to Licensee in this Agreement).

(d) In the event of an assignment by Licensee, any purported assignee must assume, in writing, for the express benefit of Licensor, all of Licensee's obligations, responsibilities, representations, covenants and warranties under this agreement, and an original copy of such assumption must be delivered to Licensor. In the case of any assignment, Licensee shall be relieved of its obligations hereunder to extent of any such assignment.

-37-

EXHIBIT A  56

(e) In the event of an assignment by Licensor, the purported assignee must assume, in writing, for the express benefit of Licensee, all of Licensor's obligations, responsibilities, representations, covenants and warranties under this Agreement, and an original copy of such assumption must be delivered to Licensee. In the case of any assignment, Licensor shall be relieved of its obligations hereunder to the extent of any such assignment.

14.   No Obligation to Produce/Rating.

(a) Nothing contained herein shall be construed to obligate Licensee to produce, distribute, release, perform or exhibit any motion picture, television program, or other production based upon, adapted from or suggested by the Property, in whole or in part, or otherwise to exercise, exploit or make use of any of the rights, licensees, privileges, or property herein granted to Licensee. Notwithstanding anything contained herein to the contrary, and without in any way limiting or derogating from any of the rights in the Property granted to Licensee, if the Picture is produced but is not released theatrically in the United States of America within two (2) years after the earlier of the date of completion of the Final Cut of the Picture or the date which is seven (7) months after the date upon which principal photography of the Picture is completed, then Licensor shall have the right to produce, exhibit, release, promote and exploit live-action motion pictures and/or television productions based upon the Property; it being understood and agreed, however, that in the event the Picture is produced as aforesaid, Licensee shall retain in perpetuity the license to distribute and exhibit the Picture in any and all manner, media and methods now known or hereafter devised, provided that Licensee shall not release and exhibit the Picture after Licensor and/or its licensees publicly announce a release date for another motion picture and/or television production based upon the Property during the period ending one (1) year after any such other motion picture and/or television production is released. In addition, Licensee acknowledges that in the event the Picture is produced but is not released theatrically in the United States of America on a timely basis as specified in the preceding sentence, Licensee shall have no right to share in any revenues derived from the licensing and exploitation of any merchandise products and commercial tie-up rights in connection with the Property, the Picture and/or such other motion picture and/or television produced based upon the Property.

(b) In the event that the Picture is produced and distributed hereunder, Licensee agrees and warrants that the Picture shall qualify to receive a rating of "R" or less (e.g. "R" or "PG-13" or "PG") from the Code and Rating Administration of the Motion Picture Association of America, Inc.

-38-

15.   <u>Reversion and Payment to Licensee</u>.

In the event that a motion picture or television production (i.e., principal photography) based on the Property has not commenced production within three (3) years from the date after the Option is exercised by Licensee, (subject to extensions pursuant to Paragraph 11), then Licensor shall have the right to elect to terminate this Agreement by written notice to Licensee not less than thirty (30) days after such three (3) year period and such notice shall become effective as of the 60th day after Licensee's receipt of same, unless Licensee, its successors or assigns commence production (i.e., principal photography) within sixty (60) days after receipt by Licensee of said notice. In the event Licensee becomes insolvent, closes its business or dissolves and fails within ninety (90) days after written demand by Licensor to actively pursue development of a motion picture or television production based on the Property or to assign its rights to a permitted assignee that will actively pursue development of the Picture, then Licensor shall have the right to terminate this this Agreement by written notice to Licensee not less than thirty (30) days after such ninety (90) day period. Further, in the event the rights in the Property have not reverted pursuant to the two preceding sentences, and in the event that Licensee fails to pay the $350,000 Limited Recourse Note dated as of September 18, 1992 executed by Sweet Pea Entertainment Corporation in favor of Licensor, within thirty (30) days after the later of commencement of production (i.e. principal photography) on a motion picture or television production based on the Property and written demand for payment of the Note by Licensor, then Licensor shall have the right to terminate this Agreement by written notice to Licensee not less than thirty (30) days after such written demand. In the event of any such termination, the rights in the Property and the Picture and all materials relative thereto, including, without limitation, all treatments and scripts based on the Property, shall revert to Licensor; provided, however, that in the event that within ten (10) years from the effective date of the reversion of rights and termination, a television and/or theatrical motion picture is produced in any manner or by any method whatsoever, based in whole or in part on the Property and specifically using a substantial part of the materials and any Picture Creation elements thereof which reverted to Licensor hereunder (such as but not limited to the treatment, script, characters, plots, storyline, illustrations, graphics or other elements thereof) for any medium whatsoever including, without limitation, television, motion pictures, live stage, video, recordings, and/or merchandising, and subject to the limitations on amounts set forth below, Licensor or its successors and assigns, if any, shall account to and pay Licensee a sum equal to five percent (5%) of all monies earned, received and/or derived by Licensor, its affiliated licensees, successors or assigns from any such project, from any and all sources and all derivative and ancillary rights therein (including, without limitation, five

