1
2
3
4
5
6
7
8        **UNITED STATES DISTRICT COURT**
9        **CENTRAL DISTRICT OF CALIFORNIA**
10
11   HASBRO, INC., et al.,                    )   Case No. CV 13-3406 DMG (JCGx)
                                              )
12                        Plaintiffs,         )   **ORDER RE PARTIES' MOTIONS**
                                              )   **FOR PARTIAL SUMMARY**
13            v.                              )   **JUDGMENT**
                                              )
14   SWEETPEA ENTERTAINMENT, INC.,            )   **UNDER SEAL**
                                              )
15   et al.,                                  )
                                              )
16                        Defendants.         )
17

18        This matter is before the Court on Plaintiffs Hasbro, Inc. and Wizards of the Coast,
19   LLC's ("Hasbro") motion for partial summary judgment as to Defendants Sweetpea
20   Entertainment, Inc. and Sweetpea, B.V.I., Ltd.'s ("Sweetpea") counterclaims [Doc. # 77],
21   and Sweetpea's motion for partial summary judgment as to Hasbro's claims.  [Doc. # 80.]
22   A hearing on the motions was held on January 24, 2014.  Having duly considered the
23   parties' written submissions and oral argument, the Court now renders its decision.

                                        **I.**
24
25                            **FACTUAL BACKGROUND**
26        This matter concerns a dispute between Hasbro and Sweetpea regarding each
27   party's respective rights to the copyrights and trademarks associated with *Dungeons &*
28   *Dragons* and *Advanced Dungeons & Dragons*.

The following facts are drawn from Sweetpea's Consolidated Separate Statement of Uncontroverted Facts in Support of Partial Motion for Summary Judgment ("CSS") [Doc. # 107-2], Sweetpea's Response to Hasbro's Separate Statement of Uncontroverted Material Facts ("SSUF") [Doc. # 107-2], Sweetpea's Statement of Genuine Disputes of Material Facts in Opposition to Plaintiff's Motion for Partial Summary Judgment ("SGD") [Doc. # 100], and Hasbro's Response to Sweetpea's Additional Facts re Motion for Partial Summary Judgment ("AF") [Doc. # 105].   The facts are undisputed unless otherwise indicated.

Hasbro is the registered owner of all copyrights and trademarks in and to the *Dungeons & Dragons* property ("the Property").  (SSUF ¶ 1 [Doc. # 107-2].)[1]  The Property is comprised of hundreds of books, magazines, guides, maps and other materials.  (*Id.* ¶ 2.)   Hasbro also owns the intellectual property associated with *Advanced Dungeons & Dragons*, which includes "worlds and trademarks other than those elements which are also contained in or associated with the Property."  (*Id.* ¶ 9.)

On September 1, 1994, Hasbro's predecessor-in-interest, TSR, and Sweetpea's predecessor-in-interest, Sweetpea Entertainment Corp., entered into an "exclusive irrevocable license agreement" under which Hasbro[2] licensed certain rights to the Property to Sweetpea.  (*Id.* ¶¶ 1, 3, 7-9; Rosenbaum Decl. Exh. A [Doc. # 77-6].)  On March 19, 1998, the parties amended their agreement ("the first amendment").  (SSUF ¶ 10; Rosenbaum Decl. Exh. F [Doc. # 77-6].)   The first amendment provided that Sweetpea's "sequel rights" would revert to Hasbro under certain circumstances.  (SSUF ¶ 11.)   On June 8, 1998, the parties again amended their agreement ("the second amendment").  (SSUF ¶ 10; Rosenbaum Decl, Exh. G [Doc. # 77-6].)   Pursuant to the parties' agreement and its amendments (collectively "the Agreement"), Sweetpea

---

[1]Sweetpea objects to many of Hasbro's uncontroverted facts as "irrelevant."  The Court has reviewed all such blanket objections and finds them without merit.

[2]To avoid confusion, the Court discusses the rights agreement in terms of Hasbro and Sweetpea's rights, rather than the rights of their respective predecessors-in-interest.

released a film entitled *Dungeons & Dragons* in theaters, a television motion picture entitled *Wrath of the Dragon God* on the Sci-Fi Channel, and a motion picture entitled *Book of Vile Darkness* on the Sci-Fi Channel.  (SSUF ¶¶ 14-17.)

**A.    The Sweetpea-WB Film Project**

In October 2012, Warner Brothers Pictures ("WB") approached Hasbro in an effort to obtain the rights to produce a *Dungeons & Dragons* film based on an existing script entitled "*Chainmail*."  (*Id.* ¶ 20; SGD ¶ 8 [Doc. # 94-1].)  *Chainmail* contains various elements that are protected by Hasbro's copyrights and trademarks in the Property.  (SSUF ¶ 21.)   WB and Hasbro failed to reach an agreement and, thereafter, WB approached Sweetpea to inquire about its rights in the Property.  (*Id.* ¶ 22; SGD ¶ 10; AF ¶ 42 [Doc. # 105].)  WB's Senior Vice President of Business Affairs, Jun Oh, testified that Sweetpea's principal, Courtney Solomon, said that "he was in fact the person who controlled the rights, the motion picture rights. . . ."  (Wogan Decl., Ex. B (Oh Depo.) [Doc. # 89].)

On December 7, 2012, WB sent Solomon a copy of *Chainmail* to review.  (SSUF ¶ 24.)   After reviewing the script, Solomon told WB in an email that *Chainmail* was "a direct lift and use of the Dungeons and Dragons property" and "WB could never make this film without the [*Dungeons & Dragons*] rights no matter what they named it."  (*Id.* ¶ 26.)  During the next several months, Sweetpea and WB negotiated all the material terms of an option purchase agreement under which Sweetpea would license *Dungeons & Dragons* rights to WB.  (*Id.* ¶ 29.)  From the outset, "it was clear that" *Chainmail* was "attached" to the WB Film Project, and the Film Project would use the *Dungeons & Dragons* trademark as the motion picture title.[3]  (*Id.* ¶¶ 30-31.)   In January 2013,

_____

[3]Sweetpea stated that these facts were "undisputed" in response to Hasbro's separate statement of uncontroverted facts.  (*Id.* ¶¶ 30-31.)  Nonetheless, Sweetpea also stated that it was undisputed that it "plans to license Dungeons & Dragons copyright and trademarks *in the future*," but it has not yet "authorized" WB to proceed with *Chainmail* and has not yet licensed any *Dungeons & Dragons* copyrights or trademarks to WB.  (CSS ¶ 7 (emphasis added) [Doc. # 107-2]; *see also* AF ¶ 44.)  Hasbro, however, disputes that whether Sweetpea has *already* authorized WB to proceed with

-3-

Sweetpea gave WB the "greenlight" to proceed with development of *Chainmail*.  (*Id.* ¶ 32.)  By April 15, 2013, WB had "put together some interesting visuals, combination of mood boards and practical location suggestions and design suggestions."  (*Id.* ¶ 34; Wogan Decl., Ex. U.)

