Patricia L. Glaser, SBN 55668
  pglaser@glaserweil.com
G. Jill Basinger, SBN 195739
  jbasinger@glaserweil.com
David Sergenian, SBN 230174
  dsergenian@glaserweil.com
GLASER WEIL FINK HOWARD AVCHEN
  & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA  90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

Christopher G. Caldwell, SBN 106790
  caldwell@caldwell-leslie.com
Linda M. Burrow, SBN 194668
  burrow@caldwell-leslie.com
CALDWELL LESLIE & PROCTOR, PC
725 South Figueroa Street, 31st Floor
Los Angeles, CA 90017-5524
Telephone: (213) 629-9040
Facsimile: (213) 629-9022

Attorneys for Defendant
*SWEETPEA ENTERTAINMENT, INC.*
*and Defendant/Counter-Claimant*
*SWEETPEA B.V.I. LTD.*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| HASBRO, INC., *et al.*, | CASE NO.  13–CV–03406–DMG (JCGx) |
| Plaintiffs, | **SWEETPEA'S DESIGNATIONS OF DEPOSITION OF STEVE RICHARDS DATED DECEMBER 12, 2013 AND DECEMBER 17, 2013** |
| v. | |
| SWEETPEA ENTERTAINMENT, INC., *et al.*, | Trial Date:  September 16, 2014 |
| Defendants. | Time:  8:30 a.m. |
| | Ctrm:  7 |
| AND RELATED COUNTERCLAIM. | |

SWEETPEA'S DEPOSITION DESIGNATIONS OF STEVE RICHARDS

925085

1   Pursuant to the Court's Scheduling and Case Management Order re Court Trial

2   dated July 1, 2014, Defendants hereby designate portions of the deposition transcript

3   of Steven Richards, former COO of Silver Pictures Entertainment, as part of their

4   case in chief at trial.

5   Mr. Richards is a third-party witness and his deposition was taken by counsel

6   for Hasbro, who asked questions for a full seven hours over two days of questioning.

7   Mr. Richards was represented by independent counsel at the deposition who refused

8   to allow Mr. Richards to stay beyond the seven hour allotment to allow any

9   significant questioning by counsel for Defendants.  Mr. Richards is not employed by

10  or controlled by Defendants, and Defendants were unable to obtain a declaration from

11  him prior to trial.  Accordingly, while Defendants have attempted to streamline the

12  presentation of evidence by making the following designations of Mr. Richards'

13  deposition testimony, Defendants also seek the Court's permission to call Mr.

14  Richards as a live witness solely for the purpose of covering topics not addressed

15  during Mr. Richards' deposition testimony.  Defendants estimate that their

16  questioning of Mr. Richards on direct will last no more than one hour.

17

18  DATED:  August 26, 2014          GLASER WEIL FINK
                                     HOWARD AVCHEN & SHAPIRO LLP

19

20
                                 By:  */s/ Patricia L. Glaser*
21                                     PATRICIA L. GLASER
22                                     G. JILL BASINGER
                                       DAVID SERGENIAN
23
                                     *Attorneys for Defendants Sweetpea*
24                                   *Entertainment, Inc. and Sweetpea B.V.I.*
                                     *Ltd. and Counter-Claimant Sweetpea*
25                                   *B.V.I. Ltd.*
26

27

28

1

**SWEETPEA'S DEPOSITION DESIGNATIONS OF STEVE RICHARDS**

925085

Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 3 of 386   Page ID #:5724

STEVE RICHARDS Vol. I Confidential                     December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                                1

1                    UNITED STATES DISTRICT COURT

2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    HASBRO, INC., and WIZARDS OF
     THE COAST, LLC,

5

6              Plaintiffs,

7

               vs.                      Case No.
8                                       13-CV-03406-DMG
                                        (JCGX)
9    SWEETPEA ENTERTAINMENT,
     INC., and SWEETPEA B.V.I.
10   LTD.,

11

               Defendants.
12   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~
     AND ALL RELATED CROSS-ACTIONS.
13   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~

14

15        CONFIDENTIAL VIDEOGRAPHER DEPOSITION OF

16                    STEVE RICHARDS

17                      VOLUME I

18

19             THURSDAY, DECEMBER 12, 2013

20                     10:13 A.M.

21

22             400 S. HOPE ST., SUITE 2400

23                LOS ANGELES, CALIFORNIA

24

25     Reported by Megan M. Grossman-Sinclair, CSR 12586



800.211.DEPO (3376)
EsquireSolutions.com

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              2

```
 1              APPEARANCES OF COUNSEL

 2

 3   For Plaintiff:

 4        FRANKFURT KURNIT KLEIN & SELZ, PC
          JESSIE F. BEEBER, AAL
 5        488 Madison Avenue
          New York, New York  10022
 6        T:  (212) 826-5561
          F:  (347) 438-2101
 7        jbeeber@fkks.com

 8
          FRANKFURT KURNIT KLEIN & SELZ, PC
 9        MAURA J. WOGAN, AAL
          488 Madison Avenue
10        New York, New York  10022
          T:  (212) 826-5523
11        F:  (347) 438-2101
          mwogan@fkks.com

12

13
     For Defendant:
14
          GLASER WEIL FINK JACOBS HOWARD &
15           SHAPIRO LLP
          JILL BASINGER, AAL
16        10250 Constellation Boulevard
          19th Floor
17        Los Angeles, California  90067
          T:  (310) 553-3000
18        F:  (310) 785-3575
          jbasinger@glaserweil.com

19

20
     For the Witness and Silver Picture Entities:
21
          GREENBERG & GLUSKER
22        ROBERT F. MARSHALL, ESQ.
          1900 Avenue of the Stars
23        21st Floor
          Los Angeles, California  90067
24        T:  (310) 201-7448
          F:  (310) 201-2348
25        Rmarshall@greenbergglusker.com
```



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              3

1              APPEARANCES (Continued)

2

3    Also Present:

4         TODD BULLOCK, VIDEOGRAPHER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 6 of 386   Page ID #:5727

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              4

```
 1                    INDEX OF EXAMINATION

 2    WITNESS:   STEVE RICHARDS, VOLUME I

 3

 4    EXAMINATION                              PAGE

 5    By Ms. Beeber                              9

 6

 7

 8            INSTRUCTIONS NOT TO ANSWER

 9                   PAGE     LINE

10                    (None)

11

12

13            INFORMATION REQUESTED

14                   PAGE     LINE

15                    (None)

16

17

18

19

20

21

22

23

24

25                    *   *   *
```



STEVE RICHARDS Vol. I Confidential                December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              5

```
 1                   INDEX TO EXHIBITS

 2   EXHIBITS                              MARKED

 3   1        Notice of Subpoena to Steve     12
              Richards.
 4
     2        Notice of Subpoena to the       12
 5            Person Most Qualified of
              Silver Pictures Entertainment,
 6            Inc.

 7   3        Notice of Subpoena to the       13
              Person Most Qualified of Zinc
 8            Entertainment, Inc.

 9   4        April 21, 1997, letter from     24
              Steve Richards to Courtney
10            Solomon.
              (ROSENBAUM 000058)
11
     5        Exclusive Irrevocable License   42
12            Agreement between TSR, Inc.,
              and Sweetpea Entertainment
13            Corporation [license
              agreement].
14            (SP000030 - SP000073)

15   6        September 2, 1994, Amendment    42
              to Exclusive Irrevocable
16            License Agreement [first
              amendment].
17            (SP000128 - SP000137)

18   7        June 8, 1998, Amendment to      44
              Agreement [second amendment].
19            (SP000138 - SP000142)

20   8        October 30, 1997, Agreement     69
              between Sweetpea
21            Entertainment, Inc. and Silver
              Pictures, Inc., re the
22            executive producer services of
              Joel Silver, etc.
23            (SP002329 - SP002339)

24

25
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 8 of 386   Page ID #:5729

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              6

1                    INDEX TO EXHIBITS (Continued)

2    EXHIBITS                                  MARKED

3    9        January 15, 1999,                    88
              Modifications to Agreement
4             between Sweetpea
              Entertainment, Inc. and Silver
5             Pictures, Inc., re the
              executive producer services of
6             Joel Silver, etc.
              (SP003303 - SP003307)
7
     10       April 1, 2003, Agreement            100
8             between Sweetpea (BVI) Ltd.
              and Sweetpea Entertainment,
9             Inc., and Ismir Productions,
              Inc.
10            (SILVER000172 - SILVER000197)

11   11       June 22, 2004, Account             134
              Statement Details Report [Wire
12            Transfer $116,666].
              (HASBRO013034 - HASBRO013035)
13
     12       May 1, 2009, e-mail from           138
14            Courtney Solomon to Steve
              Richards, Subject: dd3 "Next
15            Steps."
              (SP014033)
16
     13       September 1, 2010, Agreement       161
17            between Sweetpea (BVI) Ltd.
              and Sweetpea Entertainment,
18            Inc., and Grayson Productions,
              LLC.
19            (SILVER000285 - SILVER000306)

20

21

22

23

24

25



```
 1                INDEX TO EXHIBITS (Continued)

 2    EXHIBITS                              MARKED

 3    14      March 24, 2011, e-mail and        164
              attached "clean version"
 4            Sweetpea Option Agreement for
              D&D 3 and "redlined version"
 5            Option Agreement for D&D 2.
              (SP014416 - SP014467)
 6
      15      October 6, 2010, e-mail from      171
 7            Steve Richards to Courtney
              Solomon Re: Wire.
 8            (SP005532)

 9    16      October 7, 2010, Wire Transfer    174
              Non-Repetitive Payment Order
10            Request.
              (SILVER000541)
11
      17      Bank of America Transaction       176
12            Report.
              (HASBRO14358)
13
      18      September 2, 1994, Amendment      181
14            to the Exclusive Irrevocable
              License Agreement between TSR
15            and Sweetpea.
              (SILVER000266 - SILVER000271)
16

17

18

19

20

21

22

23

24

25                       *  *  *
```



```
 1              LOS ANGELES, CALIFORNIA

 2        THURSDAY, DECEMBER 12, 2013; 10:13 A.M.

 3

 4              VIDEOGRAPHER:  This is Tape No. 1

 5   to the videotaped deposition of Steve Richards in

 6   the matter of Hasbro, Inc., et al., versus

 7   Sweetpea Entertainment, Inc., et al.; and Sweetpea

 8   B.V.I., Ltd. versus Hasbro, Inc., et al., being

 9   heard before the United States District Court for

10   the Central District of California, Western

11   Division, Case No. 13-CV-03406-DMG (JCGX).

12              This deposition is being held at

13   2049 Century Park East in Los Angeles, California.

14   Today's date is December 12, 2013, and the time on

15   the record is 10:14 a.m.

16              My name is Todd Bullock.  I am the

17   videographer.  The court reporter is Megan

18   Grossman-Sinclair.

19              Counsel, will you please introduce

20   yourselves and affiliations, and the witness will

21   be sworn.

22              MS. BEEBER:  I am Jessie Beeber

23   from Frankfurt Kurnit Klein & Selz on behalf of

24   Hasbro, Inc. and Wizards of the Coast LLC,

25   Plaintiffs.
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 11 of 386  Page ID #:5732

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              9

 1                    MS. WOGAN:  I am Maura Wogan,

 2     Jessie Beeber's partner, with Frankfurt Kurnit.

 3                    MS. BASINGER:  Jill Basinger with

 4     Glaser Weil on behalf of Sweetpea Entertainment,

 5     Inc.; and Sweetpea BVI, Ltd.

 6                    MR. MARSHALL:  Robert F. Marshall,

 7     counsel for Mr. Richards at the deposition,

 8     counsel for Silver Pictures as well.  And I am

 9     from Greenberg Glusker.

10                    VIDEOGRAPHER:  Thank you.  Would

11     the court reporter please swear in the witness.

12

13                    STEVE RICHARDS,

14            having been first duly sworn,

15                testifies as follows:

16

17                    EXAMINATION

18     BY MS. BEEBER:

19            Q.   Good morning, Mr. Richards.

20            A.   Hi, there.

21            Q.   Have you ever had your deposition

22     taken before?

23            A.   I haven't.

24            Q.   Okay.  So let me just spend a few

25     minutes telling you a little bit about what this



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 12 of 386   Page ID #:5733

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              10

1    is about.

2                    You were just sworn in by the court

3    reporter and given the oath to tell the truth, the

4    whole truth, and nothing but the truth.  It's the

5    same as if you were sworn in in a court of law.

6    We don't have a judge sitting here today, so there

7    may be times when I ask a question and your

8    counsel or counsel for the defendants object; they

9    say "objection."  That doesn't mean that you can't

10   answer the question.  That's something that's

11   going to be ruled upon by a judge at a later time.

12                   So the way that the questions and

13   answers will work is I will say a question.  If

14   you can wait until I am completely done with the

15   question, give counsel an opportunity to object if

16   they are going to object, and then begin your

17   answer.  We will have a clean record, and the

18   court reporter won't get mad at us.

19                   We will start talking over each

20   other, I am sure, at some point, but try to keep

21   in mind I have to finish my whole question, and

22   then I'm going to wait for you to finish your

23   whole answer before I go.

24                   If you don't understand my

25   question, please let me know.  I will try to



1   rephrase it.  You can take a break at any time.  I

2   just ask that if I have asked a question and you

3   haven't answered it yet, you give your answer and

4   then ask to take a break.  But please don't be shy

5   about that.  If you need to get up, whatever it

6   is, just let me know, and we will go off the

7   record and we can take a break.

8           A.   Okay.

9           Q.   The same thing; if you get a phone

10  call or something that you need to deal with, just

11  let me know.  We can pause and take care of that.

12              We do need to make sure that you

13  say all of your answers out loud because the court

14  reporter can't take down a nod of the head yes or

15  no.

16          A.   Right.

17          Q.   And, you know, that's pretty much

18  it.  If you have questions as we go along, please

19  let me know, and we will try and figure it out.

20          A.   Okay.

21          Q.   Are you taking any medications

22  today, or is there any other reason that you would

23  not be able to give truthful testimony today?

24          A.   Just caffeine.

25          Q.   Well, I am glad you have that.



 1   That will help us.

 2                  I am going to start by marking the

 3   subpoenas that we served on you and some of the

 4   related entities in this case.  So the first one I

 5   am marking as Richards 1 is the plaintiff Hasbro

 6   Inc.'s notice of subpoena to Steve Richards.

 7                  MS. BASINGER:  I'm sorry.  Are you

 8   marking it Plaintiff's, or are you marking it

 9   Richards?

10                  MS. BEEBER:  Richards 1.

11                  (Exhibit No. 1 was marked for

12                  identification by the shorthand

13                  reporter and is attached hereto.)

14                  MS. BEEBER:  And I am marking as

15   Richards 2 -- I am marking as Richards 2 plaintiff

16   Hasbro's, Inc. notice of subpoena to the person

17   most qualified of Silver Pictures Entertainment

18   Inc. pursuant to Federal Rule of Civil

19   Procedure 45.

20                  (Exhibit No. 2 was marked for

21                  identification by the shorthand

22                  reporter and is attached hereto.)

23                  MS. BEEBER:  And I am marking as

24   Richards 3, plaintiff Hasbro, Inc.'s notice of

25   subpoena to the person most qualified of Zinc



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 15 of 386  Page ID #:5736

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            13

```
 1   Entertainment, Inc. pursuant to Federal Rule of

 2   Civil Procedure 45.

 3              (Exhibit No. 3 was marked for

 4              identification by the shorthand

 5              reporter and is attached hereto.)

 6              (Whereupon, a discussion was held

 7              off the record.)

 8   BY MS. BEEBER:

 9         Q.   So, Mr. Richards, if you could look

10   at Richards 2 and turn to Page 4.

11              Are you here at the deposition

12   today as the person most qualified of Silver

13   Pictures Entertainment, Inc. to answer questions

14   regarding the matters for examination that are set

15   forth on Page 4?

16         A.   I am.

17         Q.   And do you have knowledge about all

18   of the topics that are listed under the matters

19   for examination 1 through 7?

20              MR. MARSHALL:  You better look at

21   them.  I don't know if he has ever really seen

22   this particular document.

23              MS. BEEBER:  Okay.  Okay.

24              MR. MARSHALL:  We have stipulated

25   before that he was the person who had the most
```



1   knowledge about the transactions and issues here

2   probably by a great magnitude over anybody else

3   for both Zinc and Silver Pictures.

4              This is -- this document,

5   unfortunately -- I don't think it's a fatal

6   mistake, but it, you know, talks about Silver

7   Pictures Entertainment; then it talks about Silver

8   Pictures, Inc.  Those are really two different

9   entities.  So within one document, you say matters

10  for examination, and then you go Page 4 and you

11  refer to Silver Pictures, Inc., and then on the

12  cover page, it's Silver Pictures Entertainment,

13  which really are two different entities.

14             MS. BEEBER:  Well, I think what we

15  are asking for in the topics is information

16  related to any Silver entity.

17             Do you see that defined term there?

18  So that's --

19             MR. MARSHALL:  Kind of, but I --

20  what I am trying to explain, is that he would be

21  the most qualified among all the people for both

22  of those entities.

23             MS. BEEBER:  Okay.  Thank you.

24             MR. MARSHALL:  Okay?

25



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 17 of 386  Page ID #:5738

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              15

1   BY MS. BEEBER:

2           Q.    Mr. Richards, if you could just

3   take a minute and look at the Topics 1 through 7

4   and let me know if you believe you are qualified

5   to testify on behalf of any Silver entity

6   regarding these topics?

7           A.    Yeah.   I think if there is any

8   person in the company that would be able to, it

9   would be me, but I can say that I probably have

10  better knowledge of some and less of others on

11  this list.

12          Q.    Okay.   On the ones where you have

13  less knowledge, do you believe that there is

14  somebody more qualified at your companies to

15  answer those questions?

16          A.    No, I don't.

17          Q.    Let's take Richards 3, which is the

18  subpoena to Zinc.   And I am going to ask you the

19  same series of questions.

20          Are you here today as the person

21  most qualified to testify on behalf of Zinc

22  Entertainment, Inc. as to the matters for

23  examination set forth on Page 4 of Richards

24  Exhibit 3?

25          A.    Yeah.   I guess the only



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              16

1  qualification I would make is I'm not sure how

2  Zinc is really even involved in the matter, but,

3  again, I am the one person at the company that

4  would have the best understanding of everything to

5  do with this.

6         Q.    Everything to do with Dungeons &

7  Dragons?

8         A.    Dungeons & Dragons, yes.

9         Q.    Okay.  So would you be the most

10  qualified to testify on behalf of Ismir --

11         A.    Yes.

12         Q.    -- with respect to Dungeons &

13  Dragons?

14         A.    Yes.

15         Q.    And Grayson with respect to

16  Dungeons & Dragons?

17         A.    Yes.

18         Q.    Can you tell me a little bit about

19  your educational background after high school?

20  Did you attend another school after high school?

21         A.    Yes, I did.

22         Q.    Where did you attend?

23         A.    Temple University.

24         Q.    Did you graduate from Temple?

25         A.    I did.



1          Q.    What was your degree?

2          A.    Accounting.

3          Q.    Did you have any further education

4    after the accounting degree from Temple

5    University?

6          A.    I did.

7          Q.    And what was that?

8          A.    An MBA from UCLA.

9          Q.    Okay.  Was the MBA in a particular

10   area?

11         A.    Master's of business.

12         Q.    I mean like a concentration like

13   finance or anything?

14         A.    No.

15         Q.    And what year did you receive your

16   MBA from UCLA?

17         A.    Tough question.

18         Q.    I have stumped you.

19         A.    Yes, I think it was 1996.

20         Q.    And what year did you graduate from

21   Temple?

22         A.    2000.  I'm sorry.  1990.

23              MS. BASINGER:  You know what, if

24   you want to make yourself a little younger, we are

25   not going to judge you.



```
 1   BY MS. BEEBER:

 2              Q.    And how many years was the MBA

 3   program?

 4              A.    It was a three-year program.

 5              Q.    So you began your MBA at UCLA in

 6   1993?

 7              A.    That sounds right.

 8              Q.    And what did you do between 1990

 9   and 1993?

10              A.    I was employed at Arthur Anderson

11   for approximately a year and a half and then went

12   to go work for one of my clients which was called

13   the Movie Group.

14              Q.    And did you cease working for the

15   Movie Group when you began your MBA program at

16   UCLA?

17              A.    No.  It was a fully employed

18   program.  So I was doing both.

19              Q.    And for how long did you work for

20   the Movie Group?

21              A.    I think around three or four years.

22              Q.    Were you working for the Movie

23   Group when you received your MBA?

24              A.    It was right around that time that

25   I transitioned to Silver Pictures.  I'm sorry; no.
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 21 of 386   Page ID
#:5742

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          19

1    I went to -- in between that I went to another

2    company called RCS Editore Films, which is Ridley

3    and Tony Scott's company.

4              Q.    And what was your position at RCS

5    Editore Films?

6              A.    I was controller.

7              Q.    Are you a CPA?

8              A.    I am.

9              Q.    When did you receive your CPA?

10             A.    I passed the exam I think when I

11   was at Arthur Anderson and then got my hours

12   completed when I was at the Movie Group.

13             Just to clarify, I -- I think I

14   started the MBA program when I was at the Movie

15   Group, but then I went to go work for Ridley and

16   Tony Scott's company, but I didn't finish the MBA

17   program until I went to Silver Pictures.  But it

18   was like -- I think I was finishing up, like, one

19   class when I was at Silver Pictures.

20             Q.    So by 1996 you were employed by

21   Silver Pictures?

22             A.    That's right.

23             Q.    Do you recall the year you started

24   at Silver Pictures?

25             A.    I am pretty sure it was 1995.



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              20

```
 1              Q.   And what was your -- you are
 2    currently employed by Silver Pictures; is that
 3    right?
 4              A.   That's correct.
 5              Q.   What is your current title?
 6              A.   It's COO.
 7              Q.   And how long have you had that
 8    title?
 9              A.   Probably three to five years.
10              MS. BASINGER:  I'm sorry.  I didn't
11    hear that.
12              THE WITNESS:  Three to five years.
13    BY MS. BEEBER:
14              Q.   What was your title at Silver
15    Pictures in 1997?
16              A.   Vice president of finance.
17              Q.   What was your title at Silver
18    Pictures in 2000?
19              A.   I really don't recall.
20              Q.   Do you recall what your position
21    was, your title was at Silver Pictures in 2005?
22              MR. MARSHALL:  You mean that
23    particular year?
24              THE WITNESS:  It could have been
25    CFO or COO.
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 23 of 386   Page ID #:5744

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            21

1   BY MS. BEEBER:

2          Q.    So before you were the COO, were

3   you the CFO of --

4          A.    Correct.

5          Q.    -- Silver Pictures?

6                Do you recall what year you became

7   the CFO of Silver Pictures?

8          A.    I don't.

9          Q.    But it was sometime between 1997

10  and three to five years ago?

11         A.    I think that's right.

12         Q.    Okay.  Do you have, like, a resume

13  or a curriculum vitae or a LinkedIn profile or

14  anything like that that lists this kind of

15  information?

16         A.    I have not spent the time to update

17  that, no.

18         Q.    Okay.

19         A.    I think that's the luxury of being

20  gainfully employed.

21         Q.    For a very long period of time at

22  the same company, which is great.

23               So who is Joel Silver?

24         A.    He is -- I would say a hundred

25  percent owner of Silver Pictures, Inc., and he is



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 24 of 386   Page ID #:5745

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            22

 1   a very well-established film producer.

 2              Q.   Do you receive any compensation

 3   based on the performance of Silver Pictures, Inc.?

 4                   MR. MARSHALL:   The company itself?

 5                   MS. BEEBER:  Uh-huh.

 6                   THE WITNESS:  No.  I on occasion

 7   get a production bonus based upon films we make.

 8   That's usually in the form of a producer fee, but

 9   that's discretionary.  And I have on a few of our

10   films gotten a participation, but that is really

11   specifically related to the performance of a film,

12   not the company generally.

13   BY MS. BEEBER:

14              Q.   How long have you known Joel

15   Silver?

16              A.   I met him maybe a month before I

17   took the job.

18              Q.   So that was in 1995?

19              A.   (No audible response.)

20              Q.   And who is Courtney Solomon?

21              A.   He is a, I guess, film producer,

22   film director.

23              Q.   Do you call him Courtney or Corey?

24              A.   Usually "Corey," but I still

25   sometimes say "Courtney."



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          23

1          Q.    How would you like to refer to him

2     today?  Because I think we will be talking about

3     him a lot.

4          A.    Either.  I mean, whatever is best

5     for you guys.

6          Q.    Okay.  It doesn't really matter to

7     me.  I will use "Courtney" since that's his, you

8     know, more formal name.

9               How long have you known Courtney

10    Solomon?

11         A.    I met him right around the -- well,

12    I don't know the year, but I met him through a

13    friend who said that he was aware of Dungeons &

14    Dragons.  And I reached out to the company to say,

15    hey, we would be interested in the property.  And

16    then Courtney came in with one of his colleagues.

17         Q.    Who was the friend who said he was

18    aware of Dungeons & Dragons?

19         A.    Malcolm Reeve, who I think at the

20    time worked for Intermedia Group.

21         Q.    Do you recall how soon -- I will

22    back up for a second.

23               Were you working at Silver Pictures

24    at the time that you first heard about Courtney

25    Solomon?



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                           24

```
 1            A.   Yes.
 2            Q.   And how soon after you started at
 3   Silver Pictures did that occur, do you think?
 4            A.   I really don't recall.
 5            Q.   Do you believe it was before 1997?
 6            A.   I -- do you know when the film was
 7   made?
 8            Q.   The -- Dungeons & Dragons, the
 9   movie?
10            A.   Yeah.
11            Q.   It was released in 2000.
12            A.   My recollection is it definitely
13   took, you know, at least two years for us to get
14   the financing together and make the film.  So --
15            Q.   Let me show you a document that
16   maybe will help you put this in time.
17            MS. BEEBER:  I am going to mark
18   this document as Richards Exhibit 4.
19            (Exhibit No. 4 was marked for
20            identification by the shorthand
21            reporter and is attached hereto.)
22   BY MS. BEEBER:
23            Q.   If you could just take a look at
24   that and let me know when you are done reading it.
25            This is, for the record, a document
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 27 of 386  Page ID #:5748

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              25

```
 1   Bates stamped Rosenbaum 000058.  It's a letter
 2   dated April 21st, 1997.
 3                  Mr. Richards, is that your
 4   signature where --
 5           A.   It is.
 6           Q.   -- it says "Regards, Steve
 7   Richards"?
 8           A.   It is.
 9           Q.   It's a letter addressed to Courtney
10   Solomon.  The first line says:
11                  "I enjoyed meeting with you
12               last week regarding Dungeons &
13               Dragons as a live action
14               syndicated television series."
15                  Does this document help you place
16   in time the first time that you met with Courtney
17   Solomon?
18           A.   It does.
19           Q.   And was the first time you met with
20   Courtney Solomon the meeting that's referred to in
21   the first sentence of this document?
22           A.    It would appear so, yeah.
23           Q.   So then your meeting with Courtney
24   Solomon would have been somewhere in the second
25   week of April of 1997?
```



```
 1              A.   Yes.

 2              Q.   And who did Courtney Solomon come

 3   with to the meeting?

 4              A.   I forget her name.

 5              Q.   It was a woman?

 6              A.   It was.

 7              Q.   Did Courtney Solomon -- I see it

 8   says "Courtney Solomon" in the address block and

 9   then "Sweetpea Entertainment."

10              Courtney Solomon came to the

11   meeting as a representative of Sweetpea

12   Entertainment; is that correct?

13              A.   It would appear so, yeah.

14              MS. BASINGER:  Calls for

15   speculation.

16   BY MS. BEEBER:

17              Q.   And was the woman associated with

18   Sweetpea Entertainment?

19              A.   Well, I think --

20              MR. MARSHALL:  If you know.

21              THE WITNESS:  Yeah, I think she

22   worked with Courtney.  So...

23   BY MS. BEEBER:

24              Q.   But you don't believe she worked

25   for some other company?
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 29 of 386   Page ID
#:5750

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              27

 1                    MS. BASINGER:  Calls for

 2    speculation.

 3    BY MS. BEEBER:

 4          Q.    You have to say it out loud.

 5    That's one of those.

 6          A.    Yeah.  No, I think she worked for

 7    him or with him.

 8          Q.    Where did the meeting take place?

 9          A.    It was in my office at -- on the

10    Warners lot.

11          Q.    Who else attended besides Courtney

12    and the woman and yourself?

13          A.    I don't recall.

14          Q.    Do you think that anyone else

15    attended?

16          A.    I just -- I don't -- possibly.

17          Q.    Do you remember what was discussed

18    at the meeting?

19          A.    Well, I can just tell generally

20    during that period of time I was interested in the

21    property, so I think it was probably an initial

22    meeting to discuss whether or not there was an

23    opportunity to work together and make something

24    based upon Dungeons & Dragons.

25          Q.    Were Courtney's or Sweetpea's



Case 2:13-cv-03406-DMG-JCG Document 213 Filed 08/26/14 Page 30 of 386 Page ID #:5751

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            28

 1  rights in Dungeons & Dragons discussed during that

 2  time period?

 3          A.   I don't know if it was discussed

 4  right at that meeting, but seeing this letter, it

 5  does make me recollect that it -- yeah, we did

 6  discuss it at some point around this time.

 7          Q.   And what did you discuss regarding

 8  Sweetpea's rights in Dungeons & Dragons?

 9          A.   Well, I think we initially had an

10  interest to make a syndicated television series,

11  and that really was I think prompted from other

12  successful shows at the time that were kind of

13  being put together with international monies

14  and -- but my recollection was Courtney kind of

15  quickly said our focus is on making a feature

16  film.

17          Q.   Did that focus have anything to do

18  with the rights that he possessed in Dungeons &

19  Dragons?

20               MR. MARSHALL:  You mean did he tell

21  him that?

22               MS. BEEBER:  Yes.

23               MR. MARSHALL:  Okay.

24               Just things that you know.  It's

25  not speculation.  Somebody told you or you heard



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 31 of 386  Page ID #:5752

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              29

  1 | or otherwise.
  2 |            THE WITNESS:  Yeah, I really just
  3 | don't recall.  I think -- I knew that he was the
  4 | holder of the rights; at least that's what I was
  5 | told, so that was why I was talking to him at that
  6 | time.
  7 | BY MS. BEEBER:
  8 |        Q.   And by "at that time," you mean
  9 | around April 21st of 1997?
 10 |        A.   Yeah.
 11 |        Q.   So at the time around April 21st of
 12 | 1997, did Courtney ever say to you that he did not
 13 | have the rights to make a syndicated television
 14 | series?
 15 |        A.   I just don't -- I don't recall
 16 | whether or not it was, hey, we really wanted to
 17 | just stay focused on making a feature film.  I
 18 | think in our agreement that we entered into with
 19 | Sweetpea there was a, if we make a feature film,
 20 | this is what your involvement would be.  If we do
 21 | make a syndicated television series, this is what
 22 | your rights would be, and this is how we would
 23 | work together.
 24 |        Q.   And the "your" that you are
 25 | referring to there is Silver Pictures or a Silver



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 32 of 386  Page ID #:5753

STEVE RICHARDS Vol. I Confidential                December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              30

1    Pictures entity?

2              A.    That's right.

3              Q.    Did Courtney say anything about

4    whether he had the right to make sequels during

5    the time period around April 21st, 1997?

6              A.    I don't recall.

7              Q.    Did Courtney tell you who he

8    obtained his rights from during the April 1997

9    time frame?

10             A.    I think it was -- if I recall

11   correctly, I think it was TSR.

12             Q.    And during this same time frame

13   around April of 1997, did Courtney go to TSR to

14   ask them for rights to make a syndicated

15   television series?

16             MS. BASINGER:  Calls for

17   speculation.

18             MR. MARSHALL:  Well, he can --

19   BY MS. BEEBER:

20             Q.    If you know.  If you know.

21             MR. MARSHALL:  Here is the thing.

22   These questions -- let's just try and nail it

23   down.  You are required to testify about what

24   somebody told you, what you saw, what you heard,

25   all your physical senses, you know, what you



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              31

 1   really know, not speculating whether somebody did

 2   something.

 3   BY MS. BEEBER:

 4          Q.   And I am not looking for your

 5   speculation either.

 6              MR. MARSHALL:  Because the question

 7   kind of, you know, calls for that in some form.

 8   So if we just clarify that you are not being asked

 9   to imagine whether he did that or didn't do that.

10              THE WITNESS:  I just don't

11   remember.

12   BY MS. BEEBER:

13          Q.   You don't remember.

14              So it's possible that he did go to

15   TSR to ask for the rights to do a syndicated

16   television series?

17              MS. BASINGER:  Calls for

18   speculation.  It's also possible he asked his

19   fairy godmother.

20   BY MS. BEEBER:

21          Q.   You can answer the question.

22              MR. MARSHALL:  Well, let's focus on

23   what he told you.  Do you remember him telling you

24   that?

25              MS. BEEBER:  You can answer my



1  question that the court reporter can read back to

2  you.

3          (Record read as follows:

4          "Question:  So it's possible that he

5          did go to TSR to ask for the rights

6          to do a syndicated television

7          series?")

8              THE WITNESS:  I think anything is

9  possible.

10 BY MS. BEEBER:

11     Q.   Did Courtney ever express to you in

12 this April 1997 time frame a willingness to do a

13 syndicated television series?

14     A.   I think our -- my recollection was

15 that our initial meeting was very positive, and I

16 think at that time we felt like, wow, we could be

17 doing a whole lot of things together, you know,

18 relating to Dungeons & Dragons.

19     Q.   So he was positive about the idea

20 of doing a syndicated television series in the

21 first meeting?

22          MS. BASINGER:  Objection.  That

23 misstates the testimony.

24          THE WITNESS:  Yeah, I think it was

25 more general that I think he was excited about



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 35 of 386   Page ID #:5756

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              33

1   working with Silver Pictures.  And we certainly

2   were excited about exploring being involved with

3   Dungeons & Dragons.

4   BY MS. BEEBER:

5            Q.    What was exciting to you about

6   being involved in Dungeons & Dragons?

7            A.    I personally remember it as a kid

8   and thought it was a very big property.  And I was

9   also a very big fan of Lord of the Rings and just

10  really felt like this could be a big, big

11  property.

12           Q.    Did Courtney provide you with any

13  chain-of-title documentation in the time period of

14  April 1997?

15           A.    I don't recall.

16           Q.    Were you in April 1997 more

17  interested in doing a television series than doing

18  a feature film?

19                 MS. BASINGER:  Calls for --

20                 MS. BEEBER:  I am asking if he was

21  more interested in one or the other.

22                 MR. MARSHALL:  I think he's

23  asked -- he's answered that question.

24  BY MS. BEEBER:

25           Q.    Let me start my question again.



1            Were you more interested in the

2    time frame of April 1997 in doing a television

3    series or a feature film based on Dungeons &

4    Dragons?

5            A.    When I met with Malcolm, it was

6    really about having the focus on trying to find a

7    property that we could do a syndicated television

8    series, but I think very early on and maybe even

9    during this meeting it was clear that there could

10   be a lot broader relationship and opportunity

11   there.

12            And really, we are a company that

13   is a feature film production company.  That is our

14   bread and butter.  That is what we focus in on.

15   So my recollection was we were just overall very

16   excited about exploring this.

17            Q.    But as of April 21st, you were

18   interested in doing a syndicated television series

19   as it says in Richards 4; correct?

20            MS. BASINGER:  That misstates the

21   testimony.  He said at that meeting.  You are

22   misstating his testimony.

23            MS. BEEBER:  I am asking about a

24   letter that he wrote that has a date --

25            MS. BASINGER:  You are arguing with



```
 1   him.
 2              MS. BEEBER:  -- that says "live
 3   action syndicated television series" and asking
 4   him if that was what he wanted to do at the time
 5   of that letter.
 6              MS. BASINGER:  And then he answered
 7   your question, and then you argued with him with
 8   the -- and you began your question but to argue
 9   with him.
10              MS. BEEBER:  There was no tone.  I
11   am not trying to argue with him.
12              Could you read my question back,
13   please?
14         (Record read as follows:
15         "Question:  But as of April 21st,
16         you were interested in doing a
17         syndicated television series as it
18         says in Richards 4; correct?")
19              MS. BASINGER:  Same objections.
20   BY MS. BEEBER:
21         Q.  You can answer the question.
22         A.  I think the initial reason why I
23   reached out to Courtney was because we were
24   interested in a television series, but I think
25   right at that time it was clear that we could have
```



 1   a broader relationship.

 2            Q.   Was it Courtney's idea to do a

 3   feature film regarding Dungeons & Dragons?

 4            A.   I think it was clear that's where

 5   his head was, yes.  He really saw the value in

 6   doing a feature film first, and I think that he

 7   convinced us of that.

 8            Q.   Did you discuss how that feature

 9   film might be distributed, during the April 1997

10   time frame?

11            A.   We had a relationship with Warners,

12   so I am sure it was discussed about Warners being

13   involved.

14            MR. MARSHALL:  When you say

15   April 21 time frame, do you mean, like, within a

16   month or two of this or late 1997?  I mean -- you

17   know, it's a little bit of an ambiguous question.

18   It's not at this meeting; you are saying just in

19   general during that time frame?

20            MS. BEEBER:  Uh-huh.

21   BY MS. BEEBER:

22            Q.   Did you understand my question?

23            A.   Yes, I did.

24            Q.   Okay.  Did you ever discuss in the

25   time frame of April 1997, you know, a few weeks



```
1  before and a few weeks after April 21st of 1997
2  doing a television movie regarding Dungeons &
3  Dragons?
4              MS. BASINGER:  It's vague and
5  ambiguous as to the phrase "television movie."
6              THE WITNESS:  I don't think we were
7  ever thinking about doing a television movie.
8  BY MS. BEEBER:
9        Q.   At any time?
10       A.   Well --
11             MS. BASINGER:  Again, vague and
12  ambiguous.
13             THE WITNESS:  It's certainly a
14  movie I think -- a TV movie would in my mind mean
15  one.  The syndicated television series that we
16  were looking to do was multi-episode.  But I think
17  what became very clear after the initial meeting
18  was, hey, let's focus in on a feature film.
19  BY MS. BEEBER:
20       Q.   And did you discuss distributing
21  that feature film through television broadcast
22  rather than a theatrical release in the time frame
23  of April 1997?
24             MR. MARSHALL:  Other than?  You
25  mean excluding?  You are making the two mutually
```



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          38

1   exclusive?

2                    MS. BEEBER:  Uh-huh.

3                    THE WITNESS:  So initial broadcast?

4                    MS. BEEBER:  Uh-huh.

5                    THE WITNESS:  I don't think so,

6   but...

7   BY MS. BEEBER:

8          Q.    Back to Richards 4 for a moment,

9   the first sentence of the second paragraph says:

10              "To this end I will follow up

11          with a proposal over the next

12          several days which will outline

13          the basics of an agreement

14          between us."

15              Do you recall what that proposal

16   was?

17          A.    I don't.

18          Q.    Did that proposal contain

19   information about doing a live-action syndicated

20   television series, if you recall?

21          A.    I really don't recall.

22          Q.    Do you recall in the time frame of

23   April 1997 an entity called Wizards of the Coast?

24          A.    Yes.

25          Q.    And what was Wizards of the Coast?



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 41 of 386  Page ID #:5762

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            39

 1          A.    Well, let me say it differently.  I

 2    don't know what the relationship of Wizards of the

 3    Coast and the TSR was or -- but, I mean, Wizards

 4    of the Coast is the entity that I think now

 5    publishes the D&D material and I guess is the

 6    creator of new material.

 7          Q.    Do you recall communicating with

 8    Wizards of the Coast during the April 1997 time

 9    frame?

10          A.    I don't -- I don't believe I did,

11    no, but it was a long time ago.

12          Q.    I understand.

13          MR. MARSHALL:  Almost 20 years, to

14    be exact.

15          If you have some documents that may

16    refresh his recollection, you should provide them

17    to the witness.

18          MS. BEEBER:  So let's mark this

19    one.

20          (Exhibit No. 5 was marked for

21          identification and later withdrawn.)

22    BY MS. BEEBER:

23          Q.    I have put in front of you,

24    Mr. Richards, what we have marked as Richards

25    Exhibit 5.  It's a document bearing the Bates



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 42 of 386   Page ID #:5763

STEVE RICHARDS Vol. I Confidential                      December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                                40

 1   numbers SP 00239 through -2339.

 2               Have you ever seen this document

 3   before?

 4           A.   Yes, I have.

 5               MR. MARSHALL:   What Bates numbers

 6   are those?   SP --

 7               MS. BEEBER:   Do you have a

 8   different one than I --

 9               MS. BASINGER:   Maura, look at

10   Page 7 of the letter.

11               MS. WOGAN:   Sorry.   Can you hand

12   those back?

13               MS. BASINGER:   And you're welcome.

14               MS. WOGAN:   Thank you.

15               MR. MARSHALL:   What does SP 00239

16   mean?

17               MS. WOGAN:   Bob, can I have that

18   back?

19           (Whereupon, a discussion was held

20           off the record.)

21               MS. BEEBER:   We are withdrawing

22   what I just previously marked as Richards

23   Exhibit 5.

24           (Whereupon, a discussion was held

25           off the record.)



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 43 of 386  Page ID #:5764

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              41

 1                    MS. BASINGER:  For the record,

 2     Jeremy is far more efficient than Maura is, and I

 3     think you are getting the B team help.

 4                    MS. BEEBER:  I would never say

 5     Maura is a B team help.

 6                    MS. BASINGER:  For this I saw him

 7     for two days.  He was an efficient human for this.

 8     I always give him a hard time, so I thought a

 9     little praise on the record couldn't possibly

10     hurt.

11                    MR. MARSHALL:  Where is he today?

12                    MS. BEEBER:  Went back to New York.

13                    MR. MARSHALL:  Oh, my God.  Didn't

14     even get any warm weather in L.A.

15                    MS. BEEBER:  No.

16                    MS. BASINGER:  Maybe that's why

17     it's warm.

18                    MS. BEEBER:  Court reporter, I am

19     going to hand you a new document to mark as

20     Richards Exhibit 5.  This is the exclusive

21     irrevocable license agreement bearing Bates

22     numbers SP 000030 to -73.

23              (Whereupon, a discussion was held

24               off the record.)

25



```
 1              (Exhibit No. 5 was marked for

 2              identification by the shorthand

 3              reporter and is attached hereto.)

 4                   MS. BEEBER:  And I am going to mark

 5   as Richards Exhibit 6 a documents Bates numbered

 6   SP 000128 through -137.

 7              (Exhibit No. 6 was marked for

 8              identification by the shorthand

 9              reporter and is attached hereto.)

10                   MS. BASINGER:  Can I have one?

11                   MS. BEEBER:  I'm sorry.

12                   MR. MARSHALL:  And I don't have

13   one.  5 and 6.

14                   MS. BEEBER:  You don't have 5

15   either?

16                   MR. MARSHALL:  No.

17                   MS. BEEBER:  Sorry.  There you go.

18                   MR. MARSHALL:  This is 5?

19                   MS. BEEBER:  Uh-huh.  Does

20   everybody have 5 and 6 now?  Because I am going to

21   mark one more.

22                   MR. MARSHALL:  Richards 5.

23                   MS. BEEBER:  Yes.

24                   MR. MARSHALL:  This is 6.

25                   MS. BEEBER:  Hold on.  No, I'm
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 45 of 386  Page ID #:5766

STEVE RICHARDS Vol. I Confidential                        December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              43

 1   sorry about that.  That's not 6.  I gave you the

 2   wrong one.

 3                   MR. MARSHALL:  This is 7.

 4                   MS. BASINGER:  No.

 5                   MS. BEEBER:  Yes, that will be 7,

 6   but I haven't marked it yet.

 7                   MR. MARSHALL:  I am anticipating

 8   it.

 9                   MS. BEEBER:  Yes.

10                   MS. BASINGER:  So you haven't given

11   us the first amendment yet.

12                   MS. BEEBER:  So 6 is -- this is 6.

13                   MS. BASINGER:  And I am assuming

14   then 7 is going to be the second?

15                   MS. BEEBER:  It is.

16                   And I am marking as Richards 7 a

17   document Bates numbered SP 00138 through -142.

18                   MR. MARSHALL:  Can I inquire, you

19   said you are identifying this by Bates numbers?

20   What does that refer to?  SP --

21                   MS. BEEBER:  That's documents

22   produced by Sweetpea.

23                   MR. MARSHALL:  Oh, these are

24   Sweetpea documents.  Okay.

25



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              44

```
 1              (Exhibit No. 7 was marked for

 2              identification by the shorthand

 3              reporter and is attached hereto.)

 4    BY MS. BEEBER:

 5              Q.   Mr. Richards, I have put now before

 6    you three documents with exhibit numbers 5, 6, and

 7    7.  My first question to you is just:  Have you

 8    ever seen any of these documents before?

 9              A.   I think I have seen all of them.  I

10    would say I am not terribly familiar with them,

11    but I would say yes.

12              Q.   Okay.  And what are these

13    documents?

14              A.   For lack of better description, I

15    think it's the chain of title.

16              Q.   The chain of title for what?

17              A.   Using I guess film-finance speak,

18    documents that would show that the production

19    company would have the rights to make a particular

20    production.

21              Q.   So in this case we have been

22    referring to Exhibit 5 as the license agreement

23    and Exhibit 6 as the first amendment and Exhibit 7

24    as the second amendment.  Rather than each time

25    identifying them all by their title and date, are
```



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              45

```
 1    you okay with me using those -- that terminology
 2    going forward today in this deposition?
 3              A.   I am.
 4              Q.   Okay.  Great.
 5                   Were you involved in any way in the
 6    negotiation of the first amendment, which is 6?
 7              A.   No.
 8              Q.   Were you involved in any way in the
 9    negotiation of the second amendment, which is 7?
10              A.   No, I was not.
11              Q.   Do you have any information about
12    what Sweetpea's intent or TSR's intent was at the
13    time that they executed the first amendment?
14                   MS. BASINGER:  Calls for
15    speculation.
16                   MR. MARSHALL:  Their intent?
17                   MS. BEEBER:  Uh-huh.
18                   MR. MARSHALL:  How is he going to
19    divine their intent?
20                   MS. BEEBER:  No, I said "do you
21    have any information about" their intent.
22                   MS. BASINGER:  How would he know if
23    they did?
24                   MR. MARSHALL:  He wasn't involved
25    in the negotiations.  You mean if someone told him
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 48 of 386   Page ID #:5769

STEVE RICHARDS Vol. I Confidential                     December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              46

 1   something?

 2              MS. BEEBER:  Can you read back my

 3   question.

 4         (Record read as follows:

 5         "Question:  Do you have any

 6         information about what Sweetpea's

 7         intent or TSR's intent was at the

 8         time that they executed the first

 9         amendment?")

10              THE WITNESS:  I could possibly.

11   BY MS. BEEBER:

12         Q.   And what would that be?

13         A.   I am -- I guess it could be that

14   Corey at some point said something, a phone

15   conversation, about, you know, this document,

16   Exhibit 5.

17         Q.   Okay.  Well, I wasn't actually

18   asking about 5.  I was just asking about 6.

19              MS. BEEBER:  I'm sorry.  Could you

20   read the question back one more time.

21              MS. BASINGER:  You also asked about

22   6 and 7.

23         (Record read as follows:

24         "Question:  Do you have any

25         information about what Sweetpea's



1            intent or TSR's intent was at the

2            time that they executed the first

3            amendment?")

4                 MR. MARSHALL:  And again, you are

5    not being asked to speculate about anything.

6                 THE WITNESS:  I mean, I was not

7    involved with the negotiation of these documents,

8    so I don't think I have anything -- I am just

9    really confused by the question.

10   BY MS. BEEBER:

11        Q.   Okay.  Did you have any -- do you

12   see on the last page it says:

13            "In witness whereof the

14            undersigned have executed this

15            agreement this" -- blank -- "day

16            of March, 1998"?

17        A.   You said on Exhibit 7?

18        Q.   I mean Exhibit 6, the first

19   amendment.

20        A.   Okay.

21        Q.   You with me there?

22        A.   Yes, I am.

23        Q.   Did you have any conversations with

24   Corey about the first amendment prior to March of

25   1998?



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              48

```
 1              A.    I don't recall.
 2              Q.    Did you have any conversations with
 3     anyone else about the first amendment prior to
 4     March of 1998?
 5              A.    I just really don't recall.
 6              Q.    Do you recall ever having any
 7     conversations with anyone about the first
 8     amendment?
 9              A.    Well, I know that this document --
10     when we made the second movie, I know that this
11     document I think was used to determine what a
12     passive royalty would have been for that
13     production.
14              Q.    Do you recall referring to or
15     discussing the first amendment, this Exhibit 6,
16     for any purpose other than determining when the
17     second movie was made, what the passive royalty
18     should be?
19              A.    Repeat the question.
20              Q.    She will read it back.
21              (Record read as follows:
22              "Question:  Do you recall referring
23              to or discussing the first
24              amendment, this Exhibit 6, for any
25              purpose other than determining when
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 51 of 386   Page ID #:5772

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              49

```
 1                 the second movie was made, what the

 2                 passive royalty should be?")

 3                      THE WITNESS:  I don't recall.

 4    BY MS. BEEBER:

 5           Q.   When was the first time that you

 6    saw the first amendment, No. 6?

 7           A.   I don't recall.

 8           Q.   Do you believe you saw the first

 9    amendment, No. 6, at any time before it was being

10    used to determine what a passive royalty should be

11    for the second movie?

12           A.    Repeat that one more time.

13           (Record read as follows:

14           "Question:  Do you believe you saw

15                 the first amendment, No. 6, at any

16                 time before it was being used to

17                 determine what a passive royalty

18                 should be for the second movie?")

19                      THE WITNESS:  You know, I think

20    it's possible that I was provided the document,

21    but I don't think I really had much interest in

22    reviewing it, you know, before the second movie.

23    BY MS. BEEBER:

24           Q.   Do you recall who gave you the

25    first amendment?
```



 1              A.   I don't recall.
 2              Q.   Let's turn to Exhibit 7.
 3                   Do you know anything about what TSR
 4    or Sweetpea intended when they entered into No. 7,
 5    the second amendment?
 6                   MS. BASINGER:  Calls for
 7    speculation, vague and ambiguous.
 8                   MR. MARSHALL:  And it's wildly
 9    overbroad, but there's about seven pages in this
10    document, so there could be 50 intentions.  So
11    anyway --
12    BY MS. BEEBER:
13              Q.   Do you know any of the parties'
14    intentions at the time they entered into this
15    second amendment that's Exhibit 7?
16                   MS. BASINGER:  Do you mean other
17    than what -- are you asking him to read it and
18    then divine some?
19                   MS. BEEBER:  No.  I am not asking
20    him to read it and then divine some.  I am asking
21    him --
22    BY MS. BEEBER:
23              Q.   Mr. Richards, as you sit here
24    today -- let's start from the very beginning and
25    we do it this way.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 53 of 386   Page ID #:5774

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              51

1            So Exhibit 7 is an amendment to

2     agreement.  And if you turn to Page 5, it has a

3     date of execution of October 9th, 1998.

4            Do you see where I am referring?

5            A.    Uh-huh.

6            Q.    Before October 8th -- actually,

7     it's executed on two different days.  I apologize.

8     It's executed by Wizards of the Coast on

9     October 8th, 1998, and by Sweetpea on October 9th,

10    1998.  Do you see where I am reading?

11           A.    I see it.

12           Q.    Before October 8th, 1998, did you

13    have any information about what Sweetpea and TSR

14    and Wizards of the Coast intended to do by

15    entering into this exhibit that we have marked

16    No. 7?

17           A.    I was not involved with the

18    negotiation.

19           Q.    Did you have any conversations with

20    Corey before October 8th, 1998, about this

21    Exhibit 7?

22           A.    I don't recall.

23           Q.    Did you have any conversations with

24    anyone else before October 8th, 1998, about this

25    document that we have marked as Exhibit 7?



1          A.   I don't recall.

2          Q.   When was the first time that you

3    saw Exhibit 7?

4          A.   Yeah, I don't recall.

5          Q.   Do you recall ever referring to

6    Exhibit 7 for a particular purpose?

7          A.   No.  If you are asking do I recall

8    specifically pointing to this document, no, but --

9    no.

10         Q.   Now, when you said with respect to

11   the first amendment, which is Exhibit 6, when you

12   made the second movie it was used to determine

13   what a passive royalty payment should be, who used

14   the document to determine that?

15         A.   Well, the production lender and one

16   of the financiers reviewed all of the chain of

17   title to get comfortable with I guess the

18   production company's ability to go off and make

19   the movie.  And within this document, I think they

20   came to the conclusion as to what -- you know,

21   that production company had the rights to go make

22   a movie.

23         Q.   Okay.  I was asking a little bit of

24   a different question.  You testified a few minutes

25   ago that the first amendment, which is No. 6, was



 1   used when you were making the second movie.

 2                   That movie -- what's the title of

 3   that movie that you are referring to there?

 4           A.   I refer to it as "Dungeons &

 5   Dragons 2."

 6           Q.   You said that the first amendment

 7   was used when you were making the second movie to

 8   determine what a passive royalty payment should

 9   be.  Do you recall saying that?

10           A.   Correct.

11           Q.   And who was the passive royalty

12   payment to be made to that you are referring to

13   there?

14           A.   Yeah, I don't remember if it was

15   TSR or Hasbro.

16           Q.   And who was using the second

17   amendment to make the determination of what the

18   passive royalty amount should be?

19                   MR. MARSHALL:  Asked and answered.

20                   MS. BASINGER:  I think you

21   misspoke --

22                   MR. MARSHALL:  Anyway, asked and

23   answered.  We already talked about the production

24   letter.

25                   MS. BASINGER:  And I apologize,



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 56 of 386   Page ID #:5777

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              54

```
 1    Jessie.  You just said you referred to the second
 2    amendment to determine the passive royalty.
 3               MS. BEEBER:  I'm sorry.
 4               MR. MARSHALL:  Anyway, he already
 5    testified about the lender using this document.
 6    It was a chain of title document to determine the
 7    passive royalty or analyze the situation.
 8    BY MS. BEEBER:
 9         Q.   Okay.  Well, maybe I am confused,
10    then, by your testimony.
11               You are saying that -- are you
12    saying that the production lender and the
13    financier used the first amendment, this
14    Exhibit 6, to determine what passive royalty
15    payment was due to TSR or Hasbro around the making
16    of the second movie?
17         A.   They definitely reviewed in --
18    reviewed the document to make sure that the
19    correct passive royalty was, you know, made so
20    that we can make the movie.  Yes.
21         Q.   Okay.  And the second movie that
22    you are referring to in this testimony is Wrath of
23    the -- Dungeons & Dragons:  Wrath of the Dragon
24    God?
25         A.   Correct.
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 57 of 386   Page ID #:5778

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              55

 1              Q.   Let's go back to Exhibit 5 for a
 2    moment.  This is the exclusive irrevocable license
 3    agreement.
 4              Did you have conversations with
 5    Mr. Solomon about Exhibit 5, ever?
 6              MR. MARSHALL:  The document is, you
 7    know -- how long is this document?  42 pages in
 8    it?  44 or 45?
 9              If you recall.
10              THE WITNESS:  I really don't recall
11    being on a call or having a meeting with Corey and
12    going through this document.
13    BY MS. BEEBER:
14              Q.   I am not asking if you went through
15    the document with him.  You testified a bit ago --
16              (Whereupon, a discussion was held
17              off the record.)
18    BY MS. BEEBER:
19              Q.   You testified a bit ago that you
20    recalled discussing Exhibit 5 with Mr. Solomon.
21              Do you recall that testimony that
22    you gave earlier?
23              A.   I don't recall.
24              MS. BASINGER:  Misstates the
25    testimony.



1    BY MS. BEEBER:

2            Q.   Okay.  So --

3                 MR. MARSHALL:  I think he said he

4    didn't recall discussing it.

5    BY MS. BEEBER:

6            Q.   I asked you:

7                 "Do you have any information

8            about what Sweetpea's intent or

9            TSR's intent was at the time they

10           executed the first amendment?"

11           And your answer was --

12                MR. MARSHALL:  The first amendment

13   we're on?

14                MS. BEEBER:  Uh-huh.

15                MR. MARSHALL:  Okay.

16   BY MS. BEEBER:

17           Q.   And your answer was:

18                "I could possibly."

19                And my next question was:

20                "And what would that be?"

21                And you said:

22                "I am -- I guess it could be

23           that Corey at some point said

24           something, a phone conversation

25           about, you know, this document,



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 59 of 386   Page ID
#:5780

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              57

 1              Exhibit 5."

 2                   So I am asking you what you recall

 3    about the conversation with Corey about Exhibit 5.

 4                   MR. MARSHALL:  Did that relate to

 5    Exhibit 5, that question earlier, or was it

 6    Exhibit 6?

 7    BY MS. BEEBER:

 8         Q.   Can you please answer my question?

 9                   MR. MARSHALL:  I don't think that

10    states the record properly, but you can answer the

11    question if you recall it.  I mean, the question

12    asks if you had any conversations with Mr. Solomon

13    about a 44-page document with, you know, over 30,

14    40 paragraphs.

15                   Are you talking about the whole

16    document or a particular provisions?  It's an

17    unfair question, quite frankly, too broad and

18    overbroad.

19                   MS. BEEBER:  I have asked a

20    different question now, which is I have had -- I

21    have read back the testimony that was given

22    earlier today where Mr. Richards testified that he

23    guessed it could be that Corey at some point said

24    something, a phone conversation about this

25    document, Exhibit 5.



 1  | BY MS. BEEBER:

 2  |          Q.   And my follow-up question to that

 3  | answer is:  What do you recall about that?

 4  |          MS. BASINGER:  I am going to object

 5  | because he said he guessed it could be.  I'm going

 6  | to go with objection, calls for speculation.

 7  |          MS. BEEBER:  Okay.

 8  |          THE WITNESS:  I think what I said

 9  | was it was possible I might have had a

10  | conversation.  And I don't think I can give you

11  | any more specifics.

12  | BY MS. BEEBER:

13  |          Q.   Do you have any recollection of a

14  | time frame in which this possible conversation

15  | could have occurred?

16  |          MS. BASINGER:  That calls for

17  | speculation.  He doesn't recall a conversation but

18  | do you have a recollection of a possible time

19  | frame that is something that you don't recall

20  | happening could have happened.  How does one

21  | answer that?  Other than carefully.

22  |          MR. MARSHALL:  Well, you can't

23  | answer it.  It's an unfair question.  It's vague,

24  | overbroad and ambiguous.

25  |          MS. BEEBER:  Can you read my



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 61 of 386   Page ID
#:5782

STEVE RICHARDS Vol. I Confidential                          December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                                      59

 1  question?

 2              MR. MARSHALL:  The specifics could

 3  be a lot better, it seems to me, because this is

 4  a -- this is a document that has maybe 50 topics

 5  within it.  So to just ask the witness whether he

 6  had any conversation that might have occurred 20

 7  years ago or nearly 20 years ago about a

 8  document --

 9              MS. BEEBER:  That wasn't my

10  question.  There have been three different

11  questions since that one.

12              Could you please read the question

13  back to the witness so he can provide an answer if

14  he can?

15          (Record read as follows:

16          "Question:  Do you have any

17          recollection of a time frame in

18          which this possible conversation

19          could have occurred?")

20              MS. BASINGER:  Objection; calls for

21  speculation.

22              MR. MARSHALL:  If you have any

23  recollection.

24              THE WITNESS:  You are asking me to

25  tell you when a conversation occurred that I don't



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 62 of 386   Page ID #:5783

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              60

1   even know if it occurred.  So I can't give you any

2   definition on that.

3   BY MS. BEEBER:

4           Q.   Okay.  When you testified, I guess

5   it could be that Corey at some point said

6   something about a phone conversation about, you

7   know, this document, Exhibit 5.

8               When you provided that testimony,

9   were you thinking about a specific conversation

10  with Corey?

11              MS. BASINGER:  Vague and ambiguous.

12              MR. MARSHALL:  If you recall.

13              THE WITNESS:  I really don't recall

14  a specific conversation where we talked about this

15  document.

16              MS. BEEBER:  Okay.  Can we take a

17  break for a few minutes?  Because I want to fix

18  that document.

19              MS. WOGAN:  I have it fixed.

20              MS. BEEBER:  Well, let's take a

21  break for a minute because we have been going for

22  about an hour.

23              VIDEOGRAPHER:  This concludes Tape

24  No. 1.  We are going off the record at 11:19 a.m.

25



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 63 of 386  Page ID #:5784

STEVE RICHARDS Vol. I Confidential                         December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              61

```
 1              (Whereupon, a recess was held from

 2         11:19 a.m. to 11:38 a.m.)

 3              VIDEOGRAPHER:  This is the

 4    beginning of Tape No. 2.  We are back on video

 5    record at 11:38 a.m.

 6    BY MS. BEEBER:

 7         Q.   We are back.

 8              There is one thing that I forgot to

 9    go over earlier today, which is:  Did you do

10    anything to prepare for this deposition today?

11         A.   Well, Bob asked that I produce a

12    couple of documents, so I had to search for those

13    documents.  And then Bob and I did meet yesterday

14    to kind of go over this as well as a few other

15    transactions that were involved.

16              MR. MARSHALL:  I am the general

17    counsel of Silver Pictures, so there were several

18    other matters that we are engaged in, so we also

19    met regarding.

20    BY MS. BEEBER:

21         Q.   Did you speak to anyone else about

22    this deposition besides Bob?

23              MR. MARSHALL:  You mean the fact

24    it's taking place or the substance?

25              THE WITNESS:  My guess is Courtney
```



STEVE RICHARDS Vol. I Confidential                December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                         62

```
 1   probably said, 'Hey, you are going to receive' --
 2   you know, 'This is ramping up, like there is a
 3   dispute,' but he never went into any detail.
 4   BY MS. BEEBER:
 5           Q.   When did you speak to Courtney?
 6                MS. BASINGER:  I am going to
 7   object.  You mean about this or the substance
 8   about D&D stuff, right?
 9                MR. MARSHALL:  About the
10   deposition, whether it was going to happen or not.
11                THE WITNESS:  It was probably when
12   it broke in the trades.
13                MR. MARSHALL:  That there was a
14   lawsuit, you mean?
15   BY MS. BEEBER:
16           Q.   Is this at the InterContinental
17   Hotel?
18                MR. MARSHALL:  Was the conversation
19   at the InterContinental Hotel?
20                MS. BEEBER:  Uh-huh.
21                THE WITNESS:  I mean, yeah, I did
22   meet with him and I think that was probably when
23   we discussed this and other things.  And the other
24   thing that we were actively involved with was the
25   release of the movie called Getaway.
```



```
 1              So I don't recall if at -- I mean,
 2    we met for a coffee that day, and I don't remember
 3    if we actually even spoke about, you know, this
 4    film, but it was definitely about the release of
 5    the film.
 6    BY MS. BEEBER:
 7         Q.   I'm sorry.  About the release of
 8    what film?
 9         A.   Of Getaway.
10         Q.   So you don't know whether you
11    discussed this lawsuit when you met with
12    Mr. Solomon at the InterContinental Hotel?
13         A.   I don't know if it was a phone call
14    or during that time that it was like, 'Yeah, you
15    know, we are in a dispute, and you are probably
16    going to be subpoenaed.'
17         Q.   Did you talk about any specifics
18    about the lawsuit?
19         A.   No.
20         Q.   Did you talk about any payments to
21    Hasbro?
22         A.   With Courtney?
23         Q.   Uh-huh?
24         A.   No, not that I remember.
25         Q.   Do you know whether your counsel
```



1   has spoken to counsel for Courtney about the

2   lawsuit?

3           A.   Well, I think Bob has had

4   conversations with the other side as well as you.

5           Q.   What were his conversations with

6   the other side about?

7                MR. MARSHALL:  Well, I am going to

8   object to that.  If they are communicated from me,

9   if you know anything about it at all, it's

10  attorney-client privilege as to any communications

11  that you had with me, but if you have any other

12  information about any other communications if they

13  occurred, you can testify about it.

14               THE WITNESS:  Yeah, I just know

15  that he had conversations, but I think it was more

16  about specific documents that were provided and

17  understanding what the reasons are that certain

18  documents are requested.

19  BY MS. BEEBER:

20          Q.   Do you recall what specific

21  documents the conversation was about?

22          A.   Well, I know that there are a

23  handful of documents that we provided you.

24          Q.   Uh-huh.  You said that you thought

25  the conversation with the other side was about



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 67 of 386  Page ID #:5788

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              65

1  specific documents that you had provided, and I

2  was just asking if you recall what specific

3  documents.

4             A.    No.  I think what I meant was I

5  think there were a request made to provide

6  documents and a lot of that discussion was about

7  just understanding what is needed to be provided.

8             Q.    Have you had any conversations with

9  counsel for Courtney about the lawsuit?

10             A.    I think I had one conversation with

11  Kevin Leichter.

12             Q.    And when was that?

13             A.    I mean, I don't specifically

14  recall, but I would imagine maybe anywhere from 4

15  to 16 weeks ago; 8 to 16 weeks ago.  But again, we

16  were actively involved with Getaway at the time,

17  so Kevin and I had a few conversations during that

18  period of time about the movie and finalizing

19  delivery to Warner Brothers for Getaway.

20             Q.    I am asking you if you -- I believe

21  you said you had one conversation with Kevin

22  Leichter.  And in response to my question, have

23  you had conversations with anyone, with Courtney's

24  counsel about this lawsuit some?

25             A.    Uh-huh.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 68 of 386   Page ID #:5789

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              66

 1          Q.   So you did have one conversation

 2   with Kevin Leichter about this lawsuit?

 3          A.   Yeah.  It was a discussion in

 4   passing; like, you know, there was a dispute with

 5   Hasbro and it's very time-consuming.

 6          Q.   Did you discuss any payments to

 7   Hasbro in that conversation?

 8          A.   I don't recall.

 9               MS. BASINGER:  Just for -- you

10   don't recall one way or the other, or you don't

11   recall that being discussed?

12               MS. BEEBER:  I don't understand

13   your question.

14               MR. MARSHALL:  He doesn't recall

15   the extent of those communications.

16               MS. BASINGER:  I don't recall

17   those -- can go both ways.  I don't recall one way

18   or the other, or I don't that happening.  There's

19   always two "I don't recalls."

20   BY MS. BEEBER:

21          Q.   You can answer her question if you

22   understand it.

23               MR. MARSHALL:  He said he didn't

24   recall conversations on that subject.

25               MS. BASINGER:  That's fine.



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              67

 1                    THE WITNESS:  I will stick to that.

 2    BY MS. BEEBER:

 3          Q.   Do you believe that you had a

 4    conversation about payments to Hasbro but you do

 5    not remember that conversation as you sit here

 6    today?

 7          A.   I don't recall.

 8                    MS. BEEBER:  I don't think that

 9    answer your question.

10                    MS. BASINGER:  That actually made

11    it worse.

12                    MS. BEEBER:  Okay.

13    BY MS. BEEBER:

14          Q.   When we were on our break, did you

15    have a conversation with Ms. Basinger?

16                    MS. BASINGER:  I think you should

17    tell exactly what we discussed.

18                    THE WITNESS:  She was very kind to

19    ask if I wanted a coffee, and I said, 'That sounds

20    great; a small black coffee, please.'

21    BY MS. BEEBER:

22          Q.   Were any jokes exchanged?

23          A.   If that could be considered a joke,

24    then maybe I made the joke.

25          Q.   But you did not discuss the



STEVE RICHARDS Vol. I Confidential                December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                        68

 1  substance of this lawsuit in any way?

 2           A.   No, we didn't.

 3           Q.   All right.  Let's go back to -- oh,

 4  how many projects have you done with Courtney?

 5           A.   I would say more than seven.

 6           Q.   How many D&D projects have you done

 7  with Courtney?

 8           A.   Three.

 9           Q.   And what were those called?

10           A.   I must say I don't really remember

11  all the names.  I just refer to it as D&D 1,

12  D&D 2, D&D 3.

13           Q.   I think you said before that you

14  recall that D&D 2 was also titled Dungeons &

15  Dragons:  Wrath of the Dragon God; correct?

16           A.   That sounds right.  I think there

17  was also another working title associated with it,

18  but that sounds very familiar.

19           Q.   And am I correct that D&D 3 was

20  titled Dungeons & Dragons:  The Book of Vile

21  Darkness?

22           A.   That is correct.

23           Q.   And what you are referring to as

24  "D&D 1" was just -- Dungeons & Dragons was the

25  title; correct?



```
 1              A.   I think that's right; or Dungeons &
 2   Dragons, the movie; or the Dungeons & Dragons
 3   movie.  I'm not sure.
 4                   MS. BEEBER:  Okay.  Let's mark
 5   Richards Exhibit 8.
 6              (Exhibit No. 8 was marked for
 7              identification by the shorthand
 8              reporter and is attached hereto.)
 9              (Whereupon, a discussion was held
10              off the record.)
11   BY MS. BEEBER:
12              Q.   I will give you a minute to look
13   over this document.
14              A.   Okay.
15              Q.   My question is going to be -- you
16   know -- my first question is going to be:  Do you
17   recognize --
18                   MS. BEEBER:  I am missing a page.
19   I don't have the signature page.
20                   MS. BASINGER:  The level of awesome
21   that that is, is --
22                   MS. WOGAN:  I do.
23                   MS. BEEBER:  I will take this one.
24   BY MS. BEEBER:
25              Q.   My first question is going to be
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 72 of 386  Page ID #:5793

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            70

1   whether you recognize the signature on the Page 10

2   under "accepted and agreed, Silver Pictures Inc."?

3              A.    I do.

4              Q.    And whose signature is that?

5              A.    Joel Silver and Courtney's.

6              Q.    Okay.  Have you seen this document

7   before?

8              A.    I definitely have seen it before.

9   Not recently, but yes, I do.

10             Q.    Were you involved in the

11  negotiations that produced this document?

12             A.    Yes, I was.

13             Q.    And what is this document?

14             A.    My recollection is that it is the

15  document that -- or the agreement that kind of

16  summarized how we were going to try to create

17  entertainment around Dungeons & Dragons.

18             Q.    Okay.  The first paragraph says:

19                   "Gentlemen, this letter is to

20                   confirm the agreement between

21                   Sweetpea Entertainment, Inc.,

22                   'producer' and Silver Pictures,

23                   Inc., 'Silver,' regarding the

24                   executive producer services of

25                   Joel Silver, 'artist,' and the



1              exclusive sales effort of Silver

2              in connection with the motion

3              picture entitled Dungeons &

4              Dungeons, the movie, the

5              'picture,' based upon the

6              underlying property entitled

7              Dungeons & Dragons, the

8              'property.'"

9                   Do you see where I am reading?

10        A.    Uh-huh.

11        Q.    So what was the -- at this point in

12   time, October 30th -- October 30th of 1997, you

13   were no longer considering making a live-action

14   television series regarding Dungeons & Dragons; is

15   that correct?

16        A.    I think the primary focus was

17   making a feature film.

18        Q.    And that's what this agreement is

19   about; correct?

20        A.    Yes.

21        Q.    And as of October 30th, 1997, had

22   it been decided how that motion picture, once

23   completed, would be exploited?

24             MS. BASINGER:  That's vague and

25   ambiguous.



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              72

 1                    THE WITNESS:  Are you saying

 2       domestically? internationally?

 3                    MR. MARSHALL:  Worldwide.

 4       "Exploited," that's a broad word.

 5                    MS. BASINGER:  And that's my

 6       objection.

 7       BY MS. BEEBER:

 8            Q.   I can break it down into two parts

 9       if that's easier for you.

10                    Did you have, as of October 30th,

11       1997, plans about how the movie, quote, "the

12       picture" in this agreement, would be exploited

13       domestically?

14            A.   I think we at that time probably

15       wanted to maximize the exploitation.  At that time

16       I don't -- I don't believe we had any domestic

17       distribution in place, but I think it would be to

18       release it theatrically, you know, on video and on

19       television.

20            Q.   And did you have any plans about

21       how you intended to exploit the picture

22       internationally as of October 30th, 1997?

23            A.   I think at that point we had maybe

24       a bit clearer idea, which was -- I'm not sure if

25       it was in place at this time or not, but we did



 1  hire a sales agent, which was called I think --

 2  actually, I forget the name -- but it was Julia

 3  Plow, and she was going to go off and sell

 4  territory by territory and generate as much sales

 5  as possible so we could use those sales to finance

 6  the movie.

 7          Q.   This agreement that we have marked

 8  as Exhibit 8 also contains a sales agency

 9  component; is that correct?

10              MR. MARSHALL:  You want to take a

11  look at the agreement?  Why don't you look at it.

12  Spend some time.

13          (Document reviewed by witness.)

14              THE WITNESS:  Okay.

15              MR. MARSHALL:  Please look at the

16  document as much as you want to for a moment.

17              You know, you are asking questions

18  about a long document.  So that's 15 years old

19  again.

20              What was your question?

21              MS. BEEBER:  I wanted to know

22  whether the agreement contained a sales agency

23  component.

24              MR. MARSHALL:  The agreement speaks

25  for itself.



```
 1                    But go ahead and answer if you can.
 2                    THE WITNESS:  Yes, it does.
 3      BY MS. BEEBER:
 4            Q.   And what was the sales agency
 5      component of this agreement?
 6                    MS. BASINGER:  That's vague and
 7      ambiguous.
 8      BY MS. BEEBER:
 9            Q.   To your understanding.
10                    MS. BASINGER:  And that is, the
11      document speaks for itself.
12                    Are you literally asking him to
13      read --
14                    MS. BEEBER:  I am literally asking
15      him whether this contains a sales agency component
16      and what his understanding of it is.
17                    MS. BASINGER:  You didn't say that.
18      You said what is it.
19      BY MS. BEEBER:
20            Q.   What is your understanding of the
21      sales agency component in this agreement?
22                    MR. MARSHALL:  Objection.
23                    MS. BASINGER:  The document speaks
24      for itself, vague and ambiguous, compound, lacks
25      foundation, calls for an expert opinion.
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 77 of 386  Page ID #:5798

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            75

```
 1              MR. MARSHALL:  The terms of the
 2   document are set forth within it.
 3              What are you trying to do -- ask
 4   him to summarize it?
 5   BY MS. BEEBER:
 6         Q.   You can answer the question.
 7              MS. BASINGER:  She may be asking
 8   him to read it out loud.
 9              MR. MARSHALL:  Well, look, no.  Are
10   you asking for any understanding that's outside of
11   this agreement or just what's in the agreement?
12              THE WITNESS:  At this point we were
13   the exclusive sales agent with respect to this
14   film outside the U.S. and Canada.
15   BY MS. BEEBER:
16         Q.   Okay.  And do you see under
17   Paragraph 1B on the first page, it says:
18              "Sales agent services, the
19              right shall be defined as all
20              rights to distribute, advertise,
21              and otherwise exploit the" --
22              capital P -- "Picture and all
23              theatrical and nontheatrical
24              video and television (including
25              without limitation video on
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 78 of 386   Page ID #:5799

STEVE RICHARDS Vol. I Confidential                      December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            76

 1              demand, pay per view and

 2              hotel/motel) media now known and

 3              hereafter devised within the

 4              territory throughout the term of

 5              this agreement."

 6                   And it goes on from there.  You can

 7     read the rest of the paragraph.

 8              A.   I do see that.

 9              Q.   What do the words "theatrical,"

10     "nontheatrical," "video" and "television" mean

11     there?

12                   MR. MARSHALL:  You mean his

13     understanding of the words?

14     BY MS. BEEBER:

15              Q.   What is your understanding of the

16     words "theatrical," "nontheatrical," "video" and

17     "television" in Richards Exhibit 8 which you said

18     you helped negotiate?

19                   MR. MARSHALL:  I don't know that he

20     said he helped negotiate.

21                   MS. BEEBER:  He did say he helped

22     negotiate it.  I laid that foundation maybe

23     ten-or-so questions back.

24                   THE WITNESS:  "Theatrical" is in

25     theaters.  "Video" is usually home entertainment.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 79 of 386   Page ID #:5800

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            77

 1   And "television" is usually something on a

 2   television box.

 3   BY MS. BEEBER:

 4            Q.   Okay.   What about "nontheatrical"?

 5            A.   I don't know if I am the best

 6   person to describe that.

 7            Q.   Well, this was an agreement between

 8   Silver Pictures and Sweetpea.

 9                 What did you think "nontheatrical"

10   meant in this agreement in October of 1997?

11                 MR. MARSHALL:   If you had any

12   understanding.

13                 THE WITNESS:   Yeah, I don't know if

14   I did.

15   BY MS. BEEBER:

16            Q.   So there was a means by which the

17   rights could be exploited nontheatrically, and you

18   didn't have any idea what that meant?

19                 MR. MARSHALL:   He didn't say that.

20   He said he didn't have a real understanding of the

21   term --

22                 MS. BEEBER:   You know what, I have

23   been really patient with the speaking objections.

24   But I have asked a question; he is going to answer

25   it.   Please just let him do that.



```
 1                    THE WITNESS:  Could you repeat the
 2      question again?
 3                    MS. BEEBER:  Could you read it
 4      back, please?
 5                (Record read as follows:
 6                "Question:  So there was a means by
 7                which the rights could be exploited
 8                nontheatrically, and you didn't have
 9                any idea what that meant?")
10                    THE WITNESS:  Generally, we -- and
11      I think on this film in particular, we helped
12      broker a sale for Germany, which was all rights,
13      and my guess is within that, nontheatrical rights
14      were granted to them, but I think that the German
15      distributor was probably most interested in the
16      theatrical video and television rights.
17      BY MS. BEEBER:
18                Q.   What did the grant of nontheatrical
19      rights to the German distributor entitle them to
20      do?
21                A.   I'm not sure if they were granted
22      or not, but my guess is it was an all-rights deal.
23                Q.   If someone was granted
24      nontheatrical rights under this agreement, what
25      would they be permitted to do with those rights?
```



```
 1              A.   I'm not sure if I am the best
 2    person to answer that question.
 3              Q.   Who would be the best person to
 4    answer that question?
 5              A.   Maybe the attorney that was
 6    negotiating that agreement.
 7              Q.   Would there be anybody at any of
 8    the Silver entities who would be able to answer
 9    that question?
10              A.   Well, we had outside counsel that
11    negotiated this agreement.
12              Q.   I am asking anybody internally at
13    the Silver entities that would be able to answer
14    that question.
15              A.   Specifically relating to this film,
16    probably not, no.
17              Q.   And who was the outside counsel?
18              A.   Greenberg Glusker.
19              Q.   Was it Mr. Marshall who assisted
20    with the negotiation and drafting of this
21    agreement?
22                   THE WITNESS:  I don't recall if you
23    were.
24                   Or maybe one of his colleagues.
25
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 82 of 386  Page ID #:5803

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            80

```
 1   BY MS. BEEBER:
 2            Q.   Does the word "nontheatrical" have
 3   any industry-wide definition?
 4            A.   Say that again.
 5            Q.   Does the word "nontheatrical" have
 6   an industry-wide definition?
 7            A.   I'm not sure if -- yeah, I'm not
 8   sure about that.
 9            Q.   Have you ever heard that
10   "nontheatrical" refers to distribution in
11   libraries and prisons?
12            A.   No.
13            MS. BASINGER:  Are you suggesting
14   this movie was distributed in prisons?
15            MS. BEEBER:  Could you not do that,
16   please?  That is extremely rude.
17            MS. BASINGER:  I apologize.
18            Perhaps she is asking if it was
19   distributed in prisons.
20            MS. BEEBER:  That was extremely
21   rude.
22            MS. BASINGER:  I just said I
23   apologized, Jessie.
24            MS. BEEBER:  Okay.
25            Could you read back the answer,
```



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              81

1    please?

2              (Record read as follows:

3              "Answer:  No.")

4    BY MS. BEEBER:

5         Q.   Did the nontheatrical rights that

6    were being granted to Silver Pictures under this

7    agreement include rights to distribute, advertise,

8    or otherwise exploit the picture on television?

9         A.   Well, I think it specifically

10   references television.

11             MS. BASINGER:  That's vague and

12   ambiguous.  Are you saying --

13             MS. BEEBER:  That's enough.

14             MS. BASINGER:  Please don't wave

15   your --

16             MS. BEEBER:  I asked a question --

17             MS. BASINGER:  You know, that's

18   getting rude.  Waving your little hand at me is

19   rude.  Now I am going to ask the question to be

20   re-read if you don't mind, as is my right, because

21   I wanted to hear it.

22             MS. BEEBER:  Okay.

23             MS. BASINGER:  If that's okay with

24   you.

25             MS. BEEBER:  Yeah, it's okay with



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 84 of 386   Page ID #:5805

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              82

```
 1    me.
 2                    MS. BASINGER:  Wonderful.
 3                    MS. BEEBER:  I think you can --
 4                    MS. BASINGER:  May I please have
 5    the question re-read?
 6                    MS. BEEBER:  Could you let me
 7    finish for a second?
 8                    I think it's fine for you to state
 9    the basis for your objection --
10                    MS. BASINGER:  I need the question
11    re-read.
12                    MS. BEEBER:  -- but you then --
13    okay.  But when you then go on and say what is
14    vague and ambiguous about the question and how the
15    witness might interpret and what word --
16                    MS. BASINGER:  But I didn't say any
17    of that.  I asked that the question be re-read.
18                    Are you talking about something
19    else?
20                    MS. BEEBER:  Could you -- I am
21    talking about what you have already done today at
22    the deposition.  Could you please --
23                    MS. BASINGER:  Really?  Can you
24    point me to that, please?
25                    MS. BEEBER:  Yes, I will.
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 85 of 386   Page ID
#:5806

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                                 83

1              MS. BASINGER:  Go ahead.

2              MS. BEEBER:  We will do it at a

3    break.  I am not going to use my time to do that.

4              MS. BASINGER:  All I wanted was the

5    question re-read.

6              MS. BEEBER:  Okay.  That's fine.

7              MS. BASINGER:  I mean, if that's

8    the problem, I can count how many times Maura has

9    asked the question to be re-read, if that's okay

10   with you.

11             MS. BEEBER:  Are you referring to

12   her hearing problem?  Are you serious?

13             MS. BASINGER:  When did I say that?

14             MS. BEEBER:  If you are implying

15   that she needs questions read back --

16             MS. BASINGER:  No.

17             MS. BEEBER:  -- because she is hard

18   of hearing --

19             MS. BASINGER:  No.  I said --

20             MS. BEEBER:  -- that is

21   unbelievable.

22             MS. BASINGER:  Why would I -- what

23   are you talking about?

24             MS. BEEBER:  That is unbelievable.

25             MS. BASINGER:  What is



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 86 of 386   Page ID #:5807

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              84

 1  unbelievable?  That I said -- I asked the question

 2  to be re-read, as Maura has done many times,

 3  because it is appropriate.

 4              Are you suggesting I have a hearing

 5  problem because I just asked that a question be

 6  re-read?

 7              MS. BEEBER:  No, I'm not at all.

 8              MS. BASINGER:  Because you seem to

 9  suggest that if I said Maura asked the question be

10  re-read then I am suggesting she has a hearing

11  problem.  So now if I ask that a question be

12  re-read, you are suggesting that I have a hearing

13  problem.

14              MS. BEEBER:  Could you please read

15  back the question to her as she asked?  I have no

16  objection to that.

17              (Record read as follows:

18              "Question:  Did the nontheatrical

19              rights that were being granted to

20              Silver Pictures under this agreement

21              include rights to distribute,

22              advertise, or otherwise exploit the

23              picture on television?")

24              MS. BASINGER:  Objection; vague and

25  ambiguous.



```
 1                    MR. MARSHALL:  Quite frankly, it
 2    calls for, you know -- well --
 3                    MS. BEEBER:  Okay.
 4                    THE WITNESS:  But my --
 5                    MS. BEEBER:  Thank you.  Thank you.
 6                    THE WITNESS:  But my answer was no?
 7                    MS. BEEBER:  Yes, your answer was
 8    no.
 9                    THE WITNESS:  So repeat the
10    question, I think.
11                    MS. BEEBER:  We could read back --
12    why don't you read back the question and his
13    answer, and he can see if there's anything he
14    wants to add to that.
15                    THE WITNESS:  Because I thought
16    there was a question about prisons and I
17    responded --
18                    MS. BEEBER:  No, that was a few
19    questions back.
20                    Do you need your question and
21    answer read back to you?
22                    THE WITNESS:  Yes, please.
23               (Record read as follows:
24               "Question:  Did the nontheatrical
25                rights that were being granted to
```



1          Silver Pictures under this agreement

2          include rights to distribute,

3          advertise, or otherwise exploit the

4          picture on television?

5              "Answer:  Well, I think it

6          specifically references

7          television.")

8    BY MS. BEEBER:

9          Q.   Is there anything you would like to

10   add to that?

11         A.   No, because I think it -- I see the

12   word "television" right here.

13         Q.   So then "nontheatrical" would not

14   include the rights to exploit the picture on

15   television; correct?

16         A.   No.  I thought what you were saying

17   is, does the nontheatrical specifically include

18   television.  And what I am saying -- well, no, I

19   think this agreement does include television

20   because it's specifically included there.

21         Q.   And the television rights, the

22   right to exploit the picture on television, are

23   not included in the word "nontheatrical"; correct?

24             MR. MARSHALL:  If you have an

25   understanding of that.



Case 2:13-cv-03406-DMG-JCG Document 213 Filed 08/26/14 Page 89 of 386 Page ID #:5810

STEVE RICHARDS Vol. I Confidential                December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            87

```
 1                     MS. BASINGER:  Calls for a legal
 2    conclusion and calls for speculation.
 3                     MR. MARSHALL:  If you have any
 4    understanding on that subject, whether
 5    "nontheatrical" is broad enough in any context --
 6                     MS. BEEBER:  No, I am asking about
 7    this specific agreement.
 8                     MR. MARSHALL:  Well, okay.  In this
 9    particular agreement, do you have any
10    understanding whether "nontheatrical" included
11    television?  If you had an understanding or formed
12    one, you can testify to it.  If you didn't then --
13                     THE WITNESS:  I think I said before
14    I'm not sure if I am the best person to describe
15    that.
16                     MS. BEEBER:  Okay.  Let's move on
17    to 15.
18                     MR. MARSHALL:  There is an
19    amendment of this, I think, wasn't there?
20                     MS. BEEBER:  Yeah.  That's what I
21    am doing right now.
22                     MR. MARSHALL:  No. 9 now?
23                     THE COURT REPORTER:  Yes.
24
25
```



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            88

```
 1              (Exhibit No. 9 was marked for
 2              identification by the shorthand
 3              reporter and is attached hereto.)
 4  BY MS. BEEBER:
 5         Q.   You can take a few minutes to
 6  familiarize yourself with the agreement.  Just let
 7  me know when you are ready.
 8         A.   Maybe you can ask your question,
 9  and maybe I'd --
10              MR. MARSHALL:  Well, take a quick
11  look.
12              THE WITNESS:  Well, I'd rather hear
13  the question, and then maybe I'll take a few
14  minutes.
15  BY MS. BEEBER:
16         Q.   My question is going to be:  Have
17  you seen this document before?
18              MR. MARSHALL:  Yeah, it's just a
19  broad question.  Just take a look very briefly,
20  and then if she asks specifics, then you can take
21  whatever time you need.
22              THE WITNESS:  So your question was?
23  BY MS. BEEBER:
24         Q.   Have you ever seen this document
25  before?
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 91 of 386   Page ID #:5812

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              89

```
 1              A.    I have.

 2              Q.    When was the last time you saw this

 3    document?

 4              A.    Greater than 15 years ago.

 5              Q.    Okay.  Were you involved in the

 6    negotiation of it?

 7              A.    Yes, I was.

 8              Q.    Under Paragraph 1 on the first

 9    page -- and for the record, this is the document

10    Bates stamped SP 003303 through SP 003307.

11                   On the first page, Paragraph 1, it

12    says:

13                   "Producer hereby elects to

14                   terminate the sales agency

15                   services of Silver as of

16                   January 15, 1999, pursuant to

17                   Paragraph 1F of the agreement."

18                   It goes on from there.

19                   Why were the sales agency services

20    of Silver terminated, if you know?

21              A.    Yeah, my recollection was I met

22    with Julia Plow, and she was extremely excited

23    about the theatrical movie.  And we determined

24    that it might be best to have her help assist us

25    in selling the movie internationally.
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 92 of 386  Page ID
#:5813

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              90

1              Q.    Had any sales of the movie

2    internationally been completed as of the date of

3    this agreement?

4              A.    I know of at least I guess two,

5    which was Hellcon and I guess Manga.

6              Q.    And were those the only two, if you

7    know?

8              A.    I don't recall.

9              Q.    Do you see Paragraph 6 on the page

10   that says SP 003305?

11             A.    Yes.

12             Q.    It says Paragraph 4A is deleted and

13   replaced with the following.

14                   And then it's in quotes:

15                   "A, in the event that the

16             executive producer portion of

17             this agreement remains in effect

18             and Silver does not exercise its

19             right to elect not to receive an

20             executive producer credit in

21             connection with the picture, then

22             if producer acquires any

23             television rights, producer

24             agrees to attempt to develop a

25             series with Silver for a period



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 93 of 386   Page ID #:5814

STEVE RICHARDS Vol. I Confidential                          December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                                    91

```
 1              equal to the earlier of twelve

 2              (12) months after the U.S.

 3              theatrical release of the picture

 4              and eighteen (18) months after

 5              delivery of the picture to the

 6              sales agent."

 7              Who is the producer in this

 8    agreement?  If you want, you can look back at the

 9    first paragraph.

10              MS. BASINGER:  The document speaks

11    for itself.

12              MR. MARSHALL:  Look at the first

13    paragraph, and you can answer that question.

14              THE WITNESS:  It looks like

15    Sweetpea Entertainment, per the agreement, is the

16    producer.

17    BY MS. BEEBER:

18         Q.   So where it says then:

19              "If producer acquires any

20              television rights, producer

21              agrees to attempt to develop a

22              series with Silver."

23              Was it your understanding in

24    January of 1999 that Sweetpea did not have

25    television rights?
```



 1              A.    Yeah.   I -- honestly I don't
 2     recall.  It's so long ago.
 3              Q.    Okay.   What was the purpose of this
 4     change to the agreement between Sweetpea and
 5     Silver Pictures, the change that if the producer
 6     acquired any television rights, the producer would
 7     agree to attempt to develop a series with Silver,
 8     if you know?
 9                    MS. BASINGER:   That's vague and
10     ambiguous.  You mean his purpose or the drafter's
11     purpose?
12                    MR. MARSHALL:   If he has any
13     understanding.
14     BY MS. BEEBER:
15              Q.    What did you understand that
16     purpose of that to be, if you know?
17                    MR. MARSHALL:   If you have any
18     understanding as to the purpose of this clause if
19     you can recall.
20                    THE WITNESS:   I really don't recall
21     why this paragraph is in here.
22     BY MS. BEEBER:
23              Q.    Do you recall any conversations
24     regarding this paragraph?
25              A.    It's so long ago.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 95 of 386  Page ID #:5816

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              93

```
 1          Q.    Okay.   That's fair.

 2                Are you still thinking or --

 3          A.    Yeah, I am thinking, but no, I

 4   don't recall.

 5                MR. MARSHALL:   If you have got any

 6   other documents that might refresh his

 7   recollection as to communications, he would be

 8   happy to look at those.

 9   BY MS. BEEBER:

10          Q.    Paragraph 10 on Page 4 of the

11   document says:

12                "The first sentence of

13                Paragraph 11 is hereby deleted in

14                its entirety and the second

15                sentence is hereby amended by

16                adding 'Alan Zeman' after

17                'Courtney Solomon.'"

18                Do you know who Alan Zeman is?

19          A.    Yes, I do.

20          Q.    Who is Alan Zeman?

21                MS. BASINGER:   Vague and ambiguous.

22   BY MS. BEEBER:

23          Q.    Who is Alan Zeman with respect to

24   the Dungeons & Dragons property?

25          A.    If I understand -- well, I think he
```



```
 1   is a financier of Sweetpea.  He is a long-term

 2   business partner of Courtney Solomon.

 3           Q.   When was the first time that you

 4   encountered the name Alan Zeman in connection with

 5   the Dungeons & Dragons property?

 6           A.   I think pretty much right at the

 7   beginning.

 8           Q.   So why was Mr. Zeman being included

 9   now in this amendment to your agreement with

10   Sweetpea in January of 1999 but was not included

11   in the original agreement from October of 1997, if

12   you know?

13               MS. BASINGER:  Calls for

14   speculation.

15               THE WITNESS:  Yeah.  I don't -- I

16   don't recall.

17               MR. MARSHALL:  What does -- what

18   does this amend?  This is an amendment; correct?

19               MS. BEEBER:  Uh-huh.

20               MR. MARSHALL:  First sentence of

21   the paragraph --

22   BY MS. BEEBER:

23           Q.   So back to Exhibit 8 for a minute,

24   the document -- the agreement from October 30th,

25   1997, the, capital P, "Picture" that is referred
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 97 of 386   Page ID
#:5818

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              95

 1  | to in this document, was that picture completed?
 2  |         A.   Yes.  I think that's D&D 1.
 3  |         Q.   And how was D&D 1 released?
 4  |              MR. MARSHALL:  You mean in
 5  | markets --
 6  |              THE WITNESS:  By whom or --
 7  |              MR. MARSHALL:  What platforms or by
 8  | whom?
 9  |              MS. BEEBER:  We can --
10  | BY MS. BEEBER:
11  |         Q.   Would it be helpful for you if I
12  | broke it down that way?
13  |         A.   It would.
14  |         Q.   On what platforms was D&D 1
15  | released in the United States?
16  |              MS. BASINGER:  Objection; vague as
17  | to time.  Do you mean ever?
18  |              MS. BEEBER:  Ever.
19  |              THE WITNESS:  I think it was all
20  | forms.  It was acquired by New Line and released
21  | theatrically, and I believe they, you know,
22  | released it and exhibited all rights.
23  | BY MS. BEEBER:
24  |         Q.   I'm sorry.  I missed the end of
25  | what you said.



 1            A.    And all rights.

 2                  MR. MARSHALL:  You mean all forms?

 3                  THE WITNESS:  Yes.

 4    BY MS. BEEBER:

 5            Q.    And what forms are you referring

 6    to?

 7            A.    Theatrical, video, television,

 8    nontheatrical, probably pay-per-view, hotels,

 9    motels, basic cable, pay TV.  I'm not sure if it

10    was released on free TV.

11            Q.    Anything else?

12            A.    I am sure there are maybe some

13    other ones that aren't coming into my head right

14    now.

15            Q.    What did you mean by

16    "nontheatrical" in the answer that you just gave?

17                  MR. MARSHALL:  Well, he listed --

18                  MS. BEEBER:  Could you please just

19    let him answer the question?

20                  MR. MARSHALL:  Well, what was the

21    answer he just gave?  Okay.

22    BY MS. BEEBER:

23            Q.    Could you answer?

24            A.    Are you wanting me to define

25    "nontheatrical"?



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 99 of 386   Page ID #:5820

STEVE RICHARDS Vol. I Confidential                          December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            97

```
 1              Q.   I am just asking --

 2                   MS. BASINGER:  Yes.

 3                   MR. MARSHALL:  If you --

 4                   MS. WOGAN:  Just go.

 5                   MR. MARSHALL:  Isn't there -- the

 6    word is "nontheatrical."  So doesn't that mean

 7    anything other than nontheatrical by definition?

 8                   MS. BEEBER:  Could you please not

 9    do that?

10                   MR. MARSHALL:  I mean, come on.  We

11    are just going over --

12                   MS. BEEBER:  Stop, stop.

13                   MR. MARSHALL:  -- belaboring

14    something that's silly.

15                   MS. BEEBER:  You're testifying.

16                   MR. MARSHALL:  This is a silly form

17    of an examination.

18                   MS. BEEBER:  If you do that again

19    and suggest an answer to the witness while a

20    question is pending, I will terminate this

21    deposition.

22                   MR. MARSHALL:  Do whatever you

23    like.

24                   MS. BEEBER:  I will go to the

25    court.  I will get someone to supervise the
```



```
 1 | deposition --
 2 |             MR. MARSHALL:  Great.
 3 |             MS. BEEBER:  -- and stop you from
 4 | doing that.
 5 |             MR. MARSHALL:  Yeah, that's fine.
 6 |             MS. BEEBER:  Okay.
 7 |             MR. MARSHALL:  But you now have
 8 | belabored the same points --
 9 |             MS. BEEBER:  Okay.
10 |             MR. MARSHALL:  -- of documents and
11 | issues that are 15 years ago without ever
12 | refreshing recollection, without ever you being
13 | specific as to your questions.  He gave you a list
14 | of 15 ways to exploit the project.
15 |             MS. BEEBER:  Could you please stop?
16 | Could you please stop giving him information?
17 |             MR. MARSHALL:  That's not
18 | information.  He testified about it.
19 |             MS. BEEBER:  It is.  It is.  Now he
20 | is go to say, 'I gave you a list."
21 |             MR. MARSHALL:  No, he doesn't have
22 | to do that.  He did that.
23 |             MS. BEEBER:  Okay.
24 |             MR. MARSHALL:  Okay.  Anyway, go
25 | ahead.
```



 1              MS. BASINGER:  I would just like to

 2   note that, Jessie, if you could be slightly more

 3   polite.  This is a third-party witness counsel.

 4   If you just let him finish and then you can make

 5   an objection.

 6              MR. MARSHALL:  That's okay.  I am

 7   not trying to be obstructive.  I -- just be a

 8   little more specific.  It would be a lot, I think,

 9   more efficient.

10              MS. BEEBER:  I would like the

11   record to reflect that Ms. Basinger just gave me a

12   nasty smile.

13              MS. BASINGER:  I'm sorry, Jessie,

14   that you consider my smile nasty after you have

15   accused me of being airy-fairy.

16              Do you have a specific

17   problem with --

18              MS. BEEBER:  I just want you to cut

19   it out.  I just want to get through this

20   deposition.  Ask questions and get answers without

21   you --

22              MS. BASINGER:  I apologize you

23   don't like my face.  I apologize you don't like my

24   suggestions.

25              MS. BEEBER:  -- making comments,



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            100

```
 1   making faces, interrupting --
 2                  THE WITNESS:  Guys, I am feeling a
 3   little uncomfortable.
 4                  Can we --
 5                  MR. MARSHALL:  Yeah, just you guys
 6   are all talking about stuff --
 7                  THE WITNESS:  Can we take a recess?
 8                  MR. MARSHALL:  Let's take break.
 9                  MS. BEEBER:  We can take a break.
10   That's fine.  That's fine.  We can take a break.
11                  MR. MARSHALL:  Yeah, you know,
12   because there is a lot of personal stuff going on
13   here which --
14                  MS. BEEBER:  I just want her to
15   stop.  We are off the record.
16                  VIDEOGRAPHER:  We are off the
17   record at 12:19 p.m.
18             (Whereupon, a luncheon recess was
19             held from 12:19 p.m. to 1:47 p.m.)
20                  VIDEOGRAPHER:  We are back on the
21   record at 1:47 p.m.
22                  MS. BEEBER:  10.
23             (Exhibit No. 10 was marked for
24             identification by the shorthand
25             reporter and is attached hereto.)
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 103 of 386  Page ID #:5824

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              101

```
 1   BY MS. BEEBER:

 2            Q.   Mr. Richards, I have handed you

 3   what the court reporter has marked as Richards

 4   Exhibit 10.

 5                 Have you ever seen this document

 6   before?

 7            A.   I have.

 8            Q.   And what is this document?

 9            A.   I think it is part of the chain of

10   title for the second movie.

11            Q.   What do you mean by "part of the

12   chain of title"?

13            A.   One of the many documents that

14   allows for a picture to be produced.

15            Q.   You are saying it's part of the

16   chain of title between Sweetpea and Silver

17   entities that gives Silver entities the right to

18   produce Dungeons & Dragons movies?

19                 MR. MARSHALL:  Well, look at the

20   agreement, Steve.  You know, instead of --

21   Steve -- leaf through it just to familiarize

22   yourself with it.  That's really what the proper

23   procedure here is.  Paragraph by paragraph.

24                 THE WITNESS:  So yeah, it's

25   basically I think a one-picture license between
```



STEVE RICHARDS Vol. I Confidential                December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          102

 1   Sweetpea and the production services entity.

 2   BY MS. BEEBER:

 3          Q.   And what's the production services

 4   entity?

 5          A.   Ismir Productions.

 6          Q.   And is that an entity related to

 7   Silver Pictures?

 8          A.   I think it's a hundred percent

 9   owned by Joel.

10          Q.   Okay.  Page 17 of the document,

11   which is Silver 000188, is that your signature

12   where it says "Sincerely, Ismir Productions Inc."?

13          A.   It is.

14          Q.   And it says by -- and that says

15   "Steve Richards," I am assuming?

16          A.   Yes.  It sure does.

17          Q.   And it says VP?

18          A.   Yes.

19          Q.   So you were vice president of Ismir

20   Productions, Inc.?

21          A.   I assume so.

22          Q.   Are you the vice president of Ismir

23   Productions, Inc. today?

24          A.   I don't know.  I'm not sure.  It's

25   not really an entity that we really still utilize.



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              103

1           Q.    Is it an entity that is still in

2    good standing, if you know?

3           A.    I don't know.

4           Q.    What was the purpose of the

5    formation of Ismir Productions Inc?

6           A.    We generally create a new entity

7    when we actually produce a film and there is a

8    bank involved.  They actually prefer an entity

9    that doesn't have any previous activity.

10          Q.    Do you know what a single-purpose

11   entity is?

12          A.    Yes.  That's what this is.

13          Q.    And what was the single purpose for

14   which Ismir Productions was formed?

15          A.    To make D&D 2.

16          Q.    And D&D 2 is, again, Wrath of the

17   Dragon God?

18          A.    Uh-huh.

19          Q.    Okay.  Do you see in the second

20   paragraph on the first page it says:

21               "References hereby made to

22               the 2000 theatrical motion

23               picture entitled Dungeons &

24               Dragons"?

25          A.    I do.



 1          Q.   Does that refresh your recollection

 2   about when Dungeons & Dragons the movie is

 3   released?

 4              THE WITNESS:  I am hearing a lot of

 5   feedback.

 6              MR. MARSHALL:  You are hearing

 7   feedback?

 8              THE WITNESS:  Yeah.  Just I am

 9   hearing her mike I think over there.

10              MS. BEEBER:  Should I move?

11              THE WITNESS:  No.

12              VIDEOGRAPHER:  No.

13              THE WITNESS:  You were saying?

14   BY MS. BEEBER:

15          Q.   Does the fact that this document

16   says references "made to the 2000 theatrical

17   motion picture entitled Dungeons & Dragons" help

18   you remember that Dungeons & Dragons was released

19   in 2000?  This is something you and I had spoken

20   about earlier.

21          A.   As long as this agreement is

22   correct, yes.

23          Q.   Do you believe that this agreement

24   is correct?

25          A.   Yes.



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                           105

 1          Q.    Were you involved in the

 2   negotiation and drafting of this agreement?

 3          A.    I believe it was actually

 4   negotiated with Greenberg Glusker and Courtney's

 5   attorney.

 6          Q.    Did you review drafts of the

 7   agreement before it was executed?

 8          A.    I think I was loosely involved with

 9   it, yeah.

10          Q.    Did you have comments on the drafts

11   that you reviewed?

12          A.    I don't -- don't recall.

13          Q.    At some point in time, did you read

14   this agreement from beginning to end?

15          A.    Not in great detail, no.

16          Q.    When was the last time you saw this

17   agreement?

18          A.    I would imagine, you know, around

19   the time that we made the movie.

20          Q.    And when was that?

21          A.    I'm not sure of the date of when we

22   commenced principal photography.

23          Q.    You said the date you commenced

24   principal photography, to be clear, of Wrath of

25   the Dragon God?



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 108 of 386   Page ID #:5829

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              106

```
 1              A.   Correct.

 2              Q.   And what was that date?

 3              A.   I don't recall.

 4              Q.   Well, you signed this agreement;

 5    right?  On Page 17 --

 6              A.   I did.

 7              Q.   -- we said that's your signature.

 8                   Did you review this agreement

 9    before you signed it?

10              A.   Not in great detail, no.

11              Q.   Did somebody at Ismir other than

12    your lawyers review it?

13              A.   No.

14              Q.   Wasn't it kind of an important

15    agreement to your business?

16              A.   I mean, I rely on my outside

17    counsel quite -- quite a lot.

18              Q.   So you didn't -- well, that's fine.

19                   Okay.  Let's go to Paragraph 2 on

20    Page 2.  It says:

21                   "Right.  Upon exercise of the

22              option, if ever, purchaser shall

23              irrevocably own the exclusive

24              right to produce one live-action

25              sequel motion picture (i.e.
```



```
1                    sequel to the" -- capital P --
2                    "Picture tentatively entitled
3                    Dungeons & Dragons 2)" -- and
4                    then it's -- "('sequel').  Based
5                    on the picture, the picture
6                    creations (as that term is
7                    defined in the TSR agreement) and
8                    with property (as that term is
9                    defined in the TSR agreement) and
10                   to use the picture --"
11                        And it goes on from there.
12                        My question is this:  It says
13   that -- "purchaser."  Who is purchaser under this
14   agreement?
15                   A.   Ismir Productions.
16                   Q.   So "purchaser" is you guys;
17   correct?
18                   A.   The single-purpose production
19   company.
20                   Q.   So purchaser has the exclusive
21   right to produce one-live action sequel motion
22   picture.  What is a sequel motion picture?
23                   MS. BASINGER:  Objection; vague and
24   ambiguous.
25                   MR. MARSHALL:  Well, I think the
```



1   agreement speaks for itself.

2                   But you can answer if you want.

3                   Which paragraph are you looking

4   at -- Paragraph 2?  Paragraph 2, I believe.

5                   THE WITNESS:  I mean, I can tell

6   you just being a film producer, we made a lot of

7   sequels.  Usually a film that we make after a

8   success of the first one.

9   BY MS. BEEBER:

10          Q.   Does it have to have anything in

11  common with the first film?

12          A.   I would say sometimes it's -- could

13  be really based upon the title or certain themes.

14          Q.   You say it's usually a film you

15  make after the success of the first one.

16                  Was Dungeons & Dragons the movie a

17  success?

18                  MR. MARSHALL:  In what terms?

19  BY MS. BEEBER:

20          Q.   In the terms of the word "success"

21  as you used it in your last answer.

22          A.   I would say successful enough, yes.

23          Q.   What was successful about

24  Dungeons & Dragons?  Why was it successful?

25          A.   I mean, I think it had good



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 111 of 386   Page ID #:5832

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              109

1   exposure when it was released, and I think it

2   actually opened to a point where I think it was

3   viewed by many as -- you know, I think a film can

4   initially open and show it has proof of concept

5   and a good property.

6          Q.   Were you involved in the decision

7   on the Silver side to enter into an agreement with

8   Sweetpea to do a sequel to Dungeons & Dragons the

9   movie?

10          A.   Yes.

11          Q.   And what went into that

12   decision-making process?  What were the

13   considerations as to whether you should do a

14   sequel or not?

15          A.   I mean, we still really believed in

16   the property.

17          Q.   Believed in the property in what

18   way?

19          A.   We really thought Dungeons &

20   Dragons was a fantastic property.

21          Q.   And at the time that you executed

22   this agreement -- what was the date of this? -- in

23   April of 2003, what were your thoughts about what

24   the sequel would be?

25               MR. MARSHALL:  It's vague and



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 112 of 386  Page ID
#:5833

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              110

 1   ambiguous.

 2                    MS. BASINGER:  Join.

 3                    May we have an understanding that

 4   if one of the counsel makes an objection, the

 5   other counsel joins automatically?

 6                    MS. BEEBER:  Sure.  That's fine.

 7                    Well, I can --

 8                    MR. MARSHALL:  You want to rephrase

 9   it?

10                    MS. BEEBER:  I can break it down

11   more specifically.

12   BY MS. BEEBER:

13           Q.   When you executed this agreement in

14   April of 2003, did you have a treatment for the

15   sequel?

16           A.   I am just not sure when this was

17   signed in relationship to when we started

18   production.  If you knew that, that would be

19   helpful for me.

20                    MS. BEEBER:  I don't think I know

21   the document --

22   BY MS. BEEBER:

23           Q.   I'm sorry; I don't.

24                    MS. BEEBER:  Jill, do you have

25   anything that establishes the date of commencement



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 113 of 386  Page ID #:5834

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              111

1    of principal photography on this film?

2                 MS. BASINGER:  He asked for what

3    production, and I don't know.

4    BY MS. BEEBER:

5              Q.    You are saying pre-production?

6    What date are you looking for?  I can tell you

7    when it was released.

8              A.    I mean, we wrote a script.

9              Q.    Okay.  But you don't know whether

10   you had a treatment or a script or anything done

11   before you signed this agreement in April 1st of

12   2003?

13             A.    I don't recall.

14             Q.    As of April 1st, 2003, had you

15   given any thought as to how the sequel would be

16   released -- on what platform?

17             A.    I mean, I would just say generally

18   when we make motion pictures, we want to exploit

19   them in every distribution channel that is

20   available.  And, you know, if that film is good

21   enough, it can -- we will pursue all of them.

22             Q.    Had you given any thought as to

23   what the initial release of the sequel would be in

24   terms of platform?

25             A.    I mean, I -- theatrical, could be



STEVE RICHARDS Vol. I Confidential
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.

December 12, 2013
112

1    video, could be television.  But I think on this

2    film specifically once we started the film, we had

3    an agreement in place with Warner Home Video which

4    included theatrical and video rights.

5              Q.    How was Wrath of the Dragon God

6    initially released in the United States?

7              A.    It was SyFy.

8              Q.    What is SyFy?

9              A.    It is a basic cable channel.

10             Q.    So would you say that Wrath of the

11   Dragon God was initially released on television?

12             A.    I would say it was initially

13   released on basic cable.

14             Q.    Is basic cable a kind of

15   television?

16             MR. MARSHALL:  If it is within your

17   knowledge.  You are asking for things that are

18   really kind of expert witness stuff, but we will

19   go ahead and do it.

20             Go ahead.

21             THE WITNESS:  Yes, I -- although I

22   am not an expert, I would say that basic cable is

23   a form of TV.

24   BY MS. BEEBER:

25             Q.    Can you turn to Paragraph 4 of the



 1    agreement?  It begins on Page 4.  It's kind of

 2    long, but I am sure your counsel will want you to

 3    read it before I start to ask you questions about

 4    that provision.

 5                   So if you want to, just read it and

 6    let me know when you are finished doing that.

 7    It's Paragraph 4, "Obligations," and it has

 8    subparts A, B, C, D, E, and F.  My questions are

 9    going to center on C and D, if that helps in your

10    reading time.

11                   MR. MARSHALL:  I'm sorry.

12    Paragraphs C and D?

13                   MS. BEEBER:  Yes.

14                   MR. MARSHALL:  On Page 5?

15                   MS. BEEBER:  On Page 5.

16                   MR. MARSHALL:  Read the whole --

17    start with the whole paragraph.

18             (Document reviewed by witness.)

19                   THE WITNESS:  Okay.

20    BY MS. BEEBER:

21             Q.   So Paragraph 4 is entitled

22    "Obligations."  And it says that -- towards the

23    bottom of the paragraph:

24                   "Purchaser" -- which we

25             established was Ismir -- "shall



 1            assume the following obligations

 2            with respect to the sequel --"

 3                 Which is the defined term of what

 4   you are getting rights granted in by this

 5   agreement.

 6            A.   Uh-huh.

 7            Q.   (Reading:)

 8                 "-- on the following terms

 9            and conditions."

10                 And C refers to:

11                 "Sweetpea's obligation under

12            Paragraph 9 of the first

13            amendment."

14                 Do you know what Paragraph 9 of the

15   first amendment is?

16            A.   Not offhand.

17            Q.   Is the first amendment one of

18   the -- as referred to in this agreement, is the

19   first amendment one of the documents that I put in

20   front of you earlier today, if you know?

21            A.   I would think you would know better

22   than me.

23            Q.   Well, do you believe that the first

24   amendment in this agreement between Sweetpea and

25   Ismir refers to the document we have been calling



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 117 of 386   Page ID #:5838

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            115

 1    "the first amendment," which is --

 2            A.    Which exhibit number?

 3            Q.    That was 6; Richards 6.

 4            A.    Okay.

 5            Q.    So Paragraph C says that basically

 6    Ismir is responsible for Sweetpea's obligation

 7    under Paragraph 9 of the first amendment to pay an

 8    account to TSR 1 2/3 percent of the net profits

 9    derived from the sequel.

10            Did you understand that to be one

11    of Ismir's obligations at the time you executed

12    this agreement?

13            A.    I mean, I really don't recall the

14    agreement.

15            MS. BASINGER:  I am going to --

16    objection; the document speaks for itself, calls

17    for a legal conclusion, misstates the document.

18    BY MS. BEEBER:

19            Q.    Do you have any understanding as to

20    why Ismir was being made responsible to satisfy

21    Sweetpea's obligation under the first amendment?

22            MR. MARSHALL:  Under Paragraph 9?

23    BY MS. BEEBER:

24            Q.    Under Paragraph 9 in the first

25    amendment as set forth in Paragraph 4C of this



 1   exhibit?

 2               MR. MARSHALL:  The first amendment,

 3   this document says, is defined in Exhibit AC.  Is

 4   there an Exhibit AC here?

 5               MS. BEEBER:  I read that also, and

 6   I didn't understand what that meant because there

 7   doesn't seem to be an AC, but you guys produced

 8   this one from your files.

 9               MR. MARSHALL:  I don't know.  This

10   just was in our file, you know.  This was the

11   one-picture license.  I don't see it.  I am just

12   trying to -- trying to find some definition

13   whether we were referring to the right document in

14   the other Paragraph 9 or not.

15               MS. BEEBER:  I mean if you -- Bob,

16   for your benefit, if you go to Richards 6 and you

17   look at Paragraph 9, it does refer to

18   1 2/3 percent of the net profit, so I am pretty

19   sure we are in the right place.

20               MR. MARSHALL:  I think you are

21   probably right.  I just was -- I saw this

22   reference and I wanted to check it out.

23               We don't have that attached to

24   this?  It's not attached?

25               MS. BEEBER:  Not as far as I can



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 119 of 386  Page ID #:5840

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          117

 1  tell.  There is something that says "AC," but that
 2  may be a typo in the agreement.  I don't know.  I
 3  just have what I have to work with here.
 4              MR. MARSHALL:  Okay.  So let's
 5  assume for the moment that it refers to
 6  Paragraph 9 of Exhibit 6.  Right?
 7  BY MS. BEEBER:
 8              Q.   Assuming for the moment that it
 9  refers to Paragraph 9 of Exhibit 6, what is your
10  understanding as to why Ismir was taking on the
11  obligation to pay Sweetpea's obligation to TSR, if
12  you know?
13              A.   I mean, I am not an attorney, so
14  I --
15              MR. MARSHALL:  Just if you know.
16  Do you have any understanding?
17              THE WITNESS:  Maybe this was just a
18  negotiated term between the two attorneys.
19              MS. BEEBER:  Okay.
20              MR. MARSHALL:  Isn't there on the
21  next sentence says that they are not assuming the
22  obligation?  I mean, I am reading this, and when
23  you read these sentences in the abstract -- it
24  says Sweetpea's obligation to pay such-and-such of
25  the net profits.  And then the next sentence says



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 120 of 386  Page ID #:5841

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              118

 1  passive royalty of two-thirds of 1 percent.  I

 2  don't know if it's the same thing or not -- shall

 3  not be assumed by purchaser.

 4              MS. BEEBER:  Those are two

 5  different things.

 6              MR. MARSHALL:  They are?

 7              MS. BEEBER:  One is the

 8  1 2/3 percent of the net profits.  Another is

 9  two-thirds of 1 percent of the budget.  They are

10  two different --

11              MR. MARSHALL:  Okay.  So first

12  there was the net profits you are talking about.

13  If you have any understanding.

14              MS. BEEBER:  If you want to read

15  paragraph --

16              Well, he already answered the

17  question.

18              MS. MARSHALL:  I didn't answer the

19  question.

20              MS. BEEBER:  No, I am not saying

21  you did.  I am not saying you did.  I am saying

22  Mr. Richards answered the question.

23              MR. MARSHALL:  Okay.  I am just

24  clarifying it's not as if everything in this

25  paragraph was assumed.  It seemed like when you



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 121 of 386  Page ID #:5842

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          119

 1 │ were questioning, you were suggesting it.  But

 2 │ anyway --

 3 │              MS. BEEBER:  I am just trying to

 4 │ understand his understanding of why Ismir was

 5 │ assuming the obligation as set forth in

 6 │ Paragraph C.

 7 │ BY MS. BEEBER:

 8 │         Q.   And I think your answer is "I don't

 9 │ know"; correct?

10 │         A.   Yeah.  With regard to net profits,

11 │ yes.

12 │         Q.   Paragraph 5 on the next page,

13 │ Page 6 of the agreement, says:

14 │              "Reimbursement:  The parties

15 │              acknowledge that under

16 │              Paragraph 9 of the first

17 │              amendment Sweetpea may be

18 │              required to make a passive

19 │              royalty payment to TSR of

20 │              two-thirds of one percent of the

21 │              'budget' for the sequel.

22 │              Provided that such payment shall

23 │              not be less than $116,667 and

24 │              shall not exceed $200,000."

25 │              You have read the rest of this



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 122 of 386   Page ID #:5843

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              120

 1  paragraph and, you know, you should feel free to

 2  read it again.  Now I am going to be asking you a

 3  question about the first sentence.

 4             MR. MARSHALL:  Take a moment to

 5  read the entire thing.

 6             MS. BEEBER:  I am not trying to

 7  trick anybody here.

 8        (Document reviewed by witness.)

 9             THE WITNESS:  Okay.

10  BY MS. BEEBER:

11        Q.   Did you have an understanding of

12  what this paragraph meant at the time that you

13  executed the agreement?

14             MR. MARSHALL:  Again, the agreement

15  speaks for itself.  His understanding is really

16  not relevant.

17             But you can answer the question.

18             THE WITNESS:  I mean, I think

19  this -- overall the agreement is allowing the

20  chain of title to be sufficient to allow the

21  single-purpose production company to go make the

22  film.  And this paragraph, although I am not an

23  attorney, is breaking down how each party is going

24  to share the responsibility of that passive

25  royalty and whatever that passive royalty is going



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 123 of 386   Page ID #:5844

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              121

 1  to be.

 2  BY MS. BEEBER:

 3          Q.   Okay.  Do you see the sentence,

 4  like, about nine lines down from No. 5; it says

 5  "commencement" on the left-hand side?

 6          A.   Yep.

 7          Q.   If you follow that to the beginning

 8  of the next sentence all the way on the right-hand

 9  side, it says:

10              "Sweetpea shall make such

11              payment even if Paragraph 7 and

12              not Paragraph 9 of the first

13              amendment is or becomes

14              applicable to the sequel."

15          At the time that you signed this,

16  did you have an understanding of what Paragraph 7

17  and Paragraph 9 of the first amendment were?

18          A.   I mean, I certainly was not --

19  first of all, this is 15 years ago, so no, I don't

20  really remember at all.  And secondly, there were

21  a lot of production counsel involved and an

22  outside bank.

23          So I think all I was concerned

24  about was making a movie and making sure we had

25  the rights to make a movie.



1          Q.   Do you know as you sit here today

2    what Paragraph 7 and Paragraph 9 of the first

3    amendment are about?

4               MR. MARSHALL:   Without looking at

5    the document you gave us?

6               MS. BEEBER:   Yeah.  Well, you can

7    look at that.

8               MR. MARSHALL:   I mean, I don't

9    know.  Passive royalty -- what are you referring

10   to -- Paragraph 9?  Okay.  You want the general

11   subject matter of this paragraph?

12   BY MS. BEEBER:

13          Q.   Before you came here today, did you

14   have any understanding of what Paragraph 7 and

15   Paragraph 9 of the first amendment were about at

16   any time?

17          A.   Well, I think 7 through 11 is all

18   about the passive royalty that would be due.

19          Q.   And is a different passive royalty

20   due in different situations?

21          A.   Yes, depending on I think the

22   ultimate way the film is released.

23          Q.   And how does the amount of the

24   passive royalty depend on the ultimate way the

25   film is released?



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              123

```
 1                    A.    Can you repeat that one more time?
 2                    MS. BEEBER:  Read it back.
 3              (Record read as follows:
 4              "Question:  And how does the amount
 5              of the passive royalty depend on the
 6              ultimate way the film is released?")
 7                    THE WITNESS:  Say it one more time.
 8              (Record read as follows:
 9              "Question:  And how does the amount
10              of the passive royalty depend on the
11              ultimate way the film is released?")
12                    THE WITNESS:  I think you know once
13     the film is released how -- what -- I mean, when
14     we make these films, we want to distribute them in
15     all possible distribution channels.  So once we
16     know how it is released, you would know which
17     media distribution channel you actually were
18     successful in being able to release it on.
19     BY MS. BEEBER:
20              Q.    And which media channel would
21     determine the amount of passive royalty that was
22     due under the first amendment -- the first one or
23     something else?
24                    MR. MARSHALL:  Depends what the --
25     anyway.
```



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          124

```
 1                    MS. BEEBER:  Don't --
 2                    MR. MARSHALL:  Wait a minute.
 3   Listen to me for a second.  You are asking
 4   questions -- you mean based on what the contract
 5   says or his understanding?
 6                    MS. BEEBER:  His understanding.
 7                    MR. MARSHALL:  Okay.  When you are
 8   asking him a definitive question, just which one
 9   is this, that can be based on what somebody has
10   told him?  Reading a document and his
11   interpretation?  What are you asking for?
12                    You know, because his -- this is an
13   objective test, not a subjective, what he thought
14   or otherwise.  I don't think it's really relevant.
15   But if you don't -- you have got to be more
16   specific as to what you are dealing with here.
17   BY MS. BEEBER:
18                    Q.   I asked you before you came here
19   today whether you had any understanding of what
20   Paragraph 7 and Paragraph 9 of the first amendment
21   were about at any time.
22                    And you said:
23                    "I think 7 through 11 is all
24                    about the passive royalty that
25                    would be due."
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 127 of 386   Page ID #:5848

STEVE RICHARDS Vol. I Confidential                December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            125

```
 1                 And I said:

 2                 "Is a different passive

 3           royalty due in different

 4           situations?"

 5                 And you said:

 6                 "Yes, depending on I think

 7           the ultimate way the film is

 8           released."

 9                 I am asking you:  How do you

10   determine in order to assess the passive royalty

11   due "the ultimate way that the film is released"?

12   I am using your words back there that you said.

13                 Can you answer that?

14           A.   Well, I think we make a movie as

15   good as we possibly can.  We try to release it in

16   all the potential distribution channels.  And

17   depending on how that is released, then I think

18   someone would be able to look at the contract and

19   determine what passive royalties would be due.

20           Q.   So let's talk about Wrath of the

21   Dragon God for a minute.

22                 How would you go about determining

23   what passive royalty was due?  What would be the

24   first step that you would take?

25                 MR. MARSHALL:  This question
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 128 of 386   Page ID #:5849

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              126

1   doesn't assume that he actually did that; correct?

2                    MS. BEEBER:  Well, he actually did.

3                    MR. MARSHALL:  No, he didn't.  He

4   said the bank determined what was due on this in

5   his prior testimony.  So, you know, if this is a

6   hypothetical, that's fine with me, but that's not

7   what he testified to.  The contract specifies what

8   the royalties are based on different usages.

9   BY MS. BEEBER:

10                   Q.   And I am asking you:  How do you

11  determine the usage in order to determine what

12  passive royalty is due?  How would you do that?

13                   A.   Well, on that -- on that film in

14  particular, I relied on the attorneys.  So they

15  actually -- based upon the film that we were

16  making, they determined what the passive royalty

17  was going to be necessary to be made at that

18  moment.

19                   Q.   And do you know how they determined

20  that?

21                   A.   Well, I think they reviewed this

22  contract.

23                   Q.   Okay.  And after reviewing the

24  contract, do you know how they determined what

25  passive royalty was due?



1              A.   I mean, there were a lot of people

2    involved.

3              Q.   If you don't know, you don't know.

4              A.   I don't.

5              Q.   You can say, "I don't know."  I'm

6    not --

7                   MR. MARSHALL:  Yeah, don't struggle

8    with giving her an answer.

9    BY MS. BEEBER:

10             Q.   Yeah, just so you understand, I'm

11   not trying to trick you or make you say something.

12             A.   Okay.

13             Q.   I just want to know what you know.

14             A.   Okay.

15             Q.   That's all I want to know.

16             A.   Okay.  Well, I'm not sure how it

17   was calculated.

18             Q.   I know.  I am not trying -- I'm not

19   trying to make this --

20             A.   Okay.

21             Q.   -- painful for you, like, in any

22   way.

23             A.   Okay.

24             Q.   I am really not.

25             A.   Okay.  Well, I'm not sure.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 130 of 386  Page ID #:5851

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              128

1        Q.   Okay.  What attorneys are you

2   referring to?

3        A.   You know, on that particular film,

4   there was bank counsel.  There was also counsel

5   for First Look Entertainment.  I think there was

6   counsel for the completion bond company.

7        Q.   Do you know which counsel it was

8   that determined what passive royalty payment was

9   due?

10       A.   You mean which attorney

11  specifically?

12       Q.   Uh-huh.

13       A.   I don't remember.

14       Q.   Do you remember who that counsel

15  represented?

16       A.   I'm not sure if it was Comerica or

17  NetWest that did the bank loan.

18       Q.   But you believe the counsel who

19  represented the bank that extended the loan was

20  the counsel that determined what passive royalty

21  was due?

22       A.   Yes.  And I would just say

23  generally they certainly don't want to be lending

24  money to a company and then find out they don't

25  have the underlying rights.



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          129

```
 1            Q.   Well, when did this counsel make
 2     the determination of what amount of royalty was
 3     due?
 4            A.   I guess at the time --
 5                 MR. MARSHALL:  No guessing.  If you
 6     know, you know.  If you don't know, you don't
 7     know.
 8                 THE WITNESS:  Can you repeat that
 9     question.
10                 MS. WOGAN:  I didn't think he was
11     guessing.
12                 MR. MARSHALL:  He said "I guess."
13            (Record read as follows:
14            "Question:  When did this counsel
15            make the determination of what
16            amount of royalty was due?")
17                 THE WITNESS:  Yeah, I would assume
18     it was around the time that we closed the loan.
19     BY MS. BEEBER:
20            Q.   But wouldn't they need to know what
21     the usage of the film was, how the film was
22     released in order to make that determination?
23                 MR. MARSHALL:  That's an
24     argumentative question.  How is he supposed to
25     know --
```



1            MS. BEEBER:  Because he told me

2      that the way that the royalty is determined is by

3      looking at the usage and looking at how it was

4      released.

5            MR. MARSHALL:  And the contract.

6            MS. BEEBER:  And now he is telling

7      me that the bank made that decision at the time

8      they provide the financing.  I am saying, well, if

9      he said before that you needed to know how it was

10     released and on what platform, what the usage was

11     in order to determine that, how was the bank

12     determining it before that happened?  That's my

13     question.

14            MR. MARSHALL:  Well, he didn't say

15     it was before.  You're assuming it was before.

16            MS. BEEBER:  He just did.  He just

17     said it was at the time that the financing was

18     extended.

19            MR. MARSHALL:  Well, that could

20     have been at the time that they -- during the

21     production of the picture, they knew what they

22     were going to distribute the picture on.

23            MS. WOGAN:  Are you testifying or

24     are you going to have your client testify?

25            MR. MARSHALL:  No, but you are



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 133 of 386  Page ID #:5854

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          131

 1  saying he said it's a different time.  He's not

 2  saying it's a different time.  He doesn't -- he

 3  said he didn't know, but you are probing

 4  something --

 5                  MS. BEEBER:  He didn't say he

 6  didn't know.  He said he -- okay.  The record will

 7  speak for itself.

 8                  MR. MARSHALL:  Okay.

 9                  MS. BEEBER:  He has given me very

10  specific answers --

11                  MR. MARSHALL:  Right.

12                  MS. BEEBER:  -- to very specific

13  questions.

14                  MR. MARSHALL:  Okay.  What's the

15  new question?

16  BY MS. BEEBER:

17          Q.   Did the bank determine the amount

18  of the passive royalty that was due before the

19  picture was initially released?

20                  MR. MARSHALL:  If you know.

21                  THE WITNESS:  Yes.  A determination

22  was made prior to the film being released because

23  a payment was made.

24  BY MS. BEEBER:

25          Q.   Do you believe that's consistent



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 134 of 386  Page ID
#:5855

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                           132

1    with the answer that you gave me a little while

2    ago that you needed to look at the usage and how

3    the film was released in order to determine the

4    royalty that was due?

5            A.    I think what I was trying to

6    communicate is we go off and we make a film as

7    good as possible.  And we -- the film could be

8    released theatrically.  It could be released on

9    video.  It could be released on pay TV.  And if

10   the film was released theatrically, there might

11   have been an additional payment that would have

12   been made, but at the time that we started

13   principal photography or when we closed the bank

14   loan, there was a determination that was made.

15           Q.    What was the determination that was

16   made?

17           A.    I guess just the passive royalty

18   that was due or might have been due at that time

19   or ultimately due.

20           Q.    And do you know at the time that

21   the bank loan was closed, how it was determined

22   what the usage would be?

23               MR. MARSHALL:  If you know or

24   recall.

25               THE WITNESS:  They probably looked



1  at the Warner Home Video contract that we had in

2  place and made a determination based upon the

3  contract that we had in place at the time.

4  BY MS. BEEBER:

5          Q.   How would the Warner Home Video

6  contract that you had in place help determine what

7  passive royalty was due, if you know?

8          A.   The intention of how they were

9  going to exploit it.

10         Q.   And what was the intention of how

11  they were going to exploit it under the Warner

12  Home Video contract?

13         A.   Definitely to release it on video

14  and possibly theatrically.

15              VIDEOGRAPHER:  Five minutes left on

16  tape, Counsel.

17              MS. BEEBER:  Okay.  Just give me

18  one second.

19              We will take a break now.

20              VIDEOGRAPHER:  This concludes

21  Tape 2.  We are off video record at 2:25 p.m.

22         (Whereupon, a recess was held from

23         2:25 p.m. to 2:48 p.m.)

24              VIDEOGRAPHER:  This is the

25  beginning of Tape No. 3.  We are back on video



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 136 of 386  Page ID #:5857

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              134

```
 1    record at 2:48 p.m.

 2                   THE COURT REPORTER:  11.

 3              (Exhibit No. 11 was marked for

 4              identification by the shorthand

 5              reporter and is attached hereto.)

 6    BY MS. BEEBER:

 7              Q.    Ready?

 8              A.    Yep.

 9              Q.    So if you look back to the

10    agreement that we were just looking at.

11              A.    Okay.

12              Q.    And remember, we were looking at

13    Paragraph 5, which was about the payment that

14    needed to be made, the passive royalty payment.

15              A.    Okay.

16              Q.    Did Ismir make the passive royalty

17    payment to TSR or its successor with respect to

18    D&D 2?

19              A.    My recollection is the production

20    lender made that payment and a whole bunch of

21    other payments probably at the time of closing of

22    the bank loan.

23              Q.    Who actually wired the money in

24    order to pay the passive royalty payment for

25    D&D 2?
```



 1              A.    I think the bank; production

 2   lender.

 3              Q.    And who was that?

 4              A.    Looks like it was Comerica.

 5              Q.    And you are looking at what we have

 6   marked as Richards Exhibit 11 in the "comment"

 7   area of the document?

 8              A.    (No audible response.)

 9              Q.    And what is it that you are

10   referring to that tells you that the money was

11   wired by Comerica?

12              MR. MARSHALL:  You don't want a

13   supposition, do you?  You just want what he knows

14   as to --

15              MS. BEEBER:  Uh-huh.

16              THE WITNESS:  Actually, I'm not

17   sure if it was Comerica receiving it or Comerica

18   making it.  Because it says incoming wire credit.

19   I'm not sure.

20              MR. MARSHALL:  You are not asking

21   him to interpret this document, are you?

22              MS. BEEBER:  No.  I am asking who

23   made the payment of the $116,666.

24              MS. BASINGER:  It does feel,

25   Jessie, he is interpreting it.



STEVE RICHARDS Vol. I Confidential                                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                                              136

```
 1                    MS. BEEBER:  Okay.  If you know.

 2                    MR. MARSHALL:  If you know.  As you

 3     sit here today, do you know --

 4                    THE WITNESS:  No.  I don't recall.

 5     But based upon my experience, if you have a

 6     production facility for a particular film, usually

 7     the production lender requires a bunch of payments

 8     to be made, and they facilitate that payment.

 9     BY MS. BEEBER:

10          Q.    And who directs them what payments

11     to be made?

12          A.    It's usually, you know, the

13     production attorney and their internal production

14     attorney -- I mean, the production counsel for the

15     bank.

16          Q.    Did you have anything to do with

17     directing that Hasbro be wired $116,666 on

18     June 22nd, 2004?

19          A.    I just don't recall, but my guess

20     is that was a payment when we closed the bank

21     loan.

22                    MS. BASINGER:  Can we just -- we

23     don't have to go off -- go off the record for one

24     second.

25
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 139 of 386   Page ID #:5860

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              137

```
 1              (Whereupon, a discussion was held

 2          off the record.)

 3              MS. BEEBER:  Did we have a pending

 4   question?

 5              THE COURT REPORTER:  No.

 6              MS. BASINGER:  So you don't know?

 7              MS. BEEBER:  I really don't.

 8              MS. WOGAN:  Did we produce the

 9   Silver Pictures wire transfer for it?

10              MS. BASINGER:  Yeah, whatever.

11   Because in your other -- for the other one -- if

12   this is the second page of an actual wire transfer

13   that you guys received, and I was wondering if --

14   where that first page was that Hasbro received.

15              MR. MARSHALL:  This is a Hasbro

16   document; correct?

17              MS. BEEBER:  This is all on the

18   record?

19              MS. BASINGER:  No, I went off the

20   record.

21              THE COURT REPORTER:  We never --

22              MS. BASINGER:  I was off the

23   record.

24              MS. BEEBER:  We're not off the

25   record.
```



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              138

```
 1                    THE COURT REPORTER:  We can take it
 2    out, but we're on the video record.
 3                    MS. BEEBER:  Can we talk about it
 4    later?
 5                    MS. BASINGER:  Well --
 6    BY MS. BEEBER:
 7            Q.    Let's talk about Book of Vile
 8    Darkness for a minute.
 9                    Do you know what Book of Vile
10    Darkness is?
11            A.    Uh-huh.
12            Q.    And what is that?
13            A.    It's the name of one of the, I
14    guess, publications that Wizards or TSR released.
15            Q.    Were you involved in a production
16    regarding Book of Vile Darkness?
17            A.    Yeah.  I view that as D&D 3.
18                    MS. BEEBER:  Let's do 35, Maura.
19    Actually, let's do this one first, 39A.
20            (Exhibit No. 12 was marked for
21            identification by the shorthand
22            reporter and is attached hereto.)
23                    THE COURT REPORTER:  12.
24                    MS. BEEBER:  Yes.  Thank you.  I am
25    doing well today, too.
```



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              139

```
 1   BY MS. BEEBER:
 2              Q.    Let me show you what the reporter
 3   has marked as Richards Exhibit 12.
 4              Have you had a chance to review it?
 5              A.    I am doing it right now.
 6              Q.    Okay.
 7              (Document reviewed by witness.)
 8              THE WITNESS:   Okay.
 9   BY MS. BEEBER:
10              Q.    Is this an e-mail that you sent to
11   Courtney Solomon on Friday, May 1st, 2009?
12              A.    Yeah, I don't recall sending it,
13   but it says my name.
14              Q.    And the subject says "DD3."  What
15   do you understand that to be?
16              A.    Dungeons & Dragons 3.
17              Q.    And it says "next steps," and there
18   is a list from 1 to 13.
19              What were those next steps for, if
20   you know?
21              A.    It certainly appears to be things
22   that are action items, things that get done.
23              Q.    And these are things to get done
24   with respect to the production of D&D 3?
25              MS. BASINGER:   That's vague and
```



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            140

 1   ambiguous.

 2              THE WITNESS:  I would say at this

 3   specific point in time it would be the things that

 4   we might need to get done to -- you know, to get

 5   together the financing to actually go make a film.

 6              MR. MARSHALL:  This is -- the date

 7   of this is --

 8              MS. BEEBER:  May 1st, 2009.

 9   BY MS. BEEBER:

10        Q.    And so what does "hire line

11   producer" mean?

12        A.    On all productions that we do, we

13   have a person that really assists with the

14   execution of the production.  And he would be

15   helping put together a budget and overseeing the

16   actual production.

17        Q.    And what is No. 4, "revised

18   treatment"?  What does that mean?

19        A.    That would most likely be something

20   that was a framework for a script.

21        Q.    Does that mean that you had a

22   treatment for D&D 3 as of May of 2009?

23        A.    I really -- I don't recall, but it

24   would seem that way.

25        Q.    Do you know who the author was of



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              141

```
 1   that treatment?
 2              A.   It could have been someone internal
 3   at Silver Pictures, or it could have been Brian
 4   Rudnick, who wrote a script.  And it could have
 5   also been him and his, I guess, previous writing
 6   partner, but I don't know for sure.
 7              Q.   And No. 7 says --
 8              MS. BASINGER:  I'm sorry.
 9              Mr. Richards, if you could do your
10   best to refrain from speculating.  If you have an
11   idea or reason for the idea, that's great, but
12   just pure speculation -- and I don't recall
13   whether Ms. Beeber gave you that instruction at
14   the beginning of your deposition or not, but pure
15   speculation isn't helpful.  But if you have a
16   basis for a belief --
17              THE WITNESS:  Okay.
18              MS. BASINGER:  -- then that's
19   absolutely appropriate.
20              THE WITNESS:  Okay.
21              MS. BEEBER:  I agree with that.
22   BY MS. BEEBER:
23              Q.   No. 7 says:
24              "Finish SyFy contract."
25              Do you know what that was -- what
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 144 of 386   Page ID #:5865

STEVE RICHARDS Vol. I Confidential                                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                                          142

1    you meant by that?

2              A.    I think it was that as well as -- 8

3    and 9 is probably really trying to nail down

4    financing for specific distribution rights for the

5    film.

6              Q.    What do you mean by that?

7              A.    Whenever we try to make

8    independent -- independently financed films, we

9    try to put together financing from various selling

10   of rights, distribution rights.  And I think those

11   three items were all, let's try to, you know, put

12   together as much collateral to make the movie as

13   possible.

14             Q.    And what distribution rights were

15   you selling to SyFy?

16             A.    It would have been basic cable.

17             Q.    And what distribution rights were

18   you selling to -- I'm sorry.  What does "conclude

19   U.S. video agreement" mean?

20             A.    Well, we -- we didn't.

21             MR. MARSHALL:  She is just asking

22   what you are contemplating here.

23   BY MS. BEEBER:

24             Q.    What do these words, "conclude U.S.

25   video agreement," mean?  What do you mean by these



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 145 of 386  Page ID #:5866

STEVE RICHARDS Vol. I Confidential                December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                         143

1    words?

2         A.   I think lock down the deal.

3         Q.   And you are saying you ultimately

4    did not lock down a U.S. video deal?

5         A.   Not prior to production.

6         Q.   And by that you would mean you

7    didn't find an entity to whom you could sell the

8    distribution rights in the United States for

9    video?

10        A.   At that time.

11        Q.   Did you ever lock down U.S. video

12   rights?

13        A.   I think as of -- as of today, no,

14   we haven't.

15        Q.   Are you still trying to do that as

16   of today?

17        A.   Me personally, no.  I am not

18   actively doing it, no.

19        Q.   Do you know someone who is?

20        A.   Yeah, I'm not sure if there is any

21   active -- active discussions going on right now.

22        Q.   Who would be having those

23   discussions if they were going on?

24             MS. BASINGER:  Calls for

25   speculation.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 146 of 386   Page ID #:5867

STEVE RICHARDS Vol. I Confidential                     December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            144

 1  BY MS. BEEBER:

 2          Q.   If you know.

 3          A.   I mean, Rand Stoll was involved.

 4          Q.   Are you still thinking or are you

 5  done?  I'm just not sure.

 6          A.   Yeah.

 7          Q.   You're done.  Okay.

 8               No. 9, "conclude IFC contract,"

 9  what does that mean?

10          A.   I'm not even sure.  I don't recall.

11          Q.   Is IFC the Independent Film

12  Channel?

13          A.   I am not sure.

14          Q.   Okay.  No. 10 says:

15               "Finish IM Global contract."

16               What did you mean by that?

17          A.   IM Global was the sales agent that

18  assisted with making sales on the film in the

19  international marketplace.

20          Q.   And what distribution rights was IM

21  Global involved with?

22          A.   Selling all forms of distribution

23  channels internationally.

24          Q.   And did you finish a contract with

25  IM Global ultimately?



1        A.    Yes.

2              Q.    And then No. 11 says "obtain cast

3    lists."  Who were you obtaining the cast lists

4    from?

5              A.    I don't recall.  Might have been

6    the casting agent.

7              Q.    Who was the casting agent?

8              A.    I think at the time we were talking

9    to Jillian Hauser.

10             Q.    No. 12 says "verify expiration date

11   of Hasbro contract."

12                   What did you mean by that?

13             A.    I think this has probably to do

14   with really understanding the rolling right and

15   understanding the specifics of that provision.

16             Q.    What is the rolling right?

17             A.    Every five years; you know, the

18   right relating to every five years.

19             Q.    Are you looking at a particular

20   document right now?

21             A.    The one that's laying on top, yeah.

22             Q.    What document are you looking at?

23             A.    Exhibit 6.

24             Q.    And where are you looking in

25   Exhibit 6?



```
 1            A.    Paragraph 6.

 2            Q.    Did you do anything to verify the

 3    expiration date of the Hasbro contract in

 4    connection with D&D 3?

 5            A.    We definitely were -- well, we did

 6    look into when the initial U.S. release of D&D 2

 7    occurred.  And that was an important aspect of,

 8    you know, ensuring we could make another movie.

 9            Q.    And do you recall when the initial

10    U.S. release of D&D 2 occurred?

11            A.    No, not specifically.  I think it

12    was in October.

13            Q.    October of 2005?

14            A.    Yeah.  I think that's right.

15            Q.    If I told you that Wrath of the

16    Dragon God was first shown on the SyFy channel on

17    October 8th, 2005, would that help you determine

18    what date you were verifying to be the initial

19    U.S. release date of D&D 2?

20            A.    Yes.

21            Q.    And what date would it be?

22            A.    That date.

23            Q.    October 8th, 2005?

24            A.    Right.

25            Q.    So then what was the expiration
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 149 of 386  Page ID #:5870

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              147

 1  date of the Hasbro contract, given that Wrath of

 2  the Dragon God was first shown on SyFy on

 3  October 8th, 2005?

 4          A.   It would be five years after that

 5  date.

 6          Q.   So October 8th, 2010?

 7          A.   Right.

 8          Q.   And what did you need to do before

 9  October 8th of 2010 --

10          MS. BASINGER:  Objection; calls for

11  speculation --

12          MS. BEEBER:  I wasn't actually done

13  with my question, but that's okay.

14          MS. BASINGER:  I'm sorry.

15  BY MS. BEEBER:

16          Q.   -- in order to prevent the Hasbro

17  contract from expiring?

18          MS. BASINGER:  Objection; calls for

19  speculation, calls for a legal conclusion.

20          MR. MARSHALL:  I agree with that.

21          So are you asking for his

22  understanding based on communications from others?

23          MS. BEEBER:  No.  I am asking

24  him -- you know, he said verify expiration date of

25  Hasbro contract in what we have marked as Richard



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                        148

1    Exhibit 12.

2              MR. MARSHALL:  Right.  Did you ask

3    him about --

4              MS. BEEBER:  And he has provided me

5    with a date of that expiration.

6    BY MS. BEEBER:

7         Q.   And now my question is:  What did

8    you need to do, what did you believe you needed to

9    do in order to prevent the Hasbro agreement from

10   expiring?

11             MR. MARSHALL:  Same objections.

12             MS. BASINGER:  And I am going to go

13   vague and ambiguous as to Hasbro agreement

14   expiring.  I think you are referring to the

15   document; right?

16             MS. BEEBER:  Uh-huh.

17             MR. MARSHALL:  If you had any

18   understanding.

19             THE WITNESS:  I mean, I am not an

20   attorney, but it doesn't seem like -- well, are

21   you asking me what Paragraph 6 says?

22   BY MS. BEEBER:

23        Q.   No.  I am asking you -- okay, I

24   will do it a different way.

25             Did you believe that -- at any



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 151 of 386   Page ID #:5872

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            149

1    time, did you believe that in order to prevent the

2    Hasbro contract from expiring, as you are talking

3    about in 12 on your list, you needed to commence

4    principal photography before October 8, 2010?  At

5    any time did you believe that?

6              A.   Yeah.  That is correct, yes.

7              Q.   Did you believe at any time that in

8    order to prevent the Hasbro contract from

9    expiring, you needed to make a passive royalty

10   payment to Hasbro before October 8th, 2010?

11             A.   No.  I think the key thing was

12   really satisfying the principal photography.  And

13   there was a passive royalty that would be

14   associated with how the film is exploited.  Yeah.

15             MS. BASINGER:  I apologize.  Would

16   you mind reading back the last question and

17   answer.

18             (Record read as follows:

19             "Question:  Did you believe at any

20             time that in order to prevent the

21             Hasbro contract from expiring, you

22             needed to make a passive royalty

23             payment to Hasbro before

24             October 8th, 2010?

25             "Answer:  No.  I think the



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                               150

1              key thing was really satisfying

2              the principal photography.  And

3              there was a passive royalty that

4              would be associated with how the

5              film is exploited.  Yeah.")

6    BY MS. BEEBER:

7              Q.   And at what point in time would you

8    determine how it was exploited in order to

9    determine the amount of the passive royalty that

10   was due?

11             A.   Say that one more time.

12             (Record read as follows:

13             "Question:  And at what point in

14             time would you determine how it was

15             exploited in order to determine the

16             amount of the passive royalty that

17             was due?")

18                  THE WITNESS:  I guess once the film

19   is fully exploited.  It could be years later I

20   guess.

21   BY MS. BEEBER:

22             Q.   If the film was exploited in

23   multiple ways as you have been talking about,

24   which way would determine the amount of the

25   passive royalty that was due?



```
 1              A.   Well, I think --

 2                   MR. MARSHALL:  Well --

 3                   MS. BEEBER:  Please let him answer.

 4                   MR. MARSHALL:  I'm going to

 5   object --

 6                   MS. BEEBER:  You can object.  You

 7   can say --

 8                   MR. MARSHALL:  The document --

 9                   MS. BEEBER:  You can say objection

10   and the basis for your objection.

11                   MR. MARSHALL:  The document speaks

12   for itself, and you are asking for a legal

13   conclusion.  That's all.

14                   MS. BEEBER:  Okay.  That's -- okay.

15   Thank you.

16                   MR. MARSHALL:  That's a fair

17   objection.

18                   MS. BEEBER:  You say objection and

19   the basis.  That's a fair objection.

20                   MS. MARSHALL:  That's it.

21                   MS. BEEBER:  Yes.  You may speak.

22                   MS. BASINGER:  Thank you.

23                   Objection; vague and ambiguous,

24   calls for a legal conclusion, lacks foundation.

25                   MS. BEEBER:  Could you read the
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 154 of 386   Page ID #:5875

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                           152

```
 1   question back, please?
 2              (Record read as follows:
 3              "Question:  If the film was
 4              exploited in multiple ways as you
 5              have been talking about, which way
 6              would determine the amount of the
 7              passive royalty that was due?")
 8              MR. MARSHALL:  You are asking for
 9   his conclusion on that?
10              MS. BEEBER:  You have already
11   objected.  You can say "objection" and the basis
12   for your objection.  That's, like, two words.
13              MR. MARSHALL:  Okay.  Calls for his
14   conclusion.
15   BY MS. BEEBER:
16         Q.   Okay.  You can answer.
17              MR. MARSHALL:  You are asking for
18   his personal knowledge?
19              MS. BEEBER:  "You asking for" --
20   "you asking for" is not objection and the basis
21   for your objection.
22              MR. MARSHALL:  No.  Okay.  It's
23   vague and ambiguous.  I am asking for
24   clarification.
25              MS. BEEBER:  Okay.  Vague and
```



 1  ambiguous.

 2              MR. MARSHALL:  What are you asking

 3  for?

 4              MS. BEEBER:  That's not --

 5              MR. MARSHALL:  His personal

 6  knowledge?  I mean, it's not --

 7              (Simultaneous speakers.)

 8              MS. BEEBER:  Can we go off the

 9  record for a second?  Off the record.

10              VIDEOGRAPHER:  Going off the record

11  at 3:12 p.m.

12              (Whereupon, a recess was held from

13              3:12 p.m. to 3:13 p.m.)

14              VIDEOGRAPHER:  We are back on the

15  record at 3:13 p.m.

16              MS. BEEBER:  Could you please read

17  back the question?

18              (Record read as follows:

19              "Question:  If the film was

20              exploited in multiple ways as you

21              have been talking about, which way

22              would determine the amount of the

23              passive royalty that was due?")

24              MR. MARSHALL:  Same objections.

25              MS. BEEBER:  Thank you.



 1           MR. MARSHALL:  Legal conclusion,

 2    calls for speculation.  The document speaks for

 3    itself.

 4           THE WITNESS:  I think that Hasbro

 5    and the production -- or the attorneys would

 6    determine what would be due after all the

 7    distribution channels were fully exploited.  I

 8    mean, I think from my perspective, I am a

 9    producer.  I just want to get the film into

10    production and pay as little as possible.  What

11    happens downstream I think is for someone that is

12    an attorney.

13    BY MS. BEEBER:

14           Q.  When you are the producer and you

15    are trying to make the payment for as little as

16    possible, do you have to give any consideration to

17    how you are intending to exploit the film at that

18    point?

19           MR. MARSHALL:  Objection; vague and

20    ambiguous.

21           But you can answer.

22           THE WITNESS:  I think we always

23    want to distribute the film in all forms that we

24    possibly can.  And sometimes we make a good movie

25    and we can distribute it theatrically, video,



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 157 of 386   Page ID #:5878

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            155

1    television; and then sometimes things don't quite

2    work out some, always, and we might not be able to

3    do it in all those forms.

4              So I think the intention is always

5    make a film and try to distribute it in as many

6    different distribution channels as possible.

7    BY MS. BEEBER:

8              Q.   Would you pay Hasbro the passive

9    royalty for a television distribution if you had

10   no intention to distribute the film on television?

11             A.   Well, I think --

12             MR. MARSHALL:  Say that again.

13   Could you repeat that?

14             MS. BEEBER:  Could you read that

15   back?

16             (Record read as follows:

17             "Question:  Would you pay Hasbro the

18             passive royalty for a television

19             distribution if you had no intention

20             to distribute the film on

21             television?"

22             MR. MARSHALL:  You mean paid

23   pursuant -- this is a clarification -- pursuant to

24   this agreement?

25             MS. BEEBER:  Uh-huh.



 1                    MR. MARSHALL:  I am going to

 2    object.  We are not parties to that agreement.

 3                    MS. BEEBER:  Your objection is

 4    "objection" and the basis.

 5                    MR. MARSHALL:  Yeah, the objection

 6    is exactly that.  We are not parties.  It's

 7    completely speculative as to what the rights are.

 8                    MS. BEEBER:  You can say,

 9    'Objection; not a party to the agreement,

10    speculative.'

11                    MR. MARSHALL:  Right.  Calls for a

12    conclusion.  You are asking somebody that didn't

13    negotiate the agreement.

14                    MS. BEEBER:  You can't say you are

15    asking for somebody who didn't negotiate.

16                    MR. MARSHALL:  That's why he's

17    speculating.

18                    MS. BEEBER:  You can say

19    'objection' --

20                    MR. MARSHALL:  No.  I'm asking why.

21                    MS. BEEBER:  And the basis -- you

22    don't say the why.  You just say the basis.

23                    MR. MARSHALL:  Well, I am going to

24    say the why, if that's okay.

25                    MS. BEEBER:  Well, then we are



STEVE RICHARDS Vol. I Confidential                              December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                                      157

```
 1   going to -- well, then we're going to walk out and
 2   get a court order and we will have somebody
 3   monitor every question that's asked.
 4                   MR. MARSHALL:  Okay.  All right.
 5                   MS. BEEBER:  And the objection
 6   that's made.
 7                   MR. MARSHALL:  Either way, do you
 8   understand the objections?  Do you have any
 9   objections to the question?
10                   MS. BASINGER:  I'm good.  I mean, I
11   join.
12                   MR. MARSHALL:  Okay.  That's good.
13                   MS. BASINGER:  Objection; calls for
14   speculation, lacks foundation, assumes facts not
15   in evidence, calls for a legal conclusion.
16                   MR. MARSHALL:  That's more.
17              (Record read as follows:
18              "Question:  Would you pay Hasbro the
19              passive royalty for a television
20              distribution if you had no intention
21              to distribute the film on
22              television?")
23                   MS. BASINGER:  Also objection;
24   incomplete hypothetical.
25                   THE WITNESS:  I think television is
```



```
 1   one form of a distribution channel.  And I don't
 2   know when the last time we made something that
 3   didn't end up on television at some point.  So...
 4   BY MS. BEEBER:
 5           Q.   So in determining the amount of the
 6   passive royalty, if something shows up on
 7   television at some point, it's appropriate for the
 8   television passive royalty to be paid?
 9                MS. BASINGER:  Calls for a legal
10   conclusion, calls for speculation, lacks
11   foundation, assumes facts not in evidence,
12   incomplete hypothetical.
13                MR. MARSHALL:  Same; same
14   objections.
15                You mean in the abstract?  You mean
16   in this agreement?
17                MS. BEEBER:  Under this agreement.
18                MR. MARSHALL:  Same objections.
19   Calls for a legal conclusion.  The document speaks
20   for itself.
21                But anyway, you can answer the
22   question.
23                THE WITNESS:  I mean, my experience
24   as a producer is sometimes there are passive
25   royalties that are triggered by various
```



1  distribution channels that are enacted or a film

2  is exhibited by that distribution channel.  So,

3  like, for instance, a writer agreement, we may end

4  up paying a writer, you know, something based upon

5  how the film was released.  So that's my

6  experience.

7  BY MS. BEEBER:

8         Q.   Okay.  My question is:  Under this

9  agreement, if you were to exploit the film on

10  television at any point in time, would it be

11  appropriate to pay the passive royalty for

12  television?

13         A.   I think that's for an attorney to

14  determine, but, you know, I think in our

15  one-picture license, there was a concept of a

16  true-up, and based upon how it was released.  I

17  mean, I think that if we are successful in really

18  maximizing the distribution channels or media,

19  there might be different passive royalties that

20  would be due.

21         Q.   What true-up are you referring to?

22  You are referring to something in your agreement

23  between Sweetpea Entertainment and --

24         A.   Just when you had me looking at

25  those two paragraphs --



```
 1              Q.   Well, that was for D&D 2.  I am
 2   talking about D&D 3 now.
 3              A.   Okay.  Well, I guess I was just
 4   talking about the concept of you -- there might be
 5   a determination at a later time once you determine
 6   how the film was actually released.
 7              Q.   And does that concept exist in the
 8   first amendment that we marked as Richards
 9   Exhibit 6?
10              MR. MARSHALL:  He referred to that
11   concept in his agreement?
12              MS. BEEBER:  Uh-huh.  He is talking
13   about a different concept now.
14              THE WITNESS:  Yeah, I --
15              MR. MARSHALL:  Again, the document
16   speaks for itself, calls for a legal conclusion,
17   speculation.
18              MS. BASINGER:  Vague and ambiguous,
19   incomplete hypothetical.
20              THE WITNESS:  I think an attorney
21   would be able to -- I don't know.
22          (Whereupon, a discussion was held
23           off the record.)
24              MS. BEEBER:  13.
25
```



```
 1              (Exhibit No. 13 was marked for

 2              identification by the shorthand

 3              reporter and is attached hereto.)

 4   BY MS. BEEBER:

 5              Q.   You want to look at this for a

 6   minute?

 7                   MR. MARSHALL:  Yeah.  Take your

 8   time.

 9              (Whereupon, a discussion was held

10              off the record.)

11              (Document reviewed by witness.)

12                   THE WITNESS:  Okay.

13   BY MS. BEEBER:

14              Q.   Okay.  Page 14 of the agreement, it

15   says:

16                   "If this accurately reflects

17              your understanding of our

18              agreement, please sign below.

19              Sincerely, Grayson Productions,

20              LLC."

21                   Then there is a signature under

22   that.

23              A.   Okay.

24              Q.   Whose signature is that?

25              A.   That's mine.
```



```
 1              Q.    And who wrote "authorized
 2     signatory" underneath?
 3              A.    One of my colleagues.  It's Stephen
 4     Bender.
 5              Q.    How do you know that?
 6              A.    I can -- I know his handwriting.
 7              Q.    Why was Mr. Bender writing
 8     "authorized signatory" under your signature?
 9              A.    A lot of times he handles getting
10     documents signed and then scanning them and then
11     sending them out to various people.
12              Q.    Did you instruct him to write
13     "authorized signatory" under your signature?
14              A.    I don't recall.
15              Q.    Was that something he could do
16     without your authorization?
17              A.    I would say sometimes we use
18     authorized signatory if I guess there is a
19     specific document allowing us to sign this
20     document, but he may not have known if I was an
21     officer of this company or not.
22              Q.    When was the last time you looked
23     at this Page 14 with "authorized signatory"
24     written below your signature?
25              A.    Probably the day I signed it.
```



1          Q.   You have not looked at it since

2    September of 2010?

3          A.   No.

4               MS. BASINGER:  Objection; assumes

5    facts not in evidence.

6    BY MS. BEEBER:

7          Q.   Do you believe you signed this

8    agreement on September 1st, 2010?

9               MS. BASINGER:  Objection; calls for

10   speculation.

11              MR. MARSHALL:  Is there a date?

12   It's dated on the top here.  "As of."

13              THE WITNESS:  I don't recall.

14   BY MS. BEEBER:

15         Q.   Do you know when you signed this

16   agreement?

17         A.   I don't.

18         Q.   What is this agreement?  What is it

19   for?

20         A.   I think it's similar to the one

21   that was used -- you know, dated April 1st.  It's

22   a one-picture license.

23         Q.   And what is it a one-picture

24   license for?  What picture?

25         A.   D&D 3.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 166 of 386  Page ID #:5887

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            164

```
 1              MS. BASINGER:  Jessie, I don't want

 2    to break your groove.  Whenever you can, I would

 3    like a quick restroom break, but whenever it's a

 4    good time.

 5              MS. BEEBER:  Okay.

 6    BY MS. BEEBER:

 7         Q.   Does this agreement contain the

 8    provision, like we were looking for in the one for

 9    D&D 2, that makes it the producer's obligation to

10    pay the passive royalty amount?

11              MR. MARSHALL:  Objection; agreement

12    speaks for itself, calls for a legal conclusion.

13              (Whereupon, a discussion was held

14              off the record.)

15    BY MS. BEEBER:

16         Q.   You can answer the question.

17         A.   I don't recall offhand, but if you

18    want, I can try to compare the two documents.

19         Q.   Well, I have something that does

20    that.

21              MS. BEEBER:  This is 14.

22              (Exhibit No. 14 was marked for

23              identification by the shorthand

24              reporter and is attached hereto.)

25              MS. BASINGER:  I don't have a copy.
```



 1  I have my own but --

 2                 MS. BEEBER:  I am going to identify

 3  it for the record.

 4                 This is a document Bates stamped

 5  SP 014416 through -14467.  The first page is a

 6  cover e-mail from Stephen Bender to Courtney

 7  Solomon on March 24, 2011 that reads:

 8                 "Corey, at the request of

 9             Steve Richards attached are two

10             PDFs of the Sweetpea option

11             agreement for D&D 3, both a clean

12             version for execution and a

13             version redlined against the

14             option agreement for D&D 2."

15                 MS. BASINGER:  And Jessie, through

16  what number?  So I know --

17                 MS. BEEBER:  It was through SP

18  014414.  Oh, no.  I'm sorry.

19                 MR. MARSHALL:  66.

20                 MS. BEEBER:  I'm sorry.

21                 MR. MARSHALL:  467.

22                 MS. BASINGER:  Do you mean 67?

23                 MS. BEEBER:  67.  That's what I

24  said the first time I think; right?  SP 014467.

25



Case 2:13-cv-03406-DMG-JCG Document 213 Filed 08/26/14 Page 168 of 386 Page ID #:5889

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              166

```
 1    BY MS. BEEBER:

 2              Q.   Did you instruct Mr. Bender, as he

 3    says in this cover e-mail, to compare the option

 4    agreement for D&D 3 against the option agreement

 5    for D&D 2 and generate a redline; do you recall?

 6              A.   I don't know if it was our outside

 7    counsel that did the redlining, but I probably --

 8    you know, I don't recall if I -- I probably asked

 9    him to forward this on to Corey for his review, if

10    that's your question.

11              Q.   Do you have any reason to believe

12    that the redline that is attached here is not a

13    redline of the option agreement for D&D 3 against

14    the option agreement for D&D 2?  And it begins on

15    Page SP 014439.

16              A.   Yeah.  I don't have any reason to

17    believe that it doesn't.

18                   MR. MARSHALL:  Can we take a break

19    now?

20                   MS. BEEBER:  I'm sorry?

21                   MR. MARSHALL:  Can we take that

22    break now?  And then we have to go at what time?

23    I think we have 50 minutes after that?

24                   MS. WOGAN:  I think we should just

25    finish this line of questioning.
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 169 of 386  Page ID #:5890

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                           167

```
1                    MR. MARSHALL:  This document?
2     Okay.
3     BY MS. BEEBER:
4              Q.   Can you turn to Page 5 of that
5     document, which is SP 0014443?
6                    Do you see the language on Page 5,
7     6, 7, and the top of 8 that's crossed out?
8              A.   I do.
9              Q.   Do you know what the significance
10    is of that text having a line through it like
11    that?
12                   MR. MARSHALL:  You mean what does
13    it mean?
14                   MS. BEEBER:  Uh-huh, for that
15    text to have a line.
16                   MS. BASINGER:  I am also so -- I am
17    going to object; incomplete document.  The first
18    page is a series of e-mails, and this is only one
19    of those e-mails.
20                   MS. BEEBER:  I'm sorry.  I don't
21    understand your objection.
22    BY MS. BEEBER:
23             Q.   But could you please --
24                   MS. BASINGER:  The objection is you
25    have put an incomplete document in front of the
```



 1  witness, and he didn't produce this document.  We

 2  did.  I know that and he doesn't.

 3                    MS. BEEBER:  Okay.

 4                    MR. MARSHALL:  This is a redline;

 5  correct?

 6                    MS. BEEBER:  Yes.  I am asking him

 7  if he understands what it means that all of this

 8  text on Page 5 has lines through it.

 9  BY MS. BEEBER:

10          Q.    Do you understand what that means?

11          A.    Right.  If I understand what

12  "redline" means.

13          Q.    Do you know what a redline --

14          A.    Yeah.

15          Q.    Okay.  So in other words, if it has

16  lines going through it, that means that that

17  language does not appear in the option agreement

18  for D&D 3.

19                    Do you agree with me?

20          A.    I understand that.

21          Q.    Okay.  Does that help you answer my

22  question from before about whether the option

23  agreement for D&D 3 contained the provision that

24  required the producer to pay the passive royalty

25  amount to the rights holder?



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 171 of 386   Page ID #:5892

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              169

 1              MS. BASINGER:  Objection; the

 2   document speaks for itself, calls for a legal

 3   conclusion.

 4              MR. MARSHALL:  Same objections.

 5   BY MS. BEEBER:

 6        Q.   You can answer the question.

 7        A.   I can see that those paragraphs are

 8   gone.

 9              MS. BEEBER:  Okay.  We can take a

10   break now.

11              VIDEOGRAPHER:  We are off the

12   record at 3:33 p.m.

13         (Whereupon, a recess was held from

14         3:33 p.m. to 3:46 p.m.)

15              VIDEOGRAPHER:  We are back on the

16   record at 3:46 p.m.

17   BY MS. BEEBER:

18        Q.   What was the passive royalty amount

19   that Hasbro was paid for D&D 3?

20        A.   $20,000.

21        Q.   And when was that payment made?

22        A.   I don't know for certain.

23        Q.   Who made that payment?

24        A.   Silver Pictures.

25        Q.   Why did Silver Pictures make that



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 172 of 386   Page ID #:5893

STEVE RICHARDS Vol. I Confidential                                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                                              170

1  payment?

2          A.   I don't know if there really was a

3  conscious decision on that, but the -- just --

4  Silver Pictures was incurring costs on the

5  production at that time and pushing to get the

6  movie into production.

7          Q.   How was the amount of the $20,000

8  payment calculated?

9          A.   I very quickly reviewed the

10  document and tried to figure out the cheapest

11  means to figure out the passive royalty that would

12  be possibly due.

13          Q.   Okay.  I am going to have a few

14  follow-up questions to that.

15               So you were the one who determined

16  how much the payment should be?

17          A.   Yes, I was, and I did so very

18  quickly.

19          Q.   As what document were you looking

20  at in order to determine that?

21          A.   Exhibit 6.

22          Q.   And what were you looking at in

23  Exhibit 6 in order to determine that?

24          A.   It was Paragraph 11D.

25          Q.   And why were you looking at



1    Paragraph 11D?

2           A.   Well, the -- basically Paragraphs 7

3    through 11 were all the different forms of passive

4    royalties that could be associated with the

5    production, depending on the way that the film was

6    distributed on the various distribution media or

7    medium or channels.

8           Q.   Okay.  So how did you choose 11D

9    out of all of those paragraphs?

10          A.   I mean, at that point we were

11   scrambling to get the movie going, and we really

12   did not have any distribution really put in place.

13   And I think from my perspective, it was like the

14   cheapest way to pay a passive royalty.  And we

15   knew -- I mean, I guess I would say my view was we

16   were always going to have the film distributed on

17   television.

18               I am hearing something.

19          Q.   Are you done with your answer?

20          A.   I got a little sidetracked.  Yes, I

21   am.

22               MS. BEEBER:  15.

23               (Exhibit No. 15 was marked for

24               identification by the shorthand

25               reporter and is attached hereto.)



 1   BY MS. BEEBER:

 2          Q.   Let me know when you are ready for

 3   questions on this.

 4          (Document reviewed by witness.)

 5               THE WITNESS:   Okay.

 6   BY MS. BEEBER:

 7          Q.   Do you have any reason to believe

 8   this is not an e-mail that Courtney Solomon wrote

 9   to you on October 6, 2010, at 7:18 a.m. and that

10   you responded to on October 6, 2010, at 9:51 a.m.?

11          A.   I don't.

12          Q.   When was the last time you saw this

13   e-mail?

14          A.   I guess when I -- I think Bob got

15   it from when I -- from your counsel or from your

16   firm, because I just saw just recently.

17          Q.   What does Corey mean when he says:

18               "I am going to wire 61,000 to

19          Silver pics today for the

20          remaining half of the D&D

21          payments"?

22               MR. MARSHALL:   Objection.

23               MS. BASINGER:   Objection; calls for

24   speculation.

25



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          173

```
 1   BY MS. BEEBER:
 2          Q.   What did you understand that to
 3   mean when you received this e-mail on October 6,
 4   2010, at 9:51 a.m., if anything?
 5               MR. MARSHALL:  Same objection;
 6   calls for speculation.  And his understanding is
 7   really irrelevant as to what Mr. Solomon meant.
 8               MS. BEEBER:  Well, the first word
 9   of his response was understood.
10               MR. MARSHALL:  I'm sorry.  You are
11   asking for his speculation as to -- you are asking
12   for his understanding of what Mr. Solomon meant.
13   To me, that's a question asking for his
14   speculation.
15               THE WITNESS:  Well, at that point I
16   know that we were scrambling to get the production
17   going.  There were a lot of things that were
18   needing to get attention.  We were having a lot of
19   financial issues going on at that time.  A lot of
20   payments had to be paid and a lot of things --
21   because we were basically right in production at
22   that time.
23               And I think a -- we knew that a
24   payment -- a passive royalty payment had to be
25   made.  And I think he was just sending funds to me
```



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                            174

1    so that the passive royalty would be made.

2    BY MS. BEEBER:

3            Q.    How did you know that a passive

4    royalty payment had to be made?

5            A.    Just based upon my experience in

6    discussions that we have had and throughout this

7    movie and D&D 2.

8            Q.    Was there a date by which the

9    passive royalty amount had to be paid?

10           A.    I mean, if you -- I don't think

11   that -- I'm not sure.  All I know is that we

12   needed to start or make sure we satisfied the

13   rolling right.  And then there was a passive

14   royalty payment that had to be made at some point.

15                 MS. BASINGER:  16?

16                 MS. BEEBER:  Uh-huh.

17           (Exhibit No. 16 was marked for

18           identification by the shorthand

19           reporter and is attached hereto.)

20   BY MS. BEEBER:

21           Q.    Do you recognize this document?

22           A.    I do.

23           Q.    When was the last time you saw this

24   document?

25           A.    I think we found it and sent it to



```
 1   you.  So in the last couple of months.

 2              Q.   What is this document?

 3              A.   It is a form that we fill out and

 4   needs to be signed by the company to initiate a

 5   wire transfer.

 6              Q.   And whose signature is on this

 7   form?

 8              A.   That's mine.

 9              Q.   And who filled this form out?

10              A.   Most likely either Adam Kuhn or

11   Stephen Bender.

12              Q.   And where did they get the

13   information to fill in the blanks?

14              MR. MARSHALL:  She is not asking

15   for speculation; if you know.

16              THE WITNESS:  I don't recall where

17   the wiring instructions came from.

18   BY MS. BEEBER:

19              Q.   Did you direct Adam Kuhn or Steven

20   Bender to fill out this form?

21              A.   Yeah.  Yes, I did.

22              Q.   Does this form refresh your

23   recollection about when the passive royalty

24   payment was made to Hasbro?

25              A.   Well, I --
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 178 of 386  Page ID #:5899

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                         176

 1              Q.    The date on which the passive

 2    royalty payment was made to Hasbro, does this

 3    refresh your recollection as to that?

 4              A.    I mean, I guess I don't even

 5    remember you asking me when it was made

 6    previously.

 7              Q.    I did, and you said, "I don't

 8    know."

 9              A.    Okay.  So if that's the case, then

10    yes, October 7th.  Well, that's what is dated.

11    I'm not sure if it was actually wire transferred

12    that date or not based upon this.

13              Q.    Okay.

14              MS. BASINGER:  Jessie, he could

15    simply mean it could have been the day before, I

16    think.  But I don't think we need to waste time on

17    that.

18              MS. BEEBER:  Could you get me 66,

19    please?

20              This is Richards 16.

21              THE COURT REPORTER:  17.

22              (Exhibit No. 17 was marked for

23              identification by the shorthand

24              reporter and is attached hereto.)

25



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          177

 1  BY MS. BEEBER:

 2          Q.   I will represent to you that this

 3  is a document that we obtained from Bank of

 4  America.  And on the second page, it shows a wire

 5  being received from Hasbro on October 7th, 2010.

 6          Does that help you determine when

 7  the wire transfer payment was made?

 8          A.   It looks like October 7th, yep.

 9          Q.   Okay.  So if you were, like, crazy

10  with production; and you had to start principal

11  photography before October 8th, 2010; and you were

12  scrambling around; and all this money was going

13  out, why did you choose October 7th, 2010, as the

14  date to make the passive royalty payment to

15  Hasbro?

16          MS. BASINGER:  I am going to

17  object.  Assumes facts not in evidence as to --

18  assumes facts not in evidence as to principal

19  photography.  Otherwise, it's fine.

20          THE WITNESS:  I don't -- I don't

21  really recall there being, like, oh, we need to

22  make this payment by October 7th.  I think it was

23  more of ensuring that the rolling right was dealt

24  with.

25



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 180 of 386   Page ID #:5901

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              178

 1   BY MS. BEEBER:

 2           Q.   So why did you make this payment on

 3   October 7th, 2010?

 4           A.   Well, we got funds on October 6th.

 5           Q.   You are saying you got $61,000 from

 6   Courtney on October 6th?

 7           A.   Right.

 8           Q.   And those funds were earmarked to

 9   pay passive royalty amounts?

10           A.   Well, you know, at that time money

11   was extremely tight on getting the production

12   fully financed.  So my recollection is we got

13   money in from Courtney on the 6th; then, you know,

14   we made the payment.

15           Q.   I guess that's what I am asking

16   you.  If money was so tight on the production at

17   that particular point in time and there was no

18   date by which you had to pay the passive royalty

19   amount, why did you send the money out to Hasbro

20   the next day?

21           A.   Yeah, I don't recall.

22           Q.   Courtney wired you 61,000.  They

23   made a $20,000 to Hasbro.

24           A.   Right.

25           Q.   Why the difference in those



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                           179

```
 1   amounts?
 2              A.   I think during that day I just very
 3   quickly looked through the document and, you know,
 4   I was scrambling, and I looked through it, and I
 5   saw that there could be a $20,000 provision that
 6   allowed for a passive royalty of 20 grand.
 7              Q.   I guess again I am not
 8   understanding why you were scrambling.
 9              Why were you scrambling?
10              A.   Just because there was so many
11   different things going on.
12              Q.   But the payment didn't need to be
13   made right then.  So why were you scrambling,
14   according to you?
15              MS. BASINGER:  Objection.
16              MR. MARSHALL:  Well --
17              MS. BASINGER:  I will go first.
18              MS. BEEBER:  I will withdraw it.
19              MR. MARSHALL:  "Scrambling" doesn't
20   necessarily mean -- okay.
21   BY MS. BEEBER:
22              Q.   Why were you scrambling to make the
23   royalty payment?
24              MR. MARSHALL:  That's not what he
25   said.
```



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              180

1                    THE WITNESS:  I was scrambling

2     because we were in production.  There were writer

3     contracts -- or actor contracts that had to be

4     finalized.  There were probably production

5     location documents that had to be finalized.

6     There were discussions I had to have with the line

7     producer.  I was probably dealing with the

8     director.  It just -- there was probably --

9     whenever we are starting production or are in

10    production the first week or so, it's extremely

11    hectic.

12    BY MS. BEEBER:

13             Q.   Okay.  So if it was such an

14    extremely hectic period of time, why did you

15    choose to look at the first amendment quickly,

16    figure out a royalty amount, initiate a wire, and

17    wire that money to Hasbro during that hectic

18    period of time?

19             A.   I think it was just one of many

20    things that needed to be attended to.

21             Q.   So it had to be attended to at that

22    period of time?

23             A.   At some point, yeah.

24             Q.   At some point.

25                  Well, if it could be attended to



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 183 of 386   Page ID #:5904

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                         181

1    later, why didn't you just do it later?

2              A.   I am sure that there is another

3    item that I did that day that probably didn't have

4    to be done that day, but I might have dealt with

5    it 24 hours earlier.

6                   I am done.

7              MS. BEEBER:  68, please.

8              18.

9         (Exhibit No. 18 was marked for

10             identification by the shorthand

11             reporter and is attached hereto.)

12   BY MS. BEEBER:

13             Q.   You ready?

14             A.   Yep.

15             Q.   Do you know what the Silver 000266

16   means, like, on the first page of this document on

17   the right-hand side?  There is, like, a number on

18   every page.

19             A.   I think it's just the way you keep

20   track of all the documents.

21             Q.   I will represent to you that the

22   documents that say Silver 000 and then a number

23   came from your file.  That was something that your

24   attorney put on to identify.  So this document

25   Silver 000266 to Silver 000270 --



1           A.    Right.

2           Q.    -- came from your file.

3           A.    Okay.

4           Q.    And the document Silver 000271

5    that's right after --

6           A.    Yeah.

7           Q.    -- was produced to us as the next

8    document in the series.

9           A.    I understand.

10          Q.    And just so the record is clear,

11   Silver 000271 is another copy of the wire transfer

12   instructions that we were just looking at.

13          A.    Right.

14          Q.    If you turn to the second page of

15   this exhibit, you will see in the margin next to

16   11D there is a star on the left-hand side and a

17   writing of two hours, $20,000 on the right-hand

18   side.

19          A.    Right.

20          Q.    Do you know what those notations

21   mean?

22          A.    I think it was just -- we knew that

23   the movie -- the motion picture we were going to

24   make was going to be greater than 60 minutes.  So

25   that's why I concluded that, you know, the



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 185 of 386   Page ID #:5906

STEVE RICHARDS Vol. I Confidential                           December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                                   183

1    cheapest form of the passive royalty would be 11D.

2              Q.   And whose handwriting is that?

3              A.   That's Steven Bender's.

4              Q.   Why was Steven Bender writing on

5    this document?

6              A.   I mean, he most likely filled out

7    the wire transfer form.  So they probably matched.

8              Q.   Did you ask Steven Bender to look

9    at the first amendment to determine what the

10   cheapest royalty rate would be?

11             A.   Not that I can recall.

12             Q.   What did you tell Steven Bender

13   about the passive royalty rate that would apply to

14   the payment that was made to Hasbro in October of

15   2010?

16             A.   I mean, I probably just instructed

17   him to fill out the form.

18             Q.   And what did you say to him?

19             A.   That we are paying $20,000 pursuant

20   to Paragraph 11D.

21             Q.   And did he ask why that particular

22   number?  Did he ask you any questions?

23             A.   That's not his style.  No.  I mean,

24   I don't recall, but I think I probably just

25   instructed him to do it.



STEVE RICHARDS Vol. I Confidential                          December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                                    184

1              Q.    What is -- is Mr. Bender still

2     employed by a Silver entity?

3              A.    Yes.

4              Q.    And what is his position today?

5              A.    I think his official title is

6     accounts manager.

7              Q.    And what entity employs him?

8              A.    Silver Pictures Management.

9              Q.    And who employed him in October of

10    2010?

11             A.    The same.

12             Q.    And what was his title in October

13    of 2010?

14             A.    I don't recall, but I can check.

15             Q.    Was he your assistant?

16             A.    No.

17             Q.    Did he have a particular role at

18    Silver Pictures Management, October of 2010?

19             A.    He is one of the several people

20    that work in the accounting department.

21             Q.    So Courtney wired you 61,000.  You

22    made a $20,000 payment to Hasbro.

23                   What did you do with the other

24    money?

25             A.    What other money?



STEVE RICHARDS Vol. I Confidential                December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          185

 1          Q.   Well, Courtney wired you $61,000 to
 2   make the rights payment; correct?
 3          A.   Yep.
 4          Q.   And you paid Hasbro $20,000 of
 5   that.
 6          A.   Yep.
 7          Q.   So there was $41,000 left of
 8   Courtney's money; right?
 9               MS. BASINGER:  That misstates the
10   evidence.  Assumes facts not in evidence.
11   BY MS. BEEBER:
12          Q.   Okay.  I will do it a different
13   way.
14          A.   It's okay.  I know I wire
15   transferred 51- back to him.
16          Q.   Why did you wire transfer 51,000
17   back to him?
18          A.   Because he wired 61-.  We -- we
19   were going to pay another 61-, so that was 122-.
20   But before making the payment, I quickly reviewed
21   the document.  And I believed that at this point
22   we could make a passive royalty payment of 20,000
23   because at that point we didn't know exactly how
24   the film was going to be distributed.  And -- but
25   I felt confident that at the very least it would



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 188 of 386   Page ID #:5909

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          186

 1   be released on television.

 2              So we made the $20,000 payment, and

 3   then I reimbursed Courtney for the other 51-.  So

 4   Silver Pictures put in $10,000 towards that

 5   payment.

 6              Q.   So you took $10,000 of Corey's

 7   money from the 61,000 and $10,000 of Silver

 8   Pictures' money and paid $20,000 to Hasbro, and

 9   you returned $51,000 to Corey; correct?

10              A.   Correct.

11              Q.   If the production was so strapped

12   for cash and everything was so hectic and you had

13   all of these things that you had to do like pay

14   out all these monies for the production, why did

15   you wire $51,000 back to Corey?

16              A.   Because he specifically sent it to

17   me for the D&D rights.

18              Q.   Would you say that Corey instructed

19   you to pay Hasbro $122,000 as the passive royalty

20   in October of 2010?

21              A.   I don't recall that.  But it was my

22   review of the document to come up with the 20-.

23              Q.   So when Corey sent you 61-, you

24   understood that to mean that you had to pay Hasbro

25   122- because Silver Pictures was going to pay the



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 189 of 386  Page ID #:5910

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                           187

 1   other half; correct?

 2              A.   Correct.

 3              Q.   And where did that 122- number come

 4   from, if you know?  If you know.

 5              MS. BEEBER:  Before you freak

 6   out --

 7   BY MS. BEEBER:

 8              Q.   If you know.

 9              THE WITNESS:  Yeah, I really don't

10   recall that, but my review of the document was how

11   we got to the 20-.

12   BY MS. BEEBER:

13              Q.   Did Corey know on October 7th,

14   2010, when you made that wire transfer, that you

15   were paying $20,000 instead of $122,000?

16              MS. BASINGER:  Objection; calls for

17   speculation.

18   BY MS. BEEBER:

19              Q.   Okay.  Did you tell Corey on

20   October 7th, 2010, that you were making a payment

21   of $20,000 instead of $122,000?

22              A.   That period of time was very

23   chaotic.  I know that -- well, I believe I did

24   speak to Corey at some point.  I don't recall if I

25   called him back that day and said, 'Hey, I am



 1    sending you back 51-.'

 2              But I think so I did have a

 3    conversation with him about, 'Hey, I reviewed this

 4    document really quickly, and I think we are -- we

 5    could be okay with just paying 20-.'

 6              But I don't recall for certain.

 7         Q.   Give me all of your reasons that

 8    you thought you were okay with paying 20- instead

 9    of some other amount in October of 2010.

10         A.   I think I already have.  I mean, I

11    think it's -- we were scrambling for -- to get

12    everything in order.  We were very tight on

13    production funding.

14              I think Courtney was under a lot of

15    financial strain himself.  And, you know, this was

16    something that I thought at the very least, based

17    upon what we thought or I thought how the film

18    would be distributed.  I felt confident that at

19    the very least it would be released on basic

20    cable.

21         Q.   What was your basis for thinking

22    you could pick that amount because you intended at

23    some point to distribute the film on television?

24         A.   Repeat the question again.

25              MS. BEEBER:  Could you read that



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              189

 1   back please?

 2              (Record read as follows:

 3              "Question:  What was your basis for

 4              thinking you could pick that amount

 5              because you intended at some point

 6              to distribute the film on

 7              television?")

 8              MR. MARSHALL:  You mean other than

 9   what he's already testified to.

10              THE WITNESS:  I think my quick

11   review of the contract and if we were successful

12   in releasing it theatrically, maybe there would be

13   another payment due for that, but at the time all

14   I knew was, you know, this would be the least --

15   the smallest amount of a passive royalty.

16   BY MS. BEEBER:

17         Q.   Where does it say in the first

18   amendment that you can pick the smallest amount of

19   the passive royalty based on the fact that you may

20   distribute the movie in one of those ways; and if

21   you distribute it in yet another way that requires

22   a larger passive royalty, you can make that up

23   later?  Where does it say that in this document?

24              MS. BASINGER:  Okay, wait.

25              Objection; compound, lacks



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 192 of 386  Page ID #:5913

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          190

 1  foundation, assumes facts not in evidence,

 2  argumentative, vague and ambiguous.

 3              MR. MARSHALL:  I reiterate those

 4  objections.

 5              If you can find a place that says

 6  it, but again, it calls for --

 7              MS. BEEBER:  Okay.  Okay.  We got

 8  your --

 9              MR. MARSHALL:  Objection, calls for

10  a legal conclusion.

11              MS. BEEBER:  We got your objections

12  on the record.

13              MR. MARSHALL:  No, I am going to

14  add another one.

15              It calls for a legal conclusion,

16  and the document speaks for itself.

17              MS. BEEBER:  I think you already

18  said those ones.  But okay.

19              THE WITNESS:  I think I will say

20  what I said before.  I was scrambling.  Maybe I

21  should have spoken to outside counsel, but I did a

22  quick review, and that was my determination.

23  And --

24  BY MS. BEEBER:

25          Q.  Did you find any words in the



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          191

1   agreement that supported your determination when

2   you were just looking just now?

3           A.   I didn't really -- I was actually

4   looking at it but thinking.

5           So do you want me to do that?

6           Q.   Yeah.  I want you to answer the

7   question that I posed to you.

8           MR. MARSHALL:  I don't think -- I

9   am going to object again; the documents calls for

10  itself -- calls for speculation and conclusion as

11  to what does or does not support anything.

12          THE WITNESS:  Yeah, I guess I am

13  not sure I am qualified to say it does or doesn't.

14  BY MS. BEEBER:

15          Q.   Well, then, what made you qualified

16  to decide that $20,000 was an appropriate amount

17  to send on October 7th, 2010?

18          MS. BASINGER:  Objection;

19  argumentative and slightly mean.

20          THE WITNESS:  Yeah, I'm not sure I

21  was.

22  BY MS. BEEBER:

23          Q.   And you did not consult outside

24  counsel with respect to your determination in

25  October of 2010?



STEVE RICHARDS Vol. I Confidential                          December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                             192

1              A.   No.   Maybe I should have.

2              Q.   Did you have outside counsel at

3    that point in time?

4              A.   Yes.

5              Q.   And who was your outside counsel?

6              A.   Greenberg Glusker.

7              Q.   Was there a particular attorney at

8    Greenberg Glusker that you were consulting with in

9    October of 2010?

10             A.   I mean, Bob and I'd speak from time

11   to time.  Matt Galsor, I would speak from time to

12   time also.

13             Q.   The conversation that you had with

14   Corey where you said, 'I paid the 20- instead of

15   the 122-,' what did Corey say to you in that

16   conversation?

17             A.   I don't recall.

18             Q.   Did he say okay?

19             A.   I don't recall what he specifically

20   said.

21             Q.   Did you say to him, 'I think we are

22   okay with the $20,000'?

23             A.   I think what I -- my recollection

24   of what I said was, 'Hey, I quickly reviewed the

25   document.  I think that there is a way for us to



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 195 of 386   Page ID #:5916

STEVE RICHARDS Vol. I Confidential                     December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              193

```
 1    only pay 20-."

 2                  You know, I went ahead and did

 3    that.  So that's my recollection.

 4            Q.   And then what did he say in

 5    response to that?

 6            A.   I just don't recall what he said.

 7            Q.   Did you speak to anybody at Hasbro

 8    about making the $20,000 payment?

 9            A.   I believe I reached out to someone

10    at Wizards prior to making the payment, but I

11    don't recall speaking to anyone after that.

12            Q.   Did you speak to anybody at Hasbro

13    ever about your determination to pay $20,000 as

14    the passive royalty amount for D&D 3?

15                  MS. BASINGER:  Objection.  You are

16    saying "Hasbro"; he is saying "Wizards."

17                  Is that interchangeable here?  I am

18    just curious or restate the question.

19                  MS. BEEBER:  That's well taken.

20    BY MS. BEEBER:

21            Q.   Did you speak to anybody at Hasbro

22    or Wizards --

23            A.   Well, I always viewed -- they were

24    kind of separate.  I mean --

25            Q.   Okay.  Then let's -- okay.  Then
```



STEVE RICHARDS Vol. I Confidential                  December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                           194

 1   let's take them one at a time.

 2                My first question --

 3                MS. BEEBER:  If you could you read

 4   back my first question.

 5           (Record read as follows:

 6           "Question:  Did you speak to anybody

 7            at Hasbro ever about your

 8            determination to pay $20,000 as the

 9            passive royalty amount for D&D 3?")

10                THE WITNESS:  Hasbro, no.

11   BY MS. BEEBER:

12           Q.   Same question but with respect to

13   Wizards.

14           A.   Yeah, I spoke to -- my recollection

15   that I probably spoke to someone before making the

16   payment at Wizards.  And I -- my guess is I

17   probably -- well, I know I continued to speak to

18   people at Wizards subsequent to that as well.

19           Q.   Okay.  You spoke to someone before

20   making the payment at Wizards --

21           A.   Well --

22           Q.   -- about the making of the payment?

23           A.   I think I requested an invoice or

24   wiring instructions or like, 'Hey, you know, we

25   are embarking on the film.  Where do I pay the



STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              195

 1    money?" -- the passive royalty.

 2              Q.   Did the amount of the passive

 3    royalty come up in that communication?

 4              A.   I don't -- I don't think so.

 5              Q.   Did you ever speak to anyone at

 6    Wizards about the amount of the passive royalty

 7    for D&D 3?

 8              A.   I don't think so.

 9              Q.   Did you ever speak to anyone at

10    Hasbro about the amount of the passive royalty for

11    D&D 3?

12              A.   No.

13                   MS. BEEBER:  Did you just give me

14    44?

15                   MS. WOGAN:  Uh-huh.

16    BY MS. BEEBER:

17              Q.   Did you ever tell Corey that Hasbro

18    agreed to take $20,000 as the passive royalty

19    amount for D&D 3?

20                   MR. MARSHALL:  Could you say that

21    again?

22                   MS. BEEBER:  Can you read it back.

23              (Record read as follows:

24              "Question:  Did you ever tell Corey

25              that Hasbro agreed to take $20,000



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 198 of 386   Page ID #:5919

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              196

1           as the passive royalty amount for

2           D&D 3?")

3                THE WITNESS:  I don't believe I did

4      that, no.

5      BY MS. BEEBER:

6           Q.   Did you ever tell Corey that

7      Wizards agreed to take $20,000 as the passive

8      royalty amount for D&D 3?

9           A.   I don't believe so.

10          Q.   Did you ever tell Corey that Hasbro

11     agreed to take $20,000 as minimum payment toward

12     the -- toward a larger royalty amount?

13               MR. MARSHALL:  Did they have an

14     express agreement?  Is that what you are saying?

15               THE WITNESS:  I mean, if -- I think

16     the kind of conversations that Corey and I had

17     were -- you know, Wizards knew what type of film

18     we were making, and it was a motion picture.  We

19     were intending to exploit it as -- as, you know,

20     all the different distribution channels that were

21     available.  And, you know, Hasbro -- or Wizards

22     never followed up with me to say that the 20,000

23     was inadequate.

24               VIDEOGRAPHER:  Five minutes left on

25     tape, Counsel.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 199 of 386   Page ID #:5920

STEVE RICHARDS Vol. I Confidential                December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                        197

```
 1   BY MS. BEEBER:
 2           Q.   Okay.  Give me all of the
 3   information that Wizards had about what type of
 4   film you were making in October of 2010.
 5           A.   Sure.  They had the script.
 6           Q.   What did the script tell them about
 7   what type of film you were making?
 8           A.   That it was a motion picture.
 9           Q.   Did the script tell them anything
10   about what distribution platform the motion
11   picture would be distributed on?
12           A.   That wasn't in the script, no.
13           Q.   Okay.  What else?
14           A.   Can you repeat the question again?
15           MS. BEEBER:  Can you read it back.
16           Actually, I guess we have to switch
17   tape.
18           We can go, like, another couple
19   minutes?
20           VIDEOGRAPHER:  Yeah.
21           MS. BEEBER:  Okay.  Please read it
22   back.
23           (Record read as follows:
24           "Question:  Give me all of the
25           information that Wizards had about
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 200 of 386   Page ID #:5921

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              198

 1              what type of film you were making in
 2              October of 2010.")
 3                   MR. MARSHALL:  Just for
 4      clarification, you mean any communications he had
 5      with them?  Otherwise, how was he going to know --
 6                   MS. BEEBER:  From you.
 7                   MR. MARSHALL:  Yeah.
 8                   THE WITNESS:  Well --
 9                   MS. BEEBER:  From you.
10                   MR. MARSHALL:  Yeah, I'd --
11                   (Simultaneous speakers.)
12                   MS. BEEBER:  No, I -- well taken.
13                   MR. MARSHALL:  -- man in the moon
14      here.
15                   MS. BEEBER:  Your point is well
16      taken.
17                   THE WITNESS:  Well, we had --
18      BY MS. BEEBER:
19              Q.   From you.
20              A.   I flew up to Seattle at one point
21      to discuss the next movie, Silver Pictures'
22      excitement about this property, our desire to make
23      additional films, to express that we really
24      believed in this property, that we wanted to not
25      only make a film of this size, but also, you know,



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 201 of 386  Page ID #:5922

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          199

1    a giant, franchisable (verbatim) sequel -- you

2    know, kind of almost a Harry Potter, Lord of the

3    Rings type of movie.

4          Q.    At any point in that meeting --

5                MS. BASINGER:  Objection.  Was he

6    done?  Because he was -- I thought he was still

7    talking.

8                MR. MARSHALL:  Anything else?

9                MS. BASINGER:  Because you said

10   "everything," and he just started -- he said the

11   script, and then he flew to Seattle.  And I was

12   wondering if he was done with his list.

13   BY MS. BEEBER:

14         Q.    I didn't think you were done with

15   your list.  I wanted to ask you a question about

16   the meeting that you were describing.

17         A.    Well, I guess just to finish up my

18   thought.  We had numerous conversations by phone,

19   talking about our ideas of the film and how

20   excited we were.  And we thought this was a

21   good -- you know, just as good as D&D 2.  And if

22   we made a great movie, we had high hopes on what

23   it could mean.  And we wanted to continue the

24   relationship.

25



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 202 of 386   Page ID #:5923

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              200

```
 1    BY MS. BEEBER:

 2            Q.   Did you speak at that meeting in

 3    any way about how you intended to release D&D 3?

 4            A.   I think it was me being very broad

 5    in saying there, you know, it could be released

 6    theatrically, it could be released on video.  We

 7    definitely intended to have it released on basic

 8    cable.

 9                 SyFy was very interested in the

10    property.  They were very excited about the second

11    movie.  They certainly had interest in this movie.

12                 But I would say at that time I had

13    really high hopes that we were making, you know,

14    just as good if not better of a movie as D&D 2.

15            Q.   Have you completed your list about

16    the information that Wizards had in October of

17    2010 from you?

18                 MS. BASINGER:  That they would have

19    gotten from him.

20                 MS. BEEBER:  I said "from you."

21                 MS. BASINGER:  Sorry.

22                 MR. MARSHALL:  That you can recall.

23                 MS. BEEBER:  Anything else?

24                 MS. BASINGER:  I am a little

25    sleepy, and your tape is running out.
```



STEVE RICHARDS Vol. I Confidential                      December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                          201

```
 1              MR. MARSHALL:  Anything else?
 2              THE WITNESS:  There might be other
 3  things but --
 4              MR. MARSHALL:  Maybe there's
 5  documents that were forwarded.  If you have got
 6  some, give them to him at session No. 2.
 7              VIDEOGRAPHER:  Two minutes.
 8              MR. MARSHALL:  Two minutes.
 9  BY MS. BEEBER:
10        Q.   Were you done with your answer?
11        A.   Yes.
12              MS. BEEBER:  Let's go off the
13  record.
14              VIDEOGRAPHER:  We are off the
15  record.  This concludes Tape No. 3.  We are off
16  video record at 4:29 p.m.
17              (Whereupon, a recess was held from
18              4:29 p.m. to 4:31 p.m.)
19              MS. BASINGER:  The parties hereby
20  relieve the court reporter of her statutory
21  obligation.
22              Once the transcript is prepared, it
23  will be sent to Mr. Marshall.  Mr. Marshall will
24  have his client review it.  The client will
25  have --
```



```
 1                      Do you need 30 days, or can you
 2    have a few less days than that?
 3                      THE WITNESS:  I don't think I
 4    need --
 5                      MR. MARSHALL:  Twenty days.
 6                      MS. BASINGER:  The client will
 7    have -- Mr. Richards will have 20 days to review
 8    the transcript and return it to Mr. Marshall.
 9    Mr. Marshall will then send it to --
10                      You can send it to me because I am
11    local.
12                      And if we do not get a signed copy,
13    an unsigned copy can be used for any and all
14    purposes.
15                      MS. BEEBER:  Thank you very much.
16                      THE COURT REPORTER:  Did you want a
17    copy, Ms. Basinger?
18                      MS. BASINGER:  Please.
19                      THE COURT REPORTER:  Rough also?
20                      MS. BASINGER:  Yes.
21                      THE COURT REPORTER:  Thank you.
22
23       (Whereupon, at the hour of 4:32 p.m., the
24            proceedings were concluded.)
25                      --oo0oo--
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 205 of 386  Page ID #:5926

STEVE RICHARDS Vol. I Confidential                    December 12, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT, INC.                              203

1              REPORTER'S CERTIFICATION

2

3

4

5       I, Megan Grossman-Sinclair, Certified

6   Shorthand Reporter, in and for the State of

7   California, do hereby certify:

8

9       That the foregoing witness was by me duly

10   sworn; that the deposition was then taken before

11   me at the time and place herein set forth; that

12   said testimony and proceedings were reported

13   stenographically by me and later transcribed into

14   typewriting under my direction; that the foregoing

15   is a true record of the testimony and proceedings

16   taken at that time.

17

18      IN WITNESS WHEREOF, I have subscribed my name

19   this      of           , 2013.

20

21   

22

23   Megan Grossman-Sinclair, CSR No. 12586

24

25

Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 206 of 386  Page ID #:5927

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                       207

1              UNITED STATES DISTRICT COURT

2         FOR THE CENTRAL DISTRICT OF CALIFORNIA

3

4    HASBRO, INC., and WIZARDS OF
     THE COAST, LLC,

5

6              Plaintiffs,

7
               vs.                    Case No.
8                                     13-CV-03406-DMG
                                      (JCGX)
9    SWEETPEA ENTERTAINMENT,
     INC., and SWEETPEA B.V.I.
10   LTD,

11
               Defendants.
12   ~~~~~~~~~~~~~~~~~~~~~~~~~~~
     AND ALL RELATED CROSS-ACTIONS.
13   ~~~~~~~~~~~~~~~~~~~~~~~~~~~

14

15        CONFIDENTIAL VIDEOTAPED DEPOSITION OF

16                 STEVE RICHARDS

17                   VOLUME II

18

19           TUESDAY, DECEMBER 17, 2013

20                 12:42 P.M.

21

22       2049 CENTURY PARK EAST, SUITE 2400

23            LOS ANGELES, CALIFORNIA

24

25    Reported by Megan M. Grossman-Sinclair, CSR 12586



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 207 of 386  Page ID #:5928

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        208

```
 1              APPEARANCES OF COUNSEL

 2

 3   For Plaintiff:

 4        FRANKFURT KURNIT KLEIN & SELZ, PC
          JESSIE F. BEEBER, AAL
 5        488 Madison Avenue
          New York, New York  10022
 6        T:  (212) 826-5561
          F:  (347) 438-2101
 7        jbeeber@fkks.com

 8
          FRANKFURT KURNIT KLEIN & SELZ, PC
 9        MAURA J. WOGAN, AAL
          488 Madison Avenue
10        New York, New York  10022
          T:  (212) 826-5523
11        F:  (347) 438-2101
          mwogan@fkks.com

12

13
     For Defendant:
14
          GLASER WEIL FINK JACOBS HOWARD &
15           SHAPIRO LLP
          JILL BASINGER, AAL
16        10250 Constellation Boulevard
          19th Floor
17        Los Angeles, California  90067
          T:  (310) 553-3000
18        F:  (310) 785-3575
          jbasinger@glaserweil.com

19

20
     For the Witness and Silver Picture Entities:
21
          GREENBERG & GLUSKER
22        ROBERT F. MARSHALL, ESQ.
          1900 Avenue of the Stars
23        21st Floor
          Los Angeles, California  90067
24        T:  (310) 201-7448
          F:  (310) 201-2348
25        rmarshall@greenbergglusker.com
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 208 of 386  Page ID #:5929

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                              209

1            APPEARANCES (Continued)

2

3      Also present:

4            TODD BULLOCK, VIDEOGRAPHER

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 209 of 386  Page ID #:5930

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        210

```
 1                    INDEX OF EXAMINATION

 2    WITNESS:  STEVE RICHARDS, VOLUME II

 3

 4    EXAMINATION                              PAGE

 5    By Ms. Beeber                             215

 6

 7                INSTRUCTIONS NOT TO ANSWER

 8         PAGE     LINE          PAGE     LINE

 9
           300       7            374      15
10
           344       2            376      24
11
           357       7            377      14
12
           365       4            278      12
13

14

15              INFORMATION REQUESTED

16              PAGE     LINE

17              330       2

18              351      22

19

20              TRANSCRIPT MARKED

21              PAGE     LINE

22              345       4

23

24

25                   *   *   *
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 210 of 386   Page ID #:5931

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      211

```
 1              INDEX TO EXHIBITS

 2   EXHIBITS                               MARKED

 3   19      Draft for production budget,     228
             D&D 3.
 4           (SILVER000544 - SILVER000545)

 5   20      Dungeons & Dragons 3 Cost        230
             Report, Period 26, 1/15/13.
 6           (SP000861 - SP000866)

 7   21      September 30, 2010, e-mail       234
             from Steve Richards to
 8           Courtney Solomon,
             Subject: Hasbro.
 9           (SP005583)

10   22      October 1, 2010, e-mail chain    245
             between Steve Richards and
11           Courtney Solomon,
             Subject:  "Michael Jaffa @
12           Hasbro called."
             (SP005577)
13
     23      August-October 2010 e-mail       249
14           chain, Subject:  Book of Vile
             Darkness.
15           (HASBRO015447 - HASBRO015449)

16   24      October 15, 2010, Wire           252
             Transfer Non-Repetitive
17           Payment Order Request.
             (SILVER000555)
18
     25      March 24, 2009, Sales Agency     258
19           Agreement between Silver
             Pictures Management, Inc., and
20           IM Global LLC.
             (IMG000050 - IMG000059)
21
     26      Dungeons & Dragons: The Book     268
22           of Vile Darkness (TV Movie
             2012) - Release Info - IMDb.
23

24

25
```



```
 1                    INDEX TO EXHIBITS (Continued)

 2      EXHIBITS                                    MARKED

 3      27      June 21, 2012, Film License          276
                Agreement between Universal
 4              Television Networks and
                Grayson Productions LLC.
 5              (SP005255 - SP005274)

 6      28      November 9, 2012, e-mail from         287
                Steve Richards to Rand Stoll,
 7              and attached Films License
                Agreement.
 8              (SP015190 - SP015234)

 9      29      Rough Draft of the Deposition         309
                of Steve Richards, Vol. 1,
10              December 12, 2013.

11      30      December 2012 e-mail chain,           339
                Subject:  D&D and Silver.
12              (WB000587 - WB000588)

13      31      November 2012 e-mail chain,           349
                Subject:  D&D, and attached
14              September 2, 1994, License
                Agreement Extract, as amended
15              March 19, 1998, and June 9,
                1998.
16              (WB000578 - WB000580)

17      32      March 22, 2013, Agreement Re          362
                Proposed Dungeons & Dragons
18              Project between Silver
                Pictures, Inc., and Sweetpea
19              Entertainment, Inc.
                (SP016764 - SP016769)
20
        33      February 2013 e-mail chain,           372
21              Subject:  Dungeons & Dragons -
                latest Warner Bros. response.
22              (SP008423 - SP008425)

23

24

25
```



```
 1   INDEX TO EXHIBITS (Continued)

 2

 3     PRIOR EXHIBITS REFERENCED

 4         Exhibit        Page

 5            14           216

 6            16           222

 7            18           226

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25            *   *   *
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 213 of 386  Page ID #:5934

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      214

```
 1              LOS ANGELES, CALIFORNIA

 2        TUESDAY, DECEMBER 17, 2013; 12:42 P.M.

 3

 4              VIDEOGRAPHER:  This is Tape No. 1

 5   to the videotaped deposition of Steve Richards,

 6   Volume II, in the matter of Hasbro Inc., et al.,

 7   vs. Sweetpea Entertainment, Inc., et al.; and

 8   Sweetpea BVI Ltd, Inc., et al., versus Hasbro

 9   Inc., et al., being heard before the United States

10   District Court for the Central District of

11   California, Western Division, Case No.

12   13-CV-03406-DMG (JCGX).

13              This deposition is being held at

14   2049 Century Park East in Los Angeles, California.

15   Today's date is December 17th, 2013, and the time

16   on the record is 12:42 p.m.

17              My name is Todd Bullock.  I am the

18   videographer.  The court reporter is Megan

19   Grossman-Sinclair.

20              Counsel, will you please introduce

21   yourselves and affiliations, and the witness will

22   be sworn.

23              MS. BEEBER:  Sure.  My name is

24   Jessie Beeber.  I am from Frankfurt Kurnit Klein &

25   Selz.  I am here today representing Hasbro, Inc.
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 214 of 386   Page ID #:5935

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        215

 1   and Wizards of the Coast LLC, the plaintiffs in

 2   the action.

 3                    MS. WOGAN:   Maura Wogan from

 4   Frankfurt Kurnit also representing Hasbro and

 5   Wizards of the Coast.

 6                    MS. BASINGER:   Jill Basinger of

 7   Glaser Weil representing Sweetpea entities.

 8                    MR. MARSHALL:   Bob Marshall from

 9   Greenberg Glusker representing the witness and

10   Silver Pictures.

11                    VIDEOGRAPHER:   Thank you.

12                    Would the court reporter please

13   swear in the witness.

14

15                    STEVE RICHARDS,

16             having been first duly sworn,

17                  testifies as follows:

18

19                       EXAMINATION

20   BY MS. BEEBER:

21          Q.   Good afternoon, Mr. Richards.

22          A.   Hello.

23          Q.   So you understand you are under

24   oath again today?

25          A.   Yes, I do.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 215 of 386  Page ID #:5936

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        216

1          Q.   And do you remember the ground

2    rules from the day we were here before?

3          A.   Yes.

4          Q.   Do you have any questions about the

5    ground rules before we proceed?

6          A.   I do not.

7          Q.   Okay.  I am going to show you what

8    we marked at your deposition last time as Richards

9    Exhibit 14, which should be in the pile before

10   you.

11              MS. BASINGER:  Since I'm referring

12   to my {UNINTELLIGIBLE}, can you just tell me what

13   is --

14              MS. BEEBER:  Sure.  This is the

15   e-mail and the redline of the option agreement.

16              (Exhibit No. 14 was previously

17              marked for identification and is

18              attached hereto.)

19              THE WITNESS:  Yes.

20   BY MS. BEEBER:

21          Q.   I am just going to ask you two

22   quick questions about this agreement.  The first

23   is whether this is a document that is made in the

24   ordinary course of your business.

25              MS. BASINGER:  That's vague and



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 216 of 386  Page ID #:5937

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      217

 1    ambiguous.

 2                    MR. MARSHALL:  Same objection.

 3                    If you can answer, you can answer

 4    that.

 5                    THE WITNESS:  It's a document which

 6    we --

 7                    MR. MARSHALL:  Can I just clarify

 8    something?  This document, when you say "the

 9    document," there is actually, like, two or three

10    documents.

11                    MS. BEEBER:  I mean, I said "the

12    exhibit."

13                    MR. MARSHALL:  The exhibit?

14                    MS. BEEBER:  Uh-huh.  Can we go off

15    the record for a minute?

16                    VIDEOGRAPHER:  We are off the

17    record at 12:44 p.m.

18            (Off the record.)

19                    VIDEOGRAPHER:  We are back on the

20    record at 12:46 p.m.

21    BY MS. BEEBER:

22            Q.    If you could take Exhibit 14 for a

23    moment.  The first page is an e-mail from Stephen

24    Bender to Courtney Solomon.

25                    Do you see where I am looking?



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 217 of 386  Page ID #:5938

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        218

```
 1              A.   Yes.

 2              Q.   Is this a document that is made in

 3     the ordinary course of Silver Pictures' business?

 4              A.   Yes.

 5              Q.   And kept in the ordinary course of

 6     Silver Pictures' business?

 7              A.   Yes.

 8              Q.   The next document is an agreement

 9     that has the Bates numbers SP014417 through

10     SP014438.  Are you with me?

11              A.   Yes, I am.

12              Q.   Is this a document that is made in

13     the ordinary course of Grayson's business?

14                   MS. BASINGER:  I am still going to

15     object, vague and ambiguous.

16                   THE WITNESS:  Yes.

17     BY MS. BEEBER:

18              Q.   And kept in the ordinary course of

19     Grayson's business?

20              A.   Yes.

21              Q.   And I have the same question about

22     the document that starts SP14439 through -14467.

23                   So is this a document that is made

24     in the ordinary course of Ismir's -- I'm sorry --

25     Grayson's business?
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 218 of 386  Page ID #:5939

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      219

1          MS. BASINGER:  Objection; vague and

2    ambiguous.

3                THE WITNESS:  This document is

4    actually probably -- was either produced by

5    production counsel or possibly the bank's

6    production -- or legal counsel?

7                MS. BASINGER:  Yeah.  Look at the

8    Bates number.

9    BY MS. BEEBER:

10         Q.   You mean the --

11         A.   The redline.

12         Q.   -- the redline was generated by

13   someone other than you.

14         A.   Yeah.

15         Q.   Okay.  Was this a document that was

16   kept in the ordinary course of your business?

17                MS. BASINGER:  Objection.  Witness

18   just stated he didn't produce it.  He didn't.

19   It's our Bates number.  I'm just -- we are

20   stipulating to its authenticity.  You don't have

21   to lay it.  We produced it, so it's authentic.

22                MS. WOGAN:  But it came --

23                MS. BASINGER:  It didn't.  It's

24   "SP."

25                MS. BEEBER:  Off the record.  Off



 1  the record, please.

 2             VIDEOGRAPHER:  We are off the

 3  record at 12:48 p.m.

 4          (Whereupon, a recess was held from

 5          12:48 p.m. to 12:49 p.m.)

 6             VIDEOGRAPHER:  We are back on the

 7  record at 12:49 p.m.

 8             MR. MARSHALL:  Was there a prior

 9  answer that should be read?

10             MS. BEEBER:  No.  He has not

11  answered the question yet.

12             THE WITNESS:  I actually thought I

13  did.

14             MR. MARSHALL:  I thought he did.

15  Maybe it was a prior question that was the same

16  question.

17             THE COURT REPORTER:  Do you want me

18  to read it?

19             MR. MARSHALL:  Yeah, read it, if

20  you would.

21             THE COURT REPORTER:  I'll start

22  here.

23          (Record read as follows:

24          "Question:  And I have the same

25          question about the document that



1              starts SP14439 through -14467.

2              So is this a document that is made

3              in the ordinary course of Grayson's

4              business?

5                   "Answer:  This document is

6              actually probably -- was either

7              produced by production counsel or

8              possibly the bank's production.

9                   "Question:  Was this a

10             document that was kept in the

11             ordinary course of your

12             business?")

13                  THE COURT REPORTER:  No answer to

14      that.

15                  MR. MARSHALL:  Asked and answered.

16                  THE WITNESS:  Well, I think Stephen

17      Bender kept it and was able to send it.  So it's

18      probably something he has.

19      BY MS. BEEBER:

20             Q.   And Stephen Bender is an employment

21      at Silver management; correct?

22             A.   That's right.

23             Q.   An employee; I'm sorry.  Did I say

24      "employment"?

25                  Okay.  If you could turn to



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 221 of 386  Page ID #:5942

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        222

 1  | Exhibit 16 in your pile, please.
 2  |           (Exhibit No. 16 was previously
 3  |           marked for identification and is
 4  |           attached hereto.)
 5  |                MR. MARSHALL:  What is the --
 6  |                MS. BEEBER:  It's Silver 000541,
 7  | the wire transfer.
 8  |                MR. MARSHALL:  Oh, yeah.
 9  | BY MS. BEEBER:
10  |           Q.   And is this a document made in the
11  | ordinary course of your business?
12  |                MS. BASINGER:  Objection; calls for
13  | speculation, vague and ambiguous.
14  |                THE WITNESS:  It's a form that we
15  | use often and use it to do wire transfers.  Yes.
16  | BY MS. BEEBER:
17  |           Q.   Okay.  And is it kept in the
18  | ordinary course of your business?
19  |           A.   Yes.
20  |           Q.   This document, not just the form
21  | but the filled-out document that is Exhibit 16,
22  | was that made in the ordinary course of your
23  | business?
24  |                MS. BASINGER:  Calls for
25  | speculation.



Case 2:13-cv-03406-DMG-JCG Document 213 Filed 08/26/14 Page 222 of 386 Page ID #:5943

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        223

```
 1                    MR. MARSHALL:  Objection; vague and

 2      ambiguous.

 3                    THE WITNESS:  We often use this

 4      form to make wire transfers.  So yes, we fill it

 5      out in our normal course of business.

 6      BY MS. BEEBER:

 7           Q.   So you filled out Exhibit 16 in the

 8      normal course of your business; correct?

 9                    MS. BASINGER:  Objection; misstates

10      the testimony, vague and ambiguous, calls for

11      speculation, also assumes facts not in evidence.

12                    THE WITNESS:  I don't recall who

13      filled this out but our -- someone in my office

14      did fill it out.

15      BY MS. BEEBER:

16           Q.   Okay.  And it was the normal course

17      of your business for someone in your office to

18      fill it out; is that correct?

19                    MS. BASINGER:  Vague and ambiguous.

20                    MR. MARSHALL:  Same objection.

21                    THE WITNESS:  There are numerous

22      times a month that we fill out such a form.

23      BY MS. BEEBER:

24           Q.   I don't understand your answer.  I

25      am asking about this particular document that is
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 223 of 386  Page ID #:5944

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        224

1   Exhibit 16.

2              A.   I'm not sure I understand your

3   question.

4              Q.   My question is:  Is it in the

5   normal course of business that someone in your

6   office filled out the form that is Exhibit 16?

7                   MS. BASINGER:  Calls for

8   speculation, vague and ambiguous, asked and

9   answered.

10                  MR. MARSHALL:  Same objection.

11                  THE WITNESS:  Can you repeat it one

12  more time?

13                  MS. BEEBER:  Court reporter can

14  read it back.

15             (Record read as follows:

16             "Question:  My question is:  Is it

17             in the normal course of business

18             that someone in your office filled

19             out the form that is Exhibit 16?")

20                  MS. BASINGER:  Objection; vague and

21  ambiguous, calls for speculation, lacks

22  foundation, asked and answered.

23                  THE WITNESS:  I don't know how it

24  changed my answer that I already gave.

25                  MS. WOGAN:  Can we go off the



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 224 of 386   Page ID #:5945

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                          225

 1   record for a minute?  I just -- seriously, can we

 2   go off the record?

 3                   VIDEOGRAPHER:  We are off the

 4   record at 12:53 p.m.

 5              (Whereupon, a recess was held from

 6              12:53 p.m. to 12:55 p.m.)

 7                   VIDEOGRAPHER:  We are back on the

 8   record at 12:55 p.m.

 9                   MS. BASINGER:  I want to say for

10   the record that counsel for Hasbro indicated that

11   unless the witness was willing to agree to these

12   documents were authentic, he would have to be

13   subpoenaed to trial, and I think that is an

14   improper.  I am just making that record.

15                   MS. WOGAN:  Well, I obviously

16   disagree with your characterization with what was

17   said.  That did not happen.

18                   MR. MARSHALL:  Okay.  Let me

19   short-circuit this.

20                   We produced the document, Silver

21   Pictures, which came from our files.  It is

22   maintained in our files.  It is kept in our files,

23   and it was prepared by someone at Silver Pictures.

24                   Is that correct?

25                   THE WITNESS:  Yes.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 225 of 386   Page ID #:5946

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        226

 1                        MR. MARSHALL:  Mr. Richards?

 2                        That should be more than enough to

 3    authenticate the document.

 4                        MS. BEEBER:  Okay.  Thank you.

 5    That's all I am looking for.

 6                        MR. MARSHALL:  Okay.

 7                        MS. WOGAN:  Great.

 8                        MS. BEEBER:  If you could turn to

 9    Exhibit 18.  I will try to say it the exact same

10    way you did, Mr. Marshall.

11              (Exhibit No. 18 was previously

12              marked for identification and is

13              attached hereto.)

14                        MR. MARSHALL:  Okay.

15                        MS. BASINGER:  Which one is 18?

16              (Whereupon, a discussion was held

17              off the record.)

18                        MS. BASINGER:  What is 18?

19                        MS. BEEBER:  It's the first

20    amendment.

21                        MS. WOGAN:  The one with the

22    handwriting.

23                        MR. MARSHALL:  What was this

24    document?  Excuse me.

25                        MS. BEEBER:  That's a Hasbro



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 226 of 386   Page ID #:5947

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        227

 1  document.

 2                    MR. MARSHALL:  But was this

 3  Exhibit 17?

 4                    MS. BEEBER:  I believe so, yes.

 5                    MR. MARSHALL:  Okay.  That's all.

 6  Yeah, got it.  Okay.

 7                    Richards 18 is the document we

 8  marked at the prior session of his deposition.

 9  BY MS. BEEBER:

10          Q.   Mr. Richards, did you produce the

11  document that is Hasbro Exhibit 18 in this

12  litigation?

13          A.   Yeah.  I believe I -- this is one

14  of the documents I forwarded to Bob Marshall.

15          Q.   And did it come from your company's

16  files?

17          A.   Yes.

18          Q.   And is it maintained in your

19  company's files?

20          A.   Yes.

21          Q.   Is it kept in your company's files?

22          A.   Yes.

23          Q.   And was it prepared by someone at

24  Silver Pictures?

25                    MS. BASINGER:  Objection.  Do you



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 227 of 386  Page ID #:5948

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        228

```
 1    mean the first amendment?

 2              MS. BEEBER:  The document that we

 3    have marked as Exhibit 18.

 4              MR. MARSHALL:  Well, it's not a

 5    Silver Pictures document, so how could it be

 6    prepared by someone at Silver Pictures?

 7              MS. BASINGER:  Yeah.

 8    BY MS. BEEBER:

 9         Q.   Was the handwriting that appears on

10    Page --

11         A.   2.  Page 2 I think.

12         Q.   -- 2 done by someone at Silver

13    Pictures?

14         A.   Yeah.  I believe it was Stephen

15    Bender.

16         Q.   Okay.  Thank you.

17              MS. BEEBER:  Okay.  Let's do 104.

18              MS. BASINGER:  What's the number?

19              MS. BEEBER:  I am going to mark

20    this.

21              MR. MARSHALL:  So be Richards 19?

22              MS. BEEBER:  Uh-huh.

23              (Exhibit No. 19 was marked for

24              identification by the shorthand

25              reporter and is attached hereto.)
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 228 of 386   Page ID #:5949

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                           229

1    BY MS. BEEBER:

2              Q.    Could you take a moment to look at

3    what we have marked as Richards 19?

4              A.    Yes.

5              Q.    Is this a document that was

6    produced by your company?

7              A.    Yes.

8              Q.    In this litigation?

9              A.    Yes.

10             Q.    And did it come from your company's

11   files?

12             A.    Yes.

13             Q.    And was it prepared by someone at

14   Silver Pictures?

15             MS. BASINGER:  Objection; calls for

16   speculation.

17             THE WITNESS:  I don't recall for

18   sure, but most likely it was prepared by one of

19   our line producers on the film.

20   BY MS. BEEBER:

21             Q.    And was it kept in the files at

22   your company?

23             A.    Yes.

24             Q.    What is 104?

25             MS. BASINGER:  What is -- that's a



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 229 of 386  Page ID #:5950

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        230

1    good question.  What is 104?

2                   MS. WOGAN:  19.

3                   MS. BEEBER:  Oh, I'm sorry.  19;

4    Exhibit 19.

5                   THE WITNESS:  It is a top sheet of

6    a draft for production budget.

7    BY MS. BEEBER:

8            Q.    For what film?

9            A.    It says "D&D 3" on the top.

10           Q.    Thank you.

11                  MS. BEEBER:  20.

12                  (Exhibit No. 20 was marked for

13                  identification by the shorthand

14                  reporter and is attached hereto.)

15   BY MS. BEEBER:

16           Q.    Have you had a moment to --

17                  MS. BASINGER:  Hold on a second.

18                  This doesn't appear to have a Bates

19   number on it.  Oh, yes, it does.  I'm sorry.  I

20   missed it.

21                  MR. MARSHALL:  Where is the Bates

22   number?

23                  MS. BASINGER:  It's right there

24   (indicating).

25                  MR. MARSHALL:  "SP," that's



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 230 of 386  Page ID #:5951

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        231

 1  Sweetpea?

 2  BY MS. BEEBER:

 3          Q.   Have you had a chance to look at

 4  what we have marked as Richards Exhibit 20?

 5                  MR. MARSHALL:  Take a quick look at

 6  it, Steve.

 7                  THE WITNESS:  Yeah.

 8  BY MS. BEEBER:

 9          Q.   And do you know what Richards

10  Exhibit 20 is?

11                  MS. BASINGER:  Vague and ambiguous.

12                  THE WITNESS:  It appears to be a

13  cost report.

14  BY MS. BEEBER:

15          Q.   A cost report for what?

16          A.   The film Dungeons & Dragons 3.

17          Q.   Do you know what it means where it

18  says "Period 26" and there is a date, 1-15-2013?

19                  MS. BASINGER:  I am going to

20  object; calls for speculation, lacks foundation.

21  You haven't established this is his document.

22                  MR. MARSHALL:  You are not asking

23  for him to speculate.

24                  MS. BEEBER:  No.  I am never asking

25  for him to speculate.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 231 of 386  Page ID #:5952

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      232

```
 1                    MR. MARSHALL:  Right.

 2                    MS. BASINGER:  Lacks foundation.

 3                    MR. MARSHALL:  Anyway, it is dated

 4    12-31.  What is the date that you had referenced?

 5                    MS. BASINGER:  There's two dates.

 6    BY MS. BEEBER:

 7            Q.   Do you understand the question?

 8            A.   Well, I don't know if I have ever

 9    seen this before, but generally a cost report is

10    issued by a production accountant.  It appears to

11    be Period 26 and with a specific end date

12    corresponding to that period.

13            Q.   Okay.  Did you have anything to do

14    with the preparation of this document?

15            A.   I don't recall.

16            Q.   Have you ever seen this document

17    before?

18            A.   I don't recall.

19            Q.   Who would know, if you know, who

20    created this document?

21                    MS. BASINGER:  That's --

22    BY MS. BEEBER:

23            Q.   At Silver Pictures.

24                    MS. BASINGER:  Vague and -- well,

25    who created it at Silver Pictures or who at Silver
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 232 of 386  Page ID #:5953

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        233

```
 1    Pictures --

 2    BY MS. BEEBER:

 3            Q.   Who would know at Silver Pictures,

 4    if anyone, if you know, who created this document?

 5                 MS. BASINGER:  Lacks foundation,

 6    vague and ambiguous, calls for speculation.

 7                 MR. MARSHALL:  Compound and

 8    complex.

 9                 THE WITNESS:  The person that

10    probably produced this is the production

11    accountant who is not an employee of Silver

12    Pictures.

13    BY MS. BEEBER:

14            Q.   And who is the production

15    accountant?

16            A.   I forget her name.

17            Q.   Do you know what company she worked

18    for?

19            A.   I think she was an employee of the

20    production company, but I don't recall.

21            Q.   Would you have any records that

22    would indicate the name of the production

23    accountant?

24            A.   Well, I probably could ask someone

25    in my office.  They probably would know.
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 233 of 386  Page ID #:5954

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        234

1          Q.    Well, maybe on a break, you could

2     ask somebody, and we can come back to that.

3                    MS. BASINGER:   I am going to -- I'm

4     going to object.   You can't instruct him.

5                    And which topic is that exactly?

6                    MS. BEEBER:   21.

7               (Exhibit No. 21 was marked for

8               identification by the shorthand

9               reporter and is attached hereto.)

10    BY MS. BEEBER:

11         Q.    Let me know when you have had a

12    chance to review what we have marked as Richards

13    Exhibit 21?

14         A.    I have read it.

15         Q.    Is this an e-mail that you sent to

16    Courtney Solomon on September 30th, 2010?

17         A.    I don't recall sending it, but it

18    appears that I did.

19         Q.    It says:

20               "We should wire transfer the

21               Hasbro money tomorrow as well.

22               Although I am not crazy about

23               doing it, I guess I can

24               personally contribute half of

25               that amount.   What are your



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 234 of 386  Page ID #:5955

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                              235

 1          thoughts?"

 2                Where it says "We should wire the

 3    Hasbro money tomorrow as well," why were you

 4    saying that you needed to transfer the Hasbro

 5    money tomorrow -- or you should transfer the

 6    Hasbro money tomorrow?

 7                MS. BASINGER:  Objection; lacks

 8    foundation, calls for speculation, vague and

 9    ambiguous.

10                THE WITNESS:  Yeah, I really don't

11    recall sending the e-mail, but there are a lot of

12    payments that need to be made in the course of a

13    production, and it could have just been me saying

14    'Hey, there is a payment that we should attend

15    to.'

16    BY MS. BEEBER:

17          Q.   Is there any reason that you said

18    it needed to be transferred tomorrow, meaning

19    October 1st, 2010?

20                MS. BASINGER:  Objection.  It

21    misstates the document.  It misstates the

22    testimony.

23                THE WITNESS:  I don't recall.

24    BY MS. BEEBER:

25          Q.   It says:



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 235 of 386   Page ID #:5956

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                236

1              "Although I am not crazy

2          about doing it, I guess I could

3          personally contribute half of the

4          amount."

5              What did you mean by "although I am

6      not crazy about doing it"?

7              MS. BASINGER:  Objection; lacks

8      foundation, calls for speculation, vague and

9      ambiguous.

10             MR. MARSHALL:  Same objection.

11             THE WITNESS:  Well, I think I

12     actually do know why, because it was my own

13     personal money.  And during this period of time,

14     we were scrambling to pay for a lot of

15     production-related expenses.  And I don't recall

16     if I did lend money to Silver Pictures.  I have.

17     But the money was very tight.

18     BY MS. BEEBER:

19         Q.   Was there any reason in your mind

20     why the money had to be paid to Hasbro in October

21     of 2010?

22             MS. BASINGER:  Objection; assumes

23     facts not in evidence, lacks foundation, calls for

24     speculation.

25             THE WITNESS:  Can you repeat the



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 236 of 386   Page ID #:5957

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                  237

1    question?

2                   THE COURT REPORTER:  You want me to

3    read it?

4                   MS. BEEBER:  Yes, please.

5              (Record read as follows:

6              "Question:  Was there any reason in

7              your mind why the money had to be

8              paid to Hasbro in October of 2010?")

9                   MS. BASINGER:  Objection; lacks

10   foundation, calls for speculation, assumes facts

11   not in evidence, vague and ambiguous.

12                  MR. MARSHALL:  Same objections.

13                  THE WITNESS:  I don't think I do.

14                  MR. MARSHALL:  You mean you don't

15   recall the reason or what, if there was a reason?

16                  THE WITNESS:  Well, I would just

17   say in general when we start a production, there's

18   things that we have to attend to.  So -- but

19   specifically, if you are asking me a specific

20   date, I don't recall.

21   BY MS. BEEBER:

22         Q.   So you are saying there was no

23   reason, as far as you can recall, why that payment

24   needed to be made in October of 2010; is that

25   correct?



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 237 of 386  Page ID #:5958

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      238

 1                    MR. MARSHALL:  Objection; assumes
 2    facts not in evidence, misstates the testimony,
 3    lacks foundation, calls for speculation, and vague
 4    and ambiguous.
 5                    THE WITNESS:  Yeah, I don't think I
 6    said I don't -- there isn't a reason.  I just
 7    don't recall there being -- I don't recall if
 8    there was a specific reason why there had to be a
 9    payment tomorrow.  I think the -- I bet I write
10    e-mails like this all the time saying, 'Hey, we
11    should probably do this tomorrow.'  I don't know
12    if there is -- that means that there is a
13    deadline.
14    BY MS. BEEBER:
15            Q.    And in your understanding, was
16    there any deadline by which the money had to be
17    wire-transferred to Hasbro?
18                    MS. BASINGER:  Objection; vague and
19    ambiguous, calls for speculation, calls for a
20    legal conclusion.
21                    MR. MARSHALL:  Same objections.  I
22    believe irrelevant.  It's his subjective
23    understanding one way or the other.
24                    But you can answer it if you can.
25                    THE WITNESS:  Well, I think having



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 238 of 386  Page ID #:5959

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                              239

 1    looked at it last week, I think that you asking me

 2    to read that paragraph, I don't even -- my

 3    recollection is it doesn't even really

 4    specifically state when a payment is due.

 5    BY MS. BEEBER:

 6           Q.   So what is your answer to the

 7    question?

 8                THE WITNESS:  Can you ask the

 9    question again?

10           (Record read as follows:

11           "Question:  In your understanding,

12           was there any deadline by which the

13           money had to be wire-transferred to

14           Hasbro?")

15                MS. BASINGER:  Objection; vague and

16    ambiguous, lacks foundation --

17                MR. MARSHALL:  Same objections.

18                MS. BEEBER:  Can I ask something?

19    Can we just have a standing rule that your same

20    objections apply when the record is read back?

21                MS. BASINGER:  No.  You ask a

22    question, I re-read it, I make objections.  I am

23    not speaking objections.  I'm doing everything

24    properly.

25                MS. BEEBER:  Okay.  I am just



Case 2:13-cv-03406-DMG-JCG Document 213 Filed 08/26/14 Page 239 of 386 Page ID #:5960

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      240

 1   saying it might move things along.

 2                  MS. BASINGER:  I am -- you made a

 3   big deal last time about stating my objections.

 4   I'm being a good girl.  There is not a single

 5   extra word.  I am just objecting.

 6            (Telephonic interruption.)

 7                  MS. WOGAN:  Want to go off the

 8   record?

 9                  MS. BEEBER:  Yes, let's go off the

10   record.

11                  MS. BASINGER:  Yes.

12                  VIDEOGRAPHER:  We are off the

13   record at 1:11 p.m.

14            (Whereupon, a recess was held from

15            1:11 p.m. to 1:12 p.m.)

16                  VIDEOGRAPHER:  We are back on the

17   record at 1:12 p.m.

18                  THE WITNESS:  You are going to have

19   to ask me the question again.

20            (Record read as follows:

21            "Question:  In your understanding,

22            was there any deadline by which the

23            money had to be wire-transferred to

24            Hasbro?")

25                  MR. MARSHALL:  Could we have the



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 240 of 386   Page ID #:5961

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        241

```
 1   same objections to the question?

 2               MS. BASINGER:  Yeah.  Same

 3   objections.

 4               MR. MARSHALL:  I believe the

 5   witness already answered that question, so it is

 6   asked and answered.  I will add that objection.

 7               Go ahead if you want to answer it

 8   again.

 9               THE WITNESS:  I don't think I have

10   anything really to add to that.

11   BY MS. BEEBER:

12         Q.   Okay.  So yes or no, is there a

13   deadline by which the passive royalty payment had

14   to be made to Hasbro?

15               MS. BASINGER:  Objection; vague and

16   ambiguous, calls for a legal conclusion, calls for

17   speculation, vague and ambiguous, calls for expert

18   testimony.

19               MR. MARSHALL:  Same objections.

20   And the question calls for matters that are

21   irrelevant, his subjective understanding or

22   interpretation of this document which he didn't

23   negotiate or prepare.

24               If you can answer, you can answer

25   it.  If you can't, you can't.
```



```
 1                    THE WITNESS:  I didn't create the

 2   document, so it's hard for me to say what the

 3   intent of the document is, but -- I don't know.

 4   BY MS. BEEBER:

 5              Q.   Is it your understanding that

 6   Sweetpea and Silver Pictures could begin

 7   production -- I'm sorry -- begin principal

 8   photography on D&D 3 before the passive royalty

 9   payment was made to Hasbro?

10                    MS. BASINGER:  Objection; calls for

11   a legal conclusion, calls for speculation, vague

12   and ambiguous.

13                    MR. MARSHALL:  Same objection.  And

14   his subjective understanding is irrelevant based

15   on the document that he didn't prepare or

16   negotiate.

17                    MS. BEEBER:  Okay.  Okay.

18                    MS. WOGAN:  That's a speaking

19   objection.

20                    MR. MARSHALL:  No, it's not.

21                    MS. BEEBER:  Yes, it is.  Now he is

22   going to say, 'Well, I didn't prepare or negotiate

23   it.'

24                    MR. MARSHALL:  No, he's not going

25   to say anything.  It calls for speculation,
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 242 of 386   Page ID #:5963

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        243

1    interpretation of a document that he didn't

2    prepare.

3                    MS. BEEBER:  Okay.  You can say it

4    calls for speculation.

5                    MS. BASINGER:  That's an a

6    perfectly appropriate objection.

7                    MS. BEEBER:  Calls for speculation.

8                    MS. BASINGER:  You don't get to

9    lecture him.  And that's a perfectly appropriate

10   objection.  And you are the one who is wasting

11   time and speaking now.

12                    THE WITNESS:  I mean, what I do

13   recall is everyone at Wizards of the Coast knew

14   what we were doing.  They knew when we were going

15   to be starting the production.  We were in

16   communication.

17                    And as far as the payment goes, I

18   don't think there was -- let's put it this way:

19   Wizards never said, 'Hey, make sure you make that

20   payment by such-and-such date.'

21   BY MS. BEEBER:

22        Q.    Is it your understanding that

23   Wizards had to request that the passive royalty

24   payment be made before it was made?

25                    MS. BASINGER:  Objection; calls for



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 243 of 386  Page ID #:5964

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        244

 1  a legal conclusion, calls for speculation, vague

 2  and ambiguous, calls for an expert opinion.

 3                MR. MARSHALL:  Same objections and

 4  an addition is calls for speculation and

 5  irrelevant matters involving his understanding of

 6  a document that he didn't prepare nor negotiate.

 7                THE WITNESS:  Can you repeat the

 8  question again?

 9            (Record read as follows:

10            "Question:  Is it your understanding

11            that Wizards had to request that the

12            passive royalty payment be made

13            before it was made?")

14                MR. MARSHALL:  All these things

15  were if you had an understanding.

16                Same objections again.

17                THE WITNESS:  Yeah, I'm not sure if

18  the document requires that or not.

19  BY MS. BEEBER:

20        Q.   I am asking for your understanding.

21                MR. MARSHALL:  Same objections.

22                THE WITNESS:  I think --

23                MS. BASINGER:  Hold on.  Different

24  question.  Vague and ambiguous, calls for a legal

25  conclusion, calls for speculation, calls for an



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 244 of 386   Page ID #:5965

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      245

1    expert opinion, asked and answered.

2              MR. MARSHALL:  I have the same

3    objections that I have been making.

4              THE WITNESS:  Yeah, I certainly was

5    not the one who negotiated the document and even

6    when the $20,000 payment was made, I didn't spend

7    a lot of time looking at it.  So I haven't spent a

8    lot of time reviewing that document.

9    BY MS. BEEBER:

10             Q.   Are you done with your answer?

11             A.   Yes.

12             MS. BEEBER:  22.

13        (Exhibit No. 22 was marked for

14        identification by the shorthand

15        reporter and is attached hereto.)

16   BY MS. BEEBER:

17             Q.   Have you had a chance to review

18   what we have marked as Richards Exhibit 22?

19             A.   Yes.

20             Q.   And is the bottom e-mail on the

21   chain an e-mail from Courtney Solomon to you on

22   October 1st, 2010?

23             A.   Yes.

24             Q.   And is the top e-mail your response

25   to Courtney on October 1st, 2010?



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 245 of 386   Page ID #:5966

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      246

1          A.   It appears that, yes.

2          Q.   And, I'm sorry; at the very bottom

3   of the e-mail, there is an e-mail from Lucy

4   Mukerjee to Courtney that says:

5               "Mike Jaffa at Hasbro called.

6               He is the VP business affairs

7               calling you re D&D."

8               And a phone number.  Do you see

9   where I am referring to?

10         A.   Yes.

11         Q.   The e-mail right above that is from

12  Courtney to you.  It says:

13              "I think that you should

14              return that call."

15         A.   Okay.

16         Q.   And then your response is:

17              "Called you back.  I will say

18              that we made wire, unless you

19              disagree."

20         A.   Yep.

21         Q.   As of Friday, October 1st, 2010,

22  had you made a wire payment to Hasbro for D&D 3?

23         A.   I don't recall, but I think it's

24  part of the evidence, so...

25         Q.   Do you recall that the wire



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 246 of 386  Page ID #:5967

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                       247

```
 1   transfer document that we just looked at a few

 2   minutes ago --

 3             A.   I don't think we looked at it.

 4             Q.   -- which Richards Exhibit 16 --

 5             A.   Okay.

 6             Q.   -- is dated October 7, 2010?

 7             A.   Okay.

 8             Q.   So then as of October 1st, 2010,

 9   had you made the wire transfer payment to Hasbro?

10             A.   No.  It appears it was made --

11   well, the wire transfer is dated October 7th.  I'm

12   not sure if it was made that day or not, but I

13   thought we covered that already the previous time.

14             Q.   Right.  Remember, last time we saw

15   a document that showed Hasbro receiving the money

16   on October 7th, 2010.

17             A.   Right.  If you say so.

18             Q.   I say so.  I will represent that to

19   you.

20             A.   Okay.

21             Q.   So then what do you mean by:

22                  ""I will say that we made

23             wire, unless you disagree"?

24             A.   Yeah, I really don't recall.  I am

25   not -- yeah.
```



```
 1              Q.   What did you think the reason was

 2    for Mike Jaffa's call to Courtney Solomon on

 3    October 1st, 2010, if you had such a thought?

 4                   MS. BASINGER:  Okay.  That calls

 5    for speculation, vague and ambiguous.

 6                   MR. MARSHALL:  Same objection.

 7    It's -- it does call for rank speculation.

 8                   THE WITNESS:  Yeah, I just really

 9    don't -- I don't remember this e-mail, and

10    actually I don't -- I don't even remember if I did

11    call him back.

12    BY MS. BEEBER:

13              Q.   Do you have any recollection of any

14    conversation with Mr. Jaffa, ever?

15                   MR. MARSHALL:  On any topic related

16    to D&D?

17                   MS. BEEBER:  Sure.

18                   THE WITNESS:  I remember speaking

19    to quite a few people at Hasbro, and he may be

20    a -- you know, one of them.

21    BY MS. BEEBER:

22              Q.   Okay.  I am asking if you have any

23    recollection of speaking to Mr. Jaffa.

24                   MS. BASINGER:  Asked and answered.

25                   THE WITNESS:  I'm not sure how it
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 248 of 386  Page ID #:5969

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      249

1   would change what I said.  I may have spoken to

2   him.

3   BY MS. BEEBER:

4           Q.   Do you have any specific

5   recollection of a conversation with Mr. Jaffa?

6           A.   I don't.

7                MS. BEEBER:  23.

8           (Exhibit No. 23 was marked for

9           identification by the shorthand

10          reporter and is attached hereto.)

11  BY MS. BEEBER:

12          Q.   Just let me know when you have had

13  a chance to review this.

14               MR. MARSHALL:  What is this -- who

15  produced this document?  This is a Hasbro

16  document?

17               MS. BEEBER:  Yes.

18               MR. MARSHALL:  None of the other

19  documents say "confidential."

20               Does that distinguish this document

21  from the other exhibits we had?

22               MS. BEEBER:  We can do this off the

23  record if you like.

24               MR. MARSHALL:  No, I just asked a

25  question.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 249 of 386  Page ID #:5970

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        250

 1              MS. BEEBER:  Okay.  Off the record.

 2              THE COURT REPORTER:  Is that okay

 3  with everyone?

 4              MS. BASINGER:  Yeah.

 5              VIDEOGRAPHER:  We are off the

 6  record at 1:24 p.m.

 7         (Whereupon, a recess was held from

 8         1:24 p.m. to 1:25 p.m.)

 9              VIDEOGRAPHER:  We are back on the

10  record at 1:25 p.m.

11  BY MS. BEEBER:

12         Q.   Mr. Richards, do you see the top

13  e-mail on this chain from Steve Richards to Liz

14  Schuh sent October 6th, 2010?  Do you see where I

15  am reading?

16         A.   I do.

17         Q.   Do you have any reason to believe

18  that you did not send this e-mail to Liz Schuh on

19  October 6, 2010?

20         A.   I don't.

21         Q.   Do you see it says -- the third

22  line down:

23         "Shooting started last week

24         and things are going very well.

25         SyFy seems pleased as well."



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 250 of 386  Page ID #:5971

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                       251

 1                    Had you had conversations with SyFy
 2      about the shooting that's referred to in that
 3      sentence?
 4                    MS. BASINGER:  That's vague and
 5      ambiguous.
 6                    THE WITNESS:  Yeah --
 7                    MR. MARSHALL:  If you can recall.
 8                    THE WITNESS:  Yeah, I don't know if
 9      the conversations were specifically about shooting
10      or maybe the kind of revisions to the script or
11      just more conceptual about what we were trying to
12      accomplish with visual effects.
13      BY MS. BEEBER:
14             Q.   But you are saying you don't know
15      which reason it was that you are saying SyFy
16      seemed pleased; is that correct?
17                    MS. BASINGER:  Objection; testimony
18      speaks for itself, vague and ambiguous.
19                    MR. MARSHALL:  Asked and answered.
20                    If you can elaborate on anything
21      else, go ahead.
22                    THE WITNESS:  Yeah, I don't think I
23      can elaborate any further.
24      BY MS. BEEBER:
25             Q.   It says:



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 251 of 386  Page ID #:5972

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                       252

1              "Our production partner

2         Sweetpea has also sent the

3         royalty payment to the wiring

4         details you provided."

5              Was that true on October 6th, 2010?

6         A.   Well, it does appear that a wire

7    was made on the 7th.

8         Q.   And Sweetpea didn't make the wire;

9    correct?

10        A.   It appears that Silver Pictures

11   did.

12        Q.   So what was your reason for saying

13   to Ms. Schuh that Sweetpea had sent the royalty

14   payment already as of October 6, 2010?

15        A.   Yeah, I can't recall what my intent

16   was of that sentence, but I think it was more

17   really probably just being in touch with Liz and

18   let her know that things were going well and, you

19   know, we were, you know, pleased with -- that we

20   started production.

21              MS. BEEBER:  24.

22         (Exhibit No. 24 was marked for

23         identification by the shorthand

24         reporter and is attached hereto.)

25              MR. MARSHALL:  This is now?



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 252 of 386   Page ID #:5973

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        253

 1                    MS. BEEBER:  24.

 2                    MS. WOGAN:  23?

 3                    MS. BEEBER:  24.

 4                    MS. BASINGER:  24.

 5                    MS. WOGAN:  24.

 6     BY MS. BEEBER:

 7            Q.    For the record, I have put in front

 8     of you what we have marked as Richards Exhibit 24.

 9                    Have you had a chance to review

10     this document?

11            A.    Yes.

12            Q.    Is this a document that was made in

13     the ordinary course of your business?

14                    MS. BASINGER:  Objection; vague and

15     ambiguous.

16                    THE WITNESS:  Yeah, I recall us

17     having a lot of fun on this question before.  It's

18     a document that we use very often to make wire

19     transfers, and I am sure someone in my office did

20     fill this out.

21     BY MS. BEEBER:

22            Q.    Okay.  And is it kept in the

23     ordinary course of your business?

24            A.    Yes.

25            Q.    And is that your signature about --



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 253 of 386  Page ID #:5974

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                 254

1          A.   It is.

2          Q.   -- seven-eighths of the way down

3   the page?

4          A.   It is.

5          Q.   And what is this document

6   reflecting?

7               MS. BASINGER:   That's vague and

8   ambiguous.

9               THE WITNESS:   I mean, it's a wire

10  transfer from Silver Pictures to After Dark.

11  BY MS. BEEBER:

12         Q.   And what is the amount of the

13  transfer?

14         A.   51,000.

15         Q.   And what is the date of the

16  transfer?

17              MS. BASINGER:   Objection; the

18  document speaks for itself.

19              THE WITNESS:   I think it -- it's a

20  hard one to see, but it looks like it's

21  October 15th.  The document is dated October 15th.

22  BY MS. BEEBER:

23         Q.   And do you see right above your

24  signature, it says:

25              "Additional payment details



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 254 of 386   Page ID #:5975

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      255

```
 1              if applicable"?

 2        A.    Yes.

 3        Q.    And it says:

 4              "Remittance of overestimated

 5        D&D 3 Hasbro fee"?

 6        A.    Uh-huh.

 7        Q.    Did you -- you didn't fill out this

 8   form yourself; correct?

 9        A.    I did not.

10        Q.    Did you instruct someone to put

11   those words into that box?

12              MR. MARSHALL:  The precise words?

13              MS. BEEBER:  Uh-huh.

14              MS. BASINGER:  Objection; calls for

15   speculation.

16              THE WITNESS:  Yeah, I don't recall.

17   BY MS. BEEBER:

18        Q.    Would someone have put those words

19   into that box without you approving them?

20              MS. BASINGER:  Calls for

21   speculation.

22              THE WITNESS:  Yeah.  That could

23   happen from time to time, yes.

24   BY MS. BEEBER:

25        Q.    Do you believe that you signed this
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 255 of 386   Page ID #:5976

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                          256

1    document and then somebody added the "additional

2    payment details" text after you had signed it?

3                    MS. BASINGER:  Calls for

4    speculation.

5                    THE WITNESS:  No.  I don't believe

6    that.

7    BY MS. BEEBER:

8            Q.   So do you believe that it said

9    "remittance of overestimated D&D 3 Hasbro fee" at

10   the time that you executed the document?

11                   MS. BASINGER:  Calls for

12   speculation.

13                   THE WITNESS:  Yeah, I don't recall,

14   but I -- I would doubt someone would put it on

15   there after I signed it.

16   BY MS. BEEBER:

17           Q.   What do those words mean, if you

18   know:

19                   "Remittance of overestimated

20           D&D 3 Hasbro fee"?

21                   MS. BASINGER:  Calls for

22   speculation.

23                   MR. MARSHALL:  Again, speculative

24   on his part as to what the words mean that he may

25   not have prepared.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 256 of 386  Page ID #:5977

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        257

 1                    THE WITNESS:  I mean, I think it

 2      reflects the amount that we returned or

 3      wire-transferred back to After Dark.  It was

 4      trying to explain why we were returning or

 5      wire-transferring money back to Courtney.

 6      BY MS. BEEBER:

 7             Q.    And why were you wire-transferring

 8      money back to Courtney?

 9             A.    At that time we were very much

10      under financial stress on getting the film

11      completely funded, and we were juggling a lot of

12      production matters.

13                    Silver Pictures had hundreds of

14      thousands of dollars into production.  It appears

15      that I was even considering putting some of my own

16      personal money into the company, which I don't

17      recall if I did or didn't, but I have in the past.

18                    And I know that Courtney at the

19      time was very specific on being stretched for

20      funding this show.  So I am sure that the reason

21      for wire-transferring this back was to alleviate

22      some of that stress.

23             Q.    It wasn't because the Hasbro fee

24      had been overestimated?

25             A.    Well, I am not even sure what that



1   means.  There was -- I mean, there was -- I

2   quickly reviewed the agreement, and then I think

3   we thought that it might be a larger amount due.

4   And I think I very quickly came to the conclusion

5   that a particular passive royalty that would be

6   sufficient at that moment was less than that.

7              So I guess that's what those words

8   are referring to.

9         Q.   Okay.  You said in your last answer

10  "we calculated."  Who is the "we" that you are

11  referring to?

12        A.   Well, I recall I very quickly

13  reviewed the agreement.

14             MS. WOGAN:  I didn't mean to

15  interrupt you.  I was just whispering.  Sorry

16  about that.  Go on.

17             THE WITNESS:  I think I answered

18  the question.

19             MS. BEEBER:  We are up to 25.

20             (Exhibit No. 25 was marked for

21             identification by the shorthand

22             reporter and is attached hereto.)

23             MS. BEEBER:  We're about to start

24  on a new topic.  Did you want to take, like, a

25  five-minute break?



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 258 of 386  Page ID #:5979

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      259

```
 1                    MR. MARSHALL:  Sure.

 2                    VIDEOGRAPHER:  We are off the

 3    record at 1:37 p.m.

 4               (Whereupon, a recess was held from

 5               1:37 p.m. to 1:51 p.m.)

 6                    VIDEOGRAPHER:  We are back on the

 7    record at 1:51 p.m.

 8    BY MS. BEEBER:

 9          Q.   I have handed you what we have

10    marked as Richards Exhibit 25.  If you could

11    turn -- just for the record, it's an IM Global

12    sales agency agreement dated as of March 25th,

13    2009, with the Bates numbers IMG000050 to

14    IMG000059.

15                    Would you turn to Page IMG000057?

16                    VIDEOGRAPHER:  Microphone, Counsel.

17                    MS. BEEBER:  Oh, I'm sorry.

18                    MS. BASINGER:  I think he means

19    me -- or both of us.

20    BY MS. BEEBER:

21          Q.   Do you see where it says "agreed

22    and accepted, Silver Pictures Management, Inc."

23    and there is a signature?

24          A.   Yes.

25          Q.   Is that your signature?
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 259 of 386   Page ID #:5980

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        260

1          A.    It is.

2          Q.    Have you ever seen this document

3    before?

4          A.    Yes.

5          Q.    Were you involved in the

6    negotiation of this document?

7          A.    Myself and others at the company

8    and our production counsel.

9          Q.    Do you see on Page IMG000052, it

10   says, Paragraph 10, holdbacks:

11               "The parties agree in good

12          faith to discuss customary

13          holdbacks in accordance with the

14          U.S. release of the picture, if

15          any."

16         A.    Yes.

17         Q.    What does that mean?  What is the

18   purpose of that provision?

19               MS. BASINGER:  Objection; calls for

20   a legal conclusion, vague and ambiguous.

21               MR. MARSHALL:  Same objections.

22               THE WITNESS:  Yeah, just in

23   general, we should be in discussion with IM Global

24   once we know what the release plans are of the

25   film.  And I think at the time of concluding this



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 260 of 386   Page ID #:5981

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                    261

1   agreement, we didn't know exactly how the film was

2   going to be released and -- yeah.

3   BY MS. BEEBER:

4           Q.   You -- I'm sorry.  You weren't

5   exactly sure where the film was going to be

6   released in the United States?

7           MS. BASINGER:  I believe he said

8   "how" not where.

9           MR. MARSHALL:  He did say "how."

10          MS. BEEBER:  Okay.  I'm sorry.

11  BY MS. BEEBER:

12          Q.   What did you mean by "how the film

13  was going to be released"?

14          A.   I think that any time we make a

15  film like this, we want to maximize all revenue

16  relating to the exploitations.  We want to exploit

17  it in all the distribution outlets that are

18  available.  And at the time I knew we didn't have

19  the SyFy deal or a basic cable deal done.  We

20  didn't have video done.  We didn't have a

21  theatrical deal done.  We didn't have, you know, a

22  pay-TV deal completed.

23              And I think this paragraph is

24  really once you know what your release -- what the

25  pattern or what the release in the U.S. will be,



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 261 of 386   Page ID
#:5982

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      262

 1   make sure to talk to us.

 2          Q.    What does a "holdback" mean?

 3          A.    Sometimes internationally or

 4   sometimes a -- one particular distributor will

 5   insist on being the first to release and want

 6   everyone else to delay theirs until they release.

 7          Q.    With respect to Dungeons & Dragons

 8   3: Book of Vile Darkness, was SyFy a distributor

 9   that insisted on being the first to release and

10   wanting everyone else to delay theirs until SyFy

11   released?

12          MS. BASINGER:  Objection; assumes

13   facts not in evidence, vague and ambiguous, calls

14   for speculation.

15          MR. MARSHALL:  Same objections, and

16   it's --

17          THE WITNESS:  Well, at the time we

18   didn't have a SyFy deal completed.

19   BY MS. BEEBER:

20          Q.    No, I am not saying at the time of

21   this agreement.

22          A.    Okay.

23          Q.    I am saying at any time.

24          MR. MARSHALL:  If you know and if

25   you were involved in all those negotiations.



```
 1                    MS. BASINGER:  Can you re-read the

 2      question?

 3                    (Record read as follows:

 4                    "Question:  With respect to

 5                    Dungeons & Dragons 3: Book of Vile

 6                    Darkness, was SyFy a distributor

 7                    that insisted on being the first to

 8                    release and wanting everyone else to

 9                    delay theirs until SyFy released?")

10                    MS. BASINGER:  Same objections.

11                    THE WITNESS:  I don't recall in the

12      third, but on the second movie, they did require

13      because we had to actually go back to Warner Home

14      Video because Warner Home Video had the theatrical

15      and video rights and they were supposed to have

16      the initial release.  And we had to go back and

17      get permission from Warners to delay their

18      theatrical or their exploitation or use of the

19      theatrical rights and the video rights.  And they

20      actually agreed to it and then released on video

21      after SyFy did on the second.

22                    On the third, I forget if it was

23      even an issue.

24      BY MS. BEEBER:

25                    Q.   In Paragraph 10, what does
```



Case 2:13-cv-03406-DMG-JCG Document 213 Filed 08/26/14 Page 263 of 386 Page ID #:5984

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                          264

```
 1   "customary holdbacks" mean where it says "the

 2   parties agree in good faith to discuss customary

 3   holdbacks"?

 4            A.   I am not a -- an attorney.  I don't

 5   know exactly what that means.

 6                 MR. MARSHALL:  Yeah, I object; it

 7   calls for speculation --

 8                 MS. BEEBER:  Did you have any --

 9                 MR. MARSHALL:  -- as to his

10   testimony as an expert witness I suppose as to the

11   meaning of the words in this contract.

12                 MS. BASINGER:  Objection; calls for

13   a legal conclusion.

14   BY MS. BEEBER:

15            Q.   Did you have any understanding of

16   the term "customary holdback" at the time that you

17   executed this agreement?

18                 MR. MARSHALL:  Same objections.

19                 But you can answer yes or no.

20                 THE WITNESS:  Can you repeat the

21   question one more time.

22            (Record read as follows:

23            "Question:  Did you have any

24            understanding of the term "customary

25            holdback" at the time that you
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 264 of 386  Page ID #:5985

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                          265

 1              executed this agreement?")

 2                    MR. MARSHALL:  Same objection.

 3                    THE WITNESS:  I feel like I

 4     answered that question.  I understand what the

 5     concept of a holdback is.

 6     BY MS. BEEBER:

 7          Q.   Was Dungeons & Dragons 3 ever

 8     distributed pursuant to this agreement with IM

 9     Global?

10                    MS. BASINGER:  That's vague and

11     ambiguous, calls for speculation, calls for a

12     legal conclusion.

13                    THE WITNESS:  IM Global made sales

14     on our behalf, and those distributors have

15     received delivery of the film, and I assume that

16     they have released the film.

17                    MS. BASINGER:  And, Jessie, are you

18     presuming this is the distribution agreement?

19     BY MS. BEEBER:

20          Q.   Do you know where the distributors

21     are located who have distributed the film pursuant

22     to sales by IM Global?

23                    MS. BASINGER:  That's vague and

24     ambiguous.

25                    THE WITNESS:  Off the top of my



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 265 of 386   Page ID #:5986

STEVE RICHARDS - VOLUME II Confidential                 December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                              266

```
 1    head --

 2              MS. BASINGER:  Hold on, Mr.

 3    Richards.

 4              Vague and ambiguous, compound.

 5              THE WITNESS:  Yeah, off the top of

 6    my head, I know a few, but I also have received

 7    reports detailing sales that they made.

 8    BY MS. BEEBER:

 9         Q.    What are the few that you know of?

10         A.    Like, Germany was a big -- a big

11    sale that was made; U.K., France.

12         Q.    Do you know when the film was

13    distributed in Germany, U.K. and France?

14         A.    Not off the top of my head.  Or I

15    don't.

16         Q.    Is there any passive royalty due to

17    Hasbro for the distribution of Dungeons & Dragons

18    3 in Germany, the U.K., and France?

19              MS. BASINGER:  Calls for

20    speculation, calls for a legal conclusion.

21              MR. MARSHALL:  Yeah, calls -- calls

22    for speculation, calls for a legal conclusion.

23    Something irrelevant as to whether he has a

24    subjective opinion one way or another on that

25    subject.  The document speaks for itself.
```



```
 1                    If you know.
 2                    THE WITNESS:  Yeah, I am not that
 3    familiar with all of the documents that Sweetpea
 4    has with Hasbro to take a position.
 5    BY MS. BEEBER:
 6             Q.   Are you or Hasbro being paid any
 7    passive royalty amount because of the distribution
 8    of Dungeons & Dragons 3 in Germany, the U.K., and
 9    France?
10                    MS. BASINGER:  Calls for
11    speculation.
12                    MR. MARSHALL:  Well, you can answer
13    as to the extent you have personal knowledge of
14    that.
15                    THE WITNESS:  Well --
16                    MR. MARSHALL:  Of payments.  Of
17    payments; correct.
18                    MS. BEEBER:  Uh-huh.
19                    MR. MARSHALL:  Yeah.
20                    THE WITNESS:  What I know is that a
21    $20,000 payment was made and that, you know, at
22    that time that --
23                    MR. MARSHALL:  Well, she is asking
24    for a different question.  These are payments made
25    by IM Global or an account of IM Global's, the
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 267 of 386   Page ID #:5988

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                           268

 1   exploitation -- are you aware of any payments that

 2   were made by IM Global or --

 3                  MS. BEEBER:  No.

 4   BY MS. BEEBER:

 5          Q.   Just are you aware of any payments

 6   that were made to Hasbro as a passive royalty for

 7   the distribution of Dungeons & Dragons 3 in

 8   Germany, the U.K., or France?

 9                  MS. BASINGER:  Calls for

10   speculation.

11                  MR. MARSHALL:  If you know.

12                  THE WITNESS:  Yeah, the only one I

13   am aware of is the one that I mentioned.

14   BY MS. BEEBER:

15          Q.   Which is what?

16          A.   The $20,000.

17                  MS. BEEBER:  What are we up to --

18   26?

19                  (Exhibit No. 26 was marked for

20                  identification by the shorthand

21                  reporter and is attached hereto.)

22                  MS. BASINGER:  This hasn't been

23   produced in discovery.

24                  MS. BEEBER:  It's just from the

25   Internet.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 268 of 386  Page ID #:5989

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        269

 1              MS. BASINGER:  Okay.  It hasn't

 2    been produced in discovery from the Internet.

 3              MR. MARSHALL:  It came out of outer

 4    space on the Internet, as most things do.

 5              MS. BASINGER:  Do we have any --

 6              MS. BEEBER:  Let's go off the

 7    record if you want to have this discussion.

 8              MS. BASINGER:  No.  I want it on

 9    the record.  I am not agreeing to go off the

10    record.

11              I have a question as to the

12    authenticity and the bona fides of this document

13    which has not been produced and which has not been

14    seen.

15              MS. WOGAN:  Just make your

16    objection.

17              MS. BASINGER:  That's what I was

18    doing.

19    BY MS. BEEBER:

20         Q.    Have you had a chance to review

21    what we have marked as Richards Exhibit 26?

22         A.    Yes.

23         Q.    Does it refresh your recollection

24    in any way about when Dungeons & Dragons 3: The

25    Book of Vile Darkness was distributed in the U.K.,



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 269 of 386  Page ID #:5990

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      270

1  Germany, and France?

2          A.   It doesn't.

3          MS. BASINGER:  Objection; calls for

4  speculation.

5          MR. MARSHALL:  But he answered.

6          MS. BASINGER:  Yes.

7          MR. MARSHALL:  He said it doesn't

8  refresh his recollection.

9  BY MS. BEEBER:

10         Q.   Do you believe that the date where

11  it says release date, "UK 17 September 2012 DVD

12  premiere" is wrong?

13         MS. BASINGER:  Calls for

14  speculation again.  This document lacks

15  authenticity and lacks bona fides.

16         THE WITNESS:  Yeah, my experience

17  with IMDb is there is always a lot of incorrect

18  information.  Having gone to my own credits, there

19  is a lot of incorrect stuff on it.

20  BY MS. BEEBER:

21         Q.   What about the date for France, 3rd

22  of December, 2012, do you have any reason to

23  believe that that is wrong?

24         MS. BASINGER:  Objection; asked and

25  answered.  He just testified.  Again, this lacks



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 270 of 386  Page ID #:5991

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        271

1    foundation.  This document is not authentic.

2              THE WITNESS:  Yeah, I do have a

3    reason to believe just because I have had

4    experiences that have been wrong in the past.  But

5    it could be right, too.

6    BY MS. BEEBER:

7         Q.   What about the date for Germany,

8    the same answer?

9              MS. BASINGER:  Same objections.

10             THE WITNESS:  Yes.

11   BY MS. BEEBER:

12        Q.   Was the Dungeons & Dragons: The

13   Book of Vile Darkness released on DVD in the U.K.

14   before November 24th, 2012?

15             MR. MARSHALL:  If you know.

16             THE WITNESS:  I don't.

17             MR. MARSHALL:  You don't know?

18             THE WITNESS:  I don't know.

19   BY MS. BEEBER:

20        Q.   Would you have any records that

21   would be able to determine the release date of the

22   DVD of Book of Vile Darkness in the U.K.?

23        A.   I mean, I -- I would call the U.K.

24   distributor.

25        Q.   I am asking if you have any



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 271 of 386  Page ID #:5992

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        272

1   documents in your company that would establish

2   that.

3               A.   I mean, possibly.  I am not aware

4   of any.  Yeah, I am not -- I'm not aware of any.

5               MS. BEEBER:  If such documents

6   exist, I would call for their production.  I think

7   they are responsive to the subpoenas we served.

8               MR. MARSHALL:  Okay.

9               MS. BASINGER:  And yet he just said

10  he is not aware of any.

11              Well, why are you looking at me?

12  He said he is not aware of any.  You said, "I

13  asked for production."  I said he is not aware of

14  any.  So what production are you seeking.

15              MS. BEEBER:  Any that exist,

16  regardless of whether he is aware of them or not.

17              Okay.  Let's go to --

18  BY MS. BEEBER:

19              Q.   Your agreement with IM Global was

20  in place as of March 24th, 2009; correct?

21              MS. BASINGER:  Objection; vague and

22  ambiguous.

23  BY MS. BEEBER:

24              Q.   The agreement that we have marked

25  as Richards Exhibit 26.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 272 of 386  Page ID #:5993

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                    273

```
 1                    MS. BASINGER:  25?

 2                    MS. BEEBER:  I'm sorry.  25.

 3                    MR. MARSHALL:  Well, I think the

 4      document speaks for itself as to what date it

 5      bears.

 6                    THE WITNESS:  Yes.

 7      BY MS. BEEBER:

 8           Q.    Did you consider this agreement in

 9      any way when you calculated the $20,000 passive

10      royalty payment that was due to Hasbro?

11           A.    I mean, I think at that point in

12      time when I did that analysis, it was a chaotic

13      production moment.  And I quickly reviewed the

14      contract and I knew at the very least it would be

15      released, you know, based upon my experience as a

16      producer, on television.  And we were very tight

17      on cash and I knew that at the very least we would

18      be releasing on that, and let's just go ahead and

19      pay that.

20           Q.    Under the first amendment that we

21      looked at the last time, and you can turn to it if

22      you would like, is there a passive royalty payment

23      due to Hasbro based on any exploitation by sales

24      of DVDs outside of the U.S.?

25                    MS. BASINGER:  Calls for
```



Case 2:13-cv-03406-DMG-JCG Document 213 Filed 08/26/14 Page 273 of 386 Page ID #:5994

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      274

 1  speculation, calls for a legal conclusion.

 2              Are you asking him to analyze the

 3  document sitting here today?

 4              MS. BEEBER:  No.  I am just asking

 5  him to check.

 6              MS. BASINGER:  Right.  Are you

 7  asking him to analyze the document sitting here

 8  today or are you asking him at the time that he

 9  considered it?

10              MS. BEEBER:  We already -- he

11  already answered the question.

12              MS. BASINGER:  Okay.  So then you

13  are asking him to analyze the document sitting

14  here today.  And if you are, objection; calls for

15  speculation, calls for a legal conclusion.

16              MR. MARSHALL:  Same objections; the

17  document speaks for itself.

18              MS. BASINGER:  He is not required

19  to analyze it for you.

20              MR. MARSHALL:  He is not an expert

21  witness here testifying as to what the agreement

22  calls for or doesn't call for.  He is giving you

23  his best testimony.

24              MS. BASINGER:  Mr. Richards, you

25  are not required to memorize the document.  Either



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 274 of 386  Page ID #:5995

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      275

 1   you know or you don't know.  But they are not

 2   entitled to --

 3                  MS. BEEBER:  I like it.  Keep

 4   going.

 5                  MS. BASINGER:  Thank you.

 6                  Mr. Richards, you are not required

 7   to analyze the document.  If you have an

 8   understanding, you should so testify.

 9                  THE WITNESS:  I wouldn't say

10   anything more than I have already said.  I mean, I

11   wouldn't -- I am saying I don't think I have

12   anything more to add.

13   BY MS. BEEBER:

14        Q.   Anything more to add to what?

15                  MR. MARSHALL:  To all his testimony

16   thus far in the deposition.

17                  MS. BEEBER:  You don't need to

18   answer for the witness, please.

19   BY MS. BEEBER:

20        Q.   Anything to add to what?

21                  MR. MARSHALL:  Well, that is what

22   his answer was.

23                  THE WITNESS:  It is what I was

24   going to say.

25                  MS. BEEBER:  Okay.  Thank you.



```
 1                      27.
 2              (Exhibit No. 27 was marked for
 3              identification by the shorthand
 4              reporter and is attached hereto.)
 5   BY MS. BEEBER:
 6         Q.   Just let me know when you have had
 7   a chance to take a look at what we have marked as
 8   Richards Exhibit 27.
 9              MS. BASINGER:  Are you asking him
10   to read the agreement or do you want to direct him
11   to something specific?
12              Hello, Jessie, I am asking you the
13   same question.  Are you looking for something
14   specific or do you want us all just to look at the
15   agreement?
16   BY MS. BEEBER:
17         Q.   When you have had a chance to
18   review it, let me know, and I will ask you a
19   question.
20              MR. MARSHALL:  Go ahead and review
21   it.  It's 20 pages.  Just, you know, review it
22   briefly so you understand what the document is or
23   is not.
24              (Document reviewed by witness.)
25              THE WITNESS:  Okay.
```



```
 1   BY MS. BEEBER:

 2             Q.   On Page 20 it says:

 3                  "In witness whereof the

 4             parties have executed this

 5             agreement as of the date first

 6             written above."

 7                  And there is a line that says

 8   "Grayson Productions LLC."

 9                  Is that your signature under that

10   line?

11             A.   It is.

12             Q.   Were you involved in the

13   negotiation of this agreement?

14             A.   Not really.  I don't -- I don't

15   think we really -- well, Rand Stoll was the one

16   who negotiated the terms.  And I think production

17   counsel and -- yeah, production counsel probably

18   provided any comments back, if there were any.

19             Q.   Okay.  Did you review this

20   agreement before you signed it?

21             A.   Not in great detail.

22             Q.   Did you review it at all?

23             A.   I think the area that I probably

24   was most -- yes, I did.  The thing that I probably

25   was most concerned about was the license fee.
```



```
 1          Q.   Which is where in the agreement?

 2          A.   5(a).

 3          Q.   Do you recall reviewing any other

 4   provisions of this agreement before signing it?

 5          A.   Not in great detail.

 6          Q.   Do you recall reviewing any of

 7   them, I am saying, in any amount of detail?

 8          A.   I really don't recall.

 9          Q.   Is the agreement with Universal

10   Television Networks and Grayson Productions a

11   document made in the ordinary course of your

12   business?  I am not saying this particular one

13   which came from Sweetpea's files, but this

14   agreement.

15               MR. MARSHALL:  Objection; vague and

16   ambiguous, calls for a conclusion, and uses a

17   legal term that the witness may or may not have

18   any understanding what it means.

19               MS. BASINGER:  Yeah, vague and

20   ambiguous, calls for speculation, calls for a

21   legal conclusion, improper expert opinion.

22               THE WITNESS:  To exploit any of our

23   distribution rights on all the different

24   distribution outlets, there usually is a license

25   agreement associated with it.
```



 1 │ BY MS. BEEBER:

 2 │          Q.   And this particular agreement

 3 │ between Grayson and Universal, was that made in

 4 │ the ordinary course of your business?

 5 │                MR. MARSHALL:  Well, objection;

 6 │ misstates the testimony as to who entered into and

 7 │ negotiated this agreement.

 8 │                MS. BASINGER:  Vague and ambiguous,

 9 │ calls for a legal conclusion, calls for

10 │ speculation, calls for an expert opinion,

11 │ compound.

12 │                THE WITNESS:  Yeah, I don't know if

13 │ there are unusual terms in this agreement, but

14 │ there would be a license agreement associated with

15 │ SyFy acquiring the rights.

16 │ BY MS. BEEBER:

17 │          Q.   Does Grayson keep a copy of this

18 │ agreement in its ordinary course of business?

19 │          A.   Yes.

20 │                MR. MARSHALL:  Well, I am going to

21 │ warrant something.  We produced documents from our

22 │ files.  We did not find this document in our

23 │ files.  So this was not produced -- this was

24 │ produced by Sweetpea.  It was not produced by

25 │ Silver.  So it is questionable whether this



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 279 of 386  Page ID #:6000

STEVE RICHARDS - VOLUME II Confidential                     December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                         280

1  document was maintained by Silver Pictures

2  entities and/or Mr. Richards.

3  BY MS. BEEBER:

4          Q.   Do you have any reason to believe

5  that the document we have marked as Richards

6  Exhibit 27 is inauthentic in any way?

7              MS. BASINGER:  Well, that's vague

8  and ambiguous, calls for a legal conclusion.

9              MR. MARSHALL:  If you have any

10  reason to believe there is any.

11             THE WITNESS:  I don't have any

12  reason to believe.

13  BY MS. BEEBER:

14         Q.   Could you turn to Paragraph 1(d),

15  which is on the second page, SP005256.

16         A.   Uh-huh.

17         Q.   It says:

18             "World premiere rights:  We

19             hereby acknowledged by licensor

20             that Dungeons & Dragons, the Book

21             of Vile Darkness, shall have its

22             'world premiere' on the SyFy

23             service.  In connection therewith

24             licensor shall not authorize or

25             permit the transmission of such



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 280 of 386   Page ID #:6001

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                    281

1          film anywhere in the world at any

2          time prior to the earlier of,

3          one, the day following the date

4          on which UTN takes its initial

5          transmission of such film or,

6          two, December 1st, 2012."

7               Do you see where I am reading?

8          A.   Yeah, I do.

9          Q.   Was Book of Vile Darkness

10   transmitted anywhere in the world before it was

11   transmitted on SyFy?

12               MS. BASINGER:  Vague and ambiguous.

13               MR. MARSHALL:  If you have any

14   knowledge.

15               THE WITNESS:  Yeah, I don't recall

16   that, but I do recall having -- you know, Rand did

17   clarify that, you know, the -- what SyFy really

18   wanted here was U.S. premiere versus world

19   premiere.

20   BY MS. BEEBER:

21          Q.   I'm sorry.  I don't understand.

22               MS. BASINGER:  I'm sorry.  Is that

23   a question?

24   BY MS. BEEBER:

25          Q.   You are saying that -- what are you



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 281 of 386  Page ID #:6002

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                    282

1  saying?

2           A.   That --

3                MS. BASINGER:  Wait, hold on.

4                MS. BEEBER:  He is going to answer

5  my question if he understands it.

6                MS. BASINGER:  I get to object;

7  right?  You said, "I don't understand.  What are

8  you saying?"

9                My objection is vague and

10  ambiguous, lacks foundation, calls for

11  speculation.

12               THE WITNESS:  What SyFy really

13  wanted was to have the ability to say it was a

14  U.S. premiere, not world premiere.

15  BY MS. BEEBER:

16          Q.   Was Paragraph 1(d) of this

17  agreement complied with by Grayson?

18               MS. BASINGER:  Calls for a legal

19  conclusion, calls for speculation, vague and

20  ambiguous.

21               MR. MARSHALL:  Objection; same

22  objections.

23               THE WITNESS:  I think we complied

24  with what SyFy wanted us to do.

25



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 282 of 386  Page ID #:6003

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        283

 1  BY MS. BEEBER:

 2          Q.   What was it that SyFy wanted you to

 3  do?

 4               MS. BASINGER:  Asked and answered.

 5               THE WITNESS:  Be able to have a

 6  U.S. premiere.

 7  BY MS. BEEBER:

 8          Q.   Was what SyFy wanted you to do

 9  memorialized in any way?

10               MR. MARSHALL:  If you know.

11               THE WITNESS:  I don't recall.

12               VIDEOGRAPHER:  Five minutes left on

13  tape, Counsel.

14               MS. BEEBER:  Thank you.

15  BY MS. BEEBER:

16          Q.   Was there an agreement entered into

17  between Grayson and SyFy altering in any way the

18  terms of this agreement we have marked as Richards

19  27?

20          A.   Written?

21          Q.   Uh-huh.

22          A.   I am not aware.

23          Q.   Was there an oral agreement between

24  SyFy and Grayson that altered the terms of

25  Richards 27 in any way?



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 283 of 386  Page ID #:6004

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                284

1          A.    I mean, I think that there was an
2     oral understanding between the parties.
3          Q.    And who specifically at the -- who
4     specifically are the parties that you are
5     referring to in that answer?
6          A.    I believe that Rand Stoll or -- I
7     am not certain, but I believe that Rand probably
8     had a conversation with SyFy.
9          Q.    And who at SyFy do you believe Rand
10    had that conversation with, if you know?
11         A.    I would not know.
12         Q.    And did Rand report to you that
13    conversation?
14         A.    Yes, I believe so.
15         Q.    And what exactly did Rand say?
16         A.    That a U.S. premiere was sufficient
17    for them.
18         Q.    And when was this conversation?
19         A.    I don't recall.
20         Q.    Was that conversation before or
21    after May 12, 2012 -- I'm sorry -- June 21st,
22    2012, if you know?  That's the date dated as of --
23              MR. MARSHALL:  That's the "as of"
24    date.  Do we know what date this was signed?  Is
25    there any reference in this document?



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 284 of 386  Page ID #:6005

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      285

 1                    MS. BEEBER:  I don't think so.

 2                    THE WITNESS:  I mean, I do think it

 3    was subsequent to the contract being signed.

 4    BY MS. BEEBER:

 5            Q.    Was the conversation between Rand

 6    and the SyFy person on the telephone?

 7            A.    I don't recall.

 8            Q.    Was it in person?

 9            A.    I really don't know.

10            Q.    Did you tell anybody else about the

11    conversation between Rand and the SyFy person at

12    the time that it occurred, at or about the time

13    that it occurred?

14                    MR. MARSHALL:  Can you restate

15    that, please?

16                    Re-read it.

17            (Record read as follows:

18            "Question:  Did you tell anybody

19            else about the conversation between

20            Rand and the SyFy person at the time

21            that it occurred, at or about the

22            time that it occurred?")

23                    MR. MARSHALL:  Objection; compound,

24    misstates facts in evidence.

25                    THE WITNESS:  I'm not sure.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 285 of 386  Page ID #:6006

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      286

 1  BY MS. BEEBER:

 2           Q.   Did you have any conversations with

 3  Mr. Solomon about the conversation between Rand

 4  Stoll and the person from SyFy?

 5           A.   I don't recall.

 6                MS. BEEBER:  Let's do the next one.

 7  Yeah, let's go off the record.

 8                VIDEOGRAPHER:  This concludes Tape

 9  No. 1.  We are off the record at 2:24 p.m.

10           (Whereupon, a recess was held from

11           2:24 p.m. to 2:26 p.m.)

12                VIDEOGRAPHER:  This is the

13  beginning of Tape No. 2.  We are back on video

14  record at 2:26 p.m.

15                MS. BASINGER:  Can -- how are they

16  different?  Are they different; do you know?

17                MS. BEEBER:  What exhibit are we up

18  to?

19                THE COURT REPORTER:  26 -- 28; I'm

20  sorry.

21                MS. BEEBER:  Yeah, I thought we did

22  26.

23                THE WITNESS:  Thank you.

24  ///

25  ///



1          (Exhibit No. 28 was marked for

2          identification by the shorthand

3          reporter and is attached hereto.)

4    BY MS. BEEBER:

5          Q.    Mr. Richards, you have in front of

6    you what we have marked as Richards Exhibit 28.

7          A.    Yep.

8          Q.    If you could just look at the first

9    page, it's an e-mail to Rand Stoll, CC Courtney

10   Solomon, from Steve Richards, dated Friday,

11   11-9-2012, subject, "Forward: Dungeons & Dragons -

12   2 films agreement."  And then I guess this is the

13   notation of the attachment.  It says,

14   "SyFy-Dungeons & Dragons" and "amp.pdf."  And the

15   text says:

16          "Rand, please don't circulate

17          this to anyone until we have

18          confirmation from Corey.  Wanted

19          you to have it in your possession

20          pending his approval."

21          Do you recall sending this e-mail?

22          A.    I don't recall.

23          Q.    Do you have any reason to believe

24   that the e-mail was not sent?

25          A.    I don't have any reason.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 287 of 386   Page ID #:6008

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        288

1           Q.   If you turn to the agreement that's
2    attached, it's on Pages SP15191 to SP15234.
3                MR. MARSHALL:  Where are we looking
4    at?
5                MS. BASINGER:  I'm sorry.  Say that
6    again.
7                MS. BEEBER:  The agreement starts
8    on 15191 and goes to 15234 -- oh, I'm sorry.
9                MR. MARSHALL:  What exhibit are
10   we --
11               MS. BEEBER:  What's the matter?
12               MS. BASINGER:  You haven't marked
13   it, I don't think.  Is it 27?
14               THE WITNESS:  28.
15               MS. BEEBER:  28.  You have it right
16   in front of you, that e-mail.
17               MR. MARSHALL:  Oh, okay.  28.
18               MS. BASINGER:  That's why I am
19   asking about this, 28.
20               MS. BEEBER:  Let's go off the
21   record for a minute.
22               THE COURT REPORTER:  Everyone
23   agree?
24               MS. BASINGER:  Yeah.
25               VIDEOGRAPHER:  We are off the



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 288 of 386   Page ID #:6009

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                    289

```
 1   record at 2:29 p.m.
 2             (Whereupon, a recess was held from
 3             2:29 p.m. to 2:30 p.m.)
 4             VIDEOGRAPHER:  We are back on the
 5   record at 2:30 p.m.
 6   BY MS. BEEBER:
 7        Q.   So the third page of this
 8   Exhibit 28, it's Bates stamped SP015192.
 9             Do you see on Paragraph 1(d), the
10   one that we were looking at in the agreement,
11   "world premiere rights."  "World" is crossed out,
12   and it says "U.S." with a circle around it, and
13   then there is a -- like, a -- well, what is that
14   next to it?  Are those your initials --
15        A.   My initials, yeah.
16        Q.   And then it says:
17             "Hereby acknowledged by
18             licensor that Dungeons & Dragons,
19             the Book of Vile Darkness," shall
20             have its --"
21             And "world" is crossed out, and
22   "U.S." is again written.
23        A.   Uh-huh.
24        Q.   And are those your initials next to
25   it?
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 289 of 386  Page ID #:6010

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      290

1          A.   They are.

2          Q.   What is that?

3          A.   I think it's just illustrating what
4  I discussed previous -- on your previous question.
5  What SyFy really was insisting on was North
6  America.  I'm not sure if it was U.S. or North
7  America, but what they were most concerned about
8  was not a world premiere but a U.S. premiere or a
9  North America premiere.

10         Q.   Why did you cross out the word
11 "world" and write in "U.S." on this document?

12         A.   Well, I'm not sure what this
13 document really is because this wasn't the one
14 that was signed.  So this might just be an
15 internal document.

16         Q.   What do you mean by "internal
17 document"?

18         A.   One -- me to Corey, or to Rand and
19 Courtney.

20         Q.   What was the purpose of you writing
21 "U.S." on the document if it was sent internally?

22         A.   I think it was to provide a comment
23 or two, but I'm not sure if there were any other
24 comments.

25         Q.   Did you make that notation --



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 290 of 386  Page ID #:6011

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        291

 1                      MS. BASINGER:  I think you -- I'm

 2     sorry.  Were you done looking through it?

 3                      THE WITNESS:  Yes.

 4     BY MS. BEEBER:

 5           Q.   Did you make that notation before

 6     or after you signed the agreement?

 7                      MS. BASINGER:  Calls for

 8     speculation.

 9                      MR. MARSHALL:  Vague and ambiguous.

10     Which agreement are you referring to?

11                      MS. BEEBER:  I am referring to the

12     executed agreement.  I just don't have the exhibit

13     number --

14                      MS. BASINGER:  27.

15                      MS. BEEBER:  -- at my fingertips.

16                      I will withdraw and restate.

17     BY MS. BEEBER:

18           Q.   Did you make the notation on

19     SP015192 before or after you executed Richards

20     Exhibit 27?

21                      MR. MARSHALL:  If you know.

22                      THE WITNESS:  Well, is there a

23     fully executed agreement?

24     BY MS. BEEBER:

25           Q.   That's your 27 that I showed you



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 291 of 386   Page ID #:6012

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                         292

```
 1   previously.
 2                MR. MARSHALL:  So if you know.
 3                THE WITNESS:  I don't know.
 4   BY MS. BEEBER:
 5        Q.   What are you looking for now?
 6        A.   I am just comparing the two
 7   signature pages.
 8        Q.   For what purpose?
 9        A.   I thought you asked whether or not
10   I made the notation before signing or after
11   signing.  But if this is the executed agreement,
12   then I am just comparing the two signature pages.
13        Q.   If which is the executed agreement?
14        A.   Exhibit 27 is the fully executed
15   agreement; right?
16        Q.   Uh-huh.
17                MS. BASINGER:  Well, I am going to
18   object to that.
19                MS. BEEBER:  I haven't even asked
20   any question.
21                MS. BASINGER:  Yeah, you just said
22   yes to a fully executed agreement.  And I note
23   from exhibit -- the other exhibit you handed out
24   that it's missing schedules.
25                THE WITNESS:  Well, but the one
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 292 of 386  Page ID #:6013

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                          293

1  that you are asking about is not an executed

2  agreement.

3              MR. MARSHALL:  Well, you have a

4  copy of this signed by SyFy or not?

5              MS. BEEBER:  I do.  We marked it as

6  Exhibit 27.

7              MR. MARSHALL:  No, the one that

8  he -- 27.  Do we have -- 28, do we have that

9  agreement signed by --

10             MS. BEEBER:  I do not have 28

11  signed by SyFy, no.  I am not trying to trick you.

12             MR. MARSHALL:  No, I understand.

13             MS. BEEBER:  I am not trying to

14  trick you.

15             THE WITNESS:  I feel like you are.

16             MR. MARSHALL:  So what's the point?

17             MS. BEEBER:  I know.

18  BY MS. BEEBER:

19        Q.   If you know, did you make those

20  notations, changing "world" to "U.S.," before or

21  after you executed Richards Exhibit 27?

22        A.   I don't.

23        Q.   That's the only question I am

24  asking.

25             MR. MARSHALL:  If you recall.



 1                    THE WITNESS:  I'm not sure.  I

 2    don't recall.

 3    BY MS. BEEBER:

 4           Q.   Do you know if SyFy -- or, I'm

 5    sorry -- Universal Television Networks executed an

 6    agreement with Grayson that had "world" changed to

 7    "U.S."?

 8           A.   Yeah, I feel like I answered that

 9    question.

10                    MR. MARSHALL:  He asked and

11    answered.

12                    THE WITNESS:  I said no, I am not

13    aware.

14    BY MS. BEEBER:

15           Q.   Did you send to Universal your

16    changes as reflected in Richards Exhibit 28

17    changing "world" to "U.S."?

18           A.   I don't recall.

19           Q.   Did anyone send your changes of

20    "world" to "U.S." to Universal?

21                    MS. BASINGER:  Calls for

22    speculation.

23                    THE WITNESS:  I am not certain.

24    BY MS. BEEBER:

25           Q.   Do you believe that anyone other



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 294 of 386  Page ID #:6015

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                          295

1    than you would have sent those changes to

2    Universal?

3                      MS. BASINGER:  Calls for

4    speculation.

5                      MR. MARSHALL:  That's definitely

6    speculative.

7                      THE WITNESS:  Like I said, I am --

8    I believe that Rand communicated and had a

9    conversation about this point and that SyFy

10   concurred that their main requirement, slash,

11   interest was a U.S. premiere or a North America

12   premiere.  I'm not certain which one of those two

13   it came out to be, but whether or not it was in

14   writing, I just don't recall.

15   BY MS. BEEBER:

16         Q.   Did that conversation that you are

17   speaking about, was it initiated by Rand or was it

18   initiated by SyFy?

19                      MS. BASINGER:  Calls for

20   speculation.

21                      MR. MARSHALL:  If you know.

22                      THE WITNESS:  Yeah, I -- I think it

23   was probably more of myself seeing that one point

24   and calling Rand and letting him know and he had

25   the conversation, but I am not certain.



 1   BY MS. BEEBER:

 2          Q.   Do you believe -- I'm sorry.  I

 3   don't understand what you mean by "seeing that one

 4   point."

 5          MS. BASINGER:  Is that a question?

 6   BY MS. BEEBER:

 7          Q.   What do you mean by "seeing that

 8   one point" in your previous answer?

 9          A.   In a draft of the agreement.

10          Q.   You are saying you saw "world

11   premiere rights" in a draft of the agreement?

12          A.   Yeah.  I scratched it out.

13          Q.   Okay.  And then you communicated to

14   Rand that -- what did you communicate to Rand?

15          A.   I think what I said was -- I am not

16   certain, but my guess is I probably had a phone

17   call with Rand and indicated, 'Hey, Rand, you

18   know, I think what SyFy really wants here is a

19   U.S. or a North America premiere, not a worldwide

20   premiere.'

21          Q.   Why did you think that SyFy really

22   wanted a U.S. premiere not a worldwide premiere?

23          A.   Just based upon my experience from

24   D&D 2.

25          Q.   Anything else?



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 296 of 386  Page ID #:6017

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      297

 1                A.    (No audible response.)

 2                Q.    You have to say it out loud.

 3                A.    No.

 4                Q.    Did you have a preference regarding

 5    whether these were world premiere rights or U.S.

 6    premiere rights?

 7                A.    I think just in general I always

 8    prefer to have limited rights versus broad rights.

 9    So I think it just probably jumped out at me.

10                Q.    Did limiting this agreement to U.S.

11    premiere rights have anything to do with your

12    agreement with IM Global?

13                MR. MARSHALL:  Calls for a legal

14    conclusion, calls for speculation, vague and

15    ambiguous.

16                THE WITNESS:  Yeah.  I am not

17    certain.

18    BY MS. BEEBER:

19                Q.    Did Rand Stoll ever express to you

20    that SyFy wanted the film available as a world

21    premiere?

22                A.    I don't recall that.

23                Q.    Did anyone ever tell you that SyFy

24    wanted Dungeons & Dragons 3 with no prior

25    exposure?



```
 1              A.   I don't recall.

 2              Q.   Did you ever speak with Courtney

 3   about whether SyFy wanted a world premiere with no

 4   prior exposure?

 5              A.   I don't remember any specific

 6   conversations, no.

 7              Q.   Do you have any recollection of

 8   speaking about that issue with Courtney?

 9              A.   Most of my recollection is in

10   conversation with Rand not Courtney.

11              Q.   Were Rand and Courtney also in

12   communication?

13              MS. BASINGER:  Calls for

14   speculation.

15              MR. MARSHALL:  Total speculation.

16   BY MS. BEEBER:

17              Q.   If you know.

18              A.   I don't know.

19              Q.   Did you want the SyFy agreement

20   limited to U.S. premiere rights because IM Global

21   was selling the DVD rights internationally?

22              MS. BASINGER:  Calls for

23   speculation, vague and ambiguous, calls for a

24   legal conclusion, compound.

25              MR. MARSHALL:  Same objections.
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 298 of 386  Page ID #:6019

STEVE RICHARDS - VOLUME II Confidential               December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                    299

1          If -- are you asking is that the

2    only reason?   When you say "because," is that what

3    you meant?

4              You can answer.

5              THE WITNESS:  You know, from my

6    perspective, we are making a movie, trying to make

7    the best movie we possibly could.  The IM Global

8    agreement definitely provided for them to try to

9    sell the movie internationally to distributors on

10   a whole array of distribution outlets, you know.

11   And we absolutely intended for great things of

12   this property and this movie.

13              So the film absolutely was -- I was

14   hoping for big international release.

15   BY MS. BEEBER:

16          Q.   Had IM Global made any

17   international sales at the time that you crossed

18   out "world" and wrote "U.S." on Richards

19   Exhibit 28?

20          A.   Yes.

21              MS. BASINGER:  Hold on.

22              Calls for speculation, vague and

23   ambiguous, vague as to time.

24              THE WITNESS:  Yes.

25   ///



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 299 of 386   Page ID #:6020

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                    300

 1   BY MS. BEEBER:

 2          Q.   What international sales had IMG

 3   Global made at that point in time?

 4          A.   I'm not sure specifically which

 5   ones, but I know that there was probably one or

 6   two.

 7          Q.   So if Rand Stoll didn't secure the

 8   agreement that you have been testifying about with

 9   SyFy, that they were only concerned about a U.S.

10   distribution -- I'm sorry -- a U.S. premiere,

11   Grayson would be in violation of the agreement;

12   correct?

13          MS. BASINGER:   Objection; calls for

14   a legal conclusion, calls for speculation.

15          MR. MARSHALL:   Objection; the

16   agreements speak for themselves.  He is

17   entitled -- you are entitled to the facts of what

18   he said, what he did, what he heard, not -- you

19   know, expert opinion as to whether somebody is in

20   violation.  So I am not going to let him answer

21   that question.

22          MS. BEEBER:   You are directing him

23   not to answer?

24          MR. MARSHALL:   Yeah.  It's a

25   completely improper question.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 300 of 386  Page ID #:6021

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                             301

```
 1                    MS. BEEBER:  What is your basis

 2      for --

 3                    MR. MARSHALL:  What I just said.

 4                    MS. BEEBER:  It's an improper --

 5                    MR. MARSHALL:  Whether or not --

 6      whether or not Grayson is in violation is not at

 7      issue in this case, so he is not going to be

 8      testifying as to his opinion and speculation as to

 9      whether Grayson is in violation of anything.

10      That's the -- the court or jury determines that.

11                    MS. BASINGER:  Bob, you are not

12      obligated to explain yourself.  You instructed

13      him --

14                    MR. MARSHALL:  I explained why.  No

15      judge is going to make him answer a question like

16      that.

17                    MS. BEEBER:  All right.  Well, I

18      would like the record to reflect that Ms. Basinger

19      just made an obnoxious gesture.

20                    MR. MARSHALL:  I didn't try and

21      make any --

22                    MS. BASINGER:  Really?  Well, I

23      would like the record to reflect that Ms. Beeber

24      has been making faces and laughing with Ms. Wogan

25      throughout the whole thing, but Ms.  Basinger has
```



Case 2:13-cv-03406-DMG-JCG Document 213 Filed 08/26/14 Page 301 of 386 Page ID #:6022

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                          302

1   chosen not to be a child, as is Ms. Beeber, and

2   not pointing such things out because Ms. Beeber is

3   insisting on prolonging this deposition because

4   Ms. Beeber apparently is trying to show off for

5   Ms. Wogan.

6                   So I don't know what Ms. Beeber

7   thinks --  see, let the record reflect once again

8   that Ms. Beeber -- actually, no, the only two

9   people that are laughing are again Ms. Beeber and

10  Ms. Wogan --

11                  MS. BEEBER:  Mr. Marshall is

12  laughing --

13                  MS. BASINGER:  Why do you start?

14  Why do you start?

15                  MS. WOGAN:  Go off the record.

16  This is ridiculous.

17                  MS. BASINGER:  Why do you start?

18                  MR. MARSHALL:  Why don't we take a

19  break?

20                  MS. BEEBER:  This is me starting?

21                  MS. WOGAN:  Off the record.  We are

22  going off the record.  All right?  Off the record?

23                  MS. BASINGER:  Off the record,

24  please.

25                  VIDEOGRAPHER:  We are off the



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 302 of 386  Page ID #:6023

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                     303

 1   record at 2:44 p.m.

 2              (Whereupon, a recess was held from

 3         2:44 p.m. to 3:00 p.m.)

 4              VIDEOGRAPHER:  We are back on the

 5   record at 3:00 p.m.

 6   BY MS. BEEBER:

 7         Q.   Are you aware of Book of Vile

 8   Darkness ever being released anywhere other than

 9   on SyFy or on DVD outside of the United States?

10              MS. BASINGER:  It's vague and

11   ambiguous, compound.

12              THE WITNESS:  I am not -- I am not

13   sure.  I am not aware.

14   BY MS. BEEBER:

15         Q.   What was the initial U.S. release

16   of Book of Vile Darkness?

17              MS. BASINGER:  Objection; calls for

18   speculation, compound, vague and ambiguous.

19              MR. MARSHALL:  If you know.

20              You mean what avenue it was

21   released?

22              MS. BEEBER:  Yeah, just exactly my

23   question.

24              THE WITNESS:  I believe it was

25   SyFy.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 303 of 386  Page ID #:6024

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                    304

```
 1   BY MS. BEEBER:

 2             Q.   And what medium is SyFy?

 3                  MS. BASINGER:  Objection; compound,

 4   calls for speculation, lacks foundation.

 5                  MR. MARSHALL:  That calls for a

 6   conclusion of the witness.

 7                  But go ahead; you can answer.

 8                  THE WITNESS:  I think -- I believe

 9   they are a basic cable network.

10   BY MS. BEEBER:

11             Q.   And that's television; correct?

12                  MS. BASINGER:  Objection; calls for

13   speculation, lacks foundation.

14                  THE WITNESS:  I think generally

15   people would refer to that as television.

16   BY MS. BEEBER:

17             Q.   Can I show you your testimony from

18   the last session?  We have the copy of the

19   transcript for you guys.

20                  MR. MARSHALL:  This is the entire

21   transcript?

22                  MS. BEEBER:  Yes.

23                  MS. BASINGER:  Are you marking

24   his --

25                  MS. BEEBER:  I don't think so.  If
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 304 of 386  Page ID #:6025

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      305

1    you guys can just look on, I will read something.

2                    Bob, if you can look on with the

3    witness.

4                    MR. MARSHALL:  Where is that?

5                    MS. BEEBER:  On Page 141.

6                    MS. BASINGER:  Well, if we don't

7    make this an exhibit, how are we going to be able

8    to then refer to it?  Because the files have

9    different paginations.

10                   MS. BEEBER:  I think we will be

11   able to find the same question and answer in the

12   transcript.

13   BY MS. BEEBER:

14        Q.   Do you see your answer that begins

15   at the bottom where it says Page 141?  It says

16   "the witness."  And it says:

17                   "The Witness:  I think that

18              Hasbro and the --"

19                   I'm sorry.  I guess you need the

20   question.  Hold on a second.

21                   Okay.  My question is on Page 139.

22   It starts at Line 25 at the top.  It says:

23                   "If the film was exploited in

24              multiple ways as you have been

25              talking about, which way would



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 305 of 386  Page ID #:6026

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                         306

1          determine the amount of the

2          passive royalty that was due?"

3               MR. MARSHALL:  Where is that?  I'm

4     sorry.

5               MS. BASINGER:  I can't find it

6     either.

7               THE WITNESS:  139.

8               MS. BEEBER:  Page 139 at the

9     bottom.

10               THE WITNESS:  The question is on

11     139, I think.

12               MS. BEEBER:  Up at the top, there

13     is a Line 25 that says:

14               "Question:  If the film was

15          exploited."

16               Look for 139 at the bottom of the

17     page.  Page 139 at the bottom, and then I am

18     reading right there.

19               MR. MARSHALL:  Why is that 136 up

20     here?  Why does that say 136?

21               MS. BEEBER:  I don't know.  It's

22     the way that it was printed.

23               MR. MARSHALL:  And the next page

24     says 138 at the top.  If you'll just -- that's

25     what's confusing.  Look at the top.



```
 1                    MS. BEEBER:  Okay.  I am referring
 2    to the one -- why don't we mark this?  If there is
 3    some confusion about what page I'm reading from,
 4    but if I take yours back --
 5                    MR. MARSHALL:  What's the question?
 6                    MS. BEEBER:  Can I take yours back,
 7    and just we'll mark it so that the record is clear
 8    about what we're referring to.
 9                    MR. MARSHALL:  Yeah, that's fine.
10                    MS. BASINGER:  So we're marking the
11    rough, the entire rough.
12                    MS. BEEBER:  Yes.
13                    MS. BASINGER:  I was just asking if
14    she was marking.  I think that's kind of wasteful.
15    I don't understand why we are doing this.
16                    MS. BEEBER:  Because Mr. Marshall
17    has a question about what page we are on and I
18    want to make sure that the record is clear about
19    where I'm reading from.
20                    MS. BASINGER:  I think we directed
21    him to it now.
22                    MS. BEEBER:  Can we go off the
23    record, please?
24                    THE COURT REPORTER:  If everyone
25    agrees?
```



 1                    MR. MARSHALL:  Okay.  Where are

 2    you?

 3                    MS. BASINGER:  Sure.

 4                    MR. MARSHALL:  Okay.

 5                    MS. BEEBER:  Let's go off the

 6    record.

 7                    VIDEOGRAPHER:  We are off the

 8    record at 3:05 p.m.

 9            (Whereupon, a recess was held from

10            3:05 p.m. to 3:07 p.m.)

11                    VIDEOGRAPHER:  We are back on the

12    record at 3:07 p.m.

13                    MS. BASINGER:  I am going to

14    object.  I think it's improper to mark an

15    uncertified, unsigned, un-reviewed transcript

16    other than deposition exhibits.

17                    MS. BEEBER:  I am directing you to

18    Page 139.  We didn't mark that.

19                    THE WITNESS:  Exhibit 29.

20                    MS. BEEBER:  I would like to show

21    you what we have marked as Richards Exhibit 29.

22    This is the rough draft of the transcript from the

23    session of your deposition that was held on

24    Thursday, December 12th, 2013.

25    ///



```
 1                 (Exhibit No. 29 was marked for

 2                 identification by the shorthand

 3                 reporter and is attached hereto.)

 4                      MS. BASINGER:  I am also objecting

 5       on the base of authenticity.

 6       BY MS. BEEBER:

 7                      Q.   If you could turn to Page 139 using

 8       the page numbers at the bottom.

 9                      A.   Uh-huh.

10                      Q.   And my question is -- at the top of

11       that page, it starts at Line 25.

12                      A.   Yep.

13                      Q.   And it says:

14                 "By Ms. Beeber:  If the film

15                 was exploited in multiple ways as

16                 you have been talking about,

17                 which way would determine the

18                 amount of the passive royalty

19                 that was due?"

20                      Then there are objections by

21       Mr. Marshall and Ms. Basinger.

22                      MS. BASINGER:  I'm sorry.  Let me

23       confirm that.  Yeah, I don't see Ms. Basinger

24       objecting.

25                      MS. BEEBER:  Okay.
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 309 of 386  Page ID #:6030

STEVE RICHARDS - VOLUME II Confidential            December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                310

 1                   MR. MARSHALL:  That was a Marshall

 2      objection.

 3      BY MS. BEEBER:

 4              Q.   And then there are objections by

 5      Mr. Marshall.  And those objections stand with

 6      respect to that question for the purposes of the

 7      deposition.  I am not trying to exclude them in

 8      any way from your answer or from anything else.

 9                   And then your answer begins on

10      Page 141 beginning at Line 18 and says:

11                   "The Witness:  I think that

12              Hasbro and the production or the

13              attorneys will determine what

14              will be due after all the

15              distribution channels were fully

16              exploited.  I mean, I think from

17              my perspective I am a producer.

18              I just want to get the film into

19              production and pay as little as

20              possible.  What happens

21              downstream I think is for someone

22              that is an attorney."

23                   My question for you, based on that

24      prior testimony, is whether all distribution

25      channels for Book of Vile Darkness have been fully



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 310 of 386   Page ID #:6031

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                       311

```
 1   exploited as of today.

 2               MS. BASINGER:  Calls for

 3   speculation, asked and answered.

 4   BY MS. BEEBER:

 5         Q.    If you know.

 6               MR. MARSHALL:  That's vague and

 7   ambiguous, the question.

 8               THE WITNESS:  I know that there are

 9   some unsold territories and, hopefully, IM Global

10   will be successful in selling them.  And whether

11   or not one of those distributors might actually

12   distribute it on some new distribution outlet,

13   it's hard for me to say yes or -- give you any

14   indication as to that, whether that's going to

15   happen or not.

16   BY MS. BEEBER:

17         Q.    So would now today be the time to

18   determine what passive royalty was due to Hasbro?

19               MS. BASINGER:  Calls for

20   speculation, calls for a legal conclusion.

21               MR. MARSHALL:  Same objection.

22   It's -- calls for speculation, calls for a legal

23   conclusion, and that involves an interpretation of

24   the agreement that Mr. Richards neither negotiated

25   or prepared.
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 311 of 386  Page ID #:6032

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        312

1              THE WITNESS:  Not being a party to

2     the agreement and not negotiating it, I don't know

3     if I am the best person to answer that question.

4     And I am not that overly familiar with that

5     agreement or the negotiation of that agreement.

6     BY MS. BEEBER:

7              Q.   Is there any outside date that

8     could be used to determine what passive royalty

9     payment was due to Hasbro?

10              MR. MARSHALL:  Objection; the

11    agreement speaks for itself.

12              MS. BASINGER:  Calls for

13    speculation, lacks foundation, calls for a legal

14    conclusion, vague and ambiguous.

15              THE WITNESS:  I am not that

16    familiar with the agreement to give you my

17    interpretation or give you an interpretation.

18    BY MS. BEEBER:

19              Q.   Could this continuing distribution

20    go on for 20 more years until the passive royalty

21    payment was determined?

22              MS. BASINGER:  Calls for

23    speculation, lacks foundation.

24              MR. MARSHALL:  Same objection.  And

25    calls for a legal conclusion and interpretation of



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 312 of 386   Page ID #:6033

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                        313

 1  an instrument that he didn't negotiate and did not

 2  prepare.

 3              If you have an opinion -- a view on

 4  that one.

 5              THE WITNESS:  Can you repeat the

 6  question?

 7          (Record read as follows:

 8          "Question:  Could this continuing

 9          distribution go on for 20 more years

10          until the passive royalty payment

11          was determined?")

12              MR. MARSHALL:  You don't have to

13  speculate.  Just answer if you know or not,

14  subject to all the other objections we made.

15              THE WITNESS:  I think it's the same

16  answer.  It's hard for me to -- I am not that

17  familiar with the agreement.

18  BY MS. BEEBER:

19          Q.   Is there a date by which the

20  passive royalty payments have to be trued up?

21              MS. BASINGER:  Calls for

22  speculation, calls for a legal conclusion, lacks

23  foundation.

24              MR. MARSHALL:  Same objections.

25  Calls for his interpretation of an instrument that



1   he did not negotiate or prepare and thus is a

2   conclusion and irrelevant, his subjective

3   understanding of the document.

4            THE WITNESS:  I don't know the

5   agreement that well.

6   BY MS. BEEBER:

7            Q.   Is there any money due to Hasbro

8   today as a passive royalty payment?

9            MS. BASINGER:  Calls for

10  speculation, calls for a legal conclusion, lacks

11  foundation.

12           MR. MARSHALL:  Same objection.

13  Calls for speculation and for a conclusion and

14  subjective interpretation of the document that he

15  did not prepare or negotiate.

16           THE WITNESS:  Am I required to keep

17  on saying the same answer?

18           Yeah, I -- I am not that familiar

19  with the agreement and -- nor have I spent a lot

20  of time reviewing the agreement.  I'm not sure

21  what the intent of the parties are.

22  BY MS. BEEBER:

23           Q.   Do you recall telling anybody at

24  Hasbro or Wizards of the Coast about the deal with

25  SyFy to release Dungeons & Dragons 3?



 1              MR. MARSHALL:  It's vague and

 2    ambiguous and lacks foundation as to time and what

 3    the reference is to "deal with SyFy" is.

 4              MS. BEEBER:  Okay.  That's fair.

 5    We will do it the old-fashioned way.  That's fine.

 6              MS. BASINGER:  Are we done with

 7    this?

 8              MS. BEEBER:  Yeah, I think so, for

 9    the moment.

10              What was the exhibit number for the

11    agreement with SyFy -- 27?  I don't actually have

12    the numbers.

13    BY MS. BEEBER:

14         Q.   Let's go back to Richards

15    Exhibit 27 for a moment.

16              MR. MARSHALL:  This is the

17    agreement dated as of June 21, 2012.

18              MS. BEEBER:  Between Universal

19    Television Networks and Grayson Productions.

20              MR. MARSHALL:  Right.

21    BY MS. BEEBER:

22         Q.   Did you ever have any discussions

23    with anyone at Hasbro or at Wizards of the Coast

24    regarding the agreement that Grayson had entered

25    into with Universal Television Networks with



1    respect to the transmission of D&D 3 on SyFy?

2                    MS. BASINGER:  Hold on.  Objection;

3    that the document speaks for itself,

4    mischaracterizes the document, lacks foundation.

5                    MR. MARSHALL:  This is a

6    clarification.  You mean did he have conversations

7    with respect to this document with SyFy?

8                    MS. BEEBER:  No.  That wasn't my

9    question.

10                   MR. MARSHALL:  Well, that is your

11   question because I just heard it.  So the question

12   is, 'I want to know whether you are talking about

13   that,' or he may have had conversations with SyFy

14   before or after.  I don't know what you are

15   talking about.

16                   MS. BEEBER:  Okay.

17   BY MS. BEEBER:

18        Q.    Did you ever have a conversation

19   with anybody at Hasbro or Wizards of the Coast

20   about D&D 3 being transmitted on the SyFy channel?

21                   MR. MARSHALL:  Okay.  That's a fair

22   question.

23                   THE WITNESS:  I spoke to Liz and

24   maybe some of her colleagues about exploitation

25   probably on basic cable as well as, hopefully,



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 316 of 386   Page ID #:6037

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                         317

1    theatrically releasing the film, releasing it on

2    video.  I mean, our -- you know, the meaning that

3    I had specifically up in Seattle really was about

4    going over the script and what we hope to do and,

5    hopefully, you know, continuing to make a lot of

6    these movies and really wanting to make big movies

7    and really reinvigorate the property.

8    BY MS. BEEBER:

9              Q.   Did you ever name to Hasbro or

10   Wizards of the Coast any distributor of D&D 3

11   other than SyFy?

12              MR. MARSHALL:  You mean a potential

13   distributor?

14              MS. BEEBER:  I mean a distributor.

15              THE WITNESS:  I mean --

16              MS. BASINGER:  Hold on, wait.

17              Vague and ambiguous, compound,

18   lacks foundation.

19              MR. MARSHALL:  She is asking -- do

20   you understand what she is asking?  Did you

21   ever --

22              THE WITNESS:  I think so.

23              MR. MARSHALL:  -- advise --

24              THE WITNESS:  I mean, I --

25              MR. MARSHALL:  -- Wizards of any



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 317 of 386  Page ID #:6038

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                318

1    potential distributor?

2                    THE WITNESS:  Yeah, I am not

3    certain, but I believe that we talked about the

4    conversations that I was having with Warner Home

5    Video.

6    BY MS. BEEBER:

7            Q.    Warner Home Video with respect to

8    D&D 3?

9            A.    Yeah.

10           Q.    Okay.

11           A.    And, you know, my guess is we

12   talked about just overall the big plans that we

13   had for the film and, hopefully, future films.

14           Q.    Other than Warner Home Video and

15   SyFy, did you mention the names of any other

16   companies that might be involved in the

17   distribution of D&D 3?

18                    MS. BASINGER:  Objection.  To who?

19   Vague and ambiguous.

20   BY MS. BEEBER:

21           Q.    To Hasbro or to Wizards of the

22   Coast?

23           A.    You know, I might have mentioned

24   Optimum, who was a U.K. distributor that really

25   had interest in the property, but other than that,



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 318 of 386  Page ID #:6039

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                          319

1    I am not certain.

2              Q.   Did you ever mention IM Global to

3    Hasbro or to Wizards of the Coast in connection

4    with the distribution of D&D 3?

5              A.   I'm not sure if I did or didn't.

6              Q.   Do you have any recollection of

7    doing that?

8              A.   I don't, no.

9              Q.   Did you ever mention IM Global to

10   anyone at SyFy with respect to the distribution of

11   Dungeons & Dragons 3?

12             A.   You know, I might have referred to

13   the sales agent.  I don't know if I used the name

14   IM Global.

15             Q.   Do you have a specific recollection

16   of referring to the sales agent in any

17   conversation with anyone at SyFy?

18             A.   I don't.

19             Q.   Do you have any recollection of who

20   that conversation would have been with at SyFy?

21             A.   The one I'm not sure happened?

22             Q.   Correct.

23             MS. BASINGER:  Yeah, calls for

24   speculation.

25             THE WITNESS:  I'm not sure I even



Case 2:13-cv-03406-DMG-JCG Document 213 Filed 08/26/14 Page 319 of 386 Page ID #:6040

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                     320

```
 1   understand the question.
 2              MR. MARSHALL:  What is the time
 3   frame you are talking about?
 4              MS. BEEBER:  Ever.
 5              MR. MARSHALL:  Ever?
 6              So she is talking about from the
 7   beginning to end.
 8              MS. BEEBER:  With respect to D&D 3.
 9              MR. MARSHALL:  Yeah.
10              THE WITNESS:  I still don't
11   understand the question.  I am saying I don't
12   remember there being a conversation, so how can I
13   refer to a person that I did have it with?
14   BY MS. BEEBER:
15       Q.   Okay.  That's fair.  I'll try to
16   I'll try to narrow it down a little bit.
17              Do you recall having any
18   conversation with anyone at SyFy about D&D 3?
19       A.   Oh, SyFy?
20       Q.   Yes.  That's what all of these have
21   been about, all these questions.
22       A.    I thought you were saying Wizards
23   and Hasbro.
24       Q.   No.  I changed to SyFy a couple
25   questions ago.  You are tired?
```



```
 1              A.   A little bit.

 2              Q.   Do you need a break?

 3              A.   No.

 4              Q.   Need a cup of coffee?

 5              A.   No.  It's okay.  Which -- when did

 6  we switch to SyFy?

 7              Q.   I don't know.  It was at least

 8  three or four questions ago.

 9              MR. MARSHALL:  Why don't we frame

10  this one right, and then we will go back and deal

11  with it.  So this question relates to SyFy.

12              MS. BEEBER:  Okay.  So I guess if

13  you could read back the last question that I had

14  asked.

15              (Record read as follows:

16              "Question:  Do you recall having any

17              conversation with anyone at SyFy

18              about D&D 3?")

19  BY MS. BEEBER:

20              Q.   I will just start again.  Do you

21  recall having any discussions with anyone at SyFy

22  about IM Global?

23              A.   Yeah, I do not recall.

24              Q.   Do you recall having any

25  discussions with anyone at SyFy about an
```



 1   international sales agent?

 2              MR. MARSHALL:  And this is at any

 3   point in time.

 4              MS. BEEBER:  Uh-huh.

 5              THE WITNESS:  I don't really recall

 6   any conversations specifically about IM Global,

 7   but I think we probably had conversations with

 8   someone at SyFy just talking about how we are

 9   going to make a movie and just how we are going to

10   try to exploit it internationally.

11   BY MS. BEEBER:

12              Q.   Do you recall having a specific

13   conversation with someone at SyFy about those

14   topics?

15              A.   I don't, but just -- I remember

16   having a number of conversations about how we are

17   going to -- you know, when we want to, hopefully,

18   make the movie, you know, when we want to start

19   shooting, when we think we might be done.  So I

20   wouldn't be surprised if that came up in the

21   discussion.

22              Q.   And who at SyFy did you have those

23   conversations with that you just testified about?

24              A.   There were two or three executives

25   there.  The only one I can really remember off the



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 322 of 386  Page ID #:6043

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        323

```
 1    top of my head is Karen O'Hara.  But there were
 2    two other people that were her colleagues.
 3                Q.   Chris Regina?
 4                A.   That name sounds familiar, but
 5    that's not the name that I -- there is probably
 6    another person as well.
 7                Q.   Do you recall ever having any
 8    conversations with Chris Regina?
 9                A.   I kind of recall speaking to Chris
10    maybe about another script.
11                Q.   But not about Dungeons & Dragons 3?
12                A.   I am not certain.
13                Q.   Do you recall having any
14    conversations with Thomas Vitali about Dungeons &
15    Dragons 3?
16                A.   I don't recall.
17                Q.   Did anyone at SyFy have any
18    comments on the script for Dungeons & Dragons 3?
19                A.   Yes.
20                Q.   What do you recall about that?
21                A.   Mainly I think overall they were
22    initially not very supportive of that script and
23    thought it might be a bit too dark and, you know,
24    the nudity might have been an issue for them in
25    their read and maybe the explicit language.
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 323 of 386   Page ID #:6044

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      324

 1              But we really -- I think based upon

 2    that feedback we tried to incorporate their

 3    feedback like we would incorporate, you know,

 4    feedback we got from a lot of different folks.

 5         Q.    Why would they care about

 6    Dungeons & Dragons 3 being dark or having nudity

 7    or explicit language?

 8              MS. BASINGER:  Calls for

 9    speculation.

10              MR. MARSHALL:  Again, calls for a

11    conclusion and speculation by this witness based

12    on others' subjective intent or knowledge.

13              THE WITNESS:  I mean, I think -- my

14    view is the comments that we received were -- we

15    were able to most likely address.  You know,

16    creative execs have different views on scripts,

17    and you are always having so try to appease

18    everyone.  It's a complicated process.

19    BY MS. BEEBER:

20         Q.    Why did you have to try to appease

21    SyFy?

22         A.    We absolutely -- you know, they

23    really liked D&D 2.  We viewed them as a great

24    potential distributor for that one distribution

25    outlet.  They expressed strong interest to



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 324 of 386  Page ID #:6045

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                            325

 1  continue to acquire basic cable rights.  You know,

 2  they are a big player in the marketplace.  So we

 3  would have -- you know, we viewed them as a good

 4  potential distributor of the film.

 5          Q.   Did they express this strong

 6  interest in distributing the film before

 7  October 7th, 2010?

 8          A.   What is that particular date?

 9          MR. MARSHALL:  Do you want to give

10  him a reference?

11  BY MS. BEEBER:

12          Q.   That's the date that you made the

13  wire payment of $20,000 to Hasbro.

14          MR. MARSHALL:  For the principal

15  photography.

16          THE WITNESS:  Say that one more --

17  repeat the question.

18          (Record read as follows:

19          "Question:  Did they express this

20          strong interest in distributing the

21          film before October 7th, 2010?")

22          THE WITNESS:  I think that they --

23  we had a very good dialogue with them, and I was

24  keeping in touch with them.  And I think, yeah,

25  they expressed strong interest to acquire the



Case 2:13-cv-03406-DMG-JCG Document 213 Filed 08/26/14 Page 325 of 386 Page ID #:6046

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                      326

 1    basic cable rights.

 2    BY MS. BEEBER:

 3           Q.   Before October 7th, 2010?

 4           A.   Well, I think all through that

 5    period.

 6           Q.   I am asking whether that strong

 7    interest that they were expressing --

 8           A.   Right.

 9           Q.   -- happened in any way before

10    October 7th, 2010?

11                MS. BASINGER:  Calls for

12    speculation, lacks foundation.

13                THE WITNESS:  I think that there

14    was.

15    BY MS. BEEBER:

16           Q.   Had any other distributor expressed

17    strong interest in distributing the film before

18    October 7th, 2010?

19           A.   Yes.

20           Q.   And who was that?

21           A.   I was in dialogue with Warner Home

22    Video.  We had already made a couple of sales, so

23    I think that there were some international

24    distributors that had that level of interest you

25    are referring to.



STEVE RICHARDS - VOLUME II Confidential
HASBRO vs. SWEETPEA ENTERTAINMENT

December 17, 2013
327

```
 1           Q.   You say "we" had made a couple of
 2    sales.  Who is the "we" in that answer?
 3           A.   IM Global.
 4           Q.   And what were the distribution
 5    rights that Warner Home Video were discussing with
 6    you?
 7           A.   I think it would have been
 8    consistent with the second movie, which was
 9    theatrical, video.  And there is probably other --
10    some other nontheatrical rights that they would
11    have probably acquired.
12           Q.   What do you mean by "nontheatrical
13    rights" in that answer?
14           A.   I'm not sure in the Warner Home
15    Video if they got SVOD rights or, you know, other
16    on-demand rights.
17           Q.   What are SVOD rights?
18           A.   Definitely someone more qualified
19    than me can answer that better, but I think it's
20    service, you know, video on demand.
21           Q.   Did you discuss television rights
22    with Warner Home Video at all?
23           A.   I don't think they had those rights
24    in the second contract, any television rights.
25           Q.   I am asking whether you discussed
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 327 of 386  Page ID #:6048

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                328

1      television rights with them with respect to D&D 3.

2              A.    I don't recall.

3              Q.    Did you execute an agreement with

4      Warner Home Video?

5              A.    No, we did not.

6              Q.    Why not?

7                    MS. BASINGER:  Lacks foundation.

8                    MR. MARSHALL:  If you know.  You

9      are not called upon to speculate.

10                   THE WITNESS:  I mean, we just did

11     not reach an agreement.

12     BY MS. BEEBER:

13             Q.    When did the negotiations with

14     Warner Home Video occur with respect to D&D 3?

15             A.    I don't recall the time periods.

16             Q.    Do you recall a year when they

17     occurred?

18             A.    Well, I mean --

19                   MR. MARSHALL:  If you recall.

20                   THE WITNESS:  I can give you a

21     range, like 2008 through 2011.

22     BY MS. BEEBER:

23             Q.    Was there a point in time when the

24     negotiations concluded?

25                   MR. MARSHALL:  Objection.  The



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 328 of 386   Page ID #:6049

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                         329

```
 1  witness testified there were no negotiations that
 2  were concluded.
 3                  MS. BEEBER:  I don't mean
 4  concluded.  I'm sorry.  I apologize.
 5  BY MS. BEEBER:
 6          Q.  Was there a time when you stopped
 7  negotiating with Warner Home Video?
 8              I apologize.  That was confusing.
 9  I'm sorry.  I didn't mean it that way.
10              MR. MARSHALL:  If you can give a
11  time.  You are not called upon to guess, but if
12  you have an estimate, that's okay.
13              THE WITNESS:  Yeah, I think what I
14  said on the range, I mean, I had numerous
15  conversations with a couple of people at the
16  organization throughout that period of time.
17  BY MS. BEEBER:
18          Q.  Do you have documents that would
19  reflect the time period in which the negotiations
20  occurred with Warner Home Video?
21          A.  I think most of them were phone
22  calls.
23          Q.  Do you have any documents that
24  would reflect when those phone calls took place?
25          A.  I don't -- I personally don't keep
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 329 of 386   Page ID
#:6050

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      330

 1   a lot, no.

 2                 MS. BEEBER:  I am going to call for

 3   the production of any documents just establishing

 4   the time frame of the Warner Home Video

 5   negotiations.

 6                 MS. BASINGER:  Assuming, of course,

 7   that that would be responsive to the document

 8   request.

 9                 MS. BEEBER:  I believe it is with

10   respect to D&D 3.

11   BY MS. BEEBER:

12          Q.   Do you recall if the negotiations

13   with Warner Home Video were still ongoing at the

14   time that you made the passive royalty payment to

15   Hasbro on October 7th, 2010?

16                 MS. BASINGER:  Calls for

17   speculation, vague and ambiguous.

18                 THE WITNESS:  I really don't

19   recall.  It would not surprise me if I phoned

20   Warner Home Video after.  I would -- yeah, I am

21   not certain, but I would guess, that yes, I had

22   conversations with them afterwards.

23   BY MS. BEEBER:

24          Q.   Did you consider the negotiations

25   with Warner Home Video in any way when you



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 330 of 386  Page ID #:6051

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                    331

 1 │ calculated the amount of the passive royalty that
 2 │ was due to Hasbro?
 3 │             MR. MARSHALL:  Objection; calls for
 4 │ speculation to his subjective intent and maybe
 5 │ mischaracterizing his testimony as to
 6 │ negotiations, but anyway.
 7 │             THE WITNESS:  Yeah, my main focus
 8 │ was making sure that we were --
 9 │             MR. MARSHALL:  Well, the question
10 │ called for a "yes" or "no."
11 │             THE WITNESS:  Repeat -- can you
12 │ repeat the question, then?
13 │             MS. BEEBER:  Thanks.
14 │         (Record read as follows:
15 │         "Question:  Did you consider the
16 │         negotiations with Warner Home Video
17 │         in any way when you calculated the
18 │         amount of the passive royalty that
19 │         was due to Hasbro?")
20 │             THE WITNESS:  Well, there was no
21 │ contract in place, so no.
22 │ BY MS. BEEBER:
23 │         Q.   What contracts were in place as of
24 │ October 7th, 2010?
25 │             MS. BASINGER:  I believe that's



1    asked and answered.

2                    MR. MARSHALL:  Asked and answered

3    four times.

4    BY MS. BEEBER:

5                    Q.   Okay.  Were there any contracts in

6    place as of October 7th, 2010, besides the

7    contract with SyFy that we marked as Richards

8    Exhibit 27?

9                    A.   Well, I don't think this was.

10                   Q.   And the contract with IM Global

11   that we marked as --

12                   MR. MARSHALL:  Why do you say SyFy?

13   I'm sorry.  I missed that.  That's 2012, SyFy.

14                   MS. BEEBER:  Right.  Those are the

15   only two contracts I am aware of with respect to

16   the distributes --

17                   MR. MARSHALL:  Ever.  Okay.

18                   MS. BEEBER:  Correct.

19                   MS. BASINGER:  I'm sorry, Jessie, I

20   believe your question -- I couldn't -- you said as

21   of 2010, and then you are pointing to 2012.

22   That's what he was saying.

23                   MS. BEEBER:  Right.  You guys

24   didn't let me finish my question, okay?  So we

25   will start again.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 332 of 386   Page ID #:6053

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      333

```
 1   BY MS. BEEBER:

 2           Q.   Were there ever any agreements in

 3   place with regard to the distribution of

 4   Dungeons & Dragons 3, to your knowledge, other

 5   than the one with IM Global and the one with SyFy?

 6                MS. BASINGER:  Objection; asked and

 7   answered.

 8                MR. MARSHALL:  It has been asked

 9   and answered, but I will let him answer it again

10   if he knows.

11                THE WITNESS:  Yeah, I think that

12   there were a handful of international contracts in

13   place.

14   BY MS. BEEBER:

15           Q.   I am just saying "ever"; right?  So

16   were any of those international contracts executed

17   as of October 7th, 2010?

18                MS. BASINGER:  Calls for

19   speculation.

20                MR. MARSHALL:  So now we are going

21   to October 2010?

22                MS. BEEBER:  Correct.  I am really

23   not trying to be confusing at all.

24                MR. MARSHALL:  Well, it's -- okay.

25                MS. BEEBER:  I think it's getting
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 333 of 386   Page ID #:6054

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        334

1  confusing when we all talk during the time that he

2  is trying to figure out the answer to the

3  question.

4  BY MS. BEEBER:

5          Q.   So my question is:  Now I am saying

6  as of October 7th, 2010, what agreements, if any,

7  had been executed with respect to the distribution

8  of Dungeons & Dragons 3?

9               MR. MARSHALL:  In any market?

10              MS. BEEBER:  In any market.

11              THE WITNESS:  I believe that there

12  were a handful.

13  BY MS. BEEBER:

14          Q.   And what were those agreements, if

15  you recall?

16          A.   Yeah, I am not certain.

17          Q.   Other than IM Global, can you name

18  one other party to such an agreement?

19          A.   I think Germany and possibly

20  France.

21              MR. MARSHALL:  I think he has

22  referred before to certain sales that IM may have

23  made, a handful.

24              MS. BEEBER:  Uh-huh.

25  ///



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 334 of 386  Page ID #:6055

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                 335

1    BY MS. BEEBER:

2              Q.   Is that all you can recall?

3              A.   That is.

4              MS. BEEBER:  I think I am getting

5    close to the end.

6              MR. MARSHALL:  That's beautiful.

7              MS. BEEBER:  Why don't we go off

8    the record for a minute.  I think everyone will

9    agree to this one?

10             MS. BASINGER:  I think we have

11   agreed to all of them.

12             MS. BEEBER:  Okay.

13             MS. BASINGER:  So yes.

14             VIDEOGRAPHER:  We are off the

15   record at 3:39 p.m.

16         (Whereupon, a recess was held from

17         3:39 p.m. to 3:42 p.m.)

18             VIDEOGRAPHER:  We are back on the

19   record at 3:42 p.m.

20   BY MS. BEEBER:

21             Q.   Mr. Richards, you have in front of

22   you Exhibit 18, Richards 18?

23             A.   Yes.

24             Q.   Did you ever send this document

25   with your handwriting on it to IM Global?



 1                    MR. MARSHALL:  It doesn't have his

 2      handwriting on it.

 3                    MS. BEEBER:  I'm sorry.  You are

 4      right.  You are right.

 5      BY MS. BEEBER:

 6           Q.   Did you ever send this document

 7      with the handwriting on it to IM Global?

 8           A.   I don't recall.

 9           Q.   Would there be any reason that you

10      would have sent this document with the handwriting

11      on it to IM Global?

12           A.   No.  I mean, I think, if anything,

13      I would be concerned about getting permission from

14      the parties of the agreement.

15                    MR. MARSHALL:  She is not asking

16      you to speculate.  Did you send it to IM Global or

17      not?

18                    THE WITNESS:  I don't recall.  I

19      don't know.

20      BY MS. BEEBER:

21           Q.   Did you ever have any discussions

22      with IM Global about the amount of the passive

23      royalty that was due to Hasbro for D&D 3?

24           A.   I don't recall having any.

25           Q.   Would there have been any reason



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 336 of 386  Page ID #:6057

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                              337

1   for you to have such discussions?

2              MS. BASINGER:  That calls for

3   speculation.

4   BY MS. BEEBER:

5       Q.    If you know?

6              MR. MARSHALL:  That's a completely

7   unfair and ambiguous question.  Calls for

8   speculation.

9              If you know of any reason.

10             THE WITNESS:  You know, maybe they

11  actually saw the agreement when we closed the

12  production loan because this was probably part of

13  the chain of title.

14             MR. MARSHALL:  This document is

15  part of the chain of title?  This is a handwritten

16  note in your file from Steve Bender.

17             MS. WOGAN:  Is he testifying or --

18             MR. MARSHALL:  This is just

19  confusing now.  What are you -- what are you

20  referring to, the document or the Steve Bender

21  notation?  That's the only difference here.

22             MS. BEEBER:  The Steve Bender

23  notation.

24             THE WITNESS:  Yeah, I didn't

25  understand that.  I thought we were talking



 1   about --

 2                  MR. MARSHALL:  Okay, he is talking

 3   about the document.

 4                  MS. BEEBER:  I said every time the

 5   one with the handwriting on it.

 6                  MR. MARSHALL:  Yeah, right.  But

 7   let's refer to the handwriting while we are

 8   talking about it.  Come on.

 9                  MS. WOGAN:  The exhibit is in front

10   of him.  It's a marked exhibit.

11                  MR. MARSHALL:  Steve, take your

12   time; listen to the questions.  Okay?  That's a

13   simple question.

14                  THE WITNESS:  This, the one with

15   the notations, was created for the wire transfer

16   which was put into our, you know, bank

17   documentation.

18   BY MS. BEEBER:

19          Q.   You are saying that the document

20   that had the handwriting on it went into your

21   chain-of-title documentation?

22          A.   No.  It went into a binder that we

23   keep our bank statements.

24          Q.   Okay.  You are saying this

25   document, Exhibit 18 with the handwriting on it,



 1    went into a binder where you keep your bank

 2    statements?

 3              A.    When a wire transfer is prepared,

 4    there is documentation that supports the wire

 5    transfer.  This is a document that Steven Bender

 6    created, and he probably filed it in our own

 7    internal bank records.

 8              Q.    And would IM Global have access to

 9    that file?

10              A.    No.

11              Q.    Was this document with the -- just

12    so we are clear because maybe there was a little

13    confusion.  Was this document with the handwriting

14    on it ever given to IM Global, to your knowledge?

15              A.    Not to my knowledge.

16              (Exhibit No. 30 was marked for

17              identification by the shorthand

18              reporter and is attached hereto.)

19    BY MS. BEEBER:

20              Q.    I have put in front of you what we

21    have marked as Richards Exhibit 30.  It's a chain

22    of e-mails bearing the Bates numbers WB000587 to

23    -580.  I'm sorry.  Sorry.  This is two documents.

24    I apologize.  Let me withdraw that exhibit and

25    let's start again.



 1                    Do you have two documents in --
 2                    MS. BASINGER:  I don't think it is,
 3     Jessie.
 4                    MS. BEEBER:  Oh, it's not?  Oh, all
 5     right.  Sorry.
 6                    MS. WOGAN:  It's 587 and 588.
 7                    MS. BEEBER:  Okay.  587 and 588.
 8     Okay.  That was just on my -- let's start again.
 9     BY MS. BEEBER:
10          Q.   I have put in front of you Richards
11     Exhibit 30, which is an e-mail chain bearing the
12     Bates numbers WB000587 and -588; correct?
13          A.   Uh-huh.
14          Q.   Let's start with the e-mail that's
15     on 588.  It's from Jun Oh to Steven Spira and
16     Patti Connolly, dated Friday, December 14th, 2012,
17     re D&D and Silver.  It says:
18               "FYI, Courtney Solomon said
19               he was going to try to speak to
20               Joel today about D&D.  I will let
21               you know as soon as I hear this
22               was taking place."
23               Do you know who Jun Oh is?
24                    MS. BASINGER:  I am going to
25     object; it lacks foundation.  Are you asking in



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 340 of 386   Page ID #:6061

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                          341

 1   terms of this document or just generally?

 2                   MS. BEEBER:  Yeah, I am asking him

 3   if he knows the people to whom the e-mail was sent

 4   and received.

 5                   MR. MARSHALL:  You can answer

 6   whether or not you know who --

 7                   THE WITNESS:  I know all three of

 8   those people.

 9   BY MS. BEEBER:

10           Q.    And who are those people?

11           A.    All three are employees of Warner

12   Brothers.

13           Q.    Do you know if, in December of

14   2012, Courtney Solomon spoke to Joel Silver about

15   D&D?

16                   MS. BASINGER:  Calls for

17   speculation.

18                   MR. MARSHALL:  That's rank

19   speculation.  I don't even know what -- well.

20   BY MS. BEEBER:

21           Q.    Do you have personal knowledge of

22   any conversation between Courtney Solomon and Joel

23   Silver regarding D&D in December of 2012?

24           A.    In December -- I don't know.  I

25   don't recall.  I don't know.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 341 of 386  Page ID #:6062

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      342

1        Q.    Did anyone ever tell you that

2  Courtney Solomon and Joel Silver had a

3  conversation about D&D during the time period

4  reflected in these e-mails which goes from

5  December 14, 2012, and December 19th, 2012?

6        A.    I mean, I believe that Corey has

7  had conversations with Joel often throughout this

8  whole period.  I mean, but specifically about D&D,

9  I don't recall.  I don't know.

10        Q.    Were you ever on a phone call

11  between Courtney and Joel regarding D&D in the

12  time period from December of 2012 to date?

13        A.    Yes.  I believe -- I'm not sure if

14  it was from November on or -- but, yeah,

15  generally, yes.

16        Q.    How many phone calls were you on

17  with Courtney and Joel regarding D&D from November

18  of 2012 to date?

19        A.    I don't know.  A handful.

20        Q.    Is that more than five?

21        A.    Two to eight.

22        Q.    Okay.  Did any of those

23  conversations regarding -- did any of those

24  conversations regard Courtney granting rights to

25  Warner Brothers to make a Dungeons & Dragons



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 342 of 386  Page ID #:6063

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        343

1   movie?

2                   MS. BASINGER:  Objection; lacks

3   foundation, misstates the evidence, misstates the

4   testimony, assumes facts not in evidence.

5                   THE WITNESS:  There were

6   conversations about Warner Brothers and a

7   particular film that they had, and Dungeons &

8   Dragons.

9   BY MS. BEEBER:

10          Q.    Is that particular film Chainmail?

11          A.    I believe so.

12          Q.    What do you recall about those

13  conversations?

14          A.    Warners had an interest in making

15  Chainmail, and they wanted to explore possibly,

16  you know, doing it as a D&D movie.

17          Q.    What did you and Joel and Courtney

18  discuss regarding that?

19          A.    Just how we could be involved, you

20  know, how real things really were, how far along

21  Warners was on that particular script.

22          Q.    Anything else?

23          A.    No.

24          Q.    When you say you discussed "how we

25  could be involved," who is the "we" in that?



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 343 of 386   Page ID #:6064

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        344

```
 1              A.    Silver Pictures.

 2              Q.    And what was discussed regarding

 3    how Silver Pictures could be involved?

 4                    MR. MARSHALL:  I am going to object

 5    to that.  It's irrelevant.  How Joel Silver can be

 6    involved in a new D&D movie is -- relates to his

 7    rights in this transaction.  It has nothing to do

 8    with D&D 3.  So I am going to object to that.

 9    It's irrelevant completely.

10    BY MS. BEEBER:

11              Q.    You can answer.

12                    MR. MARSHALL:  I am not going to

13    let him answer.

14                    MS. BEEBER:  You are directing him

15    not to answer on the grounds of irrelevant?

16                    MR. MARSHALL:  Here is what we are

17    not going to do.  We are not going to find out

18    what Joel Silver's rights are vis-a-vis any new

19    movie for D&D because whoever wins this lawsuit,

20    our position is Joel Silver has the right to

21    produce D&D 7 or whatever we are talking about.

22    So what we are not going to do is investigate Joel

23    Silver's right.

24                    MS. BEEBER:  And what is the basis

25    for your direction not to answer?
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 344 of 386  Page ID #:6065

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        345

1              MR. MARSHALL:  Irrelevant.  Fishing

2      expedition.  It has nothing to do with this

3      lawsuit which focuses on D&D 3.

4              MS. BEEBER:  Okay.  Could you

5      please just mark this part of the transcript?  We

6      will seek a ruling.

7              MR. MARSHALL:  I have let you ask

8      the questions whether or not they had

9      conversations, and he has testified to it, but you

10     can talk about what Courtney Solomon wanted to do.

11     BY MS. BEEBER:

12             Q.   When you said "how real" it was,

13     what did you mean by that?

14             A.   Like any project that Warners --

15     based upon our experience, Warners sometimes gets

16     excited about something and then it goes cold.  It

17     depends on which executives is supportive of the

18     project; you know, is it Jeff Robinov, is it -- do

19     they have a director attached, and a whole lot of

20     nuances that can make it real or not real or

21     likely or unlikely.

22             Q.   And what was -- was there any

23     conclusion about how real this project was with

24     Warners?

25             A.   I think it was really more about



 1   Joel asking questions.

 2            Q.   What questions was Joel asking?

 3            A.   Those types of questions like who

 4   is the -- you know, who are the director -- who is

 5   the director, which executives are involved.

 6            Q.   Any other questions that you

 7   recall?

 8                 MR. MARSHALL:  On that topic?

 9                 If you can remember them.

10                 THE WITNESS:  I can't remember

11   anything else.

12   BY MS. BEEBER:

13            Q.   Did Courtney answer the question

14   about who was the director?

15            A.   Yeah.  I think there was a director

16   that Warners had in mind, but I don't remember the

17   name.  And I really -- I don't really recall the

18   specifics of that.

19            Q.   Did Courtney answer which

20   executives were involved?

21            A.   Yes.

22            Q.   What was his answer to that?

23            A.   I don't recall.

24            Q.   Was Jun Oh one of the executives

25   that he mentioned?



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 346 of 386  Page ID #:6067

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        347

```
 1              A.   I think Joel's question was more on

 2    the creative side versus -- I think Jun Oh is more

 3    of a business affairs guy.

 4              Q.   Was it Jon Berg?

 5              A.   Yeah -- well, yes.

 6              Q.   What did Courtney say about

 7    Jon Berg?

 8              A.   Well, to be clear, I think it was

 9    also, like, to try to understand whether or not

10    Jon Berg's boss was supportive and anyone else in

11    the organization was supportive.  I mean John, it

12    was his project, so we knew John was very

13    interested in trying to get the movie made.

14              Q.   And who was Jon Berg's boss?

15              A.   Well, at the time I think it was

16    Greg Silverman, and then Greg reported to Jeff

17    Robinov.

18              Q.   What, if, anything did Courtney say

19    about how much Jon Berg's boss was behind the

20    project?

21              A.   Yeah, I don't -- I don't recall the

22    specifics of that.

23              Q.   What was discussed with respect to

24    how far along WB -- how far along Warner was?

25              A.   Say that one more time.
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 347 of 386  Page ID
#:6068

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      348

 1              Q.    What was discussed with respect to

 2    how far along Warner was on this project?

 3              A.    I think with the right casting

 4    and --

 5                    MR. MARSHALL:  Answer the question

 6    directly.

 7                    THE WITNESS:  I don't really recall

 8    leaving -- I don't recall on how, like, certain it

 9    was after that, relating to the call I was a part

10    of.

11    BY MS. BEEBER:

12              Q.    Do you have any way to place in

13    time the time frame when the call occurred?

14                    MS. BASINGER:  Calls for

15    speculation.

16                    THE WITNESS:  Yeah.  One call I

17    know I was in Park City.  I could try to figure

18    out -- I was standing by a fire pit.  Yeah, I

19    could try to figure out when I was in Park City,

20    that date.

21                    MR. MARSHALL:  Do you have any

22    document that might refresh his recollection on

23    timing?

24                    MS. BEEBER:  Yeah, I do.  Where is

25    the one that I had quickly done?



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 348 of 386   Page ID #:6069

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        349

 1                    MR. MARSHALL:  I think he basically

 2      said that it could have started around this time

 3      and went on for a month or two, a couple months.

 4                    MS. BEEBER:  31.

 5              (Exhibit No. 31 was marked for

 6              identification by the shorthand

 7              reporter and is attached hereto.)

 8      BY MS. BEEBER:

 9              Q.   Okay.  I am showing you what we

10      have marked as Richards Exhibit 31.  It's an

11      e-mail chain with the Bates numbers WB000578 to

12      -580.  Let me know when you are ready to --

13              A.   I am.

14              Q.   Do you see the e-mail from you on

15      the bottom of the first page to Steven Spira dated

16      December 29, 2012?  It says:

17              "Steve, please find below

18              information pertaining to

19              Dungeons & Dragons.  This is for

20              WB's internal review only and not

21              to be shared with anyone outside

22              the organization."

23                    And then there are a couple of

24      pages of information here.

25                    Why were you sending information



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 349 of 386  Page ID #:6070

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        350

1  pertaining to Dungeons & Dragons to Steven Spira

2  in November of 2012?

3          A.   I think at this time Steve Spira

4  was trying to ascertain what rights, I guess, if

5  any, Sweetpea might have or what rights we may be

6  willing to work with Sweetpea on together.

7          Q.   Did Courtney Solomon know that you

8  were sending this e-mail?

9          A.   He had knowledge that we were

10  trying, you know, for some time to try to do a big

11  franchise movie at Warner Brothers, and we had

12  some discussions.  Whether he knew specifically I

13  sent this e-mail, I'm not sure.

14          Q.   Was this e-mail of November 29,

15  2012, sent before or after the conversation you

16  and Courtney and Joel had about the WB project, if

17  you know?

18          A.   I think this was probably before.

19          Q.   And by "this," you mean the e-mail

20  dated November 29th, 2012?

21          A.   Yes.

22          Q.   And how soon thereafter did you

23  have the conversation with Courtney and Joel that

24  you testified about?

25                  MS. BASINGER:  Objection; that



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 350 of 386   Page ID #:6071

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        351

1  misstates the testimony.

2              THE WITNESS:  Yeah, I am not

3  certain.

4  BY MS. BEEBER:

5         Q.   And then Steven Spira says:

6              "Thanks, will analyze

7         quietly, but does this mean you

8         have the exclusive film rights

9         incl." -- i-n-c-l period -- "use

10        of their IP, et cetera."

11             Did you ever answer that question

12  of Steve Spira's?

13        A.   I don't recall.

14             VIDEOGRAPHER:  Five minutes left on

15  tape, Counsel.

16  BY MS. BEEBER:

17        Q.   If you had answered that question

18  by e-mail, would you have that e-mail today?

19             MS. BASINGER:  Calls for

20  speculation.

21             THE WITNESS:  I mean, I can check.

22             MS. BEEBER:  Okay.  I am going to

23  call for the production of any e-mail response to

24  Mr. Spira's e-mail dated November 29th, 2012.

25  ///



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 351 of 386  Page ID
#:6072

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        352

1   BY MS. BEEBER:

2          Q.   Where did you get the information

3   that's on Page 579 and Page 580?

4               MS. BASINGER:  That's vague and

5   ambiguous.

6               THE WITNESS:  I mean, I probably

7   had someone in my office go through the

8   chain-of-title documentation.

9   BY MS. BEEBER:

10         Q.   Did you have someone in your office

11  go through the chain-of-title documentation?

12              MS. BASINGER:  Calls for

13  speculation.

14              MR. MARSHALL:  If you can recall.

15              There is the title of the document,

16  but if you look at it --

17              THE COURT:  Yeah.

18              MR. MARSHALL:  Let's read the

19  document.

20              THE WITNESS:  Yeah, but I'm just

21  telling you --

22              MS. WOGAN:  You are just dying to

23  sit in that witness chair.

24              MR. MARSHALL:  I am not dying to do

25  anything, but you are just fooling around.  I



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 352 of 386   Page ID #:6073

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        353

1    mean, come on.  The document says what it is.  It

2    speaks for itself.

3                    THE WITNESS:  I don't think I

4    created this because I don't think I would have

5    taken the time to type it.

6    BY MS. BEEBER:

7            Q.   Who in your office would have

8    created it?

9                    MS. BASINGER:  That assumes facts

10   not in evidence.

11                   MR. MARSHALL:  I think he has

12   testified that somebody prepared this document in

13   his office.

14                   MS. BEEBER:  I don't think he has.

15   That's what I am trying to find out.

16                   MR. MARSHALL:  I thought he said

17   that.

18                   MS. BEEBER:  He said maybe,

19   probably.

20                   MR. MARSHALL:  He assumed.

21                   THE WITNESS:  Most likely it would

22   have been Adam Kuhn or Stephen Bender.

23   BY MS. BEEBER:

24           Q.   Did you review this information

25   before you sent it to Steve Spira, the information



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 353 of 386  Page ID #:6074

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                              354

1  that begins towards the top of Page 579 and then

2  goes on to 580?

3          MS. BASINGER:  Objection; vague and

4  ambiguous.

5          MR. MARSHALL:  If you recall

6  reviewing it before you sent it.

7          THE WITNESS:  I probably glanced at

8  it very quickly.

9  BY MS. BEEBER:

10     Q.    Did you do anything to verify

11  whether the information was correct or not?

12          MS. BASINGER:  Vague and ambiguous.

13          THE WITNESS:  I don't recall.

14  BY MS. BEEBER:

15     Q.    By sending this e-mail to

16  Mr. Spira, were you trying to negotiate a deal for

17  Sweetpea or for Silver Pictures or for both?

18          MS. BASINGER:  Assumes facts --

19  objection; assumes facts not in evidence, lacks

20  foundation, calls for a legal conclusion.

21          MR. MARSHALL:  Objection;

22  irrelevant, vague and ambiguous, compound.

23          I have no idea what that question

24  is supposed to mean.  He hasn't testified he was

25  trying to negotiate a deal for anybody.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 354 of 386  Page ID #:6075

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                              355

1    BY MS. BEEBER:

2         Q.    You can answer.

3         A.    Yeah, I think most likely this

4    e-mail was because Warners expressed interest in

5    possibly exploring the idea of making a Dungeons &

6    Dragons movie.  So I was asked to -- probably to

7    send this on to Spira to flush that level of

8    interest out.

9         Q.    And were you looking to negotiate

10   that deal with Warner to make that movie?

11              MS. BASINGER:  Objection.

12              MR. MARSHALL:  Objection.

13              Go ahead.

14              MS. BASINGER:  Objection; lacks

15   foundation, misstates the testimony, misstates the

16   document, calls for speculation.

17              MR. MARSHALL:  To the extent it

18   talks about -- you are asking questions about Joel

19   Silver negotiating his deal?  I am not going to

20   let him answer.  If you are talking about

21   questions about a relationship on D&D 2 with

22   Mr. Solomon's company, he can testify if he

23   understands the question.  Again, there is no

24   statement that he ever was negotiating on behalf

25   of anybody by sending this document.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 355 of 386   Page ID #:6076

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                    356

1    BY MS. BEEBER:

2             Q.    Were you negotiating on behalf of

3    anybody by sending this document?

4             A.    I was not negotiating.

5             Q.    Did you negotiate on behalf of

6    anybody with Warner Brothers regarding the

7    Chainmail project?

8             A.    I wasn't' negotiating.

9             VIDEOGRAPHER:   One minute.

10   BY MS. BEEBER:

11            Q.    I said did you negotiate with

12   anybody at Warner Brothers regarding the Chainmail

13   project?

14            A.    I didn't negotiate.

15            Q.    I'm sorry?

16            A.    I did not -- I did not negotiate.

17            MS. BEEBER:   All right.  We will

18   change the tape.

19            VIDEOGRAPHER:   This concludes Tape

20   No. 2.  We are off video record at 4:07 p.m.

21            (Whereupon, a recess was held from

22            4:07 p.m. to 4:19 p.m.)

23            VIDEOGRAPHER:   This is the

24   beginning of Tape No. 3.  We are back on video

25   record at 4:19 p.m.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 356 of 386   Page ID #:6077

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                         357

1              MS. WOGAN:  Can we go off the

2      record for a moment?  And I will make these copies

3      fast.

4              MS. BEEBER:  No, we will stay on

5      the record, and I will just do something else.

6      BY MS. BEEBER:

7          Q.   Does Silver Pictures stand to gain

8      anything if the Warner Brothers project goes

9      through?

10             MS. BASINGER:  It's vague and

11     ambiguous, calls for a legal conclusion.

12             MR. MARSHALL:  Vague.  Objection;

13     vague and ambiguous, calls for a legal conclusion

14     and speculation.

15             We have already told you that

16     whoever produces this project, including Hasbro or

17     Courtney Solomon, that the -- that Joel Silver and

18     his related companies believe they have a right to

19     produce a new motion picture involving Dungeons &

20     Dragons.

21             MS. BEEBER:  But you are not

22     permitting this witness to testify as to the basis

23     of those --

24             MR. MARSHALL:  Yeah, because that's

25     Joel Silver's rights, the contractual rights that



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 357 of 386  Page ID #:6078

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        358

 1   we argued about for months.  So we are not going

 2   to get into that.

 3                 We told you that we are equal

 4   opportunity claimants here, both against you and

 5   Universal and Warner Brothers and Sweetpea.  So

 6   from that -- and whether or not there is something

 7   to gain is totally speculative and -- because we

 8   don't know whether that will -- we will prevail or

 9   otherwise.

10                 MS. WOGAN:  It's coming.

11   BY MS. BEEBER:

12         Q.   Do you have any knowledge as to how

13   far along the Warner Brother -- the Warner

14   Brothers project is?

15                 MS. BASINGER:  Vague and ambiguous.

16                 MR. MARSHALL:  Currently?

17                 MS. BEEBER:  Currently.

18                 MR. MARSHALL:  Current knowledge,

19   if you have any.

20                 THE WITNESS:  I really don't.

21   BY MS. BEEBER:

22         Q.   When was the last time you had a

23   discussion with anyone about the development of

24   the Warner Brothers project?

25         A.   Me personally?



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 358 of 386  Page ID #:6079

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                         359

1          Q.    Uh-huh.

2          A.    Nine months maybe, approximately.

3          Q.    You have not spoken to anybody

4    about the Warner Brothers project in nine months?

5          A.    I said "approximately."  Six to

6    nine months.

7          Q.    Do you know whether Joel Silver has

8    had discussions with anyone about the development

9    of the Warner Brothers project in the last nine

10   months?

11         A.    When was the lawsuit filed?

12               MS. WOGAN:  May; May of 2012.

13               MR. MARSHALL:  That was --

14               MS. BEEBER:  '13.

15               MR. MARSHALL:  2013, your lawsuit,

16   correct?

17               MS. BEEBER:  Uh-huh.

18               MR. MARSHALL:  So that was about

19   six months ago, six or seven months ago.  So the

20   lawsuit was filed.  So she is saying since that

21   lawsuit or before.

22               MS. BEEBER:  No.  That wasn't my

23   question.  He asked when the lawsuit was filed.

24               THE WITNESS:  I was going to say

25   when that happened, we -- it seemed like other



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 359 of 386  Page ID #:6080

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        360

 1   things became more pressing.

 2   BY MS. BEEBER:

 3          Q.   What other things became more

 4   pressing?

 5                MR. MARSHALL:  Don't name -- don't

 6   name things specifically.

 7                He is talking about another Silver

 8   business.

 9                MS. BEEBER:  How do you know what

10   he's talking about?  Let him answer the question.

11                MR. MARSHALL:  I'm not going to let

12   him sit here -- here is the deal.  He is not going

13   to answer, tell you pictures that Joel Silver is

14   doing in response to your questions.  And that is

15   what he is referring to.  Okay?

16                MS. BEEBER:  You are directing him

17   not to answer --

18                MR. MARSHALL:  Yeah.  He is not

19   telling you what Joel Silver's business is.  He is

20   said he turned to other things.

21                MS. BEEBER:  I didn't know whether

22   those other things had anything to do with

23   Dungeons & Dragons or not.

24                MR. MARSHALL:  We just said they

25   weren't.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 360 of 386  Page ID #:6081

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                          361

 1                    MS. BEEBER:  You said that.

 2                    MR. MARSHALL:  No.  You said, what

 3     are they.  You didn't ask the question do they

 4     have anything to do with Dungeons & Dragons.  If

 5     you'd like to ask that question, he will answer

 6     that question.

 7     BY MS. BEEBER:

 8          Q.   Did they have anything to do with

 9     Dungeons & Dragons?

10          A.   Repeat the whole question.

11                    MR. MARSHALL:  Since you stopped or

12     the conversations terminated, did you have any --

13                    MS. WOGAN:  Are you conducting the

14     deposition and answering the question?

15                    MR. MARSHALL:  Go ahead.  Let's

16     just move it.  This has been laborious at best, so

17     we are trying to get through with it here.  We are

18     at 4 hours and -- or 6 hours and 42 minutes.

19                    So do you want to restate the

20     question, Jessie?

21                    MS. BEEBER:  I will withdraw it.

22                    MR. MARSHALL:  Okay.  I thought you

23     probably would in the long run.

24                    MS. BEEBER:  What are we up to?

25                    THE COURT REPORTER:  32.



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 361 of 386  Page ID #:6082

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        362

```
 1              (Exhibit No. 32 was marked for

 2              identification by the shorthand

 3              reporter and is attached hereto.)

 4  BY MS. BEEBER:

 5          Q.   Ready?  I have put before you

 6  Richards Exhibit 32.  It's a document dated

 7  March 22nd, 2013, to Silver Pictures, Inc.,

 8  attention Joel Silver, Steve Richards, from DD

 9  Project LLC with Bates numbers SP016764 to

10  SP016769.  Have you ever seen this document

11  before?

12          A.   Yes.

13          Q.   When did you see this document?

14          A.   I would say on or about that date.

15          Q.   On or about March 22nd, 2013?

16          A.   Yes.

17          Q.   Where did you see the document?

18              MR. MARSHALL:  Where?

19              MS. BEEBER:  Uh-huh.

20              THE WITNESS:  Probably in my

21  office.

22  BY MS. BEEBER:

23          Q.   How did you get the document?

24          A.   Probably by e-mail.

25          Q.   Do you recall who the e-mail was
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 362 of 386  Page ID #:6083

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                    363

 1  from?

 2          A.   Either from my attorney or from

 3  Courtney.

 4          Q.   And by your "attorney," are you

 5  referring to Greenberg Glusker?

 6          A.   Yes.

 7          Q.   What is this document?

 8          MR. MARSHALL:  The document speaks

 9  for itself as to what it is.

10          MS. BASINGER:  Vague and ambiguous,

11  calls for speculation, calls for a legal

12  conclusion, lacks foundation.

13          MR. MARSHALL:  I think the document

14  explains what it is or purports to be.

15          THE WITNESS:  It's a proposal from

16  Courtney on how we may be able to proceed and be

17  involved with D&D.

18  BY MS. BEEBER:

19          Q.   Did you or anyone else at Silver

20  Pictures accept this proposal?

21          A.   My recollection is there is --

22  there was a lot of discussion about this document.

23          Q.   Discussion with whom?

24          A.   Internally and with --

25          MR. MARSHALL:  Don't talk about



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 363 of 386  Page ID #:6084

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                          364

1   conversations with your lawyer.  Her question was,

2   did we ever accept this document.

3                   THE WITNESS:  No.

4   BY MS. BEEBER:

5           Q.   Have you rejected this proposal?

6                   MS. BASINGER:  Calls for a legal

7   conclusion, vague and ambiguous.

8                   MR. MARSHALL:  Same objection.

9                   But you can answer.

10                  THE WITNESS:  I think it was

11  rejected with suggestions.

12  BY MS. BEEBER:

13          Q.   And what were those suggestions?

14          A.   I don't recall specifically.

15          Q.   Was that a document in writing that

16  rejected the suggestions?

17          A.   I don't recall.

18          Q.   Did the Silver camp make comments

19  to Richards Exhibit 32, written comments?

20                  MR. MARSHALL:  If you can recall.

21                  MS. BASINGER:  Jessie, do you mean

22  transmitted to us or do you mean internally?

23                  MS. BEEBER:  Transmitted to

24  Solomon.

25                  THE WITNESS:  I think that there



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 364 of 386  Page ID #:6085

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                         365

 1  might have been discussions that our counsel had

 2  with their counsel.

 3  BY MS. BEEBER:

 4          Q.   Were those discussions regarding

 5  the terms of this proposal that we have marked as

 6  Richards Exhibit 32?

 7              MR. MARSHALL:  You are not being

 8  asked to speculate and you are not being asked to

 9  convey communications between you and your

10  counsel.  That violates the attorney-client

11  privilege.  So I think this is probing an area

12  that could be privileged.  So I would rather the

13  witness not answer these questions.  Instruct him

14  not to answer.  He has testified that we didn't

15  accept it and...

16  BY MS. BEEBER:

17          Q.   Do you have any current discussions

18  with Courtney Solomon regarding the resolution of

19  claims between Silver Pictures and Mr. Solomon and

20  Sweetpea?

21          A.   Nothing recent, no.

22          Q.   When was the last time you had such

23  discussions?

24              MS. BASINGER:  Objection; assumes

25  facts not in evidence.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 365 of 386   Page ID #:6086

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        366

```
 1                      MR. MARSHALL:  When was the lawsuit
 2   filed?
 3                      MS. BEEBER:  The lawsuit was filed
 4   in May --
 5                      MS. WOGAN:  Early May, 2013.
 6                      THE WITNESS:  I think it was right
 7   around that time.
 8   BY MS. BEEBER:
 9        Q.   Am I correct that this proposal
10   that's in Richards Exhibit 32 is contingent on
11   Sweetpea winning its lawsuit against Hasbro?
12                      MS. BASINGER:  Calls for
13   speculation, calls for a legal conclusion, lacks
14   foundation.
15                      MR. MARSHALL:  Well, it's
16   completely speculative and doesn't reflect the
17   evidence and facts in evidence.  This proposal was
18   given three months before a lawsuit was filed.  So
19   how could it be contingent on that?
20   BY MS. BEEBER:
21        Q.   You can answer.
22                      MR. MARSHALL:  If you know.
23                      THE WITNESS:  Can you repeat the
24   question.  Is it contingent on --
25                      (Record read as follows:
```



 1              "Question:  Am I correct that this

 2              proposal that's in Richards Exhibit

 3              32 is contingent on Sweetpea winning

 4              its lawsuit against Hasbro?")

 5                   MS. BASINGER:  Same objections.

 6                   MR. MARSHALL:  Same objections.

 7                   You mean contingent at the time the

 8   letter was sent?

 9                   MS. BEEBER:  No.

10                   MR. MARSHALL:  That's the only

11   thing it can mean, but that's the only thing your

12   question can possibly mean.  There was no lawsuit,

13   so how could it be contingent on that?  And the

14   document speaks for itself whether it is

15   contingent on anything, whatever the contingencies

16   are in the document.

17                   MS. WOGAN:  This is the longest

18   speaking objection I have ever heard.

19                   MR. MARSHALL:  It's not a speaking

20   objection.  You are talking about a document.  She

21   is trying to summarize things in a confusing,

22   ridiculous manner, in my opinion, with a witness.

23                   The document sets forth the

24   contingencies.  You are asking him to speculate

25   about dates and when something was contingent on a



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 367 of 386  Page ID #:6088

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      368

 1   lawsuit that was filed after the document was

 2   sent.  I think you can appreciate that.

 3   BY MS. BEEBER:

 4              Q.   Can any deal be made with Sweetpea

 5   regarding Silver Pictures and Sweetpea's rights in

 6   Dungeons & Dragons if Hasbro wins the lawsuit?

 7              MS. BASINGER:  Calls for

 8   speculation, calls for a legal conclusion, won't

 9   happen, vague and ambiguous.

10              MR. MARSHALL:  I think that does

11   call for a legal conclusion and speculation by the

12   witness.

13              If you have any opinion on that at

14   all.

15              THE WITNESS:  If you are asking me

16   to speculate if you guys settle or if you win?

17              MS. BEEBER:  Uh-huh.  If we win.

18   Not if we settle; if we win.

19              THE WITNESS:  That's beyond my

20   expertise.

21   BY MS. BEEBER:

22              Q.   So whether Hasbro wins the lawsuit

23   or Sweetpea wins the lawsuit, it's irrelevant with

24   respect to Silver Pictures's rights in Dungeons &

25   Dragons; is that correct?



 1                     MS. BASINGER:  Objection; that

 2     misstates the testimony, calls for a legal

 3     conclusion.

 4                     MR. MARSHALL:  We've already -- I

 5     already told that you whoever wins --

 6                     MS. BEEBER:  Can I just have the

 7     witness, really, answer this question?

 8                     MR. MARSHALL:  We are stipulating

 9     to that fact.  I mean, what are you asking him

10     questions about conclusion?

11                     MS. BEEBER:  You are stipulating --

12                     MR. MARSHALL:  Yeah, we are going

13     to sue whoever wins the lawsuit if Joel Silver is

14     not producing.  It's on the record.  There you go.

15     I don't understand what the issue is.

16                     MS. BEEBER:  All I want is for the

17     witness to answer the question.

18                     MR. MARSHALL:  Yeah, but you've

19     asked questions that call for speculation, his

20     analysis of agreements, his conclusions as to the

21     agreements, and expert testimony as to what

22     agreements mean.  So that's why we object to them.

23     We told that you we are neutral on who wins.

24                     MS. BEEBER:  Actually, you have

25     told us that a bunch of times, and Mr. Richards



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 369 of 386   Page ID #:6090

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      370

1  has never said that.

2                    MR. MARSHALL:  Okay.  Tell them.

3                    MS. BEEBER:  That's what I'm trying

4  to ask.

5                    THE WITNESS:  I have actually

6  answered the question.  I am not qualified to

7  answer it.

8                    MS. BEEBER:  He is not qualified to

9  answer the question.  That's his answer.  So

10  everything that you said is, frankly, irrelevant.

11                    MR. MARSHALL:  Okay, good.

12                    MS. BEEBER:  He will not answer

13  that question.  Do you want me to ask it one more

14  time and then we'll see if he'll answer it?

15                    MR. MARSHALL:  Didn't he just say

16  he's not qualified here?

17                    MS. BEEBER:  He just said he's not

18  qualified to answer the question, correct.

19                    MR. MARSHALL:  Okay.  That's his

20  answer.

21                    MS. BEEBER:  So I have no

22  statement.  I have no stipulation.  I have no

23  understanding from the witness regarding that

24  whole situation, which is I guess what you are

25  saying I am not entitled to get in this



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 370 of 386  Page ID #:6091

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        371

 1   deposition.

 2                    MR. MARSHALL:  I don't think you

 3   are.

 4                    MS. BEEBER:  And I am going to have

 5   a very interesting record to give to the judge,

 6   given your last five or six speeches.

 7                    MR. MARSHALL:  Whatever you want to

 8   do.  The reality is you have asked the witness a

 9   highly confusing question.  He can't analyze what

10   claims we have.  He can't testify --

11                    MS. BEEBER:  Are you directing him

12   not to answer my question?

13                    MR. MARSHALL:  He answered.  He

14   said he is not qualified to answer the question.

15   You are asking for an expert.  You are asking for

16   his analysis of a document or other documents or

17   rights, I guess.  I don't know what you are asking

18   exactly.  But, so, you know, it's unfair to do

19   that.

20                    MS. BEEBER:  And we don't know what

21   the witness thinks either because you won't let

22   him answer.  But, okay.

23                    MR. MARSHALL:  I mean, come on.

24   What's the --

25                    MS. BEEBER:  Let's go off the



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 371 of 386  Page ID #:6092

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        372

 1  record for a minute.

 2                    MS. BASINGER:  Fine.

 3                    VIDEOGRAPHER:  We are off the

 4  record at 4:36 p.m.

 5              (Whereupon, a recess was held from

 6              4:36 p.m. to 4:39 p.m.)

 7                    VIDEOGRAPHER:  We are back on the

 8  record at 4:39 p.m.

 9                    MS. BEEBER:  I have put in front of

10  you what we have marked as Richards Exhibit 33.

11              (Exhibit No. 33 was marked for

12              identification by the shorthand

13              reporter and is attached hereto.)

14  BY MS. BEEBER:

15         Q.   It's a document Bates stamped

16  SP008423 to SP008425.  It's an e-mail from

17  Courtney Solomon dated February 8th, 2013, which

18  says:

19              "Dear all.  I spoke with

20              Steve Spira today.  Here is the

21              result of the call."

22              And then if you go down to the

23  fourth paragraph, it says:

24              "He told me that Joel Silver

25              called him today claiming that he



```
 1              had developed the script with Roy

 2              Lee and Jon Berg and saying that

 3              Bert Fields felt he had some

 4              claim in that regard.  Spira felt

 5              that it was likely untrue and

 6              bluster, but he needed to circle

 7              back with Berg who is in London.

 8              I said we had all discussed this

 9              at the beginning and it was not

10              the case according to Berg."

11              Is Silver Pictures claiming rights

12      in the script Chainmail?

13              MR. MARSHALL:  Objection; vague,

14      ambiguous, calls for a legal conclusion, and any

15      opinion this witness had could only be gained

16      through attorney-client privileged communications.

17              MS. BEEBER:  No, I am asking about

18      Silver Pictures.

19              MR. MARSHALL:  That is Silver

20      Pictures.  Silver Pictures is who he works for.

21      Silver Pictures is represented by attorneys.  I

22      don't understand the issue that you just phrased,

23      why that changes anything.

24      BY MS. BEEBER:

25              Q.  I am not asking for any
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 373 of 386  Page ID #:6094

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      374

```
 1  communications with attorneys.  I am asking you

 2  whether it's true what's stated in this e-mail,

 3  that Joel Silver is claiming that he developed the

 4  script with Roy Lee and Jon Berg.

 5             MR. MARSHALL:  You are asking

 6  whether he knows that Joel Silver made that claim?

 7             MS. BEEBER:  Correct.

 8             THE WITNESS:  Yeah, I am not aware.

 9  BY MS. BEEBER:

10       Q.   You have never heard Joel Silver

11  claim that he developed the script at Warner

12  Brothers?

13       A.   Yeah.  I'm not sure if he made that

14  claim.

15       Q.   What, if anything, is the basis for

16  Joel Silver or Silver Pictures making any claim

17  with respect to the Warner Brothers project?

18             MR. MARSHALL:  Oh, boy.  Objection;

19  vague, ambiguous, calls for a legal conclusion,

20  completely irrelevant.  Relates to rights held by

21  Joel Silver and/or Silver Pictures.  And any

22  information as to the rights or basis for any

23  claim would be necessarily gained through

24  conversations with legal counsel.  So, therefore,

25  he should not answer that question.
```



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 374 of 386   Page ID #:6095

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                              375

 1                    MS. BEEBER:  You are directing him

 2     not to answer?

 3                    MR. MARSHALL:  Yep.

 4     BY MS. BEEBER:

 5          Q.    Do you know if Joel Silver had any

 6     role in the development of the script Chainmail at

 7     Warner Brothers?

 8                    MR. MARSHALL:  If he knows.

 9                    THE WITNESS:  I mean, we definitely

10     have had discussions with Roy Lee over -- over the

11     years.  What development occurred in that regard,

12     I am not aware.  I'm not sure.

13     BY MS. BEEBER:

14          Q.    Was Joel Silver seeking a producing

15     credit with respect to any project that Courtney

16     Solomon and Warner Brothers did regarding

17     Chainmail and Dungeons & Dragons?

18                    MS. BASINGER:  That's vague and

19     ambiguous, vague as to time, calls for

20     speculation, calls for a legal conclusion.

21                    MR. MARSHALL:  Same objections.

22     And, again, don't reveal anything regarding or

23     relating to your communications with counsel.  If

24     you gained information through communications with

25     counsel, don't say it.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 375 of 386   Page ID #:6096

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                          376

```
 1                    THE WITNESS:  Well, I -- over the
 2    years, Corey and I have always talked about, you
 3    know -- we have talked about trying to refresh
 4    this franchise and do a big movie at Warner
 5    Brothers.  So there were discussions about us
 6    being involved with the project.
 7    BY MS. BEEBER:
 8           Q.   Did anyone at -- did Joel Silver or
 9    anyone at Silver Pictures specifically ask for a
10    producer credit with respect to any project that
11    Courtney and Warner Brothers were working on in
12    2012 and 2013?
13                    MR. MARSHALL:  Relating to
14    Dungeons & Dragons?
15                    MS. BEEBER:  Relating to Dungeons &
16    Dragons.
17                    MR. MARSHALL:  Just the producer
18    credit?  That's all?
19                    MS. BEEBER:  Yes.
20                    MR. MARSHALL:  Isolated to a
21    producer credit, and that's all.
22                    THE WITNESS:  Yes.
23    BY MS. BEEBER:
24           Q.   And what was the basis for his
25    assertion of that right?
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 376 of 386  Page ID #:6097

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                             377

1          THE WITNESS:  Doesn't this go

2    into --

3          MR. MARSHALL:  If he gained the

4    basis for his assertion of his rights and are

5    based on attorney-client communications, you are

6    not going to answer.

7          THE WITNESS:  Yeah, I think it all

8    ties into that.

9          MR. MARSHALL:  To what our legal

10   claims are?

11         THE WITNESS:  Attorney

12   communications.

13   BY MS. BEEBER:

14        Q.   Was it based on any agreement

15   between any Silver entity and any Sweetpea entity,

16   written agreement?

17         MR. MARSHALL:  Same objection.

18   Attorney-client privilege.

19   BY MS. BEEBER:

20        Q.   If you can look at Hasbro

21   Exhibit 8.

22         MR. MARSHALL:  Which one?

23         MS. BEEBER:  Exhibit 8.

24         MS. BASINGER:  What is that?

25         MS. BEEBER:  It's the October 30th,



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 377 of 386  Page ID #:6098

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                     378

 1   1997, agreement between Sweetpea and Silver

 2   Pictures.

 3                   MR. MARSHALL:  Right.

 4                   MS. BEEBER:  And then Hasbro

 5   Exhibit 9, which amended that agreement, dated as

 6   of January 15th, 1999.

 7                   MS. BASINGER:  I am going to object

 8   to the characterization of the document as

 9   amended.

10                   MS. BEEBER:  Modified?

11   BY MS. BEEBER:

12          Q.   Is Mr. Silver's claim for a

13   producer credit based in any way on any of these

14   agreements?

15                   MR. MARSHALL:  Objection; vague,

16   ambiguous, calls for a legal conclusion, and is

17   based on the attorney-client communications.  So I

18   am not going to allow the witness to answer that.

19                   MS. BEEBER:  You are directing the

20   witness not to answer?

21                   MR. MARSHALL:  Yeah.

22                   MS. BEEBER:  On the basis of

23   attorney-client communications?

24                   MR. MARSHALL:  Yeah.  Whatever

25   rights we have got or whatever claims have been



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 378 of 386  Page ID #:6099

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      379

 1    discussed with this witness and/or Joel Silver

 2    with his attorneys and what the basis of those

 3    claims, and this instrument if it is a basis.

 4                   MS. BEEBER:  Can I ask you to mark

 5    all the directions not to answer?

 6                   THE COURT REPORTER:  They will be

 7    in the index.

 8                   MS. BEEBER:  Thank you.

 9                   I have no further questions.

10                   MR. MARSHALL:  What have we got?

11                   MS. BASINGER:  How much time

12    remains for me?

13                   MR. MARSHALL:  Two minutes.

14                   MS. BASINGER:  About a minute and a

15    half.

16                   THE WITNESS:  That should be

17    sufficient.

18                   MS. BASINGER:  Exactly.  I want to

19    state for the record that even though this

20    deposition was also noticed by the Sweetpea

21    entities, counsel for Hasbro has not left

22    sufficient time for Sweetpea to do any

23    questioning, only a minute and a half, and I tend

24    to be longwinded.

25                   On that basis we reserve our right



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 379 of 386  Page ID
#:6100

STEVE RICHARDS - VOLUME II Confidential          December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                              380

1   to move to have the deposition excluded because we

2   have not had an opportunity to cross-examine the

3   witness.

4              MS. BEEBER:  What are we supposed

5   to do about that?

6              MS. BASINGER:  I am just making a

7   record.  I am not attacking you or anything.

8              MS. BEEBER:  I think if you want to

9   ask questions, you should ask questions.

10             MS. BASINGER:  It has been

11  indicated by Mr. Marshall that he will not allow

12  the witness not to testify past seven hours.

13             MS. BEEBER:  I had no indication of

14  that.

15             MS. BASINGER:  My apologies.  It

16  has been indicated to me by Mr. Marshall that the

17  witness will not testify past seven hours.

18             MR. MARSHALL:  Look, we have been

19  here, like, two days so far.  We are not inclined

20  to go any longer than this.

21             MS. BASINGER:  And on that basis

22  also, I am not going to adjourn the deposition

23  also on that basis.

24             MS. BEEBER:  I am being informed --

25  I want the record to be clear that this is the



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 380 of 386   Page ID #:6101

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      381

 1   first I am hearing, with a minute and a half left
 2   in the time, that Mr. Marshall is refusing to
 3   produce his witness in response to your subpoena.
 4   I had no notice of that before this moment.
 5                    MS. BASINGER:  Well, that's not
 6   true, Ms. Beeber.  He did produce the witness
 7   pursuant to my subpoena.  It's just that you used
 8   all the time pursuant to both subpoenas.  And I am
 9   not arguing with you.  I would love seven more
10   hours with the witness as well.
11                    MS. BEEBER:  All I want to be clear
12   on the record is that I had no indication of this
13   from Mr. Marshall --
14                    MR. MARSHALL:  Indication of what?
15   I don't even know what you are talking about.
16                    MS. BEEBER:  That you would not
17   allow the witness to answer --
18                    MR. MARSHALL:  Do whatever you
19   want.  We are not staying here.  You have got 15
20   minutes, ask whatever it is.
21                    MS. BEEBER:  Will you produce him
22   on another date for Ms. Basinger to ask her --
23                    MR. MARSHALL:  No, not necessarily.
24   I think it should be over at this point in time.
25   But I will deal with it later.  If she has



1  questions, maybe we will come back again.  I
2  haven't told her anything about that.  I don't
3  know where all that came from.
4              MS. BEEBER:  Okay.  Okay.  I didn't
5  know either.  I don't know either.
6              MR. MARSHALL:  I am just telling
7  you we have been here for two days.  The witness
8  has patiently listened.  We tried to answer all
9  the questions.  We came up to seven hours.  It's
10  now quarter of 5:00, ten to 5:00.  You know, we
11  don't want to continue answering questions today
12  unless it's very short.
13              MS. BASINGER:  And it's not short.
14              MR. MARSHALL:  And if it's not very
15  short, we are not going to answer questions.  And
16  we will leave for another day whether or not we
17  are coming back.  And I don't think it really is
18  appropriate given what has transpired so far.  I
19  am telling her that right now.  Okay?  That's all.
20              MS. BEEBER:  Okay.
21              MR. MARSHALL:  So whatever motions
22  she wants to make or do, be my guest, because it's
23  all, I think, unfair to the witness at this point
24  and ourselves because we are third-party
25  witnesses, as you know.



1          We are trying to be as responsive

2     as possible.  We have gone through a number of

3     documents.  You have comprehensively covered

4     subjects.  You know, I mean, we are just not

5     staying here for three hours more.  You know, that

6     ain't happening today, which I think everybody can

7     understand.

8               I am going to leave for New York in

9     the morning.  He is busy, et cetera.  So I am

10    explaining to Ms. Basinger, she is not doing that.

11    If she's got five minutes, ten minutes, cool.  But

12    that's it.

13               MS. BEEBER:  For today.

14               MR. MARSHALL:  Yeah, then we'll

15    deal with it later, but I am not inclined to do

16    that, but she can -- we can discuss a way.

17               MS. BEEBER:  Okay.  Thanks very

18    much.

19               MS. BASINGER:  And on that basis, I

20    am not closing the deposition because our subpoena

21    is still outstanding.

22               MS. BEEBER:  Okay.  Thank you.

23               MR. MARSHALL:  Yeah.  Okay.  Does

24    that clarify it for you?

25               MS. BEEBER:  It does.



Case 2:13-cv-03406-DMG-JCG   Document 213   Filed 08/26/14   Page 383 of 386   Page ID #:6104

STEVE RICHARDS - VOLUME II Confidential                December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        384

```
 1                    MR. MARSHALL:  I wasn't trying to

 2   do anything without telling anybody.

 3                    THE COURT REPORTER:  Same

 4   stipulation?

 5                    MS. BASINGER:  Same stip.

 6              (Stipulation from the deposition of

 7              Steve Richards, Volume I, is

 8              incorporated as follows:

 9              "MS. BASINGER:  The parties hereby

10              relieve the court reporter of her

11              statutory obligation.

12                    "Once the transcript is

13              prepared, it will be sent to

14              Mr. Marshall.  Mr. Marshall will

15              have his client review it.  The

16              client will have --

17                    "Do you need 30 days, or can

18              you have a few less days than that?

19              "THE WITNESS:  I don't think I

20              need --

21              "MR. MARSHALL:  Twenty days.

22              "MS. BASINGER:  The client will

23              have -- Mr. Richards will have 20

24              days to review the transcript and

25              return it to Mr. Marshall.
```



Case 2:13-cv-03406-DMG-JCG  Document 213  Filed 08/26/14  Page 384 of 386  Page ID #:6105

STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                        385

1              "Mr. Marshall will then send

2          it to --

3              "You can send it to me because

4          I am local.

5              "And if we do not get a signed

6          copy, an unsigned copy can be used

7          for any and all purposes.

8          "MS. BEEBER:  Thank you very much.")

9              THE COURT REPORTER:  And same copy

10  order?  Same copy?

11              MS. BASINGER:  Yes.  We do not need

12  a -- we don't need a rough because you are going

13  to do them fairly quickly; right?  You don't have

14  to --

15              MS. BEEBER:  This is all on the

16  record.

17              THE COURT REPORTER:  Okay.  Let's

18  go off.

19              VIDEOGRAPHER:  This concludes

20  Tape 3 and the end of the videotaped deposition of

21  Steve Richards, Volume II.  We are going off video

22  record, December 17th, 2013, at 4:51 p.m.

23  ///

24  ///

25  ///



STEVE RICHARDS - VOLUME II Confidential                    December 17, 2013
HASBRO vs. SWEETPEA ENTERTAINMENT                                      386

1    (Whereupon, at the hour of 4:51 p.m., the

2         proceedings were concluded.)

3                   --oo0oo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    REPORTER'S CERTIFICATION

2

3

4

5        I, Megan Grossman-Sinclair, Certified

6   Shorthand Reporter, in and for the State of

7   California, do hereby certify:

8

9        That the foregoing witness was by me duly

10  sworn; that the deposition was then taken before

11  me at the time and place herein set forth; that

12  said testimony and proceedings were reported

13  stenographically by me and later transcribed into

14  typewriting under my direction; that the foregoing

15  is a true record of the testimony and proceedings

16  taken at that time.

17

18       IN WITNESS WHEREOF, I have subscribed my name

19  this      of           , 2013.

20  

21

22

23  Megan Grossman-Sinclair, CSR No. 12586

24

25