Patricia L. Glaser, SBN 55668
pglaser@glaserweil.com
G. Jill Basinger, SBN 195739
jbasinger@glaserweil.com
David Sergenian, SBN 230174
dsergenian@glaserweil.com
GLASER WEIL FINK HOWARD AVCHEN
& SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA  90067
T: (310) 553-3000 | F: (310) 556-2920

Christopher G. Caldwell, SBN 106790
caldwell@caldwell-leslie.com
Linda M. Burrow, SBN 194668
burrow@caldwell-leslie.com
CALDWELL LESLIE & PROCTOR, PC
725 S. Figueroa Street, 31st Floor
Los Angeles, CA 90017-2463
T: (213) 629-9040 | F: (213) 629-9022

Attorneys for Defendant
*SWEETPEA ENTERTAINMENT, INC.*
*and Defendant/Counter-Claimant*
*SWEETPEA B.V.I. LTD.*

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| HASBRO, INC., *et al.*, | CASE NO.  13–CV–03406–DMG (JCGx) |
| Plaintiffs, | **SWEETPEA ENTERTAINMENT INC.'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| SWEETPEA ENTERTAINMENT, INC., *et al.*, | Trial Date:  September 16, 2014 |
| Defendants. | Time:  8:30 a.m. |
| | Ctrm:  7 |
| AND RELATED COUNTERCLAIM. | |

1

2     **1.    TABLE OF CONTENTS**

3      1.    TABLE OF CONTENTS ...................................................i

I.    PROPOSED FINDINGS OF FACT ...............................................1

    **A.**    The Parties................................................................... 1

    **B.**    The Dungeons & Dragons Game .............................................2

    **C.**    Formation of Sweetpea and Acquisition of the Film Rights to Dungeons & Dragons.................................................................2

    **D.**    TSR and Sweetpea's Dispute Regarding the First Picture; Negotiation of the First Amendment ....................................5

    **E.**    Negotiation of the First Amendment ...................................6

       **1.**    The Meaning of the Term "Sequel" ...........................6

       **2.**    Whether Sequels Could Be Released on Television .................7

       **3.**    Timing of the Reversion Clock for Sequels .............................8

       **4.**    Timing of Royalty Payments.....................................8

       5.    TSR's Use of the Words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" as a Title...........................9

       6.    Sweetpea's Right of First Negotiation/Last Refusal .................9

       7.    Sweetpea's Right to Notice and Opportunity to Cure.............10

    **F.**    *Dungeons & Dragons* (2000)..............................................11

    **G.**    *Dungeons & Dragons: Wrath of the Dragon God* (2005) ("*D&D 2*")................................................................................11

    **H.**    *Dungeons & Dragons: The Book of Vile Darkness* (2010) ("*D&D 3*")................................................................................13

       **1.**    *D&D 3* Was Developed Independently, Without Financing By Any Television Network......................................13

       **2.**    WOTC Was Involved in the *D&D 3* Project from the Beginning................................................................14

       **3.**    Richards Met with WOTC to Discuss Distribution Plan for *D&D 3*, Including the Plan to Release *D&D 3* on DVD..........14

       **4.**    Grayson and Sweetpea Enter Into an Agreement to Produce

*D&D 3*; Mr. Richards Requests Wire Information from Hasbro ....................................................................... 15

5.     The $20,000 Payment to Hasbro for the Third Dungeons & Dragons Movie: *Dungeons & Dragons: The Book of Vile Darkness* ("*D&D 3* ") ................................................ 16

6.     WOTC Collaborated on a Consumer Contest, Shooting Behind-the-Scenes Footage for DVD Extras ......................... 17

7.     *D&D 3* Was Classified by Sweetpea and IATSE as a Low-Budget Motion Picture .............................................. 18

8.     *D&D 3* Obtained a PG–13 Rating for Theatrical/Non-Theatrical Release ................................................. 18

9.     WOTC Approved Footage from *D&D 3* ................................. 19

10.    *D&D 3* Was Released on DVD and Video on Demand ........... 19

11.    *D&D 3* Was A Sequel to *D&D and D&D 2* ............................ 20

I.    Warner Bros.' *Chainmail* Project ........................................ 22

J.    Statements to the Press Regarding the Warner Bros. Project ............. 26

II.   PROPOSED CONCLUSIONS OF LAW ........................................ 27

A.    Federal Jurisdiction and Venue ......................................... 27

B.    Plaintiffs' Claim for Contributory Copyright Infringement Is Denied ................................................................... 27

1.     There Has Been No Contributory Infringement ...................... 27

2.     Hasbro is not Entitled to Injunctive Relief .............................. 30

C.    Plaintiffs' Claims for Trademark Infringement, False Designation of Origin and Unfair Competition, and Dilution Are Rejected .......... 33

1.     Even If Sweetpea's Rights Reverted To Hasbro, There Have Been No Trademark Violations ............................................ 34

2.     Hasbro is not Entitled to Injunctive Relief .............................. 37

D.    Plaintiffs' Claim for Declaratory Relief that Sequel Rights Reverted Is Rejected ......................................................... 41

1.     The Elements of a Claim for Declaratory Relief ...................... 42

2.     The Applicable Rules of Contract Interpretation ..................... 43

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

**3.** The License Agreement Does Not Require Sweetpea to Commence Principle Photography on a Theatrical or Non-Theatrical Motion Picture to Avoid Reversion of Its Sequel Rights ........................................................................... 45

**4.** Payment of a Theatrical or Non-Theatrical Royalty Prior to Commencement of Principal Photography Is Not a Condition of Sweetpea Maintaining its Sequel Rights ............ 47

**5.** A "Sequel," as that Term Is Used in the License Agreement, Does Not Require a Continuation of Characters or Storylines ................................................................... 49

**6.** Sweetpea Timely Commenced Principal Photography of a Theatrical or Non-Theatrical Production .................................. 51

**7.** D&D 3 Was Not a Made-for-TV Movie .................................. 55

**8.** *D&D 3* Was a Sequel Based on the Picture, Picture Creations and the Property ...................................................... 56

**E.** Sweetpea's Affirmative Defense of Waiver Is Granted ..................... 56

**F.** Sweetpea's Affirmative Defense of Estoppel Is Granted ................... 57

**G.** Sweetpea's Affirmative Defense of Laches Is Granted ..................... 58

**H.** Sweetpea's Counterclaim for Declaratory Relief Is Granted ............ 60

**1.** Sweetpea Has the Sole, Exclusive Right to Make Sequels to and Remakes of *D&D* ................................................ 60

**2.** Sweetpea Has the Right of First Negotiation/Last Refusal with Respect to the Universal Film Project ............................. 60

**3.** Hasbro is Prohibited from Using, and Prohibited from Permitting Any Third Party to Use, the Words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" as a Primary Title in a Live-Action Motion Picture ....................... 61

**4.** Hasbro is Prohibited from Permitting Any Third Party to Use  the Words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" as a Secondary Title in a Live-Action Motion Picture   ........................................... 62

**I.** Plaintiffs' Affirmative Defense of Waiver Is Denied ........................ 62

**J.** Plaintiffs' Affirmative Defense of Conditions Precedent Is Denied .. 63

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**K.**     Plaintiffs' Affirmative Defense of Unclean Hands Is Denied ............ 64

III.    CONCLUSION ............................................................................... 65

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1

# **TABLE OF AUTHORITIES**

2

3
**Page(s)**

## **Cases**

4

5

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,

6
     960 F.2d 1020 (Fed. Cir. 1992) ................................................................ 58

7

*A&M Records, Inc. v. Napster, Inc.*,

8
     239 F.3d 1004 (9th Cir. 2001) ................................................................. 28

9

*AARP v. 200 Kelsey Assocs., LLC*, No. 06 CIV. 81 (SCR),

10
     2009 WL 47499 (S.D.N.Y. Jan. 8, 2009) .................................................. 36

11

*Aurora World, Inc. v. Ty Inc.*,

12
     719 F. Supp. 2d 1115 (C.D. Cal. 2009) .................................................. 32, 33

13

*Avery Dennison Corp. v. Sumpton*,

14
     189 F.3d 868 (9th Cir. 1999) ................................................................... 34

15

*Bank of the West v. Superior Court*,

16
     2 Cal. 4th 1254 (1992) ........................................................................... 43

17

*Bertolli USA, Inc. v. Filippo Bertolli Fine Foods, Ltd.*,

18
     662 F. Supp. 203 (S.D.N.Y. 1987) .......................................................... 35

19

*Bionghi v. Metro. Water Dist. of S. Cal.*,

20
     70 Cal. App. 4th 1358 (1999) ................................................................. 44

21

*Boisson v. Banian Ltd.*,

22
     280 F. Supp. 2d 10 (E.D.N.Y. 2003) ....................................................... 31

23

*Bosley Med. Inst., Inc. v. Kremer*,

24
     403 F.3d 672 (9th Cir. 2005) ............................................................. 34, 37

25

*Brighton Collectibles, Inc. v. Pedre Watch Co., Inc.*,

26
     No. 11CV00637 AJB(WVG),

     2013 WL 5719071 (S.D. Cal. Oct. 21, 2013) ........................................... 39

27

28

*City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*,

43 Cal. 4th 375 (2008) .................................................................43, 45

*City of Long Beach v. Mansell,*
   3 Cal. 3d 462 (1970) ...............................................................57, 58

*Columbia Pictures Indus., Inc. v. Fung,*
   710 F.3d 1020 (9th Cir. 2013) *cert. dismissed,*
   134 S. Ct. 624, 187 L. Ed. 2d 398 (U.S. 2013) ...........................28

*Couveau v. Am. Airlines, Inc.,*
   218 F.3d 1078 (9th Cir. 2000) ...............................................58-59

*Danjaq LLC v. Sony Corp.,*
   263 F.3d 942 (9th Cir. 2001) .............................................58, 59-60

*DeFeo v. Procter & Gamble Co.,*
   831 F. Supp. 776 (N.D. Cal. 1993) ............................................42

*Department of Parks & Recreation v. Bazaar Del Mundo Inc.,*
   448 F.3d 1118 (9th Cir. 2006) ....................................................33

*Dolori Fabrics, Inc. v. Limited, Inc.,*
   662 F. Supp. 1347 (S.D.N.Y. 1987) ...........................................31

*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006) .............................................30, 32, 38, 40

*Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.,*
   808 F. Supp. 952 (E.D.N.Y. 1992) ........................................35, 39

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,*
   654 F.3d 989 (9th Cir. 2011) ................................................30, 31

*Founding Members of the Newport Beach Country Club v.*
   *Newport Beach Country Club, Inc.,*
   109 Cal. App. 4th 944 (2003) ....................................................44

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,*
   826 F.2d 837 (9th Cir. 1987) .....................................................64

*G. E. J. Corp. v. Uranium Aire, Inc.,*

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

311 F.2d 749 (9th Cir. 1962) ............................................................... 63

*Golden Gate Rest. Ass'n v. City & County of S.F.,*
    512 F.3d 1112 (9th Cir. 2008) ..................................................... 41

*Gov't Emps. Ins. Co. v. Dizol,*
    133 F.3d 1220 (9th Cir. 1998) ..................................................... 42

*Guerra v. Sutton,*
    783 F.2d 1371 (9th Cir. 1986) ..................................................... 42

*Hadady Corp. v. Dean Witter Reynolds, Inc.,*
    739 F. Supp. 1392 (C.D. Cal. 1990) ............................................ 57

*Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.,*
    736 F.3d 1239 (9th Cir. 2013) ................................... 32, 38, 40, 41

*Heston v. Farmers Ins. Group,*
    160 Cal. App. 3d 402 (1984) ....................................................... 43

*Intel Corp. v. Hartford Acc. & Indem. Co.,*
    952 F.2d 1551 (9th Cir. 1991) ................................... 56, 57-58, 63

*Jackson v. Axton,*
    25 F.3d 884 (9th Cir. 1994) .................................................. 59, 60

*Jada Toys, Inc. v. Mattel, Inc.,*
    518 F.3d 628 (9th Cir. 2008) ....................................................... 33

*Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.,*
    285 F.3d 848 (9th Cir. 2002) ....................................................... 34

*Keystone Driller Co. v. General Excavator Co.,*
    290 U.S. 240 (1933) ................................................................ 64-65

*Kling v. Hallmark Cards, Inc.,*
    225 F.3d 1030 (9th Cir. 2000) ..................................................... 59

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.,* No. 12-15985,
    --- F.3d ---, 2014 WL 3844135 (9th Cir. Aug. 6, 2014) ......... 35, 37

*Levi Strauss & Co. v. Aetna Cas. & Surety Co.*,
    184 Cal. App. 3d 1479 (1986) ................................................................... 35

*Levi Strauss & Co. c. Shilon*,
    121 F.3d 1309 (9th Cir. 1997) ................................................................... 44

*Lotus Dev. Corp. v. Borland Int'l, Inc.*,
    831 F. Supp. 202 (D. Mass. 1993)
    *rev'd*, 49 F.3d 807 (1st Cir. 1995)
    *aff'd*, 516 U.S. 233 (1996) ...................................................................... 60

*Luvdarts, LLC v. AT&T Mobility, LLC*,
    710 F.3d 1068 (9th Cir. 2013) ................................................................ 27-28

*Maritz, Inc. v. Cybergold, Inc.*,
    947 F. Supp. 1328 (E.D. Mo. 1996) ........................................................ 35

*MercExchange, L.L.C. v. eBay, Inc.*,
    500 F. Supp. 2d 556 (E.D. Vir. 2007) ...................................................... 40

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ................................................................................. 27

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    518 F. Supp. 2d 1197 (C.D. Cal. 2007) ................................................... 32

*Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.*,
    205 Cal. App. 3d 442 (1988) ............................................................... 43-44, 45

*Morey v. Vannucci*,
    64 Cal. App. 4th 904 (1998) ..................................................................... 43

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
    638 F.3d 1137 (9th Cir. 2011) .................................................................. 33

*New Era Publ'ns Int'l v. Henry Holt & Co.*,
    873 F.2d 576 (2d Cir. 1989) ..................................................................... 59

*Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*,
    69 Cal. 2d 33 (1968) ................................................................................. 29

1

2 *Perfect 10, Inc. v. Amazon.com,*
3     508 F.3d 1146 (9th Cir. 2007) ...................................................................28

4 *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,*
5     494 F.3d 788 (9th Cir. 2007) .....................................................................28

6 *Platt Pac., Inc. v. Andelson,*
7     6 Cal. 4th 307 (1993) ................................................................................63

8 *Reader's Digest v. Conservative Digest,*
9     821 F.2d 800 (D.C. Cir. 1987) ..................................................................31

10 *Reno Air Racing Ass'n v. McCord,*
11     452 F.3d 1126 (9th Cir. 2006) ...................................................................37

12 *Rheem Mfg Co. v. United States,*
13     57 Cal. 2d 621 (1962) ...............................................................................56

14 *Rodeo Collection, Ltd. v. W. Seventh,*
15     812 F.2d 1215 (9th Cir. 1987) ...................................................................38

16 *Scholz v. Migliaccio*, No. C13-1229 JLR,
17     2013 WL 4482077 (W.D. Wash. Aug. 20, 2013) .......................................40

18 *Seiler v. Lucasfilm, Ltd.,*
19     808 F.2d 1316 (9th Cir. 1987) ...................................................................28

20 *Silverstein v. Penguin Putnam, Inc.,*
21     368 F.3d 77 (2d Cir. 2004) ........................................................................31

22 *S. Pac. Co. v. Bogert,*
23     250 U.S. 483 (1919) ..................................................................................58

24 *Spiraledge, Inc. v. SeaWorld Entm't, Inc.*, No. 13CV296-WQH-BLM,
25     2013 WL 3467435 (S.D. Cal. July 9, 2013) ...........................................39-40

26 *Stormans, Inc. v. Selecky,*
27     586 F.3d 1109 (9th Cir. 2009) ..............................................................32, 40

28 *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.,*
    24 F.3d 1088 (9th Cir. 1994) .....................................................................29

*United We Stand Am., Inc. v. United We Stand, Am. N.Y., Inc.*,
    128 F.3d 86 (2d Cir. 1997) ........................................................ 34

*Wagner v. Columbia Pictures Indus. Inc.*,
    146 Cal. App. 4th 586 (2007) .................................................... 47

*Walt Disney Co. v. Powell*,
    897 F.2d 565 (D.C. Cir. 1990) .................................................. 31

*Winet v. Price*,
    4 Cal. App. 4th 1159 (1992) ...................................................... 44

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................... 40

*Wolf v. Walt Disney Pictures & Television*,
    162 Cal. App. 4th 1107 (2008) .................................................. 32

## **Statutes**

15 U.S.C. § 1114 ................................................................................ 33, 34

15 U.S.C. § 1114(1) ............................................................................ 34

15 U.S.C. § 1125(a) ............................................................................ 33

15 U.S.C. § 1125(a)(1) ....................................................................... 33

15 U.S.C. § 1125(a)(1)(A) .................................................................. 33

15 U.S.C. § 1125(c) ............................................................................ 33

15 U.S.C. § 1125(c)(1) ....................................................................... 33

17 U.S.C. § 502(a) ............................................................................. 30

Cal. Civ. Code § 1625 ........................................................................ 44

Cal. Civ. Code § 1636 ........................................................................ 43

1

2

3

Cal. Civ. Code § 1638 ...................................................................................43, 62

Cal. Civ. Code § 1639 ........................................................................................43

Cal. Civ. Code § 1641 ........................................................................................45

Cal. Civ. Code § 1647 ........................................................................................43

Cal. Code Civ. Proc. § 1856(a) .........................................................................44

Cal. Code Civ. Proc. § 1856(b) ...................................................................44, 45

Cal. Code Civ. Proc. § 1856(c) ..........................................................................43

4

5

6

7

8

9

10

11

12

13

**Other Authorities**

J. Thomas McCarthy, *Trademarks & Unfair Competition*,
    § 30.5 (2d ed. 1984) ...............................................................................35, 39

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant Sweetpea Entertainment, Inc. and Defendant/Counter-Claimant Sweetpea B.V.I. Ltd. (collectively, "Sweetpea") respectfully submits these proposed findings of fact and conclusions of law in advance of the trial before the Court, scheduled to commence on September 16, 2014.

