GLASER WEIL FINK HOWARD
  AVCHEN & SHAPIRO LLP
PATRICIA L. GLASER, State Bar No. 55668
  *pglaser@glaserweil.com*
G. JILL BASINGER, State Bar No. 195739
  *jbasinger@glaserweil.com*
DAVID SERGENIAN, State Bar No. 230174
  *dsergenian@glaserweil.com*
10250 Constellation Boulevard, 19th Floor
Los Angeles, CA  90067
Telephone:  (310) 553-3000
Facsimile:  (310)556-2920

CALDWELL LESLIE & PROCTOR, PC
CHRISTOPHER G. CALDWELL, State Bar No. 106790
  *caldwell@caldwell-leslie.com*
LINDA M. BURROW, State Bar No. 194668
  *burrow@caldwell-leslie.com*
725 South Figueroa Street, 31st Floor
Los Angeles, California 90017-5524
Telephone: (213) 629-9040
Facsimile: (213) 629-9022

Attorneys for Defendant SWEETPEA
ENTERTAINMENT, INC. and
Defendant/Counterclaimant
SWEETPEA B.V.I. LTD.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HASBRO, INC., a Rhode Island corporation; and WIZARDS OF THE COAST LLC, a Delaware limited liability company,<br><br>          Plaintiffs,<br><br>    vs.<br><br>SWEETPEA ENTERTAINMENT, INC., a Delaware corporation; and SWEETPEA B.V.I. LTD., a British Virgin Islands corporation,<br><br>          Defendants.<br><br>AND RELATED COUNTERCLAIM | Case No.: CV 13-03406-DMG (JCG)<br><br>[HON. DOLLY M. GEE]<br><br>**DEFENDANTS' MARK-UP OF PLAINTIFFS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Trial Date: September 16, 2014 |

# TABLE OF CONTENTS

Page

I. BACKGROUND ..................................................................................1

   A.    Claims by Plaintiffs Hasbro and WOTC..................................1

   B.    Counterclaims By Counter-Defendant SBL ............................2

   C.    Parties .......................................................................................3

   D.    Dungeons & Dragons ...............................................................4

   E.    *D&D* Trademarks and Copyrights ...........................................6

II. THE AGREEMENT ...........................................................................8

   A.    The License Agreement ............................................................8

      1.   Sweetpea Granted Right to Make One (1) Motion Picture....................8

      2.   Sweetpea Was Not Granted Rights to Make Subsequent Productions...............................................................9

      3.   TSR Reserved All Other Rights (Including *AD&D*) .............................9

      4.   Sweetpea Had No Obligation to Produce Any Motion Pictures..........10

      5.   Sweetpea Had Three Years to Commence Production of the Picture or Its Rights Under the License Agreement Were Subject to Reversion ...............................................10

   B.    Sweetpea Proposes Amending the License Agreement...........................10

   C.    WOTC Acquires TSR and Declines Sweetpea's Requested Amendment ............................................................11

   D.    TSR Elects to Terminate the License Agreement Based Upon Sweetpea's Failure to Timely Commence Principal Photography of the Picture.......................................11

   E.    The Parties' Initial Exchange of Settlement Proposals...........................12

      1.   TSR's January 30, 1998 Proposal......................................12

      2.   Sweetpea's February 9, 1998 Counter-Offer.......................................13

   F.    The 1998 Lawsuit....................................................................13

   G.    The March 12-13, 1998 Mediation .........................................14

   H.    Post-Mediation Negotiation Over Terms of First Amendment, Including Superseding the Right of First Negotiation/Last Refusal........................................15

I.    The First Amendment.................................................................17

    1.   Rights Category #1:  The Picture Rights .............................17

    2.   Rights Category #2:  The Sequel Rights..............................18

    3.   Rights Category #3:  The Television Rights.........................19

    4.   Amendments to Holdbacks on TSR's Reserved Rights .....................20

    5.   First Amendment Intended as "Short-Form".........................21

J.    The Parties Exchange Draft Long-Form Agreements ...........................22

    1.   Sweetpea's Long-Form Proposal .........................................22

    2.   TSR Rejects Sweetpea's Long-Form In Its Entirety ...........................23

    3.   TSR's Long-Form Proposal .................................................24

K.    The Second Amendment ....................................................25

III. THE FIRST AND SECOND D&D MOVIES ...............................................26

    A.   The First Movie: *Dungeons & Dragons* (2000) ...............................26

    B.   The Second Movie: *Wrath of the Dragon God* (2005) ...........................28

IV. THE THIRD D&D MOVIE: *THE BOOK OF VILE DARKNESS* ...................31

    A.   Sweetpea Appoints Grayson Its Agent For The Third Movie ................31

    B.   Grayson Proposes to "Start Fresh" with the Third Movie ......................33

    C.   Grayson Budgets And Pitches The Third Movie As A Syfy Original Movie.................................................................33

    D.   Grayson Writes The Treatment And Script For Exhibition Of The Third Movie On The Syfy Cable Television Network...............33

    E.   Sweetpea and Grayson "Scramble" To Make The Rights Payment To Hasbro Upon Commencement Of Principal Photography Of The Third Movie............................................35

    F.   Grayson Commences Principal Photography Using A Shooting Script Written In A Television Format And With The Intent to Distribute Movie On Syfy .......................................38

    G.   Sweetpea Exercises Its Television Rights By Wiring $20,000 To Hasbro And Telling Hasbro That The Payment Is Being Made For A 2-Hour Television Movie Of The Week ....................38

    H.   Sweetpea Learns That The Television Rights Payment Was Made to Hasbro But Makes No Attempt To Pay The Non-Theatrical Rights Payment............................................40

-ii-

I.    Grayson Repeatedly Tells Hasbro That The Third Movie Is A Made-For-TV Movie That Will Premiere On Syfy Followed By A DVD Release ..................................................41

J.    Hasbro Cooperates With Grayson To Ensure The Third Movie is Consistent With The D&D Brand And To Promote The Syfy Premiere and Subsequent DVD Release ..................42

K.    The WOTC Representatives Working With Grayson Had No Knowledge Of The Reversion Provisions Or Other Relevant Terms Of The Agreement ................................43

L.    Grayson Grants Syfy "World Premiere" Rights To The Third Movie ..........................................................43

M.    Hasbro Is Surprised By News That The Third Movie Released On DVD In The United Kingdom ........................44

N.    The Third Movie Premieres In The United States On The Syfy Cable Television Network And Is Not Further Distributed In The United States ................................44

O.    The Third Movie Contains No Characters Or Picture Creations From The First Movie ...............................45

V. THE WARNER BROS. D&D FILM PROJECT...............................47

A.    The Infringing *Chainmail* Script...............................47

B.    Sweetpea's Authorization to Develop the *Chainmail* Script and to Use the *D&D Trademark* as the Title of the WB Film Project ....48

C.    Sweetpea's Unauthorized Use of the *D&D* Trademark to Promote and Advertise the WB Film Project...........................52

D.    Irreparable Harm to Plaintiffs ................................53

VI. CUSTOM AND PRACTICE IN THE MOTION PICTURE INDUSTRY ......54

A.    Term Sheets and Deal Memos ................................54

B.    "Use It Or Lose It" Provisions in Limited License Agreements .............54

C.    Meaning of the Term "Sequel" ................................56

D.    Meaning Of The Term "Non-Theatrical" ...............................58

E.    Determining Whether a Motion Picture is Theatrical, Non-Theatrical or Television ................................59

F.    Payment of Rights Payment Upon Commencement of Principal Photography ................................60

G.    Rights of the Parties Upon Reversion ...............................60

DEFENDANTS' MARK-UP OF PLAINTIFFS' POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

H.    Effect of Right of First Negotiation/Last Refusal Clause Following Execution of First Amendment ..............................62

I.    Hasbro Had No Obligation To Provide Notice and Opportunity to Cure In Connection with the Reversion of the Sequel Rights ......................................................63

VII. ULTIMATE FINDINGS OF FACT ..................................................63

A.    Hasbro's Claim That the Sequel Rights Reverted ...................63

    1.    What Was Sweetpea Required To Do To Prevent The Sequel Rights From Reverting to Hasbro?.....................63

    2.    Sweetpea Failed to Do What Was Required to Prevent the Sequel Rights from Reverting to Hasbro ........................69

    3.    The Sequel Rights Reverted to Hasbro ...........................69

B.    The Parties' Respective Rights Upon Reversion .....................69

C.    Sweetpea's Claim That It Holds The Right Of First Negotiation/Last Refusal............................................................70

D.    Sweetpea's Claim That It Hasbro May Not License Others To Use The Secondary Title Rights .................................70

PROPOSED CONCLUSIONS OF LAW ........................................................70

I. PROPOSED CONCLUSIONS OF LAW RELATING TO JURISDICTION.....70

A.    Jurisdiction and Venue...............................................................70

B.    Declaratory Judgment ...............................................................71

C.    Claims Permitted at Trial .........................................................71

II. PROPOSED CONCLUSIONS OF LAW RELATING TO HASBRO'S CLAIM THAT THE SEQUEL RIGHTS REVERTED ...............72

A.    Contract Interpretation Under California Law...........................72

B.    The Reversion Of The Sequel Rights Is Not A Forfeiture Because The First Amendment Is An Option Contract. .........75

C.    Agency Law ...............................................................................78

III. PROPOSED CONCLUSIONS OF LAW RELATING TO HASBRO'S CLAIMS TO ENJOIN COPYRIGHT AND TRADEMARK INFRINGEMENT ..................................................79

A.    Trademark ..................................................................................79

    1.    Use in Commerce ...........................................................79

    2.    Trademark Infringement ..................................................79

-iv-

3.  False Designation and Unfair Competition .........................80

4.  Trademark Dilution..................................................................81

5.  Likelihood of Confusion as a Matter of Law.......................81

6.  Requirements for Injunctive Relief under the Lanham Act..................82

7.  Trademark Licensee Estoppel................................................84

B.  Copyright........................................................................................84

1.  Direct Infringement................................................................85

2.  Contributory Infringement ....................................................86

3.  Requirements for Injunctive Relief under the Copyright Act .............86

IV. PROPOSED CONCLUSIONS OF LAW RELATING TO SWEETPEA'S AFFIRMATIVE DEFENSE OF WAIVER .............................88

V. PROPOSED CONCLUSIONS OF LAW RELATING TO SWEETPEA'S AFFIRMATIVE DEFENSE OF ESTOPPEL...........................90

VI. PROPOSED CONCLUSIONS OF LAW RELATING TO SWEETPEA'S AFFIRMATIVE DEFENSE OF LACHES............................91

VII. PROPOSED CONCLUSIONS OF LAW RELATING TO LAW OF THE CASE AS A BAR TO SWEETPEA'S SECONDARY TITLE COUNTERCLAIM ......................................92

VIII. PROPOSED CONCLUSIONS OF LAW RELATING TO SWEETPEA'S ARGUMENT THAT THE NOTICE AND CURE PROVISION OF PARAGRAPH 19(B) OF THE LICENSE AGREEMENT PREVENTS THE REVERSION OF THE SEQUEL RIGHTS ................................................93

Pursuant to the Court's Order dated September 23, 2014 (Dkt. No. 278), Defendant Sweetpea Entertainment, Inc. and Defendant/Counterclaimant Sweetpea B.V.I. Ltd. (collectively, "Sweetpea") respectfully submit their "mark-up" of Plaintiffs' Post-Trial Proposed Findings of Fact and Conclusions of Law (Dkt. No. 292-1).

\* \* \*

Pursuant to Federal Rule of Civil Procedure 52 and Rule 52-1 of the Local Rules of the United States District Court for the Central District of California, Plaintiffs Hasbro, Inc. and Wizards of the Coast, LLC hereby submit the following as their Post-Trial Proposed Findings of Fact and Conclusions of Law:

# I.

# BACKGROUND

1.      **This is an action brought by Plaintiffs Hasbro, Inc. ("Hasbro") and Wizards of the Coast, LLC ("WOTC") (together, "Plaintiffs" or "Hasbro") against Defendants Sweetpea Entertainment, Inc. ("SEI") and Sweetpea B.V.I. Ltd. ("SBL") (together "Sweetpea").**

2.      **Following this Court's Order Re: Parties' Motions for Partial Summary Judgment dated February 25, 2014 [ECF # 154] ("SJ Order"), the only claims remaining for trial are the following:**

**A.      Claims by Plaintiffs Hasbro and WOTC**

3.      **Hasbro's Claim for a Declaration That The Sequel Rights Reverted. Hasbro seeks a declaration that, pursuant to an amendment to a license agreement entered into by the parties (the "First Amendment"), all rights previously granted to Sweetpea to produce theatrical and non-theatrical motion picture sequels, prequels and/or remakes ("Sequel Rights") based on an existing motion picture entitled "*Dungeons & Dragons*" (the "Picture"), certain elements created by Sweetpea in connection with the Picture (the "Picture Creations"), and certain elements of Hasbro's *Dungeons and Dragons* ("*D&D*") property (the "Property"), reverted to Hasbro because Sweetpea failed to do what was required to prevent the Sequel**

Rights from reverting within the time period specified in the First Amendment.  *See*
Complaint dated May 13, 2013 [ECF #1] ("Complaint") ¶¶ 91–98.

4.  **Hasbro's Claim to Enjoin Copyright Infringement.  Hasbro seeks a
permanent injunction to enjoin Sweetpea and its licensees from using any of
Hasbro's copyrights in the entire *D&D* property (the "*D&D* Universe") in
connection with any theatrical or non-theatrical motion picture without
authorization from** Hasbro.  Complaint ¶ 61–67.

5.  **Hasbro's Claim to Enjoin Trademark Infringement.  Hasbro seeks a
permanent injunction to enjoin Sweetpea and its licensees from using Hasbro's
trademark "DUNGEONS & DRAGONS" in connection with any theatrical or non-
theatrical motion picture without authorization from Hasbro.** Complaint ¶¶ 68–90.

**B.    Counterclaims By Counter-Defendant SBL**

6.  **Counter-Defendant SBL seeks a declaration that:**

i.   **Sweetpea has the sole, exclusive right to make a "Sequel";**

ii.  **Sweetpea has the sole, exclusive right to make a live-action motion
picture using the Property;**

iii. **Sweetpea has the "Right of First Negotiation" and the "Right of
Last Refusal"** ~~with respect to a film project at Universal Pictures ("the
Universal Film Project") — *i.e.*, the right to make a *D&D* sequel on the
same financial terms that Hasbro and/or WOTC have agreed to with
Universal Pictures~~**;[1]**

iv.  **Hasbro is prohibited from using the words "Dungeons & Dragons"
or "Advanced Dungeons & Dragons" as a primary title in a live-
action motion picture;**

---

[1] Following the practice employed by Plaintiffs in their Mark-Up of Sweetpea's initial
proposed Findings, text in red indicates an addition by Sweetpea to clarify its position.
(*See* Dkt. No. 229 at 3 n.1).)

v.   Hasbro is prohibited from permitting any third party to use the words "Dungeons & Dragons" or "Advanced Dungeons & Dragons" as a secondary title in a live-action motion picture [disposed of on summary judgment]; and

vi.   **Hasbro is required to cooperate in good faith with Sweetpea on the use of the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" so as to minimize the competitive impact of the Universal Film Project on any of Sweetpea's motion pictures.**

Trial Ex. 337 (SBL's Counterclaims dated September 3, 2013) ("Counterclaims") at 38.

7.   Sweetpea's Memorandum of Contentions of Fact and Law dated February 4, 2014 [ECF # 140] ("Sweetpea Mem.") contained two additional claims for declaratory relief that were not pled by Sweetpea in the Counterclaims ("Additional Claims"). *Compare* Sweetpea Mem. at 24 *with* Trial Ex. 337 (Counterclaims) at 38.

8.   **Sweetpea's Additional Claims purport to seek a declaration that "Sweetpea owns all of its Picture Creations" and "Sweetpea's rights to use the D&D Title have not reverted to Hasbro."** Sweetpea Mem. at 24.

9.   ~~Sweetpea has not sought leave of the Court to amend the Counterclaims in order to plead the Additional Claims.~~ Sweetpea's "Additional Claims" were expressly set forth in the jointly prepared Final Pretrial Conference Order, dated March 24, 2014. (*See* Dkt. No. 194 at 13 (¶¶ g, h).)

**C.   Parties**

10.   **Plaintiff Hasbro is, and at all relevant times was, a corporation duly organized and existing under the laws of the State of Rhode Island, with its principal place of business in Pawtucket, Rhode Island.** *See* Joint Statement of Admitted Facts [ECF # 130] ("JSAF") ¶ 1.

11.   For almost 90 years, Hasbro has been in business of creating, manufacturing and selling toys and games, including Mr. Potato Head, Play-Doh, Monopoly,

Candyland, My Little Pony, G.I. Joe and Transformers.  *See* Trial Declaration of Liz Schuh dated August 26, 2014 [ECF # 218-1] ("Schuh Decl.") ¶ 2.

12.  **Plaintiff WOTC is, and at all relevant times was, a limited liability company duly organized and existing under the laws of the State of Delaware, with its principal place of business in Renton, Washington.  WOTC is the successor-in-interest to TSR, Inc. ("TSR"), and is a wholly-owned subsidiary of Hasbro.**  *See* JSAF ¶¶ 2–4.

13.  WOTC creates, manufactures and sells fantasy and role-playing games and other products for the gaming market, including the role-playing game *D&D*.  *See* Schuh Decl. ¶¶ 3, 6.

14.  **Defendant/Counter-Defendant SBL is, and at all times was, a company duly organized and existing under the laws of the British Virgin Islands, with its principal place of business in Los Angeles, California.  SBL is the successor-in-interest to Sweetpea Entertainment Corporation ("SEC").**  *See* JSAF ¶¶ 5, 7.[2]

15.  **Defendant SEI is, and all times was, a company duly organized and existing under the laws of the state of Delaware, which transacts business in Los Angeles, California.**  *See* Trial Ex. 337 (Counterclaims) ¶ 2.

**D.  Dungeons & Dragons**

16.  First created in 1974 by Gary Gygax and originally owned and published by TSR, *D&D*, along with its related property *Advanced Dungeons & Dragons* ("*AD&D*") (together, the *D&D* Universe), is the first and most famous and commercially-successful role-playing game in the world.  *See* JSAF ¶ 8; Schuh Decl. ¶¶ 5–8.

17.  Over the 40-year history of *D&D* and *AD&D*, Hasbro and its predecessors-in-interest TSR and WOTC created the *D&D* Universe, which includes hundreds of books, articles, compendia, magazines and other materials containing content for use in the games, ~~as well as copyrights and trademarks related thereto~~.  *See* JSAF ¶ 10.

---

[2] For ease of reference, SEC and SBL are referred to herein as "Sweetpea."

DEFENDANTS' MARK-UP OF PLAINTIFFS' POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

18.     The *D&D* Universe contains thousands of original, highly delineated, distinct and detailed literary descriptions and graphic depictions of fictional places, characters, weapons, creatures, magic items, spells, interrelated settings, plots, foes, allies, quests, treasures, character classes and other elements that players can incorporate in their own games.  *See* JSAF ¶ 11.

19.     The *D&D* Universe has grown far beyond the original tabletop role playing game, and has spawned hundreds of novels, multiple video games, and other merchandise.  *See* Schuh Decl. ¶ 7.

20.     *D&D* is more than a board game; for many it is a hobby.  Schuh Decl. ¶¶ 3-4; 9/17 Tr. (Schuh) 114:17–116:12.

21.     ~~*D&D* players commonly create a single character that they carry from story to story, adventure to adventure, over the course of a single "campaign" that may last for months or even years of play.~~  9/17 Tr. (Schuh) 115:21–116:12.

22.     Materials published over the years by Hasbro and its predecessors to help guide Dungeon Masters have analogized campaigns to "a series of novels or movies, with the same characters facing new challenges that aren't necessarily related to the challenges that came before."  Trial Ex. 557 at 557-0129; *see also* Trial Ex. 576 at 576-0257 ("The campaign and the adventures within it are very similar to a series of fantasy novels.  The characters are the heroes and heroines in these novels; focus the action on them.")

23.     ~~The D&D Universe includes several prominent book series that feature popular characters who return in each novel.  For example,~~ The *New York Times* best-selling *Legend of Drizzt* series, <span style="color:red">which is part Advanced Dungeons & Dragons and therefore not licensed to Sweetpea,</span> by R.A. Salvatore has been published for more than 25 years and features the same group of characters in more than two dozen novels.  ~~*D&D* fans have come to cherish such characters and expect to see them return in successive stories.~~  *See* 9/17 Tr. (Schuh) 114:11–116:12; <span style="color:red">127:5-128:10.</span>

**E.    *D&D* Trademarks and Copyrights**

24.    Hasbro and/or WOTC are the registered owners of some of the copyrights in the *D&D* Universe.  *See* JSAF ¶ 12.

25.    Hasbro is the registered owner of some of the trademarks DUNGEONS & DRAGONS (the "*D&D* Trademark") and ADVANCED DUNGEONS & DRAGONS (the "*AD&D* Trademark") identified in Exhibit F to the Complaint.  *See* JSAF ¶ 13.

26.    Since the inception of the *D&D* Universe in 1974 and continuously thereafter, a wide variety of goods and services have consistently been identified with the *D&D* Trademark in connection with a highly successful worldwide merchandizing program.  *See* JSAF ¶ 14.

27.    Hasbro and its predecessors have used, and Hasbro continues to use, the *D&D* Trademark to brand entertainment products and services.  *See* JSAF ¶ 15.

28.    The *D&D* brand is widely known by, and even popular with, people outside of the traditional role-playing gaming world.  *See* Schuh Decl. ¶ 8.

29.    The *D&D* Trademark is famous and distinctive within the meaning of Section 43(c) of the Lanham Federal Trademark Act, 15 U.S.C. § 1125(c).  *See* JSAF ¶ 18.

30.    Hasbro's *D&D* Trademark and related marks are registered for numerous classes of goods and services, including the one non-abandoned mark registered in International Class 41 that is identified in the Complaint (for e-books).  *See* JSAF ¶¶ 13–18.  *See* Trial Ex. 536.

31.    These include Reg. No. 4368634,[3] registered on July 16, 2013 based on use dating back to 2008, for the mark DUNGEONS & DRAGONS in International Class 41 for "Providing online publications in the nature of e-books in the field of fantasy adventures"; Reg. No. 4268729 (not identified in the Complaint),[4] registered on January

---

[3] Available at http://tess2.uspto.gov/bin/showfield?f=doc&state=4803:vhjuz1.2.1 (last visited Sept. 23, 2014).
[4] Available at http://tess2.uspto.gov/bin/showfield?f=doc&state=4803:vhjuz1.3.1 (last visited Sept. 23, 2014).

1, 2013 based on use dating back to 2010, for the mark DUNGEONS & DRAGON ENCOUNTERS in International Class 41 for "Entertainment services, namely, organizing and conducting game tournaments"; and Reg. No. 3325343 (not identified in the Complaint),[5] registered on October 30, 2007 based on use dating back to 2006 for the mark DUNGEONS & DRAGONS ONLINE in International Class 41 for  "Entertainment services, namely, providing interactive games by means of a global computer network."

32.   In addition, Hasbro is the owner of a pending application (Serial No. 85/583897)[6], filed on an intent to use basis on March 29, 2012, for the mark DUNGEONS & DRAGONS in International Class 41 for "Entertainment services, namely the production and distribution of motion pictures, ongoing television programs, television game shows, and animated television series . . . ."

33.   Hasbro also owns numerous other registrations and pending applications for the mark DUNGEONS & DRAGONS in a variety of other categories all related to the same property.  For example, it owns Reg. No. 4392351,[7] registered on August 27, 2013 based upon use dating back to 2008, in International Class 9 for "Downloadable electronic publications in the nature of e-books in the field of fantasy adventures.  It also owns Reg. No. 4041888,[8] registered on August 2, 2011 based upon use dating back to 2010, in International Class 16 for "comic books."

34.   Other registrations include Reg. No. 3155935,[9] registered on October 17, 2006 based upon use dating back to 1992 for "fantasy adventure novels" and Reg. No.

---

[5] Available at http://tess2.uspto.gov/bin/showfield?f=doc&state= 4803:vhjuz1.4.1 (last visited Sept. 23, 2014).
[6] Available at http://tmsearch.uspto.gov/bin/showfield?f=doc&state= 4805:86hwjp.7.3 (last visited Sept. 23, 2014).
[7] Available at http://tess2.uspto.gov/bin/showfield?f=doc&state= 4803:vhjuz1.5.1 (last visited Sept. 23, 2014).
[8] Available at http://tess2.uspto.gov/bin/showfield?f=doc&state= 4803:vhjuz1.6.1 (last visited Sept. 23, 2014).
[9] Available at http://tess2.uspto.gov/bin/showfield?f=doc&state=4803:vhjuz1.7.1 (last visited Sept. 23, 2014).