-39-

EXHIBIT A  58

(5%) percent of all advances, option payments, compensation, rights payments, license fees, rentals, purchase prices, royalties, participations, commercial tie-ins and otherwise). In any event, Licensor shall remain primarily liable to Licensee hereunder for all such accountings and sums. Said payments shall continue to Licensee, its successors and assigns until Licensee (its licensees, successors or assigns, as applicable) shall have received a sum equal to the aggregate of the following:

    (i)  The cash payments made or payable by Licensee and any deferred payments which Licensee remains obligated to pay and of which Licensee has notified Licensor in writing in connection with the development of the Property to the writers of the treatment, script and all redrafts and polishes; and

    (ii)  All option payments and License Fee payments to Licensor under this Agreement;

Licensor shall provide in writing for all such payments to Licensee, its successors and assigns, in Licensor's agreements with its successors and assigns.

Licensor, its successors, licensees and assigns shall keep complete and accurate books and records regarding the production, distribution, marketing, exhibition and exploitation and all monies and other consideration earned or received therefrom. Statements and payments to Licensee shall commence with the exhibition, distribution, merchandising or exploitation of any such production whichever shall first occur, and shall be rendered and paid no less than quarterly on March 31, June 30, September 30 and December 31 of each calendar year for so long as any such project or production is exhibited, distributed or otherwise exploited in any manner. Licensee and/or its representatives shall have the right, upon reasonable notice, to inspect and make extracts from the books and records of Licensor, its successors, licensees and assigns regarding any such projects and productions. Licensor shall so provide in its agreements with all such parties.

    16.  Intentionally deleted.

    17.  Notices.

    All notices which either party may be required or may desire to give to the other party hereunder shall be prepaid and may be delivered personally or sent by registered or certified mail or telegraph or telegram to the applicable address indicated on Page 1 hereof or such other address as either party may from of such other address as either party may from time to time designate in writing to the other party. Statements to Licensor may be sent by regular mail. Notices to Licensee should be sent to Sweetpea Entertainment Corporation, 2001 Hillcrest Road, Los Angeles, CA 90068, Attn: Courtney Solomon/John Benitz. Licensor

-40-

230/LICENSE-02

shall send a courtesy copy of each notice to Licensee hereunder
to Peter J. Dekom, Esq., Bloom, Dekom and Hergott, 150 South
Rodeo Drive, Third Floor, Beverly Hills, CA 90212. Licensee
shall send courtesy copy of notices to Licensor hereunder to
Lorraine Williams and Arthur M. Martin, Jenner & Block, One IBM
Plaza, Chicago, Illinois 60611. Failure to send a courtesy copy
shall not be deemed a breach hereof. The date of such personal
delivery, mailing or delivery to a telegraph office or the date
dispatched by telecopier, as the case may be, of any notice or
payment hereunder, shall be deemed the date of service of such
notice or making of such payment.