On and after April 16, 2013, WB Vice-President Oh sent emails indicating that WB and Sweetpea had "closed" their *Dungeons & Dragons* rights deal.  (Wogan Decl., Ex. V; *id.*, Ex. X.)  On May 1, 2013, Sweetpea emailed WB "the Option Purchase Agreement" between the parties "in connection with the motion picture entitled 'Dungeons and Dragons (2013)' (the 'Picture')."  (CSS ¶ 6; SSUF ¶ 36.)  There is no evidence in the record that this agreement was ever signed by the parties.  (*See* CSS ¶ 6.)  In response to a letter from Hasbro's counsel on April 30, 2013 demanding that Sweetpea stop further development of the WB Film Project, Sweetpea's counsel refused and stated that Sweetpea would "use all available legal avenues to hold [Hasbro] responsible for any damage it may cause to the contractual relationship with Warner Brothers."  (SSUF ¶¶ 37-38.)

In July 2013, Solomon gave at least two interviews relating to the WB Film Project at "Comic-Con 2013," an annual comic book convention in San Diego.  (*Id.* ¶¶ 42-43.)  On July 20, 2013, Solomon stated in an interview with *Crave Online* that he was the producer of the "new D&D reboot," and in answer to a question about whether he had "any stake" in the film, he responded:

> As far as working with Warner Brothers is concerned, as far as this is going to be a $100+ million version of *Dungeons & Dragons* it was supposed to be

---

*Chainmail*.  It has presented evidence that WB's Vice-President Oh considered the parties' licensing deal with Sweetpea to be "closed."  (*See* SSUF ¶ 35.)  Hasbro has also identified evidence that WB and Sweetpea understood that the deal they negotiated concerned a film based on *Chainmail*.  (SSUF ¶ 30.)  Accordingly, Hasbro has raised a triable issue as to whether Sweetpea and WB reached a final, binding agreement under which Sweetpea licensed WB the copyright and trademark rights to produce *Chainmail* into a film.  In the discussion section, *infra*, the Court considers whether the material facts identified by Hasbro are sufficient to defeat Sweetpea's motion for partial summary judgment on Hasbro's copyright and trademark claims.

in the first place, all of that was great . . . .  [Warner Brothers] ha[s] a really interesting, good script for [the D&D reboot] that they've been putting together for quite a long period of time[.]

(*Id.* ¶ 42 (alterations in original); Wogan Supp. Decl. ¶ 3 [Doc. # 42].)  There is no evidence in the record of any script in development to which Solomon could have been referring other than then the *Chainmail* script.  In a video interview released on July 24, 2013, Solomon responded to a question regarding whether he had "other projects . . . in the pipeline" with the following:

I have a producing movie, which is a reboot of Dungeons & Dragons which we're doing with Warner Brothers . . . .

[T]his one is going to be the proper version of it, it should be very, very cool and we're just finding a director for that movie right now, so that's exciting[.]

(SSUF ¶ 43; Wogan Second Supp. Decl. ¶ 6 [Doc. # 57].)

## B.   **The Hasbro-Universal Film Project**

On November 15, 2012, Hasbro reached an agreement in principle with Universal Studios, Inc. ("Universal"), a division of NBC Universal, Inc., that would grant Universal certain rights in the *Dungeons & Dragons* Property.[4]  (SGD ¶ 12.)  The latest draft agreement that Hasbro and Universal exchanged on May 16, 2013 expressly provides that Hasbro purports to license secondary title rights only.  (*Id.* ¶ 20.)  The parties dispute whether any script, story treatment, or other written material was ever created for the Universal Film Project.  (*Id.* ¶ 13.)  Sweetpea notes that witnesses for Hasbro testified and/or declared that they did not remember, know of, or see any written documents in connection with the film project, but they did not explicitly state that no written

---

[4]Sweetpea disputes the extent of Hasbro's rights under the parties' licensing agreement, but it has identified no dispute of material fact with respect to whether Hasbro and Universal reached an agreement in principle on November 15, 2012.  (*See* SGD ¶ 12.)

documents exist.  (*Id.*)  Sweetpea also identifies emails that discuss a plan for a "story summit" and that discuss plans to start writing a script in January 2013.  (*Id.*; AF ¶ 20-22.)  Neither party has introduced into evidence, however, any tangible work made in connection with the Universal Film Project.

## II.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.   Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324 (quoting Fed. R. Civ. P. 56(c), (e) (1986)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

## III.

## DISCUSSION

**A.    Hasbro's Copyright Claim**

"A plaintiff bringing a claim for copyright infringement must demonstrate (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that

are original." *Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (internal quotation omitted).  The Ninth Circuit "recognize[s] three doctrines of copyright liability:   direct copyright infringement, contributory copyright infringement, and vicarious copyright infringement."  *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).  "To prove a claim of direct copyright infringement, a plaintiff must show that he owns the copyright and that the defendant himself violated one or more of the plaintiff's exclusive rights under the Copyright Act."  *Id.*  To prove a claim of contributory copyright infringement, a plaintiff must prove that the defendant "with knowledge of the infringing activity, induce[d], cause[d] or materially contribute[d] to the infringing conduct of *another*."   *Id.* (internal quotation omitted) (emphasis in original).  The Ninth Circuit has held that the knowledge requirement is satisfied where a defendant had reason to know of the direct infringement.  *Id.*  Finally, to prove a claim of vicarious copyright infringement, a plaintiff must show that the defendant "enjoy[ed] a direct financial benefit from *another's* infringing activity and ha[d] the right and ability to supervise the infringing activity."   *Id.* (internal quotations omitted) (emphasis in original).

## 1.     Direct Infringement

Sweetpea contends that Hasbro cannot prove that Sweetpea was *directly* involved in the creation of a work or product that infringed Hasbro's copyright (Mot. at 5-7 [Doc. # 80]), and Hasbro appears to concede this point.  (Opp'n at 11-13 [Doc. # 87].)  Thus, Sweetpea's motion is **GRANTED** as to Hasbro's direct copyright infringement claim.