## I.      PROPOSED FINDINGS OF FACT

### A.      The Parties

1.      Plaintiff and Counter-Defendant Hasbro, Inc. is, and at all relevant times was, a corporation duly organized and existing under the laws of the State of Rhode Island, with its principal place of business in Pawtucket, Rhode Island.  (Admitted Fact 1.)

2.      Plaintiff  and Counter-Defendant Wizards of the Coast LLC ("WOTC") is, and at all relevant times was, a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Renton, Washington.  (Admitted Fact 2.)

3.      WOTC is a wholly-owned subsidiary of Hasbro.  (Admitted Fact 3.)

4.      WOTC is the successor-in-interest to TSR, Inc. ("TSR").  (Admitted Fact 4.)[1]

5.      Defendant and Counter-Claimant Sweetpea B.V.I. Ltd. is, and at all times was, a company duly organized and existing under the laws of the British Virgin Islands, with its principal place of business in Los Angeles, California. (Admitted Fact 5.)

6.      Courtney Solomon is the Chairman and President of Sweetpea. (Admitted Fact 6.)

7.      Sweetpea is the successor-in-interest to Sweetpea Entertainment Corporation.  (Admitted Fact 7.)[2]

_____

[1] As used herein, "Hasbro" refers collectively to Hasbro, Inc. and WOTC.

[2] As used herein, "Sweetpea" refers collectively to Sweetpea B.V.I. Ltd. and Sweetpea Entertainment Corporation.

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

### B.   The Dungeons & Dragons Game

8.      Dungeons & Dragons is a fantasy role-playing game in which players create their own characters and participate in imaginary adventures.  Typically, the adventure is a quest for treasure or a magical item, with the players encountering obstacles along the way.  (Solomon Decl. ¶ 6.)

9.      Part of the appeal of Dungeons & Dragons is that each player in the game is an active participant who not only creates his or her own character, but also participates in the story by choosing how the character reacts to the various obstacles that confront him or her.  (Solomon Decl. ¶ 6.)

10.     Each Dungeons & Dragons game is led by a "Dungeon Master" (the "DM") who leads the rest of the players through an imaginary quest through an imaginary land, in which the players encounter imaginary monsters, obstacles, treasures and other characters.  (Solomon Decl. ¶ 6.)

11.     In leading the game, the DM may rely on Dungeons & Dragons handbooks, players manuals, and other publications for source material, which provide certain character classes, along with monsters, artifacts and other elements of the adventure to describe what the players encounter.  This source material, however, is only the starting point, and the DM has the freedom to use his or her imagination to decide what the players encounter.  (Solomon Decl. ¶ 7(d).)

12.     Dungeons & Dragons was first published in 1974 by Tactical Studies Rules, Inc., which became TSR, Inc.  WOTC acquired TSR in 1997. (Dkt. No. 1, ¶20.)

### C.   Formation of Sweetpea and Acquisition of the Film Rights to Dungeons & Dragons

13.     Solomon formed Sweetpea in 1990 for the purpose of obtaining film rights to Dungeons & Dragons and producing a feature film version of Dungeons & Dragons.  (Solomon Decl. ¶ 11.)

14.    TSR and Sweetpea Entertainment Corporation entered into an Option Agreement dated May 3, 1991 (the "Option Agreement").  In exchange for a payment to TSR of $15,000, the Option Agreement granted Sweetpea Entertainment Corporation the option to license the copyrights and trademarks of Dungeons & Dragons.  (Solomon Decl. ¶ 13; Tr. Ex. 1.)

15.    Sweetpea Entertainment Corporation assigned its rights under the License Agreement to Sweetpea B.V.I. Ltd. in 1993.  (Solomon Decl. ¶ 27.)

16.    Sweetpea exercised the Option on September 1, 1994.  (Admitted Fact 19).

17.    Upon Sweetpea's exercise of the Option on September 1, 1994, the "Exclusive Irrevocable License Agreement" between TSR and SEC (the "License Agreement") went into effect.  (Solomon Decl. ¶ 14; Tr. Ex. 51,12.)

18.    Mr. Solomon was personally involved in Sweetpea's negotiations with TSR to acquire the rights to Dungeons & Dragons, and with negotiation of the License Agreement.  (Solomon Decl. ¶ 15.)

19.    TSR was represented in those negotiations by Lorraine Williams, TSR's President and CEO, Willard Martins, TSR's Chief Operating Officer, and counsel. (Solomon Decl. ¶ 16.)

**D.     The License Agreement**

20.    The License Agreement grants Sweetpea the right "to produce, distribute, exhibit and exploit in any and all manner, medium, media and methods now known or hereafter devised, one (1) theatrical or television motion picture based in whole or in part on the [Dungeons & Dragons] Property… ."  (Tr. Ex. 12-0004 [¶2].)

21.    The License Agreement also grants Sweetpea a Right of First Negotiation/Last Refusal with respect to "remakes of and sequels to any motion picture or television or video gram or live stage production produced" by Sweetpea

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   pursuant to the terms of the License Agreement.  (Solomon Decl. ¶ 19; Tr. Ex. 12–

2   0007 to 12–0008 [¶¶ 2(a), 2(k)].)

3       22.     There is no provision in the License Agreement for Sweetpea's Right of

4   First Negotiation/Last Refusal to revert to Hasbro.  To the contrary, the License

5   Agreement provides that Sweetpea's Right of First Negotiation "shall again arise for

6   each such sequel or remake contemplated on different terms," (Tr. Ex. 12–0009 [¶

7   2(k)(i)]) and Sweetpea's Right of Last Refusal "shall revive and apply to each and

8   every further offer or offers at any time received by Licensor and relating to the

9   sequel and/or remake rights or any interest therein and shall revive for each and every

10  sequel and remake which Licensor desires to produce itself on terms other than those

11  proposed to Licensee by Licensor…"  (Solomon Decl. ¶ 20; Tr. Ex. 12–0009

12  [¶ 2(k)(ii)].)

13      23.     Sweetpea and TSR also agreed that TSR would have the right to

14  terminate or rescind the parties' agreement only upon a "Termination Default": (a) if

15  Sweetpea did not pay the license payment that was due upon Sweetpea's exercise of

16  its option under the Option Agreement, (b) if Sweetpea failed to commence

17  production of a Picture within three years of Sweetpea's exercise of its option under

18  the Option Agreement, (c) if Sweetpea did not comply with copyright and trademark

19  notice requirements, or (d) if Sweetpea exploited, without TSR's authorization, any of

20  the rights reserved to TSR.  (Solomon Decl. ¶ 24; Tr. Ex. 12–0029 [¶ 5], 12–0039

21  [¶ 15], 12–0042 [¶ 19(c)].)

22      24.     With respect to any other breach or default of the License Agreement

23  SEC and TSR agreed that TSR's only remedy would be to file a lawsuit for damages

24  and that TSR "*shall not have the right to terminate or rescind this Agreement or any*

25  *of the rights licensed or granted hereunder*...." (Solomon Decl. ¶ 25; Tr. Ex. 12–0041

26  [¶ 19(a) (emphasis added)].)

27      25.     The License Agreement also contains notice and cure provisions that

28  require TSR to give notice and a ten-day opportunity to cure before TSR could treat

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

any act or omission, including SEC's failure to make any required royalty payment, as a breach or default.  (Tr. Ex. 12–0042 [¶¶ 19(a),(b)].)  The License Agreement further provides that if Sweetpea failed to commence principal photography of the Picture within three years of the execution of the License Agreement, Sweetpea would have 60 days to begin production following notice by TSR.  (Solomon Decl. ¶ 26; Tr. Ex. 12–0039 ¶ 15].)

**D.    TSR and Sweetpea's Dispute Regarding the First Picture; Negotiation of the First Amendment**

26.    According to the License Agreement, once Sweetpea exercised the Option on September 1, 1994, it had three years to commence principal photography. (Tr. Ex. 15, [¶15].)

27.    Sweetpea commenced principal photography on the first Dungeons & Dragons movie ("*D&D*") before the September 1, 1997 deadline.  (Solomon Decl. ¶ 36.)

28.    On October 1, 1997, TSR gave notice to Sweetpea of Sweetpea's purported failure to timely commence principal photography. (Solomon Decl. ¶ 36; Tr. Ex. 24.)

29.    According to the License Agreement, Sweetpea had 60 days from TSR's notice, or until December 1, 1997, to commence principal photography.  (Tr. Ex. ¶12-0039 [15].)

30.    TSR filed a lawsuit against Sweetpea on February 20, 1998, in an action titled *TSR, Inc. v. Sweetpea Entertainment Corporation, et al.*, Los Angeles Superior Court Case No. SC051319 (the "TSR Lawsuit").  (Solomon Decl. ¶ 37; Tr. Ex. 30.)

31.    TSR's lawsuit sought a declaration that, under the License Agreement, Sweetpea was required to commence principal photography of the Picture on or before December 1, 1997; Sweetpea failed to commence principal photography by that date; and the rights TSR granted to Sweetpea in the License Agreement reverted to TSR.  (Tr. Ex. 30.)

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

923077

32.     Less than two weeks after TSR filed the lawsuit, TSR and Sweetpea scheduled a mediation before Philip Meldman, Esq., which took place on March 12, 13 and 18, 1998.  Sweetpea was represented by Robert Barnes and Sheri Jeffrey from the law firm Kaye, Scholer, Fierman, Hayes & Handler (now known as Kaye Scholer LLP).  (Barnes Decl. ¶ 3.)  TSR was represented by Bruce Isaacs and Lee Rosenbaum from the law firm Wyman, Issacs, Blumenthal & Lynne LLP.  Courtney Solomon participated on behalf of Sweetpea.  (Barnes Decl. ¶ 6; Solomon Decl. ¶ 41.)   Jeffrey Christianson (then-General Counsel and Corporate Secretary of WOTC) attended on behalf of TSR.  (Barnes Decl. ¶ 8.)

33.     On March 19, 1998, TSR and Sweetpea executed an amendment to the License Agreement (the "First Amendment"), along with a settlement agreement resolving the TSR lawsuit.  (Admitted Fact 22, Tr. Exs. 37, 46.)

34.     Although TSR and Sweetpea contemplated that the First Amendment would be replaced by a long-form amendment (Tr. Ex. 37, [¶14(c)], 37-0004 [¶16].), the parties ultimately agreed to abandon negotiations over the proposed long form and "to supplement or clarify the short form Amendment only if necessary to enable Sweetpea to obtain bank financing for the Picture." (Barnes Decl. ¶ 12; Tr. Ex.  60-0001.)

35.     TSR and Sweetpea then entered into the Second Amendment, dated June 8, 1998.  (Admitted Fact 23, Tr. Ex. 73).

**E.     Negotiation of the First Amendment**

     **1.     The Meaning of the Term "Sequel"**

36.     In Paragraph 6 of the First Amendment, TSR granted to Sweetpea "the rights to make one or more sequels (which shall be defined to include prequels) or remakes based on the Picture, the Picture Creations and the Property."  (Tr. Ex. 37–0001 [¶ 6].)

37.     The parties did not discuss any specific definition for the term "sequel" while negotiating either the original License Agreement or any of the Amendments. (Solomon Decl. ¶ 41.)

38.     "Sequel" is a commonly used term in the entertainment industry, which means nothing more than another movie in a series of movies.  A sequel does not need to have any characters or storyline in common with the first movie or the prior movies in the series.  (Solomon Decl. ¶ 44; Dekom Decl. ¶ 10.)  Instead, a sequel may share a primary title with its prior film, along with certain settings, character classes, and themes, all of which create the expectation in the consumer's mind that the sequel is related to the series' previous films.  (Solomon Decl. ¶ 44; Dekom Decl. ¶ 9;)

### 2.     Whether Sequels Could Be Released on Television

39.     The License Agreement defines "Picture" as "One (1) theatrical *or television motion picture* based in whole or in part on the Property and including all rights granted in Paragraph 2 hereafter…"  (Tr. Ex.12–0002 [¶ 1(d)] (emphasis added).)

40.     The First Amendment provides for Sweetpea to have a rolling right to make a sequel or remake so long as it commences principal photography on each picture within five years of the immediately prior picture's initial U.S. release or seven years from the final director's cut of the picture.  (Solomon Decl. ¶ 52; Tr. Ex. 37-0001 [¶6].)

41.     There is no provision in any draft of the First Amendment providing that if Sweetpea releases a sequel or remake on television, or if the sequel or remake were released only outside the United States, Sweetpea's theatrical or non-theatrical sequel rights would revert to TSR.  (Barnes Decl. ¶¶ 26 and 29; *see generally* Tr. Ex. 34, 36, 40, 41, 43, 44, 45.)

42.     A non-theatrical release includes films intended for initial release on home video.  (Dekom Decl. ¶ 43.)

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

43.     Paragraph 2(a) of the License Agreement expressly contemplated that sequels would include films released on television (as well as theatrically and non-theatrically), and the First Amendment does not narrow this right.  Nothing in the First Amendment requires that a Picture or sequel can only be released in any particular medium.  (Solomon Decl. ¶ 49; Tr. Ex. 37–0001 [¶¶ 1, 6].)

### 3.     Timing of the Reversion Clock for Sequels

44.     According to the First Amendment, Sweetpea's sequel and remake rights would revert to Hasbro if Sweetpea did not timely commence principal photography of a remake or sequel.  (Tr. Ex. 37.)

45.     In determining how and when Sweetpea's sequel and remake rights would revert, TSR and Sweetpea used two different measurements of time—five years from the initial U.S. release of the prior picture or seven years from the final director's cut of the immediately prior picture—because the parties understood there could be a situation in which the immediately prior picture was not actually released but a director's cut was completed.  (Solomon Decl. ¶ 51; Tr. Ex. 37.)

46.     The parties did not agree that Sweetpea's right to make a subsequent sequel or remake  "reversion clock" triggered *only* by the U.S. release of the immediately prior picture.  Instead, TSR and Sweetpea agreed that this right would be triggered by *either* the U.S. release *or* the director's cut of the prior picture. (Solomon Decl. ¶ 53.)

### 4.     Timing of Royalty Payments

47.     The First Amendment does not require Sweetpea to make an initial royalty payment before commencing principal photography on any sequel or remake, and there is no evidence that the parties intended to impose such a deadline.  (Barnes Decl. ¶ 31; Tr. Ex.  37.)

8

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

### 5. TSR's Use of the Words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" as a Title

48.     The original License Agreement provided for a "holdback" on TSR's right to use the title "ADVANCED DUNGEONS & DRAGONS" until a year after the Picture had been released.  (Barnes Decl. ¶ 42; Solomon Decl. ¶ 57; Tr. Ex.  12.)

49.     During the negotiations surrounding the First and Second Amendments, TSR asked Sweetpea to eliminate these holdbacks.  After protracted negotiations, TSR and Sweetpea agreed in Paragraph 14(b) of the First Amendment:

> (b)     After January 1, 2000, TSR shall not use or permit others to use the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" in the primary title of any live-action motion picture or television program; provided TSR may use the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" in a secondary title in such productions, in a size no greater than 50% of the size of the primary artwork title and in no case above or before the primary artwork title in such productions.

(Tr. Ex. 37.)

50.     Paragraph 15 of the First Amendment provides that Hasbro will have the right to use "Dungeons & Dragons" in the primary title(s) in productions" only if (a) "Sweetpea, in its sole discretion, elects not to use such words in the title(s) at any point (and not due to a breach by TSR of the Agreement)," or (b) "the first picture produced by Sweetpea is not released in theaters in the United States prior to January 1, 2004…"  (Trial Ex. 37–0003 to 37–0004 [¶ 15].)

### 6. Sweetpea's Right of First Negotiation/Last Refusal

51.     Prior to the execution of the First Amendment, Paragraph 2(k) of the License Agreement was the sole mechanism by which Sweetpea could acquire sequel or remake rights, and would have required a case-by-case negotiation of each sequel or remake.  (Tr. Ex. 12.)

52.     In negotiating the First Amendment, the parties agreed that in addition to this Right of First Negotiation/Last Refusal, Sweetpea would be given the "automatic" sequel rights in Paragraph 6 that do not require any further negotiation between TSR and Sweetpea.  (Barnes Decl. ¶ 35; Tr. Ex.  37.)

53.     The parties did not intend for the sequel and remake rights in Paragraph 6 of the First Amendment to replace Sweetpea's Right of First Negotiation/Last Refusal in the License Agreement or that Sweetpea's Right of First Negotiation/Last Refusal would otherwise be rescinded, superseded, or deleted.  (Solomon Decl.¶¶ 50, 63.)

54.     The First Amendment makes no reference to Paragraph 2(k) of the License Agreement, nor does it expressly indicate in any way that Paragraph 2(k) does not remain operative.  (Tr. Ex.  37.)

55.     The Second Amendment does not delete, or in any way make reference to, Paragraph 2(k).  (Barnes Decl. ¶ 37; Tr. Ex.  73.)

### 7.     Sweetpea's Right to Notice and Opportunity to Cure

56.     The First Amendment applies that the 60-day notice and cure provision in Paragraph 15 of the License Agreement to Sweetpea's obligation to resume principal photography on D&D on or before January 1, 1999.  (Solomon Decl. ¶ 70; Tr. Ex.  37.)