1843735,[10] registered on July 5, 1994 in International Class 28 for "video game cartridges and video output games."

    35.    Hasbro is the owner of an existing federal registration for the mark DUNGEONS & DRAGONS registered on June 6, 1978 based on use dating back to 1974 in International Class 16 for "Printed instructional booklet for the playing of fantasy war games."

# II.

## THE AGREEMENT

### A.    The License Agreement

    36.    **On May 3, 1991, TSR and Sweetpea entered into an Option Agreement, pursuant to which TSR granted Sweetpea an exclusive irrevocable option (the "Option") to license from TSR certain limited motion picture and related rights to the *D&D* Universe.**  *See* Trial Ex. 1; JSAF ¶ 19.

    37.    **Sweetpea exercised the Option on September 1, 1994.**  *See* Trial Ex. 10; JSAF ¶ 20.

    38.    **Upon Sweetpea's exercise of the Option on September 1, 1994, an "Exclusive Irrevocable License Agreement" between TSR and Sweetpea (the "License Agreement") went into effect.**  *See* Trial Ex. 12; JSAF ¶ 21.

    39.    **Peter Dekom, an attorney Sweetpea designated as its expert witness in this action, represented Sweetpea <span style="color:red">in a limited role</span> in connection with the negotiation of the License Agreement and was identified in the License Agreement as Sweetpea's attorney to receive notices on behalf of Sweetpea.**  9/19 (pm) Tr. (Dekom) 44:11–46:2, 46:14–17; Trial Ex. 12 ¶ 17.

#### 1.    Sweetpea Granted Right to Make One (1) Motion Picture

    40.    **Pursuant to the License Agreement, TSR granted Sweetpea the right to produce and exploit "one (1)" motion picture** ~~(defined in the License Agreement, and~~

---

[10] Available at http://tmsearch.uspto.gov/bin/showfield?f=doc&state= 4805:86hwjp.7.16 (last visit Sept. 23, 2014).

DEFENDANTS' MARK-UP OF PLAINTIFFS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

herein, as the "Picture") **based on certain elements of the _D&D_ Universe (defined in the License Agreement and herein as the "Property").** *See* Trial Ex. 12 ¶¶ 1, 2.

### 2. Sweetpea Was Not Granted Rights to Make Subsequent Productions

41.   Pursuant to the License Agreement, Sweetpea did not receive the right to produce and exploit subsequent productions based on the Property**, but it did receive a "Right of First Negotiation/Last Refusal" with respect to sequels and remakes.** *See* Trial Ex. 12 ¶ 2(k).

42.   **Paragraph 2(k)(i) of the License Agreement set forth Sweetpea's "Right of First Negotiation," which obligated any party interested in producing a sequel or remake to approach the other and "negotiate in good faith . . . with respect to such sequel and/or remake rights."** Trial Ex. 12 ¶ 2(k)(i).

43.   **Sweetpea's "Right of Last Refusal" was set forth in Paragraph 2(k)(ii) of the License Agreement, which provided that, if the parties were unable to reach an agreement on the material terms in the negotiation required by Paragraph 2(k)(i), and TSR decided to produce a sequel or remake based on the Property, either on its own or by engaging another producer, Sweetpea had the right to elect to produce such sequel or remake itself on the same terms.** Trial Ex. 12 ¶ 2(k)(ii).

### 3. TSR Reserved All Other Rights (Including _AD&D_)

44.   The License Agreement expressly provides that "[a]ll rights in and to the Property not specifically granted to [Sweetpea] herein are reserved to [TSR] (subject only to the limited holdbacks expressly described in subparagraphs 4(a), (b), and (c) above)." Trial Ex. 12 ¶ 4(d).

45.   In Paragraph 4(b) of the License Agreement, TSR reserved the right to license others to "produce a live-action or animated motion picture and/or television production based on [its] 'ADVANCED DUNGEONS & DRAGONS' game and trademark" subject to a certain "holdback" provision limiting TSR's ability to exploit that right for a specific period of time following the release of the Picture. Trial Ex. 12 ¶ (4)(b).

4.     **Sweetpea Had No Obligation to Produce Any Motion Pictures**

46.     Pursuant to the License Agreement, Sweetpea had no obligation to produce any motion pictures based on the Property.  *See* Trial Ex. 12 ¶ 14(a) ("Nothing contained herein shall be construed to obligate [Sweetpea] to produce, distribute, release, perform or exhibit any motion picture, television program, or other production based upon, adapted from or suggested by the Property, in whole or in part, or otherwise to exercise, exploit or make use of any of the rights, licensees [sic], privileges, or property herein granted to Licensee.").

5.     **Sweetpea Had Three Years to Commence Production of the Picture or Its Rights Under the License Agreement Were Subject to Reversion**

47.     Pursuant to the License Agreement, in the event that principal photography of the Picture had not commenced within three years from September 1, 1994 – *i.e.*, on or before September 1, 1997 – TSR had the right to elect to terminate the License Agreement by following certain procedures set forth in Paragraph 15, and in the event of such termination, Sweetpea's rights in the Picture and the Property granted under the License Agreement would revert to TSR.  Trial Ex. 12 ¶ 15.

B.     **Sweetpea Proposes Amending the License Agreement**

48.     **Between 1993 and 1997, Sweetpea worked to develop and finance a *Dungeons & Dragons* motion picture**, but as the September 1997 deadline for the commencement of principal photography approached, Sweetpea was not able to obtain sufficient financing for the film.  *See* Trial Declaration of Courtney Solomon dated August 26, 2014 [ECF # 214] ("Solomon Decl.") ¶¶ 28–31.

49.     In late 1996, Sweetpea was presented with a "very substantial television series opportunity."  Solomon Decl. ¶ 32.

50.     On or about April 22, 1997, Sweetpea sent TSR a letter proposing that the parties amend the License Agreement in a manner that would, among other things, allow Sweetpea the right to produce sequels and television programs.  *See* Trial Declaration of Lee N. Rosenbaum dated August 22, 2014 [ECF # 224–1] ("Rosenbaum Decl.") ¶ 14;

Trial Ex. 17-0001–2 (describing Sweetpea's "intention . . . to reestablish D&D in the mass market through the TV series, and then to spin off the series").

**C.    WOTC Acquires TSR <u>and Declines Sweetpea's Requested Amendment</u>**

51.    <u>Shortly after Sweetpea sent its written proposal to TSR, in May 1997,</u> **WOTC acquired TSR and WOTC's management took control of the *D&D* brand.** *See* Solomon Decl. ¶ 33; 9/23 Tr. 61:21–62:9.

52.    **In or around June 1997, Mr. Solomon met with Peter Atkinson, the CEO of WOTC and the newly-acquired TSR, to discuss Sweetpea's plans to develop *D&D* projects under the License Agreement.**  *See* Trial Ex. 21.

53.    **At this meeting, Mr. Atkinson "made it clear that TSR had its own agenda regarding Hollywood and media, and that TSR was not interested in pursuing any of the changes [Sweetpea] require[d] to [its] license agreement with TSR."**  Trial Ex. 21 (Solomon letter to Atkinson) at 0021-0001; 9/23 Tr. (Solomon) 65:4–22.

54.    <u>Mr. Atkinson advised Mr. Solomon that WOTC desired a theatrical release for the *D&D* motion picture, not the television series proposed by Sweetpea.  *See* 9/23 Tr. (Solomon) 62:23–63:23; 65:4–22.</u>

**D.    ~~TSR Elects to Terminate the License Agreement Based Upon Sweetpea's Failure to Timely Commence Principal Photography of the Picture~~[11]**

55.    <u>In or about the fall of 1997, TSR came to believe that Sweetpea had failed to commence principal photography of the Picture within the three-year time period allotted to Sweetpea under Paragraph 15 of the License Agreement.  Specifically, TSR believed that the "photography" shot by Sweetpea was not footage intended for a genuine motion picture, but was "limited filmed photography . . . undertaken solely for the purpose of attempting to satisfy the contractual requirement of commencement of principal</u>

---

[11] **Although WOTC acquired TSR in May 1997, the correspondence and agreements continued to identify the party-in-interest as "TSR."**

DEFENDANTS' MARK-UP OF PLAINTIFFS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  photography in order to avoid the reversion of rights to TSR." Rosenbaum Decl. ¶¶ 10–
2  11; Trial Ex. 30 ¶ 11.

3      56.    On October 1, 1997, pursuant to Paragraph 15 of the License Agreement,
4  WOTC sent Sweetpea written notice of Sweetpea's failure to commence principal
5  photography of the picture within three years of the effective date of the Option. *See*
6  Trial Ex. 24 at 24–0001.

7      57.    Sweetpea responded in a letter to TSR denying that Sweetpea had failed to
8  commence principal photography. Rosenbaum Decl. ¶ 12; *see also* 9/22 Tr. 168:9–22.

9  **E.    The Parties' Initial Exchange of Settlement Proposals**

10     58.    Following this initial exchange of letters, counsel for TSR and Sweetpea
11 engaged in discussions in an attempt to resolve the dispute without litigation.
12 Rosenbaum Decl. ¶ 13.

13 **1.    TSR's January 30, 1998 Proposal**

14     59.    On January 30, 1998, TSR's attorney, Lee Rosenbaum, an experienced
15 transactional entertainment lawyer with the law firm Wyman & Isaacs LLP, sent his
16 initial settlement proposal to Sweetpea. *See* Trial Ex. 28. Decl. ¶ 2.

17     60.    Mr. Rosenbaum proposed that the parties amend the License Agreement in a
18 manner that would grant Sweetpea, for the first time, the rights to produce theatrical
19 sequels and television series subject to specified financial terms ~~and separate reversion~~
20 ~~clauses.~~ *See* Trial Ex. 28.

21     61.    ~~With respect to sequels,~~ Mr. Rosenbaum proposed in Paragraph 2 of his
22 letter that, provided Sweetpea resumed principal photography and released the Picture
23 theatrically in the United States, Sweetpea would have "the right to produce a theatrical
24 remake or sequel (which is defined to include a prequel) to the Picture within the earlier
25 of five (5) years from the initial U.S. theatrical release of the immediately preceding
26 Picture or remake or sequel to the Picture or seven (7) years from the completion of the
27 final director's cut of the immediately preceding picture or remake or sequel to the
28 Picture." Trial Ex. 28 at 28-0002.

62. ~~For each sequel or remake,~~ Sweetpea would be obligated to pay 2% of the final production budget but no less than $350,000, "*payable on the commencement of principal photography."* Trial. Ex. 28 at 28-0002 (emphasis added).

63. ~~With respect to television series,~~ Mr. Rosenbaum proposed in Paragraph 4 of his letter that TSR would negotiate with Sweetpea and Silver Pictures "to develop and produce a live-action television series based on the Picture," provided that Sweetpea first produce and release the Picture. Trial Ex. 28 at 28-0003. However, if the television series was not produced within five years of July 1, 1998 "the right to produce a live-action television series titled 'Dungeons & Dragons' [would] revert." If Sweetpea and Silver Pictures did produce the television series, Sweetpea then would have the right to produce spin-offs of the television series, provided that such right would revert if Sweetpea failed to produce a spin-off series "within five (5) years after the first airing of the final episode of the previous series. . . ." Trial Ex. 28 at 28-0003.

**2.** Sweetpea's February 9, 1998 Counter-Offer

64. On February 9, 1998, Sweetpea's attorney, Sheri Jeffrey, an experienced transactional entertainment lawyer with the law firm Kaye Scholer, Fierman, Hayes & Handler (now Kaye Scholer LLP), replied to TSR's initial proposal. Rosenbaum Decl. ¶ 20; Trial Ex. 29.

65. Sweetpea's counter-offer agreed that Sweetpea's rights to make sequels and television productions would be subject to reversion, but proposed grouping these rights together as "subsequent production rights" that would be subject to a single reversion clause~~, rather than separating them as proposed by TSR~~. Rosenbaum Decl. ¶ 20; Trial Ex. 29 at 29-0003.

66. Sweetpea's counter-offer was not acceptable to TSR. Rosenbaum Decl. ¶ 20.

**F.   The 1998 Lawsuit**

67. Shortly after the exchange of proposals, on February 20, 1998, TSR and WOTC commenced an action against Sweetpea in the Superior Court for the County of

DEFENDANTS' MARK-UP OF PLAINTIFFS' POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   Los Angeles (the "1998 Action") seeking a declaration that Sweetpea's rights under the

2   License Agreement had reverted because Sweetpea failed to commence principal

3   photography of the Picture within the three-year time period.  *See* Trial Ex. 30 ¶¶ 12–13.

4        68.    Robert Barnes, a commercial litigator and Ms. Jeffrey's partner at Kaye

5   Scholer, appeared in the 1998 Action on behalf of Sweetpea.  Ms. Jeffrey did not appear

6   in the 1998 Action.  9/22 Tr. (Barnes) 173:16–174:8 (Mr. Barnes was "handling the

7   litigation side of the matter primarily").

8   **G.    The March 12-13, 1998 Mediation**

9        69.    After the commencement of the 1998 Action, the parties agreed to engage in

10  a mediation.  Rosenbaum Decl. ¶ 22.

11       70.    ~~The starting point for the mediation was TSR's January 30, 1998 letter [Trial~~

12  ~~Ex. 28] and Sweetpea's February 9, 1998 response [Trial Ex. 29].~~  *See* Trial Ex. 32 at 32–

13  0002 (Barnes suggesting that "discussions begin at the point where [TSR] and [Sweetpea]

14  left off, that is with [Sweetpea's] February 9, 1998 response to [TSR's] January 30, 1998

15  proposals").

16       71.    The mediation commenced late in the afternoon on Thursday, March 12,

17  1998 and continued all night through the morning of Friday, March 13.  Rosenbaum

18  Decl. ¶ 23; Trial Declaration of Robert Barnes dated Aug. 26, 2014 [ECF # 212] ("Barnes

19  Decl.") ¶ 8.

20       72.    Present on behalf of Sweetpea were Ms. Jeffery, Mr. Barnes and Mr.

21  Solomon.  *See* Rosenbaum Decl. ¶ 23; Barnes Decl. ¶ 8.

22       73.    Present on behalf of TSR were Mr. Rosenbaum, his litigator-partner Bruce

23  Isaacs, Jeffrey Christianson (WOTC's in-house counsel), and Brian Kemp (WOTC's

24  client representative).  Rosenbaum Decl. ¶ 23.

25       74.    Mr. Solomon was the "principal negotiator" for Sweetpea who "participated

26  in each mediation session, and . . . approved or negotiated all the terms that are reflected

27  in the First Amendment."  *See* Solomon Decl. at ¶¶ 2, 15, 41; 9/22 Tr. (Barnes) 194:21–

28  195:2.

-14-

75.     Mr. Solomon does not recall any discussions between TSR and Sweetpea during the negotiation of the First Amendment regarding whether a sequel could be released as a television motion picture.  Solomon Decl. ¶ 49.

76.     Mr. Rosenbaum does not recall either the generalities or the specifics of any discussions at the mediation, and thus does not recall agreeing that Sweetpea would be able to extend its rights to produce theatrical and non-theatrical sequels by producing a television production and testified that, if any such agreement had been reached, he would have remembered it because he has never seen such an arrangement in his 30+ years as an entertainment lawyer.  See 9/16 Tr. (Rosenbaum) 123:8—124:11 (Rosenbaum deposition excerpt, 255:8-20), 220:17–222:3.

77.     After the all-night mediation session, the parties reached agreement on the material terms of an amendment to the License Agreement and memorialized the terms in a "Term Sheet."  Rosenbaum Decl. ¶ 25.  See Trial Ex. 34 (Term Sheet redlined by Ms. Jeffrey); Rosenbaum Decl. ¶ 26 (disregarding the redlined changes in Trial Exhibit 34 reveals the original language of the Term Sheet).

**H.    Post-Mediation Negotiation Over Terms of First Amendment, Including Superseding the Right of First Negotiation/Last Refusal**

78.     Following the mediation, Mr. Rosenbaum and Ms. Jeffrey were the primary negotiators on behalf of TSR and Sweetpea, respectively, in connection with the First and Second Amendments. 9/22 Tr. (Barnes) 180:6–11; Transcript of the Deposition of Robert Barnes dated Sept. 12, 2014 ("Barnes Tr.") 77:2–4, 7–17, 21–22; see also Trial Ex. 62 at 62-0002 (letter from Barnes to Isaacs stating "[a]s I have suggested may times before, *you and I should stay on the sidelines and the transactional lawyers* [*i.e.* Mr. Rosenbaum and Ms. Jeffrey] *and the principals should be* left to close the open issues in the time honored manner of talking directly to one another"); 9/22 Tr. (Barnes) 184:6–13; see Rosenbaum Decl. ¶¶ 26-28, 37-45.

79.     Paragraph 7 of the Term Sheet (Paragraph 6 of the First Amendment) provided, in relevant part:

1    TSR grants to Sweetpea the rights to make one or more sequels (which shall

2    be defined to include a prequel) or remake based on the Picture and Picture

3    Creations and *as provided in Paragraph 2(k) of the Agreement*.

4  *See* Trial Ex. 34 ¶ 7 (emphasis added); *see also id.* ¶ 11 (same with respect to television).

5        80.    On March 16, 1998, Mr. Rosenbaum sent Ms. Jeffrey his proposed

6  modifications ~~to the Term Sheet~~, with the following italicized note regarding the

7  language of Paragraphs ~~7 and~~ 11 ~~of the Term Sheet~~:

8            *Note:  The reference in the draft to "and as provided in Paragraph 2(k)"*

9            *is confusing, as this paragraph is intended to supersede those provisions*

10           *with respect to first negotiation/refusal.*

11  Trial Ex. 33 at 33-0002 (italics in original; underline added for emphasis).

12       81.    ~~Mr. Rosenbaum's comment to Ms. Jeffrey is consistent with~~ Mr. Barnes'

13  recollect[s]~~ion~~ that at the mediation, "[t]he parties agreed . . . that Sweetpea would be

14  given 'automatic' sequel rights that would not require any further negotiation between

15  TSR and Sweetpea."  *See* Barnes Decl. ¶ 35.

16       82.    ~~On March 16, 1998, Ms. Jeffrey accepted Mr. Rosenbaum's proposed~~

17  ~~modification to the Term Sheet regarding Paragraph 2(k).~~  Rosenbaum Decl. ¶ 28; Trial

18  Ex. 34 at 34-0003 (stating, in Jeffrey's cover letter, "[a]ttached is a redraft and clean copy

19  of the Amendment to reflect the comments in your letter to me of this morning as we

20  discussed").

21       83.    On March 16, 1998, Ms. Jeffrey sent Mr. Rosenbaum a redline ~~of the Term~~

22  ~~Sheet~~ showing the phrase "and as provided in Paragraph 2(k) of the Agreement" being

23  stricken from both new Paragraph 6 (addressing sequels) and new Paragraph 10

24  (addressing television), and substituted the defined term "the Property" for the stricken

25  language in Paragraphs 6 and 10~~which~~ ~~was consistent with Mr. Rosenbaum's earlier~~

26  ~~comment~~.  *See* Rosenbaum Decl. ¶ 28; Trial Ex. 34 at 34-0004–5.

27       84.    Mr. Solomon received and reviewed the March 16, 1998 letter from Ms.

28  Jeffrey (Trial Ex. 34) when or shortly after it was sent to Mr. Rosenbaum.  Trial Ex. 34 at

34-0003 (Mr. Solomon is cc'ed); Designations from Transcript of the Deposition of Courtney Solomon, dated Dec. 10 and 11, 2013 ("Solomon Tr.") 445:18–446:7, 448:8–21.

85.  ~~The deletion of the phrase "and as provided in Paragraph 2(k) of the Agreement," remained unchanged through TSR's and Sweetpea's subsequent negotiations over the Term Sheet and in the final version of the First Amendment.~~ *See* Exs. 35, 36 and Ex. 37 ¶¶ 6, 10.

86.  ~~After further negotiation, the modified Term Sheet ultimately became~~ the "First Amendment" to the License Agreement, which TSR executed on March 19, 1998 and Sweetpea countersigned on March 23, 1998.  *See* Trial Exs. 42, 47, and 37 (final execution copy); Rosenbaum Decl. ¶ 29.

I.   **The First Amendment**

87.  ~~Sweetpea's motion picture rights in the First Amendment are divided into three separate and distinct categories:~~

(a)  ~~Paragraphs 1 through 5 address the rights relating to the capital "P" Picture that TSR had granted to Sweetpea in the original License Agreement;~~

(b)  ~~Paragraphs 6 through 9 address the "Sequel Rights" that TSR, for the first time, was granting to Sweetpea; and~~

(c)  ~~Paragraphs 10 through 12 address the "Television Rights" that TSR, for the first time, was granting to Sweetpea.~~

Trial Ex. 37 ¶¶ 1–12.

88.  ~~Each of these three rights categories contains its own separate and independent (i) grant of rights, (ii) financial terms, and (iii) reversion clause.~~  Trial Ex. 37 ¶¶ 1–5, 6–9, 10–12.

1.   ~~**Rights Category #1:  The Picture Rights**~~

89.  **Under the License Agreement, Sweetpea had the right to produce a "Picture" *i.e.* "one (1) theatrical or television motion picture based in whole or part**

on the Property **and including all rights granted in Paragraph 2 hereafter,**" Trial Ex. 12 ¶¶ 1(d), 2.

90.     By the time the parties attended the mediation and negotiated the terms of the First Amendment in March of 1998, Sweetpea already was producing ~~the Picture as~~ a *theatrical* motion picture.  *See* Trial Ex. 37 ¶ 2 (requiring budget of at least $20 million); 9/16 Tr. (Rosenbaum) 218:18–219:1 ("It was never a contention of whether this was a theatrical motion picture or a television motion picture.  *It was always represented as a theatrical motion picture, and we always proceeded on that assumption.*") (emphasis added); Solomon Decl. ¶ 34 (after the television series opportunity fell through, "Sweetpea had no choice but to go back to the original plan of making a Dungeons & Dragons feature film"); 9/19 (am) Tr. (Toll) 127:18–128:23.

91.     With respect to the financial terms governing the ~~Picture~~ rights, the First Amendment required that the budget ~~for the Picture~~ be at least $20 million, and obligated Sweetpea to pay TSR 2% of the ~~Picture's~~ budget "on or before the resumption of principal photography," less the $350,000 licensee fee that Sweetpea had already paid by that point.  Trial Ex. 37 ¶ 2.

92.     ~~The First Amendment attached two reversion mechanisms to the Picture rights.  See~~ Trial Ex. 37 ¶ 1, 5.

**2.     ~~Rights Category #2:  The Sequel Rights~~**

93.     **The First Amendment granted Sweetpea, ~~for the first time,~~ "the rights to make one or more sequels (which shall be defined to include prequels) or remakes based on the Picture, the Picture Creations and the Property."**  Trial Ex. 37 ¶ 6.

94.     ~~Paragraphs 7 through 9 of the First Amendment set forth the amounts that Sweetpea was obligated pay TSR for its exercise of the Sequel Rights,~~ with the amount dependent upon the particular "sequel" or "remake" right being exercised:

(a)     For "each *sequel* intended for *theatrical* release," Sweetpea was obligated to pay TSR 2% of the budget, but no less than $350,000 or

more than $600,000, plus 5% of net profits.  Trial Ex. 37 ¶ 7 (emphasis added).

(b)    For "each *remake* intended for *theatrical* release," Sweetpea was obligated to pay TSR a 1% of the budget, but no less than $175,000 and no more than $300,000, plus 2.5% of net profits. Trial Ex. 37 ¶ 8 (emphasis added).

(c)    For "each *non-theatrical sequel* or *remake*," Sweetpea was obligated pay TSR 2/3% percentage of the budget, but no less than $116,667 and no more than $200,000, plus 1 and 2/3% of net profits (the "Non-Theatrical Rights Payment").  Trial Ex. 37 ¶ 9.

95.    ~~The fact that the payment provisions in Paragraphs 7 through 9 refer to "each sequel intended for theatrical release," "each remake intended for theatrical release," and "each non-theatrical sequel or remake" (whereas Paragraphs 10 through 12, relating to television, do not refer to "Sequels" or "remakes") supports Hasbro's position that the parties intended the Sequel Rights granted in Paragraph 6 to be exploited solely as theatrical and non-theatrical productions, not television productions.~~  Trial Ex. 37 ¶¶ 6–9.

96.    ~~With respect to the reversion of the Sequel Rights,~~ **Paragraph 6 of the First Amendment provides that** ~~the Sequel Rights~~ **"shall revert on a rolling basis (but not the Picture Creations) to TSR on the earlier of (i) five years from of the initial U.S. release or (ii) seven (7) year's from the final director's cut of the immediately prior picture."**  Trial Ex. 37 ¶ 6.