18.  Confidentiality/Publicity.

Both Licensor and Licensee and their respective
officers, directors and employees, shall use their best efforts
to keep the terms of the Option Agreement and this Agreement
confidential and shall not, without the prior written consent of
the other, reveal any of its material terms to any other person
or entity, except as required by law and judicial order and
except as required for financing, production and/or distribution
of the Picture and other versions of the Property authorized
hereunder, and except to the lawyers, accountants, officers and
directors of Licensor and Licensee. Notwithstanding the
foregoing, the inadvertent failure by Licensor or Licensee to
comply with the provisions of this paragraph shall not be deemed
a breach hereof.

Licensor will not, directly or indirectly, issue,
authorize or permit the issuance of any publicity, oral and/or
written and/or visual, or grant any interviews or make any
statements relating to Licensee, the Picture or any allied or
incidental rights of Licensee therein, unless same are first
approved in writing by Licensee, provided that the foregoing
shall not be deemed to apply to incidental non-derogatory
references to the Picture in personal publicity issued solely for
Licensor's corporation.

19.  Breach of Agreement.

(a)  Except as provided in Paragraphs 5, 15 and 19(c) of
this Agreement with respect to the effectiveness or termination
of this Agreement, in the event of any breach of this Agreement
by Licensee, Licensor shall be limited to Licensor's remedy at
law for damages, if any, and shall not have the right to
terminate or rescind this Agreement or any of the rights licensed
or granted hereunder, or to enjoin or restrain the production,
distribution, advertising, promotion, merchandising or other
exploitation of any television or motion picture production
hereunder or any video production thereof, or any live stage
production permitted by the terms hereof, or any allied or
subsidiary rights in any of the foregoing granted to Licensee
hereunder.

-41-

(b)   No act or omission by either party hereunder shall constitute an event of default or breach of this Agreement, unless the other party shall have first notified such party in writing, setting forth in reasonable detail the basis for such alleged breach or default and such allegedly breaching party shall not have commenced reasonable efforts to cure said alleged breach within ten (10) business days after receipt of such notice.   Notwithstanding the foregoing, if Licensee fails, without cause, to comply with its payment obligations hereunder, such failure shall not constitute a breach or event of default unless Licensor shall have first notified Licensee in writing, of such failure, and Licensee shall not cured such failure within ten (10) business days after receipt of such notice.

(c)   Notwithstanding anything to the contrary in subparagraphs (19)(a) or (b) above, in the event a "Termination Default" (as defined below) occurs prior to the occurrence of any one of the events described in clauses (i)-(iv) below, then Licensor shall have the right to terminate this agreement.   If any one of the following events occurs prior to the occurrence of a Termination Default, then Licensor's remedies shall be limited to a claim for damages as set forth in subparagraphs 19(a) and (b) above: (i) a studio has commenced active development of the the Picture; (ii) Licensee has firm bona fide written commitments for the financing of not less than forty percent (40%) of the final approved budget for the Picture; (iii) active preproduction of the Picture has commenced (active preproduction shall be deemed to have commenced twelve weeks prior to the scheduled start date for principal photography of the Picture); or (iv) Licensee has entered into or has caused a studio, distributor or other financier to enter into a pay-or-play contract with a director or principal cast member.   As used herein, a "Termination Default" shall be defined as the occurrence of any of the following: (x) Licensee's failure, without cause, to comply with its payment obligations as set forth in Paragraph 5(a); (y) Licensee's failure to comply with the copyright and trademark notice requirements set forth in Paragraph 9; or (z) an unauthorized exploitation by Licensee of any of the rights expressly reserved to Licensor hereunder.   Notwithstanding anything to the contrary in the preceding sentence, the occurrence of any of the events described in clauses (x), (y) and (z) above shall not be deemed to be a Termination Default if Licensee effects a cure within the following time periods: with respect to clause (x), ten (10) business days; with respect to clause (y), thirty (30) business days; and with respect to clause (z), twenty (20) business days.   Licensee shall be deemed to have effected a cure if Licensee has either remedied the applicable violation or breach or, if such violation or breach is not reasonably capable of being cured within the appropriate cure period, has demonstrated to Licensor's reasonable satisfaction that Licensee has taken steps to diligently act in good faith to cure same within a reasonable period of time thereafter.

-42-

230/LICENSE-02