## 2.     Contributory Infringement

### a.     Hasbro Alleged a Contributory Infringement Theory in its Complaint

Sweetpea contends that summary judgment on Hasbro's direct infringement claim ends the inquiry because "Hasbro has not asserted a contributory infringement claim and cannot avoid summary judgment by belatedly asserting one at this late stage in litigation . . . ."  (Reply at 3 [Doc. # 107].)  Sweetpea mischaracterizes Hasbro's complaint.  In

Hasbro's first claim for "Copyright Infringement," Hasbro alleges a theory of infringement predicated on Sweetpea's authorization of a third party's infringement:

> [B]y licensing Sequel Rights to WB, Sweetpea has infringed Hasbro's exclusive right to authorize third-parties to reproduce, prepare derivatives based upon, distribute and/or publicly perform the Property.

(Compl. ¶ 64.)

Sweetpea's citation to *Coleman v. Quaker Oats Co.* is inapposite. (Reply at 3, quoting *Ortiz v. Lopez*, 688 F. Supp. 2d 1072, 1082 (E.D. Cal. 2010), citing 232 F.3d 1271, 1292-93 (9th Cir. 2000).). In *Coleman*, the Ninth Circuit considered whether plaintiffs challenging an adverse employment action under the Age Discrimination in Employment Act ("ADEA") could raise, for the first time in the context of motions related to summary judgment, their intent to proceed under a disparate impact theory. *Id.* at 1291. An employee challenging an adverse employment action under the ADEA may proceed under a disparate treatment theory or a disparate impact theory of liability, each of which requires the plaintiff to adduce different evidence. *Id.* at 1292. The Ninth Circuit held that plaintiffs could not proceed on a different theory at the summary judgment stage because to do so would prejudice the defendants. *Id.* at 1292-93.

Here, in contrast, despite the fact that Hasbro did not specifically label its claim a "contributory infringement" claim, Hasbro put Sweetpea on notice of its intent to rely on a theory that Sweetpea authorized a third-party to infringe Hasbro's copyright in its complaint. Sweetpea has identified no case interpreting *Coleman* to stand for the proposition that a plaintiff may not proceed on a theory unless it specifically labels the theory in the complaint. Indeed, such a reading would be contrary to the liberal notice pleading standard. *See Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) ("Notice pleading requires the plaintiff to set forth in his complaint *claims for relief*, not causes of action, statutes or legal theories." (emphasis in original) (citing Fed. R. Civ. P. 8(a)(2)). Thus, Sweetpea's argument is unavailing.

**b.** **Sweetpea is Not Entitled to Summary Judgment on Hasbro's Contributory Copyright Claim**

Under Ninth Circuit precedent, "a defendant is a contributory infringer if it (1) has knowledge of a third party's infringing activity, and (2) 'induces, causes, or materially contributes to the infringing conduct.'" *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794-95 (9th Cir. 2007), quoting *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). "Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party." *Id.*, quoting *A&M Records, Inc. v. Napster*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001).

Here, it is undisputed that WB produced the *Chainmail* script based on copyrighted *Dungeons & Dragons* material. It is also undisputed that Sweetpea and WB engaged in substantial negotiations with the intent to reach an agreement under which Sweetpea would license *Dungeons & Dragons* copyrights to WB so that the two parties could produce a movie.

The parties dispute whether Sweetpea had the right to license any of the *Dungeons & Dragons* copyrighted material. Hasbro contends that Sweetpea's rights reverted under the parties' Agreement, and thus Sweetpea did not have the right to license any of the *Dungeons & Dragons* rights. (Hasbro's Supp. Brief at 1, 9-10 [Doc. # 120].) Sweetpea contends that it has the right to license some *Dungeons & Dragons* copyrighted material and some of the *Advanced Dungeons & Dragons* copyrighted material. (Sweetpea Supp. Brief at 5-9 [Doc. # 116].) As the parties have not asked the Court to resolve their contractual dispute in their motions for summary judgment, and indeed they suggested at the hearing on these motions that their contractual dispute is dependent in part on findings of fact, the Court must draw all inferences in favor of the non-moving party for the purposes of Sweetpea's motion. Accordingly, the Court assumes, without deciding, that Sweetpea did not have any rights to license the *Dungeons & Dragons* or *Advanced Dungeons & Dragons* copyrighted material.

1    Hasbro argues that it has raised triable issues of fact as to whether (1) Sweetpea
2    "authorized WB to use the infringing work—the *Chainmail* script—as the basis for the
3    WB Film Project," in part by representing to WB that Sweetpea could license the rights
4    to develop *Chainmail* into a movie; and (2) the authorization was "finalized when the
5    deal 'closed' on April 16, 2013."  (Opp'n at 12-13.)

6    Sweetpea responds that, as a matter of law, its conduct was insufficient to subject it
7    to liability for contributory copyright infringement because (1) the *Chainmail* script was
8    produced before WB entered negotiations with Sweetpea; and (2) there is no evidence
9    that any infringing work was produced after Sweetpea began negotiations with WB.
10   Thus, Sweetpea argues that it did not "materially contribute" to any infringing conduct by
11   WB.  (Reply at 4-5.)  It also contends that it had an agreement in principle with WB, but
12   it never "authorized" the development of *Chainmail* into a film.  (Reply at 4-5.)

13   There is no question that if Sweetpea entered into an agreement with WB in which
14   it licensed the rights to *Dungeon & Dragons*, and WB subsequently produced a film
15   based on *Chainmail*, Sweetpea would be liable for contributory copyright infringement.
16   Here, however, there is no evidence in the record that the agreement between Sweetpea
17   and WB was ever signed, or that a film based on *Chainmail* was ever produced.  Indeed,
18   it appears that Sweetpea and WB halted production of the film due to the filing of this
19   lawsuit.  As a result, the Court must consider (1) whether there is sufficient evidence of
20   direct infringement by WB to support a claim of contributory infringement against
21   Sweetpea and, if so, (2) whether there is sufficient evidence that Sweetpea induced,
22   caused, or materially contributed to WB's infringing conduct to raise a material issue of
23   fact.  The Court addresses each question in turn.

### i.    Evidence of Direct Infringement

25   With respect to the first question, the law is clear that "intermediate copying"—
26   such as the creation of a script—is copying in violation of the Copyright Act.  *Sega*
27   *Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518 (9th Cir. 1992).  As the *Sega*
28   court noted, "[i]n order to constitute a 'copy' for purposes of the Act, the allegedly

infringing work must be fixed in some tangible form, 'from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.'" *Id.* (quoting 17 U.S.C. § 101).  Thus, the *Chainmail* script violates the Act, even in the absence of a final script or film.  *See Walt Disney Prods. v. Filmation Assocs.*, 628 F. Supp. 871, 876 (C.D. Cal. 1986) (script, story board, story reel, and promotional trailer constituted actionable copies).