57.     The First Amendment further provides that Sweetpea is not entitled to any notice or opportunity to cure certain specified breaches of the First Amendment: (a) a failure to comply with the minimum budget requirement; (b) a failure to obtain a completion bond; (c) a failure to provide insurance, (d) a failure to provide financing for the film, or (e) a failure to pay TSR 2% of the film's budget on or before principal photograph were to recommence.  (Tr. Ex.  37.)

58.     The First Amendment does not alter Sweetpea's right to ten days' notice and opportunity to cure for all other breaches and defaults.  (Solomon Decl. ¶ 69, Tr. Ex.  37.)

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

923077

**F.**   ***Dungeons & Dragons*** **(2000)**

59.    Sweetpea resumed principal photography in May 1999, a month earlier than required by the Second Amendment.  (Solomon Decl. ¶ 76.)

60.    Joel Silver attached to D&D as an Executive Producer, Steve Richards, a producer who worked with Silver's company Silver Pictures, was a co-producer of the film.

61.    The budget for *D&D* was $25 million.

62.    *D&D* was initially released in U.S. theatres on December 8, 2000 (Admitted Fact 25.)  It was thereafter released in other media, including home video and television.

63.    *D&D*'s domestic box office gross was approximately $15 million.  The film ultimately grossed approximately $33.8 million in worldwide box office.  *D&D*'s box office receipts were in the top five of all films exhibited during *D&D*'s opening weekend.  (Solomon Decl. ¶ 82.)

**G.**   ***Dungeons & Dragons: Wrath of the Dragon God*** **(2005) (“*D&D 2*”).**

64.    Under Paragraph 6 of the First Amendment, Sweetpea had until December 8, 2005—five years after *D&D*'s U.S. theatrical release—to commence principal photography on a sequel, prequel or remake.  (Solomon Decl. ¶ 82; Tr. Ex. 37 ¶ 6.)

65.    The second Dungeons & Dragons motion picture was titled *Dungeons & Dragons: Wrath of the Dragon God* (“*D&D 2*”).  (Solomon Decl.  ¶ 95; Tr. Ex.)

66.    Richards produced *D&D 2* through a single purpose entity called Ismir Productions (a single purpose entity created by Silver Pictures for the purpose of producing *D&D 2*), the right to produce one live action sequel to *D&D* to Ismir. (Solomon Decl. ¶ 68; Richardson Depo. p.103.)

67.    Although the First Amendment does not set a deadline for when a royalty payment must be made, before Hasbro would permit Sweetpea to license its *D&D 2* sequel rights to Ismir, Hasbro demanded that Ismir make the initial royalty payment

before principal photography commenced.  (Solomon Decl. ¶ 89; Tr. Ex.  90–0004 [¶ 5] (emphasis added).)

68. The First Amendment provides for a $116,667 payment for a non-theatrical sequel or remake. (Tr. Ex. 37 ¶9.)

69. Ismir Productions and Sweetpea made a royalty payment of $116,667 on or about May 14, 2004, before commencing principal photography on *D&D 2*. (Solomon Decl. ¶ 90; Admitted Fact 26.)

70. Richards sent a copy of the Ismir Agreement to Hasbro on April 12, 2004 (Tr. Ex. 87-1.)

71. The Ismir Agreement expressly provided that, if *D&D 2* was released theatrically, Ismir would increase its royalty payment to the amount applicable to a theatrical sequel no later than 10 days after *D&D 2*'s general theatrical release. (Tr. Ex. 87-6.)

72. Hasbro did not object to the provision in the Ismir Agreement.

73. *D&D 2* was first exhibited on the Syfy Channel on October 8, 2005. (Admitted Fact 27).

74.  *D&D 2* was subsequently released on DVD and through subscription video on demand ("SVOD") such as Amazon Prime.  (Solomon Decl. ¶ 98.)

75. Prior to this litigation, Hasbro did not claim that *D&D 2* was a television motion picture because it was initially released on television.  (Solomon Decl. ¶_98.)

76. Between the time that the *D&D 2* movie was released and the time that *Dungeons & Dragons: The Book of Vile Darkness* ("*D&D 3*") was released, Hasbro never suggested to Sweetpea that it believed Sweetpea's sequel rights purportedly had reverted.  (Solomon Decl. ¶ 100.)

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

### H.   *Dungeons & Dragons: The Book of Vile Darkness* **(2010) ("*D&D 3*").**

#### 1.   *D&D 3* **Was Developed Independently, Without Financing By Any Television Network**

77.     After the second Dungeons & Dragons movie, a third Dungeons & Dragons movie was produced, which was titled *Dungeons & Dragons: The Book of Vile Darkness* ("*D&D 3*").  (Solomon Decl. ¶ 99.)

78.     Richards produced *D&D 3*, through a single-purpose entity formed by Silver Pictures called Grayson Productions, LLC ("Grayson"),[3]  (Solomon Decl.  ¶ 102.)

79.     The actual production spend for *D&D 3* was $2,528,542.  (Admitted Fact 31).

80.     A $2.5 million budget is inconsistent with a made-for-TV movie because the license fees for such films are so low that the producer would never recover its investment.  (Solomon Decl.¶ 112.)

81.     Sweetpea wanted the movie to be exploited in whatever medium—theatrical, non-theatrical and/or television—would provide the greatest exposure for the Dungeons & Dragons property and would be most profitable.  (Solomon Decl. ¶ 103.)

82.     Solomon and Richards had discussions with the Syfy Channel about making *D&D 3* as a made-for-TV Dungeons & Dragons movie for the Syfy Channel. (Solomon Decl. ¶ 106; Tr. Ex. 96.)

83.     Syfy eventually passed on the project.  (Tr. Ex. 107, 108.)

84.     After *D&D 3* was completed, Syfy licensed the right to exhibit the film on the Syfy television network in exchange for a $350,000 license fee.  (Admitted Fact 32.)

85.     $350,000 is a reasonable license fee for a completed film licensed for television exhibition.  (Solomon Decl. ¶ 112.)

---

[3] As used herein, "Silver Pictures" refers to Silver Pictures and Grayson collectively.

86.     A made-for-TV movie is generally financed at least in part, by the network.  The network also sets the budget and approves rights over the director, cast, script, and locations.  Networks generally also set air dates for made-for TV movies before the film is made.  (Solomon Decl. ¶ 109.)

87.     *D&D 3* had none of the indicia of a made-for TV movie. (Solomon Decl. ¶110.)

88.     *D&D 3* was released on DVD in the United Kingdom on [date]. (Solomon Decl. ¶ 111.).

89.     *D&D 3* aired on Syfy on November 24, 2012.  (Solomon Decl. ¶ 129, Admitted Fact 33)

> ### 2.     WOTC Was Involved in the *D&D 3* Project from the Beginning

90.     On or about October 18, 2006, Richards, along with the writers of the *D&D 2* and *D&D 3* screenplays, had an extensive conversation with Ed Stark, a Game Designer and Special Projects Manager at WOTC, during which they discussed elements of the Dungeons & Dragons property they intended to use in the *D&D 3* script.

91.     In their October 2006 discussion, Richards and the writers also told Stark the fact that the story they were considering might result in *D&D 3* being given an R rating, rather than a PG–13, rating from the MPAA.

92.     MPAA ratings only apply to films released theatrically, not on television.

93.     No one at Hasbro ever told Richards that the story being developed for *D&D 3* was not a sequel or that Sweetpea did not have the right to make *D&D 3* a theatrical or non-theatrical film.

> ### 3.     Richards Met with WOTC to Discuss Distribution Plan for *D&D 3*, Including the Plan to Release *D&D 3* on DVD

94.     Richards had discussions with WOTC personnel as to how *D&D 3* would be marketed.  (Richards Depo at 200.)

95.     Richards told WOTC's representatives that it was his intent to release *D&D 3* in all media, specifically including theatrically, non-theatrically and on television.  (Richards Depo at 200.)

96.     Richards and Brian Rudnick, who wrote the screenplay for *D&D 3*, traveled to the Seattle, Washington area in April 2010**,** to meet with executives from WOTC to discuss *D&D 3* and to go over the *D&D 3* script.

97.     One of the primary purposes of this meeting was to shoot footage of some of WOTC's R&D staff playing the Dungeons & Dragons games based on scenes from *D&D 3* to be used as extra content on the *D&D 3* DVD.

98.     WOTC personnel, including Greg Leeds, its President and CEO, and Liz Schuh, from WOTC's Brand Marketing Department expressed enthusiasm for this plan.  (Richards Decl. ¶ 30.)

**4.      WOTC Provided Detailed Notes on the *D&D 3* Screenplay**

99.     The *D&D 3* screenplay was also reviewed by Chris Perkins, a game designer at WOTC.  Perkins provided comments on the screenplay, including that the use of the term "blood mage" was part of separate intellectual property and thus needed to be replaced. (Tr. Ex.  453–0003.)

100.   Although Perkins reviewed the screenplay, neither he nor anyone else at WOTC or Hasbro expressed the view that Sweetpea did not have the right to produce and distribute *D&D 3* theatrically or non-theatrically because it was not a sequel or remake. (Tr. Ex.  453.)

**4.      Grayson and Sweetpea Enter Into an Agreement to Produce *D&D 3*; Mr. Richards Requests Wire Information from Hasbro**

101.   Sweetpea and Grayson entered into an agreement on or about September 1, 2010, in which Sweetpea granted to Grayson "an exclusive and irrevocable option to purchase… the exclusive right to produce one live action, sequel motion picture" to

1  Dungeons and Dragons: The Movie, which was tentatively entitled "Dungeons &

2  Dragons 3." (Tr. Ex. 118.)

3     102.   Richards notified WOTC by email that he intended to begin principal

4  photography on *D&D 3* by October 1, 2005. (Tr. Ex. 124.)

5     103.   No one at WOTC or Hasbro told Richards that a royalty payment would

6  have to be made before principal photography could start. (Richards Depo p. 243.)

7     **5.     The $20,000 Payment to Hasbro for the Third Dungeons &**
            **Dragons Movie:** *Dungeons & Dragons: The Book of Vile*
8           *Darkness* **("D&D 3 ")**

9     104.   Principal photography on *D&D 3* began on October 1, 2005. (Admitted

10  Fact 28.)

11     105.   Silver Pictures commenced principal photography within five years of

12  the initial U.S. release of *D&D 2*.

13     106.   Richards proposed that Silver Pictures and Sweetpea make a royalty

14  payment to Hasbro immediately before principal photography commenced, and that

15  Sweetpea and Silver Pictures each pay half the fee. (Solomon Decl. ¶ 117; Tr. Ex.

16  121.)

17     107.   Although Solomon did not believe that the First Amendment required a

18  royalty payment before principal photography commenced, he agreed to Richards'

19  proposal.

20     108.   Solomon instructed Richards to pay the royalty for a non-theatrical

21  sequel, which, according to the First Amendment, would be $119,000. (Solomon

22  Decl. ¶ 119.)

23     109.   At Solomon's direction, Solomon's company, After Dark Films, wired

24  $66,000 in two separate payments to Silver Pictures, representing After Dark's share

25  of the non-theatrical royalty. (Solomon Decl. ¶¶121, 122.)

26     110.   The wire transfer order for the bulk of the money After Dark Films wired

27  to Silver Pictures includes the following works: "Dungeons & Dragons, Passive

28

4835-1345-9229

16

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

923077

1   Royalty due per 11.d of March 19, 1998 Agreement." (Tr. Ex. 128.)  Those words

2   were written by Richards.  Solomon did not see this document until his deposition.

3   (Solomon Decl. ¶ 123.)

4       111.   On or about October 7, 2010, Richards, based on a quick review of the

5   First Amendment, and without consulting with Solomon, decided to pay the royalty

6   applicable to television distribution, which he calculated would be $20,000.

7   (Admitted Fact 29; Richards Depo at 169-70.)

8       112.   Richards believed that if *D&D 3* were to be distributed theatrically or

9   non-theatrically, he could pay an additional royalty consistent with that form of

10   distribution.  (Richards Depo. at 159.)

11       113.    Richards did not negotiate the First Amendment, was not a party to the

12   First Amendment, and did not consult either Solomon or an attorney when he decided

13   to make the $20,000 royalty payment.  (Richards Depo. at 189-92.)

14       114.   Solomon believed that Sweetpea's obligation to make a royalty payment

15   under the First Amendment had been satisfied, and was never told by either Richards

16   or anyone at Hasbro that it was not.  (Solomon Decl. ¶ 125.)

17         **6.**      **WOTC Collaborated on a Consumer Contest, Shooting**
18                   **Behind-the-Scenes Footage for DVD Extras**

19       115.   In or around November 2010, Richards and WOTC executive Liz Schuh,

20   discussed a consumer contest  to promote *D&D 3*'s upcoming release.

21       116.   WOTC's summary of the contest expressly mentioned that the winner

22   would receive, among other things, a copy of the *D&D 3* DVD.

23       117.   In these discussions, Richards suggested to Schuh that the winner of the

24   contest participate in a specific scene from the script for *D&D 3*.

25       118.   Ms. Schuh and others expressed enthusiasm for the contest.  (Tr. Ex.

26   138.)

27

28

**SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

### 7.   *D&D 3* Was Classified by Sweetpea and IATSE as a Low-Budget Motion Picture

119.   After Dark is a signatory to collective bargaining agreements with the International Alliance of Theatrical Stage Employees ("IATSE"), a labor union that represents technicians, artisans and craftspersons in the entertainment industry. (Solomon Decl. ¶ 126.)

120.   Consistent with its obligations under its agreements with IATSE, on or about dated January 21, 2011, After Dark and IATSE entered into a Project Agreement for *D&D 3*, titled "Project Agreement: Dungeons and Dragons 3 Productions, LLC – After Dark Films, LLC," by and between Dungeons and Dragons 3 Productions, LLC, IATSE and After Dark Films, LLC, (the "IATSE Agreement"). (Solomon Decl.¶ 126, Trial Exhibit 534.)

121.   According to the IATSE Agreement, *D&D 3* falls under the collective bargaining agreement that applies to "Low Budget Theatrical" films.  (Tr. Ex. 534.)

### 8.   *D&D 3* Obtained a PG–13 Rating for Theatrical/Non-Theatrical Release

122.   The Motion Picture Association of America ("MPAA") film rating system is a voluntary rating scheme administered by an independent agency, the Classification & Ratings Administration ("CRA").

123.   Television programming is subject to a separate ratings scheme, the TV Parental Guidelines, which is a voluntary system that applies only to television programming.  (Tr. Ex.  148.)

124.   The final version of *D&D 3* contained numerous scenes with strong sexual content and nudity that would not be appropriate for televison.  (Tr. Ex. 332.)

125.   These scenes were filmed, edited, and left in the final cut of *D&D 3* because Silver Pictures had always intended for *D&D 3* to be released non-theatrically and, if possible, theatrically, in which case strong sexual content and nudity would be acceptable.

126.   After the film was completed, Silver Pictures applied for, and the MPAA granted, a rating of PG–13 for *D&D 3*.

127.   The completion bond Silver Pictures obtained for the *D&D 3* required that the firm qualify for an MPAA rating of "not more restrictive than R."

### 9.    **WOTC Approved Footage from *D&D 3***

128.   On or about March 2, 2012, Richards and Rudnick screened footage *D&D 3* which was then in post-production, for WOTC representatives, including Perkins.

129.   Perkins told Rudnick in an email that he was "very excited" and that he appreciated all of the hard work Rudnick had put into the film "to make it spectacular."  (Tr. Ex.  454–0001.)

130.   No one at WOTC or Hasbro  ever told Richards or Solomon that they were displeased with the story, screenplay, or quality of *D&D 3*.

131.   No one at WOTC or Hasbro ever told Richards or Solomon that Sweetpea did not have the right to release *D&D 3* theatrically or non-theatrically, even after they learned that, at a minimum, Sweetpea was intending to release the film on video.  (Tr. Ex.  454.)

### 10.    ***D&D 3* Was Released on DVD and Video on Demand**

132.   Before licensing *D&D 3* to Syfy, Sweetpea and Silver undertook efforts to distribute *D&D 3* theatrically and non-theatrically.

133.   Silver presold the rights to release the film on DVD in the United Kingdom.  (Solomon Decl. ¶ 129.)

134.   Silver and Syfy also sought distribution through SVOD (subscription video on demand).  (Solomon Decl. ¶ 130; Tr. Ex.  195.)

135.   *D&D 3* was released on DVD in the U.K. on August 9, 2012, and became available for purchase on Amazon on October 1, 2012.  (Solomon Decl. ¶ 132; Tr. Ex.  328, 525.)

### 11.   *D&D 3* Was A Sequel to *D&D and D&D 2*

136.   Like the first and second Dungeons & Dragons movies, the full title for *D&D 3 Dungeons & Dragons: The Book of Vile Darkness,* (aka *Dungeons & Dragons* 3) has the words "Dungeons & Dragons" in the title.

137.   *D&D 3*, like *D&D 2* and *D&D* before it, contained the iconic Dungeons & Dragons story: a band of characters drawn from character classes of the Dungeons & Dragons universe set off on a quest to seek valuable items.  Along the way the characters encounter magical beings and creatures and have fights with magical weapons and spells.  Somewhere along the journey, the characters encounter dragons. (Solomon Decl. ¶ 137.)

138.   Each of the movies, like every Dungeons & Dragons game, ends when the characters finish their quest or die trying.  (Solomon Decl. ¶ 137.)

139.   Unity of storylines and characters between the original Dungeons & Dragons movie and its sequels is not important to the audience for Dungeons & Dragons film.  Because each Dungeons & Dragons game involves an adventure and storyline from the previous game, with new characters drawn from the character classes in the Dungeons & Dragons universe.  (Solomon Decl. ¶ 136.)

140.   *D&D 3*, like *D&D 2*, was directed by Gerry Lively.  When the same director helms two movies in a series, both of which contain "Dungeons & Dragons" in the title and a classic Dungeons & Dragons adventure, moviegoers understand that the movies belong to the same series or franchise.  (Solomon Decl.  ¶ 137.)