**3.    ~~Rights Category #3:  The Television Rights~~**

97.    **Paragraph 10 of the First Amendment granted Sweetpea** ~~, for the first time,~~ **the "rights to make one or more live-action television series or television motion pictures . . . based on the Picture, the Picture Creations and the Property . . . provided that Sweetpea shall have first released the Picture."**  Trial Ex. 37 ¶ 10.

98.    **Paragraph 11 of the First Amendment set forth the amounts that Sweetpea was obligated to pay TSR** ~~for its exercise of the Television Rights~~**, with the amount dependent upon the type and length of the particular television program**:

(a)    **For live-action television series, Sweetpea was obligated to pay TSR between $5,000 and $10,000 per episode, depending on the length of each episode.**  Trial Ex. 37 ¶ 11(a)-(c).

(b)    **For a live-action television "movie of the week or miniseries" Sweetpea was obligated to pay TSR $10,000 per hour, but no more than $80,000 in total (the "Television Motion Picture Rights Payment")** <span style="color:red">**"The above sums would be one-half (1/2 of the above if initial broadcast is other than U.S. prime-time network free television."**</span> Trial Ex. 37 ¶ 11(d).

99.    ~~With respect to the reversion of the Television Rights,~~ **Paragraph 12 of the First Amendment provides: "If Sweetpea does not commence a production based on the rights referenced in Paragraph 11 hereunder on a rolling basis within five (5) years after the initial broadcast of the final original episode of any television series or any television motion picture, such rights shall revert to TSR (but not the Picture Creations) and the restrictions in Paragraph 15 shall be released with respect to future productions."**  Trial Ex. 37 ¶ 12.[12]

~~100.   The fact that the First Amendment includes a separate grant of rights (Paragraph 10) and a separate reversion clause (Paragraph 12) relating to the Television Rights is strong evidence that the parties did not intend for the exercise of Television Rights to reset the reversion clock for Sequel Rights.~~

**4.    Amendments to Holdbacks on TSR's Reserved Rights**

101.    **Paragraph 14 of the First Amendment terminated the "holdback" provision in Paragraph 4(b) of the License Agreement (relating to TSR's reserved**

---
[12] In Paragraph 12 of the First Amendment, the parties intended to refer to Paragraph 10 (not 11) and Paragraph 14 (not 15).  The erroneous references to Paragraphs 11 and 15 resulted from a drafting error.  Rosenbaum Decl. FN 10; *see* Trial Ex. 34.

**rights in the *AD&D* property) and replaced this provision with terms set forth in Paragraph 14 of the First Amendment.** Trial Ex. 37 ¶ 14(b).

102. **Paragraph 14(b) of the First Amendment provides,** ~~in relevant part~~**:**

**TSR shall not use or permit others to use the words 'Dungeons & Dragons' and/or 'Advanced Dungeons & Dragons' in the primary title of any live-action motion picture or television program; *provided TSR may use the words 'Dungeons & Dragons' and/or 'Advanced Dungeons & Dragons' in a secondary title in such productions, in a size no greater than 50% of the size of the primary artwork title and in no case above or before the primary artwork title in such productions*.**

Trial Ex. 37 ¶ 14(b) (emphasis added). *See also* Trial Ex. 244 (internal Warner Bros. Pictures email summarizing information provided by Sweetpea's attorney, who informed Warner Bros. Pictures, among other things, ~~including~~ that Hasbro has right to license "others" to use *D&D* in the secondary title of a motion picture).

~~103.   The only express limits on Hasbro's use of the secondary title are set out in Paragraph 14(b), i.e., the size and placement restrictions described above.  Trial Ex. 37 ¶ 14(b).~~

~~104.   Paragraph 14(b) "does not . . . limit Hasbro's reserved rights to use or permit others to use secondary title rights in any such production."  SJ Order at 27.~~

**5.   ~~First Amendment Intended as "Short-Form"~~**

~~105.   At the time of execution, the parties understood that the First Amendment was a "short-form" amendment — or a "deal memo" — rather than a final expression of all the terms and conditions of the agreement between the parties.  Rosenbaum Decl. ¶ 25; Trial Ex. 46 at 46-0001 (referring to First Amendment as "summary statement of terms" that the parties intended to "be included in a long-form document").  *See* Toll Decl. ¶ 20; Barnes Decl. ¶ 10; Solomon Decl. ¶ 72.~~

106.  **Both Sweetpea and TSR were represented by attorneys (Mr. Rosenbaum and Ms. Jeffrey) with experience negotiating agreements in the entertainment industry.**  *See* Rosenbaum Decl. ¶2; 9/22 Tr. (Barnes) 168:12–16.

107.  The parties intended to, and did, use the material terms expressly stated in the First Amendment, as well as the terms and conditions that the parties' attorneys understood would be incorporated based upon custom and practice in the entertainment industry, to prepare drafts of a more detailed "long-form" amendment.  *See* Barnes Decl. ¶ 10; Rosenbaum Decl. ¶ 25; 9/19 Tr. (Toll) 104:13–21.

**J.  The Parties Exchange Draft Long-Form Agreements**

108.  Following the execution of the First Amendment, TSR and Sweetpea exchanged drafts of a long-form amendment that, if executed, would have superseded the First Amendment.  *See* Rosenbaum Decl. ¶ 25 and at 9 n.8.

**1.  Sweetpea's Long-Form Proposal**

109.  On March 26, 1998, Ms. Jeffrey sent Mr. Rosenbaum Sweetpea's proposed draft long-form agreement.  *See* Trial Ex. 48; Barnes Decl. ¶ 11.

110.  Sweetpea's proposed long-form drastically departed from the material terms of the First Amendment, seeking to renegotiate several key agreements, including:

(a)  Sweetpea proposed including a single definition of the terms "'Picture' or 'Pictures'" that would have included "[a]ll live action motion pictures . . . television motion pictures, pilots, mini-series, and/or series. . . ."  Trial Ex. 48 ¶ 1(d). This conflicted with the separate and far more limited Sequel Rights and Television Rights that TSR had granted to Sweetpea pursuant to the First Amendment.  *See* Trial Ex. 37 ¶¶ 6, 10

(b)  Sweetpea proposed collapsing the First Amendment's separate reversion clauses for Sequel Rights and Television Rights into a single reversion clause that would have applied to "any subsequent motion picture or television production," and proposed that Sweetpea would "not be required to produce the same type of subsequent

1   production (e.g., a television series may be followed by a theatrical motion picture)."
2   Trial Ex. 48 ¶ 12 (proposed replacement Paragraph 15 b.).

3   (c)   ~~Whereas~~ **the First Amendment granted Sweetpea the right to**
4   **make sequels "based on the Picture, the Picture Creations _and_ the Property,"** Trial
5   Ex. 37 ¶ 6 (emphasis added), ~~Sweetpea proposed language that would have permitted~~
6   ~~Sweetpea to produce any "subsequent productions" "based in whole or in part on the~~
7   ~~Property"~~ Trial Ex. 48 ¶ 2 (emphasis added).

8   111.   ~~On the other hand, Sweetpea's draft long-form did incorporate the parties'~~
9   ~~agreement to eliminate Sweetpea's Right of First Negotiation/Last Refusal.  Specifically,~~
10   ~~Ms. Jeffrey proposed replacing Paragraph 2 of the License Agreement with a new~~
11   ~~Paragraph 2 that cut off at subparagraph (h), thereby expressly eliminating subparagraph~~
12   ~~2(k).~~  _See_ Trial Ex. 48 at 48–0002–4; Solomon Decl. ¶ 74; 9/23 Tr. (Solomon) 80:15–24 (
13   "Q: And you would agree that Ms. Jeffrey's draft of the Long Form does not include
14   2(k), a right of first negotiations and last refusal, true?  A: I do.").

15   112.   ~~In addition, Sweetpea's draft long-form reflected the universal custom and~~
16   ~~practice in the entertainment industry [_see supra_ Section VI F.] by expressly providing~~
17   ~~that the rights payments would be "payable on the commencement of principal~~
18   ~~photography . . . ."~~ Trial Ex. 48 at ¶¶ 4.b.(b)(i)-(iii).

19   **2.   TSR Rejects Sweetpea's Long-Form In Its Entirety**

20   113.   On April 1, 1998, Mr. Rosenbaum responded to Ms. Jeffrey's letter,
21   indicating that he had "serious problems" with Sweetpea's draft long-form.  Trial Ex. 50
22   at 50-0001.

23   114.   Among other issues, Mr. Rosenbaum rejected Ms. Jeffrey's proposal to
24   broaden Sweetpea's rights by granting Sweetpea the right to produce any motion picture
25   based "in whole or in part on the Property."  Mr. Rosenbaum commented:

26   The rights granted [under the First Amendment] comprise the right to
27   produce one motion picture based upon the Property and the right to produce
28   remakes, sequels and television programs 'based on the Picture, the Picture

-23-

Creations and the Property.' (see Paragraphs 6 and 10 of the short-form amendment).  You and I have specifically discussed this point: *Sweetpea may not go back to the Property for a picture or television program based on the Property alone but completely unrelated to the first Picture and the Picture Creations.*

Trial Ex. 50 at 50-0001 (emphasis added); Rosenbaum Decl. ¶ 33(c).

115.   The next day, on April 2, 1998, Mr. Rosenbaum sent a second letter that rejected Sweetpea's draft long-form in its entirety.  Mr. Rosenbaum wrote:

I must tell you that I find [Sweetpea's draft] so far afield from our agreement and so overreaching that I can only suggest that we scrap the long-form altogether and live by the short-form amendment alone. . . . I am at a loss to understand how things so got so far off course, *but it is an undue burden on my time and my client's resources to continue to negotiate a long-form which is so at odds with both the spirit and the letter of the short-form amendment.*

Trial Ex. 51 at 51-0001 (emphasis added).

116.   On April 3, 1998, Mr. Rosenbaum's partner, Mr. Isaacs, sent a letter to Ms. Jeffrey's partner, Mr. Barnes, stating the "draft of the long-form deviates from the agreement so much that it is not worth the time or effort to respond to it. *Simply stated, [the] draft is not acceptable.*" Trial Ex. 52 at 52-0001 (emphasis added).

117.   Following additional correspondence and telephone calls between the parties, on April 6, 1998, Mr. Isaacs told Mr. Barnes that he did not "believe it is an appropriate drafting technique for one party [i.e., Sweetpea], after a thorny mediation and a difficult settlement embodied in an executed short-form agreement, to send to the other party a one-sided draft long-form riddled with issues which are blatantly contrary to the letter of the agreement, let alone its spirit." Trial Ex. 54 at 54-0002.

3.     **TSR's Long-Form Proposal**

-24-

118.   On April 9, 1998, Mr. Rosenbaum sent Ms. Jeffrey a new draft long-form agreement ~~that "incorporate[d] all the terms of the short-form amendment with as few disruptions as possible to the Agreement." See~~ Trial Ex. 57.

~~119.   Unlike Ms. Jeffrey's draft, the draft prepared by Mr. Rosenbaum reflected the agreement reached in the First Amendment by providing for a separate grant of Sequel Rights that would be subject to one reversion clause [Trial Ex. 57 ¶ VI (new Paragraph 2(l))], and a separate grant of Television Rights that would be subject to a second reversion clause [Trial Ex. 57 ¶¶ VII (new Paragraph 2(m))].~~

~~120.   Mr. Rosenbaum's draft was consistent with Ms. Jeffrey's draft in two significant ways:~~

(a)     ~~Mr. Rosenbaum's draft, like Ms. Jeffrey's draft, expressly eliminated Sweetpea's Right of First Negotiation/Last Refusal with respect to sequels and remakes.~~ See Rosenbaum Decl. ¶ 45; Trial Ex. 57 ¶ IV. (deleting the words "all sequels and remakes of any television or theatrical motion picture produced hereunder" from the third and fourth lines of Paragraph 2(k) of the License Agreement).

(b)     ~~Mr. Rosenbaum's draft, like Ms. Jeffrey's draft, reflected the universal custom and practice in the entertainment industry [see supra Section VI F.] by expressly providing that the rights payments would be "payable upon the commencement of principal photography."~~ Trial Ex. 57 ¶¶ VI., VII. (new sub-paragraph 2(l)(i)–(iii) and 2(m)(iv)).

~~121.   The fact that both parties' long-form drafts expressly eliminated Sweetpea's Right of First Negotiation/Last Refusal with respect to sequels and remakes, and provided that the rights payments were payable upon the commencement of principal photography, establishes the mutual intention of the parties on these points.~~

**K.     The Second Amendment**

122.   **Following months of further negotiations, the parties opted not to enter into a long-form amendment.**  See Rosenbaum Decl. ¶¶ 46–47; Solomon Decl. ¶¶ 75–76.

123.   **On or about October 8, 1998, TSR and Sweetpea executed the second amendment to the License Agreement, which is dated as of June 8, 1998 (the "Second Amendment").**  *See* Trial Ex. 73; JSAF ¶ 23.

124.   **Paragraph 12 of the Second Amendment provided that "[a]ll references in the [First] Amendment to a 'formal amendment' [i.e., the Long-form Amendment] are deleted.  The parties acknowledge that this amendment, when taken together with the [License Agreement and the First Amendment], constitutes a valid, binding, enforceable and fully integrated agreement between the parties."**  Trial Ex. 73 ¶ 12.

125.   **Together, the License Agreement, the First Amendment and the Second Amendment comprise the <span style="color:red">entire</span> "Agreement" between Hasbro and Sweetpea relating to *D&D*, except to the extent there is any conflict between the terms of the License Agreement and the First Amendment, in which case the terms of the First Amendment control.**  *See* JSAF ¶ 24; Trial Ex. 37 ¶ 17.

### III.

### THE FIRST AND SECOND D&D MOVIES

**A.    The First Movie: *Dungeons & Dragons* (2000)**

126.   **Sweetpea produced a motion picture entitled "*Dungeons & Dragons*," which was released in theaters in the United States on December 8, 2000.**  JSAF ¶ 25.

127.   <u>The first movie featured several fully developed characters, including the lead protagonists Ridley Freeborn (Justin Whalin) and Snails (Marlon Wayans), their co-adventurers Marina the Mage, Elwood the Dwarf and Norda the Elf, and the benevolent Empress Savina (Thora Birch).  In the movie, these "good guys" challenge an evil mage named Profion (Jeremy Irons) and his evil henchman Damodar (Bruce Payne).</u>  Trial Ex. 330; 9/23 Tr. (Solomon) 7:7–24.

128.   <u>The first movie takes place in the realm of "Ismir."  Two unlikely heroes — the thieves Ridley and Snails — team up with Marina and other characters to locate the "Rod of Savrille," a powerful magical item that grants its holder the ability to summon</u>

and control red dragons.  The heroes race to find the Rod of Savrille before it falls into the hands of Profion, who wants to use the Rod to overthrow the rule of Empress Savina. In the film's penultimate scene, the heroes battle against Profion and his henchmen for control of the Rod of Savrille.  Ridley ultimately wields then destroys the Rod of Savrille. *See* Trial Ex. 330.

129.   The final scene of the first movie, in which the heroes reunite at the grave of Snails then mysteriously vanish into thin air, was intended to set up a sequel featuring these same characters if they were commercially successful.  9/23 Tr. (Solomon) 11:1–19; *see also* Trial Ex. 330 (featuring Courtney Solomon's director's commentary over the final scene, stating "[t]he new ending really sets up something we were gonna just show you in the second movie.  This scene was going to be in the second movie, but we're giving you a preview of that in the first movie now").

130.   New Line Cinema, the distributer and a significant financier of the first movie, insisted that the actors return to Prague to reshoot this last scene so that, if the film or DVD release proved to be successful, they would be positioned to capitalize on that success by releasing a sequel featuring the same characters.  *See* 9/23 Tr. (Solomon) 13:4–20; 16:14.

131.   However, because the characters from the first movie were not well received by the public, Sweetpea decided not to bring them back in later productions in order not to "beat the dead horse."  *See* 9/23 Tr. (Solomon) 8: 3–19 ("I could tell you long stories about how much I read about how they [the characters from the film] were not well received by the public."); 9:8–14; 12:3–6.

132.   The first movie was not as successful as Mr. Solomon and the people involved with its production had hoped.  Solomon Tr. 198:17–199:4; Solomon Decl. ¶¶ 80–81 (stating that the "the overall box office results were disappointing" and that the film grossed just $15 million domestically on a budget of approximately $25 million); 9/23 Tr. (Solomon) 8:3–19.

133.   WOTC was disappointed by the first movie as well, as both the company and its fan base believed the film was not true to the *D&D* brand.  9/17 Tr. (Schuh) 86:7–12 ( "[The first movie] was not consistent with brand elements, and our fans were very clear in telling us, and I believe Sweetpea, if they were paying attention, that the movie had not been true to D&D.").

134.   Following the release of the first movie, Mr. Solomon was "not particularly" passionate about taking on further *D&D* projects.  Solomon Tr. 203:22–204:05.

135.   The lack of success of the first movie "kick[ed]" Sweetpea into "[d]irector jail" for a certain period of time.  Solomon Tr. 199:5–8.

136.   Sweetpea appointed Steve Richards, then an employee of Silver Pictures, ~~as its agent~~ to develop and produce sequels to the first movie because Mr. Solomon believed Mr. Richards "still had a passion for the property."  Solomon Tr. 205:03–12, 202:13–203:15 (Sweetpea relied on Mr. Richards to produce the *D&D* motion pictures following the initial Picture).

137.   In the time period following the release of the ~~unsuccessful~~ first movie, Sweetpea's "idea was to maintain the franchise until such time as we could take another proper shot at the apple cart," in other words, "until such time as the right moment presented itself to then do a proper version of the movie and hopefully do it right[.]"  Solomon Tr. 199:9–200:5.

**B.     The Second Movie:  *Wrath of the Dragon God* (2005)**

138.   **Ismir Productions, Inc. ("Ismir") is a single purpose entity that was formed for the purpose of producing a second *D&D* movie that ultimately was titled *Dungeons & Dragons: Wrath of the Dragon God*.  *See* Designations from Transcript of the Deposition of Steve Richards dated Dec. 12 and 17, 2013 (the "Richards Tr.") 101:2–103:18; Solomon Decl. ¶ 83.**

139.   **Steve Richards was the Vice President of Ismir.**  Richards Tr. 102:19–21.

140.   **Mr. Solomon was "somewhat soured by [his] experience with WOTC" and "chose not to be involved in [the second *D&D* film] on a day-to-day basis."**

-28-

1  Instead, he entrusted Mr. Richards ~~with Sweetpea's rights in the Property and~~ **to**
2  **oversee the next film**.  *See* Solomon Decl. ¶ 96–97

3          141.    **Sweetpea appointed Ismir** ~~as Sweetpea's sole agent~~ **to produce and**
4  **exploit** ***Dungeons & Dragons: Wrath of the Dragon God***.  *See* Solomon Tr. 62:3–25
5  (stating that Mr. Richards was responsible for negotiating on behalf of Sweetpea in
6  relation to *D&D*); 202:13–203:15 (Sweetpea relied on the companies set up by Silver and
7  Mr. Richards (i.*e.*, Ismir and Grayson) to produce the *D&D* motion pictures following the
8  first movie).

9          142.    **Sweetpea and Ismir entered into an agreement dated as of April 1, 2003**
10  **(the "Ismir Agreement"), pursuant to which Sweetpea granted Ismir the right to**
11  **produce and exploit one live action motion picture sequel** ~~to the Picture~~ **based on the**
12  **Picture, the Picture Creations and the Property.**  Trial Ex. 85 at 85-0002.

13          143.    **Pursuant to the Ismir Agreement, Sweetpea retained the obligation to**
14  **pay to TSR (by that point, Hasbro) the passive royalty owed under Paragraph 9 of**
15  **the First Amendment for the production of a non-theatrical sequel or remake.**  *See*
16  Trial Ex. 85 at 85-0005; 9/18 (am) Tr. (Richards) 36:1–15.

17          144.    **The Ismir Agreement provided that "Sweetpea shall make such**
18  **payment to TSR in a timely manner as may be required under the [Agreement], but**
19  ***in no event later than commencement of principal photography of the Sequel*."**  Trial
20  Ex. 85 at 85-0006 (emphasis added).

21          145.    ~~The Ismir Agreement is evidence that both Sweetpea Ismir understood that,~~
22  ~~in order to exercise the Sequel Rights under the First Amendment, Sweetpea was~~
23  ~~obligated to pay the non-theatrical rights payment to Hasbro (arising under Paragraph 9~~
24  ~~of the First Amendment) on or before the commencement of principal photography of the~~
25  ~~motion picture.~~  *See* Trial Ex. 85; 9/18 (am) Tr. (Richards) 36:15, 38:23–39:1.

26          146.    **On April 12, 2004, Mr. Richards sent to Hasbro for the first time the**
27  **final execution copy of the Ismir Agreement.**  9/18 (am) Tr. (Richards) 27:7–11.

28

DEFENDANTS' MARK-UP OF PLAINTIFFS' POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

147.   **Mr. Richards subsequently sent Hasbro a draft side-letter agreement** ~~that was intended to provide the production lender of the movie greater comfort regarding the rights being granted to/exercised by Ismir.~~  *See* 9/18 (am) Tr. 29:3–30:9.

148.   **The draft side-letter indicated to Hasbro that the second movie was a "nontheatrical sequel, i.e., *it is not intended for general theatrical release in the U.S.*"** Trial Ex. 88 at 88-0002 (emphasis added).

149.   **By letter dated May 20, 2004, Hasbro provided a red-lined version of the draft-side letter that previously had been provided by Mr. Richards.**  Trial Ex. 90.  The red-line included language expressly providing that Hasbro "had not agreed to the specific terms of the Ismir-Sweetpea agreement or acquisition of rights" and that Hasbro "reserve[d] the right to object to the terms of the Ismir-Sweetpea Agreement, including but not limited to objections that such terms are inconsistent with the terms of the TSR-Sweetpea Agreement."  Trial Ex. 90 at 90-0003.

150.   **On or about May 14, 2004, Sweetpea instructed Ismir (via Mr. Richards) to make a payment to Hasbro, and a payment was made, in the amount of $116,666** ~~in connection with the third movie~~. *See* JSAF ¶ 26.

151.   **The payment of $116,666 to Hasbro was intended to reflect the full amount of the non-theatrical rights payment pursuant to Paragraph 9 of the First Amendment.**  *See* Trial Ex. 336 (Sweetpea Interrogatory Responses) at Response No. 2; Trial Ex. 37 ¶ 9.

152.   **On October 8, 2005, *Dungeons & Dragons: Wrath of the Dragon God* was broadcast in the United States on the Syfy television network.**  JSAF ¶ 27.

153.   ~~The events portrayed in second movie are loosely related to the first movie.~~ **The story returns to the realm of "Ismir" and a single character — the henchman Damodar — returns from the first movie**, ~~this time as the primary villain~~.  *See* Schuh Decl. ¶ 25; 9/18 (am) Tr. (Richards) 130:23–3, 18–21 ("Q: But a creative decision was made not to include those characters [from the first movie] in the second movie; isn't that

right?  A: I think on a second movie we felt using Damodar was a good choice"); Trial Ex. 331 (second movie).

## IV.

## THE THIRD D&D MOVIE:

## *DUNGEONS & DRAGONS: THE BOOK OF VILE DARKNESS*

A. ~~Sweetpea Appoints Grayson Its Agent For The Third Movie~~

154.  **Sweetpea** ~~and its agent~~ **admit that, given the October 8, 2005 release of** *Dungeons & Dragons: Wrath of the Dragon God***, the "expiration date" for the Sequel Rights (commencement of principal photography on the third movie) was five years from that date: October 8, 2010**.  *See* Trial Ex. 37 ¶ 6; Trial Ex. 337 (Counterclaim) ¶ 37; Richards Tr. 145:10–147:7.

155.  **Grayson Productions LLC ("Grayson") is a single purpose entity that was formed for the purpose of producing a third *D&D* movie that ultimately was titled *Dungeons & Dragons: The Book of Vile Darkness*.**  Richards Tr. 160:24–162:6, 163:18–25; Trial Ex. 118.

156.  **Mr. Richards was an authorized agent for Grayson.**  *See* Trial Ex. 118 at 118-00014.

157.  **Sweetpea and Grayson entered into an agreement dated as of September 1, 2010 (the "Grayson Agreement"), pursuant to which Sweetpea granted Grayson the right to produce and exploit one live-action motion picture sequel** ~~to the Picture~~ **based on the Picture, the Picture Creations and the Property.**  *See* Trial Ex. 118 at 118-0002.