The more difficult question is whether Sweetpea can be held liable for WB's infringing conduct where it is undisputed that the *Chainmail* script was written before Sweetpea became involved in the film project.  Sweetpea contends that it cannot be held liable, but it offers no legal support for this argument.  (Reply at 4-5.)  Hasbro appears to argue that Sweetpea can be held liable for authorization even where the infringing conduct occurred before Sweetpea's authorization.  (Opp'n at 11-14.)  The cases Hasbro cites, however, do not support its proposition that the relative timing of infringement is irrelevant.

The Court need not resolve this issue, however, as Hasbro has identified evidence sufficient to raise a triable issue of fact as to whether Sweetpea encouraged the development of an infringing work *after* it became involved in the WB Film Project. Specifically, it is undisputed that in January 2013, Sweetpea gave WB the "greenlight" to proceed with development of *Chainmail*.  (SSUF ¶ 32.)  It is also undisputed that by April 15, 2013 WB had "put together some interesting visuals, combination of mood boards and practical location suggestions and design suggestions."  (*Id.* ¶ 34; Wogan Decl., Ex. U)  Finally, it is undisputed that the script WB was developing infringed the *Dungeons & Dragons* copyright.   (SSUF ¶ 26.)   Accordingly, WB engaged in "intermediate copying" that constitutes copyright infringement under federal copyright law and is sufficient to support a claim of contributory infringement.

Sweetpea's contention that *it* did not produce the visuals and mood boards (Reply at 5-7), is irrelevant, as the question in a contributory copyright claim is whether the defendant "induce[d], cause[d], or materially contribute[d] to the infringing conduct" of

another, *Perfect 10*, 494 F.3d at 794-95, not whether the defendant directly engaged in infringing conduct.

### ii.   Evidence of Contributory Infringement

As discussed, *supra*, Hasbro contends that Sweetpea is liable for contributory infringement because it "authorized" WB to develop *Chainmail* into a film.   Sweetpea apparently argues that it negotiated with WB with respect to producing a *Dungeons & Dragons* film, but not necessarily a film based on *Chainmail*.   (*See* Reply at 4-5.) Specifically, Sweetpea argues that it cannot be held liable for contributory copyright infringement because (1) the unsigned agreement between Sweetpea and WB did not refer to the *Chainmail* script, and (2) Solomon specifically told WB that "a movie based on *Chainmail* could not be made without authorization by Sweetpea or Hasbro."  (*Id.*)

Regarding its first point, Sweetpea is incorrect.   While the unsigned agreement between Sweetpea and WB does not specifically mention *Chainmail*, Hasbro has identified evidence that raises a triable issue as to whether the parties were negotiating the development of *Chainmail*—not a different script—into a film.  First, Solomon and WB representatives exchanged multiple emails in which they discussed the *Chainmail* script and whether Sweetpea owned the rights necessary to produce the script.  (Wogan Decl. of 1/6/14, Exh. A (Solomon Depo. 121:5-6); *id.*, Exh. B (Oh Depo., 156:6-10); *id.*, Exh. G (Solomon email of 12/7/12, 10:02 A.M.); *id.*, Exh. H (Solomon email of 12/7/12, 8:47 A.M.); *id.*, Exh. I (Solomon email of 12/7/12, 11:59 A.M.).)  Indeed, Sweetpea has not identified any evidence that the parties ever discussed any *Dungeons & Dragons* script other than *Chainmail.*  Second, in an interview with *Crave Online* on July 20, 2013, Solomon told his interviewer that that "[he was] the producer" of the "new D&D reboot" and "[Warner Brothers] *have a really interesting, good script for [the D&D reboot] that they've been putting together for quite a long period of time*."  (Wogan Decl. of 7/25/13 ¶ 3 & Exh. A (emphasis added) [Doc. # 42].)  This is more than sufficient to raise an inference that the licensing agreement between the parties was intended to authorize WB to produce *Chainmail* into a film.

-12-

As to Sweetpea's second point, the fact that Solomon told WB representatives that he could edit the *Chainmail* script to avoid infringing Hasbro's copyright is irrelevant in the context of this motion, in which the Court must assume that Hasbro's rights reverted and thus *any* authorization by Sweetpea of *Dungeons & Dragons* copies would infringe Hasbro's copyright.

Finally, to the extent that Sweetpea appears to argue that any agreement between it and WB is not sufficiently final to constitute "authorization," it has not identified any legal authority in support of this proposition. Indeed, courts have found sufficient evidence of authorization to defeat summary judgment where the conduct at issue was less formal than an explicit agreement. *See, e.g.*, *Fox v. Riverdeep, Inc.*, No. 07-13622, 2008 WL 5244297, at *6 (E.D. Mich. Dec. 16, 2008) (party's instruction to direct copyright infringer that she "does not need to do anything else" with respect to licensing was sufficient to defeat summary judgment).

Moreover, Hasbro has presented sufficient evidence to raise a triable issue as to whether Sweetpea and WB understood that they had a binding deal in which Sweetpea licensed *Dungeons & Dragons* rights to WB. Under California law, a contract need not be formalized in a signed writing to be valid. *Mitchell v. Exhibition Foods, Inc.*, 184 Cal. App. 3d 1033, 1048, 229 Cal. Rptr. 535 (1986). Rather, oral or written negotiations of the parties "ordinarily result in a binding contract when all of the terms are definitely understood, even though the parties intend that a formal writing embodying these terms shall be executed later." *Pac. Grove-Asilomar Operating Corp. v. Cnty. of Monterey*, 43 Cal. App. 3d 675, 686, 117 Cal. Rptr. 874 (1974), quoting (1 Witkin, Summary of Cal. Law (8th ed.) Contracts § 102, pp. 103-04); *see also Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 313-14 (9th Cir. 1996), citing Restatement (Second) of Contracts § 27 (1981); *Columbia Pictures Corp. v. De Toth*, 87 Cal. App. 2d 620 (1948) ("A manifestation of assent sufficient to conclude a contract is not prevented from doing so because the parties manifest an intention to memorialize their already made agreement in writing."). Whether the parties intended their agreement to be effective immediately or

1  to become binding only when the agreement was executed depends on the circumstances.

2  *See First Nat'l Mortg. Co. v. Fed. Realty Inv. Trust*, 631 F.3d 1058, 1065-66 (9th Cir.