141.   *D&D 3* contained the following items and/or elements that were originally featured in *D&D* and *D&D 2*:

| Item/Element | *D&D* | *D&D 2* | *D&D 3* |
|---|---|---|---|
| Teleportation Portal | Teleportation portals are featured. | Teleportation portals are featured. | Teleportation portals are featured. |

| Item/Element | D&D | D&D 2 | D&D 3 |
|---|---|---|---|
| Fire-Breathing Dragons | Fire-breathing dragons are featured. | Fire-breathing dragons are featured. | Fire-breathing dragons are featured. |
| Magical Swords | Magical swords are featured. | Magical swords are featured. | Magical swords are featured. |
| Magical Armor | Magical armor is featured. | Magical armor is featured. | Magical armor is featured. |
| Rod of Sarville | The Rod of Sarville is featured. | The Rod of Sarville is featured. | The Rod of Sarville is featured. |
| Humans, Elves, Dwarves, Mages, and Orcs | Human, elf, dwarf, mage and orc characters are featured. | Human, elf, dwarf, mage and orc characters are featured. | Human, elf, dwarf, mage and orc characters are featured. |
| Barbarians | | Lux, a female Barbarian, is introduced. | The Barbarians ambush the protagonist Grayson and his father |
| Pendulum Trap | Ridley must navigate a Pendulum Trap when he is in the Thieves Guild Maze. | | Bezz triggers a Pendulum Trap in the dragon cave, which severs the "Eye of the Beholder" spell. |
| Healing Magic | Ridley is magically healed. | Ormaline and Nim are magically healed. | Grayson is magically healed by Akordia. |
| Achievement of Divine Power | | One of the protagonists, Melora, learns to use divine power. | Grayson learns how to channel divine power. |
| Questers | | The term "Questers" is used to describe the group of adventurers. | The term "Questers" is used to describe the group of adventurers. |

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

| Item/Element | D&D | D&D 2 | D&D 3 |
|---|---|---|---|
| Ring of the Ram/Force | | Ormaline uses a Ring of the Ram against Damodar. | Grayson uses a Ring of Force[4] against Akordia. |
| Trapped Treasure Chest | | Nim disarms the trapped chest. | Sieth disarms a trapped chest. |
| Vorpal Weapon | | Berek finds a Vorpal Weapon in Malek's vault. | Grayson is given a Vorpal Weapon after the sack of Little Silver Keep |
| Staff of Lightning | | Ormaline uses the Staff of Lightning. | Lurk, the Mage, uses a Staff of Lightning when Ranfin, Grayson's father, is captured. |

(Solomon Decl. ¶ 138.)

**I.      Warner Bros.' *Chainmail* Project**

142.   *D&D 3* is a sequel to *D&D* and *D&D 2*.

143.   The *Chainmail* project began in September 2011, when Jon Berg, the creative executive at Warner Bros. Pictures ("Warner Bros."), asked writer David Leslie Johnson to prepare a draft screenplay for the project based on the *D&D* property.  (Berg Decl. ¶ 3.)

144.   Although Warner Bros. did not own any motion picture rights to *D&D* at that time, Warner Bros. intended that if it decided to further develop the project after reviewing the draft screenplay, it would either acquire those rights, or revise the screenplay to eliminate all *D&D* elements and convert the screenplay into a generic sword and sorcery story.  (Berg Decl. ¶ 4.)

---

[4] The Fourth Edition of Dungeons & Dragons was released in 2007.  "Ring of Force" is Dungeons & Dragons Fourth Edition equivalent of Ring of the Ram.

145.   Berg received a preliminary draft of Johnson's *Chainmail s*creenplay in or around August 2012, which Berg shared with other creative executives at Warner Bros.  (Berg Decl. ¶ 3.)

146.   The screenplay was enthusiastically received by Warner Bros., and Berg immediately began to investigate how Warner Bros. could acquire the motion picture rights to the *D&D* property.  (Berg Decl. ¶ 4.)

147.   On September 24, 2012, Jun Oh, a Senior Vice President of Business Affairs at Warner Bros., spoke to Bennett Schneir at Hasbro who informed Oh that the Dungeons & Dragons rights were "complicated" and that he would need to "find out what exactly the status [was] on the rights."  (Oh Decl.¶ 3, Tr. Ex. 190.)

148.   Schneir is the lead creative director for feature films at Hasbro.  (Oh Decl.¶ 3.)

149.   Oh and Berg spoke again on September 28, 2012.  Schneir started the conversation by advising that the rights on *D&D* were "tricky" and that Hasbro held certain theatrical film rights, but not others.  Schneir also advised Oh that Hasbro's rights in the title "Dungeons & Dragons" were non-exclusive and, moreover, that the title could only be used in connection with a qualifier.  (Oh Decl. ¶¶ 6; Berg Decl. ¶ 6; Tr. Ex. 191.)

150.   In early October 2012, Berg arranged to have a copy of the September 5, 2012 *Chainmail* script sent to Schneir.  (Berg Decl. ¶ 7.)

151.   Schneir informed Berg that Hasbro liked the *Chainmail* script.  (Berg Decl. ¶ 7.)

152.   On October 29, 2012, Oh spoke by telephone with Rob Carlson and June Horton, Hasbro's agent and business affairs representative at William Morris Endeavor ("WME").  Carlson and Horton advised Oh that Hasbro "was still working out the rights issues."  (Oh Decl. ¶ 8; Berg Decl. ¶ 11; Tr. Ex. 541.)

153.   Oh spoke again with Carlson and Horton on November 1, 2012.  Michael Eisner, Hasbro's head of legal and business affairs was also on the call.  (Oh Decl. ¶ 9.)

154.   Carlson, Horton, and Eisner told Oh that there were further restrictions on Hasbro's rights in the title "Dungeons & Dragons" for feature films.  Eisner told Oh that "Dungeons & Dragons" could only be used as a sub-title that was at most 50% of the size of the main title of the film.  Eisner and Horton also advised Oh that the other rights holder was Courtney Solomon.  (Oh Decl. ¶ 9.)

155.   Schneir told Berg in early November 2012, that, in contrast to Hasbro's initial reaction, he now had some issues with the *Chainmail* script – specifically, that the script focused on the older *D&D* intellectual property instead of the newer "Forgotten Realms" version.  (Berg Decl. ¶ 12.)

156.   On November 7, 2012, Oh sent an email to Eisner asking that he "please provide [Warner Bros.] with a detailed explanation of the breadth of the rights the other party has in connection with the Dungeons & Dragons property."  (Oh Decl. ¶ 10; Tr. Ex. 210.)  Eisner did not respond.

157.   On November 15, 2012, Oh received a call from Carlson who advised Oh that Hasbro intended to close a deal for Dungeons & Dragons with Universal Pictures.  Carlson told Oh that because the *Chainmail* script contained "much older D&D [*D&D*] IP," Hasbro had decided that it wanted to "start from scratch."  (Oh Decl. ¶ 11; Tr. Ex. 223.)

158.   Later on November 15, 2012, Mr. Berg received an email from Steve Spira, President of Worldwide Business Affairs for Warner Bros., asking whether Warner Bros. should consider pursuing the "other rights" for the *D&D* property, specifically, the rights that Hasbro had indicated were held by another party.  Berg advised Spira by email that he was, in fact, interested in pursuing those other rights. (Berg Decl. ¶ 14; Tr. Ex. 221.)

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW
923077

159.   Thereafter, Oh and Berg endeavored to determine whether Mr. Solomon held the rights in *Dungeons & Dragons* necessary for Warner Bros. to produce *Chainmail*.  (Oh Decl. ¶ 12; Berg Decl. ¶ 15-16.)

160.   On November 30, 2012, Berg received an email from a producer named Mark Canton, who forwarded an email sent to him by Courtney Solomon, attaching Sweetpea's chain of title documents with respect to Dungeons & Dragons, and confirming that Sweetpea owned the rights to Dungeons & Dragons.  (Berg Decl. ¶ 15; Tr. Ex. 228.)

161.   Based on the chain of title materials that Sweetpea provided to Warner Bros. in November 2012, and Berg's discussions with Solomon, Berg concluded that Sweetpea controlled the rights to the "classic" version of *D&D*, which comprised much of the *D&D* material in the Chainmail script.  (Berg Decl. ¶ 16);

162.   Warner Bros. sent the *Chainmail* script to Solomon on December 7, 2012.  (Solomon Decl. ¶ 143; Tr. Ex. 236.)

163.   Prior to December 7, 2012, Solomon had not seen a copy of the *Chainmail* script.  (Solomon Decl. ¶ 144.)

164.   After Solomon received a copy of the *Chainmail* script, he did not copy or make any works based on the script.  (Solomon Decl. ¶ 145.)

165.   Solomon notified Warner Bros. on December 7, 2012, that *Chainmail* might contain elements that came from Advanced Dungeons & Dragons, and that those rights had been retained by Hasbro.  (Solomon Decl. ¶¶ 148, 149; Tr. Ex.  238, 239.)

166.   On December 7, 2012,  Solomon was in an editing suite in Atlanta editing a movie he directed entitled *Getaway*.  (Solomon Decl. ¶¶ 150, 151; Tr. Ex. 326, 327.)

167.   Warner Bros. has not prepared, or directed anyone else to prepare, rewrites or polishes of the *Chainmail* screenplay, or any other derivative works since the script was delivered to Warner Bros. in August 2012.  (Berg Decl. ¶ 17.)

168.   Solomon is not aware of any drafts of the *Chainmail* script, any treatments, or any other derivative works that were created after September 2012. (Solomon Decl. ¶ 147.)

169.   Warner Bros. and Sweetpea entered into an agreement in principle on April 16, 2013 for the motion picture rights to *Dungeons & Dragons*.  (Berg Decl. ¶ 16; Oh Decl. ¶ 12; Solomon Decl. ¶ 155; Tr. Ex. 283.)

170.   On June 27, 2014, Warner Bros. entered into an agreement with Sweetpea dated as of June 13, 2014 (the "Sweetpea-WB Agreement"), pursuant to which Sweetpea granted and assigned to Warner Bros. all of its right, title and interest in the Dungeons & Dragons property as those rights then existed.  (Oh Decl. ¶ 13; Solomon Decl. ¶ 164; Tr. Ex.  540.)

171.   The grant and assignment was expressly subject to any modification to the rights in the property that might occur as a result of this litigation, as set forth in Paragraph 5 of the Sweetpea-WB Agreement.  (Tr. Ex. 540.)

**J.       Statements to the Press Regarding the Warner Bros. Project**

172.   Hasbro and WOTC filed this lawsuit on May 13, 2013.  (Tr. Ex.  527).

173.   The next day, Sweetpea issued a statement, in which Solomon was quoted:

> Sweetpea Entertainment has had Dungeons & Dragons motion picture rights since the 1990's including sequel, prequel and remake rights" said Sweetpea principal Courtney Solomon. "We have made three pictures so far, and we're going to make more—including the tentpole project that is currently in advanced stages of development with Warner Bros."

174.   The purpose of this press release was to communicate, in the context of ongoing litigation, that Hasbro's and WOTC's claims were baseless, Sweetpea had rights in the Dungeons & Dragons property, and that Sweetpea planned to produce a Dungeons & Dragons movie with Warner Bros.  (Solomon Decl. ¶ 161; Tr. Ex. 293.)

175.   Solomon gave two interviews at the July 2013 Comic-Con Convention to promote his film *Getaway*.  (Solomon Decl. ¶ 161, 163; Tr. Exs. 293, 303, 526.)

176.   In those interviews, Solomon was asked about Dungeons & Dragons. Solomon responded by, among other things, mentioning that a new film was being produced.  (Solomon Decl. ¶ 162, 163; Tr. Exs. 293, 303, 526.)

177.   At the time Solomon made those statements, he was not promoting a new movie, because no movie had then been produced, nor has a new Dungeons & Dragons film been produced to date.

178.   Solomon intends to abide by the courts' determination regarding the respective rights of the parties in the Dungeons & Dragons property.

179.   Solomon has no plan to create a Dungeons & Dragons feature film unless and until the issues regarding Sweetpea's sequel rights in the property are resolved.

180.   Solomon does not intend to make public statements in conflict with any judicial determination regarding rights in the Dungeons & Dragons property.

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Federal Jurisdiction and Venue

181. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1338(a) (copyright and trademark), and 1367 (supplemental jurisdiction), as well as 15 U.S.C. § 1121(a) (trademark).  28 U.S.C. § 2201 authorizes this Court to grant the requested declaratory relief.  Venue is proper pursuant to 28 U.S.C. § 1391(a)(1) and (c), because each of the defendants has its principal place of business and/or transacts substantial business in Los Angeles, California.  The facts requisite to federal jurisdiction are admitted.

### B.   Plaintiffs' Claim for Contributory Copyright Infringement Is Denied

#### 1.   There Has Been No Contributory Infringement

182. "One infringes contributorily by intentionally inducing or encouraging direct infringement."  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930, "*Grokster III*" (2005).

183. Contributory infringement includes situations where the defendant "knew of the direct infringement; and (2) … either induced, caused, or materially contributed to the infringing conduct." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013).

184. To  establish contributory liability, a plaintiff must first establish direct infringement by third parties because secondary liability cannot exist in the absence of direct infringement by a third party. *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1169 (9th Cir. 2007); *see also A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.").

185. To establish infringement, a copyright plaintiff must introduce the infringing work. *See Seiler v. Lucasfilm, Ltd.*, 808 F.2d 1316, 1319 (9th Cir. 1987) ("There can be no proof of 'substantial similarity' and thus of copyright infringement unless [the plaintiff's] works are juxtaposed with [the alleged infringer's work] and their contents compared.").

186. Hasbro's contributory copyright infringement claim is limited to Warner Bros.' alleged direct infringement in developing and producing a theatrical motion picture based upon a screenplay titled *Chainmail*.  (Dkt. No. 131 of 3-4.)  Hasbro contends that Sweetpea induced, caused, or materially contributed to Warner Bros.' infringing activity by "ratifying" the *Chainmail* script and authorizing Warner Bros. to develop the script into a theatrical Dungeons & Dragons motion picture.  (*Id.* at 4.)

187. To establish contributory infringement by inducement, a plaintiff must establish a direct connection between the defendant's conduct and the infringing activity of a third party. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1032 (9th Cir. 2013) cert. dismissed, 134 S. Ct. 624, 187 L. Ed. 2d 398 (U.S. 2013) (citing ("*Grokster III*"), 545 U.S.at 936–37) (contributory copyright infringement under an inducement theory requires a showing of causation).

188. Failure to establish a direct causal connection between a defendant's conduct and direct infringement by a third party is fatal to a contributory infringement claim.  *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 796 (9th Cir. 2007) (rejecting contributory infringement claim where the defendant had "no direct connection to the infringement").

189. Evidence that Sweetpea authorized Warner Bros. to infringe on Hasbro's Dungeons & Dragons copyrights does not, by itself, establish liability for contributory infringement.  Mere authorization which does not result in infringing acts is not sufficient to establish contributory infringement:  "[C]ontributory infringement, even when triggered solely by an 'authorization,' is a form of third party liability that requires the authorized acts to constitute infringing ones."  *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1093 (9th Cir. 1994).[5]

190. The *Chainmail* script existed before Solomon began discussions with Warner Bros. and has not been changed, nor have any derivative works based on the *Chainmail* script been prepared.

191. Hasbro therefore cannot meet its burden to identify any infringement to which Sweetpea contributed.

192. Sweetpea is entitled to judgment on Plaintiff's first cause of action for contributory copyright infringement.

193. The only evidence of allegedly infringing conduct by a third party is the script of *Chainmail* that was not altered after Warner Bros. sent a copy of the screenplay to Sweetpea on December 7, 2012, the first time Sweetpea reviewed the *Chainmail* script.  Moreover, Mr. Solomon received the script before he engaged in the conduct that Hasbro characterizes as "authorization" (*i.e.*, reaching an agreement-in-principle to produce a Dungeons & Dragons sequel, "greenlighting" the

---

[5] Hasbro has not pointed to any authority that a defendant can be liable for "ratifying" infringing conduct that occurred in the past.  The Court analyzes Hasbro's ratification theory as coterminous with Hasbro's authorization theory.

1   production, and making public statements regarding the production).  All of those acts

2   of purported authorization took place *after* the allegedly infringing conduct (the

3   *Chainmail* script).  After Sweetpea's authorization, neither Warner Bros. nor

4   Sweetpea has engaged in any conduct that infringes on Hasbro's copyrights.

5   Accordingly, there is no causal connection between Sweetpea's authorization and any

6   infringing activity by a third party.

7                    **2.      Hasbro is not Entitled to Injunctive Relief**

8          194. "The Copyright Act provides that a court 'may . . . grant temporary and

9   final injunctions on such terms as it may deem reasonable to prevent or restrain

10   infringement of a copyright.'"  *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654

11   F.3d 989, 994 (9th Cir. 2011) (citing 17 U.S.C. § 502(a)).  "Thus, injunctive relief to

12   prevent copyright infringement is available as an equitable remedy in the court's

13   discretion."  *Id.*

14          195. "According to well-established principles of equity, a plaintiff seeking a

15   permanent injunction must satisfy a four-factor test before a court may grant such

16   relief."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citation

17   omitted).  "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury;

18   (2) that remedies available at law, such as monetary damages, are inadequate to

19   compensate for that injury; (3) that, considering the balance of hardships between the

20   plaintiff and defendant, a remedy in equity is warranted; and (4) that the public

21   interest would not be disserved by a permanent injunction."  *Id.*

22          196. The Supreme Court has been "very clear that even where infringement had

23   been proven, a plaintiff may not be granted injunctive relief until he satisfies the four-

24   factor test, which includes demonstrating irreparable injury."  *Flexible Lifeline Sys.,*

25   *Inc.*, 654 F.3d at 995 (citing *eBay Inc.*, 547 U.S. at 394).