158.  **Sweetpea appointed Grayson** ~~as Sweetpea's sole agent~~ **to produce and exploit the third movie.**  *See* Solomon Tr. 187:9–21 (describing third movie as "their piece of business"), 186:2–188:19 (no one at Sweetpea watched third movie before or even years after its release); 9/18 (am) Tr. (Richards) 57:24–58:14 ("Q: And didn't [Mr. Solomon] communicate to you that you would be in charge of producing that third D&D movie? . . . .  A: I think that was understood."); Solomon Decl. ¶ 101–02 (noting Mr.

Solomon had no "day-to-day involvement with the development or production of D&D3" and that "Steve Richards was in charge of the day-to-day activities involved with producing D&D 3.").

159. **Sweetpea appointed Grayson** ~~as Sweetpea's sole agent~~ **to communicate with Hasbro and WOTC regarding all matters relating to the third movie.**  *See* Solomon Tr. 192:19–25 (Solomon had no communications with Hasbro regarding third movie); 9/18 (am) Tr. (Richards) 58:15–24 ("Q: And as between you and Mr. Solomon, you were the one who handled communications with Hasbro and [WOTC] relating to the D&D film projects after 2002; isn't that right?  A: That's correct."); Schuh Decl. ¶ 11 (all WOTC communications regarding the third movie were with Mr. Richards and Grayson's screenwriter).

160. **Sweetpea appointed Grayson** ~~as Sweetpea's sole agent~~ **to make rights payments to Hasbro to maintain Sweetpea's rights.**  Solomon Tr. 211:13–212:9 (Mr. Richards "was actually the person making the payments to maintain the rights.  That would have been his thing.  And I think one of the few areas where I actually directed him specifically was to make sure that that was done, you know, according to the instructions I gave."), 336:11–23 (Grayson was "mechanically responsible for the payments of the rights fee to Hasbro"); 9/18 (am) Tr. (Richards) 58:25–60:19 ("Q: But you [Mr. Richards] took care of making . . . rights payments; isn't that right?  A: That's correct."); 9/23 Tr. (Solomon) 103:25–104:2 ( "Q: You put Mr. Richards in charge of making payments to Hasbro to maintain the rights, correct?  A: By doing the purchase agreement with him, yes.").

161. **Mr. Richards participated directly in all areas of production of the third movie, including scriptwriting, fundraising, negotiating distribution agreements, hiring key personnel including actors, and marketing the film.**  *See* 9/17 Tr. Tr. (Richards) 156:5–15; 182:25–183:3.

162. **Mr. Solomon "had complete confidence" that Mr. Richards would "do a great job producing the [third film] and would preserve Sweetpea's sequel rights**

until such time that Sweetpea [could] produce a big-budget, tent-pole theatrical motion picture . . . ." Solomon Decl. ¶ 137 n.1.

B.      ~~Grayson Proposes to "Start Fresh" with the Third Movie~~

163.    **On October 18, 2006, Mr. Richards had a telephone call with WOTC to discuss his initial plans for the third movie.** *See* Trial Ex. 530.

164.    **During this initial conversation, Mr. Richards told WOTC that he intended to "start fresh," with the intent to "get away from the camp humor of the first movie" in favor of a darker tone.** 9/17 Tr. (Schuh) 108:24–109:8.

C.      ~~Grayson Budgets And Pitches The Third Movie As A Syfy Original Movie~~

165.    ~~From its inception, the third movie was intended to be broadcast as a Syfy Original Movie.~~ *See* 9/18 (am) Tr. (Richards) 68:21–25; 83:19–21; 85:5–7.

166.    On October 13, 2008, Mr. Richards prepared and sent to Mr. Solomon a "Budget Assumption" of $4.5 million for the third movie that proposed obtaining financing from Syfy, among others.  Trial Ex. 96; 9/18 (am) Tr. (Richards) at 71:7–72:21.

167.    Grayson engaged Rand Stoll to serve as a sales agent to license ~~domestic~~ distribution rights for the third D&D movie.  9/18 (am) Tr. (Richards) 69:19–22

168.    On or about November 5, 2008, Mr. Stoll sent an email to Syfy pitching the idea of producing the third and fourth *D&D* movies as Syfy Original Movies with $4+ million budgets each.  Syfy responded to Mr. Stoll: "[We] will greenlight and put together a contract for two $750k SCI FI original D&D titles.  We definitely want to make these as original movies for SCI FI."  Trial Ex. 96; Solomon Decl. ¶ 107.

169.    On January 9, 2009, Syfy sent Mr. Solomon a draft of a contract that would grant Syfy rights in the yet-to-be-produced third and fourth *D&D* movies.  Trial Ex. 99.

D.      ~~Grayson Writes The Treatment And Script For Exhibition Of The Third Movie On The Syfy Cable Television Network~~

170.    **On February 2, 2009, Mr. Richards received from Brian ~~Rudnick~~, the writer of the third movie, the initial treatment for *Dungeons & Dragons: The Book of Vile Darkness*.** *See* 9/18 (am) Tr. (Richards) 79:4–20; Trial Ex. 568.

-33-

1    171.   A "treatment" is a short document that provides a road map to write a

2    screenplay; a treatment is often the first-step in the development of a motion picture.  *See*

3    9/18 (am) Tr. (Richards) 60:23–61:15.

4    172.   Over the next months, Mr. Rudnick, Grayson's script writer for the third

5    movie, made creative changes to the treatment in response to comments provided by

6    Syfy.  9/18 (am) Tr. (Richards) 84:10–17; Trial Ex. 104 (May 6, 2009 email from

7    Rudnick to Richards indicating that Rudnick had "changed some of the monsters to the

8    ones suggested by Sci-fi").

9    173.   On August 3, 2009, Mr. Solomon sent a revised treatment to Syfy ~~with the~~

10   ~~intent that the movie be released on the Syfy channel.~~  Trial Ex. 105; *see* 9/18 (am)

11   Tr. (Richards) 84:18–85:7.

12   174.   On October 16, 2009, Mr. Richards sent an initial draft of the script for the

13   third movie to several executives at Syfy.  Trial Ex. 107; 9/18 (am) Tr. (Richards) 86:11–

14   20.

15   175.   The script that Mr. Richards sent to Syfy on October 16, 2009 was

16   specifically formatted for exhibition on television: it included eight acts, breaks for

17   television commercials, was approximately 100 pages, and featured a six-page "teaser" at

18   the beginning of the script that is typical of television movies.  9/18 (am) Tr. (Richards)

19   89:14–90:17 ("Q: This script is written in the format of a made-for-TV movie, true?  A:

20   It's definitely formatted for exhibition on TV, that's right."); *see also* 9/17 Tr. (Richards)

21   162:5–13; 164:16–165:6 and 9/18 (am) Tr. (Richards) 87:11–88:21 (describing the

22   differences between a script written for a two-hour television movie on the one hand, and

23   a theatrical motion picture, on the other hand, including that the former would (i) be split

24   into approximately eight acts; (ii) be paced so as to have a cliffhanger right before a

25   planned commercial break, and (iii) have a limited page count, less than 120 pages, in

26   order to fit the production within a two-hour window with commercial breaks).

27

28

1   **E.      ~~Sweetpea and Grayson "Scramble" To Make The Rights Payment To Hasbro~~**

2   **~~Upon Commencement Of Principal Photography Of The Third Movie~~**

3        176.   ~~The course of performance of Sweetpea (via Mr. Solomon) and Sweetpea's~~

4   ~~agent Grayson (via Mr. Richards) establishes that Sweetpea understood that, in order to~~

5   ~~prevent the reversion of the Sequel Rights, (1) a rights payment had to be made to Hasbro~~

6   ~~upon the commencement of principal photography of a non-theatrical sequel, and (2)~~

7   ~~Sweetpea needed to make, at minimum, a "non-theatrical" rights payment to Hasbro.  *See*~~

8   ~~*infra ¶¶* 177–190.~~

9        177.   **Principal photography on *<span style="color:red">Dungeons & Dragons:</span> The Book of Vile***

10  ***Darkness* commenced on October 1, 2010.**  JSAF ¶ 28.

11       178.   **Mr. Richards knew, based on his experience, that the commencement of**

12  **principal photography is a "key moment" in the production of a motion picture** ~~and~~

13  ~~is generally when rights payments must be made to a rightsholder like Hasbro.~~  *See* 9/18

14  (am) Tr. (Richards) 37:25–38:6.  ~~Mr. Solomon also knew that industry practice called for~~

15  ~~rights payments to be made at the commencement of principal photography.~~  9/23 Tr.

16  (Solomon) 91:9–14.

17       179.   On September 30, 2010, the day before the commencement of principal

18  photography, Mr. Richards emailed Mr. Solomon saying "[w]e should wire transfer the

19  Hasbro money tomorrow [i.e., October 1, 2010] as well.  Although I am not crazy about

20  doing it, I guess I could personally contribute half of the amount."  Trial Ex. 121.

21       180.   **On October 1, 2010, Mr. Solomon received an email indicating that**

22  **Michael Jaffa, Hasbro's Vice President of Business Affairs, had called him**

23  **regarding *D&D*.  Mr. Solomon forwarded this email to Mr. Richards and wrote "I**

24  **think that you [Mr. Richards] should return that call."** Trial Ex. 122.

25       181.   Mr. Richards replied to Mr. Solomon's email on October 1, 2010, writing "I

26  will call him.  *I will say that we made wire*, unless u disagree."  Trial Ex. 122 (emphasis

27  added).

28

182. ~~A statement by Mr. Richards to Mr. Jaffa on October 1, 2010 that a rights payment relating to *D&D* had been made to Hasbro would have been false, as no~~ payment was made to Hasbro ~~until~~ on October 7, 2010.  *See* Trial Ex. 131.

183. ~~Mr. Solomon did not "disagree" with Mr. Richard's offer to lie to Mr. Jaffa that a rights payment had been made to Hasbro by October 1, 2010.~~  *See* 9/23 Tr. (Solomon) 97:22–98:9.

184. ~~Mr. Richards offered to lie to Hasbro, and Mr. Solomon did not disagree, because Sweetpea and Grayson understood the rights payment had to be made to Hasbro upon the commencement of principal photography in order to validly exercise Sweetpea's rights.~~  *See* Solomon Tr. 208:10–23 (in determining "what was required to keep the rights intact with Sweetpea," Mr. Richards "obviously had his opinions as to *when payments need to be made* and, you know, what he needed to do") (emphasis added), 252:10–23 (Mr. Solomon and Mr. Richards "had determined that our production plan was fine and *the date that he ultimately was proposing to pay was within the constraints of when we were supposed to make the payment*") (emphasis added).

185. **On October 6, 2010, Mr. Solomon emailed Mr. Richards: "I'm going to wire $61,000 to Silver Pics today for the remaining half of the D&D rights payments, that's $61,000 + the $5000 that I topped up from last weeks['] transfer."** Trial Ex. 125.

186. **On October 6, 2010, Sweetpea (via After Dark Films) wired $61,000 to Grayson (via Silver Pictures) with the notation "Dungeons & Dragons 3 – rights purchase fee."**  Trial Ex. 130; *see* Trial Ex. 336 (Sweetpea Interrogatory Responses) at Response No. 2.

187. **Sweetpea specifically instructed Grayson to pay Hasbro the non-theatrical rights payment pursuant to Paragraph 9 of the First Amendment** ~~because Sweetpea understood that the timely payment to Hasbro of this amount was necessary to validly exercise and "maintain" Sweetpea's Sequel Rights (*i.e.*, to prevent the Sequel Rights from reverting).~~  *See* Solomon Tr. 211:13–212:09 (admitting that Mr. Richards

was "the person making the *payments to maintain the rights*") (emphasis added), 249:17–
250:6 ("I sent him the *proper amount for the money to be paid properly. . .* I have several
issues with this stuff, but I sent him – just logically knowing what I did, *I sent him the
proper amount of my half of the money to be paid on the proper date.*") (emphasis
added), 260:21–261:07 ("It was my understanding that, to maintain our theatrical sequel
rights, we had to make a nontheatrical sequel."), 287:2–16 (Sweetpea sent the $61,000
"specifically to make the rights payment for a nontheatrical sequel"), 200:17–20
("keep[ing] the rights alive" means "prevent[ing] the rights from reverting back to
Hasbro").

188.    **On October 6, 2010, Mr. Richards reported to WOTC that "[o]ur
production partners, Sweetpea, have . . . sent the royalty payment to the wiring
details you provided."** Trial Ex. 126 at 126-0001.

189.    ~~Mr. Richards' statement to WOTC that Sweetpea had sent a royalty payment
on or before October 6, 2010 was false, as~~ no royalty payment was made until the
following day, and Sweetpea never sent any payment directly to Hasbro.  *Compare* Trial
Ex. 126 at 126-0001, *with* Trial Ex. 131; *see also* 9/18 (am) Tr. (Richards) 101:5-9 ("Q.
When you made this statement to Ms. Schuh that: 'Our production partners, Sweetpea,
have also sent the royalty payment to the wiring details you provided?'  That statement is
false, correct?  A. That's an incorrect statement.").

190.    ~~Mr. Richards falsely reported to WOTC that the rights payment had been
made to Hasbro on or before October 6, 2010 because Mr. Richards understood that the
rights payment was due to Hasbro upon the commencement of principal photography.~~
*See* Solomon Tr. 208:10–23 (in determining "what was required to keep the rights intact
with Sweetpea," Mr. Richards "obviously had his opinions *as to when payments need to
be made* and, you know*, what he needed to do*").

**F.     ~~Grayson Commences Principal Photography Using A Shooting Script Written In A Television Format And With The Intent to Distribute Movie On Syfy~~**

191.   The "shooting script" for *Dungeons & Dragons: The Book of Vile Darkness* — *i.e.* the script used at the commencement of principal photography on October 1, 2010 — was still formatted so that the film could have been edited for exhibition on television. 9/18 (am) Tr. (Richards) 105:9–106:18 ("Q: This is still a TV script, isn't it Mr. Richards?  A. It's still broken down with act breaks, yes.  Q: So, yes?  A. Yes.").

**G.     ~~Sweetpea Exercises Its Television Rights By Wiring $20,000 To Hasbro And Telling Hasbro That The Payment Is Being Made For A 2-Hour Television Movie Of The Week~~**

192.   **On October 7, 2010**~~, Sweetpea, through its agent~~ **Grayson (via Silver Pictures), wired Hasbro $20,000 with the following notation:  "Dungeons & Dragons, Passive Royalty due per 11.d of the March 19, 1998 Agreement."**  Trial Ex. 131; JSAF ¶ 29; Trial Ex. 37 ¶ 11(d) (payment provision for television movies of the week).

193.   ~~Sweetpea's agent,~~ **Mr. Richards, made the determination to pay to Hasbro, as Sweetpea's rights payment in connection with** *Dungeons & Dragons: The Book of Vile Darkness***, $20,000 pursuant to Paragraph 11(d) of the First Amendment**~~, based upon his stated and actual intention that the movie would be released in the United States on the SyFy television network~~ Richards Tr. 171:8–17 ("we were always going to have the film distributed on television"); 185:25–186:1 ("I felt confident at the very least it would be released on television."); Trial Ex. 128 at 128-0002 (copy of First Amendment produced by Silver Pictures with handwritten star and notation "2 HOURS $20,000" next to Paragraph 11(d), which provides the rights payment for television movies of the week and miniseries); 181:7–183:3; 9/18 (am) Tr. (Richards) 102:3–103:22; *see also* 9/18 (am) Tr. (Richards) 60:7–19 ("Q: And you actually ended up making the determination about the amount of [the] rights [] payment to pay; isn't that right? . . .  A: I did make the determination for the [$]20,000."); 68:21–25 ("Q: And isn't

1   it a fact, Mr. Richards, that when you prepared that initial budget for the third movie, you

2   were intending to produce it as a Syfy Original movie?  A: Throughout this whole time

3   we always thought it was going to appear on Syfy."); 83:19–21 ("Q: So, you were still

4   intending to make a movie that would be released on SyFy; is that right?  A: Yes, that

5   was the hope."); 85:5–7 ("Q: You intended for the initial release of this movie to be on

6   Syfy; isn't that right?  A: We intended it to appear on SyFy, yes."); 96:8–13 (discussing

7   Trial Ex. 124 "Q: Aren't you saying that SyFy seems pleased with the shooting that

8   started last week?  A: What I was really – I think what that means is, I've had dialogue up

9   to this point, and they seemed happy with what we're putting together.  And I still felt

10   very confident that they would end up buying the movie."); 98:5–9 ("I felt very confident

11   that they [Syfy] would end up buying the movie, and that they would be very happy with

12   the end result. . . and we were going to keep them involved with the discussions.");

13   103:23–104:2 ("Q: Mr. Richards, didn't you pay the television amount because you more

14   than hoped, you knew that this low budget fantasy movie with no-name actors was

15   headed for basic cable in the U.S.; isn't that right?  A: At the very least, yes."); 112:3–7

16   ("Q: But you felt confident, by the way, making representations about [] Syfy because

17   you still – you knew that this [the third movie] was going to end up on Syfy; isn't that

18   right?  A: I felt very confident that they would end up seeing the movie and liking it and

19   wanting the movie."); 114:16–22 ("Q: You always knew that Mr. Regina would come

20   through and pick up this movie, isn't that right?  A: I had always hoped.  Q: It was more

21   than a hope, wasn't it Mr. Richards?  All along you said that you knew that this would be

22   distributed on the SyFy channel; isn't that right?  A:  I think I felt very confident that it

23   would end up on Syfy.").

24       194.  ~~In determining the rights payment to make to Hasbro, Mr. Richards~~ *did not*

25   ~~consider the potential foreign distribution of the third movie.~~  9/18 (am) Tr. (Richards)

26   118:12-120:23.

27       195.  In response to Plaintiffs' interrogatory, Sweetpea attempted to characterize

28   the $20,000 payment to Hasbro as having been made pursuant to Paragraph 9 of the First

Amendment.  Trial Ex. 336 at (Sweetpea Interrogatory Response No. 2) (claiming that $20,000 was "pre-payment of the minimum license fee calculated pursuant to Paragraph 9 of the First Amendment, such $20,000 being 2/3 of 1% of the estimated budget of *Dungeons & Dragons: The Book of Vile Darkness*").

~~196.   Sweetpea attempted to characterize the $20,000 payment to Hasbro as having been made pursuant to Paragraph 9 of the First Amendment because Sweetpea understood that, to validly exercise its Sequel Rights and prevent the reversion of the Sequel Rights, Sweetpea was obligated to pay Hasbro the non-theatrical rights payment pursuant to Paragraph 9 of the First Amendment.~~

## H.   Sweetpea Learns That The Television Rights Payment Was Made to Hasbro But Makes No Attempt To Pay The Non-Theatrical Rights Payment

197.   On October 15, 2010, Grayson (via Silver Pictures) wired $51,000 back to Sweetpea (via After Dark Films) with payment details noting the wire was a "remittance of overestimated D&D 3 Hasbro Fee."  Trial Ex. 133.

198.   Mr. Solomon knew "fairly quickly" that Grayson had made a rights payment to Hasbro of only $20,000.  9/23 Tr. (Solomon) 104:9–14.

199.   On October 17, 2010, Mr. Solomon received an email from the director of accounting for After Dark Films advising him that a wire "in the amount of $51,000" had been received from Silver Pictures.  Trial Ex. 134; 9/23 Tr. (Solomon) 105:3–22.

200.   On November 9, 2010, Mr. Solomon's director of accounting sent him a spreadsheet detailing the funds that had been disbursed and received in connection with the third movie.  The spreadsheet lists a deposit dated October 15, 2010 in the amount of $51,000 from Silver Pictures Management, Inc. with the note "[r]ights purchase fee refund."  Trial Ex. 135 at 135-0002.

201.   On December 6, 2010, Mr. Richards sent Mr. Solomon an email attaching an overview of the finances for *Dungeons & Dragons: The Book of Vile Darkness* that specified $20,000 had been spent on "rights."  Trial Ex. 136 at 136–0002; 9/23 Tr. (Solomon) 110:24–111:3.

202.   After Grayson wired the $51,000 payment to Sweetpea, Sweetpea never instructed Grayson to make any other rights payment to Hasbro.  *See* Solomon Tr. 384:17–385:21.

203.   Neither Sweetpea nor ~~its agent~~ Grayson paid Hasbro any monies in connection with *Dungeons & Dragons: The Book of Vile Darkness* other than the $20,000, which Grayson indicated was paid pursuant to Paragraph 11(d) of the First Amendment.  *See* JSAF ¶ 29; Trial Ex. 131; Richards Tr. 169:18–171:17; 9/18 (am) Tr. (Richards) 104:8–23.

**I.    ~~Grayson Repeatedly Tells Hasbro That The Third Movie Is A Made-For-TV Movie That Will Premiere On Syfy Followed By A DVD Release~~**

204.   ~~At all relevant times, including from early 2009 through June 2012, Sweetpea, through its agent Grayson, represented to WOTC that *The Book of Vile Darkness* was being produced as a made-for-television, "Syfy Original Movie" that would premiere on the Syfy cable television network, and that the Syfy premiere would be followed by a DVD release.~~  *See* Schuh Decl. ¶¶ 9–20; 9/17 Tr. (Schuh) 26:25–27:16; 41:1–11; 42:24–43:3; 60:5–10 and 18–23; 65:18–22; *see also* Trial Ex. 116 at 116-0003; Trial Ex. 126 (Richards indicating that "Scyfy [sic] seems pleased" with the shooting for the third movie); Trial Ex. 141 (email chain concerning "visit the set" fan promotion in which WOTC repeatedly asks if Mr. Richards had received "sign off" from Syfy and he responded "yes we can go live").

205.   WOTC was never told that *Dungeons & Dragons: The Book of Vile Darkness* would necessarily have a theatrical release.  *See* 9/17 Tr. (Schuh) 32:6–16, 32:23–33:3; 41:16–20; 42:7–19 ("Q:  And Mr. Richards also told you it was his hope that [the third film] would be a big theatrical release, isn't that right? [Ms. Schuh]: I don't recall Mr. Richards saying that.  Q: And do you remember anyone from Silver Pictures saying that?  A: There was a conversation in 2007 with two people that I never saw or heard from again who claimed to be associated with Silver Pictures who said they had a vision for a big . . . D&D movie that would be a theatrical release that would rival Lord

of the Rings.  We never heard or saw them again.  They disappeared into the night.
There was no pitch.  There was no script, there was no evidence that that vision was ever
commenced."); 43:12–15 (no recollection of Richards communicating his "hope" that
third movie would be released theatrically).

206.  ~~WOTC was led to believe that Syfy was financing the production of *The Book of Vile Darkness*.~~  9/17 Tr. (Schuh) 134:9–13.

207.  **In April 2010, Mr. Richards met in person with WOTC.**  9/18 (am) Tr. (Richards) 91:15–25.  At no point during this visit did Mr. Richards tell WOTC that Syfy had passed on the deal to license *Dungeons & Dragons: The Book of Vile Darkness*.  9/18 (am) Tr. (Richards) 94:19–23.

208.  ~~To the contrary, WOTC was continually told that the third movie would premiere on the Syfy channel in the fourth quarter of 2011; based on this,~~ **WOTC created a promotional-tie in publication, a *D&D* book related to *Dungeons & Dragons: The Book of Vile Darkness*** ~~, which WOTC intended to release to coincide with the movie's Syfy premiere~~.  Although WOTC ultimately released the tie-in publication in December 2011, the third film did not premiere on Syfy until almost a year later, in November of 2012.  9/17 Tr. (Schuh) 88:25–89:15.

**J.    Hasbro Cooperates With Grayson To Ensure The Third Movie is Consistent With The D&D Brand And To Promote The Syfy Premiere and ~~Subsequent~~ DVD Release**

209.  ~~In light of WOTC's disappointment with the public's reception of the first movie,~~ **WOTC made an effort to review and offer comments on the scripts for the second and third movies for the purpose of promoting brand consistency and better representing the *D&D* brand.**  *See* 9/17 Tr. (Schuh) 86:7–16, 87:2–5.

210.  **Chris Perkins, a senior editor at WOTC, reviewed the script and footage of the third movie, and provided notes to Messrs. Richards and Rudnick, as part of his efforts to ensure brand continuity and consistency in the movie, as well as**

to ensure the third movie did not contain elements drawn from Hasbro's "Forgotten Realms" property.  *See* 9/17 Tr. (Schuh) 67:20-24, 76:15–21, 111:22–112:5.

K. ~~The WOTC Representatives Working With Grayson Had No Knowledge Of The Reversion Provisions Or Other Relevant Terms Of The Agreement~~

211.   The primary responsibility of the WOTC employees in contact with Messrs. Richards and Rudnick regarding *Dungeons & Dragons: The Book of Vile Darkness* (except for Hasbro's Vice President of Business Affairs, Michael Jaffa) was to oversee the *D&D* brand.  ~~These individuals had no responsibility to police licensing contracts or collect royalties for Hasbro, and were unaware that the mode of release of the third movie could have any impact on the amount of the royalty payment owed to Hasbro under the Agreement.~~  9/17 Tr. (Schuh) 91:18–92:22.