3  2011).  "The mutual intention to which the courts give effect is determined by objective

4  manifestations of the parties' intent, including the words used in the agreement, as well as

5  extrinsic evidence of such objective matters as the surrounding circumstances under

6  which the parties negotiated or entered into the contract; the object, nature and subject

7  matter of the contract; and the subsequent conduct of the parties."  *Morey v. Vannucci*, 64

8  Cal. App. 4th 904, 912, 75 Cal. Rptr. 2d 573 (1998).

9       Here, Hasbro identified multiple WB emails and a note to file suggesting that WB

10  understood its licensing deal with Sweetpea was final and binding.  (*See* Wogan Decl. of

11  1/6/14, Exh. S; *id.*, Exh. V; *id.*, Exh. X.)  Hasbro also identified evidence that suggests

12  that *Sweetpea* considered the deal to be closed, specifically an interview in which

13  Solomon referred to himself as "the producer" of WB's new *Dungeons & Dragons*

14  "reboot," (Wogan Decl. of 7/25/13 ¶ 3 & Exh. A [Doc. # 42]), and Sweetpea's reference

15  to its "contractual relationship" in discussing its agreement with WB.  (SSUF ¶¶ 37-38.)

16  Most importantly, neither WB nor Sweetpea manifested an intent, either in writing or by

17  their actions, that only a signed writing would seal their deal.

18       In sum, Hasbro has identified sufficient evidence to raise a reasonable inference

19  that Sweetpea engaged in contributory infringement, and Sweetpea's motion is **DENIED**

20  as to this claim.

21  **B.**    **Hasbro's Trademark Claims**

22        **1.**    **Legal Standard**

23       Hasbro asserts three claims under federal trademark law against Sweetpea,

24  specifically:  (1) federal trademark infringement in violation of 15 U.S.C. § 1114; (2)

25  false designation of origin and unfair competition in violation of 15 U.S.C. §

26  1125(a)(1)(A), and (3) trademark dilution in violation of 15 U.S.C. § 1125(c).  (Compl.

27  ¶¶ 68-90.)

28

In its motion, Sweetpea argued that it was entitled to summary judgment on Hasbro's trademark claims because Hasbro could not demonstrate that Sweetpea "used" the *Dungeons & Dragons* trademark in commerce.  (Mot. at 7-8.)

For the first time in its reply, Sweetpea argued that "there is no dispute" that it was authorized to use the *Dungeons & Dragons* trademark.  (Reply at 8.)  In supplemental briefing ordered by the Court, however, the parties clarified that they *do* dispute whether Sweetpea is authorized to use the *Dungeons & Dragons* trademark in the primary title of a film and, in particular, Hasbro contends that Sweetpea's title rights with respect to the production of new films reverted.  [Doc. # 120 at 1, 8.]  As discussed, *supra*, the Court draws all reasonable inferences in favor of Hasbro—the non-moving party—in considering Sweetpea's motion for partial summary judgment, and therefore, it assumes that the title rights reverted for the purposes of Sweetpea's motion.

Turning to Sweetpea's argument about use in commerce, in order to prevail on its trademark claims under the Lanham Act, Hasbro must prove that Sweetpea "use[d]" the *Dungeons & Dragons* trademark "in commerce" and that the use was likely to confuse customers regarding the source of the product.  *Karl Storz Endoscopy America, Inc. v. Surgical Tech., Inc.*, 285 F.3d 848, 853-54 (9th Cir. 2002) (citing 15 U.S.C. §§ 1114(1), 1125(a)(1)).   Sweetpea does not adequately address likelihood of confusion in its briefing.  Accordingly, the Court considers only whether Hasbro has raised a triable issue as to Sweetpea's "use in commerce" of the trademark.  *See* 15 U.S.C. §§ 1114(1), 1125(a)(1), and 1125(c)(1).

Sweetpea contends that "Hasbro has identified no facts showing that Sweetpea has actually used the Dungeons & Dragons trademarks in any physical object," and "talking about something [*i.e.*, referring to a *Dungeons & Dragons* film] does not constitute trademark use."  (Reply at 10, 12.)  In support of its argument, Sweetpea cites 15 U.S.C. § 1127, which defines "use in commerce" as follows:

(1) on goods when—

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sole or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

Sweetpea's statement of the law is incorrect. The Ninth Circuit has explained that the definition of "use in commerce" in Section 1127 "applies to the required use a plaintiff must make in order *to have rights in a mark* . . . ." *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1024 n.11 (9th Cir. 2004). Section 1127 is not, however, the legal standard for proving infringement. In *Bosley Medical Institute, Inc. v. Kremer*, the Ninth Circuit held that the "use in commerce" language in the Lanham Act "is simply a jurisdictional predicate to any law passed by Congress under the Commerce Clause," and to determine whether a defendant has engaged in commercial use of a trademark, a court must consider whether the use was "in connection with a sale of goods or services." 403 F.3d 672, 677 (9th Cir. 2005). Such commercial use "does not require any actual *sale* of goods and services," but rather that the defendant "offer[ed] *competing* services to the public." *Id.* at 679 (emphasis in original). The Lanham Act was "expressly enacted to be applied in commercial contexts" and "does not prohibit all unauthorized uses of a trademark." *Id.* The *Bosley* court explained that the commercial use requirement of the Lanham Act serves the Act's purpose "to protect consumers who have formed particular associations with a mark from buying a competing product using the same or substantially similar mark and to allow the mark holder to distinguish his product from that of his rivals." *Id.* at 676.

-16-

The Second Circuit has also explicitly noted in *dictum* that district courts err in applying Section 1127's definition of "use in commerce" to the infringement provisions of the Copyright Act because the language of Section 1127 makes it "plainly apparent from the context that the full definition set forth in § 1127 cannot apply to the infringement actions," specifically 15 U.S.C. §§ 1114 and 1125. *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 132 (2d Cir. 2009) (internal quotation marks omitted). The *Rescuecom* court concluded that:

> Congress did not intend that [the "use in commerce" definition set forth in 15 U.S.C. § 1127] apply to the sections of the Lanham Act which define infringing conduct. The definition was rather intended to apply to the sections which used the phrase in prescribing eligibility for registration and for the Act's protections.

*Id.* at 139; *see also* 4 McCarthy on Trademarks and Unfair Competitions § 23:11.50 (4th ed.) ("'[U]se in commerce' is a statutory vestige of the old common law 'affixation' requirement . . . . [and] was never intended to limit the scope of 'uses' that would constitute infringement.").

## 2.     Hasbro Has Identified Material Facts Demonstrating Use in Commerce

The issue here is whether Hasbro has raised a triable issue of fact as to whether Sweetpea used the *Dungeons & Dragons* trademark in connection with the sale of goods. Hasbro does not allege that Sweetpea sold any goods using the *Dungeons & Dragons* trademark. As noted above, however, actual sale is unnecessary. *Bosley*, 403 F.3d at 679. Nor is there any evidence in the record that Sweetpea actually produced a film in collaboration with WB that used the *Dungeons & Dragons* mark in the title. Rather, Hasbro has identified evidence that (1) Sweetpea licensed[5] WB the right to use the

---

[5]As discussed, *supra*, the parties appear to disagree as to whether Sweetpea and WB entered into a final, binding agreement. Nonetheless, Hasbro has identified sufficient evidence that the agreement was final and binding to raise a genuine issue of material fact as to whether Sweetpea licensed WB the *Dungeons & Dragons* trademarks.