26          197. "[I]n a copyright infringement case, the plaintiff must demonstrate a

27   likelihood of irreparable harm as a prerequisite for injunctive relief, whether

28   preliminary or permanent."  *Id.* at 998; *see also id.* at 1000 (reversing district court

1   because it "relied solely on the presumption of irreparable harm to issue its

2   injunction").

3      198. Under the foregoing principles, even if Sweetpea is liable for contributory

4   infringement of Hasbro's copyrights, Hasbro is not entitled to injunctive relief.  First,

5   there is no evidence that Hasbro would be irreparably harmed absent an injunction.

6   The alleged infringement occurred in 2012 or 2013 when Sweetpea allegedly induced,

7   caused or materially contributed to the *Chainmail* script.  The proposed injunction

8   would do nothing to "undo" Sweetpea's conduct in this regard.

9      199. Second, Hasbro has adduced no evidence that Sweetpea's alleged

10   infringement is continuing.  To the contrary, Sweetpea has represented to the Court

11   that it will abide by the Court's ruling on the parties' claims for declaratory relief.

12   Hence, there is no conduct threatened by Sweetpea for the Court to enjoin, and,

13   correspondingly, Hasbro faces no irreparable harm.[6]  *See Walt Disney Co. v. Powell*,

14   897 F.2d 565, 568 n.2 (D.C. Cir. 1990) ("When a defendant has ceased its infringing

15   conduct and shows no inclination to repeat the offense, a court may not issue a[ ]

16   permanent injunction....") (quoting *Reader's Digest v. Conservative Digest*, 821 F.2d

17   800, 807 (D.C. Cir. 1987)) (alterations in original); *Boisson v. Banian Ltd.*, 280

18   F.Supp.2d 10, 15 (E.D.N.Y. 2003) ("permanent injunctive relief will not be awarded

19   in cases where there is no history of infringement, the defendant is cooperative in

20   ceasing to sell infringing products and there does not exist any probability of future

21   infringement") (citing *Dolori Fabrics, Inc. v. Limited, Inc.*, 662 F.Supp. 1347, 1358

22   (S.D.N.Y. 1987)).

23      200. Because a plaintiff establishing infringement no longer is entitled to a

24   presumption of irreparable harm, *see Flexible Lifeline Sys., Inc.*, 654 F.3d at 998-

---

[6] If *Chainmail* poses any possible present threat to Hasbro, that threat derives from
WB's potential production of a film based on *Chainmail*.  Yet Hasbro has elected not
to sue WB.  Hasbro's decision in this regard undermines its purported fear of future
infringement.  In any event, Warner Bros. is not a party to this proceeding, nor is
there any evidence that Warner Bros. will not abide by the rights determinations made
by this Court.

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   1000, and Hasbro has not met its burden to prove irreparable harm, no injunction is

2   warranted.  *See also Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77, 84 (2d Cir.

3   2004) ("injunctive relief to enforce a copyright is not compelled") (citing cases).

4       201. Even if Hasbro could establish irreparable harm, it cannot show that its

5   remedies at law are inadequate.  Unlike in cases where a plaintiff faces some practical

6   obstacle to obtaining legal relief, here Hasbro simply abandoned its claim for

7   damages and attorney's fees on its copyright claim.  *Cf. Metro-Goldwyn-Mayer*

8   *Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197, 1220 (C.D. Cal. 2007) (finding

9   inadequate legal remedy where defendant was unlikely to be able to pay statutory

10  damages and "it would simply be untenable for Plaintiffs to track and proceed against

11  every infringer who continues to illegally reproduce and distribute" the infringing

12  works).  Hasbro's election not to pursue even *de minimus* damages does not justify

13  equitable relief.  To the contrary, the absence of damages to Hasbro underscores why

14  equitable relief is inappropriate given the lack of any present or future injury to

15  Hasbro arising from Sweetpea's alleged contributory infringement.

16      202. Hasbro also has not satisfied the third prong of the four-part test because it

17  has failed to establish that the harm it will suffer absent an injunction outweighs the

18  burden that the entry of the injunction would place on Sweetpea.  *See eBay*, *Inc.* 547

19  U.S. at 391; *see also Herb Reed Enterprises, LLC v. Florida Entertainment*

20  *Management, Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013) (balance of hardships

21  irrelevant if no irreparable harm).  While the burden of an injunction on Sweetpea

22  might be minimal, Hasbro has not shown that it will face *any* harm absent an

23  injunction.

24      203. Finally, an "injunction is [not] in the public interest."  *Winter v. Natural*

25  *Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "The plaintiffs bear the initial burden

26  of showing that [issuance of an] injunction is in the public interest."  *Aurora World,*

27  *Inc. v. Ty Inc.*, 719 F.Supp.2d 1115, 1127 (C.D. Cal. 2009) (citation omitted).  "The

28  district court, however, 'need not consider public consequences that are highly

1   speculative.'" *Id.* (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir.

2   2009)).  Just as there is no evidence to substantiate Hasbro's fear of future

3   infringement, there is no evidence to show that an injunction would be in the public's

4   interest.  *See also Herb Reed Enterprises, LLC*, 736 F.3d at 1251 (declining to address

5   the public interest factor where the plaintiff failed to supply evidence of irreparable

6   harm).

### C.   Plaintiffs' Claims for Trademark Infringement, False Designation of Origin and Unfair Competition, and Dilution Are Rejected

204. Hasbro asserts three claims under federal trademark law against Sweetpea,

specifically (1) federal trademark infringement in violation of 15 U.S.C. § 1114, (2)

false designation of origin and unfair competition in violation of 15 U.S.C. §

1125(a)(1)(A), and (3) trademark dilution in violation of 15 U.S.C. § 1125(c).  The

only remedy sought by Hasbro on its trademark claims is injunctive relief.

205. "To prevail on a claim of trademark infringement under the Lanham Act,

15 U.S.C. § 1114, a party 'must prove: (1) that it has a protectible ownership interest

in the mark; and (2) that the defendant's use of the mark is likely to cause consumer

confusion."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d

1137, 1144 (9th Cir. 2011) (quoting *Dep't of Parks & Recreation v. Bazaar Del

Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)).  Similar elements apply to claims

for false designation of origin.  *See* 15 U.S.C. § 1125(a).  To prove trademark

dilution, "a plaintiff must show that (1) the mark is famous and distinctive; (2) the

defendant is making use of the mark in commerce; (3) the defendant's use began after

the mark became famous; and (4) the defendant's use is likely to cause

dilution by blurring or dilution by tarnishment."  *Jada Toys, Inc. v. Mattel, Inc.*, 518

F.3d 628, 634 (9th Cir. 2008) (citing 15 U.S.C. § 1125(c)(1)).

206. As this Court has determined that Sweetpea's rights to produce a

Dungeons & Dragon's sequel did not revert to Hasbro's, and Hasbro's claim therefore

1   fails.  Sweetpea also had the right to use the Dungeons & Dragons trademarks in

2   connection with that sequel.

3       207. Because Sweetpea has acted within its rights at all relevant times,

4   Sweetpea did not infringe Hasbro's ownership interest in the Dungeons & Dragons

5   mark.  *See* 15 U.S.C. § 1114.

6           **1.    Even If Sweetpea's Rights Reverted To Hasbro, There Have**
            **Been No Trademark Violations**
7

8       208. Even if Hasbro prevailed on its declaratory relief claim, Sweetpea has not

9   violated Hasbro's trademark rights.  Hasbro's trademark claims fail because Hasbro

10  has not proven that Sweetpea used the mark commercially.

11      209. To prevail on its trademark claims, Hasbro must show that Sweetpea

12  "use[d]" plaintiff's trademark "'in commerce' and that the use was likely to confuse

13  customers as to the source of the product."  *Karl Storz Endoscopy Am., Inc. v.*

14  *Surgical Technologies, Inc.*, 285 F.3d 848, 853-54 (9th Cir. 2002) (citing 15 U.S.C.

15  §§ 1114(1), 1125(a)(1)); *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676 (9th

16  Cir. 2005) ("Infringement claims are subject to a commercial use requirement.").  To

17  determine whether a defendant has engaged in "commercial use" of a trademark, the

18  Court must consider whether the use was "in connection with a sale of goods or

19  services."  *Bosley Med. Inst., Inc.*, 403 F.3d at 676.  The commercial use requirement

20  advances the Lanham Act's objective "to protect consumers who have formed

21  particular associations with a mark from buying a competing product using the same

22  or substantially similar mark and to allow the mark holder to distinguish his product

23  from that of his rivals."  *Id.* (citing *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868,

24  873 (9th Cir. 1999)).

25      210. The commercial use requirement does not require the infringing goods or

26  services to have been sold at the time of the alleged infringement.  *See id.* at 679

27  (Lanham Act's commercial use requirement "does not require any actual *sale* of

28  goods and services. Thus, the appropriate inquiry is whether [defendant] offers

1   *competing* services to the public.") (citing *United We Stand America, Inc. v. United*

2   *We Stand, America New York, Inc.*, 128 F.3d 86, 90 (2d Cir. 1997).

3       211. Where there has been infringement prior to any actual sales by the

4   defendant, the infringing goods or services already existed or were "imminent and

5   impending." *Essie Cosmetics, Ltd. v. Dae Do International, Ltd.*, 808 F.Supp. 952,

6   957 (E.D.N.Y. 1992) (quoting J. Thomas McCarthy, *Trademarks and Unfair*

7   *Competition*, § 30.5 at 470 (2d ed. 1984)). *See also Maritz, Inc. v. Cybergold, Inc.*,

8   947 F.Supp. 1328, 1335 (E.D. Mo. 1996) (Lanham Act infringement action not

9   premature when defendant's web site sent out information regarding allegedly

10  infringing product, even though product itself was not yet operational); *Bertolli USA,*

11  *Inc. v. Filippo Bertolli Fine Foods, Ltd.*, 662 F.Supp. 203 (S.D.N.Y. 1987) (although

12  defendant's product had not entered the marketplace, trademark infringement action

13  was not premature when defendant had sent product samples to two distributors and

14  had printed product labels); *Levi Strauss & Co.*, 121 F.3d at 1311-12 (defendant

15  engaged in commercial use when he provided private investigator with samples of

16  counterfeit blue jeans in conjunction with offer to sell thousands more); *La Quinta*

17  *Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 12-15985, --- F.3d ----, 2014 WL 3844135,

18  *1 (9th Cir. Aug. 6, 2014) (although defendant's hotel chain had not yet expanded

19  into the United States, its hotels already existed in Mexico and it had been attempting

20  to expand into the U.S. market for more than fifteen years).

21      212. Here, in contrast, no competing film existed at the time of the allegedly

22  infringing conduct.  Indeed, the potentially competing film has never been produced

23  and may never be produced.  Moreover, when Mr. Solomon made the allegedly

24  infringing statements about the putative film to the press, he expressly acknowledged

25  the incipient nature of the film project.  Unlike the uses described in *La Quinta*,

26  *Maritz*, *Bertolli*, and *Levi Strauss*, among others, anyone hearing or reading Mr.

27  Solomon's comments would have known instantly that the product was nonexistent

28  and unavailable.  Hence the facts here are the opposite of the circumstances in the

1  cases on which Hasbro relies, where the infringing defendants (1) offered to sell

2  existing goods or services to the public, or (2) were actively launching products or

3  businesses based on an infringing mark.

4      213. *AARP v. 200 Kelsey Associates, LLC*, 06 CIV. 81 (SCR), 2009 WL 47499

5  (S.D.N.Y. Jan. 8, 2009), is not to the contrary.  In *AARP*, the defendants had not yet

6  published a magazine called "Modern Maturity," which had the same name as the

7  AARP's flagship publication.  In denying a motion to dismiss, the court found that the

8  AARP had adequately alleged commercial use because "plaintiff has alleged that

9  defendants 'are actively seeking licensees to publish a magazine called "Modern

10 Maturity" and 'have conducted [an] extensive analysis of the publishing industry' in

11 preparation for the launch of such magazine." *Id.* at *10.  Accordingly, the court

12 reasoned that

13      "[i]t is *reasonable to infer* that, in doing so, defendants have not only

14      used the Modern Maturity mark, but have done so through the channels

15      of commerce. Indeed, it would be difficult to fathom defendants pitching

16      their Modern Maturity magazine concept to a potential publisher without

17      providing the publisher with some sort of mock-up or prototype. Any

18      such mock-up or prototype would likely use the Modern Maturity mark,

19      as defendants concede that this is the name of their planned magazine.

20      Even without such a prototype, the pitch itself would necessarily involve

21      the transmission of ideas pertaining to magazine content, design, and

22      layout, including the offending name."

23 *Id.* (emphasis added).

24      214. Faced with a motion to dismiss, the *AARP* court speculated about how the

25 defendants might have used the plaintiff's mark commercially.  *See id.*  Unlike the

26 extensive outreach that the defendants in *AARP* were alleged to have conducted with

27 potential publishers, however, here Mr. Solomon's allegedly infringing statements

28 were made in a handful of press interviews.  Hasbro was unable at trial to identify any

1  other infringing commercial use.  Moreover, Hasbro offered no evidence that Mr.

2  Solomon uttered the words "Dungeons & Dragons" during those press interviews

3  with the intent to capitalize on the goodwill associated with Hasbro's mark.

4      215. More significantly, Mr. Solomon was not offering *any* "competing

5  services [or goods] to the public." *Bosley Med. Inst., Inc.*, 403 F.3d at 679.  As his

6  own statements made clear, he was describing a "good" that did not exist and that

7  would not be available to the public for years, if at all.  The link between Mr.

8  Solomon's statements and the putative release, years in the future, of a nonexistent

9  film is simply too tenuous to form a basis for the commercial use requirement of

10  Hasbro's trademark claims.

11          **2.      Hasbro is not Entitled to Injunctive Relief**

12      216. Even if Sweetpea infringed Hasbro's mark, Hasbro is not entitled to

13  injunctive relief.  As noted above, "permanent injunction may be entered where the

14  plaintiff shows: '(1) that it has suffered an irreparable injury; (2) that remedies

15  available at law, such as monetary damages, are inadequate to compensate for that

16  injury; (3) that, considering the balance of the hardships between the plaintiff and

17  defendant, a remedy in equity is warranted; and (4) that the public interest would not

18  be disserved by a permanent injunction.'" *La Quinta Worldwide LLC* , 2014 WL

19  3844135 at *9 (quoting *eBay Inc.*, 547 U.S. at 391).  As the Court recognized in *La*

20  *Quinta,* the *eBay* factors are equally applicable in trademark cases.  *See id.*; *see also*

21  *Reno Air Racing Ass'n v. McCord,* 452 F.3d 1126, 1137-38 (9th Cir. 2006) (citing

22  *eBay* and stating that district courts should apply "traditional equitable principles" in

23  deciding whether to grant permanent injunctive relief in matters arising under the

24  Lanham Act).

25      217. The "'traditional principles of equity' demand a fair weighing of the

26  factors listed above, taking into account the unique circumstances of each case." *La*

27  *Quinta Worldwide LLC*, 2014 WL 3844135 at *9 (quoting *eBay, Inc.*, 547 U.S. at

28  391, 394).  "It is important to consider the totality of circumstances bearing on

1   whether a permanent injunction is appropriate equitable relief." *Id.* Even where a

2   defendant is liable for infringement, the Court may issue permanent injunction only

3   where it has analyzed all of the aforementioned factors. *See id.* (reversing permanent

4   injunction granted in trademark case because "[w]e are concerned that the district

5   court's analysis does not discuss a fact we think relevant to weighing the equities in

6   this case. . . . The omission of this consideration from the district court's analysis

7   leaves us uncertain whether the district court considered all relevant factors in

8   assessing the balance of hardships.").

9       218. Even if Sweetpea infringed Hasbro's trademark, equitable principles

10   militate against a permanent injunction. First, Hasbro has not "suffered an irreparable

11   injury" and hence cannot obtain an injunction against Sweetpea. The Ninth Circuit

12   recently confirmed that the Supreme Court's decisions requiring evidence of actual

13   irreparable harm to obtain an injunction in intellectual property cases—*see eBay*, 547

14   U.S. at 391-92; *Winter*, 555 U.S. at 22—apply equally to trademark actions regardless

15   of whether the relief sought was preliminary or permanent and that irreparable harm is

16   no longer presumed from the fact of infringement. *See Herb Reed Enterprises, LLC,*

17   736 F.3d at 1248-50. "Gone are the days when '[o]nce the plaintiff in an

18   infringement action has established a likelihood of confusion, it is ordinarily

19   presumed that the plaintiff will suffer irreparable harm if injunctive relief does not

20   issue.'" *Id.* at 1250 (alteration in original) (quoting *Rodeo Collection, Ltd. v. W.*

21   *Seventh*, 812 F.2d 1215, 1220 (9th Cir. 1987)).

22       219. Hasbro failed to present any concrete evidence that it will be irreparably

23   harmed in the absence of the injunctive relief it seeks. *See id.* at 1250-51 (reversing

24   the imposition of a preliminary injunction because the district court's finding that the

25   plaintiff would be irreparably harmed was "cursory and conclusory, rather than being

26   grounded in any evidence or showing" made by the plaintiff).[7] Notably, Hasbro

27

28   [7] Although *Herb Reed* involved a preliminary injunction, the court explicitly held that the same analysis applies to permanent injunctions. "Our imposition of the

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  abandoned its claim for trademark damages.  (*See* Dkt Nos. 185, 189 and 190), and

2  there is no evidence that the allegedly infringing conduct has injured Hasbro

3  whatsoever.