212.   ~~Ms. Schuh, who was Mr. Richards' primary contact at WOTC, did not have any specific knowledge of Hasbro's rights under the Agreement.~~  9/17 Tr. (Schuh) 97:20–98:3 (no knowledge of approval rights), 110:2–16 (no knowledge of sequel requirement or approval rights), 110:17–25 (no knowledge of the License Agreement or First Amendment prior to this lawsuit).

213.   Mr. Richards never asked anyone at Hasbro or WOTC to confirm whether *Dungeons & Dragons: The Book of Vile Darkness* was a sequel to the first movie or confirm that it was a nontheatrical release, 9/18 (am) Tr. (Richards) 44:17–25, ~~and WOTC was never told that the movie was supposed to be a "sequel" to the earlier films.~~ 9/17 Tr. (Schuh) 109:9–110:1.

L. Grayson Grants Syfy ~~"World Premiere"~~ Rights To The Third Movie

214.   Grayson and Universal Television Networks entered into a "Film License Agreement" dated as of June 21, 2012 (the "Syfy Agreement"), which provided, among other things, that "'Dungeons & Dragons: The Book of Vile Darkness' shall have its 'world premiere' on the Syfy Service."  Trial Ex. 172 at 172–0002 (¶ 1(d)); JSAF ¶ 32.

**M.** ~~Hasbro Is Surprised By News That~~ **The Third Movie Released On DVD In
The United Kingdom**

215.   Mr. Richards did not tell anyone at WOTC that *Dungeons & Dragons: The
Book of Vile Darkness* would be released in the United Kingdom ahead of its U.S.
premiere on the Syfy channel.  *See* 9/18 (am) Tr. (Richards) 123:18–20.

216.   **In or about October 2012, WOTC representatives learned from the
*D&D* fan community that the third movie** ~~apparently~~ **had been released on DVD in
the United Kingdom.**  ~~This surprised Ms. Schuh and others at WOTC because it ran
counter to everything WOTC had been told about how *The Book of Vile Darkness* was
intended to be released and distributed.~~   9/17 Tr. (Schuh) 27:17–28:6; 56:21–57:1.

217.   **On October 26, 2012, Ms. Schuh sent an email to Mr. Richards asking
him whether the DVD had been released in the United Kingdom.  Mr. Richards
responded** ~~evasively, saying only~~ **"[w]e have not made a DVD deal yet in the US.  We
will investigate this reference."**  Trial Ex. 199.

218.   **After this point, Ms. Schuh** ~~came to believe that Mr. Richards was not
acting as an honest business partner to WOTC, but nevertheless~~ **continued to carry out
an agreed-upon promotional campaign relating to the film.**  9/17 Tr. (Schuh) 124:9–
18; 125:7–126:4 ("It would not have done [WOTC] any good to pretend that the movie
didn't exist, and it's not our practice to tell fans that we have a dishonest partner.  So, it
was still in our best interest to notify the fans that the movie was coming.")

**N.**   **The Third Movie Premieres In The United States On The Syfy Cable
Television Network And Is Not Further Distributed In The United States**

219.   On November 2, 2012, Syfy issued a press release announcing that the
"SYFY ORIGINAL MOVIE *DUNGEONS AND DRAGONS: THE BOOK OF VILE
DARKNESS PREMIERES SATURDAY, NOVEMBER* 24."  Trial Ex. 203.

220.   **On November 24, 2012, *Dungeons & Dragons: The Book of Vile
Darkness* premiered in the United States on the Syfy television network.**  JSAF ¶ 33;
Richards Tr. 303:15–304:15.

221.   The only distribution of *Dungeons & Dragons: The Book of Vile Darkness* in the United States was on the Syfy television network.  Richards Tr. 142:24–143: 21, 303:7–13; Solomon Tr. 402:2–14; 9/18 (am) (Richards) 85:21–86:6.

222.   Sweetpea ~~never had a plan to release~~ *The Book of Vile Darkness* ~~as a theatrical motion picture and~~ made no efforts to have the third movie released theatrically in the United States.  Solomon Tr. 193:1–11; 9/23 Tr. (Solomon) 48:3–15.

223.   Mr. Solomon does not remember Mr. Richards ever saying that he wanted to release the third movie theatrically.  Solomon Tr. 193:12–16.

224.   No agreement has been signed regarding the home video distribution of *Dungeons & Dragons: The Book of Vile Darkness* in the United States, and ~~Sweetpea's agent~~ Grayson is unaware of any efforts or plans to do so.  *See* Richards Tr. 142:24–143:21.

## O.   **The Third Movie Contains No Characters ~~Or Picture Creations~~ From The First Movie**

225.   There are no characters in the third movie that also appeared in the first or second movies.  *See* Schuh Decl. ¶ 26; Trial Ex. 336 (Sweetpea Interrogatory Responses) at Response No. 3 (failing to identify any characters in *The Book of Vile Darkness* that also appeared in either the first *Dungeons & Dragons* movie or *The Wrath of the Dragon God*); *See* Trial Exs. 330 (first movie), 331 (second movie), 332 (third movie).

226.   ~~The plot of the third movie is unrelated to anything that happens in either the first or second films.~~  *See* Schuh Decl. ¶ 26; Trial Exs. 330 (first movie), 331 (second movie), 332 (third movie).

227.   ~~The story in the third movie is completely new and takes place in a separate fantasy realm apart from the first movies.~~  9/18 (am) Tr. (Richards) 133:21–134:24; *see also* Trial Exs. 330 (first movie), 331 (second movie), 332 (third movie).

228.   ~~Each element that Mr. Dekom, Mr. Richards, or Mr. Solomon purported to identify as in common between the first and third movies is a generic fantasy trope (*e.g.*, fire-breathing dragons, magical spells, swords, heroes on a quest, etc.).~~  *See* 9/19 (pm) Tr.

(Dekom) 10:2–11:20 ("Q: How is [the story in the first and third movies] similar, Mr. Dekom?  A:  It was the same notion of a quest.  It was the same notion of the dragons, the castle, the middle ages . . . .it was a similar movie."); Solomon Decl. ¶ 139 (citing "teleportation portal[s]," "fire-breathing dragons," "magical swords" and "magical armor," and "Elves, Dwarves, Mages, and Orcs" as purported elements common to the first and third movies); 9/18 (am) Tr. 124:17–22 (Richards) ("Q: What are the creative elements found in the 2000 movie that also were in *The Book of Vile Darkness*?  A: I think that there are similar spells and there is similar themes, and in all three movies there is a kind of ragtag team of adventurers trying to achieve a particular goal.").

229.  ~~Mr. Solomon admitted that several of the concepts listed in Paragraph 139 of his trial declaration did not originate in the *Dungeons & Dragons* movies and/or were generic.~~  *See* 9/23 Tr. (Solomon) 22:8–10 (admitting concept of "teleportation" predates the movies); 25:5–10 ("Q You would agree that a fire-breathing dragon is a common element found in fantasy and fiction movies, correct? A: I would").

230.  ~~The only similarities that Mr. Solomon could identify between the dragons featured in the first and third movies were generic characteristics of any fire-breathing dragon.~~  9/23 Tr. (Solomon) 31:14–32:1 (identifying as commonalities that both dragons were red, and "they are dangerous, they fight, they cause damage, [and] they set things on fire").

231.  <span style="color:red">At trial</span> Mr. Richards could not identify a single creative element from the first movie that also appeared in the third movie.  9/18 (am) Tr. (Richards) 127:10–129:19 ("Q:  Can you identify any creative element that was in the first movie that also appeared in the third movie?  A: I did not prep myself to answer that question.  Q:  So, the answer is no?  A: I wish I could call my creative person on the movie and ask him.  The Court:  You don't get a life-line.  Q: 'Yes' or 'no,' Mr. Richards?  A: I am not aware.").

232.  ~~Mr. Dekom could not identify a single Picture Creation from the first movie that also appeared in the third movie.~~  9/19 (pm) Tr. (Dekom) 11:25–12:21.

233.   ~~In his sworn trial declaration Mr. Solomon identified a single non-generic element, the "Rod of Sarville," as purportedly appearing in each of the three films.~~ Solomon Decl. ¶ 139 (stating "The Rod of Sarville [sic] is featured" in each of the three columns of Mr. Solomon's chart).  ~~His statement was false.~~  *See* 9/23 Tr. (Solomon) 37:18–38:2; 40:21–25.

234.   Mr. Solomon claimed that his listing of the Rod of Savrille on his chart was an "innocent mistake," 9/23 Tr. (Solomon) 41:20–42:8, but he admitted that he was "keenly aware" that the Rod of Savrille had been destroyed in the first movie and did not appear in the second or third movies.  9/23 Tr. (Solomon) 36:18–40:5; 40:21–25 ("Q: And you knew [the Rod of Savrille] wasn't in the second and third movies, correct?  A: Yeah, I did.  Q: You knew it was not in those movies?  A: I did know it was not in those movies.").

# V.

## THE WARNER BROS. D&D FILM PROJECT

**A.     The ~~Infringing~~ *Chainmail* Script**

235.   **In or about October 2012, Warner Bros. Pictures ("WB") approached Hasbro to obtain the rights necessary to produce a *D&D* movie based on a script entitled *Chainmail* (the "*Chainmail* script").**  JSAF ¶ 34.

236.   **Jun Oh, a Senior Vice President of Business Affairs at WB, was the executive primarily responsible for WB's negotiations relating to the *Chainmail* script.**  *See* Trial Declaration of Jun Oh dated August 25, 2014 [ECF # 209] (the "Oh Decl.") ¶ 1–3.

237.   **WB provided Hasbro with a copy of the *Chainmail* script, dated September 5, 2012, which was written by David Leslie Johnson.**  JSAF ¶ 35.

238.   **The *Chainmail* script contains numerous characters, settings, back stories and other elements from the *D&D* Universe.**  JSAF ¶ 36–37; Trial Declaration of James Wyatt dated August 25, 2014 (ECF # 255) (the "Wyatt Decl.") ¶ 5–9; *see* Trial Ex. 531.

239.   ~~The *Chainmail* script contains various elements that are protected by Hasbro's copyrights and trademarks in the Property.~~  *See* Sweetpea's Response to Hasbro's Separate Statement of Uncontroverted Material Facts [ECF # 107-2] ("SSUF") ¶ 21; *see also* SJ Order at 9 ("It is undisputed that WB produced the *Chainmail* script based on copyrighted *Dungeons & Dragons* material.").

240.   Neither Mr. Eisner nor Mr. Schneir, the two Hasbro representatives with whom Mr. Oh had discussions concerning Hasbro's rights in the *D&D* Universe, ever stated that Hasbro lacked the necessary rights to make a motion picture based on the *Chainmail* script.  9/22 Tr. (Oh) 30:7–31:6.

241.   ~~Rob Carlson, Hasbro's agent at William Morris Endeavor, never told Mr. Oh that Hasbro lacked the necessary rights to produce the *Chainmail* script.~~  9/22 Tr. (Oh) 32:16–23, 36:1–13.

242.   At the time WB and Hasbro were discussing the *Chainmail* script, Mr. Oh did not know whether Mr. Schneir, Mr. Eisner, or anyone else at Hasbro had completed their chain-of-title review relating to Hasbro's rights in the *D&D* universe.  9/22 Tr. (Oh) 41:21–42:1; *see also* Trial Ex. 219 (Nov. 13, 2012 email from Eisner to Oh indicating that Eisner was still "awaiting word from [WOTC] regarding the chain of title issues [Mr. Oh] asked about").

243.   **Hasbro did not reach an agreement with WB to produce a *Dungeons & Dragons* movie based on the *Chainmail* script.**  *See* JSAF ¶ 38.

244.   **Hasbro never granted WB any rights in the *D&D* Universe.**  *See* JSAF ¶ 39.

**B.   ~~Sweetpea's Authorization to Develop the *Chainmail* Script and to Use the *D&D Trademark* as the Title of the WB Film Project~~**

245.   **In or about November 2012, WB approached Sweetpea to inquire about its rights in the *D&D* Universe to produce a motion picture (the "WB Film Project").**  *See* JSAF ¶ 40.

246.   Over the next several months, Sweetpea, through its attorney Ralph Brescia, negotiated the terms of an option purchase agreement with WB.  Mr. Brescia and Mr. Oh exchanged numerous phone calls and negotiated ~~all material terms of~~ the agreement, including the grant of rights, financial terms, merchandising, and reversion.  *See* Oh Decl. ¶ 12; Trial Exs. 244, 248, 252; 9/22 Tr. (Oh) 52:4–16.

247.   **From the outset through the conclusion of WB's negotiations with Sweetpea, it was clear that the *Chainmail* script was always attached to the WB Film Project, and that the project would use the *D&D* Trademark as the title of the motion picture.**  SSUF ¶¶ 30, 31; *See* Trial Ex. 252 (email from J. Oh noting "[w]e [*i.e.* WB] would definitely be utilizing the DUNGEONS & DRAGONS title").

248.   **On December 7, 2012, WB provided Mr. Solomon with a copy of the *Chainmail* script, with every page watermarked "COURTNEY SOLOMON," for the "specific business purpose" of reviewing it for Mr. Solomon's "proposed involvement in the possible development and production of a motion picture currently entitled 'Dungeons & Dragons.'"**  JSAF ¶ 41.

249.   After reviewing the first third of the *Chainmail* script, Mr. Solomon ~~admitted~~ that the script was "entirely based on dungeons and dragons and advanced dungeons and dragons character types" and that WB could not "make this movie without the rights from us or Hasbro or they will be sued for sure."  Trial Ex. 238; Solomon Decl. ¶ 147 ("When I read the *Chainmail* script in 2012, I suspected that there were elements in the script that may have come from Advanced Dungeons & Dragons, and thus may have been reserved to Hasbro.").

250.   **Mr. Solomon** ~~admitted that he~~ **knew "how to fix this so that if we submitted the script for the approval to [H]asbro under our rights agreement and the limitation of their approval they would be very hard pressed to screw with us."**  Trial Ex. 238; Solomon Decl. ¶ 148.

251.   **After reading the entire *Chainmail* script, Mr. Solomon** ~~admitted~~ **that the script was a "direct lift and use of the Dungeons and Dragons property,"**

Solomon Tr. 133:18-23, **and that "WB could never make this film without the D&D
rights no matter what they named it,"** Solomon Tr. 13 133:25-134:2.  ~~The settings,
character types, creatures, spells, magic, magical weapons and items and even lingo are
all proprietary clearly to Dungeons and Dragons."~~  Trial Ex. 237; Solomon Tr. 136:3–12.

252.  **Mr. Solomon told WB that he owned the right to use "Dungeons &
Dragons" as the primary title in a motion picture and that these rights "were better
than the Hasbro rights."** *See* Designations from Transcript of the Deposition of Jun Oh
dated Nov. 15, 2013 (the "Oh Tr.") 181:2–17.

253.  **On December 20, 2012 Mr. Oh sent an "update" email to others at WB
that related the current state of WB's negotiations with Mr. Solomon.  In the
update, Mr. Oh stated that "Hasbro/*others* may use DUNGEONS & DRAGONS or
ADVANCED DUNGEONS & DRAGONS below or after the title and no greater
than 50% of the size of the title."**  Trial Ex. 244 (emphasis added).

254.  **Mr. Oh sent this email, which he described as a "snapshot of the most
important deal terms" in the WB Film Project negotiation, based on statements
made by Sweetpea's attorney, Mr. Brescia, about Sweetpea's and Hasbro's title
rights under the Agreement.**  9/22 Tr. (Oh) 15:19–17:22, 23:24–24:21 ("Q: . . . Is it true
that Mr. Brescia told you that Hasbro or *others* may use Dungeons & Dragons or
Advanced Dungeons & Dragons below or after the title. . . . is that – that what you were
told?  A: I believe so . . .") (emphasis added)

255.  ~~In January 2013, WB gave the "greenlight" to proceed with the development
of the *Chainmail* script.~~  SSUF ¶ 32; Trial Exs. 250, 540 at 540-0001.

256.  ~~As early as January 10, 2013, WB had decided that the WB Film Project
would include the words "Dungeons & Dragons" as part of the film's title.~~  *See* Oh Tr.
205:2–206:23; Trial Ex. 252.

257.  By April 15, 2013, WB ~~already~~ had ~~begun to develop the WB Film Project,
including~~ created some "visuals," "mood boards" and "practical location suggestions and

1  design suggestions." relating to the WB Film Project, but there is no evidence that
2  Sweetpea encouraged, knew of or was advised of such activities.  Trial Ex. 273.

3  258.  On April 16, 2013, Mr. Brescia and Mr. Oh "closed" the rights deal between
4  WB and Sweetpea granting WB rights to produce a theatrically-released film based on
5  the *D&D* Universe and to use the words "Dungeons & Dragons" in the primary title of
6  such movie.  JSAF ¶ 42; Trial Exs. 272, 275.

7  259.  After this deal closed, WB understood that it had reached an agreement in
8  principal with Sweetpea on all the material terms for the acquisition of the rights
9  necessary to produce a motion picture using based on the *Chainmail* script.  9/22 Tr. (Oh)
10  52:4–16.

11  260.  On May 1, 2013, WB and Sweetpea exchanged a draft "Option Purchase
12  Agreement between Warner Bros. Pictures ('WB') and Sweetpea Entertainment, Inc. in
13  connection with the motion picture entitled 'Dungeons and Dragons (2013)' (the
14  'Picture')" that memorialized the terms of the rights deal between WB and Sweetpea that
15  Oh and Brescia had "closed" on April 16, 2013.  Trial Ex. 283.

16  261.  Sweetpea contributed to WB's infringement of Hasbro's copyrights by
17  encouraging the development of infringing works after Sweetpea became involved with
18  the WB Film Project, including "greenlighting" the development of the *Chainmail* script
19  and the production of various "visuals, combination of mood boards and practical
20  locations and design suggestions."  SSUF ¶¶ 32, 26; Trial Exs. 250, 273, 540 at 540-0001

21  262.  In or around June 2013, WB held talks with several potential directors and
22  considered Eli Roth to be the "frontrunner" to direct the film based on the *Chainmail*
23  script.  There is no evidence that Sweetpea encouraged, knew of or was advised of such
24  activities.  9/22 Tr. (Oh) 55:17–25, 56:23–57:1, 61:21–62:4, 62:17–23; Trial Exs. 574,
25  575.

26  263.  Sweetpea further contributed to WB's infringement of Hasbro's copyrights
27  by encouraging WB to reproduce and distribute the infringing *Chainmail* script to
28  potential directors for the WB Film Project.  *See* 9/22 Tr. (Oh) 57:2–58:3 (Mr. Solomon

-51-

was sent a copy of the *Chainmail* script ahead of negotiations with WB and that WB

likely sent additional copies to the talent that WB was negotiating with to direct the film);

*see also* Trial Ex. 526 (Solomon Comic-Con Interview) ("I have a producing movie,

which is a reboot of Dungeons & Dragons which we're doing with Warner Brothers, and

that's sorta like a hundred-million dollar, an event movie . . . . [T]his one is going to be

the proper version of it, it should be very, very cool and *we're just finding a director for*

*that movie right now, so that's exciting*") (emphasis added).

**C.   ~~Sweetpea's Unauthorized Use of the~~ *D&D* ~~Trademark to Promote and~~**

**~~Advertise the WB Film Project~~**

264.   Sweetpea's involvement with the WB Film Project occurred after the *D&D*

Trademark became famous.  *See* JSAF ¶ 49.

265.   On May 14, 2013, the day after Hasbro filed its complaint in this action,

Sweetpea issued a press release, as quoted in *Deadline Hollywood*, that Sweetpea had

"made three pictures so far, and [it was] going to make more — including a tentpole

project that is currently in advanced stages of development with Warner Bros." SSUF

¶ 41; Trial Ex. 293 at 293–0001; Solomon Decl. ¶ 160 ("The press release was

accurate.").

266.   Mr. Solomon gave a videotaped interview at the "Comic-Con 2013"

convention, released on July 24, 2013, in which he stated "I have a producing movie,

which is a reboot of Dungeons & Dragons which we're doing with Warner Brothers, and

that's sorta like a hundred-million dollar, an event movie . . . ."  Trial Ex. 526; Solomon

Decl. ¶ 163.

267.   At the same convention in July 2013, Mr. Solomon gave an interview with a

reporter from the website craveonline.com, during which he claimed to be the producer

of "the new *D&D* reboot" that he described as "a $100+ million version of *Dungeons &*

*Dragons* it was supposed to be in the first place."  Mr. Solomon stated that he was

working with Warner Brothers and "they have a really interesting, good script for it that

DEFENDANTS' MARK-UP OF PLAINTIFFS' POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  they've been putting together for quite a long period of time." Trial Ex. 303 at 303-
2  0002–3; Solomon Decl. ¶ 161–62.

3  ~~268.   Sweetpea made the statements to the trade press using the *D&D* Trademark~~
4  ~~for the purpose of advertising and promoting the WB Film Project by capitalizing on the~~
5  ~~good will associated with the *D&D* Trademark.~~

6  ~~269.   Sweetpea's statements to the trade press using the *D&D* Trademark~~
7  ~~constitutes its use of the mark in connection with the sale of goods, *i.e.*, the future film.~~

8  ~~270.   Sweetpea's licensing agreement with WB capitalized on the *D&D*~~
9  ~~Trademark by purporting to license its use to WB.~~

10  271.   ~~Sweetpea's unauthorized use of the *D&D* Trademark in connection with a~~
11  ~~theatrical motion picture following the reversion of the Sequel Rights is likely to cause~~
12  ~~consumer confusion.~~  Schuh Decl. ¶¶ 27-29.

13  **~~D.     Irreparable Harm to Plaintiffs~~**

14  272.   Recently, WOTC has worked to focus its *D&D* brand development in order
15  to reinforce the *D&D* brand and build it into a premiere entertainment franchise.  *See*
16  Schuh Decl. ¶ 28.

17  273.   Over the past several years, Hasbro and WOTC have carefully coordinated
18  their marketing, product presentation, licensing efforts, and community outreach in order
19  to communicate a consistent message about the *D&D* brand to their fans and customers.
20  *See* Schuh Decl. ¶ 28.

21  274.   ~~If there were to be a *D&D* movie in the marketplace that is not consistent~~
22  ~~with WOTC's coordinated brand development strategy, it will harm WOTC by making it~~
23  ~~more difficult for WOTC to control the creative direction of the *D&D* brand.~~  *See* Schuh
24  Decl. ¶ 29.

25  275.   ~~Moreover, an unauthorized motion picture will make it extremely difficult~~
26  ~~for WOTC to present a consistent brand message because it will not be possible to~~
27  ~~coordinate such a movie with WOTC's current strategy to develop *D&D* into a premiere~~
28  ~~entertainment franchise.~~  *See* Schuh Decl. ¶ 29.

276. ~~Sweetpea's unauthorized use of Hasbro's copyrighted material from the~~ ~~*D&D* Universe and the *D&D* Trademark in connection with a theatrical motion picture~~ ~~following the reversion of the Sequel Rights will cause irreparable harm to Hasbro by~~ ~~diminishing Hasbro's ability to control the WOTC brand, business reputation, and~~ ~~consumer good will associated with WOTC products and publications.~~ *See* Schuh Decl. ¶¶ 27–29.

## VI.

## CUSTOM AND PRACTICE IN THE MOTION PICTURE INDUSTRY

### A.   Term Sheets and Deal Memos

277.   In the motion picture entertainment industry, it is customary for parties to enter into "deal memos" or "term sheets" that summarize the main business terms of an agreement between the parties without including all of the specific terms and conditions. Toll Decl. ¶ 19.

278. ~~When parties draft these types of documents, they customarily use shorthand~~ ~~and include only as much language as is necessary for the parties to understand the terms~~ ~~of the deal.~~ Toll Decl. ¶ 19.

279. ~~Terms and conditions that are customary in the industry, often including~~ ~~very crucial matters, are intentionally omitted from the deal memo because it is mutually~~ ~~understood that these customary terms are automatically part of the deal and there is no~~ ~~reason to waste time drafting them unless and until the parties enter into a formal long-~~ ~~form agreement.~~ Toll Decl. ¶ 19.

280. ~~Because the First Amendment is a deal memo, it is consistent with the~~ ~~custom and practice of the motion picture entertainment industry for any omitted or~~ ~~undefined terms to be supplied by customary usage or practices in that industry. See~~ Toll Decl. ¶ 23; 9/19 (am) Tr. (Toll) 105:13–21.

### B.   "Use It Or Lose It" Provisions in Limited License Agreements

281. ~~The Agreement between Hasbro and Sweetpea constitutes a limited license~~ ~~agreement commonly used in the motion picture entertainment industry and, according to~~

1   industry custom and practice, would be interpreted as such.  *See* Toll Decl. ¶¶ 24, 26(a)–

2   (g).