*Dungeons & Dragons* mark in the title of a film (*see* Wogan Decl. of 1/6/14, Exh. B (Oh Depo. at 120:25-121:2; 181:9-17); *id.*, Exh. L (Oh email of 1/10/13, 12:23 P.M.)), and (2) Sweetpea's principal, Solomon, promoted the WB-Sweetpea Film Project in interviews with the trade press using the *Dungeons & Dragons* mark.  (Wogan Decl. of 7/25/13 ¶ 3 & Exh. A [Doc. # 42]; Wogan Second Supp. Decl. of 8/9/13 ¶ 6 (quoting from video interview) [Doc. # 57].)

During oral argument on this motion, Hasbro argued that the Ninth Circuit's decision in *Levi Strauss & Co. v. Shilon* compels a finding that trademark infringement can occur even when the product offered for sale has not yet been produced.  121 F.3d 1309, 1312 (9th Cir. 1997).  In *Levi Strauss*, the district court granted partial summary judgment to the plaintiff, Levi Strauss and Company, on its trademark infringement claims where the defendant, Shilon, offered to sell 10,000 sets of counterfeit Levis Strauss labels and tags and 10,000 pairs of "blank" counterfeit Levi's jeans to a private investigator posing as a clothing distributor.  *Id.* at 1311.  Shilon never provided the investigator with the actual jeans and tags, but he did provide a sample set of tags, labels and jeans.  *Id.*  Shilon argued that he could not be held liable for actual sale because he simply made a "naked offer to provide labels."  *Id.* at 1311-12.  The Ninth Circuit rejected Shilon's argument and affirmed the district court opinion, holding that "[t]he statute does not require that the defendant be in possession of counterfeit goods at the time of the offer or that the defendant make an actual sale," and rather, "[a]n offer to sell without more will suffice to establish liability."[6]  *Id.*  *Levi Strauss* thus stands for the proposition that an offer to sell goods that infringe a trademark is sufficient to support a claim of trademark infringement.

In this case, there is no evidence in the record that Sweetpea explicitly offered to sell goods—*i.e.*, the *Dungeons & Dragons* film—using Hasbro's trademark.  Indeed in

---

[6]Sweetpea's contention that *Levi Strauss* is distinguishable because this case involves "spoken words" rather than tags and labels (Reply at 11), is not supported by the Ninth Circuit's reasoning.

his interviews with the trade press, Solomon made clear the movie did not yet exist, but rather was in development.  Solomon's statements to the trade press support an inference, however, that Sweetpea sought to advertise or promote the WB film project by capitalizing on the good will associated with Hasbro's mark.  Thus, the evidence identified by Hasbro is sufficient to support an inference that Solomon used the mark in connection with the sale of goods, *i.e.*, the future film.  *Bosley*, 403 F.3d at 677.

Hasbro's evidence that Sweetpea licensed the *Dungeons & Dragons* trademark to WB is also sufficient to raise a triable issue on Hasbro's trademark claims or, at least, with respect to Hasbro's trademark dilution claim.[7]  In *Panavision Intern., L.P. v. Toeppen*, the Ninth Circuit held that a defendant trading on the value of the plaintiff's marks by registering trademarks as Internet domain names and selling the domain names to the rightful trademark owners, constituted "commercial use" under the Lanham Act.  141 F.3d 1316, 1325 (9th Cir. 1998), holding modified on other grounds in *Yahoo! Inc. v. La Lique Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006).  The *Toeppen* court held that the defendant's commercial use "was his attempt to sell the trademarks themselves" and "[i]t does not matter that he did not attach the marks to a product."  *Id.*  In another case, the Ninth Circuit explained that "commercial use" under Section 1125(c)(1) "requires the defendant to be using the trademark as a trademark, capitalizing on its trademark status" or "trad[ing] on the value of marks as marks."  *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 880 (9th Cir. 1999).  Here, Sweetpea's licensing agreement with WB capitalized on the trademark *Dungeons & Dragons* as a trademark and, for the purposes of this summary judgment motion, the Court must assume that Sweetpea did not have the right to do so, as discussed, *supra*.

Accordingly, Sweetpea's motion is **DENIED** as to Hasbro's trademark claims.

---

[7]Sweetpea does not distinguish its commercial use arguments with respect to Hasbro's trademark dilution and Hasbro's other trademark claims.

**C.**   **Hasbro Is Entitled to Summary Judgment on Sweetpea's  Counterclaim for
Copyright Infringement**

Here, there is no question that a valid copyright exists as to the *Dungeons and
Dragons* materials.   As discussed, *supra*, the parties dispute the ownership of the
copyright and contend that ownership involves factual questions that must be resolved by
a jury.  Thus, drawing all inferences in favor of Sweetpea—the nonmoving party—in the
context of Hasbro's motion for summary judgment, the Court assumes that Sweetpea
owns the relevant portions of the copyright and proceeds to the second element of the
claim.

Sweetpea appears to allege a direct infringement claim against Hasbro, but it has
not identified any evidence that would support a finding that Hasbro has "copied,
distributed, advertised and/or sold and continues to copy, distribute, advertise and/or sell
an unauthorized work or works that are substantially similar to and copy protected
elements of [Sweetpea's] copyrights . . . ."  (Ans. ¶ 64 [Doc. # 62].)  Rather, both parties
appear to construe Sweetpea's claim as a contributory copyright infringement claim, in
which Sweetpea alleges that Hasbro "induced, caused or materially contributed" to
Universal's infringing activity.  (*See, e.g.*, Mot. at 10 [Doc. # 77]; Opp'n at 8 [Doc. ##
94, 99].)  Because secondary liability for copyright infringement cannot be proven absent
direct infringement by a third party,  *Napster, Inc.*, 239 F.3d at 1013 n.2, Sweetpea must
show that Universal copied "constituent elements of the work that are original."  *Funky
Films, Inc.*, 462 F.3d at 1076.

Copying may be proven by direct or circumstantial evidence.  "Absent evidence of
direct copying, proof of infringement involves fact-based showings that the defendant [1]
had 'access' to the plaintiff's work and [2] that the two works are 'substantially similar.'"
*Id.* (internal quotation omitted).  The substantial similarity test contains two components:
(1) an extrinsic test which "focuses on articulable similarities between the plot, themes,
dialogue, mood, setting, pace, characters, and sequence of events in the two works"; and
(2) an intrinsic test which "examines an ordinary person's subjective impressions of the

similarities between two works." *Id.* (internal quotations omitted).  The intrinsic test is "exclusively the province of the jury," and thus, courts at summary judgment apply only the extrinsic test. *Id.*  "A plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment, because a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests." *Id.* (internal quotations omitted).