4      220. The evidence of trademark infringement involved (1) Sweetpea

5  transferring to WB its right to use the mark in the title of a yet-to-be produced film,

6  and (2) Mr. Solomon uttering the words "Dungeons & Dragons" in connection with

7  the WB-Sweetpea film project in interviews with the trade press.  It is undisputed that

8  these actions relate to a film that has not been made, may never be made, and if it is

9  made, will not be released for years.  As such, there is no "imminent and impending"

10  act that supports equitable relief.  *See Essie Cosmetics, Ltd.*, 808 F.Supp. at 957 ("In a

11  trademark infringement action, a court may grant injunctive relief 'even before

12  defendant actually opens the business,' so long as the threatened act of defendant is

13  '*imminent and impending*.'") (quoting J. Thomas McCarthy, *Trademarks and Unfair*

14  *Competition*, § 30.5 at 470 (2d ed.1984)) (emphasis added).  As the film does not—

15  and may not ever—exist, it is therefore not surprising that Hasbro was unable to

16  present any evidence of "imminent or impending" lost sales or consumer confusion.

17  There is nothing in the record to suggest that Sweetpea (or any Sweetpea assignee)

18  will attempt to exploit commercially any rights in the "Dungeons & Dragons"

19  property beyond those that this Court determines are held by Sweetpea.

20      221. Hasbro has thus failed to meet its burden to show irreparable harm.  *See,*

21  *e.g.*, *Brighton Collectibles, Inc. v. Pedre Watch Co., Inc.*, No. 11CV00637

22  AJB(WVG), 2013 WL 5719071, at *4 (S.D. Cal. Oct. 21, 2013) (despite jury verdict

23  of infringement "conclusory assertions that [plaintiff's] reputation and goodwill has

24  been and will be harmed" without "specific facts or evidence showing Defendant has

25  caused this result" are insufficient to establish irreparable harm for purposes of a

26  permanent injunction); *Spiraledge, Inc. v. SeaWorld Entm't, Inc.*, No. 13CV296-

27

28  irreparable harm requirement for a permanent injunction in a trademark case applies
   with equal force in the preliminary injunction context."  *Herb Reed*, 736 F.3d at 1249.

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   WQH-BLM, 2013 WL 3467435, at *4 (S.D. Cal. July 9, 2013) (on preliminary

2   injunction motion, finding that Plaintiff "failed to submit probative, nonspeculative

3   evidence that [it] lost, or likely will lose, prospective customers or goodwill due to

4   SeaWorld's use of the Aquatica mark" and denying motion); *Scholz v. Migliaccio*,

5   No. C13-1229 JLR, 2013 WL 4482077, at *4 (W.D. Wash. Aug. 20, 2013)

6   ("irreparable harm will not be presumed where plaintiff presents no proof beyond

7   speculation that his reputation or goodwill in the market will be damaged, because the

8   court has no way of evaluating this intangible harm").

9       222. Just as Hasbro failed to prove actual harm, it failed to show its remedies at

10  law are inadequate.  "[T]he requisite analysis for the second factor of the four-factor

11  test inevitably overlaps with that of the first . . . ."  *MercExchange, L.L.C. v. eBay,*

12  *Inc.*, 500 F.Supp.2d 556, 582 (E.D. Vir. 2007).  Indeed, as Hasbro has not

13  demonstrated any evidence of harm, it cannot argue that legal remedies are

14  insufficient to address that harm.  Given the lack of harm, Hasbro's decision not to

15  seek monetary damages is understandable.  This lack of damages, however, does not

16  justify equitable relief.  To the contrary, the absence of harm to Hasbro shows why

17  neither legal nor equitable relief is appropriate.

18      223. Even assuming Hasbro had supplied evidence satisfying the first two

19  elements of a request for injunctive relief—and it did not—the harm it will suffer

20  absent an injunction does not outweigh the burden that the entry of the injunction

21  would place on Sweetpea.  *See eBay*, 547 U.S. at 391; *see also Herb Reed*, 736 F.3d

22  at 1251 (balance of hardships irrelevant if no irreparable harm).  Even though the

23  burden of an injunction on Sweetpea may be minimal, Hasbro has not established that

24  it will face any harm whatsoever absent an injunction.

25      224. Nor is the "injunction… in the public interest."  *Winter*, 555 U.S. at 20.

26  Hasbro has failed to present any evidence that, absent an injunction, the public will be

27  deceived or confused about the mark.  Because the alleged infringement relates to a

28  film that does not exist (and may never be made), Hasbro's concerns are entirely

40

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

speculative.  *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) ("the court should weigh the public interest in light of the *likely* consequences of the injunction. Such consequences must not be too remote, insubstantial, or speculative and must be supported by evidence.") (citing *Golden Gate Rest. Ass'n v. City & County of S.F.*, 512 F.3d 1112, 1126 (9th Cir. 2008)) (emphasis in original).  The public interest will not be impacted if the Court refuses to enter an injunction in this case.  In any event, this factor is irrelevant given that Hasbro cannot establish irreparable harm.  *See Herb Reed*, 736 F.3d at 1251 (declining to address the public interest factor where the plaintiff failed to supply evidence of irreparable harm).

**D.     Plaintiffs' Claim for Declaratory Relief that Sequel Rights Reverted Is Rejected**

225. Hasbro's fifth claim seeks a declaration that Sweetpea's rights, granted under paragraph 6 of the First Amendment, to produce and exploit theatrical and non-theatrical motion picture sequels, prequels and remakes based upon the "Picture," the "Picture Creations" and the "Property" (as those terms are defined in the License Agreement) (the "Sequel Rights"), reverted to Hasbro.  Hasbro contends that under the License Agreement, Sweetpea was required to timely exercise its sequel rights by meeting three conditions: (1) commencing principal photography of a "theatrical" or "non-theatrical" (not a television) motion picture; (2) paying the applicable theatrical or non-theatrical (not television) rights payment prior to the commencement of principal photography; and (3) producing a "sequel," "prequel" or "remake" "based upon the Picture, the Picture Creations and the Property," as those terms are defined in the License Agreement.  (Dkt. No. 131 at 7.)  Hasbro further contends that Sweetpea failed to meet those conditions, and therefore Sweetpea's sequel rights automatically reverted to Hasbro.  (*Id.* at 8.)

226. For the reasons discussed below, the Court finds that Sweetpea's sequel rights did not revert to Hasbro because:  (a) Sweetpea could avoid reversion of its sequel rights by commencing principal photography of any type of motion picture

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

(including television); (b) payment of a theatrical or non-theatrical rights payment prior to commencement of principal photography was not a condition of Sweetpea maintaining its sequel rights; (c) a "sequel," as that term is used in the License Agreement, does not require a continuation of characters or storylines; (d) Sweetpea timely commenced principal photography of *D&D 3*, which was intended as a theatrical or non-theatrical motion picture; (e) *D&D 3* was not a made-for-television movie; and (f) *D&D 3* was a sequel based upon the Picture, the Picture Creations and the Property.

### 1.    The Elements of a Claim for Declaratory Relief

227. The elements of a claim for declaratory relief are:  (a) an actual and substantial controversy has arisen, and now exists, between Hasbro and Sweetpea concerning whether Sweetpea's Sequel Rights reverted to Hasbro; (b) Hasbro and Sweetpea have adverse legal interests; (c) the controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment; (d) the parties desire a judicial determination of the parties' respective rights and duties under the License Agreement, as amended; and (e) a judicial declaration is necessary and appropriate in order to set at rest the respective rights and obligations of the parties.  *See Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1222 (9th Cir. 1998).  Declaratory relief is appropriate where the judgment will "serve a useful purpose in clarifying and settling the legal relations in issue, and … will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *DeFeo v. Procter & Gamble Co.*, 831 F. Supp. 776, 778 (N.D. Cal. 1993) (quoting *Guerra v. Sutton*, 783 F.2d 1371, 1376 (9th Cir. 1986)).

228. There is a justiciable controversy between Hasbro and Sweetpea regarding the meaning of the License Agreement, and declaratory relief is appropriate because it will clarify and settle the parties' rights and obligations with respect to the License Agreement, and eliminate uncertainty, insecurity, and doubt as to the meaning of the License Agreement.

229. Under the applicable rules of contract interpretation and for the reasons explained below, Sweetpea is entitled to a judicial declaration that Sweetpea's Sequel Rights under the License Agreement have not reverted to Hasbro.

### 2.    The Applicable Rules of Contract Interpretation
#### a)    Discerning the Parties' Intent

230. The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties at the time of contracting.  *See* Cal. Civ. Code § 1636; *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998).  A court must determine what the parties meant by the words used, in light of all the circumstances.  *See Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33, 38 (1968) ("*PG&E*"); Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"); *id.* § 1639 ("the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title.").

#### b)    The Role of Extrinsic Evidence

231. The court first provisionally considers relevant extrinsic evidence in order to determine whether the words of a contract are reasonably susceptible to a particular meaning urged by either party, before actually admitting any such evidence to assist with interpretation.  *See PG&E*, 69 Cal.2d at 39–40; *Bank of the West v. Super. Ct.*, 2 Cal.4th 1254, 1265 (1992) ("language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract*.").  If the court concludes that the words are reasonably susceptible to more than one interpretation, it admits extrinsic evidence to interpret those words.  *See PG&E*, 69 Cal.2d at 39.

232. Admissible extrinsic evidence includes:  (1) the circumstances, under which it was made and the matter to which it relates, *see* Cal. Civ. Code § 1647; (2) the parties' statements during negotiations and communicated intent, *see Heston v.*

*Farmers Ins. Group*, 160 Cal.App.3d 402, 412 (1984); (3) the parties' "course of dealing" and "course of performance," including pre-dispute conduct, *see* Cal. Code Civ. Proc. § 1856(c); *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal.4th 375, 393 (2008)); and (4) usage of trade, *see Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.*, 205 Cal. App. 3d 442, 451 (1988) ("industry custom binds those engaged in the business even though there is no specific proof that the particular party to the litigation knew of the custom") (citation omitted).

### c)  Limitations on the Use of Extrinsic Evidence

233. The use of extrinsic evidence is limited.  First, a party's undisclosed intent or understanding is not relevant.  *See Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003); *Winet v. Price*, 4 Cal. App. 4th 1159, 1166 (1992).

234. Second, extrinsic evidence and other rules of construction may be used to interpret the words chosen, but not to add, subtract, or vary the words used in the written agreement.  *See Bionghi v. Metro. Water Dist. of S. Cal.*, 70 Cal. App. 4th 1358, 1364–65 (1999) (party cannot "smuggle extrinsic evidence to add a term to an integrated contract"); *Levi Strauss & Co. v. Aetna Cas. & Surety Co.*, 184 Cal. App. 3d 1479, 1486 (1986) ("[t]he court does not have the power to create for the parties a contract which they did not make, and it cannot insert in the contract language which one of the parties now wishes were there.") (citation omitted).

235. Third, a written agreement "supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument," Cal. Civ. Code § 1625, and those terms "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement."  Cal. Code Civ. Proc. § 1856(a).

236. Fourth, the terms of a writing may be "explained or supplemented by extrinsic evidence of consistent additional terms," but not if "the writing is intended

1  also as a complete and exclusive statement of the terms of the agreement."  Cal. Code

2  Civ. Proc. § 1856(b).

3            **3.**        **The License Agreement Does Not Require Sweetpea to**

                  **Commence Principle Photography on a Theatrical or Non-**

4                    **Theatrical Motion Picture to Avoid Reversion of Its Sequel**

5                    **Rights**

6       237. The Court finds that Paragraph 6 of the First Amendment did not require

7  Sweetpea to commence principal photography of a theatrical or non-theatrical motion

8  picture within the five/seven year reversionary period to avoid reversion.  Instead, to

9  avoid reversion, Sweetpea was required to commence principal photography on any

10  motion picture sequel, prequel or remake, including a television motion picture.

11       238. The plain language of the First Amendment is consistent with this

12  interpretation.  Nothing in Paragraph 6 of the First Amendment requires that a sequel,

13  prequel or remake must be a theatrical or non-theatrical production.  Instead,

14  Paragraph 6 merely requires Sweetpea to produce a sequel or remake within "the

15  earlier of (i) five (5) years from the initial U.S. release or (ii) seven (7) years from the

16  director's cut of the immediately prior picture."  (Tr. Ex. 37 ¶ 6.)

17       239. If the parties intended to limit Sweetpea's sequel rights to theatrical and

18  non-theatrical motion pictures, they could have inserted the words "theatrical or non-

19  theatrical" before the word "sequel," but the words "theatrical" and "non-theatrical"

20  do not appear anywhere in Paragraph 6.

21       240. Furthermore, the original License Agreement permitted Sweetpea to

22  release a Picture and sequels thereto in all media, including on television.  Paragraph

23  1(d) of the License Agreement defines a "Picture" as "One (1) theatrical or television

24  motion picture based in whole or in part on the Property…"  Paragraph 2(a) of the

25  License Agreement grants Sweetpea the right to make, subject to the rights of First

26  Negotiation and Last Refusal, "remakes of and sequels to any motion picture or

27  television or video gram or live stage production" Sweetpea may produce.  *See* Cal.

28  Civ. Code §1641 ("The whole of a contract is to be taken together, so as to give effect

1  to every part, if reasonably practicable, each clause helping to interpret the other").
2  The plain meaning of Paragraph 6 of the First Amendment is consistent with the
3  entirety of the parties' agreement.

4  241. The history of the parties' negotiation of the First Amendment also
5  supports the Court's interpretation that Sweetpea could avoid reversion of its sequel
6  rights by commencing principal photography of a television motion picture.  Solomon
7  and his attorney, Barnes, testified that TSR and Sweetpea agreed during their 1998
8  mediation that Sweetpea would be permitted to exploit its sequel rights by producing
9  television motion pictures, and that Sweetpea's proposal in this regard was met with
10 little, if any pushback by TSR.  None of the drafts of the First Amendment, or the
11 executed version, provide that a sequel, prequel or remake that is exploited only on
12 television will cause reversion.

13 242. The course of conduct of the parties following execution of the First
14 Amendment further supports the conclusion that the parties agreed that Sweetpea
15 could avoid reversion of its sequel rights by commencing principle photography of a
16 television motion picture.  A court may also consider the post-contracting, pre-dispute
17 conduct and statements of the parties to aid in the interpretation of disputed words or
18 phrases in a contract.  *See City of Hope Nat'l Med. Ctr.*, 43 Cal. 4th at 393.

19 243. The parties exchanged draft long-form amendments in April 1998 that
20 allowed Sweetpea to avoid reversions by commencing principal photography of a
21 television motion picture sequel, and Hasbro's counsel did not object to this
22 provision.  (Tr. Exs. 48 – 57.)

23 244. Sweetpea's interpretation is also consistent with industry custom and
24 practice.  Evidence of industry "custom or standard practice is admissible to interpret
25 the terms of a contract," *Midwest TV*, 205 Cal. App. 3d at 451, as contracts "are to be
26 read on the assumption that . . . the usages of trade were taken for granted when the
27 document was phrased."  Cal. Code Civ. Proc. § 1856(b), Law Rev. Comm.

28

1  Comment.  Industry usage becomes "an element of the meaning of the words used"

2  unless it is "carefully negated."  *Id.*

3  245. Pursuant to the custom and practice in the entertainment industry, when

4  parties wish to limit the media in which in which intellectual property may be

5  exploited by a licensee, the parties will include language in the relevant agreement

6  that explicitly restricts the grant of rights to the licensee to particular media.  (Dekom

7  Decl. ¶¶ 26–40.)  Here, consistent with industry custom and practice, the parties did

8  not include any language in Paragraph 6 that restricts Sweetpea's grant of right to

9  particular media, or provides that if Sweetpea produces a television sequel,

10  Sweetpea's sequel rights are subject to reversion.

11  246. Hasbro's interpretation of Paragraph 6 would require the Court to add to or

12  modify the express terms of the First Amendment.  Hasbro's contention that the

13  parties agreed that Sweetpea's rights would be divided into three separate "buckets"

14  with three separate reversionary clocks, such that production of a television sequel

15  would not stop the reversionary clock for theatrical or non-theatrical sequels, is

16  unsupported by the evidence.  Hasbro asks the Court to construe the First Amendment

17  as it if contained language in Paragraph 6 that states that a sequel or remake must be

18  theatrical or non-theatrical.  Paragraph 6 contains no such language.  Hasbro's

19  interpretation is contrary to the settled principles of contract interpretation, and is

20  rejected.  *See Wagner v. Columbia Pictures Indus., Inc.*, 146 Cal. App. 4th 586, 592

21  (2007) (rejecting proffered contract interpretation where it was unsupported by the

22  agreements in plain language).

### 4.  Payment of a Theatrical or Non-Theatrical Royalty Prior to Commencement of Principal Photography Is Not a Condition of Sweetpea Maintaining its Sequel Rights

25  247. The Court finds that payment of a theatrical or non-theatrical royalty prior

26  to commencement of a principal photography is not a condition precedent Sweetpea

27  maintaining its sequel rights.  Paragraph 6 of the First Amendment is silent on when

28

royalty payments for sequels or remakes must be made.  Paragraphs 7, 8, 9 and 11 of the First Amendment, which contain royalty payment schedules, are also silent on when royalty payments for sequels or remakes must be made.  There is no provision of the First Amendment that states that royalty payments must be made by a certain date.  If the parties had intended for a deadline to apply to royalty payments for sequels and remakes, they could have included an express provision in the First Amendment that so provided.  The parties, however, did not include such a provision in the First Amendment.