3       282.   Such limited license agreements customarily provide that the producer will

4   lose the right to create sequels, remakes, television spin-offs and other derivative works

5   unless the producer uses those rights by continuing to produce and release new

6   productions (and pay the applicable license fees) within specified periods.  *See* Toll Decl.

7   ¶ 26(d).

8       283.   The First Amendment follows this limited license structure: **Paragraph 6 of**

9   **the First Amendment provides that the sequel and remake rights "shall revert on a**

10  **rolling basis" within a specified time period** and Paragraph 12 has similar language

11  with respect to television rights.  *See* Toll Decl. ¶ 26(d); Trial Ex. 37 ¶¶ 6, 12.

12      284.   In connection with a rolling reversion provision, such as Paragraph 6 of the

13  First Amendment, it is the custom and practice in the industry that reversion occurs

14  unless the applicable sequel or remake commences production and the applicable

15  payment for that sequel or remake is paid in full on or before the expiration date.  *See*

16  Toll Decl. ¶ 26(e).

17      285.   It is contrary to the custom and practice in the motion picture industry that

18  the production of a *television* motion picture or series, together with the payment of the

19  applicable license fee, would extend or reset the reversion clock for the production of

20  *theatrical* sequels and remakes.  *See* Toll Decl. ¶ 26(f).

21      286.   The entire purpose of the "use it or lose it" provisions is to force the

22  producer to continue producing new productions.  Because of this, with "major" motion

23  pictures, it is unheard of for the producer to have the right to retroactively extend its

24  theatrical motion production rights by starting production of a television motion picture

25  and paying the relatively nominal license fee for that television production and, then, at

26  some later date, paying the incremental license fee applicable to a theatrical or non-

27  theatrical sequel or remake.  *See* Toll Decl. ¶ 26(g).

28

## C.     Meaning of the Term "Sequel"

287.   ~~In the motion picture entertainment industry, the term "sequel," when the parties have not indicated a different intention, most commonly is used to refer to a theatrical motion picture (*i.e.*, a motion picture initially released in theaters to paying audiences).~~  *See* Toll Decl. ¶ 14.

288.   ~~Although certain agreements define the term "sequel" expansively to include motion pictures initially released through a different distribution medium, such as direct-to-home-video or direct-to-internet, industry custom and practice is that, in the absence of an indication that the parties intended to apply a more expansive definition, the term "sequel" will mean a theatrical motion picture.~~  *See* Toll Decl. ¶ 14.

289.   ~~It is the custom and practice in the motion picture entertainment industry that the term "sequel," when not modified by other language and in the absence of an indication that the parties intend to define the term differently, refers to a motion picture which features the same principal characters (or, in some instances, a single central character) from the prior underlying motion picture, appearing in a new story that may follow from, but is substantially different than, the story contained in the prior underlying motion picture.~~  Toll Decl. ¶ 14.

290.   ~~The best reference to show the customary understanding of the definition of "sequel" in the motion picture industry is~~ the Writer's Guild of America Basic Agreement (the "WGA Agreement"), which has, for many years, governed contractual relationships between writers and producers of motion pictures.  *See* Toll Decl. ¶ 40; 9/19 (am) Tr. (Toll) 30:19–31:6; 47:12–48:17; Trial Exs. 550–53 (excerpts of the WGA Agreement from 1988, 1995, 1998 and 2011).

291.   ~~The WGA Agreement's definition of "sequel" is very familiar to anyone who regularly negotiates motion picture industry contracts and evidence of what the parties here had in mind when they used the term "sequel" in the First Amendment.~~  *See* Toll Decl. ¶ 40; 9/19 (am) Tr. (Toll) 30:19–31:6 ("[The definition of 'sequel' in the WGA Agreement] is reflective of what practitioners in the industry, the business affairs

-56-

1   people who negotiate contracts, the lawyers who negotiate contracts have in mind when

2   they use the term 'sequel.'"), 47:12–48:17; Trial Exs. 550–553.

3       292.  Article 16.A.1(c) of the 2011 version of the WGA Agreement provides that

4   "[t]he term 'sequel,' as used with reference to a particular motion picture, means a new

5   theatrical motion picture in which the principal characters of the first theatrical motion

6   picture participate in an entirely new and different story."  Trial Ex. 553.

7       293.  Although the Writer's Guild of America has published four updates to the

8   WGA Agreement between 1988 and the present, this ~~fundamental~~ definition of the term

9   "sequel" has remained unchanged throughout each revision.  *See* Trial Exs. 550–553;

10   9/19 (am) Tr. (Toll) 173:1–13.

11       294.  The WGA definition employs objective, readily discernable criteria ~~for~~

12   ~~determining whether a motion picture is a "sequel" and is customarily used in license~~

13   ~~agreements.~~ 9/19 (am) Tr. (Dekom) 168:19–169:4 (Sweetpea's expert has seen the

14   WGA definition used in license agreements); 171:23–172:4 ("Q: So, the WGA employs

15   objective criteria to make that determination, correct?  A: That's correct."); *see* Trial

16   Declaration of Peter Dekom dated Aug. 26, 2014 (ECF # 211) (the "Dekom Decl.") ¶ 20.

17       295.  ~~Sweetpea's broader, contrary definition is not found or confirmed in any~~

18   ~~other sources, much less a source known, or relied upon, by persons in the motion picture~~

19   ~~entertainment industry.~~  9/19 (pm) Tr. (Dekom) 20:14–17 ("Q: Yet you weren't able to

20   find any outside definitions other than yourself that supported your definition of sequel;

21   correct – better than Wikipedia?  A: I didn't look because I am an expert in this field--");

22   38:10–40:2 (striking from Dekom's trial declaration all references to the definition of the

23   word "sequel" taken from internet websites as not relevant).

24       296.  ~~Sweetpea's broader, contrary definition of the term "sequel," is inconsistent~~

25   ~~with the custom and practice in the industry that, if the parties to a license or rights~~

26   ~~acquisition agreement intend for the producer to acquire broad rights to produce any and~~

27   ~~all motion pictures of any nature based on the property which is the subject of the license,~~

28   ~~then they will explicitly provide for that result, rather than providing for a limited license~~

1   ~~or a grant of only sequel and/or remake rights.~~  Toll Decl. ¶ 41.  ("I have seen in literally

2   thousands of agreements a grant of rights provision that provides substantially as follows:

3   [Producer is hereby granted] the right to produce and exploit one or more motion

4   pictures, television productions or other audiovisual works of any nature based in whole

5   or in part on the property.'"); Dekom Decl. ¶¶ 9, 10.

6       297.  ~~According to custom and practice in the motion picture entertainment~~

7   ~~industry, the purpose of a license limited for the production of "sequels" and "remakes"~~

8   ~~based on an original production (as opposed to any and all derivative productions based~~

9   ~~on the property) is to create conditions where, if the original production fails: (i) the~~

10  ~~licensee  cannot make another picture which might further damage the underlying~~

11  ~~property and cannot take more creative directions off the table for future licenses, and (ii)~~

12  ~~the sequel and remake rights would revert to licensor (because, in all probability, licensee~~

13  ~~would not want to, and would not be able to find the financing to produce a movie in the~~

14  ~~same creative direction that had already failed.~~  Toll Decl. ¶ 62.

15      298.  ~~Sweetpea's broader, contrary definition of the term "sequel" is~~

16  ~~inconsistent with the custom and practice in the industry related to a license limited for~~

17  ~~the production of "sequels" and "remakes" based on an original production (as opposed~~

18  ~~to any and all derivative productions based on the property).  It is customary that, in~~

19  ~~connection with a limited license, once a licensee has exhausted the commercial and~~

20  ~~creative possibilities of the creative direction of its original production, the sequel rights~~

21  ~~and remake rights would then revert and only that one creative direction would have been~~

22  ~~played out — not the entire franchise.~~  Toll Decl. ¶ 62

23  **D.    Meaning Of The Term "Non-Theatrical"**

24      299.  ~~In the motion picture industry,~~ **For purposes of the Agreement between**

25  **Hasbro and Sweetpea,** **the term "non-theatrical," when used to describe a motion**

26  **picture, refers to a motion picture distributed in "all manner of packaged media,**

27  **including home video, DVD, video on demand, etc." rather than in theaters or on**

28  **television**.  *See* Dekom Decl. ¶ 43; Solomon Decl. ¶ 50.

-58-

1
2

## E.    Determining Whether a Motion Picture is Theatrical, Non-Theatrical or Television

3
4
5
6
7

300.   ~~In determining whether a motion picture is theatrical, non-theatrical or television, it is the custom and practice in the motion picture entertainment industry to look at the producer's intended mode of release at the time of commencement of principal photography.~~  Dekom Decl. ¶ 45; 9/19 (am) Tr. (Dekom) 152:23–153:9; Toll Decl. ¶¶ 52–54.

8
9
10
11
12

301.   ~~In the motion picture entertainment industry, the producer's intentions are determined when a "producer gives the rightsholder a notice stating that it is producing a particular category of production (*e.g.*, a theatrical motion picture, a direct-to-video picture or television motion picture), citing the relevant clause of the applicable rights agreement, and encloses the payment specified by that clause."~~  Toll Decl. ¶ 54

13
14
15
16
17
18

302.   ~~In the motion picture entertainment industry, the producer's notice and rights payment to licensor are "dispositive" in determining the producer's original production intentions and in determining which rights are being exercised by the producer.~~  *See* Toll Decl. ¶ 54; 9/19 (am) Tr. (Toll) 84:20–85:6 ("In determining whether the parties have [done what is required] to prevent reversion, one would look at the notice that's given when the right is exercised and the payment given in connection with that notice.")

19
20
21
22

303.   ~~In the motion picture entertainment industry, the actual mode of release of a motion picture is not relevant in determining the rights and obligations of the parties under the First Amendment or any comparable agreement.~~  9/19 (am) Tr. (Toll) 71:9–72:14.

23
24
25
26
27
28

304.   ~~In determining whether a motion picture is theatrical, non-theatrical or television, it is the custom and practice in the motion picture industry to look at how the producers intend initially to release the movie in the *United States*, not in foreign markets.~~  Toll Decl. ¶ 53; *See* 9/19 (pm) Tr. (Dekom) 73:18–20 ("Again, it's really a question of is it a meaningful release in a meaningful market.  And if it's not, then the answer is yes, you look at the United States.") 74:13 (testifying that "the U.S. release is

absolutely relevant" to the inquiry of the producer's intention); 68:18–20 (testifying that "[i]n 1998 . . .40-plus percent was going to come from [the] international [market]"); 75:8–12 (Mr. Dekom, estimating that, in 1998, that the market share of United Kingdom represented approximately 13% of the total international market).

305. ~~Use of the term "initial U.S. release" in Paragraph 6 of the First Amendment is further evidence that the parties intended the terms "sequels" and "remakes" in Paragraph 6 to refer to motion pictures in the theatrical or the non-theatrical (*i.e.*, home entertainment) markets.~~ *See* Trial Declaration of Roger Toll dated Aug. 22, 2014 (ECF # 225-1) (the "Toll Decl.") ¶ 49 ("initial release" is a term of art in the motion picture business referring to theatrical and non-theatrical movies; parties referring to television generally use the terms "initial airing" or "initial broadcast," as in Paragraph 12 of the First Amendment).

**F.    Payment of Rights Payment Upon Commencement of Principal Photography**

306. ~~It is the custom and practice in the motion picture entertainment industry that, in order to exercise the relevant rights, the producer must pay any applicable rights payment upon the commencement of principal photography.~~ 9/19 (am) (Dekom) Tr. 158:6–18; Toll Decl. ¶ 26(c). *See also* 9/18 (am) Tr. (Richards) 37:25–38:6 (Richards was aware of this practice); 9/23 Tr. (Solomon) 91:9–14 (Solomon was aware of this practice).

**G.    Rights of the Parties Upon Reversion**

307. ~~Based on custom and practice in the motion picture entertainment industry, since (at the latest) October 8, 2010, when the Sequel Rights reverted to Hasbro, Hasbro has held, and continues to hold, the right to produce theatrical and non-theatrical motion pictures based in whole or in part on the Property.~~ *See* Toll Decl. ¶ 29 ("[T]he point of the 'use it or lose it' provision is to assure that the licensor and its subsequent licensees will be able to use all of the elements in the underlying property (including the title and associated logos) together with new elements they create to produce more theatrical motion pictures.").

308.   ~~It would be contrary to custom and practice in the motion picture~~
~~entertainment industry that, upon the reversion of the Sequel Rights to Hasbro, the rights~~
~~to produce new theatrical and non-theatrical motion pictures based on the Property~~
~~became "frozen" indefinitely and not subject to exploitation by the owner of the Property.~~
*See* Toll Decl. ¶¶ 29 ("[I]n my 30+ years of experience in the motion picture
entertainment industry, I have never heard of a situation in which the right to produce
further motion pictures initially is granted to a producer subject to a 'use it or lose it'
reversion clause and then, after such rights revert due to the producer's own failure to
timely exploit them, they are effectively frozen and cannot be exercised by the
licensor."), 62, 68.

309.   ~~Rather, it is the custom and practice in the motion picture entertainment~~
~~industry that, once the licensee loses the right to produce sequels, the licensor will then~~
~~have the right to use all elements in the underlying property including titles and logos.~~
9/19 (am) Tr. (Toll) 26:2–8 ("[U]pon such a reversion, [Hasbro] gets back all rights
necessary for it to exploit the property in the best way possible."), 136:11–15 (Licensor
"gets back everything that it contributed to the transaction in the first instance"), 136:21–
137:1 ("[T]he things that were originally part of the Property that was licensed by the
rights holder to the producer, that goes back to the rights holder.").

310.   ~~The provisions in Paragraphs 14 and 15 of the First Amendment do not~~
~~impact the custom and practice regarding the reversion of the title and logos, as those~~
~~provisions specifically address the pre-reversion situation where Hasbro and Sweetpea~~
~~both held rights to make feature films, which might create a conflict.~~  9/19 (am) Tr. (Toll)
25:18–27:6 ("[O]nce Sweetpea's rights reverted, Sweetpea really has no interest in
continuing to prevent [Hasbro] and its assignees from using the Dungeons & Dragons
title.").

**H.      Effect of Right of First Negotiation/Last Refusal Clause Following Execution
of First Amendment**

311.     ~~Sweetpea's claim that it continues to hold the Right of First Negotiation/Last
Refusal notwithstanding the outright grant of Sequel and Television Rights to Sweetpea
pursuant to the First Amendment is contrary to custom and practice in the motion picture
entertainment industry.~~  *See* Toll Decl. ¶¶ 30–33.

312.     ~~It is the custom and practice in the motion picture entertainment industry
that, if a producer is granted the applicable rights in connection with its first negotiation,
the last refusal right serves no purpose and never becomes operative.~~  *See* Toll Decl. ¶ 30.

313.     ~~It is also customary in the motion picture entertainment industry that once a
producer acquires the applicable rights, or the owner has licensed the rights to a third
party after complying with the requirements of the clause (i.e., after the producer has had
its full shot at acquiring the rights), the purpose of the clause has been served and it is no
longer applicable.~~  *See* Toll Decl. ¶ 31.

314.     ~~Thus, according to custom and practice in the motion picture entertainment
industry, if a producer acquires the applicable rights and later loses those rights, the
producer has already received the full benefit of the clause and it does not spring back
into life again to cloud the licensor's title.  The producer has had its opportunity to
exploit the property, satisfying the purpose of the clause, and it is not customary at that
point for there to be any further restriction on the owner's right to exploit and dispose of
the property as it sees fit.~~  *See* Toll Decl. ¶ 31.

315.     ~~According to custom and practice in the motion picture entertainment
industry, the clause in subparagraph 2(k)(i) of the License Agreement providing that
"Licensee's Right of First Negotiation shall arise again for each sequel or remake
contemplated on different terms" would be understood to address the situation in which
the negotiation between owner and producer fails to result in an agreement, the owner
proposes to self-produce a sequel or remake on terms discussed with the producer during
the negotiation, and then the owner changes its mind and proposes to self-produce a~~

1  sequel or remake on different terms than those previously discussed by the parties.  *See*
2  Toll Decl. ¶ 33.

3  316.  Consistent with the custom and practice in the industry, the right of first
4  refusal would not spring into life again in a situation where, as in the current case, all
5  remake and sequel rights were licensed to Sweetpea pursuant to a negotiation under
6  2(k)(i), and those rights later reverted to Hasbro because Sweetpea did not continue to
7  exercise them on a timely basis.  *See* Toll Decl. ¶ 33.

8  317.  Given the fact that the First Amendment was a deal memo or term sheet, it is
9  not significant that there is no provision expressly deleting paragraph 2(k) because the
10  parties would have understood the custom and practice in the industry that the right of
11  First Negotiation/Last Refusal would no longer apply given the outright grant of those
12  rights in the First Amendment.  9/19 (am) Tr. (Toll) 105:13–106:2.

13  **I.    Hasbro Had NO Obligation To Provide Notice and Opportunity to Cure In**
14  **Connection with the Reversion of the Sequel Rights**

15  318.  It is the custom and practice in the motion picture entertainment industry
16  that, when a party has the right to produce a motion picture (whether an initial motion
17  picture, a sequel, a remake or a subsequent production) that party has no obligation to
18  produce that picture and, thus, the failure to exercise the option (and pay the appropriate
19  rights payment) is not a breach of the license.  9/19 (am) Tr. (Toll) 95:25–96:24.

**VII.**

**ULTIMATE FINDINGS OF FACT**

22  **A.    Hasbro's Claim That the Sequel Rights Reverted**

23      **1.    What Was Sweetpea Required To Do To Prevent The Sequel Rights**
24          **From Reverting to Hasbro?**

25  319.  **The evidence at trial demonstrated the parties' mutual intention that,**
26  **to prevent the Sequel Rights from reverting, Sweetpea was required do *each* of the**
27  **following on or before October 8, 2010 (five years from the initial U.S. release of the**
28  **second movie):**

    (a)    **Commence principal photography of**

        **i.    a "sequel"**

        ii.    **"based on the Picture, the Picture Creations and the Property"**

        iii.   ~~intended for initial U.S. theatrical or non-theatrical release;~~

~~and~~

   ~~(b)   Pay Hasbro the applicable rights payment for a theatrical or non-theatrical sequel upon the commencement of principal photography.~~

*See infra and supra, passim.*

***Commence Principal Photography of a "Sequel"***

320.  **The parties agree that, to prevent the Sequel Rights from reverting, Sweetpea was required to commence principal photography of a "sequel" within the time period specified in Paragraph 6 of the First Amendment.**  *See* Trial Ex. 37 ¶ 6 (granting Sweetpea's rights to make one of more "sequels" and setting the date those rights would revert to TSR); Trial Ex. 528-0026 (Sweetpea's Counterclaim) ¶ 37 ("Sweetpea's Sequel Rights cannot revert back to Hasbro unless . . . Sweetpea fails to commence principal photography on a Sequel within the timeframe set forth in the Agreement"); 9/19 (am) (Dekom) Tr. 158:6–18 ("Upon or before commencement of principal photography you would expect a payment to have been made."); Toll Decl. ¶ 26(c).

321.  ~~The custom and practice in the motion picture industry evidences the parties' mutual intention that the term "sequel," as used in Paragraph 6 of the First Amendment, means a motion picture which features the same principal characters (or, potentially, a single central character) as in the Picture, appearing in a new story that may follow, but is substantially different, from the story contained in the Picture.~~  *Supra* ¶¶ 287–298.

***"Based on the Picture, the Picture Creations and the Property"***

322.   The plain language of Paragraph 6 of the First Amendment evidences the parties' mutual intention that any "sequels" produced by Sweetpea be "based on the Picture, the Picture Creations and the Property."  Trial Ex. 37 ¶ 6.

323.   ~~The drafting history of Paragraph 6 of the First Amendment evidences the parties' mutual intention that "Sweetpea may not go back to the Property for a picture or television program based on the Property alone but completely unrelated to the first Picture and the Picture Creations."~~  Trial Ex. 50 at 50-0001; *see also supra* ¶ 114.

324.   ~~Sweetpea admits the evidence does not support its initial contention that, pursuant to Paragraph 6 of the First Amendment, Sweetpea received "'the sole, exclusive right to make one or more live-action motion picture sequels, prequels or remakes [ ] based in whole or in part on any combination of the Picture, Property and Picture Creations.'"~~  *See* Defendants' Mark-Up of Plaintiffs' Proposed Findings of Fact and Conclusions of Law [ECF #242] Ex. A ¶ 55 (quoting Counterclaims at 25 ¶ 37).

### ~~*Intended for Initial U.S. Theatrical or Non-Theatrical Release*~~

325.   ~~The plain language and structure of the First Amendment evidences the parties' mutual intention that, to prevent the Sequel Rights from reverting, Sweetpea was required to produce a "theatrical" or "non-theatrical" sequel or remake.~~  Trial Ex. 37 ¶¶ 1–5 (Picture), 6–9 (Sequels), 10–12 (Television); *supra* ¶¶ 87–100 .

326.   ~~Sweetpea admits that, to prevent the Sequel Rights from reverting, it was obligated to produce a non-theatrical (or, presumably, a theatrical)[13] motion picture, and that the production of a television motion picture would not prevent the reversion of the Sequel Rights.~~  *See* Solomon Tr. 260:21–261:07 ("It was my understanding that, to maintain our theatrical sequel rights, we had to make a nontheatrical sequel."), 268:7–269:08 ("if we didn't make the nontheatrical movie and instead we elected to make a TV movie and actually made a TV movie" pursuant to paragraph 10, "then potentially [the Sequel Rights] might have reverted").

---

[13]Note from Sweetpea:  Plaintiffs mischaracterize the cited testimony, as evidenced by their use of "presumably" in this purported "fact."

327.   ~~The drafting history of the First Amendment~~ evidences the parties' mutual intention that, to prevent the Sequel Rights from reverting, Sweetpea was required to produce a "theatrical" or "non-theatrical" sequel or remake.  *See supra* ¶¶ 59–63 (Rosenbaum's January 30, 1998 proposal, providing for a separate grants of rights and reversion clauses for sequels and television motion pictures); 64–66 (Jeffrey's Feb. 9, 1998 counter-offer, proposing a single grant of rights and reversion provision unacceptable to TSR and not reflected in First Amendment), 110(a)–(b) (Jeffery's draft long-form, proposing to collapse all rights into a single grant of "subsequent production" rights), 113–117 (TSR's rejection of Sweetpea's draft long-form), 119 (Rosenbaum's draft long-form, reflecting First Agreement's separate grants of rights and reversion clauses); Trial Ex. 37 ¶¶ 1–12 (executed First Amendment, providing separate grants of rights and reversion clauses for each of the Picture, Sequel, and Television Rights).

328.   ~~Custom and practice in the motion picture industry evidences the parties' mutual intention that Sweetpea would not be able to extend its rights to produce theatrical motion picture sequels by producing a television motion picture accompanied by a television rights payment.~~  *Supra* ¶ 285–286.

329.   **The term "non-theatrical," as used in the First Amendment, means a motion picture distributed in "all manner of packaged media, including home video, DVD, video on demand, etc." rather than in theaters** ~~or on television.~~  *See* Dekom Decl. ¶ 43; Solomon Decl. ¶ 50.

330.   ~~Custom and practice in the motion picture industry evidences the parties' mutual intention that, the question of whether a motion picture being produced under the First Amendment is "theatrical," "non-theatrical" or a "television motion picture," turns on the medium by which the producer intends, at the commencement of principal photography, to distribute the motion picture.~~  *Supra* ¶ 301.

331.   ~~Custom and practice in the motion picture industry evidences the parties' mutual intention that, in determining the medium by which the producer intended, at the commencement of principal photography, to distribute the motion picture, the dispositive~~

-66-

~~inquiry is what the producer communicated to the rightsholder and what payment the~~
~~producer made to the rightsholder – i.e., "what you say and what you say."~~ *Supra* ¶ 302.

332.   ~~Custom and practice in the motion picture industry evidences the parties'~~
~~mutual intention that, in determining the medium by which the producer intended, at the~~
~~commencement of principal photography, to distribute the motion picture, the relevant~~
~~inquiry is how the producer intended to initially distribute the motion picture~~ *~~in the~~*
*~~United States~~*~~, not the intended distribution in a foreign territory.~~ *Supra* ¶ 304.