Sweetpea has failed to raise a genuine issue of material fact as to whether Universal engaged in direct copying of the copyrighted work.  Sweetpea has not identified any evidence of direct copying of the work by Universal, and "[a]bsent evidence of direct copying, proof of infringement involves fact-based showings that the defendant [1] had 'access' to the plaintiff's work and [2] that the two works are 'substantially similar.'" *Id.*  While there does not appear to be any dispute as to whether Universal had access to the copyrighted work, Sweetpea identifies no evidence of substantial similarity between the copyrighted work and a work produced by Universal because it identifies *no evidence of any copy whatsoever*.  Sweetpea concedes that there is no copy in evidence, but it appears to argue that a copy exists that Hasbro failed to produce in response to discovery requests.  (Opp'n at 8-9.)  Sweetpea contends that a jury could conclude a copy *exists* based on several emails that suggest that Universal's screenwriter may have begun writing a script as early as late 2012 or early 2013.  (*Id.* at 9.)  Whether a jury could conclude that a copy exists, however is not the relevant question.  In order to defeat summary judgment as to its copyright infringement claim, Sweetpea must raise a triable issue of material fact as to whether a copy made by Universal is "*substantially similar*" to the copyrighted work.  As Sweetpea has failed to do so, Hasbro's partial summary judgment motion is **GRANTED** as to Sweetpea's copyright infringement counterclaim.

**D.**   **Hasbro Is Entitled To Summary Judgment on Sweetpea's  Counterclaims for False Designation of Origin and Unfair Competition and Trademark Dilution**

Sweetpea asserts two claims under federal trademark law against Hasbro, specifically:  (1) false designation of origin and unfair competition in violation of 15

U.S.C. § 1125(a)(1)(A), and (2) trademark dilution in violation of 15 U.S.C. § 1125(c). (Ans. ¶¶ 68-83.)   The counterclaims at issue relate to the agreement in principle that Hasbro reached with Universal in which Hasbro granted Universal the option to use the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" ("the trademark") in the "secondary title" in a motion picture. (Mot. at 11.)  The parties do not dispute that Hasbro has the right to use the trademark in a secondary title in a motion picture that it produces *itself*.  (Opp'n at 11-12; Reply at 7, 11-12 [Doc. # 104].)  Rather, the sole issue is whether Hasbro had the right to assign *to a third-party* its rights to use the trademark in a secondary title.  (*Id.*)

The contract and its amendments are not models of clarity.  The 1994 agreement provides, in relevant part:[8]

> 4.   Reserved Rights/Hold Backs/Restrictions. . . .
>
> (b) Advanced Dungeons & Dragons:   Licensor may produce or grant licenses to others to produce a live-action or animated motion picture and/or television production based on Licensor's "ADVANCED DUNGEONS & DRAGONS" game and trademark, but it shall not have the right, and shall not authorize or permit others to exhibit, release, promote or exploit any live action ADVANCED DUNGEONS & DRAGONS motion picture and/or television production or any merchandising or publishing in connection therewith, at anytime earlier than twelve (12) months following the initial general commercial release in the United States of the Picture produced hereunder.   Notwithstanding the foregoing, if the Picture to be produced hereunder is not released theatrically in the United States of America within two (2) years after the earlier of the date of completion of the Final Cut of

---

[8]The agreement contains a choice of law provision that was modified by the second amendment to provide that it is to be construed in accordance with California law.  (Licensing Agreement ("LA") ¶ 20 [Doc. # 77-6]; Second Amendment ("SA") ¶ 6 [Doc. # 77-6].)

the Picture or the date which is seven (7) months after the date upon which principal photography of the Picture is completed, then the holdbacks and restrictions contained in the preceding sentence shall be null and void automatically without notice to Licensee from Licensor being required.

\*       \*       \*

(d)  Licensor's Reserved Rights.  All rights in and to the Property not specifically granted to Licensee herein are reserved to Licensor (subject only to the limited holdbacks expressly described in subparagraphs 4(a), (b) and (c) above) . . . .

\*       \*       \*

13.    Assignment . . . .

(c)   Licensor may assign, sublet, or transfer this Agreement to any person, firm, or corporation, without limitation, provided, however, that the purported assignee is able to assume all of Licensor's rights and obligations hereunder and that the assignment in no way affects any of the rights granted to Licensee hereunder or any of the representations and warranties of Licensor hereunder (e.g. any purported assignee of Licensor must become the holder of the rights granted to Licensee in this Agreement).

(Licensing Agreement ("LA") ¶¶ 4, 13 [Doc. # 77-6, Exh. A].)

The 1998 first amendment to the agreement provides, in relevant part:

14.    The holdbacks provided in Paragraph 4(b) of the Agreement shall be terminated except:

(a)     [Hasbro] shall not use or permit others to use the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" in any live-action motion picture or television program in any manner until January 1, 2000; provided [Hasbro] may use the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" as a source material credit only in such productions, provided such credit (i) will be in a size no greater than

50% of the size of the primary artwork title and (ii) in no case will appear above or before the title.

(b)     After January 1, 2000, [Hasbro] shall not use or permit others to use the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" in the primary title of any live-action motion picture or television program; provided [Hasbro] may use the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" in a secondary title in such productions, in a size no greater than 50% of the size of the primary artwork title and in no case above or before the primary artwork title in such productions.

(c)     Upon execution of the formal amendment, [Hasbro] may use or permit others to use the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" as the primary or secondary title of any animated theatrical motion picture or animated television program[.]

(First Amendment ("FA") ¶ 14 [Doc. # 77-6, Exh. F].)

The disagreement between the parties concerns the first amendment, section 14(b), which provides that "[a]fter January 1, 2000 . . . .  [Hasbro] may use the words 'Dungeons & Dragons' and/or 'Advanced Dungeons & Dragons' in a secondary title in such productions."  (FA ¶ 14(b).)  Sweetpea contends that because the agreement does not specifically state that Hasbro may "use *or permit others to use*" the secondary title rights, it necessarily *prohibits* the assignment of such rights, and thus, *Sweetpea* is entitled to summary judgment on its trademark counterclaims.   (Opp'n at 12-13 (emphasis added).)