248. It is instructive that the First Amendment *does* provide a deadline for payment of a license fee for the original Picture.  Paragraph 3 of the First Amendment provides:  "Sweetpea shall pay TSR 2% of the budget defined in Paragraph 5(a) of the Agreement *on or before resumption of principal photography* less the $350,000 license fee already paid."  (Tr. Ex.  37–0001 [¶ 3] (emphasis added).)  Paragraph 5(a) of the License Agreement also contains an express deadline for payment of a royalty for the original Picture requiring the applicable license fee be payable upon exercise of the option and the remainder, if any, … shall be payable *upon commencement of principal photography* of the Picture produced hereunder."  (Tr. Ex.  12–0029 [¶ 5(a)] (emphasis added).)  The lack of an express deadline for royalty payments for sequels and remakes, coupled with the express deadlines for payment of the royalty for the original Picture, establishes that the parties did not agree that royalty payments for sequels and remakes would be due no later than commencement of principal photography, as Hasbro contends.

249.  The history of the parties' negotiations further supports the conclusion that TSR and Sweetpea never agreed that royalty payments for sequels or remakes had to be made on or before commencement of principal photography.  Barnes testified that he has no recollection of the parties agreeing to such a deadline during negotiations.  (Barnes Declaration ¶ 31.)

250. Hasbro's conduct post-contract is also consistent with an understanding that the First Amendment does not require Sweetpea to make a royalty payment on or before principal photography of a sequel or remake.  Hasbro does not contest that *D&D 2* is a sequel to *D&D*.  For *D&D 2*, Hasbro specifically bargained for a provision in its agreement with Ismir requiring Ismir to pay a royalty on or before commencement of principal photography.  If Hasbro believed that the First Amendment required by its own terms payment of a royalty for a sequel or remake no later than commencement of principal photography, it would have been unnecessary for Hasbro to demand that Ismir agree to that additional term.  The fact that Hasbro specifically bargained for a deadline for a royalty payment for a sequel supports the conclusion that both parties understood that the First Amendment did not impose a deadline for a royalty payment for a sequel or remake.

251. Finally, custom and practice in the industry, especially with respect to independent film production, is consistent with not requiring royalty payments to be made on or before commencement of principal photography, unless specifically bargained for and agreed to.  As Dekom testified, pursuant to custom and practice in the independent film production industry, independent film producers typically attempt to pay as little up front as possible and will typically "true up" the rights payment as soon as they know what the primary medium of exploitation will be.  Similarly, when no deadline for a royalty payment is specified, custom and practice in the industry is that unless there is an express provision that failure to make a royalty payment, such a failure will not result in reversion of rights.  (Dekom ¶¶ 59–66; Tr. Ex. 37.)

### 5. A "Sequel," as that Term Is Used in the License Agreement, Does Not Require a Continuation of Characters or Storylines

252. Hasbro contends that the term "sequel," as used in the First Amendment, means a subsequent motion picture that contains characters, storylines, settings or events from the prior film.  Sweetpea disputes Hasbro's definition and contends that a

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  "sequel" means a subsequent movie, television program, or other production that is

2  linked to a prior production in the minds of consumers by taking place in the same

3  "world" or "universe" as the prior production.

4      253. Paragraph 6 of the First Amendment provides in relevant part that

5  Sweetpea has "the rights to make one or more sequels (which shall be defined to

6  include prequels) or remakes based on the Picture, the Picture Creations and the

7  Property." (Tr. Ex. 37–0001 [¶ 6].) Other than the specification that the term

8  "sequel" includes prequels, "sequel" is not defined in the First Amendment or the

9  License Agreement. The plain language of the License Amendment, therefore, does

10 not resolve the ambiguity created between the parties' competing interpretation of the

11 term "sequel." The Court thus turns to extrinsic evidence to resolve the ambiguity.

12     254. Dekom testified persuasively that in the entertainment industry, the term

13 "sequel" means a subsequent movie, television program, or other production that is

14 linked to a prior production in the minds of consumers by taking place in the same

15 "world" or "universe" as the prior production. As long as the productions are based

16 on the same set of rules, contain the same classes of characters within those rules, and

17 adhere to consumer expectations of what would be a valid sequel, it is not necessary

18 to create a contiguous storyline or to utilize one or more of the same characters

19 therefrom or the same venues from earlier productions. This is particularly true

20 where the title refers to the underlying intellectual property itself. Dekom provides

21 numerous examples of sequels that do not have any characters or storylines in

22 common with the original pictures. (Dekom Decl. ¶¶ 9–22.) While Hasbro's expert

23 Roger Toll opines that a sequel must contain the same principal characters as the prior

24 underlying picture, appearing in a new story that may follow, but is substantially

25 different from, the story contained in the prior picture. As Dekom points out,

26 however, Toll's definition of sequel is outdated. (Dekom Decl. ¶¶ 57, 58.)

27     255. The source material upon which the *D&D* films were based is relevant to

28 consideration of the meaning of the term "sequel." The concept of a "returning

1  character" is incongruous with the Dungeons & Dragons game, which does not

2  involve specific characters.  Instead Dungeons & Dragons players invent their own

3  characters, using established character classes, and develop their own storylines.  The

4  "Dungeons & Dragons" title creates an expectation among moviegoers that a film will

5  involve certain classes of characters on an adventure for a treasure or magical item

6  and will operate within the rules and parameters of the Dungeons & Dragons

7  universe.  (Solomon Decl. ¶ 46; Dekom Decl. ¶¶ 22, 24, 25.)

8  256. Habro's conduct post-contract further supports the conclusion that both

9  parties to the First Amendment understood that a sequel would not require a

10  continuity of characters or storylines.  Hasbro was aware, before *D&D 3* aired on

11  Syfy, that the film would also be released on DVD.  Hasbro cooperated with Silver

12  Pictures on filming DVD extras for the DVD release of *D&D 3*.  Hasbro provided

13  detailed notes and approved the screenplay for *D&D 3*.  (Tr. Ex. 453.)  It was

14  therefore apparent to Hasbro before *D&D 3* was produced that the film would not

15  feature recurring characters or storylines.

16  257. The only non-theatrical motion pictures Sweetpea is permitted to produce

17  under the First Amendment are sequels and remakes.  (Tr. Ex.  37–0001 [¶ 6].)  If

18  Hasbro was aware that Silver Pictures was producing a non-theatrical motion picture

19  that was not a sequel or remake (and therefore exceed the scope of rights granted to

20  Sweetpea), one would expect Hasbro to complain that Silver Pictures was producing

21  an unauthorized motion picture using Dungeons & Dragons property.  Instead, Hasbro

22  blessed *D&D 3*, and worked with Silver Pictures to approve and promote the film.

23  Hasbro's behavior is consistent with the parties' understanding that a sequel does not

24  require a continuity of characters or storylines.

25  **6.     Sweetpea Timely Commenced Principal Photography of a
         Theatrical or Non-Theatrical Production**

26

27  258. Although the Court has ruled that Sweetpea was not required to produce a

28  theatrical or non-theatrical sequel or remake to avoid reversion of its sequel rights, the

1  Court also finds that even if Sweetpea were required to commence principal
2  photography of a theatrical or non-theatrical motion picture on or before October 8,
3  2010, five years after the initial U.S. release of *D&D 2*, Sweetpea did so by
4  commencing principal photography on *D&D 3* on October 1, 2010.  (Admitted Fact
5  28.)

6      259. In determining whether *D&D 3* was a theatrical or non-theatrical
7  production, the issue of the parties' intent is of primary importance.  First, Paragraph
8  6 requires only that Sweetpea commence principal photography of a sequel or remake
9  within five years from the initial U.S. release or seven years from final director's cut
10  of the immediately prior picture.  (Trial. Ex. 37–0001 [¶ 6].)  The parties agreed that,
11  so long as Sweetpea commenced principal photography of a sequel or remake before
12  the applicable deadline, its rights would not revert.  Accordingly, Paragraph 6, as
13  interpreted by the parties, looks to the beginning of production of a sequel or remake,
14  not how that sequel or remake is ultimately released.

15      260. Nor does the First Amendment require that a sequel or remake actually be
16  released to avoid reversion of Sweetpea's sequel rights.  As Solomon testified, the
17  inclusion of the seven-year period from final director's cut in Paragraph 6 was
18  intended to address the circumstance where a sequel or remake was not actually
19  released, but a director's cut was completed.

20      261. Nor must a sequel or remake be released in the United States.  The License
21  Agreement makes it clear that the parties contemplated that Sweetpea might release
22  the Picture internationally.  In Paragraph 13(a) of the License Agreement, there is a
23  list of pre-approved assignees of Sweetpea's rights, which includes both U.S. and
24  "Foreign/International" distributors and production companies.  (Tr. Ex. 12
25  ¶¶ 13(a)(ii) and 2(a)(v) (listing among others, Canal Plus, Fujisankei Entertainment,
26  Shochiku Films and Bertolusconni).)  Consistent with the custom and practice in the
27  entertainment industry, by including foreign distributors and production companies in
28  the list of pre-approved assignees evidences the parties' awareness of—and

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  agreement to—a release outside of the United States.  (Dekom Decl. ¶ 46.)  Barnes

2  likewise has no recollection of any proposal by TSR, or any agreement by the parties,

3  that would have required Sweetpea to release a sequel or remake in the United States

4  to avoid reversion.  (Barnes Decl. ¶ 30.)

5       262. In addition, industry custom and practice dictates that a motion picture

6  should be labeled theatrical, non-theatrical, or television by evaluating the parties'

7  intent, especially in the context of an independent production.  It is not unusual for a

8  movie never to attain U.S. theatrical release.  (Dekom Decl. ¶¶ 46, 47.)

9       263. The goal of independent film producers, like Richards, is to maximize a

10  film's profits by exploiting the film in whatever media will be the most profitable.

11  For that reason, Richards' practice is to make a film with the intent that it be

12  distributed theatrically or on home video, although it is often impossible to know how

13  the film will be released until it is completed.  )

14       264. The production of *D&D 3* was consistent with a theatrical or non-theatrical

15  motion picture.  Silver Pictures spent approximately $2.5 million on *D&D 3*.  A

16  budget of $2.5 million is reasonable for a movie that is intended to be released non-

17  theatrically and on television, but it is not consistent with a motion picture that is

18  intended to be released solely on television.  The production was characterized in the

19  contract between the International Alliance of Theatrical Stage Employees ("IATSE")

20  and by Solomon's company, After Dark Films, as a "Low Budget Theatrical" motion

21  picture.  *D&D 3* applied for and received a PG–13 rating from the MPAA, which only

22  applies to theatrical motion pictures, not television programming.  The completion

23  bond for *D&D 3* required that the film "qualify for an MPAA rating of not more

24  restrictive than 'R'…"  (Tr. Ex.  148–0004 (¶ 9(b)).)  The final version of *D&D 3*

25  contained numerous scenes with strong sexual content and nudity, which were filmed,

26  edited, and left in the final cut because Silver Pictures intended to release the film

27  non-theatrically and theatrically, if possible.  (Richards Depo ¶ 46.)  Finally, even

28  before there was a license in place to air *D&D 3* on the Syfy Channel, Silver Pictures

923077

1   had presold rights to release the film on DVD outside the U.S.  Silver Pictures

2   explored releasing *D&D 3* through SVOD (subscription video on demand).  (Tr. Ex.

3   195.)  *D&D 3* was released on DVD in the U.K. on August 9, 2012, and became

4   available for purchase on Amazon on October 1, 2012, before *D&D 3* aired on Syfy.

5   (Tr. Ex.  328, 525.)

6       265. Hasbro points to Richards' pre-production payment of $20,000 royalty,

7   which Hasbro describes as a television royalty, as evidence *D&D 3* was intended as a

8   television motion picture.  The court, however, places little weight on this fact.  It was

9   Sweetpea's intent to make a non-theatrical royalty payment, and Sweetpea sent

10  $61,000—more than one-half of the non-theatrical royalty payment under Paragraph 9

11  of the First Amendment—to Richards.  (Tr. Exs.  125, 130.)

12      266. Richards, who did not negotiate the License Agreement or its

13  amendments, is not a party to the Agreement or its amendments, and is not a lawyer,

14  decided on his own to make $20,000 payment.

15      267. Richards did not discuss this payment with Solomon and did not consult or

16  counsel with anyone else before the payment was made.  When Richards paid the

17  $20,000, Silver Pictures and Sweetpea were under enormous financial pressures and

18  time constraints.  Production of *D&D 3* had just begun.  Silver Pictures was

19  struggling to finance and distribute the film.  There were numerous production details

20  that commanded Richards' attention.  Richards believed it was reasonably likely that

21  at a minimum *D&D 3* would be released on television, and thus he would owe at least

22  the minimum television royalty.  Richards was also under the correct impression that

23  there was a deadline by which he was required to make a royalty payment to Hasbro,

24  and Hasbro had not requested that a royalty payment be made by any date certain.

25  Richards thus believed that when *D&D 3* was later released non-theatrically or

26  theatrically, or if Hasbro requested additional royalty payments, he could make that

27  payment at a later date.  (Tr. Ex.  131.)

28

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

923077

268. Hasbro had agreed on a lesser payment for the time being and that Mr. Richards would top it up later and that Hasbro would work with Silver Pictures and Sweetpea on the payment issue.

269. Richards' conduct is consistent with the custom and practice in the film industry. It is also consistent with custom and practice of independent film productions. Moreover, it is consistent with custom and practice in independent film productions to rely a notice and cure provision, such as Paragraph 19(b) of the License Agreement, to permit independent producers to make such payment decisions without the fear of losing any rights without first being given an opportunity to cure. (Dekom Decl. ¶ 54.) Richard's payment of a $20,000 royalty is thus insufficient to transform *D&D 3* from a theatrical or non-theatrical production into a television production.

### 7.    D&D 3 Was Not a Made-for-TV Movie

270. Hasbro places undue weight on the fact that Syfy marketed *D&D 3* as an original Syfy movie, and attempts to describe *D&D 3* as a made-for-TV movie. Although Silver Pictures and Sweetpea had discussions with Syfy to co-produce *D&D 3* as a made-for-TV movie, Syfy ultimately passed on *D&D 3* as a made-for-TV movie. (Tr. Exs. 107, 108.)

271. Silver Pictures then developed *D&D 3* independently, with the intent that it be exploited in whatever medium—theatrical, non-theatrical and/or television— would provide the greatest exposure for the Dungeons & Dragons property and would be most profitable.

272. Although Syfy ultimately acquired a license to exhibit *D&D 3,* that license did not transform *D&D 3* into a made-for-TV movie. Syfy did not provide any financing for the film. Syfy did not approve the director. Syfy did not approve the script. Syfy did not approve the cast. Syfy did not approve locations. Syfy did not approve any budget or set a deadline by which the film would have to be completed. While *D&D 3* may have exhibited on Syfy, and marketed as a Syfy Original Movie, it

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  was intended for a theatrical or non-theatrical exhibition, and was thus not a television

2  production.

### 8.  *D&D 3* Was a Sequel Based on the Picture, Picture Creations and the Property

273. The Court finds that *D&D 3* was a sequel to *D&D* and *D&D 2*.  In Paragraph 6 of the First Amendment, TSR granted to Sweetpea "the rights to make one or more sequels (which shall be defined to include prequels) or remakes based on the Picture, the Picture Creations and the Property."  (Tr. Ex.  37–0001 [¶ 6].) "Picture Creations" is defined in the License Agreement as in relevant part:  "The characters, story, plotlines, *themes, or other elements* created … for the Picture or versions of the Picture … that were created in whole or in part by Licensee and/or a third party contracted by Licensee… .  (Tr. Ex. 12–0002 [¶ 2(e)] (emphasis added).) By including the phrase "based on the Picture, the Picture Creations and the Property," the parties intended that Sweetpea could base sequels on the Picture and Picture Creations by using any of the themes or elements from *D&D* in subsequent productions.  The parties do not dispute that *D&D 3* is based on the Property, and Sweetpea has presented ample evidence of elements that are contained in *D&D, D&D 2,* and *D&D 3*, such that *D&D 3* is based on both the Picture and Picture Creations. (Solomon Decl. ¶¶ 52–55.)

274. Hasbro has failed to meet its burden to establish that Sweetpea's right to produce Dungeons & Dragons sequels and remakes reverted to Hasbro.  The Court therefore rejects Hasbro's claim for declaratory relief.

### E.  Sweetpea's Affirmative Defense of Waiver Is Granted

275. Sweetpea's first affirmative defense is that Hasbro waived its right to claim that *D&D 2* and *D&D 3* were not sequels, prequels or remakes.  "California courts will find waiver when a party intentionally relinquishes a right, or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished."  *Intel Corp. v. Hartford Acc.*

1  &  *Indem. Co.*, 952 F.2d 1551, 1559 (9th Cir. 1991) (citing *Rheem Mfg Co. v. United*

2  *States*, 57 Cal.2d 621 (1962)).

3  276. Prior to and during the production of *D&D 2* and *D&D 3*, Hasbro was

4  fully aware of the factual bases for its current claim that those films were not sequels,

5  prequels or remakes of *D&D*.  Nonetheless, Hasbro freely and knowingly allowed

6  Sweetpea to proceed with the production and release of *D&D 2* and *D&D 3*.  Indeed,

7  Hasbro collaborated closely with Sweetpea in the production of all three *D&D* films,

8  including approving scripts and certain footage.

9  277. Despite Hasbro's contemporaneous knowledge of the material facts

10  underlying its current reversion argument, there is no evidence that Hasbro ever

11  communicated its current position to Sweetpea prior to its April 30, 2013 demand

12  letter.  Rather than raising the issue in 2005 (when *D&D 2* was produced and

13  released) or from 2010 through 2012 (when *D&D 3* was produced and eventually

14  released), Hasbro not only remained silent on this issue but *assisted* Sweetpea's

15  production efforts.  Because from 2005 through 2012 Hasbro's conduct was—at a

16  minimum—wholly inconsistent with its current attempt to enforce its intellectual

17  property rights, Hasbro waived its ability to enforce those rights against Sweetpea.

18  **F.    Sweetpea's Affirmative Defense of Estoppel Is Granted**

19  278. Sweetpea's second affirmative defense is that Hasbro is equitably estopped

20  from claiming that *D&D 2* and *D&D 3* were not sequels, prequels or remakes.

21  "Generally speaking, four elements must be present in order to apply the doctrine of

22  equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he

23  must intend that his conduct shall be acted upon, or must so act that the party

24  asserting the estoppel had a right to believe it was so intended; (3) the other party

25  must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his

26  injury."  *City of Long Beach v. Mansell*, 3 Cal.3d 462, 489 (1970)); *Hadady Corp. v.*

27  *Dean Witter Reynolds, Inc.*, 739 F.Supp. 1392, 1399 (C.D. Cal. 1990).

28

279. Just as Hasbro waived its right to enforce its reversion claim, equitable principles estop it from doing so.  *See Intel Corp.*, 952 F.2d at 1559 (9th Cir. 1991) ("The doctrine of waiver looks to 'the act, or the consequences of the act, of one side only,' in contrast to the doctrine of estoppel, which 'is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts.'") (quoting 30 Cal.Jur.3d *Estoppel and Waiver* 2 (1987)).  Equity prevents Hasbro from suing Sweetpea for conduct that Hasbro was aware of and encouraged for years.  *See A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1044 (Fed. Cir. 1992) ("The length of the delay [by the party seeking to enforce its rights] also favors drawing the inference [that such party had abandoned its claims] because the longer the delay, the stronger the inference becomes.").

280. From 2005 through 2012, Hasbro (1) was fully apprised of the materials facts underlying its reversion claim; (2) acted in a manner which encouraged Sweetpea to produce and release *D&D 2* and *D&D 3*; (3) never articulated its reversion argument to Sweetpea; and (4) caused Sweetpea to detrimentally rely upon Hasbro's conduct.  *See City of Long Beach*, 3 Cal.3d at 489.  Accordingly, Hasbro is estopped from seeking to hold Sweetpea liable for actions that Hasbro's own conduct induced.

## G.    Sweetpea's Affirmative Defense of Laches Is Granted

281. Sweetpea's third affirmative defense is that Hasbro's claims are barred by the defense of laches.  Sweetpea argues that Hasbro unreasonably delayed in asserting its reversionary rights, and that, as a result, Sweetpea was prejudiced.

282. "Laches is an equitable defense that prevents a plaintiff, who 'with full knowledge  of the facts, acquiesces in a transaction and sleeps upon his rights.'" *Danjaq LLC*, 263 F.3d 942, 950-51 (9th Cir. 2001) (quoting *S. Pac. Co. v. Bogert*, 250 U.S. 483, 500 (1919) (McReynolds, J., dissenting)).  "To demonstrate laches, the 'defendant must prove both an unreasonable delay by the plaintiff and prejudice to

923077

1  itself.'" *Id.* at 951 (quoting *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th

2  Cir. 2000)).

3      283. "Generally speaking, the relevant delay is the period from when the

4  plaintiff knew (or should have known) of the allegedly infringing conduct, until the

5  initiation of the lawsuit in which the defendant seeks to counterpose the laches

6  defense." *Id.* at 952 (citing *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1036 (9th

7  Cir. 2000); *Jackson v. Axton*, 25 F.3d 884, 889 (9th Cir. 1994)).  If, as Hasbro claims

8  the reversionary clock began with the October 2005 release of *D&D 2*, Hasbro waited

9  two-and-a-half years from the time when it claims its rights reverted (October 8,

10  2010) to the filing of this lawsuit (May 13, 2013).  Such a delay is sufficient to

11  establish laches.  *See New Era Publ'ns Int'l v. Henry Holt & Co.*, 873 F.2d 576, 584-

12  85 (2d Cir. 1989) (holding that "unconscionable" two-year delay supported laches and

13  denial of injunction arising from copyright claims).

14      284. Hasbro's delay was unreasonable.  "In determining reasonableness, courts

15  look to the cause of the delay." *Danjaq LLC*, 263 F.3d at 954.  Hasbro has no

16  credible justification for its delay in filing this suit.  Hasbro fails to justify its dilatory

17  approach to filing this lawsuit.  At the same time Hasbro was sitting on its rights vis-

18  à-vis Sweetpea, it was negotiating with Universal and WB regarding a future *D&D*

19  film.  Given the centrality of the ownership of the intellectual property rights in *D&D*

20  during those negotiations, Hasbro's failure to utter a single word to Sweetpea (or

21  anyone else) about its reversion claim during this period was inexcusable.

22      285. While "laches requires prejudice," *Couveau*, 218 F.3d at 1084, the

23  prejudice here is glaring:  due to Hasbro's decision not to enforce its reversionary

24  rights beginning in 2005, Sweetpea expended tremendous human and financial

25  resources to produce *D&D 3*.  Hasbro's decision not to raise the reversion claim in

26  2010, 2011 or 2012 led to Sweetpea producing *D&D 3* from October 2010 through

27  2012 and releasing the film in November 2012.  Moreover, Sweetpea then negotiated

28  and reached an agreement-in-principle with WB regarding a future *D&D* project in

mid-April 2013.  None of the foregoing would have been necessary had Hasbro timely raised its claims.  This is paradigmatic prejudice.  *See Danjaq LLC*, 263 F.3d at 955 ("A defendant may also demonstrate prejudice by showing that it took actions or suffered consequences that it would not have, had the plaintiff brought suit promptly.") (citing cases); *Jackson*, 25 F.3d at 889 ("Here, Appellees have shown that circumstances have changed in a way that would not have occurred had [Plaintiff] sued earlier."); *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 831 F.Supp. 202, 220 (D. Mass. 1993) *rev'd*, 49 F.3d 807 (1st Cir. 1995) *aff'd*, 516 U.S. 233 (1996) (noting that one form of prejudice is "continuing investments and outlays by the alleged infringer in connection with the operation of its business").

### H.    Sweetpea's Counterclaim for Declaratory Relief Is Granted

#### 1.    Sweetpea Has the Sole, Exclusive Right to Make Sequels to and Remakes of *D&D*

286. As discussed above, the Court has determined that Sweetpea's sequel rights did not revert to Hasbro.  Accordingly, Sweetpea maintains the sole, exclusive right to make sequels and remakes of *D&D*.

#### 2.    Sweetpea Has the Right of First Negotiation/Last Refusal with Respect to the Universal Film Project

287. Sweetpea also seeks a declaration that its Right of First Negotiation/Last Refusal applies to any sequel or remake Hasbro intends to make with a third party, including the Universal Film Project.  Paragraph 2(k) of the License Agreement provides Sweetpea with a right of Right of First Negotiation/Last Refusal with respect to any sequel or remake Hasbro intends to make with a third party.  (Tr. Ex.  12–0008 to 12–0010 [¶ 2(k)].)  Hasbro contends that when Sweetpea and TSR entered into the First Amendment, because Sweetpea was granted automatic sequel rights, Paragraph 2(k) was effectively superseded.

288. The License Agreement is not reasonably susceptible to Hasbro's interpretation.  The First Amendment makes no reference to Paragraph 2(k) of the

1  License Agreement, nor does it expressly indicate in any way that Paragraph 2(k)

2  does not remain operative.  (Tr. Ex.  37.)  The Second Amendment also does not

3  delete, or in any way make reference to, Paragraph 2(k).  (Barnes Decl.¶ 37; Tr. Ex.

4  73.)  Accordingly, the License Agreement, as amended, unambiguously provides that

5  Sweetpea has a Right of First Negotiation/Last Refusal with respect to any sequel or

6  remake Hasbro intends to make with a third party.

7  **3.  Hasbro is Prohibited from Using, and Prohibited from Permitting Any Third Party to Use, the Words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" as a Primary Title in a Live-Action Motion Picture**

8

9

10  289. According to the plain language of the First Amendment, Hasbro is not

11  permitted to "use or permit others to use the words 'Dungeons & Dragons' and/or

12  'Advanced Dungeons & Dragons' in the primary title of any live-action motion

13  picture or television program…"  (Trial Ex. 37–0003 [¶ 14(b)].)

14  290. Paragraph 15 of the First Amendment provides that Hasbro "will have the

15  right to use such words in the primary title(s) in productions" only if (a) "Sweetpea, in

16  its sole discretion, elects not to use such words in the title(s) at any point (and not due

17  to a breach by TSR of the Agreement)," or (b) "the first picture produced by

18  Sweetpea is not released in theaters in the United States prior to January 1, 2004…"

19  (Trial Ex. 37–0003 to 37–0004 [¶ 15].)

20  291. Neither of those two conditions apply.  Sweetpea has never elected not to

21  use such words, and the first picture, *D&D*, was released in theaters in the United

22  States on December 8, 2000.  (Admitted Fact 25.)

23  292. Hasbro is therefore prohibited from using or permitting others to use

24  "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" in the primary title

25  of a live-action motion picture.

26

27

28

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

### 4. Hasbro is Prohibited from Permitting Any Third Party to Use the Words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" as a Secondary Title in a Live-Action Motion Picture[8]

293. Paragraph 14(b) expressly states that Hasbro's predecessor-in-interest "*TSR* may use the words 'Dungeons & Dragons' and/or 'Advanced Dungeons & Dragons' in a secondary title in such productions," but the First Amendment does not provide that TSR may permit *others* to use those words in a secondary title.  (Trial Ex. 37–0003 [¶ 14(b), Second Clause] (emphasis added).)  It is clear from Paragraph 14, that the parties' omission of the phrase "permit others to use" from the second clause of Paragraph 14(b) was intentional because that phrase appears three times in Paragraph 14.  (Trial Ex. 37–0003 [¶¶ 14(a), 14(b), 14(c)].)

294. Because the First Amendment unambiguously precludes TSR from permitting others to use the words "Dungeons & Dragons" as a secondary title, no extrinsic evidence is necessary or admissible.  *See* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity").  Nevertheless, TSR's right to use the "Dungeons & Dragons" secondary title was heavily negotiated, and, as a result of those negotiations, the parties agreed that TSR—and only TSR—would retain "Dungeons & Dragons" secondary title rights.

### I. Plaintiffs' Affirmative Defense of Waiver Is Denied

295. Hasbro's first affirmative defense to Sweetpea's counterclaim is that Sweetpea waived its right to enforce Paragraph 2(k) of the License Agreement, which provides Sweetpea with a Right of First Negotiation/Last Refusal for future *D&D*

---

[8] Sweetpea recognizes that the Court has already addressed this issue in the context of Sweetpea's trademark claim against Hasbro.  Sweetpea raises the issue here because it has not been addressed in the context of Sweetpea's declaratory relief claim, and the issue is expressly preserved for trial in the Final Pretrial Conference Order at page 19, lines 19-25, and page 21, lines 3-8.

films.  Specifically, Hasbro alleges that Sweetpea waived that right when it executed the First Amendment in 1998.

296. The requirements to establish waiver are set forth above.  Hasbro's argument fails because Hasbro cannot point to any evidence that Sweetpea "intentionally relinquishe[d]" the Right of First Negotiation/Last Refusal or acted "so inconsistent[ly]" with its intent to enforce the right.  *Intel Corp.*, 952 F.2d at 1559.  There is no evidence of such a relinquishment in the First Amendment itself, the negotiations leading to the First Amendment, or Sweetpea's subsequent conduct.  Most notably, Sweetpea never agreed orally or in writing that Paragraph 2(k) of the License Agreement would be rescinded, superseded or deleted.  As a result, Hasbro has failed to establish waiver.

### J.      Plaintiffs' Affirmative Defense of Conditions Precedent Is Denied

297. Hasbro's second affirmative defense is based on two separate arguments relating to conditions precedent.  First, Hasbro argues that its obligation pursuant to Paragraph 2(k) of the License Agreement to provide Sweetpea with a Right of First Negotiation/Last Refusal for future *D&D* films did not arise in connection with the Universal project because Hasbro never intended to make a sequel or remake (*i.e.*, with Universal) based upon the property rights Hasbro granted to Sweetpea under the License Agreement.  Accordingly, Hasbro argues it was under no obligation to negotiate with Sweetpea prior to its negotiations with Universal in 2012.

298. "Under the law of contracts, parties may expressly agree that a right or duty is conditional upon the occurrence or nonoccurrence of an act or event." *Platt Pac., Inc. v. Andelson*, 6 Cal.4th 307, 313 (1993) (citations omitted).  "Thus, a condition precedent is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises." *Id.* (citations omitted).

299. Hasbro's argument fails because Hasbro has not met its burden to show that the Universal project does not arise out of the rights that Hasbro granted to

923077

1  Sweetpea in the License Agreement.  *See G. E. J. Corp. v. Uranium Aire, Inc.*, 311

2  F.2d 749, 752 (9th Cir. 1962) ("if appellants did not have all the information

3  necessary to enable them to prove that the condition precedent to their liability was

4  not satisfied, if such was the fact, they should have had it, and therefore the law

5  rightfully casts the burden of proof upon them") (citations omitted).  To the contrary,

6  the Universal project contains the words "Dungeons & Dragons" in the title.  Because

7  Hasbro's attempt to distance the Universal project from the rights it granted to

8  Sweetpea lacks evidentiary support, this affirmative defense must fail.

9       300. The second part of Hasbro's affirmative defense is the claim that, because

10  Hasbro or its licensee never exploited Hasbro's reserved rights under the License

11  Agreement (*e.g.*, by promoting or distributing a motion picture based on Hasbro's

12  reserved rights), Hasbro's duty to cooperate pursuant to Paragraphs 4(c) of the

13  License Agreement and 14(d) of the First Amendment never arose.

14       301. Here, too, Hasbro has failed to meet its burden to prove that the Universal

15  project does not exploit the terms "Dungeons & Dragons" or "Advanced Dungeons &

16  Dragons."  Accordingly, Hasbro has failed to establish that it may escape liability for

17  its failure to cooperate with Sweetpea regarding the exploitation of Hasbro's reserved

18  rights.

19  **K.    Plaintiffs' Affirmative Defense of Unclean Hands Is Denied**

20       302. Hasbro's third affirmative defense is that Sweetpea cannot be entitled to

21  declaratory or equitable relief because Sweetpea's conduct is tainted with

22  inequitableness and bad faith.

23       303. The unclean hands defense has two elements.  "To prevail, the defendant

24  must demonstrate that the plaintiff's conduct is inequitable and that the conduct

25  relates to the subject matter of its claims."  *Fuddruckers, Inc. v. Doc's B.R. Others,*

26  *Inc.*, 826 F.2d 837, 847 (9th Cir. 1987).

27       304. Hasbro cannot satisfy the "inequitable" prong of the unclean hands

28  defense.  Sweetpea's conduct in producing *D&D 2* and *D&D 3* comes nowhere near

1  the bad faith required for the Court to invoke this equitable defense.  *See, e.g.*,

2  *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933) (courts

3  "apply the maxim requiring clean hands only where some unconscionable act of one

4  coming for relief has immediate and necessary relation to the equity that he seeks in

5  respect of the matter in litigation").  As set forth above, Sweetpea had every right to

6  produce *D&D 2* and *D&D 3,* and acting consistent with its rights cannot as a matter of

7  law constitute bad faith.  Hasbro was fully aware of, participated in, and approved

8  Sweetpea's production of *D&D 2* and *D&D 3*.  Hasbro's complicity in Sweetpea's

9  relevant conduct—the making of the two films—is irreconcilable with its allegations

10 of bad faith.

### III.   CONCLUSION

12      1.   Hasbro's First Claim for Contributory Copyright Infringement is denied.

13      2.   Hasbro's Second, Third, and Fourth Claims for Trademark Infringement,

14 False Designation of Origin and Unfair Competition, and Dilution are Denied.

15      3.   Hasbro's Fifth Claim for Declaratory Relief that Sweetpea's sequel rights

16 reverted to Hasbro is denied.

17      4.    Sweetpea's Affirmative Defense of Waiver is granted.

18      5.   Sweetpea's Affirmative Defense of Estoppel is granted.

19      6.   Sweetpea's Affirmative Defense of Laches is granted.

20 Sweetpea's Counterclaim for Declaratory Relief is granted as follows: (a) Sweetpea

21 maintains the sole, exclusive right to make sequels and remakes of *D&D*; (b)

22 Sweetpea has the Right of First Negotiation/Last Refusal with respect to the Universal

23 Film Project; (c) Hasbro is prohibited from using, and prohibited from permitting any

24 third party to use, the words "Dungeons & Dragons" and/or "Advanced Dungeons &

25 Dragons" as a primary title in a live-action motion picture; and (d) Hasbro is

26 prohibited from permitting any third party to use the words "Dungeons & Dragons"

27 and/or "Advanced Dungeons & Dragons" as a secondary title in a live-action motion

28 picture.

1      7.   Hasbro's Affirmative Defense of Waiver is denied.

2      8.   Hasbro's Affirmative Defense of Conditions Precedent is denied.

3      9.   Hasbro's Affirmative Defense of Unclean Hands is denied.

4

5   DATED:  August 26, 2014       GLASER WEIL FINK
                           HOWARD AVCHEN & SHAPIRO LLP

6

7                       By:  */s/ G. Jill Basinger*

8                         PATRICIA L. GLASER
                      G. JILL BASINGER
                      DAVID SERGENIAN

9                         *Attorneys for Sweetpea*

10

11  DATED:  August 26, 2014

12                     CALDWELL LESLIE & PROCTOR, PC
                   CHRISTOPHER G. CALDWELL
                   LINDA M. BURROW

13

14

15                     By       */s/ Christopher G. Caldwell*

16                       CHRISTOPHER G. CALDWELL
                   Attorneys for Defendant

17                     SWEETPEA ENTERTAINMENT, INC.
                   and Defendant/Counter-Claimant

18                     SWEETPEA B.V.I. LTD.

19

20

21

22

23

24

25

26

27

28

SWEETPEA'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

923077