333.   ~~The plain language of the License Agreement and the First Amendment~~
~~evidences the parties' mutual intention that the initial distribution of motion pictures~~ *~~in~~*
*~~the United States~~* ~~is determinative of the parties' rights and obligations under the~~
~~Agreement, not the distribution in foreign territories.~~  *See* Trial Ex. 12 ¶¶ 1(g) (the period
in which Sweetpea would be entitled to share in revenue from merchandise relating to the
picture was tied to the initial theatrical release of the Picture *in the United States*), 3(b)
(TSR's obligations to manufacture merchandise relating to the initial Picture, and
Sweetpea's rights to share in revenues from such picture-related merchandise, were
dependent on the film being released theatrically *in the United States*), 4(b) (the holdback
on TSR's right to exploit an AD&D motion picture was 12 months following the initial
general commercial release of the Picture *in the United States*), 14 (in the event that
Sweetpea had completed production of the initial Picture but failed to release it
theatrically *in the United States* within a specified period of time, TSR would have been
permitted to produce and exploit its own motion pictures and television programs based
on the Property); *see also* Trial Ex. 37 ¶ 6 (the rolling reversion clock in Paragraph 6
commences upon the initial release of the previous picture *in the United States*).

*~~Pay Hasbro the Applicable Rights Payment Upon Commencement of Principal~~*
*~~Photography~~*

334.   **The plain language of the First Amendment evidences the parties'
mutual intention that Sweetpea was obligated to pay Hasbro a** ~~specified~~ **rights**

**payment for each sequel intended for theatrical release, each remake intended for theatrical release and each non-theatrical sequel or remake.** Trial Ex. 37 ¶¶ 7–9.

335. ~~The drafting history of the First Amendment evidences the parties' mutual intention that the rights payments specified in Paragraphs 7 through 9 of the First Amendment would be payable to Hasbro upon the commencement of principal photography.~~ *See supra* ¶¶ 62, 112, 120(b), 121.

336. ~~Custom and practice in the motion picture industry evidences the parties' mutual intention that the rights payments specified in Paragraphs 7 through 9 of the First Amendment would be payable to Hasbro upon the commencement of principal photography.~~ *See supra* ¶ 306.

337. ~~Sweetpea admits that making the rights payment to Hasbro was a necessary condition for Sweetpea "to maintain the rights."~~ Solomon Tr. 211:13–212:09 (admitting that Mr. Richards was "the person making the *payments to maintain the rights*" and that instructing Mr. Richards to make the rights payment was "one of the few areas where I actually directed him specifically") (emphasis added), 249:17-250:6 ("I sent him the *proper amount for the money to be paid properly.* I have several issues with this stuff, but I sent him – just logically knowing what I did, *I sent him the proper amount of my half of the money to be paid on the proper date*.") (emphasis added); Richards Tr. 177:2–24 (Sweetpea's agent made the rights payment to Hasbro for the purpose of "ensuring that the rolling right was dealt with").

338. ~~The course of performance of Sweetpea (via Mr. Solomon) and Sweetpea's agent Grayson (via Mr. Richards) establishes the parties' mutual intention that, to prevent the Sequel Rights from reverting, (1) a rights payment had to be made to Hasbro upon the commencement of principal photography of a non-theatrical sequel, and (2) Sweetpea needed to make, at minimum, a "non-theatrical" rights payment to Hasbro.~~ *See supra* ¶¶ 144–145, 177–190.

339. ~~Custom and practice in the motion picture industry evidences the parties' mutual intention that, to prevent the Sequel Rights from reverting, Sweetpea was required~~

-68-

1   to make the theatrical or non-theatrical rights payment to Hasbro upon the

2   commencement of principal photography.  *See supra* ¶¶ 282, 284–285, 306.

3       **2.      Sweetpea Failed to Do What Was Required to Prevent the Sequel Rights**

4           **from Reverting to Hasbro**

5       340.    Sweetpea did not commence principal photography of a "sequel" on or

6   before October 8, 2010 because *The Book of Vile Darkness* contains none of the

7   characters – principal or otherwise – who appeared in the first movie.  *See supra* ¶ 225.

8       341.    *The Book of Vile Darkness* was not "based on the Picture, the Picture

9   Creations and the Property" because not a single Picture Creation from the first movie

10  appears in the third movie.  *See supra* ¶¶ 226–234.

11      342.    *The Book of Vile Darkness* was not a theatrical or non-theatrical motion

12  picture, but was a television movie intended for initial release in the United States on the

13  Syfy cable television network.  *See supra* ¶¶ 219–224.

14      343.    Sweetpea exercised its Television Rights, not its Sequel Rights, by making a

15  $20,000 rights payment to Hasbro and indicating that the payment was for a television

16  movie of the week.  *See* Ex. 131; *see also supra* ¶¶ 202–203 (at no time did Sweetpea

17  make the rights payment for a theatrical or non-theatrical sequel).

18      **3.      The Sequel Rights Reverted to Hasbro**

19      344.    The Sequel Rights reverted to Hasbro on October 8, 2010.

20  **B.    The Parties' Respective Rights Upon Reversion**

21      345.    The evidence demonstrates the parties' intention that, upon the reversion of

22  the Sequel Rights:

23          (a)    Sweetpea may not produce or exploit or authorize others to produce or

24              exploit any theatrical or non-theatrical motion pictures based on the

25              Property (with the exception of the Picture Creations) [Trial Ex. 37

26              ¶ 6];

27

28

(b) ~~Hasbro may produce and exploit and may authorize others to produce and exploit theatrical or non-theatrical motion pictures based on the Property~~; *see supra* ¶¶ 307–310.

346. ~~Hasbro may use and may authorize others to use the words "Dungeons & Dragons" or "Advanced Dungeons & Dragons" in the primary or secondary title of theatrical or non-theatrical motion pictures.~~ *See supra* ¶¶ 309–310.

## C.   Sweetpea's Claim That It Holds The Right Of First Negotiation/Last Refusal

347. ~~The evidence demonstrates the parties' intention that, in entering into the First Amendment, Sweetpea's Right of First Negotiation/Last Refusal that previously had been granted to it pursuant to Paragraph 2(k) of the License Agreement would be eliminated and/or superseded by the outright grant of Sequel Rights and Television Rights.~~ *See supra* ¶¶ 78–86, 111, 120–121, 311–317.

## D.   Sweetpea's Claim That It Hasbro May Not License Others To Use The Secondary Title Rights

348. ~~The evidence establishes the parties' intention that, upon execution of the First Amendment, Hasbro had the right to use and to permit others to use the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" as the secondary title in a motion picture subject to the size restrictions in Paragraph 14(b) of the First Amendment.~~ *See supra* ¶¶ 44–45, 101–104, 253–254.

## PROPOSED CONCLUSIONS OF LAW

## I.

## PROPOSED CONCLUSIONS OF LAW RELATING TO JURISDICTION

## A.   Jurisdiction and Venue

349. **This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1338(a) (copyright and trademark), 1367 (supplemental jurisdiction) and 15 U.S.C. § 1121(a) (trademark).**

350. **This Court has personal jurisdiction over the Defendants and venue is proper pursuant to 27 U.S.C. §§ 1391(a)(1) and (c) because each of the Defendants**

has its principal place of business and/or transacts substantial business in Los Angeles, California.

**B.    Declaratory Judgment**

351.    **This Court is authorized to declare the rights and legal relations of interested parties to an actual case or controversy.**  28 U.S.C. § 2201.

352.    **Declaratory relief is appropriate where (a) an actual and substantial controversy exists between parties concerning their respective rights under an agreement; (b) the parties have adverse legal interests; (c) the controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment; (d) the parties desire a judicial determination of their respective rights under an agreement; and (e) "a judicial declaration is necessary and appropriate in order to set at rest the respective rights and obligations of the parties."**  *See Hollywood Foreign Press Ass'n v. Red Zone Capital Partners II*, 870 F. Supp. 2d 881, 916 (C.D. Cal. 2012).

353.    **Under California law, in cases presenting an actual case or controversy, a party to a contract may seek a declaration of rights and duties under the contract.**  Cal. Civ. Proc. Code § 1060; *Hollywood Foreign Press Ass'n v. Red Zone Capital Partners II*, 870 F. Supp. 2d 881, 916–25 (C.D. Cal. 2012) (interpreting the terms of the parties' amended licensing agreement for the production of the Golden Globe Awards telecast).

**C.    Claims Permitted at Trial**

354.    Defendants have asserted two counterclaims that appear nowhere in their pleadings but which are expressly identified in the jointly prepared Final Pretrial Conference Order, dated March 24, 2014.  (*See* Dkt. No. 194 at 13 (¶¶ g, h).).  *See supra* ¶ 7. After a party's time to amend its pleadings as a matter of course elapses, a party must obtain leave of the court to file an amendment.  *See* Fed. R. Civ. P. 15(a).

355.   The deadline for Sweetpea to move to amend its pleadings in this case was October 4, 2013.  *See* Scheduling and Case Management Order for Jury Trial [ECF # 63] at 2, 17.

356.   "Only claims or defenses contained in the complaint and answer and any court authorized amendment or supplement may be included in the Final Pretrial Conference Order," *see* Local Rules of the United States District Court for the Central District of California ("Local Rules") at 16-7.2; Appendix A to the Local Rules at Chapter I-129,  provided, however, that the Pretrial Conference Order "supersedes the pleadings, including the complaint and answer, and controls the course of the litigation thereafter.  *Leonard Roofing, Inc. v. Ironshore Specialty Ins. Co*., No. EDCV 12-00156 VAP, 2013 WL 4763842, at \*3 (C.D. Cal. Aug. 29, 2013) (rejecting claims by the plaintiff that the defendant should be barred from asserting an affirmative defense that was included in the Final Pretrial Conference Order but not asserted in the answer) (citing Fed.R.Civ.P. 16(d); *Northwest Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 924 (9th Cir. 1988)).

## II.

## PROPOSED CONCLUSIONS OF LAW RELATING TO
## HASBRO'S CLAIM THAT THE SEQUEL RIGHTS REVERTED

**A.   Contract Interpretation Under California Law**

357.   **Under California law, a contract must be interpreted to give effect to the parties' mutual intention at the time the contract was formed.** Cal. Civ. Code § 1636.

358.   **"The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."** Cal. Civ. Code § 1638.

359.   **"The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."** Cal. Civ. Code § 1641.

-72-

360.   **"The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."**  Cal. Civ. Code § 1644.

361.   **"Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense."**  Cal. Civ. Code § 1645.

362.   Where the meaning of words used in a contract is reasonably disputed, the Court must examine extrinsic evidence which is relevant to show whether the contract is reasonably susceptible of a particular meaning.  *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1352 (Cal. Ct. App. 2004).

363.   "First the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party.  If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract."  *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (Cal. Ct. App. 2004).

364.   "Where, as here, the contract at issue is fully integrated, California law allows the admission of parol evidence" if it is "(1) 'relevant' to prove (2) 'a meaning to which the language of the instrument is reasonably susceptible.'"  *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 938 (9th Cir. 2002) (citation omitted).

365.   "Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." *Dore v. Arnold Worldwide, Inc.*, 139 P.3d 56, 60 (Cal. 2006) (quotation marks and citations omitted).

366.   **"The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties."** *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1357 (Cal. Ct. App. 2004); *see also* Cal. Civ. Code § 1636.

367.   **"The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement**, as well as extrinsic evidence" *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1357 (Cal. Ct. App. 2004).

368.   Extrinsic evidence can include the following:

   (a)   statements made by the parties during negotiations, Cal. Civ. Code § 1647;

   (b)   the parties' subsequent course of performance, s*ee Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 754 (Cal.1960); and

   (c)   the custom and practice within the relevant industry. Cal. Civ. Proc. §§ 1856(c), 1861; Cal. Civ. Code § 1645; *Ermolieff v. R.K.O. Radio Pictures*, 19 Cal. 2d 543, 550 (Cal.1942).

369.   Evidence of industry custom or standard practice is admissible to interpret the terms of a contract, as contracts are read on the assumption that the usages of trade were taken for granted when the document was phrased." *Hollywood Foreign Press Ass'n v. Red Zone Capital Partners II*, 870 F. Supp. 2d 881, 923 (C.D. Cal. 2012) (citations omitted).

370.   "Evidence of custom and practice applies regardless of whether the signatories are industry insiders, because when there is a custom in a certain industry, those engaged in that industry are deemed to have contracted in reference to that practice unless the contrary appears." *Hollywood Foreign Press Ass'n v. Red Zone Capital Partners II*, 870 F. Supp. 2d 881, 923 (C.D. Cal. 2012) (*citing Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.*, 205 Cal. App. 3d 442 (Cal. Ct. App. 1988).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.** ~~**The Reversion Of The Sequel Rights Is Not A Forfeiture Because The First Amendment Is An Option Contract.**~~

371. ~~The grant of Sequel Rights under the First Amendment is an option because it granted Sweetpea the right, but not the obligation, to make sequels to the original Picture within a particular period of time.~~ *See* Trial Exs. 37 ¶ 6; 12 ¶ 14(a) ("Nothing contained herein shall be construed to obligate [Sweetpea] to . . . exercise, exploit, or make use of any of the rights, licenses, privileges, or property herein granted to [Sweetpea]."); *see also Palo Alto Town & Country Vil., Inc. v. Bbtc Co.*, 11 Cal. 3d 494, 499–500 (Cal. 1974) ("[A]n irrevocable option is a Contract, made for consideration, to keep an offer open for a prescribed period.").

**CLARIFICATION BY SWEETPEA:  In the sixteen years since the parties entered into the First Amendment in 1998, Plaintiffs never claimed that the First Amendment was an option contract, nor did Plaintiffs take that position in this litigation until their post-trial brief on October 6, 2014.  Like their belated assertion of the reversion argument in April 2013, Plaintiffs' post-trial debut of the "option argument" ignores the plain language of the First Amendment, which (1) does not mention the terms "option," "accept" or "expire" (*compare* Exh. 1); (2) contains no deadline by which Sweetpea must accept Plaintiffs' "offer" (*compare* Exh. 1-0001, ¶ 2); and (3) contrary to the concept of an option, expressly "grants to Sweetpea" specific, vested rights which "shall revert" only upon the nonoccurrence of *subsequent* events (Exh. 37-0001, ¶¶ 5, 6, 12).  *See generally Warner Bros. Pictures, Inc. v. Brodel*, 31 Cal.2d 766, 773 (1948) ("The [option] contract has already been made, as far as the optionor is concerned, but is subject to conditions which are *removed by the acceptance*.") (emphasis added) (citation omitted).**

**Indeed, even if the First Amendment were an option contract (which it is not), Sweetpea timely exercised its "option" to obtain sequel rights when it produced *D&D 1* in 2000, two years after Plaintiffs' "offer."  (*See* Exh. 37-**

DEFENDANTS' MARK-UP OF PLAINTIFFS' POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW

0001, ¶ 1.)  **Even if there were an option contract, Sweetpea "exercised" the "option" and thereby obtained the right—in perpetuity—to make sequels (subject to its compliance with the terms of Paragraph 6) by producing** *D&D 1*.  **(*See, e.g.*, ¶ 434, *infra*.)**

**Moreover, because Sweetpea, the purported "optionee," is not asking the Court to extend the time to exercise the "option" (*i.e.*, to avoid a forfeiture), much of the case law addressing construction of option contracts against forfeiture is inapposite.  *Cf. Holiday Inns of Am., Inc. v. Knight*, 70 Cal.2d 327, 330 (1969) ("those cases dealt with the time within which an option must be exercised and correctly held that such time cannot be extended beyond that provided in the contract").  Unlike in each of the cases cited by Plaintiffs, Sweetpea is relying on California Civil Code § 1442 for the bedrock principle that contracts shall be interpreted, wherever reasonably possible, to avoid the forfeiture of a party's vested, contractual rights.  (*See* ¶ 434, *infra*.) *See Bornholdt v. S. Pac. Co.*, 327 F.2d 18, 20 (9th Cir. 1964) (applying § 1442 to reject plaintiffs' attempt to invoke a contractual reversion clause).  Plaintiffs' eleventh-hour attempt to evade § 1442 has no foundation in the facts, the law or equity.**

372.   <u>The expiration of an option is not a forfeiture.</u>  *See Bekins Moving & Storage Co. v. Prudential Ins. Co.*, 176 Cal. App. 3d. 245, 253–254 (Cal. App. 1985) ("**In order for there to be a 'forfeiture' there must be some right or vested interest involved. An option is merely an offer**."); *Drewry v. Welch*, 236 Cal. App. 159, 167 (Cal. App. 1965) (rejecting defendant loggers' argument that the termination of their timber rights was a forfeiture and stating "this is not a case of forfeiture but of a failure by defendants to properly exercise an option which would grant them the right to continue logging on plaintiffs' land").

373.   ~~With respect to the third movie, Sweetpea did not exercise its option to produce a theatrical or non-theatrical sequel or remake based on the Picture, the Picture~~

-76-

1  ~~Creations and the Property, but instead exercised its option to produce a television motion~~
2  ~~picture.~~  Trial Ex. 131.

3        374.   California law is clear: where "the optionee ha[s] failed to meet the
4  conditions of the option, and . . . the time for doing so [has] expired, the option ha[s]
5  lapsed." *Cummings v. Bullock*, 367, F.2d 182, 186 (9th Cir. 1966).

6        375.   Under California law, the terms of an option are strictly construed in favor
7  of the party granting the option⸺ here, Hasbro.  *Cummings v. Bullock*, 367 F.2d 182,
8  186 (9th Cir. 1966) ("An option, given for consideration, binds the optionor, but it does
9  not bind the optionee.  He may, if he chooses, walk away from the deal.  That is why the
10 language of the option agreement is construed in favor of the optionor and why the *courts*
11 *require that the optionee comply strictly with whatever conditions the agreement imposes*
12 *upon his right to exercise the option if he chooses to do so*.")(emphasis added); *see also*
13 *Bekins Moving & Storage Co. v. Prudential Ins. Co.*, 176 Cal. App. 3d 245, 250–51 (Cal.
14 App. 1985) ("Since the optioner is bound while the optionee is free to accept or not as he
15 chooses, courts are strict in holding an optionee to exact compliance with the terms of the
16 option").

17       ~~376.   The reversion of the Sequel Rights to Hasbro ⸺ *i.e.* the expiration of~~
18 ~~Sweetpea's option to produce sequels to the original Picture ⸺ is therefore not a~~
19 ~~"forfeiture" under California law.~~

20       377.   **Finally**, ~~although~~ **equity may intervene to avoid a grossly**
21 **disproportionate forfeiture that results from a trivial or non-material breach**, *see*
22 *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.*, 195 Cal. App. 3d 1032, 1051–52 (Cal.
23 App. 1987) (citing *Jacobs & Young v. Kent*, 230 N.Y. 239, 241 (1921)), ~~this principle is~~
24 ~~not applicable in this case because Hasbro does not claim the Sequel Rights reverted due~~
25 ~~to Sweetpea's breach of the Agreement, but due to its failure to exercise the Sequel~~
26 ~~Rights within the specified time period.~~

27
28

## C.     Agency Law

378.    A principal can create an agency relationship, and confer authority, by authorizing the agent beforehand or subsequently ratifying the agent's actions.  Cal. Civ. Code § 2307.

379.    California law recognizes two types of principal-agent relationships: actual and ostensible. Cal. Civ. Code § 2298.

380.    An actual agent is one truly employed by the principal.  Cal. Civ. Code § 2298.

381.    An actual agent possesses the authority given to him by his principal, or the authority the principal, intentionally or by want of ordinary care, allows the agent to believe he possesses.  *See* Cal. Civ. Code § 2316.

382.    An ostensible agent is created "when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent." *See* Cal. Civ. Code § 2300.

383.    An ostensible agent possesses the authority that the principal, intentionally or negligently, causes or allows a third person to believe the agent possesses.  Cal. Civ. Code § 2317.

384.    An agent possess the authority "to do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency." Cal. Civ. Code § 2319.

385.    A principal is responsible to third persons for the actions of his agent in the transaction of the business of the agency, including the agent's willful omission to fulfill the obligations of the principal. *See* Cal. Civ. Code § 2338.

386.    "An agent acting within his apparent or ostensible authority binds the principal where the principal has intentionally or negligently allowed others to believe the agent has authority."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 479 (9th Cir. 2000).

387.   <u>Within the scope of the authority conferred on the agent, "the act of the agent is binding upon the principal as if it were done by the principal himself."</u>  *Hoffman v. John Hancock Mut. Life. Ins. Co.*, 92 U.S.C. 161, 164 (1875); *see also* Restatement (Third) of Agency § 2.02 (2006).

## III.

## PROPOSED CONCLUSIONS OF LAW RELATING TO HASBRO'S CLAIMS TO ENJOIN COPYRIGHT AND TRADEMARK INFRINGEMENT

**A.   Trademark**

388.   <u>Hasbro is the registered owner of</u> <span style="color:red">some of</span> <u>the trademarks *Dungeons & Dragons* (the "*D&D* Trademark") and *Advanced Dungeons & Dragons*.</u>  JSAF ¶ 13.

389.   <u>The *D&D* Trademark is used in commerce, is non-functional, is distinctive, and has acquired substantial secondary meaning in the marketplace.</u>  JSAF ¶ 17.

**1.     Use in Commerce**

390.   **"[T]he 'use in commerce' language in the Lanham Act "is simply a jurisdictional predicate to any law passed by Congress under the Commerce Clause,' and to determine whether a defendant has engaged in commercial use of a trademark, a court must consider whether the use was 'in connection with a sale of goods or services.'"**  SJ Order at 16 (quoting *Bosley Med. Institute, Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005)).

**2.     Trademark Infringement**

391.   **To prevail on its Lanham Act trademark claim, a plaintiff "must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion.'"**  *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 11202–03 (9th Cir. 2012).

392.   **The critical test in determining whether a later use infringes upon the rights of a trademark owner is whether consumers are likely to be confused as to the source of the goods or services in question.**  *See, e.g., Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385 (9th Cir. 1993).

393.     **Courts in the Ninth Circuit often apply the so-called "*Sleekcraft*" factors in considering whether confusion is likely.**  *See, e.g., Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391–92 (9th Cir. 1993).  **These non-exclusive factors include :  1) the strength of the mark; 2) proximity of the goods; 3) similarity of the marks; 4) evidence of actual confusion; 5) marketing channels used; 6) type of goods and degree of care likely to be exercised by the purchaser; 7) defendant's intent in selecting the mark; and 8) likelihood of expansion of product lines.**  *Id*., (*citing AMF Inc. v. Sleekcraft Boats*, 599 F.2d 34, 348–49 (9th Cir. 1979)).

394.     **This test is used both in cases involving infringement of registered marks under section 32 of the Lanham Act**, *e.g.*, *Network Automation, Inc. Advanced Sys. Concepts, Inc.,* 638 F.3d 1137 (9th Cir. 2011), **and in cases involving claims for false designation or origin or association under Section 43(a) of the Lanham Act**, *e.g., Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1035 (9th Cir. 2010).

### 3.     False Designation and Unfair Competition

395.     **To prove a claim for falls designation of origin and unfair competition, a plaintiff must establish that (1) it has a protectable ownership interest in a mark; (2) the defendant used the mark in commerce; and (3) the defendant's use of the mark is likely to cause confusion about the origin of good or services associated with the mark.**  *See* 15 U.S.C. § 1125(a)(1)(A); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046–47 n.6,8 (9th Cir. 1999) (false designation claim under § 1125(a)(1)(A) has same elements as trademark infringement claim under § 1114).

396.     Ninth Circuit law is clear that a registered trademark is not a prerequisite to bring such a claim under § 1125.  *See*, *e.g.*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68 (1992) (stating that the Lanham Act "protects qualifying unregistered trademarks"); *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046 n.7 (9th Cir. 1998) (stating "[r]egistration is not a prerequisite for protection under

-80-

[Lanham Act] § 43(a)"); *Protectmarriage.com v. Courage Campaign*, 689 F. Supp. 2d 1125, 1228-30 (E.D. Cal. 2010) ("While the mark is unregistered, registration is not a prerequisite to suit."). **Plaintiffs did not, however, preserve—and certainly did not prove—any common law claims at trial. (*See* Dkt. No. 194 (Final Pretrial Conference Order) at 3:3 – 4:5 (alleging claims only for federally registered marks).)**

### 4.    Trademark Dilution

397.    **To prevail on a claim for trademark dilution, the trademark owner must show "(a) that its mark is famous; (b) that the junior user has made commercial use of the famous mark; (c) that the junior user began using the mark after it had become famous; and (d) that such use caused actual dilution."** *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007)

398.    The *D&D* Trademark is famous and distinctive within the meaning of Section 43(c) of the Lanham Federal Trademark Act, 15 U.S.C. § 1125(c).  JSAF ¶ 18.

399.    Ninth Circuit law is clear that a registered trademark is not a prerequisite to bring such a claim under § 1125.  *See, e.g.*, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767-68 (1992) (stating that the Lanham Act "protects qualifying unregistered trademarks"); *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1046 n.7 (9th Cir. 1998) (stating "[r]egistration is not a prerequisite for protection under [Lanham Act] § 43(a)");  *Protectmarriage.com v. Courage Campaign*, 689 F. Supp. 2d 1125, 1228-30 (E.D. Cal. 2010) ("While the mark is unregistered, registration is not a prerequisite to suit.").  **Plaintiffs did not, however, preserve—and certainly did not prove—any common law claims at trial.  (*See* Dkt. No. 194 (Final Pretrial Conference Order) at 3:3 – 4:5 (alleging claims only for federally registered marks).)**

### 5.    ~~Likelihood of Confusion as a Matter of Law~~

400.    Where a licensee persists in the unauthorized use of a licensor's trademark, courts at the preliminary injunction stage have found that the continued use alone

establishes a likelihood of consumer confusion." *Robert Trent Jones II, Inc. v. GFSI, Inc.*, 537 F. Supp. 2d. 1061, 1065 (N.D. Cal. 2008); *see also* 4 McCarthy on Trademarks and Unfair Competition § 25:31 (4th ed.) ("In sum, the law is simple.  If, as a matter of contract law, a service mark or trademark license has ended, the licensee has no right to continue use of the licensed mark.  Any such use is without the trademark owner's consent and constitutes infringement."); *Church of Scientology Int'l v. Elmira Mission of Church of Scientology,* 794 F.2d 38, 44 (2d Cir. 1986); *Sun Microsystems, Inc. v. Microsoft Corp.,* 999 F. Supp. 1301, 1311 (N.D. Cal. 1998); *Paisa, Inc. v. N & G Auto, Inc.,* 928 F. Supp. 1009, 1012 n. 4 (C.D. Cal.1996);  *Hollywood Athletic Club Licensing Corp. v. GHAC-CityWalk*, 938 F. Supp. 612, 614 (C.D. Cal. 1996).[14]

### 6. Requirements for Injunctive Relief under the Lanham Act

401.   **Under the Lanham Act, district courts "shall have the power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable . . . to prevent a violation under [§ 1125(a)]."**  15 U.S.C. § 1116(a).

402.   **"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to**

---

[14] Note by Sweetpea:  Each of the cases on which Plaintiffs rely applies the standards for a preliminary, rather than a permanent injunction, and is thus inapposite.  Moreover, except for *Robert Trent Jones*, each of the cases cited by Sweetpea pre-dates *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) and thus applies the presumption of irreparable harm "once the plaintiff establishes likelihood of confusion."  *E.g., Hollywood Athletic Club Licensing Corp. v. GHAC-CityWalk,* 938 F.Supp. 612, 615 (C.D. Cal. 1996).  Post-*eBay,* however, courts must apply "traditional principles of equity" and perform "a fair weighing of the factors" for irreparable harm, "taking into account the unique circumstances of each case."  *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 880 (9th Cir. 2014).

compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 763 F. 3d 1239, 1248–49 (9th Cir. 2013) (applying *eBay* factors in trademark case).

403.   Proof of actual lost sales or actual damages to good will and reputation are not required in order for a court to conclude a party will suffer irreparable injury; "the law views the owner of a trademark as damaged by an infringing use which places the owner's reputation beyond its control, though no loss in business is shown." *Quicksilver, Inc. v. Kymsta Corp.*, 2008 WL 9463577, No. CV 02-5497-VBF, at * 11 (C.D. Cal. Apr. 15, 2008) *aff'd* 360 Fed. Appx. 886 (9th Cir. 2009).

404.   ~~"Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement."~~ *Century 21 Real Estate Corp. v. Sandlin*, 846 F. 2d 1175, 1180 (9th Cir. 1988).

405.   Where a party moves ahead with a business transaction fully aware that the mark used in the transaction is likely to cause confusion in the market, any losses stemming from an injunction do not weigh in the party's favor in determining the balance of hardships between the parties. *See Boldface Licensing +Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1198 (C.D. Cal. 2013); *c.f. Cadence Design Sys, Inc. v. Avant! Corp.*, 125 F. 3d 824, 829 (9th Cir. 1997) ("[A] defendant who knowingly infringes another's copyright cannot complain of the harm that will befall it when properly forced to desist from its infringing activities.").

406.   "It is well established that trademark law protects not only the private interests of the trademark owner but also the public's interest in not being confused by the infringing products." *Quicksilver, Inc. v. Kymsta Corp.*, 2008 WL 9463577, No. CV 02-5497-VBF, at * 12 (C.D. Cal. Apr. 15, 2008) *aff'd* 360 Fed. App. 886 (9th Cir. 2009).

407.   "[A]n intent to confuse consumers is not required for a finding of trademark infringement. . . . [The alleged infringer's intent] is only relevant to the extent it bears upon the likelihood that consumers will be confused by the alleged infringer's mark . . . ." *Brookfield Commcn's, Inc. v. West Coast Enter. Corp.*, 174 F.3d 1036, 1059 (9th Cir. 1999) (collecting cases).

### 7.   Trademark Licensee Estoppel

408.   ~~Sweetpea, a long-time licensee of Hasbro's D&D Trademark, is barred from challenging the validity of Hasbro's trademark by the doctrine of licensee estoppel.~~ *See, e.g. STX, Inc. v. Bauer USA, Inc.*, No. C 96-1140, 1997 WL 337578, (N.D. Cal. June 5, 1997), citing *Pacific Supply Co-op v. Farmers Union Cent. Exch.*, 318 F.2d 894, 908 (9th Cir. 1963).

409.   Licensee estoppel is based on the common-sense principle "that a licensee should not be permitted to enjoy the use of the licensed mark while at the same time challenging the mark as being invalid." 3 *McCarthy on Trademarks and Unfair Competition* § 18:63 (4th ed.).

## B.   Copyright

410.   **Copyright is the exclusive right to copy, which includes the exclusive rights to (1) authorize, or make additional copies, or otherwise reproduce the copyrighted work in copies; (2) recast, transform, adapt the work, that is prepare derivative works based upon the copyrighted work; (3) distribute copies of the copyrighted work to the public by sale or other transfer of ownership; and (4) perform publicly a copyrighted motion picture.** *See* 17 U.S.C. § 106.

411.   **The Ninth Circuit recognizes three separate doctrines of copyright liability, two of which are at relevant here: direct copyright infringement and contributory copyright infringement.** *See Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).

412.   **To succeed in its claim for contributory infringement against Sweetpea, Hasbro must demonstrate direct copyright infringement by a third party.** *See A&M*

*Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 n.2 (9th Cir. 2001) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.").

### 1. Direct Infringement

413. **To establish direct infringement by a third party, Hasbro must demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."** *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006).

414. **Hasbro can establish copying by showing a third party had access to its copyrighted work, and that there is "substantial similarity" between the third party's work and Hasbro's copyrighted material.** *See Berick v. Crichton*, 761 F.2d 1289, 1291 (9th Cir. 1985).

415. **To determine "substantial similarity," courts apply a two-part test, the extrinsic test and the intrinsic test, to compare the similarities of ideas and expression in two works.** *Kouf v. Walt Disney Pictures & Television*, 16 F. 3d 1042, 1044–45 (9th Cir. 1994).

416. **The extrinsic test compares the individual features of the works; it looks to find specific, articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events.** *Berick v. Crichton*, 761 F.2d 1289, 1292 (9th Cir. 1985).

417. **The intrinsic test is a subjective test that focuses on whether the ordinary, reasonable audience would recognize the defendant's work as a 'dramatization' or 'picturization' of the plaintiff's work.** *Kouf v. Walt Disney Pictures & Television*, 16 F. 3d 1042, 1044–45 (9th Cir. 1994).

418. **To prevail on its copyright claim, Hasbro must show substantial similarity of *both* ideas and expression.** *Berick v. Crichton*, 761 F.2d 1289, 1292 (9th Cir. 1985).

419.   **It is undisputed that Hasbro and/or WOTC are the registered owners of the copyrights associated with the *D&D* Universe**, ~~and that Warner Brothers Pictures produced the *Chainmail* script based on copyrighted *Dungeons & Dragons* material~~. JSAF ¶ 12; SJ Order at 9; Trial Ex. 531 (Summary of Dungeons & Dragons Material Appearing in Chainmail/Dungeons & Dragons script).

420.   ~~The *Chainmail* script infringes Hasbro's copyrights under 17 U.S.C. § 106~~. SJ Order at 10–11.

421.   ~~"Warner Brothers engaged in 'intermediate copying' that constitutes copyright infringement under federal copyright law and is sufficient to support [Hasbro's] claim of contributory infringement."~~ SJ Order at 11.

**2.   Contributory Infringement**

422.   **Under Ninth Circuit precedent, "a defendant is a contributory infringer if it (1) has knowledge of a third party's infringing activity, and (2) 'induces, causes, or materially contributes to the infringing conduct.'"** *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 794-95 (9th Cir. 2007).

423.   **The Ninth Circuit has held that the knowledge requirement may be satisfied by showing a party had actual knowledge, or that the party had a reason to know of direct infringement.** *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).

**3.   Requirements for Injunctive Relief under the Copyright Act**

424.   **The Copyright Act provides that a court "may. . . grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."** 17 U.S.C. § 502(a).

425.   **"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public**

interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also id.* at 392 (explaining that the requirements for a permanent injunction under copyright and patent law are essentially the same).

426.   **A plaintiff may establish irreparable harm by showing that continuing infringement may damage the plaintiff's (i) brand, business reputation, and goodwill; and (ii) competitive position and market share.** *See Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 948–49 (N.D. Cal. 2009) *aff'd* 673 F. Supp. 2d 943 (9th Cir. 2009).

427.   Evidence tending to establish damage to plaintiff's goodwill and brand can support a finding that damages will be an inadequate remedy because such harms are "difficult, if not impossible, to quantify." *See Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 949 (N.D. Cal. 2009) *aff'd* 673 F. Supp. 2d 943 (9th Cir. 2009).

428.   **In examining the balance of hardships, "courts must balance the competing claims of injury and must consider the effect on each party of granting or withholding the requested relief."** *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 950 (N.D. Cal. 2009) *aff'd* 673 F. Supp. 2d 943 (9th Cir. 2009).

429.   A defendant does not suffer any "hardship" merely by being compelled to comply with the law. *See City of Carlsbad v. Shah*, 850 F. Supp. 2d 1087, 1113 (S.D. Cal. 2012); *see also Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 950 (N.D. Cal. 2009) *aff'd* 673 F. Supp. 2d 943 (9th Cir. 2009).

430.   **"The sole interest of the United States and the primary object in conferring the monopoly of copyright protection lie in the general benefits derived by the public from the labor of authors.  In other words, the public receives a benefit when the legitimate rights of copyright holders are vindicated."** *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 950 (N.D. Cal. 2009) *aff'd* 673 F. Supp. 2d 943 (9th Cir. 2009).

# IV.

## PROPOSED CONCLUSIONS OF LAW RELATING TO SWEETPEA'S AFFIRMATIVE DEFENSE OF WAIVER

431.   **"Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it."**   *See also United States v. King Features Entm't, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988).

432.   **"The burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against a waiver."**   *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 31, 900 P.2d 619, 636 (1995), *as modified on denial of reh'g* (Oct. 26, 1995) (internal citations, ellipses, brackets and quotation marks omitted).

433.   **An implied waiver of rights will be found only "where there is 'clear, decisive and unequivocal' conduct which indicates a purpose to waive the legal rights involved."**   *United States v. Amwest Surety Ins. Co.,* 54 F.3d 601, 602–03 (9th Cir. 1995) (quoting *Groves v. Prickett,* 420 F.2d 1119, 1125 (9th Cir. 1970)).

434.   **Prior to October 8, 2010, Sweetpea had the right to produce (i) a theatrical or non-theatrical sequel or remake based on the Picture, the Picture Creations and the Property pursuant to Paragraph 6 of the First Amendment (a "Sequel"), and/or (ii) a television series or television motion picture based on the Picture, the Picture Creations and the Property pursuant to Paragraph 10 of the First Amendment (a "Television Program").**   Trial Ex. 37 ¶¶ 6, 10.

435.   **Pursuant to the Agreement, Sweetpea had no obligation, at any time, to produce either a Sequel or a Television Program.**   *See* Trial Ex. 12 ¶ 14(a) ("Nothing contained herein shall be construed to obligate [Sweetpea] to produce, distribute, release, perform or exhibit any motion picture, television program, or other production based upon, adapted from or suggested by the Property, in whole or in part, or otherwise to exercise, exploit or make use of any of the rights, licensees [sic], privileges, or property herein granted to Licensee.").

-88-

436.   ~~On October 7, 2010, Sweetpea exercised its right to produce a Television Program by sending a $20,000 rights payment to Hasbro with a notice expressly stating that Sweetpea was exercising its right to produce a Television Program.~~  *See* Trial Ex. 131.

437.   ~~At all relevant times, Sweetpea represented to Hasbro that it was producing a Television Program for initial release on the Syfy Channel.  *See supra* ¶¶ 204–208.~~

438.   ~~In light of Sweetpea's express exercise of its right to produce a Television Program pursuant to Paragraph 10, Hasbro had no right to insist that Sweetpea's production meet the requirements of a Sequel pursuant to Paragraph 6.~~

439.   ~~Accordingly, Hasbro's activities in connection with the development and promotion of *The Book of Vile Darkness*, which at all times was held out to be a *Television Program*, cannot be construed as "'clear, decisive and unequivocal' conduct which indicates a purpose to waive" Hasbro's right to seek a claim that Sweetpea's right to produce s~~equels ~~reverted.~~ *Amwest Surety Ins. Co.,* 54 F.3d at 602–03.

440.   **Moreover, "[w]aiver is the intentional relinquishment of a *known* right."** *Cathay Bank v. Lee*, 14 Cal. App. 4th 1533, 1539, 18 Cal. Rptr. 2d 420, 423 (Cal. App. 1993) (emphasis in original).

441.   **"Waiver depends solely on the intent of the waiving party[.]"** *State Farm Fire & Cas. Co. v. Jioras*, 24 Cal. App. 4th 1619, 1628, n. 7, 29 Cal. Rptr. 2d 840, 845 (1994).

442.   **Because waiver requires the "intentional relinquishment of a known right[,] . . . there must be actual knowledge of the existence of the fact upon which such right can be predicated."** *Weisman v. Clark*, 232 Cal. App. 2d 764, 768-69, 43 Cal. Rptr. 108, 111 (Cal. App. 1965).

443.   **"Such knowledge must be actual, not constructive."** *Id.*; *see, e.g.*, *Bergstad v. Comm'r of Soc. Sec. Admin.*, 967 F. Supp. 1195, 1205 (D. Or. 1997) (waiver claim invalid where claimant lacked actual knowledge of right).

444.   ~~Sweetpea cannot prove by "clear and convincing evidence" that any of the~~ ~~individuals whose conduct provides the basis for Sweetpea's waiver defense had "actual~~ ~~knowledge" of the any of reversion of other relevant the terms of the First Amendment,~~ ~~as would be required to show "the intentional relinquishment of a *known* right."~~ *Cathay Bank*, 14 Cal. App. 4th at 1539 (emphasis added).

<h2 style="text-align:center">V.</h2>

<h2 style="text-align:center">PROPOSED CONCLUSIONS OF LAW RELATING TO SWEETPEA'S AFFIRMATIVE DEFENSE OF ESTOPPEL</h2>

445.   **Estoppel requires conduct that "reasonably misleads another to his prejudice so that a repudiation of such conduct would be unjust in the eyes of the law."**  *Matsuo Yoshida v. Liberty Mut. Ins. Co.*, 240 F.2d 824, 829-30 (9th Cir. 1957)

446.   **"The party invoking the doctrine [of estoppel] must prove four elements: (1) that the party to be estopped was apprised of the facts; (2) that he intended his conduct to be acted on, or that he acted in such a way that the party asserting estoppel reasonably could believe that he intended his conduct to be acted upon; (3) that the party asserting estoppel was ignorant of the actual facts; and (4) that the party asserting estoppel relied upon the conduct to his injury."** *Am. Cas. Co. of Reading, Pennsylvania v. Baker*, 22 F.3d 880, 891-92 (9th Cir. 1994) (internal citations and quotation marks omitted).

447.   **"Where any one of the elements of equitable estoppel is absent, the claim must fail."** *Id.*

448.   ~~Sweetpea cannot establish any of the elements required to support its~~ ~~estoppel defense:~~

      a.   ~~Hasbro did not know that Sweetpea purportedly was intending to~~ ~~exercise its right to produce a Sequel pursuant to Paragraph 6 of the First Amendment~~ ~~because at all times it was represented to Hasbro that Sweetpea was exercising its right to~~ ~~produce a Television Program pursuant to Paragraph 10 of the First Amendment.~~

1   ~~Moreover, none of the individuals whose conduct provides the basis for Sweetpea's~~

2   ~~estoppel defense were apprised of the terms of the First Amendment.~~  *~~Supra~~* ~~¶¶ 211–213.~~

3   ~~b.      There is no evidence that, in providing comments on the script for~~ *~~The~~*

4   *~~Book of Vile Darkness~~*~~, allowing employees of Wizards of the Coast to be filmed playing~~

5   ~~Dungeons & Dragons for a DVD extra, or in participating in any other activity in~~

6   ~~connection with the development and promotion of~~ *~~The Book of Vile Darkness~~*~~ – a~~

7   ~~production that at all times was represented to be a Television Program that would~~

8   ~~premiere on the Syfy cable television network and then would be released to DVD –~~

9   ~~Hasbro intended to mislead Sweetpea into believing that Sweetpea had validly exercised~~

10  ~~its right to produce a Sequel within the specified time period.~~

11  ~~c.      Sweetpea was not ignorant of the provisions of the First Amendment~~

12  ~~and the requirements, under that agreement, for Sweetpea to properly exercise the Sequel~~

13  ~~Rights and to prevent the reversion of the Sequel Rights.~~

14  ~~d.      There is no evidence that Sweetpea relied on any of Hasbro's conduct~~

15  ~~in failing to either (a) commence principal photography of a theatrical or non-theatrical~~

16  ~~sequel or remake based on the Picture, the Picture Creations and the Property or (b) pay~~

17  ~~Hasbro the applicable rights payment for a theatrical or non-theatrical sequel or remake,~~

18  ~~as was required to prevent the Sequel Rights from reverting to Hasbro.~~

19  ### VI.

20  ## PROPOSED CONCLUSIONS OF LAW RELATING TO

21  ## SWEETPEA'S AFFIRMATIVE DEFENSE OF LACHES

22  449.   **"Laches is an equitable defense that prevents a plaintiff, who 'with full**

23  **knowledge of the facts, acquiesces in a transaction and sleeps upon his rights.'"**

24  *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012)

25  (quoting *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001).

26  450.   **To prove laches, the "defendant must prove both an unreasonable delay**

27  **by the plaintiff and prejudice to itself."**  *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078,

28  1083 (9th Cir. 2000).

451.  **In measuring a plaintiff's alleged delay in bringing suit, "[t]here must, of course, have been knowledge on the part of the plaintiff of the existence of the rights, for there can be no laches in failing to assert rights of which a party is wholly ignorant, and whose existence he had no reason to apprehend."**  *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000) (quoting *Halstead v. Grinnan*, 152 U.S. 412, 417 (1894)).

452.  ~~Hasbro had no knowledge of Sweetpea's claim that~~ *~~The Book of Vile Darkness~~* ~~represented an exercise of Sweetpea's Sequel Rights pursuant to Paragraph 6 of the First Amendment, as opposed to an exercise of its Television Rights pursuant to Paragraph 10 of the First Amendment, until Sweetpea's counsel took that position in a letter delivered to Hasbro's counsel on May 2, 2013.~~  *~~See~~* ~~Trial Ex. 285.~~

453.  ~~Accordingly, Hasbro did not unreasonably delay in bringing its claim on May 13, 2013 for a declaration that Sweetpea's Sequel Rights reverted, which date was less than two weeks after Hasbro learned, for the first time, of Sweetpea's position that it continued to hold the Sequel Rights.~~

454.  ~~Moreover, Sweetpea presents no evidence that it was prejudiced by Hasbro's "delay" of bringing this lawsuit less than two weeks after learning of Sweetpea's position that it continued to hold the Sequel Rights.~~

## VII.

<u>PROPOSED CONCLUSIONS OF LAW RELATING TO LAW OF THE CASE</u> ~~AS A BAR TO SWEETPEA'S SECONDARY TITLE COUNTERCLAIM~~

455.  ~~Under "law of the case" doctrine, a court is generally precluded from reconsidering an issue that has previously been decided by the court in the same case.~~ *U.S. v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997).

456.  <u>"A court may have discretion to depart from law of the case where (1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances</u>

-92-

exist; or (5) a manifest injustice would otherwise result. *U.S. v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997).

457.   Failure to apply the doctrine of the law of the case absent one of the requisite conditions constitutes an abuse of discretion.  *U.S. v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997).

458.   **On February 25, 2004, this Court issued the SJ Order, which granted Hasbro's motion for partial summary judgment as to SBL's claims for copyright and trademark infringement.**  SJ Order at 28.

459.   **Among the issues addressed in the SJ Order was "whether Hasbro had the right to assign *to a third-party* its right to use [Dungeons & Dragons and/or Advanced Dungeons & Dragons] in the secondary title" of a motion picture.**  SJ Order at 22  (emphasis added).

460.   **The SJ Order states that "under the first amendment, Hasbro's secondary title rights after January 1, 2000 have been reserved, and Hasbro does not require permission from [Sweetpea] to assign them."**  SJ Order at 27.

461.   The Court's ruling in the SJ Order is the law of the case and bars SBL from seeking to re-litigate its claim that Hasbro is prohibited from authorizing others to use the words "Dungeons & Dragons" and/or "Advanced Dungeons & Dragons" as the secondary title in a motion picture.

## VIII.

## PROPOSED CONCLUSIONS OF LAW RELATING TO SWEETPEA'S ARGUMENT THAT THE NOTICE AND CURE PROVISION OF PARAGRAPH 19(B) OF THE LICENSE AGREEMENT PREVENTS THE REVERSION OF THE SEQUEL RIGHTS

462.   Pursuant to the License Agreement, Sweetpea was never obligated to a sequel, remake or any other motion picture based on the Property.  *See* Trial Ex. 12 ¶ 14(a).

-93-

463.   ~~Sweetpea's obligation to pay Hasbro one of the amounts specified in Paragraphs 7, 8 or 9 of the First Amendment would have arisen only if Sweetpea had commenced principal photography of a sequel or remake intended for initial release in the U.S. by means of a theatrical or non-theatrical distribution.~~  *See* Trial Ex. 37 ¶¶ 6-9; Toll Decl. ¶ 53.

464.   ~~Sweetpea's obligation to pay Hasbro one of the amounts specified in Paragraphs 7, 8 or 9 of the First Amendment did not arise upon the commencement of principal photography of *The Book of Vile Darkness* because that motion picture was neither (a) a sequel or remake, nor (b) intended for initial release in the U.S. by means of theatrical or non-theatrical distribution.~~  *See* Trial Ex. 131 (Sweetpea's agent Grayson (via Silver Pictures) paid Hasbro $20,000 with note stating that payment was being made pursuant to paragraph 11(d) of the First Amendment, which governs television movies of the week).

465.   ~~Hasbro was not obligated, pursuant to Paragraph 19(b) of the License Agreement, to notify Sweetpea of its failure to pay Hasbro the Non-Theatrical Rights Payment upon the commencement of principal photography of *The Book of Vile Darkness*, or to give Sweetpea ten business days after such notice to "cure" any non-payment, because Sweetpea's payment of $20,000 to Hasbro on October 7, 2010 represented an exercise of Sweetpea's *Television* Rights pursuant to Paragraph 11(d) of the First Amendment, not a breach or event of default of Sweetpea's payment obligations pursuant to Paragraph 9 of the First Amendment.~~  Trial Ex. 12 ¶¶ 14(a), 19(b); Trial Ex. 37 ¶¶ 6–11; Trial Ex. 131.

DEFENDANTS' MARK-UP OF PLAINTIFFS' POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  DATED:  October 13, 2014          GLASER WEIL FINK
                                        HOWARD AVCHEN & SHAPIRO LLP
2

3                                    By: */s/ Patricia L. Glaser*
                                     PATRICIA L. GLASER
4                                    G. JILL BASINGER
                                     DAVID SERGENIAN
5

6  DATED:  October 13, 2014          CALDWELL LESLIE & PROCTOR, PC
                                     CHRISTOPHER G. CALDWELL
7                                    LINDA M. BURROW

8

9  By          */s/ Christopher G. Caldwell*
                                        CHRISTOPHER G. CALDWELL
10

11                                   Attorneys for Defendant SWEETPEA
12                                   ENTERTAINMENT, INC. and
                                     Defendant/Counterclaimant
13                                   SWEETPEA B.V.I. LTD.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-95-