Upon careful review of the contract language, the Court disagrees with Sweetpea. First, Sweetpea is incorrect that it is entitled to summary judgment because the contract language is "clear and unambiguous."  (Opp'n at 12.)   The language of the first amendment is *silent* as to whether Hasbro may assign its secondary title rights, and thus is not "clear and unambiguous."  Second, Sweetpea's argument that the parties' omission

of the words "or permit others to use" in section 14(b) "establishes with certainty" (*id.* at 13) that the parties intended to prohibit Hasbro from assigning its rights is also incorrect as a matter of law.  Sweetpea invokes the legal doctrine of *expressio unius est exclusion alterius*,[9] which the California Supreme Court has observed is "an aid to resolve ambiguities of a contract."  *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013) (quoting *Steven v. Fid. & Cas. Co. of New York*, 58 Cal. 2d 862, 27 Cal. Rptr. 172 (1962)).  The *Steven* court held, however, that "if the applicability of a contract can be determined only by use of the maxim of *expressio unius*, the contract is ambiguous, and extrinsic evidence is therefore admissible to prove the intent of the parties."  *Steven*, 58 Cal. 2d at 871.  Accordingly, to the extent that *expressio unius* applies here, the Court must recognize that the contract is ambiguous and admit extrinsic evidence.

Hasbro offers several contractual interpretation arguments in support of its contention that it is entitled to summary judgment on Sweetpea's trademark counterclaims, none of which is persuasive.  First, Hasbro contends that the language "in such productions" in section 14(b) refers back to productions by Hasbro and/or its licensees.  (Reply at 9-10.)  The contract is not reasonably susceptible to Hasbro's interpretation.  The relevant provision provides that "[Hasbro] shall not use or permit others to use the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" in the primary title of *any live-action motion picture or television program*; provided *[Hasbro]* may use the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" in a secondary title *in such productions . . . .*"  (FA ¶ 14(b)) (emphasis added.)  Under the plain language of the contract, "in such productions" refers back to "any live-action motion picture or television program."  The second clause explicitly grants Hasbro secondary title rights with respect to any live-action motion

---

[9]The doctrine provides that "to express or include one thing implies the exclusion of the other, or of the alternative."  *Black's Law Dictionary* 661 (9th ed. 2009).

-25-

picture or television program, but is silent as to Hasbro's right to permit others to use such rights.

Second, Hasbro contends that section 13(c) of the 1994 agreement (1) specifically authorizes it to assign its rights "without limitation," or, in the alternative, (2) "further evidences Hasbro's freedom to assign the Agreement and the rights and obligations thereunder to third parties." (Mot. at 14-15; Reply at 10.)  With respect to Hasbro's first point, section 13(c) expressly provides that Hasbro may assign its rights "without limitation, *provided, however, that the purported assignee is able to assume all of Licensor's rights and obligations hereunder . . .* (e.g. any purported assignee of Licensor must become the holder of the rights granted to Licensee in this Agreement)."  (LA ¶ 13(c) (emphasis added).)   The contract is reasonably susceptible, however, to an interpretation that Hasbro may not assign its rights *under the Agreement* unless it assigns *all* rights pursuant to section 13(c).   Thus, Hasbro's argument that section 13(c) "evidences [its] freedom to assign the Agreement" is unpersuasive.  Similarly, Hasbro's argument that its rights under the Agreement are assignable under general principles of contract law (Mot. at 15) is unavailing, given that the contract explicitly imposes certain limitations on assignment.

Hasbro's most persuasive argument is that it has reserved its secondary title rights, except as specifically limited, because those rights preexist the Agreement.   Hasbro contends that because it is the owner of the *Dungeons & Dragons* trademark, it "does not require contractual permission from its licensee, Sweetpea, to grant licenses to third parties to exercise the trademark rights that Hasbro expressly reserved for itself under the Agreement."  (Reply at 8.)   Thus, the argument is that where Hasbro has not explicitly licensed secondary title rights to Sweetpea, such rights are reserved to Hasbro.

In the 1994 agreement, Hasbro "[r]eserved . . . [a]ll rights in and to the Property not specifically granted to Licensee" by the agreement.  (LA ¶ 4(d).)  In paragraph 4(b) of the agreement, Hasbro reserved the right to "produce *or grant licenses to others to produce* a live-action or animated motion picture and/or television production based on

-26-

[its] 'ADVANCED DUNGEONS & DRAGONS' game and trademark," but this right was subject to a "holdback" provision that limited the right for a specific time-period. (LA ¶ 4(b) (emphasis added).)  The first amendment "terminated" the holdback provision in paragraph 4(b) of the agreement, "except" for certain new holdbacks delineated in the amendment.  (FA ¶ 14.)

Sections 14(a) and 14(b) provide the new holdbacks concerning title rights in live-action motion pictures or television programs.  (*Id.*)  *Before January 1, 2000*, "[Hasbro] shall not use or permit others to use the words 'Dungeons & Dragons' and/or 'Advanced Dungeons & Dragons' in any live-action motion picture or television program in any manner . . . ."  (FA ¶ 14(a) (emphasis added).)  Read in isolation, section 14(a) provides for certain holdbacks on Hasbro's title rights *before* January 1, 2000, but it does not otherwise limit Hasbro's reserved rights.

Section 14(b) provides that *after January 1, 2000*, Hasbro shall not use or permit others to use *primary* title rights in any live-action motion picture or television program.  (FA ¶ 14(b).)  It does not, however, limit Hasbro's reserved rights to use or permit others to use *secondary* title rights in any such production.  (*Id.*)  Indeed, the first amendment specifically provides that Hasbro "may use" secondary title rights subject only to certain size and placement restrictions.  (*Id.*)

Sweetpea has not argued that Hasbro's reservation of rights in the original agreement is in any way modified by the first or second amendments to the agreement. Therefore, under the first amendment, Hasbro's secondary title rights after January 1, 2000 have been reserved, and Hasbro does not require permission from its licensee to assign them.

Accordingly, Hasbro's motion for partial summary judgment with respect to Sweetpea's counterclaims for false designation of origin/unfair competition and trademark dilution is **GRANTED**.

-27-

1

IV.

CONCLUSION

In light of the foregoing:

(1)    Sweetpea's motion for partial summary judgment is **GRANTED** in part and **DENIED** in part as follows:

(a)    Sweetpea's motion is **GRANTED** as to Hasbro's claim for direct copyright infringement;

(b)    Sweetpea's motion is otherwise **DENIED**;

(2)    Hasbro's motion for partial summary judgment is **GRANTED** as to Sweetpea's claims for copyright infringement and trademark infringement; and

(3)    Due to privacy considerations, this Order shall be filed under seal.  Within seven days from the date of this Order, the parties will meet and confer regarding which portions of the Order they propose to be redacted such that a redacted version of the Order may be filed.  The parties shall file a joint report with the Court by no later than March 4, 2014 regarding the proposed redacted version of the Order.

**IT IS SO ORDERED**.

DATED:    February 25, 2014

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE